DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
AILEEN M. McGRATH, State Bar #280846
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:         brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Plaintiff,<br><br>        vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, ALAN R. HANSON, Acting Assist. Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100,<br><br>        Defendants. | Case No. 17-4642<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      The Attorney General of the United States seeks to impose two unauthorized and unlawful conditions on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). These conditions do not appear in any federal statute, and they do not reflect the will of Congress in appropriating funds for the Byrne JAG program. To the contrary, the new conditions are simply the latest attempt by the Trump Administration to coerce state and local jurisdictions into carrying out the federal government's immigration enforcement priorities. The City and County of San Francisco ("the City" or "San Francisco") seeks declaratory relief and an injunction prohibiting the Attorney General and the other Defendants from implementing or enforcing these new funding conditions.

2.      Like many cities, San Francisco has a vibrant immigrant community, many members of which are undocumented. San Francisco has long endeavored to foster cooperation and trust between its immigrant community and city employees and agencies by lawfully limiting when city employees and agencies may assist with the enforcement of federal immigration laws. San Francisco's laws generally prohibit city employees from using city funds or resources to assist in enforcing federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") detainer requests—which are voluntary—and limit when local law enforcement officers may give the federal government advance notice of a person's release from jail.

3.      San Francisco enacted these Sanctuary City laws based on robust evidence showing that San Francisco is a safer, healthier, and stronger city when its officials do not enforce federal immigration laws. San Francisco is safer when all people, including undocumented immigrants, feel safe reporting crimes to authorities. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. San Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. And San Francisco communities are strengthened when members of the public, including undocumented immigrants, can use public transit, visit libraries, or take their children to the playground without fear. For these reasons, among others, San Francisco has made the considered judgment not to comply with voluntary

detainer requests, not to allow federal immigration authorities unlimited access to jails, and not to provide federal officials with information about a person's release date and time from local custody.

4.      But San Francisco, and other jurisdictions, have found themselves targeted by Attorney General Sessions and other members of President Donald Trump's administration, who make no secret of their intent to undo these considered policy choices. The Attorney General has repeatedly condemned "sanctuary cities" that "refus[e] to detain known felons under federal detainer requests" or otherwise refuse to use local resources to carry out demands from federal immigration authorities.[1] Similarly, the acting Director of ICE told Congress in June that the federal government expects local governments "[to] allow us access to the jails."[2] Likewise, President Trump has criticized "[s]anctuary cities, like San Francisco, [that] block their jails from turning over criminal aliens to Federal authorities for deportation."[3]

5.      Since taking office, the President, directly and through his Administration, has tried various tactics to require local jurisdictions to carry out detainer requests and allow ICE unlimited direct access to individuals held in local custody. The Attorney General has tried to publicly shame sanctuary jurisdictions by falsely claiming that the vast majority of the public oppose these policies.[4] The Attorney General has sent letters to several jurisdictions with sanctuary policies, threatening to withdraw federal funding from them if they did not certify that their laws complied with federal requirements.[5] And most notably, the President issued Executive Order 13,768, targeting sanctuary

---

[1] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions ("March 27 Sessions remarks").

[2] H. Approps. Comm. Hr'g Tr., Fed. News Serv. Transcripts, 2017 WLNR 18737622 (June 13, 2017) (testimony of Acting ICE Director Thomas Homan).

[3] Press Release, White House Office of the Press Secretary, Statement on Sanctuary Cities Ruling (Apr. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/04/25/statement-sanctuary-cities-ruling.

[4] March 27 Sessions remarks (claiming that "80 percent of Americans believe that cities that arrest illegal immigrants for crimes should be required to turn them over to immigration authorities"); Michelle Ye Hee Lee, *Do 80 Percent of Americans Oppose Sanctuary Cities?*, Washington Post (Mar. 28, 2017) (showing that a majority of the public opposes cutting federal funding to cities with sanctuary laws).

[5] Press Release, U.S. Dep't of Justice, Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017),

---

cities and commanding federal agencies to withhold federal funding from these cities unless they changed their policies to begin enforcing federal immigration law. Exec. Order No. 13,768, 82 Fed. Reg. 8799 at 8799 (Jan. 25, 2017) ("Executive Order"). The order was enjoined by a federal court for violating numerous constitutional provisions. *City and County of San Francisco v. Donald J. Trump*, --- F. Supp. 3d ---, No. 3:17-cv-00485-WHO, 2017 WL 1459081, at *21-*29 (N.D. Cal., Apr. 25, 2017) ("*San Francisco v. Trump*").

