1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  JESSE C. SMITH, State Bar #122517
   Chief Assistant City Attorney
3  RONALD P. FLYNN, State Bar #184186
   Chief Deputy City Attorney
4  YVONNE R. MERÉ, State Bar #173594
   Chief of Complex and Affirmative Litigation
5  CHRISTINE VAN AKEN, State Bar #241755
   TARA M. STEELEY, State Bar #231775
6  MOLLIE M. LEE, State Bar #251404
   SARA J. EISENBERG, State Bar #269303
7  AILEEN M. McGRATH, State Bar #280846
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4602
   Telephone:    (415) 554-4748
10 Facsimile:    (415) 554-4715
   E-Mail:       brittany.feitelberg@sfcityatty.org
11
   Attorneys for Plaintiff
12 CITY AND COUNTY OF SAN FRANCISCO

13

14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17 CITY AND COUNTY OF SAN              Case No. 3:17-CV-04642-WHO
   FRANCISCO,
18                                     **PLAINTIFF CITY AND COUNTY OF SAN**
            Plaintiff,                 **FRANCISCO'S OPPOSITION TO**
19                                     **DEFENDANTS' NOTICE OF MOTION AND**
       vs.                             **MOTION TO DISMISS**
20
   JEFFERSON B. SESSIONS III, Attorney   Judge:         Honorable William H. Orrick
21 General of the United States, ALAN R.  Hearing Date:  February 28, 2018
   HANSON, Acting Assist. Attorney General of  Time:     2:00 p.m.
22 the United States, UNITED STATES      Place:         Courtroom 2, 17th Floor
   DEPARTMENT OF JUSTICE, DOES 1-100,
23                                       Trial Date:    December 10, 2018
            Defendants.
24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.     San Francisco's Sanctuary City Laws.................................................................. 2

II.    The Byrne JAG Program ..................................................................................... 2

    A.    The Byrne JAG Program Is A Formula Grant For Criminal Justice Funding. ................................................................................................ 2

    B.    DOJ Announces New Requirements For Byrne JAG Funding. ................. 3

ARGUMENT ................................................................................................................ 5

I.    San Francisco Is Entitled To A Declaration Concerning Compliance With Section 1373 ...................................................................................................... 5

    A.    San Francisco's Declaratory Relief Claim Is Justiciable. ........................... 5

        1.    This Court Has Already Determined San Francisco's Claim Is Justiciable. ...................................................................... 6

        2.    Recent Developments Bolster The Justiciability Of San Francisco's Claim. .................................................................... 7

    B.    San Francisco's Sanctuary City Laws Comply With Section 1373.......... 11

        1.    Defendants' Interpretation Of Section 1373 Is Overbroad And Infirm. .................................................................................. 11

        2.    Chapter 12H Does Not Prohibit Sharing Of Immigration Status. .15

        3.    Chapter 12I Does Not Prohibit Sharing Of Immigration Status....18

II.    The Notice, Access, And Section 1373 Requirements Are Unconstitutional........18

    A.    The Newly Announced Requirements Violate The Separation Of Powers: Congress Has Not Authorized The Attorney General To Impose Them. ....................................................................................... 19

        1.    Section 10102(a) Is Not A Grant Of Any Authority.................... 19

        2.    Even If Section 10102 Was A Grant Of Authority, It Would Not Permit The Attorney General To Impose The Newly Announced Requirements. ................................................. 21

        3.    The Formula Grant Structure Of Byrne JAG Confirms That The Attorney General Is Not Authorized To Impose New Substantive Requirements........................................................ 22

    B.    The Newly Announced Requirements Violate The Spending Clause: Even Congress Could Not Constitutionally Impose Them........................ 24

        1.    The Requirements Are Ambiguous. ........................................... 24

2.      The Requirements Are Not Reasonably Related To
        The Byrne JAG Program's Purpose..................................26

3.      The Notice and Access Requirements Attempt To Induce
        Local Governments To Act Unconstitutionally............................27

CONCLUSION..............................................................................................28

CCSF's Oppo. to Defs. Motion to Dismiss;
Case No.  3:17-CV-04642-WHO

ii

n:\cxlit\li2018\180160\01250851.docx

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Abbott Labs. v. Gardner*
  387 U.S. 136 (1967)..................................................................................................6

*Aetna Life Ins. Co. v. Haworth*
  300 U.S. 227 (1937)..................................................................................................6

*Air Transp. Ass'n of Am. v. City & Cty. of San Francisco*
  992 F. Supp. 1149 (N.D. Cal. 1998) .......................................................................15

*Arizona v. United States*
  567 U.S. 387 (2012)................................................................................................27

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
  548 U.S. 291 (2006)................................................................................................24

*Badaracco v. Commissioner*
  464 U.S. 386 (1984)................................................................................................15

*Benning v. Georgia*
  391 F.3d 1299 (11th Cir. 2004) ..............................................................................24

*Blount v. Rizzi*
  400 U.S. 410 (1971)................................................................................................15

*Bond v. United States*
  134 S. Ct. 2077 (2014)............................................................................................12

*Charles v. Verhagen*
  348 F.3d 601 (7th Cir. 2003) ..................................................................................24

*City of Chicago v. Sessions*
  No. 17C5720, 2017 WL 5499167 (N.D. Ill. Nov. 16, 2017).................................10

*City of Chicago v. Sessions*
  264 F. Supp. 3d 933 (N.D. Ill. 2017) ...............................................................20, 21

*City of Los Angeles v. McLaughlin*
  865 F.2d 1084 (9th Cir. 1989) ................................................................................22

*City of Philadelphia v. Sessions*
  No. CV 17-3894, 2017 WL 5489476 (E.D. Pa. Nov. 15, 2017).............................27

*Colwell v. Dep't of Health and Human Servs.*
  558 F.3d 1112 (9th Cir. 2009) ..................................................................................6

*Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*
    40 F.3d 426 (D.C.Cir.1994) ...................................................................................11

*Danner v. Int'l Freight Sys. of Washington, LLC*
    855 F. Supp. 2d 433 (D. Md. 2012) ........................................................................14

*F.A.A. v. Cooper*
    566 U.S. 284 (2012) ...............................................................................................21

*Goldman v. Salisbury (In re Goldman)*
    70 F.3d 1028 (9th Cir. 1995) .................................................................................16

*Griffin v. Oceanic Contractors, Inc.*
    458 U.S. 564 (1982) ...............................................................................................23

*Huffman v. C.I.R.*
    978 F.2d 1139 (9th Cir. 1992) ...............................................................................21

*Ind. Towers of Washington v. Washington*
    350 F.3d 925 (9th Cir. 2003) .................................................................................19

*Lopez-Valenzuela v. Arpaio*
    770 F.3d 772 (9th Cir. 2014) .................................................................................27

*Massachusetts v. U.S.*
    35 U.S. 444 (1978) .................................................................................................26

*McCarthy v. Madigan*
    503 U.S. 140 (1992) ...............................................................................................10

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996) ...............................................................................................13

*Morales v. Trans World Airlines, Inc.*
    504 U.S. 374 (1992) ...............................................................................................14

*Morales v. Chadbourne*
    793 F.3d 208 (1st Cir. 2015) .................................................................................28

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    567 U.S. 519 (2012) ..........................................................................................24, 26

*Newton v. Am. Debt Servs., Inc.*
    75 F. Supp. 3d 1048 (N.D. Cal. 2014) ..............................................................19, 25

*New York v. U.S.*
    505 U.S. 144 (1992) ...............................................................................................26

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*
    514 U.S. 645 (1995) ...............................................................................................12

*Organized Village of Kake v. U.S. Dep't of Agric.*
   795 F.3d 956 (9th Cir. 2015) ...................................................................9

*Pennhurst State Sch. and Hosp. v. Halderman*
   451 U.S. 1 (1981)..................................................................................24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*
   132 S. Ct. 2065 (2012)..........................................................................16

*Rice v. Santa Fe Elevator Corp.*
   331 U.S. 218 (1947)..............................................................................12

*Roach v. Mail Handlers Ben. Plan*
   298 F.3d 847 (9th Cir. 2002) ................................................................12

*San Francisco v. Trump*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) .......................................6, 18, 19

*San Francisco v. Trump*
   267 F. Supp. 3d 1201 (N.D. Cal. 2017) ...............................2, 5, 6, 7, 28

*San Francisco v. Trump*
   No. 17-cv-00485, 2017 WL 5569835 (N.D. Cal. 2017).........................8

*S. Dakota v. Dole*
   483 U.S. 203 (1987)..........................................................................24, 27

*Steinle v. City and Cty. of San Francisco*
   230 F. Supp. 3d 994 (N.D. Cal. 2017) ............................................12, 15

*Stewart v. Ragland*
   934 F.2d 1033 (9th Cir. 1991) ..............................................................17

*Sunbelt Rentals, Inc. v. Victor*
   No. C 13-4240 SBA, 2014 WL 492364 (N.D. Cal. Feb. 5, 2014)..........19