6.     In the Administration's most recent effort to end sanctuary policies, the Office of Justice Programs ("OJP")—a Department of Justice ("DOJ") agency that oversees the administration of the Byrne JAG program—announced on July 25, 2017, that the FY 2017 Byrne JAG application would impose two new conditions on funding recipients. These conditions require San Francisco to (1) provide federal immigration officials access to local detention facilities to interrogate any suspected aliens held there ("Access Requirement"); and (2) provide the Department of Homeland Security ("DHS") with 48 hours' notice before releasing an individual, where the federal government has requested notice in order to take that individual into custody for immigration reasons ("Notice Requirement") (together, the "Notice and Access Requirements").

7.     In practice, the Notice and Access Requirements could require San Francisco officials to unlawfully hold inmates longer than they otherwise would to ensure that DHS receives the required 48 hours of advance notice. And they would compel San Francisco to abandon its longstanding laws and policies that deny federal immigration officials freewheeling access to local detention facilities.

8.     The Notice and Access Requirements violate the United States Constitution, and are contrary to other laws. The Constitution establishes a balance of power between the state and federal governments, as well as among the coordinate branches of federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office. An executive branch agency of the federal government may not seize for itself the power that the Constitution reserves for Congress. Nor may it intrude on authority that the Constitution has preserved for state and local governments. Yet the Notice and Access Requirements

---

https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

violate both of these precepts. DOJ is improperly attempting to wield powers that only Congress may be entitled to invoke, and is seeking to compel San Francisco to bend its considered policy judgments to the federal government's will.

9.      San Francisco faces the immediate prospect of losing over $1.4 million in this fiscal year if it does not receive FY 2017 Byrne JAG funds. San Francisco uses these funds for a variety of important law enforcement purposes, including a pioneering Young Adult Court program that works to prevent at-risk youth from entering a "lifelong entanglement with the criminal justice system,"[6] and to fund other initiatives designed to reduce recidivism, deter drug use, provide services to at-risk youth, and supervise probationers with substance abuse and/or mental health issues.

10.     San Francisco faces an unacceptable choice: either comply with DOJ's unconstitutional new grant conditions and abandon local policies that San Francisco has found to promote public safety and foster trust and cooperation between law enforcement and the public; or, maintain these policies but forfeit critical funds that it relies on to provide essential services to San Francisco residents.

11.     San Francisco accordingly seeks declaratory and injunctive relief to ensure that San Francisco and other sanctuary jurisdictions continue to be eligible for these funds—which serve a critical public safety purpose—instead of being coerced into enforcing federal immigration law.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

13.     Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. §1391(e).

//

//

---

[6] Tim Requarth, *A California Court for Young Adults Calls on Science*, N.Y. Times, Apr. 17, 2017, https://www.nytimes.com/2017/04/17/health/young-adult-court-san-francisco-california-neuroscience.html.

# PARTIES

14.     Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

15.     Defendant Jefferson B. Sessions is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official leading the DOJ, which is responsible for the governmental actions at issue in this lawsuit.

16.     Defendant Alan R. Hanson is Acting Assistant Attorney General of the United States in charge of OJP, which administers JAG funding. He is sued in his official capacity.

17.     Defendant DOJ is an executive department of the United States of America that is responsible for administering the Byrne JAG program.

18.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

# FACTUAL ALLEGATIONS

## I.     San Francisco's Sanctuary City Laws and Policies

19.     San Francisco has been a Sanctuary City since 1989, when it first enacted ordinances ("Sanctuary City Laws") to protect Central American refugees who were escaping violent civil wars in their home countries and seeking legal protections in the United States. Since then, San Francisco's Sanctuary City Laws, codified in Chapters 12H and 12I of the San Francisco Administrative Code, have been amended to reflect San Francisco's broad commitment and responsibility to ensure public safety and welfare. San Francisco departments and agencies have adopted and implemented policies consistent with Chapters 12H and 12I.

20.     As set forth in the legislative findings to Chapter 12I:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law

1   enforcement and public health officers and employees, and to ensure
2   community security, and due process for all. (S.F. Admin. Code § 12I.1.)

3       21.    San Francisco's Sanctuary City Laws and policies prohibit local agencies from either

4   (1) "provid[ing] at least 48 hours' advance notice to DHS regarding the scheduled release date and

5   time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody

6   of the alien pursuant to the Immigration and Nationality Act," or (2) "permit[ting] personnel of the

7   [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual

8   believed to be an alien) and inquire as to his or her right to be or remain in the United States," as

9   required by the Notice and Access Requirements. Byrne JAG FY 2017 State Solicitation (attached

10  hereto as Exhibit A) ("State Solicitation"); Byrne JAG FY 2017 Local Solicitation, which was made

11  available for applicants on August 3, 2017 (attached hereto as Exhibit B) ("Local Solicitation").

12      22.    Specifically, San Francisco Administrative Code Chapter 12H prohibits San Francisco

13  departments, agencies, commissions, officers, and employees from using San Francisco funds or

14  resources to assist in the enforcement of federal immigration law or to gather or disseminate

15  information regarding the release status, or other confidential identifying information, of an individual

16  unless such assistance is required by federal or state law.