*Susan B. Anthony List v. Driehaus*
   134 S. Ct. 2334 (2014)............................................................................6

*Texas v. United States*
   523 U.S. 296 (1998)..............................................................................6, 9

*Thomas v. Anchorage Equal Rights Comm'n*
   220 F.3d 1134 (9th Cir. 2000) ................................................................6

*Traverso v. People ex rel. Dep't of Trans.*
   46 Cal. App. 4th 1197 (1996) ...............................................................17

*United States v. Morrison*
   529 U.S. 598 (2000)..............................................................................13

*Vasquez v. New York City Dep't of Educ.*
  No. 11-CV-3674 (AJN), 2015 WL 3619432 (S.D.N.Y. June 10, 2015) ...................................19

**Constitutional Provisions**

U.S. Const.
  art. I, § 8, cl. 1 .................................................................................................................18

**Federal Statutes**

8 U.S.C.
  § 1367(2) ...........................................................................................................................13
  § 1373 ........................................................................................................................ *passim*
  § 1373(a) .......................................................................................................................4, 13
  § 1373(b) .......................................................................................................................4, 13

20 U.S.C.
  § 10006(b) ..........................................................................................................................22

34 U.S.C.
  § 10102 ..................................................................................................................19, 20, 21
  § 10102(a) ....................................................................................................................19, 20
  § 10102(a)(1) ......................................................................................................................20
  § 10102(a)(2) ......................................................................................................................20
  § 10102(a)(3) ......................................................................................................................20
  § 10102(a)(6) ......................................................................................................................20
  §§ 10151-10158 .................................................................................................................19
  § 10152(a)(1)(A)–(H) .................................................................................................3, 23, 27
  § 10153(a) ...........................................................................................................................23
  § 10153(a)(2) ........................................................................................................................3
  § 10153(a)(4) ........................................................................................................................3
  § 10153(a)(5)(A)–(C) ............................................................................................................3
  § 10153(a)(5)(D) ..............................................................................................................3, 19
  § 10156(a) ...........................................................................................................................23
  § 10156(d) ......................................................................................................................3, 23
  § 10156(d)(2)(A) ............................................................................................................3, 23
  § 10157(b) ...........................................................................................................................23
  § 10171 ...............................................................................................................................22
  § 10191 ...............................................................................................................................22

42 U.S.C.
  § 3712 .................................................................................................................................21

**Regulations**

2 C.F.R.
  § 200.207 ............................................................................................................................22
  § 2800.101 ..........................................................................................................................22

28 C.F.R.
 § 18.5(a)-(b) ...................................................................................................10
 § 66.12 (removed Dec. 25, 2014) ...................................................................21
 § 66.12 (a) ......................................................................................................22
 § 66.12(b) .......................................................................................................22
 § 66.12(c) ........................................................................................................22

**State Cases**

*People v. Brannon*
 32 Cal. App. 3d 971 (1973) ...........................................................................17

*San Francisco Taxpayers Assn. v. Bd. of Supervisors*
 2 Cal. 4th 571 (1992) .....................................................................................16

**State Statutes and Codes**

S.F. Admin. Code
 Chapter 12H ........................................................................................... *passim*
 Chapter 12I .............................................................................................. *passim*
 § 12H.2 ...........................................................................................................16
 § 12.I.1 ............................................................................................................13
 § 12I.2 .............................................................................................................16
 § 12I.3 ...............................................................................................................2
 § 12I.3 (e) .......................................................................................................18
 § 12I.5 .............................................................................................................18

**Legislative Materials**

Ending Sanctuary Cities Act of 2016
 H.R. 6252, 114th Cong. (2016) ......................................................................15

H.R. Rep. 109-233 .................................................................................................27

Stop Dangerous Sanctuary Cities Act
 H.R. 5654, 114th Cong. (2016) ......................................................................15

Stop Dangerous Sanctuary Cities Act
 S. 3100, 114th Cong. (2016) ...........................................................................15

**Other References**

Federal Grant Practice
 § 25.10 ............................................................................................................22

*Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 537 (1947).......................21

*The Federal Government's Authority to Impose Conditions on Grant Funds,*
 Congressional Research Service (Mar. 23, 2017).............................................23

**INTRODUCTION**

Over the past year, the Trump administration has made eliminating sanctuary cities one of the hallmarks of its policy agenda. And it has pursued this goal not only from the bully pulpit but also through executive fiat without regard for the constitutional limits that constrain government action. First, just days after taking office, President Trump signed an executive order that directed the Attorney General and Secretary of Homeland Security to withdraw all federal funds from sanctuary jurisdictions. Despite last-minute efforts by the Attorney General to narrowly interpret the order, this Court declared that order unconstitutional. Taking a different tactic, the Department of Justice ("DOJ") announced the imposition of new requirements on the receipt of Byrne JAG federal grants. But the requirements—which seek to interfere with local jurisdictions' considered policy judgments about what makes their communities safer by conditioning the receipt of important criminal justice funds on an agreement to assist with federal immigration enforcement—are unconstitutional as well.

The requirements violate separation of powers principles because Congress did not authorize the Attorney General to impose substantive conditions on Byrne JAG funds. And even if he did have the power to impose some conditions on the grant, these specific requirements would run afoul of constitutional limits on the Spending Clause power by imposing ambiguous and unrelated conditions on the receipt of grant funds. In short, the Attorney General has taken for himself powers that Congress did not—and indeed could not—delegate to him. His request to dismiss San Francisco's claims regarding these violations should be denied. *See* Part II, *infra*.

San Francisco has also stated a valid claim for declaratory relief concerning one of the newly added requirements—*i.e.*, that jurisdictions complete a Certificate of Compliance with Section 1373. Section 1373 prohibits state and local governments from restricting communications "regarding an individual's . . . citizenship or immigration status." The Attorney General has endorsed a reading of this phrase that stretches the statutory text beyond its breaking point, arguing that the word "regarding" expands the reach of this provision to cover any information that assists ICE. But this exceedingly overbroad interpretation is not supportable, and should be rejected along with Defendants' challenge to the merits of San Francisco's third cause of action. *See* Part I(B), *infra*. Nor should San Francisco's claim be dismissed as non-justiciable. This Court has already concluded that San

Francisco's claim for declaratory relief regarding Section 1373 satisfies Article III's demands.  *See San Francisco v. Trump*, 267 F. Supp. 3d 1201, 1218 (N.D. Cal. 2017).  Defendants offer no reason for this Court to revisit its determination.  If anything, recent developments—including DOJ's statement at a hearing before this Court that jurisdictions will be expected to certify compliance *with the federal government's interpretation of Section 1373*—underscore the existence of an actual and immediate controversy.  *See* Part I(A), *infra*.

**BACKGROUND**

**I.   San Francisco's Sanctuary City Laws.**

San Francisco has been a Sanctuary City since 1989, when it enacted ordinances ("Sanctuary City Laws") in response to a wave of refugees fleeing violence in their home countries.  First Amended Complaint (Dkt. No. 61) ("FAC") ¶ 29.  San Francisco's current Sanctuary City Laws, codified in Chapters 12H and 12I of the Administrative Code, continue to reflect San Francisco's commitment to ensure the public safety and welfare, while declining to use municipal resources to enforce federal immigration laws.  Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by federal or state law.  Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil detainer request issued by the federal government, without a finding of probable cause by a judicial officer.  Further, unless the individual involved meets certain criteria, Chapter 12I prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released.  *See* S.F. Admin. Code § 12I.3.  These provisions do not prohibit, or in any way restrict, San Francisco employees from communicating with ICE about an individual's citizenship or immigration status.

**II.   The Byrne JAG Program**

**A.   The Byrne JAG Program Is A Formula Grant For Criminal Justice Funding.**

The Byrne JAG program is "the leading source of federal justice funding to state and local

jurisdictions."  Office of Justice Programs, *Welcome to BJA's Edward Byrne Memorial Assistance Grant (JAG) Program*.  The program provides states and local governments with "critical funding necessary to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, . . . crime victim and witness initiatives and mental health programs."  *Id.*

The Byrne JAG program is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed metric.  The Bureau of Justice Assistance—a department within the Office of Justice Programs ("OJP")—awards funds to all eligible grantees in amounts derived from a mandatory statutory formula.  *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government" funds consistent with the established formula) (emphasis added).  The formula for state allocations is a function of population and violent crime.  *Id.* § 10156(d).  For local governments, the allocation is a function of the state's allocation and the ratio of violent crime in the locality to violent crime in the state.  *Id.*  Award recipients are entitled to their share of the formula allocation as long as their proposed programs satisfy one of eight statutory purpose areas,[1] and certain other administrative requirements.  *See* 34 U.S.C. § 10153(a)(2) & (a)(5)(A)–(C) (requiring applicants to supply information about their intended use of funding); *id.* § 10153(a)(4) (requiring information demonstrating financial integrity); *id.* § 10153(a)(5)(D) (permitting the Attorney General to require localities to certify they "will comply with all provisions of this part and all other applicable Federal laws").  Immigration is not one of the listed purposes.