17      23.    Similarly, San Francisco Administrative Code Chapter 12I prohibits San Francisco law

18  enforcement officials from detaining an individual who is otherwise eligible for release from custody

19  on the basis of a civil immigration detainer request issued by the federal government. A detainer

20  request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary

21  City Laws. A detainer request is not issued by a judge based on a finding of probable cause. It is

22  simply a request by ICE that a state or local law enforcement agency hold individuals after their

23  release date to provide ICE agents extra time to decide whether to take those individuals into federal

24  custody and then deport them.

25      24.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to

26  a federal immigration officer's request for advance notification of the date and time an individual in

27  San Francisco's custody is being released, unless the individual in question meets certain criteria. It

28  also prohibits San Francisco law enforcement officials from arresting, detaining, or providing any

individual's personal information to a federal immigration officer, on the basis of an administrative

warrant, prior deportation order, or other civil immigration document based solely on alleged

violations of the civil provisions of immigration laws. *See* S.F. Admin. Code § 12I.3(c), (d), (e).

25.     Complying with civil immigration detainer requests would require San Francisco to

expend funds and commit scarce law enforcement personnel and resources to track and respond to

requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged

detention. *See* S.F. Admin. Code § 12I.1 ("According to Section 287.7 of Title 8 of the Code of

Federal Regulations, the City is not reimbursed by the federal government for the costs associated with

civil immigration detainers alone. The full cost of responding to a civil immigration detainer can

include, but is not limited to, extended detention time, the administrative costs of tracking and

responding to detainers, and the legal liability for erroneously holding an individual who is not subject

to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil

immigration enforcement diverts limited local resources from programs that are beneficial to the

City.").

26.     Further, honoring civil immigration detainer requests, in the absence of probable cause,

violates the Fourth Amendment to the United States Constitution and could subject San Francisco to

civil liability. *See Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Mercado v. Dallas Cty.,*

*Texas*, 229 F. Supp. 3d 501, 512-13 (N.D. Tex. 2017); *see also Melendres v. Arpaio*, 695 F.3d 990,

1000-01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

27.     San Francisco's Sanctuary City Laws and policies do not protect criminals. They do not

interfere with or hinder criminal prosecutions. They do not prohibit law enforcement in all other

respects from collaborating with federal authorities to "protect public safety." *See* S.F. Admin. Code

§ 12I.4.

28.     Instead, San Francisco's Sanctuary City Laws protect children, ensuring that their

parents feel safe taking them to playgrounds, to schools, and to hospitals. They protect the safety and

health of all residents of San Francisco, helping to ensure that everyone, including undocumented

//

//

immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care. They support family stability and community engagement. And they reduce crime.[7]

## II.    Byrne JAG Provides Critical Funding to San Francisco

### A.    The Byrne JAG Program

29.    Byrne JAG's origins trace back over three decades to the Anti-Drug Abuse Act of 1988, H.R. 5210, 100th Cong. (1988), which created the original Byrne Formula Grant program. In its original form, the Byrne Formula Grant program provided states with block grants based on population. *See* Anti-Drug Abuse Act § 6091(a), 42 U.S.C. § 3756 (1994). The program encouraged states to use those funds for very specific enumerated purposes, such as "disrupting illicit commerce in stolen goods and property," "developing and implementing programs which provide assistance to jurors and witnesses," and "addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing." *See* 42 U.S.C. § 3751 (2000).

30.    Several years after the Byrne Formula Grant program was enacted, Congress also authorized the creation of the Local Law Enforcement Block Grant ("LLEBG") program, through the FY 1996 law appropriating funding to DOJ. Omnibus Consolidated Rescissions and Appropriations Act of 1996, H.R. 3019, 194th Cong. (1996). The LLEBG program provided money to states and localities based on their crime rates.[8] Each year, the LLEBG and Byrne Formula Grant programs disbursed as much as $1 billion to states and local governments.

31.    Congress consolidated the LLEBG and Byrne Formula Grant programs in 2006, as part of an effort to reduce duplication and streamline the programs. The consolidated program was renamed as today's Edward Byrne Memorial Justice Assistance Grant program. *See* Violence Against

---

[7] *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress, Jan. 26, 2017, https://www.americanprogress.org/issues/immigration/-reports/2017/01/26/297366/the-effects-ofsanctuary-policies-on-crime-and-the-economy/ ("On average, 35.5 fewer crimes [were] committed per 10,000 people in sanctuary counties compared to nonsanctuary counties."); Scott D. Rhodes et. al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015); Russell B. Toomey et. al., *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-origin Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28 (2014).