**B.     DOJ Announces New Requirements For Byrne JAG Funding.**

In August 2017, OJP posted the State and Local Solicitations for the FY 2017 Byrne JAG grants.  FAC Exhs. B & D.  The Solicitations included three new requirements.

The first requirement concerns 8 U.S.C. Section 1373 ("Section 1373"), which prohibits state and local governments from restricting their officials from sending to, or receiving from, the Immigration and Naturalization Service information regarding an individual's citizenship or

---

[1] The eight purpose areas are: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs. 42 U.S.C. § 10152(a)(1)(A)–(H).

immigration status.  The Solicitations stated that jurisdictions would be required to complete a

Certificate of Compliance ("Section 1373 Certification").  The Section 1373 Certification requires the

applicant's Chief Legal Officer—in San Francisco's case, City Attorney Dennis J. Herrera—to certify

under penalty of perjury that he or she has carefully reviewed Section 1373, and has conducted—or

caused to be conducted—a "diligent inquiry and review," and that with respect to the "program or

activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in

effect, and is not subject to or bound by

> "any prohibition or any restriction . . . that deals with either (1) a government
> entity or –official sending or receiving information regarding citizenship or
> immigration status as described in 8 U.S.C. § 1373(a); or (2) a government
> entity or –agency sending to, requesting or receiving from, maintaining, or
> exchanging information of the types (and with respect to the entities) described
> in 8 U.S.C. § 1373(b)" ("Section 1373 Requirement").

FAC Exh. B at 38.[2]

The Solicitations also included two other requirements related to federal immigration

enforcement.  The "Access Requirement" demands that San Francisco provide federal immigration

officials unfettered access to local detention facilities to interrogate any suspected aliens held there.

*Id.* at 30.  The "Notice Requirement" directs San Francisco to "provide at least 48 hours' advance

notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody

when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and

Nationality Act."  *Id.*

On September 5, 2017, the City submitted its application for its FY 2017 Local Byrne JAG

allocation.  FAC ¶ 127.  Along with the application, San Francisco submitted a disclaimer noting its

legal challenge to the Access and Notice Requirements and confirming that it will not comply with

those Requirements.  *Id.*  Although San Francisco has not received a Byrne JAG award document at

this time,[3] DOJ has issued award documents to two other jurisdictions.  *Id.* ¶¶ 102-103.  Those award

---

[2] The Section 1373 Certification is not the only time that jurisdictions will be required to assure
DOJ that they comply with Section 1373.  Each time that San Francisco wants to draw-down funds
from its Byrne JAG award, it must again certify compliance with Section 1373.  FAC ¶ 82.

[3] DOJ has represented that it is not issuing award letters until the Seventh Circuit Court of
Appeals rules in *Chicago v. Sessions*, No. 17-2991.  That case is fully briefed and the Seventh Circuit
heard argument on January 19, 2018.

documents contain DOJ's description of the Notice and Access Requirements, and DOJ has asserted that these are the final award conditions and that it will describe the Notice and Access Requirements the same way in any future award documents. *Id.* ¶¶103-104.  Notably, the Access and Notification Requirements in the award documents DOJ referenced differ from DOJ's earlier statements.  For jail access, DOJ describes the Requirement as mandating that recipients have in place a "local ordinance, -rule, -regulation, -policy, or –practice . . . that is designed to ensure that agents of the United States . . . are given access [to] a local-government . . . correctional facility" to meet with individuals believed to be aliens and question them.  Defendants' Request for Judicial Notice (Dkt. No. 66-1), Exh. E at 19. For advance notification, recipients must have in place a "local ordinance, -rule, -regulation, -policy, or –practice . . . that is designed to ensure that, when a local-government . . . correctional facility receives from DHS a formal written request . . . [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . provide the requested notice to DHS." *Id.*

## ARGUMENT

**I.      San Francisco Is Entitled To A Declaration Concerning Compliance With Section 1373.**

Defendants argue that San Francisco's first cause of action for declaratory relief concerning its compliance with Section 1373 should be dismissed because (A) it is non-justiciable (Defendants' Notice of Motion and Motion to Dismiss (Dkt. No. 66) ("Mot.") at 11-15) and (B) San Francisco Administrative Code Chapters 12H and 12I conflict with Section 1373 (*id.* at 15-20).  Defendants are wrong on both counts.

### A.      San Francisco's Declaratory Relief Claim Is Justiciable.

This Court has already concluded that San Francisco's claim for declaratory relief regarding Section 1373 satisfies Article III's demands and is thus justiciable.  *San Francisco v. Trump*, 267 F. Supp. 3d at 1218.  In so holding, the Court disapproved Defendants' arguments that declaratory relief is not proper because Defendants have not "deprived [San Francisco] or threatened to deprive it of any federal funds."  Defs.' Mot. to Dismiss, *San Francisco v. Trump*, No. 17-485, Dkt. No. 111, at 12. The Court should reject these rehashed arguments here as well.  Defendants point to nothing that diminishes the justiciability of San Francisco's request for declaratory relief.  To the contrary, recent

developments have only heightened and crystallized Defendants' threats regarding San Francisco's compliance with Section 1373.

Indeed, Defendants' attempt to again forestall review of this issue is startling, given that they previously urged this Court to resolve San Francisco's claim regarding Section 1373 *in this very case*. *See* Opp. to Plfs. Mot. for Summary Judgement, *San Francisco v. Trump, et al.*, No. 17-485, (Dkt. No. 172) at 9 (characterizing *San Francisco v. Sessions* as presenting a "concrete dispute regarding the implementation of actual [OJP] grants," and arguing that "[i]t is in the context of such a dispute that questions like [San Francisco's Section 1373 declaratory relief claim] should be addressed"). For all of these reasons, the Court should deny Defendants' request to dismiss San Francisco's declaratory relief claim as non-justiciable.

> ### 1.    This Court Has Already Determined San Francisco's Claim Is Justiciable.

As the Court recognized, the relevant Article III question regarding declaratory relief is whether the claim involves an "actual controversy." *San Francisco v. Trump*, 267 F. Supp. 3d at 1216 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). More precisely, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (internal quotation marks omitted).[4]

Defendants' recycled argument that San Francisco's declaratory relief claim is unripe because "USDOJ has not denied the plaintiff any grant funds based on its ordinances" (Mot. at 2), is flatly inconsistent with this authority. As the Court has already held, events that transpired last spring and

---

[4] Although the Court's Article III discussion in *Trump* concerned standing to bring a claim for declaratory relief, "[s]tanding and ripeness under Article III are closely related." *Colwell v. Dep't of Health and Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009). To the extent Defendants frame their present argument in terms of ripeness (Mot. at 12), the Court's earlier decision in *Trump* is no less relevant. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (holding that the "constitutional component of the ripeness inquiry is often treated under the rubric of standing"). In any case, while Defendants purport to argue constitutional ripeness alone (Mot. at 12 n.5), the cases they discuss involve what Defendants characterize as "mere[] 'prudential ripeness.'" *Id.* at 12; *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967); *Texas v. United States*, 523 U.S. 296, 300 (1998). But "[t]he Supreme Court has . . . question[ed] 'the continuing vitality of the prudential ripeness doctrine.'" *San Francisco v. Trump*, 250 F. Supp. 497, 529 (N.D. Cal. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014)). Defendants disclaim any argument that prudential ripeness is not satisfied here. Mot. at 12 n.5.

---

summer were sufficient to show "a real and immediate controversy between San Francisco and the federal government regarding whether San Francisco complies with section 1373." *San Francisco v. Trump*, 267 F. Supp. 3d at 1216. In March 2017, the Attorney General singled out San Francisco and its "sanctuary policies" when urging jurisdictions to comply with Section 1373 or face consequences. Request for Judicial Notice ("RJN"), Exh. A. He indicated that DOJ would soon take steps to ensure that these jurisdictions complied with Section 1373. *Id.* Similarly, in a subsequent speech to law enforcement representatives, the Attorney General noted that "[s]ome 300 jurisdictions in this country refuse to cooperate with federal immigration authorities," and, that "politicians have forbidden [local law enforcement] to help." *Id.* Exh. B at 2. He specifically singled out San Francisco as one of the jurisdictions that "have these policies." *Id.*

The Court found these threats to amount to a "'real and substantial' dispute regarding whether San Francisco complies with section 1373." *San Francisco v. Trump*, 267 F. Supp. 3d at 1218. Defendants do not—and could not—point to any recent developments that diminish those threats or resolve the dispute. Indeed, recent developments only confirm that there is a significant and immediate dispute between the parties regarding Section 1373.