[8] *See* Nathan James, *Edward Byrne Memorial Justice Assistance Grant Program: Legislative and Funding History*, Congressional Research Service at 2-3 (Feb. 1, 2008), http://research.policyarchive.org/18740.pdf.

Women and Department of Justice Reauthorization Act of 2005, H.R. 3402, 109th Cong. (2006); U.S. House of Representatives, Committee on the Judiciary, *Department of Justice Appropriations Authorization Act, Fiscal Years 2006 Through 2009, Report to accompany H.R. 3402*, 109th Cong., 1st Sess., H.R. Rep. No. 109-233, at 89 (2005), ("Judiciary Committee Report").

32.    Congress' core purpose in reformulating the existing grant programs was "to cover the same ground" as the previous grant programs while allowing recipients more freedom "to use the grants constructively." Judiciary Committee Report at 89. The reforms would "lessen the administrative burden of applying for the grants." *Id.* And the resulting program would be streamlined and would ensure that "the same authorized funding levels and uses will be available." 150 Cong. Rec. S9,950 (daily ed. Sept. 29, 2004) (statement of Sen. Leahy) (discussing similar, precursor version of 2005 Act).

33.    To that end, Byrne JAG is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed metric. Unlike discretionary grants, which agencies award pursuant to agency discretion, "'formula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). The Bureau of Justice Assistance ("BJA")—a department within OJP— awards Byrne JAG funds to all eligible grantees in amounts based on Bureau of Justice Statistics ("BJS") calculations derived from the Byrne JAG statutory formula. *See* 42 U.S.C. § 3755(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government" funds consistent with the established formula) (emphasis added).

34.    The formula for state allocations is a function of population and violent crime. *See id.* § 3755(a). For local governments, the allocation is a function of the state's allocation and the ratio of violent crime in the locality to violent crime in the state. *See id.* § 3755(d).

35.    BJS first computes a preliminary allocation for each state and United States territory based on its share of violent crime and population (weighted equally). BJS then reviews that initial allocation amount to determine if it is less than the minimum amount defined in the statutory formula (0.25 percent of the total). U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, Technical Report, *Justice Assistance Grant Program*, 2016 at 2 (Sept. 2016),

https://www.bja.gov/jag/pdfs/JAG-Technical-Report.pdf ("Byrne JAG Technical Report"). If this is the case, the state or territory is funded at the minimum level. *Id.* Each of the remaining states receives the minimum award plus an additional amount based on its share of violent crime and population. *Id.*

36.     Once each state's final amount is determined, 60 percent is allocated to the state in the first instance, and 40 percent is allocated for direct grants to local governments. 42 U.S.C. § 3755(d). States are obligated to pass a certain percentage of the "state" grant to local governments within the state. 42 U.S.C. § 3755(c)(2).

37.     For example, in FY 2017, California's total allocation is $28.3 million. Of this, $17.7 million (60 percent) is allocated to the State.[9] The other $10.6 million (40 percent) is allocated for direct grants to local jurisdictions.[10] Of the $17.7 million allocated to the State, a minimum of 62.9 percent must be passed through to local jurisdictions.[11] In recent years, California has passed through over 85 percent of JAG funds to local jurisdictions.[12]

38.     Congress placed few conditions on recipients of Byrne JAG funds. Award recipients are entitled to their share of the formula allocation as long as their proposed programs satisfy one of the statutory purpose areas. In contrast to the Byrne Formula Grant statutory requirements—which enumerated dozens of specific purposes—the Byrne JAG program allows recipients to allocate their funds in furtherance of any one of eight purpose areas: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs, including behavioral programs and crisis intervention teams. 42 U.S.C. § 3751(a)(1)(A)-(H).

//

---

[9] *See* https://www.bja.gov/Funding/17JAGStateAllocations.pdf.

[10] *See* https://www.bja.gov/Programs/JAG/jag17/17CA.pdf.

[11] Byrne JAG Frequently Asked Questions (FAQs)–Updated June 2017, at 2, https://www.bja.gov/Funding/JAGFAQ.pdf; *see also* FY 2014 Justice Assistance Grant (JAG) Program Variable Passthrough (VPT) percentages, https://www.bja.gov/Funding/JAGvpt.pdf.

[12] *See, e.g.,* Byrne JAG Fiscal Year 2016 California State Application, at 26, http://www.bscc.ca.gov/downloads/2016%20BSCC%20Application%20to%20BJA%20for%20Byrne%20JAG%20Funding.pdf.

39.     None of these program purposes encompass federal immigration enforcement. Indeed, Congress specifically removed an immigration-related funding condition when it merged the Byrne Formula Grant program with LLEBG to create Byrne JAG. Congress eliminated the Byrne Formula Grant requirement that recipients make "[a]n assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record." 42 U.S.C. § 3753(a)(11) (2002).