### 2. Recent Developments Bolster The Justiciability Of San Francisco's Claim.

First, in August 2017, Defendants announced that jurisdictions receiving Byrne JAG funds would be required for the first time to execute the Section 1373 Certification. *See* pp. 3-4, *supra*. Defendants curiously omit any discussion of the contents of the Section 1373 Certification, even though that Certification is the centerpiece of San Francisco's claim for declaratory relief. *See* FAC ¶¶ 124-35. That Certification requires San Francisco's Chief Legal Officer to certify under penalty of perjury that there are no "prohibitions or restrictions potentially applicable to [any program or activity funded with Byrne JAG dollars] . . . that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in [Section 1373]." FAC Exh. B at 38. And the City Attorney must acknowledge that a "materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact)" in the Certification will subject him to criminal prosecution, and San Francisco to civil penalties or administrative remedies for false claims. *Id.* Because of the breadth of this Certification—and to respond to the Court's request to consider San

Francisco's Section 1373 issues in the context of a particular grant application, *San Francisco v. Trump*, No. 17-cv-00485, 2017 WL 5569835, at *1 n. 1 (N.D. Cal. 2017)—San Francisco framed its request for declaratory relief in relation to the Section 1373 Certification.  *See* FAC ¶¶ 166-76.

The Section 1373 Certification belies Defendants' characterization of San Francisco's claim for declaratory relief.  Defendants suggest that San Francisco faces no harm related to Section 1373 unless and until "OJP determines whether Chapter 12H or 12I violates Section 1373."  Mot. at 13.  But San Francisco does not have the luxury to await Defendants' "initial determination" on this matter.  *Id.* The Section 1373 Certification requires that San Francisco understand *now* what Section 1373 means.

This is particularly true given that Defendants have made clear that the City Attorney's execution of the Certification will amount to an endorsement of *Defendants*' views on Section 1373. Defendants made this shocking assertion at a hearing before this Court, in the wake of questions regarding whether a jurisdiction can "certify that it's in compliance with 1373" based on its own "good-faith belief that you're in compliance with 1373."  *California v. Sessions*, No. 17-4701, Hr'g Tr. at 14:8-14 (Dec. 13, 2017).  Counsel for Defendants stated that "the Government is expecting that the State, if they certify compliance, will be agreeing to the Government's interpretation on the issues that we've raised to them."  *Id.* at 29:16-19.

In light of Defendants' representation, San Francisco may be unable to sign the Section 1373 Certification without further guidance from this Court.  San Francisco cannot sign, under penalty of perjury, a document certifying compliance with the federal government's "interpretation" of Section 1373, because the City does not comply with that overbroad reading of the law.  Accordingly, the Section 1373 Certification only heightens the existing immediate dispute between the parties.[5]

<u>Second</u>, OJP has sent two letters to San Francisco expressing its "concerns" that certain "San Francisco laws, policies, or practices may violate section 1373."  FAC Exh. A; RJN Ex. C.  OJP sent

_____

[5] Because San Francisco seeks a declaration that it complies with the terms of the Section 1373 Certification, Defendants are wrong to argue that San Francisco lacks standing to seek declaratory relief regarding its policies implementing Chapters 12H and 12I. Mot. at 13-14. San Francisco's claim for declaratory relief tracks the language of the Section 1373 Certification.  *See, e.g.,* FAC ¶¶ 169-171.  The Certification asks whether the departments administering Byrne JAG-funded programs have in place any "restriction or prohibition" on the sharing of immigration-status information with ICE.  The Certification thus puts not only those departments' laws but also their policies at issue.

1   the first letter to San Francisco on November 15, 2017.  FAC Exh. A.  Then, five days after the filing

2   of Defendants' Motion to Dismiss, OJP sent a further communication to San Francisco on January 24,

3   2018.  RJN Ex. C.

4           These letters confirm the existence of a real controversy between San Francisco and

5   Defendants regarding Section 1373.  The November 15 letter identifies San Francisco's Sanctuary

6   City Laws as potentially violating Section 1373.  FAC Exh. A.  Those laws form the foundation of San

7   Francisco's declaratory relief claim.  And the January 24, 2018 letter reiterates those same "concerns,"

8   notwithstanding San Francisco's response confirming that its laws fully comply with Section 1373.

9   RJN Ex. C; FAC Exh. C.  In addition, the January 24 letter made clear that OJP's concerns are not

10  limited to San Francisco's laws, but also concern San Francisco's "policies, or practices."  RJN Ex.

11  Cat 1.  Thus, the letter requests that San Francisco produce "[a]ll documents reflecting any orders,

12  directives, instructions, or guidance to your law enforcement employees . . . whether formal or

13  informal . . . regarding whether and how those employees may, or may not, communicate with [DOJ],

14  the Department of Homeland Security, and/or [ICE]."  *Id.* at 2.   In addition, the letter included

15  additional threats that were not clear in the November 15 letter: OJP stated in the January 24 letter that

16  "[s]hould the Department determine your jurisdiction is out of compliance with section 1373, the

17  Department may . . . seek return of your FY 2016 grant funds, require additional conditions for receipt

18  of any FY 2017 Byrne JAG funding for which you have applied, and/or deem you ineligible for FY

19  2017 Byrne JAG funds."  *Id.*  These letters, together, confirm that there is an escalating controversy

20  between Defendants and San Francisco regarding whether San Francisco complies with Section 1373.

21  And the January 24 letter refutes Defendants' claim that San Francisco's policies and its

22  implementation of those policies are not at issue.  Mot. at 13-14.  The letters together clearly threaten a

23  "loss of [Byrne JAG] funds promised under federal law," thus "satisf[ying] Article III's standing

24  requirement."  *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).

25          Defendants' reasons for discounting these letters are not convincing.  Contrary to Defendants'

26  representations, the letters do not show that San Francisco's declaratory relief claim "rests upon

27  contingent future events that may not occur as anticipated."  *Id.* at 13 (*quoting Texas*, 523 U.S. at 300).

28  Defendants suggest in their Motion that they have not firmly concluded that San Francisco's laws

violate Section 1373, and that OJP may change its mind in the course of performing an evaluation. *Id.* But that intimation is belied by DOJ's own statements establishing that the "review" process, which OJP is performing with respect to dozens of other jurisdictions, is designed to coerce jurisdictions to change *their policies*—not to lead Defendants to change their mind about Section 1373's reach. In a statement accompanying a wave of letters sent to other jurisdictions, the Attorney General stated that the purpose of this "preliminary review" is to "urge [these] jurisdictions . . . to reconsider their policies that undermine the safety of their residents." RJN Exh. D at 2. And in those letters, OJP made clear that its purportedly "preliminary" determination regarding non-compliance will change only if jurisdictions can convince OJP that their laws do not in fact mean what they say. *See, e.g.,* RJN Exh. E at 2 (asking the City of New York to "certify that it interprets and applies" a law prohibiting employees from "notifying federal authorities of [a] person's release" does not in fact restrict New York employees from sharing information "regarding the date and time of an alien's release from custody"). Because San Francisco is not prepared to change its laws to require sharing the vast swaths of information Defendants claim Section 1373 covers (*see* pp. 11-12, *infra*), there is little chance OJP will suddenly reconsider its initial assessment of San Francisco's Section 1373 compliance.[6]

Defendants are also wrong to suggest that these letters are part of an administrative process that the Court should not interrupt. Neither of the letters appear to begin any sort of formal administrative process. *See* 28 C.F.R. § 18.5(a)-(b) (referring to administrative hearings). San Francisco cannot be relegated to an undefined, amorphous, and illusory administrative process. And even if DOJ were following a defined administrative process, it would not affect the justiciability of San Francisco's declaratory relief claim before this Court. As the Supreme Court has made clear, certain factors "weigh heavily against requiring administrative exhaustion" before seeking judicial relief. *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). Exhaustion is unnecessary if there is (1) "an indefinite [administrative] timeframe," (2) "undue prejudice" to the plaintiff in the form of "irreparable harm if

---

[6] The decision in *City of Chicago v. Sessions*, No. 17C5720, 2017 WL 5499167 (N.D. Ill. Nov. 16, 2017), is not to the contrary. Mot. at 13. As the decision itself notes, "Chicago did not request a declaration of compliance with Section 1373 in its Motion for a Preliminary Injunction." 2017 WL 5499167 at *3. For that reason, the *Chicago* court declined to "inject[] this issue into the case" on a motion for reconsideration. *Id.* The *Chicago* court's further discussion of the relevance of OJP's letter to Chicago is dicta.

1 unable to secure immediate judicial consideration," or (3) the agency hearing officer lacks

2 "institutional competence" to determine "the constitutionality of a statute." *Id.* at 147–48; *see also*

3 *Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*, 40 F.3d 426, 432 (D.C.Cir.1994) (exhaustion

4 unnecessary "when resort to administrative remedies [would be] 'clearly useless.'").

5       Such is the case here.  OJP has articulated no timeframe by which it will resolve its inquiry into

6 San Francisco's Section 1373 compliance.  San Francisco will soon be presented with the Section

7 1373 Certification, which the City Attorney may be unable to sign without Court guidance—a

8 circumstance that will render San Francisco ineligible for grant funds.  And the purported

9 administrative process does not afford San Francisco any avenue for challenging Defendants'

10 overbroad interpretation of Section 1373.