40.     The current Byrne JAG statute contains no immigration-related conditions. Recipients simply must use funds for a program or activity that falls within one of the several statutory purposes, and certify that they will "comply with all provisions of this [statutory] part and all other applicable Federal laws." 42 U.S.C. § 3752(a)(5)(D).

41.     Nowhere in the Byrne JAG statutory authorizing provisions—or elsewhere in federal law—did Congress indicate that Byrne JAG funding recipients must comply with the Notice and Access Requirements that Defendants are imposing. Nor does federal law give the Attorney General—or any official acting at his direction—the authority to impose these conditions.

**B.     Use of Byrne JAG Funds**

42.     The San Francisco Department of Children, Youth and their Families ("DCYF") applies for local Byrne JAG funds and state pass-through funds on behalf of the City. DCYF keeps a portion of the grant and also administers grant funds to the following departments: Adult Probation, District Attorney, Juvenile Probation, Public Defender, Police, Sheriff. DCYF also passes through funds from the local grant to San Francisco Superior Court and a third party evaluator.

43.     Consistent with the Byrne JAG statute, San Francisco uses its Byrne JAG funds to support critical law enforcement programs designed to reduce criminal behavior and improve public safety. Specific programs funded with this grant include: (1) Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services; (2) Focused Drug

Deterrence, short and long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets; (3) Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges; (4) Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody; (5) Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues; (6) Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system, and (7) Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

44. San Francisco uses State Byrne JAG pass-through funds for two pilot projects designed to reduce recidivism for juveniles and young adults. One project works with the San Francisco Unified School District to create an alternative to suspension for at-risk youth. Students facing suspension—or exhibiting behaviors that put them at risk for suspension—are paired with trained role models who help them learn de-escalation skills and keep them from missing needed instruction time.

45. The other project is a Young Adult Court aimed at reducing recidivism for youth ages 18-25. This Court was designed in response to a growing body of neuroscience research showing that young adults are fundamentally different from both juveniles and older adults in how they process information and make decisions. Our traditional justice system is not well-equipped to address cases involving these individuals, who are qualitatively different in development, skills, and needs from both children and older adults. The Young Adult Court fills this gap by providing case management and other support for eligible young adult offenders from high-risk backgrounds.

46. These City programs span seven departments, and a total of approximately ten full time equivalent positions for these programs are funded with Byrne JAG funds. Without local and state

JAG funds, San Francisco would be forced to reduce or eliminate these programs, including eliminating staff positions, unless other funding sources could be identified.

### III. The Administration Has Placed Conditions on Byrne JAG Funding to Coerce San Francisco to Abandon Its Sanctuary City Policies

#### A. The Notice and Access Requirements Conflict with San Francisco's Sanctuary City Laws and Policies

47. For many years, OJP has administered the Byrne JAG program consistent with congressional intent: local jurisdictions received federal funding according to a formula to support law enforcement initiatives, and the federal government imposed few restrictions on state and local governments wishing to receive these grant funds.

48. But in 2016, OJP began to change course, issuing guidance that 8 U.S.C. section 1373 ("Section 1373") was an "applicable law" for which jurisdictions had to certify compliance to receive Byrne JAG funds. Beginning in FY 2017, DOJ expanded upon this mandate, requiring a detailed Certification of Compliance to be completed by an applicant's Chief Legal Officer.

49. Section 1373 prohibits state and local governments from restricting their officials from sending to, or receiving from, the Immigration and Naturalization Service information regarding an individual's citizenship or immigration status.

50. Then in late July 2017, OJP went even further. The Attorney General announced that "[r]ecipients for FY 2017 will be notified of new conditions of their grants."[13]

51. The Attorney General stated that:

> From now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities. This is consistent with long-established cooperative principles among law enforcement agencies. This is what the American people should be able to expect from their cities and states, and these long overdue requirements will help us take down MS-13 and other violent transnational grants, and make our country safer.[14]

---

[13] *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

[14] *Id.*

---

52.     DOJ has made clear that the Notice and Access Requirements are distinct from Section 1373. The new conditions are not included as part of the existing requirement that recipient jurisdictions certify compliance with Section 1373. State Solicitation at 21; Local Solicitation at 20. Rather, they are independent "award conditions" not connected to any statutory requirement. State Solicitation at 32; Local Solicitation at 30.

53.     OJP included the Notice and Access Requirements in the State Solicitation. The State Solicitation was posted on OJP's website on July 25, 2017, and provided that applications were to be submitted no later than August 25, 2017.

54.     The State Solicitation provided, first, that OJP will require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." State Solicitation at 32.

55.     Further, the State Solicitation provided that OJP will require grant applicants to "permit personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." State Solicitation at 32.