11       In short, Defendants offer no reason for this Court to revisit its determination that San

12 Francisco's declaratory relief claim is justiciable.

13       **B.**       **San Francisco's Sanctuary City Laws Comply With Section 1373.**

14       Defendants' primary argument is that Chapters 12H and 12I violate Section 1373 because they

15 prohibit San Francisco employees from sharing information *other* than immigration status—e.g., an

16 individual's address, contact information, and release date—with federal officials.  San Francisco

17 concedes that its laws generally prohibit sharing of this information, but vigorously disputes that this

18 violates federal law.  Defendants' argument to the contrary rests on an overbroad, untenable, and

19 unconstitutional interpretation of Section 1373.  *See* Part I(B)(1), *infra*.  Defendants also argue that

20 12H and 12I violate Section 1373 because they prohibit the sharing of immigration status with federal

21 officials.  They do not.  *See* Part I(B)(2)-(3), *infra*.

22       **1.**       **Defendants' Interpretation Of Section 1373 Is Overbroad And Infirm.**

23       Under Section 1373, state and local governments cannot prohibit or restrict their employees

24 from sharing with federal immigration officials "information regarding [an individual's] citizenship or

25 immigration status."  The crux of the dispute between the parties turns on the proper interpretation of

26 this phrase.  Defendants contend that the word "regarding" expands the reach of this provision to cover

27 an exceedingly broad swath of information, including—at a minimum—address, contact information

28 and (for individuals in custody) release date.  Notably, Defendants have never defined precisely how

the phrase should be understood or placed any limits on their broad interpretation.  To the contrary, they have stated that "information regarding immigration status" includes all information that "facilitates taking an alien into custody for lawful removal proceedings" (Mot. at 16) and—even more broadly—any "information that allows [ICE] to do its job."  *California v. Sessions*, No. 17-4701, Hr'g Tr. at 30:9-10 (Dec. 13, 2017).  As this Court previously noted, read this broadly, the phrase could cover "everything in a person's life."  *Id.* at 23:1-2.  It could extend the reach of Section 1373 to public school students' records or employee personnel files—and potentially even to information covered by independent confidentiality laws, like confidential health records.

The word "regarding" cannot bear this great weight.  Indeed, Supreme Court and Ninth Circuit precedent foreclose such a broad interpretation of the term.[7]  In *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847 (9th Cir. 2002), the Ninth Circuit addressed the meaning of the term "relate to," which Defendants agree is "closely analogous" to "regarding."  Mot. at 16.  *Roach* turned on the proper interpretation of the preemption provision of the Federal Employees Health Benefits Act, which states that the terms of a contract under that act "which relate to the nature, provision, or extent of coverage or benefits" supersede and preempt any state or local law "which relates to health insurance or plans." 298 F.3d at 849.  The Ninth Circuit stated: "[I]n the context of a similarly worded preemption provision in the Employee Retirement Income Security Act (ERISA), the Supreme Court has explained that the words 'relate to' cannot be taken too literally."  *Id.*  The court went on to explain:

> "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really, universally, relations stop nowhere.'" *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) (quoting H. James, Roderick Hudson xli (New York ed., World's Classics 1980)).  Instead, "relates to" must be read in the context of the presumption that in fields of traditional state regulation "the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  *Id.* at 655 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).

*Id.* at 849-50.  *Cf. Bond v. United States*, 134 S. Ct. 2077, 2089 (2014) ("[I]t is incumbent on the federal courts to be certain of Congress' intent before finding that federal law overrides the usual

---

[7] In addition, another court in this District has rejected the argument that Section 1373 is broad enough to encompass even release date, concluding that "no plausible reading of 'information regarding . . . citizenship or immigration status' encompasses the release date of an undocumented inmate."  *Steinle v. City and Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

constitutional balance of federal and state powers.") (internal quotation marks omitted).

Here, too, "regarding" should not be understood to "extend to the furthest stretch of its indeterminacy." Chapters 12H and 12I reflect San Francisco's considered judgment that limiting local involvement in federal immigration enforcement promotes public health, safety, and welfare. S.F. Admin. Code § 12.I.1. These traditional matters of local concern lie at the heart of a state's police power. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618 (2000); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). And even Defendants do not contend that Section 1373 clearly and unambiguously applies to contact information and release date. Nor could they. When Congress wants to draft legislation that applies broadly to information about undocumented individuals, it knows how to do so. *See* 8 U.S.C. § 1367(2) (prohibiting the disclosure of "*any information which relates to an alien* who is the beneficiary of an application for relief under [specific provisions] of the Immigration and Nationality Act"). It did not do so here. The language Congress chose to use is—at most—ambiguous. *See California v. Sessions*, No. 17-4701, Hr'g Tr. at 30:2-4 (Dec. 13, 2017) ("MR. READLER: Sure. Well, obviously, Congress chose a broad phrase. It could have said 'just immigration status.' THE COURT: Or maybe an ambiguous phrase.").

Accordingly, Section 1373 cannot be construed in such a manner as to supersede San Francisco's exercise of its core police powers. Rather, "information regarding . . . citizenship or immigration status" should be interpreted to include only immigration status information in the possession of local governments. This would include, for example, an individual's immigration or visa status, an individual's self-report about immigration status, or a third party's statement about an individual's immigration status. This type of information is not official immigration status, but it is information "regarding" immigration status.

This interpretation is confirmed by the contrast between Section 1373(a) and (b), which refer to information "regarding . . . immigration status," and subsection (c), which uses the different phrase "[immigration] status information." Defendants argue that this difference supports their broad reading of "regarding." Mot. at 16. But in fact this difference reflects the unique and paramount role of the federal government with respect to immigration status information. Section 1373 subsections (a) and (b) are directed at information in the possession of state and local governments, which are not

empowered to make immigration status determinations and cannot vouch for the accuracy of citizenship and immigration status that may be in their possession.  For this reason, immigration status information held by state and local governments will always be "regarding … immigration status" (like a self-report of immigration status), rather than a definitive statement of immigration status.  In contrast, subsection (c) applies to information maintained by federal immigration officials, who *do* know individuals' actual citizenship immigration status and can therefore provide that information, with no qualifiers necessary.

Defendants make three additional arguments in support of their contrary position that "information regarding . . . citizenship or immigration status" includes far more—*i.e.*, anything ICE needs to do its job.  None has merit.

First, Defendants rely on the Supreme Court's decision in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).  Mot. at 16.  But the case does not justify the exceedingly broad interpretation of "regarding" urged by Defendants.  In *Morales*, several airlines filed a suit alleging that the Texas Attorney General's attempt to enforce guidelines concerning airline fare advertising was preempted by the Airline Deregulation Act, which prohibits states from enforcing any law "relating to rates, routes, or services" of any air carrier.  504 U.S. at 378-80.  In concluding that the phrase was broad enough to cover airline fare advertisement guidelines, the Court noted that the ordinary meaning of the term "relating to" is a "broad one" (*id.* at 383)—but the Court then cautioned:

> In concluding that the NAAG fare advertising guidelines are pre-empted, we do not, as Texas contends, set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines. Nor need we address whether state regulation of the nonprice aspects of fare advertising (for example, state laws preventing obscene depictions) would similarly "relat[e] to" rates; the connection would obviously be far more tenuous. To adapt to this case our language in *Shaw,* "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner" to have pre-emptive effect.

*Id.* at 390.  And, indeed, since *Morales*, courts have upheld state and local laws against preemption challenges, finding them too tenuous, remote or peripheral to be considered "relat[ed] to rates, routes, or services."  *See, e.g.*, *Danner v. Int'l Freight Sys. of Washington, LLC*, 855 F. Supp. 2d 433, 459 (D. Md. 2012) (negligence causes of action with respect to the misplacement of the Cargo not preempted); *Air Transp. Ass'n of Am. v. City & Cty. of San Francisco*, 992 F. Supp. 1149, 1183-88 (N.D. Cal.

1998), *affd and remanded in part on other grounds,* 266 F.3d 1064 (9th Cir. 2001) (San Francisco's

Equal Benefits Ordinance not preempted).

Second, Defendants argue that the "breadth of Section 1373 is also reinforced by other

language that Congress used, such as making clear that no local policy could 'in any way restrict' the

sharing of such information . . . ." Mot. at 16-17.  But this language has no bearing whatsoever on the

question of *what* information local governments cannot prohibit "or in any way restrict" their

employees from sharing.

Third, Defendants point out that the date and time of an undocumented inmate's release from

custody is "critical information" because federal law concerning the detention of criminal aliens states

that federal officials must take custody of the individual "when the alien is released"—which the Ninth

Circuit has held to mean immediately upon release.  Mot. at 18-19.  San Francisco does not dispute

that release date information would be useful to ICE, but that has no bearing on the question presented

here—*i.e.*, whether Congress chose to include it within the scope of Section 1373.  As another court in

this District has found: "if the Congress that enacted [the Act] had intended . . . specifically to bar

restrictions of sharing inmates' release dates, it could have included such language in the statute."