56.     DOJ lacks statutory authority for imposing the Notice and Access Requirements on Byrne JAG recipients. As described above, the Byrne JAG authorizing legislation requires program applicants to certify that they will "comply with all provisions of this part and all other applicable Federal laws." 42 U.S.C. § 3752(a)(5)(D). But no federal law requires that local jurisdictions provide advance notice before releasing a purported alien from their custody, or that they grant federal officials extensive access to local detention facilities to interrogate individuals in local custody. Nor does any federal law give the Attorney General—or any divisions of DOJ—the authority to impose conditions of his choice.

57.     Furthermore, the Notice and Access Requirements are ambiguous as to what jurisdictions must do to be in compliance. For example, the Notice Requirement does not explain whether notice must be given only when the scheduled release date and time is known at least 48 hours in advance, or whether it requires jurisdictions to hold inmates in custody for additional time to

provide a full 48 hour period of notice to ICE. Likewise, the Access Requirement is unclear as to whether jurisdictions are required to provide access to inmates in custody only when those individuals consent, or instead whether jurisdictions are required to compel unwilling inmates to meet with ICE representatives.

58.     OJP included the same two requirements in the Local Solicitation, which was made available for applicants on August 3, 2017. Local applications for FY 2017 Byrne JAG funding must be submitted no later than September 5, 2017.

59.     The Local Solicitation describes these two new requirements as "award requirements." Local Solicitation at 29. It provides that "[i]f selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award requirements (including all award conditions)." *Id.* The Local Solicitation further provides that "[c]ompliance with the requirements of the two foregoing new award conditions will be an authorized and priority purpose of the award." Local Solicitation at 30.

60.     The 2017 Byrne JAG application will require San Francisco to submit assurances that it will comply with all award requirements. Likewise, to accept the award, San Francisco will again need to submit assurances that it will comply with all award requirements.

61.     San Francisco cannot make these assurances for three reasons.

62.     First, San Francisco's Sanctuary City Laws and policies do not comply with the Notice and Access Requirements.

63.     Second, practical difficulties also prevent San Francisco complying with the Notice Requirement. The Sheriff's Department is frequently unable to project whether and when an inmate will be released with enough time to provide federal officials with 48 hours' advance notice. And those release dates and times are often dictated by factors outside of San Francisco's control. For instance, an inmate's release is often controlled by a court order that requires San Francisco to release the inmate as quickly as possible. San Francisco officials potentially face liability for delaying an inmate's release once a court has ordered it. *See Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (noting that local governments may violate the constitutional rights of inmates when they continue to hold inmates after a court has authorized their release).

64.     Third, the Notice Requirement appears to be yet another effort by the Administration to require compliance with federal detainer requests, despite constitutional problems with requiring compliance. Although federal detainer requests are purportedly voluntary, Attorney General Sessions has frequently criticized jurisdictions, like San Francisco, for failing to honor them.[15] The 48 hours' notice condition will allow the Attorney General to accomplish this goal indirectly by cloaking a detainer request in the guise of a notice requirement. That is, because San Francisco will often lack 48 hours' advance notice of an individual's release date and time, San Francisco will be forced to adjust inmates' release times to ensure that it can provide the federal government with the required period of notice.

65.     Coercing San Francisco to detain individuals in this way conflicts with the Fourth Amendment. A number of courts have found that holding an individual for immigration purposes after they would otherwise have been released from custody violates the Fourth Amendment. *See San Francisco v. Trump*, 2017 WL 1459081, at *4; *see also Galarza v. Szalczyk*, 745 F.3d 634, 643-45 (3d Cir. 2014); *Mercado*, 229 F. Supp. 3d at 512-13; *Morales v. Chadbourne*, --- F. Supp. 3d ---, 2017 WL 354292, *4-*5 (D. R.I. Jan. 24, 2017); *Miranda-Olivares v. Clackamas Cnty.*, No. 3:12-cv-02317-ST, 2014 WL 1414305, *11 (D. Or. Apr. 11, 2014). Given the reality of how inmates' release times are determined, San Francisco is simply unable to comply with DOJ's notice condition without running afoul of the Fourth Amendment.

### B.     The Unconstitutional New Conditions Are Part of the Trump Administration's Sustained Campaign to Eradicate Sanctuary Policies

66.     With the Executive Order enjoined, the Notice and Access Requirements appear to be the most recent iteration of the Administration's attempts to put an end to sanctuary policies. The Attorney General, and other members of the Trump Administration, have repeatedly targeted sanctuary jurisdictions for declining to honor detainer requests and refusing to affirmatively carry out federal immigration enforcement.