*Steinle v. City and Cty. of San Francisco,* 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).  The fact that it

did not is perhaps an issue to take up with Congress, but this Court should not rewrite the statute to

facilitate ICE's immigration enforcement activities.[8]  *See Badaracco v. Commissioner,* 464 U.S. 386,

398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects

susceptible of improvement."); *Blount v. Rizzi,* 400 U.S. 410, 419 (1971) ("[I]t is for Congress, not this

Court, to rewrite the statute.").

### 2.  Chapter 12H Does Not Prohibit Sharing Of Immigration Status.

Defendants' secondary argument that Chapter 12H violates Section 1373 because it prohibits

employees from sharing immigration status with federal officials (Mot. at 18–19) fares no better.

---

[8] Notably, Congress has repeatedly considered—and rejected—legislation that would allow federal agencies to withhold grants from jurisdictions that decline to provide release dates to federal immigration authorities.  *See, e.g.*, Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016).  None of this legislation has been enacted.

Chapter 12H is fully consistent with Section 1373.

Chapter 12H includes two related prohibitions and a savings clause.  The "assistance" provision restricts "us[ing] any City funds or resources to assist in the enforcement of Federal immigration law."  S.F. Admin. Code § 12H.2.  The "information" provision restricts using City funds or resources to "gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I."  *Id*.  Finally, the savings clause exempts from both provisions any assistance "required by Federal or State statute, regulation, or court decision." *Id*.

Defendants' argument that Chapter 12H violates Section 1373 fails for three independent reasons.  As an initial matter, Defendants' 12H arguments focus on the "assistance" provision, but it is the more specific "information" provision that governs the sharing of information with federal immigration officials.  "A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates."  *San Francisco Taxpayers Assn. v. Bd. of Supervisors*, 2 Cal. 4th 571, 577 (1992).[9]  And the "information" provision imposes no restriction on sharing immigration status with ICE.  It restricts the sharing of "personal information."  But "personal information" is defined to mean "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family emergency contact information."  S.F. Admin. Code § 12I.2.  This does *not* include information about a person's immigration status, which cannot be used to identify or contact an individual.  Thus, responding to Defendants' hypothetical, Chapter 12H does not "prevent an employee from using her office telephone to call federal authorities to report on an individual's immigration status."  Mot. at 18.

---

[9] Federal courts are "bound by California rules of construction in [their] independent interpretation of the California statutes at issue."  *Goldman v. Salisbury* (*In re Goldman*), 70 F.3d 1028, 1029 (9th Cir. 1995).  And while Defendants have argued in the past that this specific canon of statutory construction does not apply because of the disjunctive "or" between the two clauses, meaning they can operate independently (*see* Opp. to Plfs. Mot. for Summary Judgement, *San Francisco v. Trump, et al.*, No. 17-485, (Dkt. No. 172) at 14 n.4), that argument is unavailing.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2072 (2012) ("We know of no authority for the proposition that the canon is confined to situations in which the entirety of the specific provision is a "subset" of the general one.  When the conduct at issue falls within the scope of both provisions, the specific presumptively governs, whether or not the specific provision also applies to some conduct that falls outside the general.").

The second reason Defendants' argument fails is that the City amended Chapter 12H specifically to delete a prior restriction against sharing immigration status information.  *See* RJN Exh. F.  The "information" provision previously prohibited sharing information about "immigration status," but the City amended that prohibition in July 2016 to delete the reference to "immigration status" and replace it with "release status and other such personal information."  "When legislators delete language, we may assume that they intended to eliminate the effect of the previous wording."  *See Stewart v. Ragland*, 934 F.2d 1033, 1037 n.6 (9th Cir. 1991).  Put differently, "[t]he sweep of [a] statute should not be enlarged by insertion of language which the Legislature has overtly left out."  *Traverso v. People ex rel. Dep't of Trans.*, 46 Cal. App. 4th 1197, 1207 (1996) (quoting *People v. Brannon*, 32 Cal. App. 3d 971, 977 (1973)).  Construing Chapter 12H to prohibit sharing immigration status information would run afoul of this rule.  The Court should reject Defendants' attempts to reinsert that deleted language to create a conflict with federal law where none otherwise exists.

Finally, Chapter 12H's savings clause expressly requires compliance with federal law, thereby avoiding any possible conflict between Chapter 12H and Section 1373.  Defendants contend that this savings clause is ambiguous and "overshadowed by the rest of Chapter 12H."  Mot. at 19-20.  But Defendants strain to find ambiguity where none exists.  Indeed, the Justice Department's Office of Inspector General found it to be sufficiently clear and approved this precise language in a 2007 report evaluating jurisdictions' cooperation with ICE and compliance with Section 1373:

> San Francisco has designated itself as a "City and County of Refuge" and has limited the extent to which municipal agencies and employees may assist in immigration enforcement. The City Administrative Code states that "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals . . . *unless such assistance is required by federal or state statute, regulation or court decision.*" The proviso requiring compliance with federal law reinforces our view that there is insufficient evidence to conclude that San Francisco fails to cooperate with ICE's efforts to remove undocumented aliens.

RJN Exh. G at 24 (emphasis in original).  The report went on to conclude that "in light of the specific provisions requiring compliance with federal law, we cannot conclude that San Francisco's policies are contrary to 8 U.S.C. § 1373."  *Id*. at 26.  This conclusion is correct.

### 3. Chapter 12I Does Not Prohibit Sharing Of Immigration Status.

Defendants make a half-hearted attempt to argue that Chapter 12I also prohibits sharing of immigration status. Mot. at 17. It does not.

Chapter 12I prohibits law enforcement officials from "provid[ing] any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws." S.F. Admin. Code § 12I.3 (e). As explained above, however, "personal information" does not include immigration status. *See* p. 16, *supra.* Thus, this subsection does not restrict local officials from sharing immigration status information with federal officials. Defendants' contrary assertion—that "personal information is defined so broadly [that] a San Francisco officer would risk disciplinary action any time he or she shared information regarding immigration status, rendering the ordinance in square violation of Section 1373" (Mot. at 17)—is pure conjecture, with no support in the record or in the plain text of Chapter 12I. To the contrary, San Francisco has affirmatively informed all employees about their rights under Section 1373, and explained that Chapters 12H and 12I impose *other* types of restrictions, which are consistent with federal law. FAC ¶ 41; RJN Exh. H.

Defendants also point out that Section 12I.5 requires the Sheriff and Juvenile Probation Officer to provide semi-annual reports to the Board of Supervisors that include, among other things, "a description of any communications" made to federal immigration authorities. Mot. at 17. And Defendants contend, without evidence, that this reporting requirement discourages local officers from sharing immigration status information with federal authorities. But this is nothing more than a run-of- the-mill reporting requirement—typical in federal, state, and local law—that gives policymakers information about how laws are implemented. It certainly does not constitute a prohibition on sharing immigration status with federal officials. Indeed, nothing in Chapter 12I sets forth such a prohibition.

## II. The Notice, Access, And Section 1373 Requirements Are Unconstitutional.

The Constitution grants Congress federal spending power, including the power to impose conditions on federal funds. *See* U.S. Const. art. I, § 8, cl. 1. "Congress can delegate some discretion to the President to decide how to spend appropriated funds" (*San Francisco v. Trump*, 250 F. Supp. 3d

497, 531 (N.D. Cal. 2017)), but it must exert that power through statute.  Moreover, even Congress' spending power is not unlimited—it is cabined by constitutional boundaries requiring any funding condition to be unambiguous, relate to Congress's purpose in authorizing the funds, and not compel local governments to engage in unconstitutional conduct.  Here, no statute authorizes the Attorney General to impose the newly announced Requirements on Byrne JAG funds.  And the newly added Requirements violate these constitutional limitations.

In other word, Congress (A) did not—and (B) could not—authorize the Attorney General to impose any of the newly announced Requirements.  Accordingly, San Francisco's second and third causes of action have merit and should not be dismissed.

### A.   The Newly Announced Requirements Violate The Separation Of Powers: Congress Has Not Authorized The Attorney General To Impose Them.

Defendants rely solely on 34 U.S.C. § 10102 ("Section 10102") to support their assertion that Congress authorized the Attorney General to impose the Notice, Access, and Section 1373 Requirements.  Mot. at 20-22.[10]  This reliance is misplaced.  Section 10102 does contain language referring to the Assistant Attorney General's ("AAG") exercise of various powers, including "placing special conditions on all grants."  But Section 10102's text and structure make clear that this provision cannot bear the great weight Defendants place upon it.  Moreover, Congress's decision to structure the Byrne JAG program as a formula grant confirms that Congress did not vest the Attorney General with authority to invent and impose new substantive requirements for grant recipients.  Accordingly, Defendants' request to dismiss Count Two of San Francisco's Complaint should be denied.