---

[15] *See* Justice News, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

67.     For instance, in statements to the Daily Caller on July 7, 2015, now-Attorney General Sessions criticized San Francisco and other sanctuary jurisdictions for failing to carry out detainer requests. Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes against all traditions of law enforcement. Laws and courtesies within departments—if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . . So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them. They finished paying for the crime they committed in our city—we've released them.'"[16]

68.     After the President appointed him to office, the Attorney General continued to take the same position targeting sanctuary cities. On July 12, 2017, the Attorney General described sanctuary city "policies" as those requiring law enforcement officials to "refuse to cooperate with federal immigration authorities regarding illegal aliens who commit crimes."[17] And he has frequently suggested that he will use every means necessary to withhold federal funding from "sanctuary cities." *See* March 27 Sessions remarks.

69.     The Trump Administration shares these views. President Trump has frequently promised to "defund" sanctuary cities, and to use the threat of withholding federal funds as "a weapon" to coerce local jurisdictions to change their policies.[18] Then-Press Secretary Sean Spicer also confirmed that "[w]e are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws."[19]

---

[16] Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily Caller, July 7, 2015, http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

[17] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[18] Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary Cities as 'Weapon'*, ABC News (Feb. 5, 2017), http://abcnews.go.com/Politics/trump-threatens-%20defunding-sanctuary-states-weapon/story?id=45286642.

[19] White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

70.     But despite its efforts to coerce so-called sanctuary cities to abandon their policy choices about what makes their own communities safer, the Administration has so far been unsuccessful in its efforts to strip federal funding from them.

71.     Shortly after taking office, President Trump issued Executive Order 13,768, which threatened to deny all federal funding to sanctuary jurisdictions and to authorize the Attorney General to take unspecified enforcement action against sanctuary cities. The Executive Order declared that "[s]anctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order at 8799.

72.     To address that purported harm, the Executive Order established the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order at 8799. In furtherance of this policy, the Executive Order provided that:

> [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.

Executive Order § 9(a).

73.     The Executive Order also mandated enforcement action: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

74.     The Administration touted the Executive Order as a means for achieving the President's goal of "ending sanctuary cities . . . . [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities."[20] The Administration vowed that "the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other

_____

[20] Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-press-office/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order."[21]

75.     The Administration's efforts were promptly blocked by a federal court, which enjoined Section 9(a) of the Executive Order for violating the Constitution. *See San Francisco v. Trump*, 2017 WL 1459081, at *21-*29. The Court held, *inter alia*, that the President—and in turn, the Attorney General and the Secretary of DHS—lacked the authority "to place a new condition on federal funds . . . not provided for by Congress," and thus had violated "basic and fundamental constitutional structures" concerning the separation of powers. *Id.* at *22. And the Court further held that even if the executive branch could exercise that spending power, the Executive Order was unconstitutional because it (1) used vague language that left localities unclear how to comply with the funding conditions; (2) lacked any nexus between the funds at issue and immigration enforcement; and (3) sought to compel local governments to "adopt certain policies" that they had determined, in their considered judgment, to be unwise. *Id.* at *22-*23. The court found these violations to warrant a nationwide injunction. *Id.* at *29.

76.     The Administration's efforts to withhold federal funding have been stymied in other ways, as well. Congress has repeatedly considered legislation that would punish cities for setting their own law enforcement priorities by allowing federal agencies to withhold certain grants.  *See, e.g.,* Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016). None of this legislation has been enacted.

77.     Indeed, the now-Attorney General introduced Senate Bill 1842, "Protecting American Lives Act," in July 2015. That bill would in part have expanded existing federal law to deprive jurisdictions having "in effect a statute, policy, or practice that prohibits law enforcement officers of the State, or of a political subdivision of the State, from assisting or cooperating with Federal immigration law enforcement in the course of carrying out the officers' routine law enforcement

---

[21] Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10* (Feb. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/press-briefing-press-secretary-sean-spicer-282017-10.

duties" of "any . . . law enforcement or Department of Homeland Security grant." S. 1842, 114th Cong. § 3 (2015). The bill never made it out of committee.

78. Put simply, Congress has never passed legislation requiring local jurisdictions to comply with the Notice Requirement or the Access Requirement. Nor has it authorized the executive branch to penalize local jurisdictions—by withholding funds or through any other form of punishment—based on their refusal to comply with the Notice or Access Requirements. Defendants' unilateral imposition of the Notice and Access Requirements, in the face of Congress' contrary position, is unprecedented, unauthorized, and unlawful.

**IV.   San Francisco Faces Immediate Injury From The Notice and Access Requirements**

79. San Francisco has received state and local Byrne JAG funds every year for decades, and intends to apply for both grants again this year.

80. For FY 2017, San Francisco is entitled to a direct Byrne JAG grant in the amount $524,845. San Francisco also expects to receive a state pass-through of Byrne JAG funds in the amount of $923,401.

81. OJP posted the FY 2017 Local Solicitation on August 3, 2017, with an application deadline of September 5, 2017. The application requires San Francisco to provide assurances that it will comply with all award requirements. *See* Local Solicitation.