### 1.   Section 10102(a) Is Not A Grant Of Any Authority.

The language on which Defendants rely appears in a statutory provision describing the powers

---

[10] Defendants do not argue that the Byrne JAG statute (34 U.S.C. §§ 10151-10158) authorizes the Attorney General to impose the Notice and Access Requirements.  Nor do they contend that the Section 1373 Requirement is permissible based on 34 U.S.C. Section 10153(a)(5)(D), which permits the Attorney General to require that localities certify they "will comply with all provisions of this part and all other applicable Federal laws."  Accordingly, Defendants have waived these arguments for purposes of this motion.  *See, e.g.*, *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1063–64 (N.D. Cal. 2014); *Sunbelt Rentals, Inc. v. Victor*, No. C 13-4240 SBA, 2014 WL 492364, at *9 n.7 (N.D. Cal. Feb. 5, 2014); *see also, e.g.*, *Ind. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003); *Vasquez v. New York City Dep't of Educ.*, No. 11-CV-3674 (AJN), 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015).

that the AAG overseeing OJP shall exercise.  In total, Section 10102 (a) provides that the AAG shall

exercise certain "specific, general, and delegated powers":

> The Assistant Attorney General shall—
>
> > (1) publish and disseminate information on the conditions and progress of the criminal justice systems;
> >
> > (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;
> >
> > (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;
> >
> > (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;
> >
> > (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency prevention; and
> >
> > (6) exercise such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants*, and determining priority purposes for formula grants.

34 U.S.C. § 10102 (a) (emphasis added).

Section 10102 (a)(6)'s reference to the AAG's ability to place special conditions on grants is

not itself a grant of authority.  Rather, the provision allows the AAG to exercise other powers "as may

be vested" in him or her through another source, namely, "pursuant to this chapter or by delegation of

the Attorney General."  *Id.*  Some other statutory authority—authority that either directly runs to the

AAG, or which runs to the Attorney General and may then be delegated—must exist for the powers in

question.  *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017) (holding that the

use of the phrase "may be vested" indicates "that any authority of the Assistant Attorney General to

place special conditions on grants must flow either from the statute itself or from a delegation of

power independently possessed by the Attorney General").

This much is clear when subsection (6) is viewed in comparison to the other enumerated

provisions in Section 10102.  Each of the other references to the AAG's powers is an express,

affirmative authorization and directive: The AAG shall "publish and disseminate information" (*id.*

§ 10102(a)(1)); "maintain liaison with the executive and judicial branches" (*id.* § 10102(a)(2));

provide information to the President (*id.* § 10102(a)(3)); and so forth.  None of the other enumerated

provisions use the "may be vested" language that subsection (6) does.  This contrast illustrates that subsection (6) is a catch-all provision that does not itself create any authority for the AAG, or the Attorney General, to exercise.  *See City of Chicago*, 264 F. Supp. 3d at 942–43.

### 2. Even If Section 10102 Was A Grant Of Authority, It Would Not Permit The Attorney General To Impose The Newly Announced Requirements.

Even if Section 10102 did give the Attorney General some measure of authority, that authority would still not allow the Attorney General to impose the Notice, Access, and Section 1373 Requirements, because they are not "special conditions" within the meaning of that provision.

"Special conditions" has a precise meaning that does not encompass the newly announced Requirements.  At the time Congress amended Section 10102—then codified as 42 U.S.C. Section 3712—the term "special conditions" had a specific meaning.  According to a DOJ regulation in place at the time, the agency could impose "special grant or subgrant conditions" on "high-risk grantees" if the grant applicant: (a) had a history of poor performance; (b) was not financially stable; (c) had a management system that did not meet certain federal standards; (d) had not conformed to the terms and conditions of a previous grant award; or (e) was not otherwise responsible.  28 C.F.R. § 66.12 (removed Dec. 25, 2014).  This language was based on the grants management common rule adopted by the Office of Management and Budget ("OMB"), and followed by "all Federal agencies" when administering grants to state and local governments.  RJN Exh. I.

In such circumstances, when a phrase has been assigned a particular meaning, courts presume that Congress was aware of—and intended to adopt—that established meaning.  *See F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) ("It is a cardinal rule of statutory construction that when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.") (internal quotation marks omitted); *see also, e.g.*, *Huffman v. C.I.R.*, 978 F.2d 1139, 1145 (9th Cir. 1992) ("Words with a fixed legal or judicially settled meaning, where the context so requires, must be presumed to have been used in that sense."); Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

Here, the newly added Requirements do not fall within the established meaning of "special conditions." True "special conditions" must be connected to the shortcoming that justifies their inclusion in the first place, *i.e.*, to some risk that the grant recipient will be financially unstable or otherwise unable to put the grant funds to an appropriate use. *See* 28 C.F.R. § 66.12 (a). An agency may impose those conditions only after following procedures designed to give notice to the grantee of the reason for the conditions and the corrective action that must be taken. *Id.* § 66.12(c). And the agency may impose only certain types of award conditions that will mitigate the risk that the recipient will be unable to successfully use its grant funding. *Id.* § 66.12(b) ("Special conditions or restrictions may include," *e.g.*, "additional project monitoring," "requiring the grantee or subgrantee to obtain technical or management assistance," or "establishing additional prior approvals."); *see also* Federal Grant Practice § 25.10 (examples of special conditions include the requirement that the recipient accept payment by reimbursement, or the requirement that the recipient allow for additional agency oversight or reporting obligations).[11] These conditions do not encompass broader requirements borne from the Attorney General's policy agenda, which are designed to coerce sanctuary cities to abandon their considered policy judgments.

### 3. The Formula Grant Structure Of Byrne JAG Confirms That The Attorney General Is Not Authorized To Impose New Substantive Requirements.

The Byrne JAG statute's structure as a formula grant confirms that Congress did not intend the Attorney General to invent and impose new, substantive requirements for grant recipients. Unlike discretionary grants, which allow federal agencies to exercise discretion over the award of federal funds,[12] formula grants specify the amount of funding recipients receive under a statutorily prescribed framework. *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the

---

[11] Although OMB has amended the regulations governing "special conditions" to now refer to these conditions as "specific conditions," the regulatory definition of those conditions and the circumstances in which they may be imposed remains largely unchanged. *See* 2 C.F.R. § 200.207 (OMB regulation defining "specific conditions"); 2 C.F.R. § 2800.101 (DOJ regulation adopting OMB definition of "specific conditions").

[12] *See, e.g.*, 20 U.S.C. § 10006(b) (Department of Education grant program) ("The Secretary shall determine which States receive grants under this section, and the amount of those grants, on the basis of information provided in State applications . . . and such other criteria as the Secretary determines appropriate . . . ."); 34 U.S.C. § 10171 (correctional options grant program); *id.* § 10191 (crime prevention campaign grant program).

formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive."); *see also* Brian T. Yeh*, The Federal Government's Authority to Impose Conditions on Grant Funds*, Congressional Research Service (Mar. 23, 2017), at 5-6 (describing the lack of agency discretion in formula grants).

The Byrne JAG program is structured precisely along these lines.  The Attorney General is directed to allocate specified portions of the Byrne JAG appropriation to the States and local governments.  34 U.S.C. § 10156(a), (b) (providing that the Attorney General "shall" allocate appropriated Byrne JAG funds to States and units of local governments according to the specified formula).  The formula also mandates the specific amount of funding each recipient is to receive, based upon the locality's population and rate of violent crime.  34 U.S.C. § 10156(a), (d).

Congress provided the Attorney General limited discretion to reserve certain portions of the congressional appropriation to fulfill statutorily defined goals.  *See id.* § 10157(b) ("Of the total amount made available to carry out this part for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government . . . pursuant to his determination that the same is necessary" to address "extraordinary increases in crime" or "mitigate significant programmatic harm . . . .").  But the Attorney General has *no authority* to withhold funding from a jurisdiction or in any way adjust the amount of grant funding a state or local government is entitled to receive under the formula.  Instead, States and local governments are entitled to their share of the Byrne JAG formula allocation as long as their proposed programs fall within the program's enumerated goals and their application is complete.  *See id.* §§ 10152(a)(1)(A)-(H), 10153(a).

The Attorney General's assertion of unfettered discretion to impose grant conditions of his choice—conditions untethered to any statutory obligation—is impossible to square with this grant structure.  Congress would not lay out a specific formula for allocating Byrne JAG funding while, at the same time, giving the Attorney General the unspoken authority to override that formula by attaching novel conditions to grant award documents and withholding appropriated federal funding from jurisdictions that fail to satisfy his policy goals.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

**B.     The Newly Announced Requirements Violate The Spending Clause: Even Congress Could Not Constitutionally Impose Them.**

Even if the Attorney General had the power to impose substantive conditions on Byrne JAG funds, he has violated the Constitution by imposing requirements that exceed constitutional limits on the spending power.  Congress' spending power is not unlimited.  *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Rather, the Constitution provides that federal funding conditions must (1) be unambiguous, (2) relate to Congress's purpose in authorizing the funds, and (3) not compel local governments to engage in unconstitutional conduct.  *Id.* at 207-10.  Because the Requirements violate these limitations, they would be unconstitutional even if Congress had authorized them.  Accordingly, Defendants' request to dismiss Count Three of San Francisco's Complaint should be denied.

**1.     The Requirements Are Ambiguous.**

The newly announced Requirements are unconstitutional because they violate the Spending Clause's prohibition on ambiguous funding conditions.  "If Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Dole*, 483 U.S. at 207.  This is because "legislation enacted pursuant to the spending power is much in the nature of a contract."  *Pennhurst*, 451 U.S. at 17.  Congress's exercise of the spending power in that "contract" is invalid unless "the State voluntarily and knowingly accepts [its] terms."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012).  Grant recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).[13]  As alleged in San Francisco's Complaint, all of the new Requirements fail this test.

---

[13] Defendants cite two cases for the proposition that uncertainty concerning the precise meaning of the challenged conditions would not, in fact, render them unconstitutional.  Mot. at 24.  But a closer reading of these authorities reveals that Defendants have taken the courts' holdings out of context. In both *Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003), and *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004), the court assessed the ambiguity of conditions placed on states in the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The courts' reasoning hinged on the ability of states to retain some latitude and flexibility in the enforcement of RLUIPA's "least restrictive means" test.  In this context, the *Verhagen* court held: "Congress cannot delineate every instance in which a State may or may not comply with the least restrictive means test; it is simply impossible to do. There are far too many circumstances affecting the States in different ways for Congress to have envisioned all aspects of compliance and noncompliance." 348 F.3d at 608.  Here, there is no corresponding need for the court to permit some amount of ambiguity in the imposition of requirements.  Thus, Defendants' cited authorities are inapposite.

Defendants offer no argument whatsoever in defense of the Section 1373 Requirement.
Indeed, the section of their Motion concerning San Francisco's ambiguity challenge does not even
mention Section 1373.  *See* Mot. at 23–24.  Accordingly, Defendants have conceded the point for
purposes of this motion.  *See, e.g.*, *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1063–64
(N.D. Cal. 2014); *see also* n.10, *supra*.[14]

And Defendants' attempts to salvage the Notice and Access Requirements fall short.

The Notice Requirement as set forth in the Local Solicitation states that jurisdictions must give
ICE 48 hours' advance notice of an inmate's scheduled release date and time.  FAC Exh. B at 30.
Nowhere does it explain whether notice must be given only when the scheduled release date and time
is known 48 hours in advance—which it may well not be—or whether jurisdictions must hold inmates
in custody for additional time to provide a full period of notice.  In its Motion, Defendants point to
award documents issued to Greenville, South Carolina, and Binghamton, New York, in which DOJ
states that the Notice Requirement does not require a jurisdiction to detain individuals in custody
beyond their release date and requires "only as much advance notice as practicable."  Mot. at 24
(quoting Defs' RJN Exhs. E & F).  But this post-hoc retreat (even if it remains consistent in the award
documents ultimately issued to other jurisdictions) does not cure the Notice Requirement's ambiguity.
It still leaves San Francisco uncertain about how much notice is "practicable" to provide.  And DOJ's
latest iteration of the Notice Requirement still refers to a "scheduled release date and time," and fails
to acknowledge that inmates may at times be released with little or no notice.  In these circumstances,
San Francisco would have no opportunity to provide DOJ with *any* advance notice.  The Notice
Requirement does not suggest this would be sufficient.

Likewise, the Access Requirement is unclear on its face as to whether jurisdictions are required
to provide access to inmates in custody only when those individuals consent, or instead whether
jurisdictions are required to compel unwilling inmates to meet with ICE.  Again, DOJ has attempted to
clarify this in litigation.  In briefing opposing the City of Philadelphia's similar request for injunctive

---

[14] Nor could Defendants credibly argue that San Francisco has "clear notice" of what it must
do to comply, given that DOJ itself has offered several conflicting interpretations of what Section
1373 demands.

relief, DOJ claimed that Philadelphia "wishfully identifies a supposed ambiguity about whether the [Access Requirement] requires allowing ICE agents access to visit an inmate even when the inmate has told the facility that the inmate does not consent to an interview.  The answer is yes.  The condition does require access in this scenario, even if the inmate might decline to answer questions." RJN Exh. J at 32.  Even with DOJ's qualification, the Access Requirement is still ambiguous regarding what type of access San Francisco must provide.  The Requirement does not identify any limiting principle on the access that ICE agents must receive.  For instance, must San Francisco allow ICE agents to use a jail interview room to "access" an uncooperative inmate for as long as ICE wishes?  Can correctional facilities require immigration officials to comply with generally applicable visitors' restrictions, or must ICE agents be allowed unfettered access?  The Access Requirement gives no guidance on these or similar questions.

It is no response to argue—as Defendants do (*see* Mot. at 24)—that confused prospective grantees can simply contact OJP with questions.  An agency cannot save a constitutionally infirm condition by setting up a hotline.  Nor is it in any way relevant to the clarity—or lack thereof—of the Notice and Access Requirements that San Francisco has not challenged other Byrne JAG requirements as ambiguous.  *See id.*  San Francisco can choose to prioritize challenges to specific requirements for various reasons.  Here, the ambiguities are particularly egregious because they heighten the coercive effect of the Requirements.  Because the Requirements are susceptible of various interpretations— some broader than others—San Francisco and jurisdictions may feel compelled to protect their interests by complying with the broadest possible construction.  The Spending Clause exists to protect state and local governments from these coercive efforts.  *Sebelius*, 567 U.S. at 577.

### 2. The Requirements Are Not Reasonably Related To The Byrne JAG Program's Purpose.

The Notice, Access, and Section 1373 Requirements also violate the Spending Clause for an additional reason: they violate the basic requirement that conditions imposed on federal grants must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (holding that the "Federal

Government . . . may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs").

Here, the Requirements are not reasonably related to Congress' purpose in creating and funding the Byrne JAG grant program. Congress' purpose in creating the current Byrne JAG program was to give state and local governments the ability "to use the grants constructively" to combat crime and to further criminal justice policies related to one of the statutorily defined purpose areas. H.R. Rep. 109-233, at 89. Congress made clear it did not seek to micromanage jurisdictions' use of Byrne JAG funds. To that end, Congress left local jurisdictions free to use Byrne JAG funds as they saw fit as long as their programming related to one of eight purpose areas related to criminal justice. *See* p. 3, *supra*; *see also* 34 U.S.C. § 10152(a)(1)(A)–(H). Not one of these purpose areas is related to federal immigration enforcement. Indeed, the Notice, Access, and Section 1373 Requirements have no relationship whatsoever to the purpose of the Byrne JAG program.

To try to invent a connection, the Attorney General has sought to draw a false connection between federal civil immigration enforcement and criminal law. But the Supreme Court has made clear that presence in this country without documentation is not a crime. *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States."); *see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 790 n. 15 (9th Cir. 2014). That certain provisions of the Immigration and Nationality Act establishing grounds of deportability for criminal offenses does not change the calculus since "[i]mmigration law has nothing to do with the enforcement of local criminal laws." *City of Philadelphia v. Sessions*, No. CV 17-3894, 2017 WL 5489476, at *48 (E.D. Pa. Nov. 15, 2017). Thus, there is no basis for the Attorney General to argue that these new Requirements will further criminal justice goals.

### 3. The Notice and Access Requirements Attempt To Induce Local Governments To Act Unconstitutionally.

Finally, the Notice and Access Requirements violate the constitutional directive that federal funding conditions "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. The Notice Requirement, as originally articulated, required jurisdictions to give the federal government 48 hours' advance notice of an inmate's release

time.  FAC Exh. B at 38.  It thus operated as a back-door detainer request, effectively compelling jurisdictions to hold inmates for a minimum of 48 hours, even if they would otherwise have been released.  The Access Requirement likewise threatens to delay an inmate's release, in circumstances where ICE's access and subsequent interrogation prolong the inmate's detention.  As numerous courts have recognized, such detentions violate the Fourth Amendment.  *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 217–18 (1st Cir. 2015).

OJP's purported revisions to the Notice Requirement do not remedy the problem.  Although Defendants now attempt to narrow that Requirement, there is no certainty that they will not revert to the broader interpretation that appeared in the Local Solicitation.  *See San Francisco v. Trump*, 267 F. Supp. 3d at 1210–14 (rejecting an "illusory promise" to enforce an executive order more narrowly than written).  And even with Defendants' qualifications, the Notice Requirement still refers to a "scheduled release date and time," and does not acknowledge that many inmates may be released with little or no notice, leaving San Francisco unable to provide any notice whatsoever.  In these circumstances, San Francisco could still be forced to unconstitutionally delay an inmate's release.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Dated: February 2, 2018

                                        DENNIS J. HERRERA
                                        City Attorney


                                By: */s/ Sara J. Eisenberg*
                                        SARA J. EISENBERG
                                        Deputy City Attorney

                                        Attorneys for Plaintiff
                                        CITY AND COUNTY OF SAN FRANCISCO