82. OJP has also posted local allocations showing that San Francisco is entitled to $524,845 in JAG funds for FY 2017. *See* https://www.bja.gov/Programs/JAG/jag17/17CA.pdf.

83. OJP expects to issue local award notifications by September 30, 2017. In order to accept the award, San Francisco will again be required to submit assurances that it will comply with all award requirements.

84. OJP posted the FY 2017 State Solicitation on July 25, 2017, with an application deadline of August 25, 2017.

85. OJP has also posted state allocations showing that the State of California is entitled to $17.7 million in JAG funds for FY 2017. *See* www.bja.gov/Funding/17JAGStateAllocations.pdf.

86. States must pass through a portion of state JAG awards to local jurisdictions in the state. *See* 42 U.S.C. § 3755(c). The California Board of State and Community Corrections ("BSCC")

is the State Administering Agency ("SAA") responsible for oversight of Byrne JAG funding in California. The BSCC has adopted a multi-year strategy for JAG funding that prioritizes law enforcement; prevention and education programs; and courts, prosecution and defense. This multi-year strategy does not include or prioritize enforcement of federal immigration laws.

87.     Once the State of California receives JAG funds, it issues a request for proposals ("RFP") for local jurisdictions to apply for pass-through funds. In 2014, California invited proposals for a three year funding cycle beginning on March 1, 2015, and ending on December 31, 2017. The initial RFP was released on September 15, 2014, with a Notice of Intent to Apply due October 3, 2014, and proposals due November 21, 2014. After the initial award, local jurisdictions were required to re-apply for the second and third year funds. San Francisco was awarded a grant for the Young Adult Court and alternative to suspension projects discussed above, with $1,045,624 awarded in 2015, $983,971 in 2016, and $981,202 in 2017.

88.     To receive pass-through Byrne JAG funds, San Francisco will again be required to submit assurances that it will comply with all award requirements.

89.     San Francisco cannot comply with the new Notice and Access Requirements without changing its local laws and policies. The threatened loss of funds thus creates significant pressure for San Francisco to abandon its laws and policies limiting interaction with ICE, despite its decision, supported by research and experience, showing that these policies make the community safer.

## COUNT ONE: SEPARATION OF POWERS

90.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

91.     In July and August 2017, Defendants issued solicitations seeking applications for the Byrne JAG program. The solicitations described the mission of the Byrne JAG program as assisting "State, local, and tribal efforts to prevent or reduce crime and violence." State Solicitation at 1; Local Solicitation at 1.

92.     The solicitations state: "Individual FY 2017 JAG awards will include two new express conditions that, with respect to the 'program or activity' that would be funded by the FY 2017 award,

are designed to ensure that States and units of local government that receive funds from the FY 2017 JAG award: (1) permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States and (2) provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." State Solicitation at 32; Local Solicitation at 30.

93.     The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and the spending power, *see* U.S. Const. art. 1, § 8, cl. 1. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

94.     Congress has not enacted the Notice and Access Requirements as part of any statutory scheme.

95.     Congress has not delegated to Defendants the ability to impose the Notice and Access Requirements on Byrne JAG funds.

96.     Defendants are unilaterally imposing the Notice and Access Requirements, without authorization from Congress.

97.     For these reasons, the Notice and Access Requirements unlawfully and unconstitutionally intrude upon and usurp powers that have been assigned to Congress, violating principles of separation of powers.

## COUNT TWO: SPENDING CLAUSE

98.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

99.     As described above, the Notice and Access Requirements violate separation of powers principles because they are not authorized by Congress, expressly or impliedly.

100.     Yet even if Congress had delegated its authority to impose conditions on the Byrne JAG funds, the Notice and Access Requirements would violate the Spending Clause by:

//

a.      imposing conditions that are ambiguous, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously…The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions]…There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." );

b.      imposing conditions that are not germane to the stated purposes of the Byrne JAG funds, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

c.      imposing conditions that would require Byrne JAG recipients to engage in unconstitutional activity such as detaining individuals without probable cause in violation of the Fourth Amendment, *see Dole*, 483 U.S. at 210 (Congress' spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional.").

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

1.      Declare the Notice and Access Requirements unconstitutional;

2.      Permanently enjoin Defendants from using the Notice and Access Requirements as funding restrictions for Byrne JAG;

3.      Award San Francisco reasonable costs and attorneys' fees; and

//
//
//
//
//
//
//

4.      Grant any other further relief that the Court deems fit and proper.

Dated: August 11, 2017

DENNIS J. HERRERA
City Attorney
RONALD FLYNN
JESSE C. SMITH
YVONNE R. MERÉ
CHRISTINE VAN AKEN
TARA M. STEELEY
MOLLIE M. LEE
AILEEN M. McGRATH

Deputy City Attorneys

By: */s/ Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO