DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:          brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Plaintiff,<br><br>     vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, ALAN R. HANSON, Acting Assist. Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100,<br><br>     Defendants. | Case No. 3:17-CV-04642-WHO<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge:          Honorable William H. Orrick<br>Hearing Date:  February 28, 2018<br>Time:           2:00 p.m.<br>Place:          Courtroom 2, 17th Floor<br><br>Trial Date:     December 10, 2018 |

**REQUEST FOR JUDICIAL NOTICE**

Plaintiff City and County of San Francisco hereby respectfully requests, pursuant to Federal Rule of Evidence 201, that this Court take judicial notice of the following material in support of its Motion for Summary Judgment.

1.      Attached hereto as **Exhibit A** is a true and correct copy of a U.S. Department of Justice Press Release dated March 27, 2017 and titled, "Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions."  As of February 2, 2018, this Press Release is posted on Department of Justice's official government website, at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

2.      Attached hereto as **Exhibit B** is a true and correct copy of a U.S. Department of Justice Press Release dated July 12, 2017 and titled, "Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime."  As of February 2, 2018, the Press Release is posted on the Department of Justice's official government website, at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

3.      Attached hereto as **Exhibit C** is a true and correct copy of a Letter from Jon Adler, Director of the Bureau of Justice Assistance, Office of Justice Programs, to Mark Farrell, Mayor, City and County of San Francisco, dated January 24, 2018.  As of February 2, 2018, a copy of this Letter is posted on the Department of Justice's official government website at https://www.justice.gov/opa /press-release/file/1028311/download.

4.      Attached hereto as **Exhibit D** is a true and correct copy of a U.S. Department of Justice Press Release dated October 12, 2017, and titled "Justice Department Provides Last Chance for Cities to Show 1373 Compliance."  As of February 2, 2018, this Press Release is posted on the Department of Justice's official government website, at https://www.justice.gov/opa/pr/justice-department-provides-last-chance-cities-show-1373-compliance.

5.      Attached hereto as **Exhibit E** is a true and correct copy of a Letter from Alan Hanson, Acting Assistant Attorney General, U.S. Department of Justice, to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal Justice, dated October 11, 2017.  As of February 2, 2018, a

copy of this Letter is posted on the Department of Justice's official government website at https://www.justice.gov/opa/press-release/file/1003041/download.

6.      Attached hereto as **Exhibit F** is a true and correct copy of San Francisco Board of Supervisors Ordinance No. 96–16, File No. 160022 (approved June 17, 2016, effective July 17, 2016). As of February 2, 2018, a copy of the ordinance is posted on the San Francisco Board of Supervisors' official government website, at http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/ordinances16/o0096-16.pdf.

7.      Attached hereto as **Exhibit G** is a true and correct copy of a Report authored by the Department of Justice Office of the Inspector General Audit Division titled "Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States" and dated January 2007.  As of February 2, 2018, this Report is posted on the Department of Justice official government website at https://oig.justice.gov/reports/OJP/a0707/final.pdf.

8.      Attached hereto as **Exhibit H** is a true and correct copy of a Memorandum from Micki Callahan, Director of the San Francisco Department of Human Resources, to All City and County of San Francisco Employees, dated January 19, 2017 and titled "Reminder about Sanctuary City Obligations."  As of February 2, 2018, the Memorandum is available on the Department of Human Resources website, at http://sfdhr.org/sites/default/files/documents/Notices-and-Reports/Sanctuary-City-Reminder-1-19-17.pdf.

9.      Attached hereto as **Exhibit I** is a true and correct copy of a Memorandum authored by Norwood J. Jackson, Deputy Controller of the Office of Federal Financial Management, dated August 29, 1997 and titled "Recompilation of OMB Circular A-102."  As of February 2, 2018, the Memorandum is available on The White House official government website at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A102/a102.pdf.

10.     Attached hereto as **Exhibit J** is a true and correct copy of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, filed before the United States District Court, for the Eastern District of Pennsylvania as Docket No. 28 on October 12, 2017 in the case of *The City of Philadelphia v. Jeff Sessions,* Case No. 2:17-cv-03894-MMB.

1   Each of these exhibits is a matter of public record and is therefore subject to judicial notice.

2   Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (a court may

3   judicially notice matters of public record unless the matter is a fact subject to reasonable dispute).

4   **Exhibits A, B, C, D, E, and H** are judicially noticeable because the statements of

5   governmental officials that they contain are not subject to reasonable dispute, as the statements "can

6   be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

7   Fed. R. Evid. § 201(b)(2).

8   **Exhibits A, B, C, D, E, G, H, and I** are judicially noticeable because government memoranda,

9   bulletins, reports, letters and statements are matters of public record appropriate for judicial notice.

10   *See Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005) (judicially noticing an administrative

11   bulletin); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (court may take

12   judicial notice of records and reports of state administrative bodies), o*verruled on other grounds by*

13   *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 (1991); *Interstate Nat. Gas. Co. v.*

14   *S. Cal. Gas. Co., 209 F.2d 380, 385 (9th Cir. 1953) (judicially noticing government agency records*

15   *and reports).*

16   **Exhibit F** is judicially noticeable because it is a San Francisco ordinance and part of the

17   San Francisco Administrative Code's legislative history.  See *Chaker v. Crogan*, 428 F.3d 1215, 1223

18   n.8 (9th Cir. 2005) (judicially noticing a state statute's legislative history); *Rabkin v. Dean*, 856 F.

19   Supp. 543, 546 (N.D. Cal. 1994) ("The Court may take judicial notice of city charters, city ordinances

20   and resolutions, and the contents and legislative history of a proposed city ordinance or resolution.").

21   **Exhibit J** is judicially noticeable because it is a court record from a proceeding that addresses

22   issues relevant to this litigation.  *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,

23   971 F.2d 244, 248 (9th Cir. 1992) (holding that a court "may take notice of proceedings in other

24   courts, both within and without the federal judicial system, if those proceedings have a direct relation

25   to matters at issue").

26   **Exhibits A, B, C, D, E, F, G, H and I** are also judicially noticeable because they are posted to

27   official government websites.  *See Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir.

28   2010) (judicially noticing information contained on a government website); *Paralyzed Veterans of*

*America v. McPherson*, No. C 06–4670 SBA, 2008 WL 4183981, at \*5 (N.D. Cal. Sept. 9, 2008) (finding that courts commonly take judicial notice of information and documents on government websites, and citing cases from various jurisdictions).  Thus the statements of government departments and agencies contained within these exhibits are not subject to reasonable dispute, as the statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. § 201(b)(2).

Dated:    February 2, 2018

DENNIS J. HERRERA
City Attorney


By: */s/ Sara J. Eisenberg*
SARA J. EISENBERG
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# EXHIBIT A

## JUSTICE NEWS

**Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions**

Washington, DC ~ Monday, March 27, 2017

Good afternoon.  The Department of Justice has a duty to enforce our nation's laws, including our immigration laws.  Those laws require us to promptly remove aliens when they are convicted of certain crimes.

The vast majority of the American people support this common-sense requirement.  According to one recent poll, 80 percent of Americans believe that cities that arrest illegal immigrants for crimes should be required to turn them over to immigration authorities.

Unfortunately, some states and cities have adopted policies designed to frustrate the enforcement of our immigration laws.  This includes refusing to detain known felons under federal detainer requests, or otherwise failing to comply with these laws.  For example, the Department of Homeland Security recently issued a report showing that in a single week, there were more than 200 instances of jurisdictions refusing to honor Immigration and Customs Enforcement (ICE) detainer requests with respect to individuals charged or convicted of a serious crime.  The charges and convictions against these aliens include drug trafficking, hit and run, rape, sex offenses against a child and even murder.

Such policies cannot continue.  They make our nation less safe by putting dangerous criminals back on our streets.

We all remember the tragic case of Kate Steinle, the 32-year-old woman who was shot and killed two years ago in San Francisco as she walked along a pier with her father.  The shooter, Francisco Sanchez, was an illegal immigrant who had already been deported five times and had seven felony convictions.

Just eleven weeks before the shooting, San Francisco had released Sanchez from its custody, even though ICE had filed a detainer requesting that he be kept in custody until immigration authorities could pick him up for removal.  Even worse, Sanchez admitted that the only reason he came to San Francisco was because of its sanctuary policies.

A similar story unfolded just last week, when Ever Valles, an illegal immigrant and Mexican national, was charged with murder and robbery of a man at a light rail station.  Valles was released from a Denver jail in late December, despite the fact that ICE had lodged a detainer for his removal.

The American people are justifiably angry.  They know that when cities and states refuse to help enforce immigration laws, our nation is less safe.  Failure to deport aliens who are convicted for criminal offenses puts whole communities at risk – especially immigrant communities in the very sanctuary jurisdictions that seek to protect the perpetrators.

DUIs, assaults, burglaries, drug crimes, gang crimes, rapes, crimes against children and murders.  Countless Americans would be alive today – and countless loved ones would not be grieving today – if the policies of these sanctuary jurisdictions were ended.

Not only do these policies endanger the lives of every American; just last May, the Department of Justice Inspector General found that these policies also violate federal law.

The President has rightly said that this disregard for the law must end.  In his executive order, he stated that it is the policy of the executive branch to ensure that states and cities comply with all federal laws, including our immigration laws.

The order also states that "the Attorney General and the Secretary [of Homeland Security] . . . shall ensure that jurisdictions that willfully refuse to comply" with the law "are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."

Today I am urging all states and local jurisdictions to comply with all federal laws, including 8 U.S.C. Section 1373. Moreover, the Department of Justice will require jurisdictions seeking or applying for Department grants to certify compliance with Section 1373 as a condition for receiving these awards.

This policy is entirely consistent with the Department of Justice's Office of Justice Programs (OJP) guidance issued last July under the previous administration. This guidance requires state and local jurisdictions to comply and certify compliance with Section 1373 in order to be eligible for OJP grants. It also made clear that failure to remedy violations could result in withholding of grants, termination of grants, and disbarment or ineligibility for future grants.

The Department of Justice will also take all lawful steps to claw-back any funds awarded to a jurisdiction that willfully violates Section 1373.

In the current fiscal year, department's OJP and Community Oriented Policing Services anticipate awarding more than $4.1 billion dollars in grants.

I urge our nation's states and cities to consider carefully the harm they are doing to their citizens by refusing to enforce our immigration laws, and to re-think these policies. Such policies make their cities and states less safe, and put them at risk of losing valuable federal dollars.

The American people want and deserve a lawful immigration system that keeps us safe and serves our national interest. This expectation is reasonable, and our government has a duty to meet it. And we will meet it.

---

**Speaker:**
Attorney General Jeff Sessions

**Component(s):**
Office of the Attorney General

*Updated March 31, 2017*

# EXHIBIT B

JUSTICE NEWS

**Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime**

Las Vegas, NV ~ Wednesday, July 12, 2017

---

Good morning. It is an honor and a privilege to be here with you all—with the selfless and courageous men and women of law enforcement. Thank you for all you do to keep us safe.

I want to thank acting U.S. Attorney (Steven) Myhre for his hospitality and for his over 25 years of public service as a prosecutor.

Thank you also to Attorney General Laxalt. You all have a real fighter here with him: an Iraq veteran, a champion for his constituents, and now a leader with a national profile. Thank you very much, Adam.

Speaking of fights, as you all know, we have a multi-front battle in front of us right now: an increase in violent crime, vicious gangs, an opioid epidemic, threats from terrorism, and human traffickers.

Since the early 1990s, the crime rate has steadily come down across the country—that is, until two years ago.

Now, violent crime is once again on the rise in many parts of America. The murder rate, for example, has surged 10 percent nationwide in just one year — the largest increase since 1968.

These numbers are shocking, and they are informative, but the numbers are not what is most important. What's most important are the people behind the numbers. Each one of the victims of these crimes had a family, friends, and neighbors. They're all suffering, too.

You know the stories all too well. Right now, Las Vegas is mourning the death of 18-year old Eric Brooks, a football star who just graduated from Spring Mountain High School. He had a promising life ahead of him, a life we will never get to see. Witnesses say that he was sitting on a park bench just before he was shot and bled to death in the street.

Too many in our communities have to live in constant fear of violence breaking out in a park, or in their own neighborhoods. Too many are living as hostages in their own homes.

We cannot accept this status quo, and this Department of Justice will not accept it. Every American has the right to be safe in their homes and in their neighborhoods.

The first and most important job of this government—and any government—is to protect the safety and the rights of its people. If we fail at this task, then every other government initiative ceases to be important.

As law enforcement officials, we have the responsibility to stop—and reverse—the surge in violent crime and opioids that has taken place over the last two years. And under President Trump's leadership, this Department of Justice will answer the call and do its part.

To that end, I have directed our federal prosecutors to work closely with our law enforcement partners at the federal, state, local, and tribal levels to combat violent crime and take violent criminals off our streets.

As we all know, the vast majority of people just want to obey the law and live their lives. A disproportionate amount of crime is committed by a small group of criminals. And the more of them we apprehend, prosecute, and convict, the more crime we can deter.

Budgets are tight, but we've worked hard to free money and positions from DC to our US Attorney offices.

We will use those funds to hire 300 more Assistant United States Attorneys and then deploy those resources nationwide to where they are most needed to fight the scourge of crime.

Case 3:17-cv-04642-WHO   Document 68-2   Filed 02/02/18   Page 3 of 4

You all are on the front lines of this fight. In Nevada, Doctors are writing 94 prescriptions for painkillers per 100 residents. Unbelievable. I understand that your criminal chief and another prosecutor did battle in trial for 10 weeks to convict a dirty doctor and his medical assistant for supplying drug dealers with opioids here in Las Vegas. That is exactly what we need to be doing: holding those responsible for their crimes, even when it is difficult. That is commitment and leading by example.

I also want to applaud these investigators and prosecutors for going after those who prey upon our children. We must make this a top priority. The horrific nature of enticement, kidnapping, and human trafficking cannot be overstated. Those who seek to profit off of the exploitation of our children must be made to feel the weight of swift and certain justice.

Having been a prosecutor for 14 years, I know firsthand that each one of these prosecutions is the result of countless hours of work by our law enforcement partners: witness interviews, reports of investigation, dangerous search warrants, and computer forensics. It is a true team effort. To those law enforcement partners: THANK YOU. You do this work at great personal sacrifice and peril. You don't get to take a case off or phone it in. A lapse in vigilance can mean grave consequences. Thank You.

Further, under President Trump's leadership, we are finally getting serious about securing our border. In fact, we are already seeing the positive results of this, with illegal border crossings falling to their lowest monthly figure in at least 17 years. That makes all of us safer.

We are enforcing our immigration laws, including right here in Nevada. In March, ICE arrested 61 foreign nationals in Nevada, 55 of whom had criminal histories. Their crimes include sex offenses, drug offenses, and domestic violence. Removing criminals like these from our streets makes Nevada safer.

With that in mind, I have directed our federal prosecutors to make criminal immigration enforcement a priority, and to appoint a Border Security Coordinator in each of their offices. Through these initiatives, we are going to remove dangerous criminals from our neighborhoods and dismantle the transnational cartels, drug traffickers and gangs that inflict violence and peddle poison in our communities.

This Department is especially focused on combatting the threat posed by transnational criminal organizations like MS-13, whose tentacles stretch from the Salvadoran prison system across the United States. They have a motto: "kill, rape, control." And that is what they do every day.

Violent gangs have murdered children and pregnant women; they have executed and permanently disfigured innocent bystanders to their crimes, and they have attacked innocent people with chains, bats, and machetes.

They also destroy the lives of the middle schoolers they recruit for membership, the young girls they entrap, gang rape, and ultimately traffic for illicit sex, and the drugs they smuggle across our borders and sell on our streets.

We will combat this threat, take the fight to them, and dismantle these criminal enterprises. It will not be easy, but I have complete faith in our prosecutors and our law enforcement at every level.

Whether it is MS-13, the Bloods, or Outlaw Motorcycle Clubs, gangs have their sights set on our youth and law-abiding citizens, but we have trained our sights on them.

To take these gangs off of our streets, we need cooperation between law enforcement at the federal, state, and local levels. I understand that we have a good measure of that cooperation right here in Las Vegas and that the Sheriff has enrolled his force in ICE's 287 G program which allows his local deputies to enforce immigration law. This is just the type of force multiplier that we need.

Unfortunately, this cooperation has been impeded by the policies of some cities and states. Some 300 jurisdictions in this country refuse to cooperate with federal immigration authorities regarding illegal aliens who commit crimes — even MS-13 gang members. These jurisdictions are protecting criminals rather than their law-abiding residents.

Now I want to be clear about this: local police are not the problem. I know that you want to help. The problem is that politicians have forbidden you to help. That makes all of us—and especially police officers on the front lines—less safe.

When cities like Philadelphia, Boston, or San Francisco advertise that they have these policies, the criminals take notice.

Case 3:17-cv-04642-WHO   Document 68-2   Filed 02/02/18   Page 4 of 4

According to a recent study from the University of California Riverside, cities with these policies have more violent crime on average than those that don't. We all know the story of Kate Steinle, who was murdered in cold blood two years ago this month. She was walking a pier in San Francisco with her father when an illegal alien—who had been deported five times and committed seven felonies—shot her in the back.

Her death was preventable—and it should have been prevented. She would still be alive today if her killer had been imprisoned or deported, as he should have been.

He walked the streets freely because San Francisco refuses to cooperate with ICE. In fact, he admitted that one reason he was in San Francisco that day was that he knew the city had these policies in place.

Now most cities and states do not have these policies—because the vast majority of the American people agree that these policies are wrong. According to one poll, 80 percent of the public believes that cities should turn over criminal illegal aliens to immigration officials.

Fortunately, Congress is listening to the American people and taking action. Almost two weeks ago, the House passed bipartisan legislation would increase penalties on illegal aliens who break our laws and the jurisdictions that attempt to shield them from justice. I hope that my former colleagues in the Senate will take up this legislation soon.

The American people want and deserve a lawful immigration system that keeps us safe and serves our national interest. And this is not asking too much. This expectation is fair; it is reasonable, and it is our duty to meet it.

The Department of Justice will not concede a single block or street corner in the United States to lawlessness or crime. We will work to strengthen our partnerships with you—law enforcement on the front lines. You are ultimately the most effective resources that we as a country have in this effort.

Many of you are working in the same neighborhoods where you grew up. You know what's at stake. You know that the safety and peace of mind of us all depends on you.

But you can also know this: we have your back and you have our deepest thanks.

Thank you.

---

**Topic(s):**
Violent Crime

**Component(s):**
Office of the Attorney General

*Updated July 12, 2017*

# EXHIBIT C



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

*Washington, D.C. 20531*

January 24, 2018

Mark Farrell
Mayor
City and County of San Francisco
1 Dr. Carlton B. Goodlett Place, Suite 496
San Francisco, California 94102

RE: Document request for Grant 2016-DJ-BX-0898, City and County of San Francisco, California

Dear Mayor Farrell:

Thank you for your response to our November 15, 2017, letter regarding your jurisdiction's compliance with 8 U.S.C. § 1373, a federal law with which your jurisdiction must comply as an eligibility requirement for receiving Byrne Justice Assistance Grant (Byrne JAG) funding from the Department of Justice (Department or DOJ). After reviewing your response, the Department remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373, or, at a minimum, that they may be interpreted or applied in a manner inconsistent with section 1373.

In light of these concerns, the Department is requesting certain documents as described below. This request is made consistent with 2 CFR § 200.336, as adopted by Department regulation 2 CFR § 2800.101. In your FY 2016 Byrne JAG award, you agreed to the following (listed as special condition #23):

> [The recipient agrees to] cooperate with [the Bureau of Justice Assistance ("BJA")] and [Office of the Chief Financial Officer ("OCFO")] on all grant monitoring requests.... The recipient [also] agrees to provide to BJA and OCFO all documentation necessary to complete monitoring tasks, including documentation related to any subawards made under this award. Further, the recipient agrees to abide by reasonable deadlines set by BJA and OCFO for providing the requested documents. Failure to cooperate with BJA's/OCFO's grant monitoring activities may result in sanctions affecting the recipient's DOJ awards, including but not limited to withholdings and/or other restrictions on the recipient's access to grant funds; referral to the Office of the Inspector General for audit review; designation of the recipient as a DOJ High Risk grantee; or termination of an award(s).

Please respond to the below request by providing to Chris Casto, BJA, at ███████████.gov by no later than February 23, 2018, all responsive documents, consistent with the instructions in Attachment A.

Documents Requested:

> All documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees (including, but not limited to, police officers, correctional officers, and contract employees), whether formal or informal, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly.

BJA will review your submissions and seek additional information, if necessary.  The Department fully anticipates your complete cooperation in this matter.  Should you fail to respond in a complete and timely manner, the Department will subpoena these documents in accordance with 34 U.S.C. §§ 10225, 10221, 10230, 10151 – 10158, 10102(a)(6), 10110, and 10110 note.

These materials are critical to our ongoing review.  Should the Department determine your jurisdiction is out of compliance with section 1373, the Department may, as detailed in your award documents, seek return of your FY 2016 grant funds, require additional conditions for receipt of any FY 2017 Byrne JAG funding for which you have applied, and/or deem you ineligible for FY 2017 Byrne JAG funds.

Thank you for your prompt attention to this request.  We look forward to working through this matter with you.  Any specific questions concerning this request can be sent to directly to Tracey Trautman, BJA Deputy Director, at ███████████.gov or call (202) █████.

Sincerely,

Jon Adler, Director
Bureau of Justice Assistance
Office of Justice Programs
810 7th Street NW
Washington, DC 20531

# EXHIBIT D

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                              Thursday, October 12, 2017

## Justice Department Provides Last Chance for Cities to Show 1373 Compliance

The Justice Department today responded to seven jurisdictions following a preliminary assessment of the jurisdictions' compliance with 8 U.S.C. 1373. These jurisdictions were identified in a May 2016 report by the Department of Justice's Inspector General as having laws that potentially violate 8 U.S.C. 1373.

The following jurisdictions have preliminarily been found to have laws, policies, or practices that may violate 8 U.S.C. 1373:

- Cook County, Illinois;
- Chicago, Illinois;
- New Orleans, Louisiana;
- New York, New York; and
- Philadelphia, Pennsylvania.

The department found no evidence that the following jurisdictions are currently out of compliance with 8 U.S.C. 1373:

- Milwaukee County, Wisconsin; and
- the State of Connecticut.

The department also previously sent letters to the following jurisdictions notifying them that the department found no evidence that they are currently out of compliance with 8 U.S.C. 1373:

- Clark County, Nevada; and
- Miami-Dade County, Florida.

Jurisdictions that were found to have possible violations of 8 U.S.C 1373 will have until Oct. 27, 2017 to provide additional evidence that the interpretation and application of their laws, policies, or practices comply with the statute.

"Jurisdictions that adopt so-called 'sanctuary policies' also adopt the view that the protection of criminal aliens is more important than the protection of law-abiding citizens and of the rule of law," said Attorney General Jeff Sessions. "I commend the Milwaukee County Sheriff's Office and the State of Connecticut on their commitment to complying with Section 1373,

and I urge all jurisdictions found to be out of compliance in this preliminary review to reconsider their policies that undermine the safety of their residents. We urge jurisdictions to not only comply with Section 1373 but to establish sensible and effective partnerships to properly process criminal aliens."

**Attachment(s):**

Download Chicago 1373 Compliance Determination Letter

Download Connecticut 1373 Compliance Determination Letter

Download Cook County 1373 Compliance Determination Letter

Download Milwaukee County 1373 Compliance Determination Letter

Download New Orleans 1373 Compliance Determination Letter

Download New York 1373 Compliance Determination Letter

Download Philadelphia 1373 Compliance Determination Letter

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-1140

*Updated October 12, 2017*

# EXHIBIT E



**U.S. Department of Justice**

Office of Justice Programs

_____

*Washington, D.C.  20531*

October 11, 2017

Elizabeth Glazer
Director
New York City Mayor's Office of Criminal Justice
1 Centre Street, Room 1012N
New York, NY  10007-1602

Dear Ms. Glazer,

Your FY 2016 Byrne JAG grant award required you to comply with 8 U.S.C. § 1373; to undertake a review to validate your jurisdiction's compliance with 8 U.S.C. § 1373; and to submit documentation, including an official legal opinion from counsel, adequately supporting the validation.  Thank you for your recent submission. The Department of Justice has reviewed your submission, all attached documentation, and your jurisdiction's laws, policies, and practices relating to compliance with section 1373, to the extent they were provided or are readily available.

This letter is to inform you that, based on a preliminary review, the Department has determined that your jurisdiction appears to have laws, policies, or practices that violate 8 U.S.C. § 1373.  These laws, policies, or practices include, but may not be limited to:

- <u>Executive Order No. 41</u>. Section 4 of the Executive Order states that police officers "shall not inquire about a person's immigration status unless investigating illegal activity other than mere status as an undocumented alien."  Under 8 U.S.C. § 1373(b)(1), however, New York may not "in any way restrict" the "requesting" of "information regarding . . . immigration status" from federal immigration officers.  On its face, the Department has determined that the Executive Order appears to bar New York officers from requesting information regarding immigration status from federal immigration officers.  In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies this section to not restrict New York officers and employees from requesting information regarding immigration status from federal immigration officers.  The Department has also determined that New York would need to certify that it has communicated this interpretation to its officers and employees.  If New York cannot provide this certification, the Department has determined that this provision violates section 1373(b).

- Executive Order No. 41. Section 2 of the Executive Order states that New York officers and employees "shall [not] disclose confidential information," which is defined to include "immigration status." Section 2(b) and (e) contain a few exceptions, including when "disclosure is required by law." In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies this Order to not restrict New York officers and employees from sharing information regarding immigration status with federal immigration officers. The Department has also determined that New York would need to certify that it has communicated this interpretation to its officers and employees. If New York cannot provide this certification, the Department has determined that this provision violates section 1373(a).

- New York Administrative Code § 9-131. Section 9-131(b) states that New York City Department of Corrections may not "honor a civil immigration detainer . . . by notifying federal immigration authorities of [a] person's release," except in certain limited circumstances.[1] Section 9-131(d) states that this law shall not be construed to "prohibit any city agency from cooperating with federal immigration authorities when required under federal law." It also states that this law shall not be construed to "create any . . . duty or obligation in conflict with any federal . . . law." In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies Section 9-131(b) and (d) to not restrict New York officers from sharing information regarding immigration status with federal immigration officers, including information regarding the date and time of an alien's release from custody. The Department has also determined that New York would need to certify that it has communicated this interpretation to its officers and employees. If New York cannot provide this certification, the Department has determined that this provision violates section 1373(a).

- New York Administrative Code § 9-131. Section 9-131(h)(1) states that New York City Department of Corrections personnel shall not "expend time while on duty or department resources . . . in response to federal immigration inquiries or in communicating with federal immigration authorities regarding any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody, other than information related to a person's citizenship or immigration status," except where certain exceptions apply. As discussed above, section 9-131(d) states that this law shall not be construed to "prohibit any city agency from cooperating with federal immigration authorities when required under federal law." It also states that this law

---

[1] An ICE detainer form ordinarily requests that a jurisdiction (1) provide advance notice of the alien's release; and (2) maintain custody of the alien for up to 48 hours beyond the scheduled time of release. The Department is not relying on New York's restriction of the latter form of cooperation in this preliminary assessment.

shall not be construed to "create any . . . duty or obligation in conflict with any federal . . . law." In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies Section 9-131(h) and (d) to not restrict New York officers from sharing information regarding immigration status with federal immigration officers, including information regarding an alien's incarceration status and release date and time. The Department has also determined that New York would need to certify that it has communicated this interpretation to its officers and employees. If New York cannot provide this certification, the Department has determined that this provision violates section 1373(a).

Your jurisdiction may submit a response to this preliminary assessment, as well as any additional evidence you would like the Department to consider, before it reaches its final determination. Please submit all additional documentation by October 27, 2017. Once the Department has had an opportunity to review your submission, the Department will notify you of its final determination.

This letter reflects the Department's preliminary assessment of your jurisdiction's compliance with 8 U.S.C. § 1373. This letter does not constitute final agency action and nothing in this letter creates any right or benefit enforceable at law against the United States. Additionally, as the United States continues to collect information about your jurisdiction, it reserves the right to identify additional bases of potential violations of 8 U.S.C. § 1373.

Sincerely,

Alan Hanson
Acting Assistant Attorney General

3

# EXHIBIT F

AMENDED IN BOARD

FILE NO.  160022                     5/24/2016                     ORDINANCE NO.  **96-16**

[Administrative Code - Due Process for All and Sanctuary]

**Ordinance amending the Administrative Code to prohibit the use of City funds or resources to assist in the enforcement of Federal immigration law, except for individuals who have been convicted of a violent <u>or serious</u> felony and held to answer for a violent <u>or serious</u> felony <u>and modifying reporting requirements</u>.**

NOTE:     **Unchanged Code text and uncodified text** are in plain Arial font.
          **Additions to Codes** are in <u>*single-underline italics Times New Roman font*</u>.
          **Deletions to Codes** are in ~~*strikethrough italics Times New Roman font*~~.
          **Board amendment additions** are in <u>double-underlined Arial font</u>.
          **Board amendment deletions** are in ~~strikethrough Arial font~~.
          **Asterisks (\*   \*   \*   \*)** indicate the omission of unchanged Code
          subsections or parts of tables.

Be it ordained by the People of the City and County of San Francisco:

Section 1.  The Administrative Code is hereby amended by revising Section 12H.2 and deleting Section 12H.2-1 in Chapter 12H, and revising Sections 12I.1, 12I.2, 12I.3, 12I.4, and 12I.5 in Chapter 12I, to read as follows:

**SEC. 12H.2.  USE OF CITY FUNDS PROHIBITED.**

No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding ~~the immigration or~~ <u>*release*</u> status of individuals <u>or any other such personal information as defined in Chapter 12I</u> in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter <u>*12H*</u> shall include, but shall not be limited to:

(a)   Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency

charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, *except as permitted under Administrative Code Section 12I.3*.

(b)   Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c)   Requesting information about, or disseminating information, *in one's official capacity,* regarding, the ~~immigration or~~ *release* status of any individual or any other such personal information as defined in Chapter 12I, *except as permitted under Administrative Code Section 12I.3,* or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d)   Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

~~*SEC. 12H.2-1.  CHAPTER PROVISIONS INAPPLICABLE TO PERSONS CONVICTED OF CERTAIN CRIMES.*~~

~~*Nothing in this Chapter shall prohibit, or be construed as prohibiting, a Law Enforcement Officer from identifying and reporting any adult pursuant to State or Federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. In addition, nothing in this Chapter shall prohibit, or be construed as prohibiting, a Law Enforcement Officer from identifying and reporting any juvenile who is*~~

1    *suspected of violating the civil provisions of the immigration laws if: (1) the San Francisco District*

2    *Attorney files a petition in the juvenile court alleging that the minor is a person within the description*

3    *of Section 602(a) of the California Welfare and Institutions Code and the juvenile court sustains a*

4    *felony charge based upon the petition; (2) the San Francisco Superior Court makes a finding of*

5    *probable cause after the District Attorney directly files felony criminal charges against the minor in*

6    *adult criminal court; or (3) the San Francisco Superior Court determines that the minor is unfit to be*

7    *tried in juvenile court, the minor is certified to adult criminal court, and the Superior Court makes a*

8    *finding of probable cause in adult criminal court.*

9    *Nothing in this Chapter shall preclude any City and County department, agency, commission,*

10   *officer or employee from (a) reporting information to the Federal agency charged with enforcement of*

11   *the Federal immigration law regarding an individual who has been booked at any county jail facility,*

12   *and who has previously been convicted of a felony committed in violation of the laws of the State of*

13   *California, which is still considered a felony under State law; (b) cooperating with a request from the*

14   *Federal agency charged with enforcement of the Federal immigration law for information regarding an*

15   *individual who has been convicted of a felony committed in violation of the laws of the State of*

16   *California, which is still considered a felony under State law; or (c) reporting information as required*

17   *by Federal or State statute, regulation or court decision, regarding an individual who has been*

18   *convicted of a felony committed in violation of the laws of the State of California, which is still*

19   *considered a felony under State law. For purposes of this Section, an individual has been "convicted"*

20   *of a felony when: (a) there has been a conviction by a court of competent jurisdiction; and (b) all direct*

21   *appeal rights have been exhausted or waived; or (c) the appeal period has lapsed.*

22   *However, no officer, employee or law enforcement agency of the City and County of San*

23   *Francisco shall stop, question, arrest or detain any individual solely because of the individual's*

24   *national origin or immigration status. In addition, in deciding whether to report an individual to the*

25   *Federal agency charged with enforcement of the Federal immigration law under the circumstances*

Supervisors Avalos; Campos, Kim, Mar, Peskin
**BOARD OF SUPERVISORS**

1    ~~described in this Section, an officer, employee or law enforcement agency of the City and County of San~~

2    ~~Francisco shall not discriminate among individuals on the basis of their ability to speak English or~~

3    ~~perceived or actual national origin.~~

4    ~~This Section shall not apply in cases where an individual is arrested and/or convicted for failing~~

5    ~~to obey a lawful order of a Police Officer during a public assembly or for failing to disperse after a~~

6    ~~Police Officer has declared an assembly to be unlawful and has ordered dispersal.~~

7    ~~Nothing herein shall be construed or implemented so as to discourage any person, regardless of~~

8    ~~immigration status, from reporting criminal activity to law enforcement agencies.~~

9    **SEC. 12I.1.  FINDINGS.**

10   The City and County of San -Francisco (the "City") is home to persons of diverse racial,

11   ethnic, and national backgrounds, including a large immigrant population. The City respects,

12   upholds, and values equal protection and equal treatment for all of our residents, regardless

13   of immigration status. Fostering a relationship of trust, respect, and open communication

14   between City employees and City residents is essential to the City's core mission of ensuring

15   public health, safety, and welfare, and serving the needs of everyone in the community,

16   including immigrants. The purpose of this Chapter *12I, as well as of Administrative Code Chapter*

17   *12H,* is to foster respect *and trust* between law enforcement and residents, to protect limited

18   local resources, *to encourage cooperation between residents and City officials, including especially*

19   *law enforcement and public health officers and employees,* and to ensure ~~family unity,~~ community

20   security, and due process for all.

21   ~~Our federal immigration system is in dire need of comprehensive reform.~~ *The United States*

22   *Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration*

23   *laws.  ICE's programs, including Secure Communities and its replacement, the Priority Enforcement*

24   *Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its*

25   *enforcement efforts.  In its description of PEP, ICE explains that all requests under PEP are for*

1   *voluntary action and that any request is not an authorization to detain persons at the expense of the*

2   *federal government.*  The federal government should not shift the *financial* burden of federal civil

3   immigration enforcement*, including personnel time and costs related to notification and detention,*

4   onto local law enforcement by requesting that local law enforcement agencies continue

5   detaining persons based on non-mandatory civil immigration detainers *or cooperating and*

6   *assisting with requests to notify ICE that a person will be released from local custody*. It is not a wise

7   and effective use of valuable City resources at a time when vital services are being cut.

8   ~~The United States Immigration and Customs Enforcement's~~ "ICE *'s*" ~~controversial~~ Secure

9   Communities program (also known as "S-Comm") shift~~s~~*ed* the burden of federal civil

10   immigration enforcement onto local law enforcement. S-Comm ~~comes~~ *came* into operation after

11   the state ~~sends~~ *sent* fingerprints that state and local law enforcement agencies ha~~ve~~*ed*

12   transmitted to *the* California Department of Justice ("Cal DOJ") to positively identify the

13   arrestees and to check their criminal history. The FBI *would* forward~~s~~ the fingerprints to the

14   Department of Homeland Security (*"DHS") to be checked against immigration and other

15   databases. To give itself time to take a detainee into immigration custody, ICE *would* send~~s~~ an

16   Immigration Detainer – Notice of Action (DHS Form I-247) to the local law enforcement official

17   requesting that the local law enforcement official hold the individual for up to 48 hours after

18   that individual would otherwise be released ("civil immigration detainers"). Civil Immigration

19   detainers may be issued without evidentiary support or probable cause by border patrol

20   agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and

21   immigration adjudication officers.

22     Given that civil immigration detainers are issued by immigration officers without judicial

23   oversight, and the regulation authorizing civil immigration detainers provides no minimum

24   standard of proof for their issuance, there are serious questions as to their constitutionality.

25   Unlike criminal warrants, which must be supported by probable cause *and issued by a neutral*

1    *magistrate*, there ~~is~~are no such requirement~~s~~ for the issuance of a civil immigration detainer. ~~At~~

2    ~~least one~~ *Several* federal court~~s~~ ~~in Indiana~~ ha~~s~~ve ruled that because civil immigration detainers

3    and other ICE "Notice of Action" documents are issued without probable cause of criminal

4    conduct, they do not meet the Fourth Amendment requirements for state or local law

5    enforcement officials to arrest and hold an individual in custody. *(Miranda-Olivares v.*

6    *Clackamas Co., No. 3:12-cv-02317-ST \*17 (D.Or. April 11, 2014) (finding that detention pursuant to*

7    *an immigration detainer is a seizure that must comport with the Fourth Amendment). See also Morales*

8    *v. Chadbourne, 996 F. Supp. 2d 19, 29 (D.R.I. 2014); Villars v. Kubiatowski, No. 12-cv-4586 \*10-12*

9    *(N.D. Ill. filed May 5, 2014).)*

10        On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the

11    responsibilities of local law enforcement agencies under S-Comm. The Attorney General

12    clarified that S-Comm d~~oes~~id not require state or local law enforcement officials to determine

13    an individual's immigration status or to enforce federal immigration laws. The Attorney

14    General also clarified that civil immigration detainers are voluntary requests to local law

15    enforcement agencies that do not mandate compliance. California local law enforcement

16    agencies may determine on their own whether to comply with non-mandatory civil immigration

17    detainers. *In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of*

18    *California had held a county liable for damages where it voluntarily complied with an ICE request to*

19    *detain an individual, and the individual was otherwise eligible for release and that  local law*

20    *enforcement agencies may also be held liable for such conduct.* ~~Other~~*Over 350* jurisdictions,

21    including ~~Berkeley, California; Richmond, California; Santa Clara County, California;~~ Washington,

22    D. C., ~~and~~ Cook County, Illinois, *and many of California's 58 counties* have already

23    acknowledged the discretionary nature of civil immigration detainers and are declining to hold

24    people in their jails for the additional ~~forty-eight~~ (48) hours as requested by ICE. Local law

25    enforcement agencies' responsibilities, duties, and powers are regulated by state law.

However, complying with non-mandatory civil immigration detainers ~~falls outside the scope of those responsibilities and~~ frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers _and notifications regarding release_ undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40_%_ ~~percent~~ of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE. ~~According to a national 2011 study by the Chief Justice Earl Warren Institute on Law and Social Policy at UC Berkeley, entitled "Secure Communities by the Numbers: An Analysis of Demographics and Due Process" ("2011 Warren Institute Study"), ICE has falsely detained approximately 3,600 U.S. citizens as a result of S-Comm. Thus, S-Comm leaves even those with legal status vulnerable to civil immigration detainers issued without judicial review or without proof of~~

1  ~~criminal activity, in complete disregard for the due process rights of those subject to the civil~~
2  ~~immigration detainers.~~
3  　　　　The City has enacted numerous laws and policies to strengthen communities and _to_
4  _build trust between communities and local law enforcement.  Local cooperation and assistance with_
5  _civil immigration enforcement_ ~~keep families united. In contrast, ICE civil immigration detainers have~~
6  ~~resulted in the separation of families. According to the 2011 Warren Institute Study, it is estimated that~~
7  ~~more than one-third of those targeted by S-Comm haved a U.S. citizen spouse or child.  Complying with~~
8  ~~civil immigration detainers thus resultsed in the deportation of potential aspiring U.S. citizens.~~
9  ~~According to the 2011 Warren Institute Study, Latinos makede up 93% of those detained through S-~~
10 ~~Comm, although they only account for 77% of the undocumented population in the U.S. As a result, S-~~
11 ~~Comm hasd a disproportionate impact on Latinos.~~
12 　　　　~~The City has enacted numerous laws and policies to prevent its residents from becoming~~
13 ~~entangled in the immigration system. But, the enforcement of immigration laws is a responsibility of the~~
14 ~~federal government. A December 2012 ICE news release stated that deportations have hit record~~
15 ~~figures each year. According to the Migration Policy Institute's 2013 report, entitled "Immigration~~
16 ~~Enforcement in the United States: The Rise of a Formidable Machinery," the federal government~~
17 ~~presently spends more on civil immigration enforcement than all federal criminal law enforcement~~
18 ~~combined. Local funds should not be expended on such efforts, especially because such entanglement~~
19 undermines community policing strategies.
20 　　　　_In 2014, DHS ended the Secure Communities program and replaced it with PEP.  PEP and S-_
21 _Comm share many similarities.  Just as with S-Comm, PEP uses state and federal databases to check_
22 _an individual's fingerprints against immigration and other databases.  PEP employs a number of_
23 _tactics to facilitate transfers of individuals from local jails to immigration custody._
24 　　　　_First, PEP uses a new form (known as DHS Form I-247N), which requests notification from_
25 _local jails about an individual's release date prior to his or her release from local custody.  As with_

1    *civil immigration detainers, these notification requests are issued by immigration officers without*

2    *judicial oversight, thus raising questions about local law enforcement's liability for constitutional*

3    *violations if any person is overdetained when immigration agents are unable to be present at the time*

4    *of the person's release from local custody.*

5        *Second, under PEP, ICE will continue to issue civil immigration detainer requests where local*

6    *law enforcement officials are willing to respond to the requests, and in instances of "special*

7    *circumstances," a term that has yet to be defined by DHS.  Despite federal courts finding civil*

8    *immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often*

9    *unable to confirm whether or not a detention request is supported by probable cause or has been*

10   *reviewed by a neutral magistrate.*

11       *The increase in information-sharing between local law enforcement and immigration officials*

12   *raises serious concerns about privacy rights.  Across the country, including in the California Central*

13   *Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access*

14   *to jail databases, booking logs, and other documents that contain personal information of all jail*

15   *inmates.*

16       *The City has an interest in ensuring that confidential information collected in the course of*

17   *carrying out its municipal functions, including but not limited to public health programs and criminal*

18   *investigations, is not used for unintended purposes that could hamper collection of information vital to*

19   *those functions.  To carry out public health programs, the City must be able to reliably collect*

20   *confidential information from all residents.  To solve crimes and protect the public, local law*

21   *enforcement depends on the cooperation of all City residents.  Information gathering and cooperation*

22   *may be jeopardized if release of personal information results in a person being taken into immigration*

23   *custody.*

24       *In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San*

25   *Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the*

1  *police station to retrieve his car, which police had located, he was detained for some time by police*

2  *officers before being released, and an ICE agent was waiting to take him into immigration custody*

3  *immediately as he left the police station. It was later reported that both the Police Department and the*

4  *San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the*

5  *police station.  He spent over two months in an immigration detention facility and remains in*

6  *deportation proceedings.  Mr. Figueroa's case has raised major concerns about local law*

7  *enforcement's relationship with immigration authorities, and has weakened the immigrant community's*

8  *confidence in policing practices.  Community cooperation with local law enforcement is critical to*

9  *investigating and prosecuting crimes.  Without the cooperation of crime victims – like Mr. Figueroa –*

10  *and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in*

11  *communities with large immigrant populations, will be seriously compromised.*

12  **SEC. 121.2. DEFINITIONS.**

13  *"Administrative warrant" means a document issued by the federal agency charged with the*

14  *enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for*

15  *immigration purposes.*

16  "Eligible for release from custody" means that the individual may be released from

17  custody because one of the following conditions has occurred:

18  (1a)  All criminal charges against the individual have been dropped or dismissed.

19  (2b)  The individual has been acquitted of all criminal charges filed against him or her.

20  (3c)  The individual has served all the time required for his or her sentence.

21  (4d)  The individual has posted a bond, or has been released on his or her own

22  recognizance.

23  (5e)  The individual has been referred to pre-trial diversion services.

24  (6f)  The individual is otherwise eligible for release under state or local law.

25

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed ~~forty-eight (~~48~~)~~ hours~~, excluding Saturdays, Sundays, and holidays,~~ and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means _the_ state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

_"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law._

_"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information._

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined

1  in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as

2  defined in Penal Code Section 18740; assault on a person with caustic chemicals or

3  flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a

4  person outside the vehicle or with great bodily injury as defined in Penal Code Sections

5  26100(c) and (d).

6  "Violent Felony" means any crime listed in Penal Code Section 667.5(c); human

7  trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as

8  defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon,

9  machine~~gun~~ gun, or .50 BMG rifle, while committing or attempting to commit a felony that is

10  charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and

11  12022.5.

12  **12I.3.  RESTRICTIONS ON LAW ENFORCEMENT OFFICIALS.**

13  (a)   Except as provided in subsection (b), a law enforcement official shall not detain an

14  individual on the basis of a civil immigration detainer after that individual becomes eligible for

15  release from custody ~~or respond to a federal immigration officer's notification request~~.

16  (b)   Law enforcement officials may continue to detain an individual in response to a

17  civil immigration detainer for up to ~~forty-eight (~~48~~)~~ hours after that individual becomes eligible

18  for release ~~and may respond to a federal immigration officer's notification request~~ if *the*

19  *continued detention is consistent with state and federal law, and* the individual meets both of the

20  following criteria:

21  (1)   The individual has been Convicted of a Violent Felony in the seven years

22  immediately prior to the date of the civil immigration detainer ~~or notification request~~; and

23  (2)   A magistrate has determined that there is probable cause to believe the individual

24  is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to

25  Penal Code Section 872.

1    In determining whether to continue to detain an individual based solely on a civil

2    immigration detainer ~~or respond to a notification request~~ as permitted in this subsection (b),

3    law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate

4    whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating

5    factors to consider includes, but is not limited to: the individual's ties to the community,

6    whether the individual has been a victim of any crime, the individual's contribution to the

7    community, and the individual's participation in social service or rehabilitation programs.

8    This subsection (b) shall expire by operation of law on October 1, 2016, or upon a

9    resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the

10   federal government has enacted comprehensive immigration reform that diminishes the need

11   for this subsection (b), whichever comes first.

12   (c)  Except as provided in subsection (d), a law enforcement official shall not respond

13   to a federal immigration officer's notification request.

14   (d)  Law Enforcement officials may respond to a federal immigration officer's

15   notification request if the individual meets both of the following criteria:

16   _____ (1)  The individual either:

17   _____ (A) has been Convicted of a Violent Felony in the seven years

18   immediately prior to the date of the notification request; or

19   _____ (B)  has been Convicted of a Serious Felony in the five years immediately

20   prior to the date of the notification request; or

21   _____ (C)  has been Convicted of three felonies identified in Penal Code

22   sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3),

23   other than domestic violence, arising out of three separate incidents in the five years

24   immediately prior to the date of the notification request; and

25

1      _____ (2)  A magistrate has determined that there is probable cause to believe the

2   individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or

3   Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and

4   has ordered the individual to answer to the same pursuant to Penal Code Section 872.

5      In determining whether to respond to a notification request as permitted by this

6   subsection (d), law enforcement officials shall consider evidence of the individual's

7   rehabilitation and evaluate whether the individual poses a public safety risk.  Evidence of

8   rehabilitation or other mitigating factors to consider includes, but is not limited to, the

9   individual's ties to the community, whether the individual has been a victim of any crime, the

10   individual's contribution to the community, and the individual's participation in social service or

11   rehabilitation programs.

12      *(ee)  Law enforcement officials shall not arrest or detain an individual, or provide any*

13   *individual's personal information to a federal immigration officer, on the basis of an administrative*

14   *warrant, prior deportation order, or other civil immigration document based solely on alleged*

15   *violations of the civil provisions of immigration laws.*

16      (edf)  Law enforcement officials shall make good faith efforts to seek federal

17   reimbursement for all costs incurred in continuing to detain an individual, after that individual

18   becomes eligible for release, in response each civil immigration detainer.

19   **SEC. 12I.4.  PURPOSE OF THIS CHAPTER.**

20      The intent of this Chapter *12I* is to address requests for non-mandatory civil

21   immigration detainers, *voluntary notification of release of individuals, transmission of personal*

22   *information, and civil immigration documents based solely on alleged violations of the civil provisions*

23   *of immigration laws*. Nothing in this Chapter shall be construed to apply to matters other than

24   those relating to federal civil immigration detainers, *notification of release of individuals,*

25   *transmission of personal information, or civil immigration documents, based solely on alleged*

1  *violations of the civil provisions of immigration laws*. In all other respects, local law enforcement

2  agencies may continue to collaborate with federal authorities to protect public safety. This

3  collaboration includes, but is not limited to, participation in joint criminal investigations that are

4  permitted under local policy or applicable city or state law.

5      SEC. 12I.5.  ~~ANNUAL~~ **SEMIANNUAL** REPORT.

6      By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each

7  provide to the Board of Supervisors and the Mayor a written report stating the number of

8  detentions that were solely based on civil immigration detainers during the first six months

9  following the effective date of this Chapter, and detailing the rationale behind each of those

10  civil immigration detainers. Thereafter, the Sheriff and Juvenile Probation Officer shall each

11  ~~annually~~ submit a written report to the Board of Supervisors and the Mayor, by January 1st

12  and July 1st of each year, addressing the ~~same~~ following issues for the time period covered

13  by the report~~.~~:

14      (a) a description of all communications received from the Federal agency charged with

15  enforcement of the Federal immigration law, including but not limited to the number of civil

16  immigration detainers, notification requests, or other types of communications.

17      (b) a description of any communications the Department made to the Federal agency

18  charged with enforcement of the Federal immigration law, including but not limited to any

19  Department's responses to inquires as described in subsection 12I.5 and the Department's

20  determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

21      Section 2.  Effective Date.  This ordinance shall become effective 30 days after

22  enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

23  ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

24  of Supervisors overrides the Mayor's veto of the ordinance.

25

1       Section 3.  Scope of Ordinance.  In enacting this ordinance, the Board of Supervisors

2   intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

3   numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

4   Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

5   additions, and Board amendment deletions in accordance with the "Note" that appears under

6   the official title of the ordinance.

7

8   APPROVED AS TO FORM:
    DENNIS J. HERRERA, City Attorney

9

10  By: _____
     JANA CLARK
     Deputy City Attorney

11

12  n:\legana\as2016\1600286\01108118.docx

13

14

15

16

17

18

19

20

21

22

23

24

25



## City and County of San Francisco
## Tails
## Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

**File Number:**   160022                    **Date Passed:**   June 07, 2016

Ordinance amending the Administrative Code to prohibit the use of City funds or resources to assist in the enforcement of Federal immigration law, except for individuals who have been convicted of a violent or serious felony and held to answer for a violent or serious felony, and modify reporting requirements.

April 07, 2016 Public Safety and Neighborhood Services Committee - RECOMMENDED

April 19, 2016 Board of Supervisors - CONTINUED
    Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

May 10, 2016 Board of Supervisors - CONTINUED
    Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

May 24, 2016 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE
    Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

May 24, 2016 Board of Supervisors - PASSED ON FIRST READING AS AMENDED
    Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

June 07, 2016 Board of Supervisors - FINALLY PASSED
    Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

File No. 160022

I hereby certify that the foregoing
Ordinance was FINALLY PASSED on
6/7/2016 by the Board of Supervisors of the
City and County of San Francisco.

Angela Calvillo
Clerk of the Board

_____
Mayor

6/17/16
_____
Date Approved

# EXHIBIT G

**REDACTED – PUBLIC VERSION**





# COOPERATION OF SCAAP RECIPIENTS IN THE REMOVAL OF CRIMINAL ALIENS FROM THE UNITED STATES

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 07-07

January 2007

**REDACTED – PUBLIC VERSION**

# COOPERATION OF SCAAP RECIPIENTS IN THE REMOVAL OF CRIMINAL ALIENS FROM THE UNITED STATES*

## EXECUTIVE SUMMARY

As required by Congress (Public Law 109-162), the United States Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an audit of the Office of Justice Programs' (OJP) State Criminal Alien Assistance Program (SCAAP).  The congressional mandate required the OIG to provide answers to four questions involving jurisdictions that receive SCAAP funding:

> *Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).*

> *Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).*

> *The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

> *The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.[1]*

SCAAP is a payment program administered by OJP, through its component the Bureau of Justice Assistance (BJA), in conjunction with the Immigration and Customs Enforcement (ICE) bureau within the Department

---

* The full version of this report included information that the Department of Homeland Security considered to be Law Enforcement Sensitive information.  To create this public version of the report, the OIG redacted (deleted) the sensitive portions and noted that the information was redacted.

[1] See Appendix II of this report for Public Law No. 109-162, section 1196 (c), (2006).

of Homeland Security (DHS).[2]  SCAAP was authorized by the Violent Crime Control and Law Enforcement Act of 1994 to provide federal assistance to states and localities for the costs of incarcerating certain criminal aliens who are in custody based on state or local charges or convictions.[3]  In fiscal year (FY) 2005, BJA distributed $287.1 million in SCAAP payments to 752 state, county, and local jurisdictions.[4]

The following table displays the 10 jurisdictions that received the largest SCAAP payments from the FY 2005 appropriation.  Collectively, they accounted for nearly 69 percent of the SCAAP payments made from that appropriation.

| TOP TEN SCAAP RECIPIENTS — FY 2005 | | |
|---|---|---|
| **State** | **Jurisdiction** | **Amount** |
| California | State of California[5] | $  85,953,191 |
| New York | State of New York | 24,022,356 |
| Texas | State of Texas | 18,582,484 |
| New York | City of New York | 15,893,255 |
| Florida | State of Florida | 12,806,110 |
| California | Los Angeles County[6] | 12,530,034 |
| Arizona | State of Arizona | 12,139,791 |
| California | Orange County | 6,562,437 |
| Illinois | State of Illinois | 4,731,269 |
| Massachusetts | State of Massachusetts | 4,728,549 |
| | TOTAL | $197,949,476 |

Source:  Bureau of Justice Assistance (BJA)

Although 752 jurisdictions received SCAAP payments from the FY 2005 appropriation, the vast majority of them received relatively small amounts. The following chart summarizes the number of recipients by dollar amount.

---

[2]  Prior to creation of the DHS in 2003, the functions currently performed by ICE were performed by the Immigration and Naturalization Service, which at the time was part of DOJ.

[3]  Public Law No. 103-322 (1994).

[4]  FY 2005 is the most recent year for which payment information was available.  See Appendix III for payment information for FYs 2005 and 2004.

[5]  When we define a jurisdiction as the "state," we are referring to the state department of corrections.  We are not including all the counties and municipalities within the state that may have separately received SCAAP payments.

[6]  This refers to the Los Angeles County Sheriff's Department.



Source:  OIG analysis of BJA data

The program reimburses states and localities that incur correctional officer salary costs for incarcerating undocumented criminal aliens who: (1) have at least one felony or two misdemeanor convictions for violations of state or local law, and (2) are incarcerated for at least four consecutive days during the established reporting period.[7]  Applicants for funding are required to provide correctional officer salary costs, the total of all inmate days, and details about eligible inmates housed in their correctional facilities during that period.

For the applications received, ICE assists BJA by checking the inmate data submitted by the jurisdictions that seek SCAAP payments to determine the immigration status of those inmates.  This process is described as "vetting" the data.[8]

---

[7]  The reporting period does not coincide with the fiscal year for which SCAAP funds are appropriated.  For example, the reporting period for FY 2006 funds was July 1, 2004, through June 30, 2005.  Similarly, the reporting period for FY 2005 funds was July 1, 2003, through June 30, 2004.

[8]  According to a July 2003 Memorandum of Understanding between ICE and OJP, ICE agreed to determine, by SCAAP applicant, the number of eligible inmates.

Historically, congressional appropriations for SCAAP have been less than the total amount sought by all the jurisdictions applying for SCAAP payments.  As a result, BJA pays a *pro rata* amount of the jurisdictions' submitted expenses.  In April 2005, the Government Accountability Office (GAO) issued a report stating that 80 percent of the SCAAP aliens were incarcerated in the five states of Arizona, California, Florida, New York, and Texas in FY 2003.  GAO found that SCAAP payments to four of those states were less than 25 percent of the estimated cost to incarcerate SCAAP criminal aliens.  The FY 2003 SCAAP payments amounted to 12 percent of the estimated incarceration costs for California, 24 percent for New York, 17 percent for Florida, and 14 percent for Arizona.[9]

## SCAAP RECIPIENTS' COOPERATION WITH ICE

The first congressional question asked us to determine whether there are recipients of SCAAP funds that do not fully cooperate with the efforts of DHS to remove undocumented criminal aliens from the United States.  Congress did not define "fully cooperate," nor did our review of immigration legislation disclose any specific steps that localities are required to take to help effect the removal of criminal aliens from the United States.

To respond to this question, we interviewed ICE officials to obtain their views, distributed a questionnaire to 164 SCAAP recipients, and conducted independent testing in 7 jurisdictions that received SCAAP funding.[10]  Our field testing included interviews with local officials and review of local files.[11]

---

[9]  Government Accountability Office.  *Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.  GAO reported that data on the cost of incarceration for the State of Texas were not available.

[10]  See Appendix IV for a list of the jurisdictions we surveyed and those that responded.  The 164 agencies in the sample received $264.8 million, or 92.2 percent of the FY 2005 SCAAP payments.  The 99 respondents to our questionnaire received $205.4 million, or 71.6 percent of the FY 2005 SCAAP payments.

[11]  We performed field work at the State of California Department of Corrections and Rehabilitation; State of Oregon Department of Corrections; State of Texas Department of Criminal Justice; Clark County, Nevada; Cook County, Illinois; City of New York, New York; and the City and County of San Francisco, California.  We selected these sites to have a mix of state, county, and local jurisdictions that received SCAAP payments of at least $1 million each.  Collectively, these seven jurisdictions received $128.3 million, or 44.7 percent of the SCAAP payments issued from the FY 2005 appropriation.

*Views of ICE Officials*

We asked ICE officials to identify SCAAP recipients that they believe do not fully cooperate with ICE in the removal of undocumented criminal aliens from the United States.  Because ICE does not maintain records describing SCAAP recipients that do not cooperate in the effort to remove criminal aliens, they noted that any information they might provide us would be anecdotal.

We also contacted officials at ICE headquarters and solicited their views first about the cooperativeness of SCAAP recipients generally and later about the seven jurisdictions where we performed field work.  ICE officials commented favorably with respect to the entities' cooperation about every jurisdiction except the City and County of San Francisco, and they declined to suggest alternative sites for our field work.

According to an agent working at ICE headquarters, the ICE San Francisco Field Office has encountered difficulties, which they attributed to a "bare minimum" of cooperation.  Specifically, we were told that ICE agents are not permitted to access San Francisco County jail records without the authorization and approval of the Sheriff.  ICE agents are authorized to enter the jails to interview prisoners and to access the "all-jail alphabetical list" of inmates but they do not have authorization to access booking cards, housing cards or other jail records.  ICE officials commented on this situation as being different from other localities that have allowed ICE agents such access.  Despite these views expressed by ICE officials, San Francisco officials believe they are cooperating sufficiently with ICE.

In the absence of a congressional definition of "fully cooperating" to guide us, we developed specific tests to measure the degree to which SCAAP recipients assisted ICE in the effort to remove criminal aliens from the United States.  We looked at whether SCAAP recipients:  (1) inquire into the immigration status of individuals in custody; (2) notify ICE when criminal aliens are in custody; (3) accept detainers from ICE; and (4) notify ICE when criminal aliens are about to be released from custody.[12]

Our review did not disclose any instances of outright failure to cooperate with ICE in the removal of criminal aliens from the United States.  Instead, we found that local jurisdictions often set the enforcement of state and local law as a priority, while sometimes permitting or encouraging law

---

[12] A detainer is a notice from ICE asking officials at the detention facility to notify ICE before releasing a detainee.

enforcement agencies and officers to work with ICE to some degree on immigration matters.

In addition to answering our questions on the level of cooperation received by state and local agencies, ICE officials also made suggestions on how to improve the SCAAP program.  Some ICE headquarters officials expressed a desire to have responsibility for SCAAP transferred from BJA to ICE and to make SCAAP payments contingent upon participation in the "287(g)" program.  Section 287(g) of the Immigration and Nationality Act provides that ICE may enter into a written agreement with a state or locality enabling qualified state or local law enforcement agents to carry out certain functions relating to immigration enforcement, including investigation, apprehension, or detention of aliens in the United States. [13]

Other ICE officials expressed the view that SCAAP is "misguided" primarily because SCAAP applications are based on a custody period in the year prior to the one in which payments are sought.  In the view of those officials, payment for the past costs of incarceration does nothing to further the removal of undocumented criminal aliens currently in the United States.

Some ICE headquarters officials also stated they would like to have graduated payments based on the SCAAP recipient taking steps toward the removal of criminal aliens from the United States.  Larger payments could be provided to a jurisdiction when a final order of removal is obtained and for participating in the "Section 287(g)" program.  This would result in payment for assisting ICE in identifying and removing criminal aliens rather than merely housing them.

*Results of Survey*

We also surveyed 164 of the 752 state, county, and local agencies that received SCAAP funding from the FY 2005 appropriation and received responses from 99 jurisdictions.  Our questionnaire included the following four questions designed to assess their cooperation with ICE: [14]

---

[13]  8 U.S.C. § 1357(g) (1996).

[14]  Our questionnaire included boxes where the respondent could check "yes" or "no."  However, some respondents wrote in "not applicable," or "unknown," and, in some cases, the respondent chose not to answer a particular question.  Our questionnaire also included spaces where the respondent could add explanatory comments.

- *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?*

- *If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody?*

- *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?*

- *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?*

None of the respondents answered negatively to all four questions. Fourteen respondents answered "no" to 2 questions and 5 respondents answered "no" to 3 questions.[15]

- Thirty jurisdictions reported they do not generally ask arrestees about their immigration status.  However, some jurisdictions explained that arrestees are asked about their country of birth rather than immigration status, and others stated that immigration status is determined during the booking process rather than at the time of arrest.[16]

- Seventeen respondents reported they do not inform ICE when they have someone in custody who they believe may be an undocumented alien.  However, many of those 17 jurisdictions added qualifying remarks.  For example, some agencies stated that ICE agents come to the state or local institution to review files, which would obviate the need to inform ICE.  Other jurisdictions criticized ICE and stated they do not inform ICE about possible undocumented aliens in their custody because they believe ICE will not respond.

---

[15]  See Appendix X for additional details about the responses that contained more than one negative answer.

[16]  Thirty-four jurisdictions checked the "no" box on the questionnaire, but 4 of those 34 jurisdictions added comments stating that they are custodial institutions and their officers do not have arrest authority.

- Eighteen jurisdictions reported they do not alert ICE prior to releasing undocumented criminal aliens from custody.  However, several of those jurisdictions added clarifying remarks.  For example, one respondent stated they are generally not aware of the immigration status of individuals in custody.  Another reported that releases of inmates must occur within a very short time after a local court orders the release.  Another jurisdiction stated its officials do not alert ICE prior to releasing an undocumented criminal alien from custody "unless ICE asks us to."

*Results of Field Work*

In addition, we interviewed officials and reviewed files at seven jurisdictions that received funding from the FY 2005 appropriation for SCAAP.  The officials whom we interviewed included local officials knowledgeable in the areas of SCAAP and detention, as well as ICE officials who had dealings with the state, county, or locality.  Local officials from all seven jurisdictions reported that their detention facilities:  (1) accept ICE detainers for undocumented criminal aliens in their custody; and (2) alert ICE before releasing undocumented criminal aliens from custody.

To test these assertions, we reviewed a total of 76 files relating to criminal aliens who had been recently discharged from local custody at the 7 locations where we performed field work.  We found that:

- ICE was notified in a timely manner that the 76 criminal aliens were in custody;

- ICE detainers were accepted for all 76 individuals;

- 70 criminal aliens were transferred to ICE, all in a timely manner.[17]

We further examined the issue of cooperation between SCAAP recipients and ICE by researching the policies of localities that may have laws, resolutions, or other policies limiting the role of local agencies in the enforcement of immigration legislation.  In some cases, localities have designated themselves with terms such as "sanctuary city" or "civil liberties safe zone."  ICE officials expressed dissatisfaction with the level of cooperation provided by some of these "sanctuary" sites.

---

[17]  Five of the remaining six individuals were transferred to other jurisdictions, such as a state prison, and one, a Cuban, was paroled because repatriation to Cuba was not possible.

We were able to locate an official "sanctuary" policy for only two jurisdictions that received at least $1 million in SCAAP funding, the State of Oregon, which received $3.4 million, and the City and County of San Francisco, which received $1.1 million and has designated itself as a "City and County of Refuge."  We also located an Executive Order issued by the Mayor of the City of New York limiting the activities of local law enforcement agencies and officers in the enforcement of immigration law.[18]  However, in each instance the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers will assist ICE or share information with ICE as required by federal law.

The results of our review were inconclusive in identifying SCAAP recipients that were not fully cooperating with ICE in its efforts to remove undocumented criminal aliens from the United States.  We found conflicting views between ICE and local jurisdictions as to what actions constitute full cooperation.  In addition, our fieldwork at select locations found that the SCAAP recipients notified ICE in a timely manner of aliens in custody, accepted detainers from ICE, and promptly notified ICE of an impending release from local custody.

## COMMUNICATION BETWEEN SCAAP RECIPIENTS AND ICE

The second congressional question asked us to determine whether any SCAAP recipients have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373).  Two key provisions of this statute provide:

- *Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, or any individual.*

- *Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:*

  - *Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.*

---

[18]  See Appendix VII.

- o   *Maintaining such information.*

- o   *Exchanging such information with any other Federal, State, or local government entity.*[19]

*Views of ICE Officials*

ICE officials objected to provisions of the administrative code of the City and County of San Francisco that limit the ability of local agencies and officers to communicate immigration information to ICE.

*Results of Survey*

We included a question in our survey asking about laws, regulations, or policies affecting each organization that might restrict the free exchange of immigration-related information between local law enforcement agencies and ICE.  The 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters.

Only the City and County of San Francisco gave a qualified "yes" in response to our queries about the existence of a local ordinance or a departmental policy limiting the ability of local law enforcement officers or agencies to exchange information with ICE relating to immigration enforcement.  The response included a copy of Chapter 12H of the City Administrative Code, which contains a provision stating "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco *unless such assistance is required by federal or state statute, regulation, or court decision.*" [Emphasis added.]  The Code also states "nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying or reporting any person pursuant to a state or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws."  Finally, the Code states that "nothing in this chapter shall preclude any . . . department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has

---

[19]  The statutory references to the Immigration and Naturalization Service now apply to ICE.

been booked at any county jail facility, and who has previously been convicted of a felony in violation of the laws of the State of California, which is still considered a felony under state law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law." [20]

San Francisco city officials also cited provisions of a police department General Order, which states that generally "a member [of the police department] shall not inquire into an individual's immigration status or release or threaten to release information to the INS regarding an individual's identity or immigration status."  However, the General Order makes exceptions that parallel those enumerated in the City Administrative Code.

*Results of Field Work*

In our interviews with local officials at the seven sites, we asked if their jurisdictions currently have in effect any statute, ordinance, executive order, or other legislation or official policy prohibiting local law enforcement agencies and officers from freely exchanging information with ICE on the citizenship or immigration status of individuals.  Officials at four of the seven sites we visited replied unequivocally, "no," while officials at the other three sites gave qualified answers.

- The State of Oregon has a state "sanctuary" statute, but the officials whom we interviewed believe it does not infringe on the exchange of information with ICE. [21]

- Officials from the City of New York informed us there is no prohibition on exchanging information with ICE on individuals who have been arrested.  Executive Order No. 41, issued by the Mayor, defines "immigration status" as "confidential information" and forbids disclosure except when "such disclosure is required by law."  The Executive Order also provides exceptions to the prohibition against disclosure when "the individual to whom [immigration]

---

[20]  The San Francisco City Administrative Code references to INS now apply to ICE.

[21]  The State of Oregon "sanctuary" statute is located in Appendix VI.

information pertains is suspected . . . of engaging in illegal activity, other than mere status as an undocumented alien" or "the dissemination of such information is necessary to apprehend a person suspected of illegal activity, other than mere status as an undocumented alien" or "such disclosure is necessary in furtherance of an investigation of potential terrorist activity."[22]

- Local officials stated the City of San Francisco Police Department's policy is "consistent with its obligations under state and federal law, to adhere to the City of Refuge Ordinance.  This ordinance prohibits the use of city resources to assist in the enforcement of federal immigration laws except in certain limited circumstances consistent with state and federal law."

As previously mentioned, ICE officials objected to San Francisco's policies but they did not raise any concerns about the flow of information to and from any of the other six sites where we performed field work.

## RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM LOCAL CUSTODY

The third congressional question asked us to determine how many criminal offenses were committed by criminal aliens who were released from state or local custody without a referral to DHS for removal from the United States.

To address this question, we performed limited testing to determine the number of subsequent *arrests* of criminal aliens who were released from state or local custody.  We based our testing on information from the vetted FY 2004 SCAAP database, which was the last year when ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[23]  There were 262,105 records in that database.  We requested assistance from the Federal Bureau of Investigation (FBI) to have those records compared to arrest data in the FBI's National Crime Information Center (NCIC).[24]

---

[22] A copy of the Executive Order may be found in Appendix VII.

[23] FY 2004 SCAAP funding was based on the incarceration of criminal aliens between July 1, 2002, and June 30, 2003.

[24] NCIC is a computerized database of criminal justice information available to law enforcement agencies nationwide.  The NCIC database consists of millions of records arranged in 18 files, including one relating to immigration violators.

After querying NCIC, the FBI provided us with nearly 433,000 text files that could not be searched by automated means. The volume of files was too great to search manually and quantify the results. Consequently, we judgmentally selected a sample of 100 criminal histories, which we reviewed for evidence of arrests of criminal aliens subsequent to June 30, 2003. The criminal histories for 73 of the 100 individuals documented at least one arrest after that date. Those 73 individuals accounted for a total of 429 arrests, with 878 charges and 241 convictions. These figures represent an average of nearly six arrests per individual.

The charges for the 73 individuals ranged from traffic violations and trespassing to more serious crimes, such as burglary or assault. Some of those charges included:

- 166 drug-related;

- 37 immigration-related;

- 213 burglary, robbery, or theft;

- 40 assault;

- 10 property damage;

- 3 terrorist threat;[25] and

- 13 weapons charges.

Based on this limited sample, we cannot statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE. Based on the information available to us in the criminal histories, we could not determine the number of the criminal aliens in our sample that were deported, if any, and later arrested after reentering the United States. We also could not determine if ICE was notified before the criminal aliens in our sample were released from custody. But if this data is indicative of the full population of 262,105 criminal histories, the rate at which released criminal aliens are rearrested is extremely high.

---

[25] The "terrorist threat" cases related to misdemeanor charges based on domestic disputes.

**CRIMINAL ALIENS RELEASED DUE TO LACK OF RESOURCES**

The fourth congressional question asked us to determine how many of the criminal aliens who were released from state or local custody were released for lack of sufficient detention space or funding to hold them.  While we believe it likely that this occurs regularly, our review could not identify specific instances of such releases because ICE does not track the number of aliens released from local custody due to lack of the necessary resources to detain them.

In an effort to address this issue, the questionnaire that we sent to 164 SCAAP recipients included a request that the respondents provide the number of criminal aliens who were released from custody between October 1, 2004, and June 30, 2006, because the respondent lacked the space or funds to detain those aliens.  None of the respondents reported having released criminal aliens from custody due to lack of resources.

Even though the respondents to our questionnaire did not report releasing undocumented criminal aliens because of insufficient local resources, we noted an issue regarding the lack of space available to ICE to detain aliens in custody.  In an April 2006 report, the Inspector General of the Department of Homeland Security reported, "[the Detention and Removal Operations (DRO)] estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S.[26]  Of this number, DRO estimates half (302,500) will be removable aliens.  Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP).  It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove [them]."[27]

The DHS Inspector General went on to state, "additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by:  (1) the propensity of illegal aliens to disobey orders to appear in immigration court;  (2) the penchant of released illegal aliens with final orders to abscond;  (3) the practice of some countries to block or inhibit the repatriation of its citizens;  and (4) two recent U.S. Supreme Court decisions

---

[26]  At our exit conference, representatives of DRO stated that references to "DRO" in the DHS OIG report would in this context be more appropriately read as "ICE."

[27]  Department of Homeland Security, Office of the Inspector General.  *Detention and Removal of Illegal Aliens:  U.S. Immigration and Customs Enforcement (ICE)*, OIG-06-033, April 2006, p. 2.

which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in 'Special Circumstances.'  Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial 'mini-amnesty' program for criminal and other high-risk aliens."

The DHS Inspector General reported that 345,006 criminal aliens were apprehended between FYs 2001 and 2004, of which 27,947 (8 percent) were released.  However, the DHS Inspector General could not determine whether they were released because of a lack of detention space or for other reasons, because ICE does not track that information.

# TABLE OF CONTENTS

**Page**

**CHAPTER 1 — INTRODUCTION** ........................................................... 1

    Background ................................................................................. 1
    Legal Authority for SCAAP .............................................................. 3
    Application Process ....................................................................... 3
    Prior Audits ................................................................................ 6
    OIG Audit Approach ...................................................................... 7

**CHAPTER 2 — SCAAP RECIPIENTS' COOPERATION WITH ICE** ............ 8

    Views of ICE Officials .................................................................... 8
    Results of OIG Survey .................................................................. 10
    Results of Field Work ................................................................... 18
    Statement of Major Cities Chiefs of Police ........................................ 22
    Additional Research ..................................................................... 23

**CHAPTER 3 — COMMUNICATION BETWEEN SCAAP RECIPIENTS AND ICE** ........................................................................................... 25

    Views of ICE Officials .................................................................. 25
    Results of OIG Survey .................................................................. 26
    Results of Field Work ................................................................... 27

**CHAPTER 4 — RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM LOCAL CUSTODY** ........................................................................ 29

    NCIC Query ............................................................................... 29

**CHAPTER 5 — CRIMINAL ALIENS RELEASED DUE TO LACK OF RESOURCES** ............................................................................... 31

    Results of OIG Survey .................................................................. 31
    DHS Inspector General Report ....................................................... 32

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS** ............................................................ 33

**STATEMENT ON INTERNAL CONTROL STRUCTURE** .......................... 34

**APPENDICES:**

   **I.**    **AUDIT OBJECTIVES, SCOPE, AND METHODOLOGY** .............. 35

   **II.**   **PUBLIC LAW 109-162** ......................................................... 37

   **III.**  **SCAAP RECIPIENTS – FYs 2004 AND 2005** ......................... 39

   **IV.**  **OIG SURVEY RECIPIENTS** .................................................... 62

   **V.**   **MAJOR CITIES CHIEFS OF POLICE POLICY** ......................... 66

   **VI.**  **STATE OF OREGON POLICY** ................................................ 68

   **VII.** **CITY OF NEW YORK POLICY** ................................................ 69

   **VIII.****SAN FRANCISCO CITY ADMINISTRATIVE CODE** .................. 72

   **IX.**  **CALIFORNIA ATTORNEY GENERAL'S OPINION #01-213** ..... 75

   **X.**   **JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY** ....................................................................... 85

   **XI.**  **BUREAU OF JUSTICE ASSISTANCE RESPONSE TO THE DRAFT AUDIT REPORT** ....................................................... 91

# CHAPTER 1 — INTRODUCTION

As required by Congress (Public Law 109-162), the United States Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an audit of the Office of Justice Programs' (OJP) State Criminal Alien Assistance Program (SCAAP).  The congressional mandate required the OIG to perform a study and report to the Judiciary Committees of the United States Senate and the United States House of Representatives on the following matters pertaining to recipients of SCAAP payments:

> *Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).*

> *Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).*

> *The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

> *The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.*[28]

## Background

SCAAP is a payment program administered by OJP through the Bureau of Justice Assistance (BJA) and in conjunction with the Immigration and Customs Enforcement (ICE) bureau within DHS.[29]  SCAAP was authorized by

---

[28] See Appendix II of this report for Public Law No. 109-162, section 1196 (c) (2006).

[29] Prior to creation of the DHS in 2003, the functions currently performed by ICE were performed by the Immigration and Naturalization Service, which at the time was part of DOJ.

the Violent Crime Control and Law Enforcement Act of 1994 to provide federal assistance to states and localities for the costs of incarcerating certain criminal aliens who are in custody based on state or local charges or convictions.[30] Since SCAAP is a payment program rather than a grant program, jurisdictions that are eligible to receive funds simply provide OJP with their accounting information and accept payment through OJP's Grants Management System. They do not have to submit program progress reports or financial status reports.

The program pays states and localities that incur correctional officer salary costs for incarcerating undocumented criminal aliens who: (1) have at least one felony or two misdemeanor convictions for violations of state or local law, and (2) are incarcerated for at least four consecutive days during the established reporting period.[31] Applicants for funding are required to provide correctional officer salary costs, the total of all inmate days, and details about eligible inmates housed in their correctional facilities during that period.

For the applications received, ICE assists BJA by checking the inmate data submitted by the jurisdictions that seek SCAAP payments to determine the immigration status of those inmates. This process is described as "vetting" the data. In FY 2005, BJA distributed $287.1 million in SCAAP payments to 752 state, county, and local jurisdictions.[32] Individual payments ranged from a high of $85.9 million (State of California) to a low of $40 (Polk County, Minnesota). In FY 2004, BJA distributed $281.6 million to 741 jurisdictions in amounts ranging from $77.4 million (State of California) to $35 (Louisville Jefferson County Metro Government, Kentucky).[33]

Historically, congressional appropriations for SCAAP have been less than the total amount sought by all the jurisdictions applying for SCAAP payments. As a result, BJA pays a *pro rata* amount of a jurisdiction's submitted expenses. In April 2005, the Government Accountability Office (GAO) reported that 80 percent of the SCAAP aliens were incarcerated in the

---

[30] Pub. L. No. 103-322 (1994).

[31] The reporting period does not coincide with the FY for which SCAAP funds are appropriated. For example, the reporting period for FY 2006 funds was July 1, 2004, through June 30, 2005. Similarly, the reporting period for FY 2005 funds was July 1, 2003, through June 30, 2004.

[32] FY 2005 was the most recent year for which payment information was available.

[33] See Appendix III for details of the SCAAP payments made from the FY 2005 and FY 2004 appropriations.

5 states of Arizona, California, Florida, New York, and Texas in FY 2003, but payments to 4 of those states were less than 25 percent of the estimated cost to incarcerate SCAAP criminal aliens.  The FY 2003 SCAAP payments amounted to 12 percent of the estimated incarceration costs for California, 24 percent for New York, 17 percent for Florida, and 14 percent for Arizona.[34]

Prior to FY 2006, there were no restrictions on how SCAAP funds could be used.  In the FY 2006 re-authorization Congress required that SCAAP payments be used by the recipients for correctional purposes.

## Legal Authority for SCAAP

The legislation governing SCAAP includes the Immigration and Nationality Act and the Violent Crime Control and Law Enforcement Act of 1994.[35]  According to BJA's SCAAP program guidelines, these statutes provide that "in general terms, if a chief executive officer of a state or a political division exercises authority over the incarceration of undocumented criminal aliens and submits a written request to the U.S. Attorney General, the Attorney General may provide compensation to that jurisdiction for those incarceration costs.  SCAAP is subject to additional terms and conditions of yearly congressional appropriations."  BJA states that eligibility for SCAAP payments extends to all 50 state governments, the District of Columbia, Guam, Puerto Rico, the U.S. Virgin Islands, and more than 3,000 counties and cities with correctional facilities.[36]

## Application Process

BJA's annual guidelines alert potential SCAAP applicants of the deadline for applying for SCAAP funding and describe the application process.  Applications for SCAAP payments are accepted electronically and "must provide all required information on undocumented criminal aliens for the prescribed reporting period, the total reporting period salary information for their full and part-time permanent and contracted correctional officers,

---

[34] Government Accountability Office.  *Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.  GAO reported that data on the cost of incarceration for the State of Texas were not available.

[35] 8 U.S.C. § 1231(i), as amended, (1996).

[36] Bureau of Justice Assistance.  *State Criminal Alien Assistance Program:  FY 2006 Guidelines*, pp. 1 and 2.  The incarceration costs for which BJA pays states and localities are the salary costs of correctional officers.

and the total of all inmate days."[37]  The "required information on undocumented criminal aliens" includes the alien registration number, name, date of birth, unique inmate identification number assigned by the local jurisdiction, country of birth, date taken into custody, date released from custody, and Federal Bureau of Investigation (FBI) number.[38]

BJA forwards the submitted information about aliens to ICE for a determination of whether each purportedly undocumented criminal alien is indeed illegally present in the United States[39]  Confirmation of each individual's immigration status is crucial in determining whether payment for detention-related expenses would be allowable under SCAAP.

In the past, ICE reported back to BJA on the eligibility for SCAAP payments using three categories:  eligible, not eligible, and unknown.  If ICE determined an individual was a qualifying undocumented criminal alien, ICE categorized that individual as eligible.  If ICE determined an individual was not an undocumented criminal alien, ICE would categorize the individual as ineligible.  The immigration status of the remaining individuals would be categorized as unknown.  After receiving the results of the ICE vetting process, BJA determined the amounts to be paid each jurisdiction using a formula based:  on (1) the number of jail days for eligible inmates, (2) an allowance for a percentage of the jail days of inmates whose eligibility was unknown, and (3) the amount of appropriated funds available for distribution.

However, FY 2004 was the last year for which ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[40]  In that year, the applicants for SCAAP payments provided data on a total of 270,807 inmates.  After vetting those records, ICE determined that 96,085 were eligible and 49,210 were ineligible as a basis for SCAAP payment.  ICE categorized the immigration status of the remaining 125,512 inmates as unknown.

The following table displays the 10 jurisdictions that received the largest SCAAP payments from the FY 2005 appropriation.  Collectively, they

---

[37]  *State Criminal Alien Assistance Program:  FY 2006 Guidelines*, p. 2.

[38]  The FBI number is issued by the FBI to track arrests and fingerprint records.

[39]  According to a July 2003 Memorandum of Understanding between ICE and OJP, ICE agreed to determine, by SCAAP applicant, the number of eligible inmates.

[40]  In the FY 2005 SCAAP funding process, ICE merely reported the number of qualifying jail days for each applicant locality.

accounted for nearly 69 percent of the SCAAP payments made from that appropriation.

| TOP TEN SCAAP RECIPIENTS – FY 2005 | | |
|---|---|---|
| **State** | **Jurisdiction** | **Amount** |
| California | State of California[41] | $   85,953,191 |
| New York | State of New York | 24,022,356 |
| Texas | State of Texas | 18,582,484 |
| New York | City of New York | 15,893,255 |
| Florida | State of Florida | 12,806,110 |
| California | Los Angeles County[42] | 12,530,034 |
| Arizona | State of Arizona | 12,139,791 |
| California | Orange County | 6,562,437 |
| Illinois | State of Illinois | 4,731,269 |
| Massachusetts | State of Massachusetts | 4,728,549 |
| | TOTAL | $197,949,476 |

Source:  Bureau of Justice Assistance (BJA)

Although 752 jurisdictions received SCAAP payments from the FY 2005 appropriation, the vast majority of them received relatively small amounts. The following chart summarizes the number of recipients by dollar amount.

---

[41]  When we define a jurisdiction as the "state" we are referring to the state department of corrections.  We are not including all the counties and municipalities within the state that may have received SCAAP payments.

[42]  This refers to the Los Angeles County Sheriff's department.



Source: OIG analysis of BJA Data

**Prior Audits**

 **Department of Justice, Office of the Inspector General,** *Office of Justice Programs State Criminal Alien Assistance Program***, 00-13, May 2000.**  Our audit reviewed FY 1996 SCAAP payments to the states of California, Texas, New York, Florida, and Illinois to determine whether the payments were appropriate based on incarceration costs and the number of undocumented criminal aliens.  The five jurisdictions collectively received 76 percent of the FY 1996 SCAAP funding.  The audit concluded that they were over-compensated by $19.3 million for unallowable inmate costs and ineligible inmates included in the SCAAP applications.  The audit also found that OJP's compensation methodology was over-inclusive in the degree to which it paid SCAAP applicants for inmates whose immigration status was "unknown."

 **Department of Justice, Office of the Inspector General,** *Immigration and Naturalization Service Institutional Removal Program***, 02-41, September 2002.**  The Institutional Removal Program (IRP) is a national program that aims to:  (1) identify removable criminal aliens in federal, state, and local correctional facilities, (2) ensure that they are not released into the community, and (3) remove them from the United States upon completion of their sentences.  In our audit report on this

program, we noted "the whole IRP process is predicated on the cooperation of the institutions in which criminal aliens are incarcerated.  Without that cooperation, the IRP cannot function effectively.  Interestingly, states and counties throughout the United States have received hundreds of millions of dollars annually through . . . SCAAP, yet there are no provisions in the program requiring state and county recipients to cooperate with the INS in its removal efforts."  Our report recommended that INS request that OJP change SCAAP provisions to require the full cooperation of state and local governments "in the INS's efforts to process and deport incarcerated criminal aliens."  The current SCAAP guidelines do not contain any such requirement.

**Government Accountability Office,** ***Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.**  GAO reported a variety of statistical data regarding the criminal alien population of federal, state, and local custodial facilities.

**Department of Homeland Security, Office of the Inspector General,** ***Detention and Removal of Illegal Aliens:  Immigration and Customs Enforcement*, OIG-06-33, April 2006.**  The DHS Inspector General reported that many criminal aliens in state and local custody will be released at the conclusion of their sentences because ICE lacks the resources to identify, detain, and remove them from the United States.

## OIG Audit Approach

We organized our audit of SCAAP to answer the four questions Congress posed in Public Law 109-162.  To answer these questions, we interviewed officials at ICE; sent an OIG-developed questionnaire to 164 SCAAP recipients; visited seven locations that received SCAAP funding from the FY 2005 appropriation; [43] reviewed files at those seven sites; interviewed local officials; and performed research on the policies of SCAAP recipients that may have designated themselves as immigration "sanctuary" sites. [44]

---

[43]  We performed field work at the State of California Department of Corrections and Rehabilitation; State of Oregon Department of Corrections; State of Texas Department of Criminal Justice; Clark County, Nevada; Cook County, Illinois; City of New York, New York; and the City and County of San Francisco, California.  We selected these sites to have a mix of state, county, and local jurisdictions that received SCAAP payments of at least $1 million each.  Collectively, these seven jurisdictions received $128.3 million, or 44.7 percent of the SCAAP payments issued from the FY 2005 appropriation.

[44]  In this report, we use the term "sanctuary" site to refer to jurisdictions that may have state laws, local ordinances, or departmental policies limiting the role of local law enforcement agencies and officers in the enforcement of immigration laws.

## CHAPTER 2 — SCAAP RECIPIENTS' COOPERATION WITH ICE

The first congressional question asked us to determine whether there are recipients of SCAAP funds that do not fully cooperate with the efforts of DHS to remove undocumented criminal aliens from the United States. Congress did not define "fully cooperate," nor did our review of immigration legislation disclose any specific steps that localities are required to take to help effect the removal of criminal aliens from the United States.

**Views of ICE Officials**

We asked ICE officials to identify SCAAP recipients that they believe do not fully cooperate with ICE in the removal of undocumented criminal aliens from the United States.  Because ICE does not maintain any records describing SCAAP recipients that do not cooperate in the effort to remove criminal aliens, they noted that any information they might provide us would be anecdotal.

We also contacted officials at ICE headquarters on several occasions and solicited their views first about the cooperativeness of SCAAP recipients generally and later about the seven jurisdictions where we performed field work.

Some ICE headquarters officials expressed the opinion that jurisdiction over SCAAP should rest with ICE rather than BJA and that payments should be contingent upon the recipient's taking of certain affirmative steps, such as participation in the "287(g)" program, to assist immigration enforcement. Section 287(g) of the Immigration and Nationality Act provides that ICE "may enter into a written agreement with a state, or any political subdivision of a state, pursuant to which an officer or employee of the state or subdivision, who is determined . . . to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across state lines to detention centers), may carry out such function at the expense of the state or political subdivision and to the extent consistent with state and local law."[45]

Enforcing immigration law remains primarily a federal responsibility, but Section 287(g) provides a mechanism for enlisting the help of state and local law enforcement entities in this effort.  Under Section 287(g), ICE provides participating state and local law enforcement officers with the training and subsequent authorization to identify, process, and when

---

[45] 8 U.S.C. § 1357(g) (1996).

appropriate, detain immigration offenders who are encountered during regular, daily law-enforcement activity.  States or localities that wish to participate in the program enter into a Memorandum of Understanding (MOU) with ICE.

Other ICE officials questioned why SCAAP applications are based on a custody period in the year prior to the one in which payments are sought.  In the view of those officials, this payment for the past costs of incarceration does not further the removal of undocumented criminal aliens currently in the United States.

ICE headquarters officials also stated they would like to have graduated payments based on the SCAAP recipient taking steps toward the removal of criminal aliens from the United States.  Larger payments could be provided to a jurisdiction when a final order of removal is obtained and for participating in the "Section 287(g)" program to determine alienage.  Those officials believe this would result in payment for assisting ICE in identifying and removing criminal aliens rather than merely housing them.

When we asked ICE headquarters officials specifically about the seven sites where we intended to perform field work, they declined to suggest alternative sites.  They also commented favorably about the cooperation ICE received from every jurisdiction, except the City and County of San Francisco. The ICE responses on the seven sites we visited included the following observations:

*Clark County, Nevada* – ICE has a very good working relationship with the Clark County Sheriff's Office, including the county jail.  The jail sends information about foreign-born subjects to ICE on a 24-hour a day basis. This information is processed, and, if appropriate, a detainer is placed on the subject.

*Cook County, Illinois* – The ICE Office of Investigations Special Agent in Charge of the Chicago field office has had a good working relationship with the Cook County jail for the last several years.

*New York, New York* – The ICE Detention and Removal Operations (DRO), New York Field Office, has received full cooperation from the participating SCAAP local and state entities.

*State of California Department of Corrections and Rehabilitation* – In 1994, the State of California amended the Penal Code to include Section 834(b), which requires all cities and localities within the State of California to

verify the immigration status of individuals arrested and to contact [ICE] when appropriate.

*State of Oregon Department of Corrections* – All state facilities have been very cooperative with respect to identifying, holding, and transferring foreign nationals to ICE custody.

*State of Texas Department of Criminal Justice* – The DRO Houston Field Office reports significant cooperation with the Texas Department of Criminal Justice in both the Texas Prison System and the Texas state jail system. The Texas Department of Criminal Justice works closely with ICE in assisting in identifying foreign-born aliens within the Texas prison and state jail system and transports the prisoners to one central location in [SENSITIVE INFORMATION REDACTED], Texas, where they can be interviewed as well as presented for court proceedings. ICE has received cooperation from operations at [SENSITIVE INFORMATION REDACTED] regarding the state prisoners system. In addition to providing transportation and identification assistance, the Texas Department of Criminal Justice provides an entire facility for exclusive use by ICE.

*City and County of San Francisco* – The San Francisco ICE Field Office has encountered difficulties in its attempt to expand the Criminal Alien Program (CAP). According to an agent working at ICE headquarters, the San Francisco County Jail and its administration appear to have implemented a "bare minimum of cooperation with ICE and the CAP to ensure they are compliant with state rules and the SCAAP regulations." Agents employed by ICE are not permitted to access jail records without the authorization and approval of the Sheriff. ICE agents are authorized to enter the jails to interview prisoners and to access the "all-jail alphabetical list" of inmates. However, ICE agents do not have the authorization to access booking cards, housing cards or other jail records, including computers.

**Results of OIG Survey**

We also surveyed 164 of the 752 state, county, and local agencies that received SCAAP funding from the FY 2005 appropriation.[46]

Our criteria for selecting the SCAAP recipients we surveyed involved grouping them into three categories: those that received at least $500,000,

---

[46] The sample was selected judgmentally, and the results cannot be projected to the universe of SCAAP recipients. See Appendix IV for a list of the jurisdictions we surveyed and those that responded.

those that received between $50,000 and $499,999, and those that received less than $50,000.

There were 59 entities that received at least $500,000, and we selected all of them for our sample.  Collectively, those 59 jurisdictions received $256.9 million, or approximately 90 percent of all the SCAAP payments made from FY 2005 funds.  There were 157 entities that received between $50,000 and $499,999 and 536 that received less than $50,000.  We judgmentally selected and surveyed 50 of the former group and 55 of the latter.  Together these groups received $7.9 million, or nearly 3 percent of the SCAAP payments from FY 2005 funds.

Our survey inquired whether the state or local agency asked arrestees about their immigration status, informed ICE about criminal aliens in local custody, accepted detainers from ICE, or alerted ICE prior to releasing criminal aliens from local custody.[47]  In our judgment, affirmative answers to these questions would indicate a degree of cooperation in the effort to remove criminal aliens from the United States.  However, it is important to note that a negative response by itself to one or more questions would not necessarily establish a lack of cooperation on the part of the SCAAP recipient.

Survey responses were received from 99 (60 percent) of the 164 SCAAP recipients that we surveyed.  The respondents received a total of $205.4 million, or 71.6 percent of the SCAAP payments from FY 2005 funds.

*Immigration Status of Arrested Individuals*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 59 | 34 | 4 | 0 | 2 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

Thirty-four respondents reported that they do not generally ask the subject of an arrest about his or her immigration status.  However, many of

---

[47] A detainer is a notice from ICE asking officials at the detention facility of notify ICE before releasing a detainee.

those jurisdictions qualified their response.  The following comments were offered by some of the respondents who replied "no."

- "[The [SENSITIVE INFORMATION REDACTED] Department of Corrections] does not have arrest authority; however every adjudicated offender is asked about his or her immigration status during in-processing."

- "Each person arrested is asked their country of origin, not necessarily about immigration status."  [SENSITIVE INFORMATION REDACTED]

- "Generally no, unless there is reason to believe [the] individual has been involved in certain criminal activities such as arrested for, or has been convicted of a felony, violent crime, etc."  [SENSITIVE INFORMATION REDACTED]

- ". . . Pursuant to [state legislation] 'a peace officer who has probable cause that an arrestee for a criminal offense is not legally present in the U.S. shall report such arrestee to the U.S. ICE office. . . .'"  [SENSITIVE INFORMATION REDACTED]

- "It is not the Police Department's policy to ask, however, some officers ask voluntarily.  It is not the Police Department's policy to take proactive enforcement action against undocumented aliens. However, if an encounter with an undocumented alien yields a wanted status for an immigration violation listed by another agency, the Police Department will confirm extradition before arrest."  [SENSITIVE INFORMATION REDACTED]

- ". . . Only on domestic battery and felonies, because on other charges ICE does not respond . . . anymore."  [SENSITIVE INFORMATION REDACTED]

- "The [[SENSITIVE INFORMATION REDACTED] Department of Corrections] is tasked with housing inmates after arrest and sentencing."

The responses from several localities emphasized the absence of federal or state law requiring them to inquire into the immigration status of arrestees.

- "There is no local ordinance or regulation from the County's Board of Supervisors authorizing the Department of Corrections to ask

- 12 –

arrestees about their immigration status."  [SENSITIVE INFORMATION REDACTED]

- "Not required under state or federal law."  [SENSITIVE INFORMATION REDACTED]

- "We do not ask the question for two reasons.  First, some time back, the local law chiefs agreed to not engage in this type of behavior in the field.  Second, a recent opinion by the California Attorney General states local and state law enforcement is not obligated to abide by the federal immigration statutes."[48] [SENSITIVE INFORMATION REDACTED]

- "Currently there are no policies or procedures in place requiring such action."  [SENSITIVE INFORMATION REDACTED]

- "Only if the investigation points to the fact that the individual(s) may be an undocumented alien."  [SENSITIVE INFORMATION REDACTED]

*Informing ICE About Aliens in Custody*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform the ICE that the individual is in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 78 | 17 | 3 | 0 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

Seventeen respondents reported they do not generally inform ICE when they have someone in custody who they believe may be an undocumented criminal alien.  However, many of those 17 jurisdictions added qualifying remarks.  In some instances, they were critical of a

---

[48]  We believe the respondent from [SENSITIVE INFORMATION REDACTED] misinterpreted the California Attorney General's opinion, which clearly states that federal law preempts state law and requires state and local government entities to cooperate with federal immigration agents.  During a follow-up interview, the county official who gave this response confirmed that he may have misinterpreted the opinion.  See Appendix IX for the opinion.

perceived lack of response on the part of ICE, but there were other explanatory factors as well.

- "Our experience has shown that ICE is not going to respond anyway." [SENSITIVE INFORMATION REDACTED]

- "On every occasion we attempt to inform ICE but ICE does not always respond." [SENSITIVE INFORMATION REDACTED]

- "Past history has shown that they will rarely pick the subjects up for transport." [SENSITIVE INFORMATION REDACTED]

- "Depends on nature of crime." [SENSITIVE INFORMATION REDACTED]

- "ICE agents come into our facility on a regular basis and review our records of undocumented aliens." [SENSITIVE INFORMATION REDACTED]

- "Sheriff's deputies do not inform ICE.  Detention staff will notify ICE if information obtained from a criminal history rap sheet or information obtained from our local database alerts [our] Department of previous contacts with ICE (releases to ICE or previously deported criminal alien)." [SENSITIVE INFORMATION REDACTED]

- "This is a sheriff's department function." [SENSITIVE INFORMATION REDACTED]

- "Law enforcement officers may contact ICE but jail staff do not.  We have an ICE employee [who] regularly reviews inmate rosters." [SENSITIVE INFORMATION REDACTED]

- "Most patrol officers do not have the time or know the number in order to inform ICE." [SENSITIVE INFORMATION REDACTED]

*Accepting Detainers from ICE*

| Survey Results | | | | |
|---|---|---|---|---|
| **Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.** | | | | |
| *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 94 | 3 | 1 | 0 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

One possible measure of cooperation with ICE would be if the respondent accepted detainers from ICE and continuing to hold criminal aliens until ICE agents can take physical custody of them.  The responses to our questionnaire disclosed a widespread willingness to accept detainers from ICE.  Ninety-four of the 99 respondents reported that they accept such detainers and the 3 that responded negatively added comments indicating that they may have misinterpreted the question as asking about the lodging of ICE prisoners.

*Alerting ICE Before Releasing Aliens from Custody*

| Survey Results | | | | |
|---|---|---|---|---|
| **Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.** | | | | |
| *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 78 | 18 | 1 | 1 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

In answer to our question about alerting ICE before releasing undocumented criminal aliens from local custody, 78 respondents reported that they notify ICE and 18 stated they do not.  We asked those that alert ICE to report how much advance notice they provide and the responses ranged from the date of release to substantially longer periods, as the following comments illustrate:

- "At least 45 days in advance."  [SENSITIVE INFORMATION REDACTED]

- "Six months."  [SENSITIVE INFORMATION REDACTED]

- 15 –

- "At any time between 6 and 30 days, depending on the type of release."  [SENSITIVE INFORMATION REDACTED]

- "ICE is informed of all foreign born state sentenced inmates and their earliest possible release dates when the inmate is processed in the county or Reception."  [SENSITIVE INFORMATION REDACTED]

- "As early in the sentence as possible."  [SENSITIVE INFORMATION REDACTED]

- "Upon initial booking."  [SENSITIVE INFORMATION REDACTED]

- "Only when ICE has placed a 'hold' on the person."  [SENSITIVE INFORMATION REDACTED]

The jurisdictions that stated they do not notify ICE offered varying explanations.  For example, [SENSITIVE INFORMATION REDACTED], stated it does not notify ICE in advance, "unless ICE asks us to."  However, as previously noted, the county also reported that ICE agents regularly visit the county facility and review the records of undocumented aliens.  That being the case, it would appear that additional notification by [SENSITIVE INFORMATION REDACTED] may not be necessary.  The [SENSITIVE INFORMATION REDACTED] reported that "releases must occur on a timeline of minutes and hours after the court issues the ruling."  [SENSITIVE INFORMATION REDACTED], stated "in most cases we are unaware of [the] status."

We asked two additional questions related to the cooperativeness of SCAAP recipients in the effort to remove criminal aliens from the United States.  These questions deal with the transportation of criminal aliens to ICE offices and participation in the Section 287(g) program.

*Transporting Undocumented Criminal Aliens to the Nearest ICE Office*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If ICE agents cannot transport an undocumented criminal alien from your facility, do your officers transport the alien to the nearest ICE office?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 23 | 70 | 2 | 0 | 4 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

We are not aware of any requirement for states, counties, or localities to transport undocumented criminal aliens to an ICE office. Therefore, an answer of "no" to our question does not imply any lack of cooperation on the part of the locality. However, we included this question because an answer of "yes" may be reasonably considered an indicator of cooperation. In response to the questionnaire, 23 respondents stated they would transport undocumented criminal aliens to the nearest ICE office if ICE agents could not do so, and 70 respondents reported they would not.

The comments provided in reply to our question included the following.

- "We have never been in the position where ICE does not transport the alien from the state correctional facility to the ICE office. In the event ICE could not transport the alien, the [SENSITIVE INFORMATION REDACTED] would not transport the alien back to the nearest ICE office." [SENSITIVE INFORMATION REDACTED]

- "Has not happened, though we would assist." [SENSITIVE INFORMATION REDACTED]

*Participation in the 287(g) Program*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *Are you aware of the program under Section 287(g) of the Immigration and Nationality Act by which local officers may be trained and authorized to perform certain immigration enforcement tasks?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 50 | 45 | 1 | 0 | 3 |
| *Is your jurisdiction currently participating in the Section 287(g) program?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 11[49] | 84 | 1 | 1 | 2 |
| *If your jurisdiction does not currently participate in the Section 287(g) program, are you interested in entering into a Memorandum of Understanding with ICE to participate in the Section 287(g) program?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 33 | 41 | 6 | 6 | 13 |

Source:  Responses from SCAAP Recipients to OIG Questionnaire

As mentioned previously, some ICE officials expressed a desire to place SCAAP under the control of ICE and make SCAAP payments contingent

---

[49]  Although 11 respondents stated they participate in the "287(g)" program, ICE officials told us only 7 jurisdictions have current MOUs.  Other jurisdictions are negotiating with ICE to participate in the "287(g)" program.

upon participation in the "287(g)" program.  Regardless of which agency has responsibility for SCAAP, we believe that participation in the "287(g)" program may be considered evidence of cooperation with ICE in the removal of criminal aliens from the United States.  For this reason we included questions about the "287(g)" program in a questionnaire we sent to 164 recipients of FY 2005 SCAAP funding.  We received responses from 99 jurisdictions and 33 of them indicated an interest in entering into an MOU to participate in the "287(g)" program.

Our questionnaire asked if the respondents were aware of the "287(g)" program, whether they participated in it, and, if not, whether they were interested in receiving information about it.  In response to our three questions, we received very few comments.  The following are examples of the comments provided by respondents.

- "We are currently in discussion with ICE officials in order to learn more about the Section 287(g) program; no decision has been made regarding participation in the program."  [SENSITIVE INFORMATION REDACTED]

- "Not sure - more information is needed."  [SENSITIVE INFORMATION REDACTED]

- "We are unfamiliar.  We require additional information in order to answer correctly."  [SENSITIVE INFORMATION REDACTED]

- "We are in the approval process."  [SENSITIVE INFORMATION REDACTED]

- "This matter must be referred to a higher legal authority than what the respondent has."  [SENSITIVE INFORMATION REDACTED]

**Results of Field Work**

*Interviews with Local ICE Officials*

At each of the sites where we performed field work, we asked local ICE officials about the cooperativeness of the SCAAP recipient in question.  The views of those officials mirrored the views previously obtained from ICE headquarters.  Local ICE officials offered favorable comments about each of the jurisdictions, except the City and County of San Francisco.  Those ICE officials stated that the San Francisco Sheriff's Department accepts detainers from ICE and promptly notifies ICE when criminal aliens are about to be released from custody, but neither the Sheriff's Department nor the Police

Department [SENSITIVE INFORMATION REDACTED].  Moreover, the process for interviewing aliens in the jail was described as "uncooperative" by the local ICE officials, who also characterized relations with the Sheriff's Department as unfriendly and marked by "much animosity."

*Interviews with State and Local Officials*

We interviewed officials and reviewed files at seven jurisdictions that received funding from the FY 2005 appropriation for SCAAP.  The officials whom we interviewed included local officials knowledgeable in the areas of SCAAP and detention.  Local officials from all seven jurisdictions reported that their detention facilities:  (1) accept ICE detainers for undocumented criminal aliens in their custody; and (2) alert ICE before releasing undocumented criminal aliens from custody.

We asked whether law enforcement officers ask arrestees about their immigration status and received mixed responses, but none that indicated an unwillingness to cooperate with ICE in the removal of criminal aliens from the United States.  For example:

- At institutions in the [SENSITIVE INFORMATION REDACTED], correctional officers generally ask an inmate's place of birth rather than immigration status.  They defer the determination of an individual's immigration status to ICE.

- At corrections facilities in the [SENSITIVE INFORMATION REDACTED], individuals are asked about their immigration status.

- In [SENSITIVE INFORMATION REDACTED], it is not considered the arresting officer's mission to determine immigration status.  Research into a detainee's place of birth occurs during the booking process.  Similarly, in the [SENSITIVE INFORMATION REDACTED], arrestees are asked about their place of birth rather than their immigration status during the booking process.

- In [SENSITIVE INFORMATION REDACTED], neither the city police nor personnel in the county sheriff's office [SENSITIVE INFORMATION REDACTED].  However, the immigration status of a detainee is often determined during the classification process either by:  (1) self-identification of the detainee as foreign-born; (2) queries of databases, including NCIC, the [SENSITIVE INFORMATION REDACTED] Law Enforcement Telecommunications System, and ICE's Law Enforcement Support Center; and

(3) submission of fingerprints through the Automated Fingerprint
Identification System.

We also asked about notification of ICE when local jurisdictions have
someone in custody who may be an undocumented alien.  The following are
some responses:

- If [SENSITIVE INFORMATION REDACTED] enforcement officers
  have reason to believe someone they arrest may be an
  undocumented alien, they inform ICE and seek further advice.

- [SENSITIVE INFORMATION REDACTED] facilities determine whether
  inmates are "foreign born" during the intake process.  Biographical
  information sheets and a fingerprint cards for foreign born inmates
  are sent to ICE for review, usually during the first week of
  incarceration.

- The [SENSITIVE INFORMATION REDACTED] Department of
  Corrections sends ICE a referral if the booking process determines
  an inmate may have a foreign place of birth.

- [SENSITIVE INFORMATION REDACTED], sends a notice to ICE with
  a request for a prompt response.  The county tries not to hold any
  inmate more than four hours past the scheduled release unless ICE
  places a detainer on that individual.

- When officers from the [SENSITIVE INFORMATION REDACTED]
  arrest an alien for a criminal offense, the police department notifies
  ICE based on information entered into the booking system.

Local officials at two jurisdictions indicated a willingness to transport
criminal aliens from their facilities to the nearest ICE office if ICE agents
could not do so.

- [SENSITIVE INFORMATION REDACTED] corrections officials said
  inmates are transported without charge to an ICE facility or to an
  ICE contract facility if ICE transportation is not available.

- [SENSITIVE INFORMATION REDACTED] corrections officials state
  their officers transport alien inmates if necessary, but they added
  this happens only on rare occasions because releases are
  coordinated with ICE.

Officials at all seven of the sites we visited were aware of the "287(g)" program, but none of the jurisdictions were participating in it.  When asked if they were interested in participating in the program, local officials offered the following comments.

- The [SENSITIVE INFORMATION REDACTED] legislature is still evaluating the overall benefits to the [SENSITIVE INFORMATION REDACTED], whose mission is directed more toward rehabilitation of inmates than to immigration enforcement.  At this time, officials do not believe the benefits are clear.

- [SENSITIVE INFORMATION REDACTED] officials believe participation in the "287(g)" program would probably conflict with state law.

- The [SENSITIVE INFORMATION REDACTED] is exploring participation in the program.  Officials are awaiting more information so they can weigh the pros and cons.  They are particularly concerned about who will pay for the state officers while engaged in "287(g)" activities, how many days officers would be required to participate, the reporting structure, and personnel issues.

- Officials from [SENSITIVE INFORMATION REDACTED]; [SENSITIVE INFORMATION REDACTED]; [SENSITIVE INFORMATION REDACTED], and the [SENSITIVE INFORMATION REDACTED] all stated their jurisdictions were not interested in participating in the "287(g)" program.

*File Reviews*

We reviewed a total of 76 files relating to criminal aliens who had been recently discharged from local custody at the 7 locations where we performed field work.  Our review disclosed that:

- ICE was notified in a timely manner that the 76 criminal aliens were in custody;

- ICE detainers were accepted for all 76 individuals;

- Seventy criminal aliens were transferred to ICE, all in a timely manner.  Five of the remaining six individuals were transferred to other jurisdictions, such as a state prison, and one, a Cuban, was paroled because repatriation to Cuba was not possible.

- 21 –

This limited review of local files did not disclose evidence of any local policy or procedure that we would consider less than fully cooperative with ICE in the removal of criminal aliens.

**Statement of Major Cities Chiefs of Police**

The complexity of determining whether jurisdictions fully cooperate with ICE is further illustrated by a statement issued in June 2006, by the Major Cities Chiefs of Police (MCC) organization.[50]  This document describes illegal immigration as a problem that "must be dealt with at the national level" and details certain concerns that local agencies have.  A key paragraph states, "local police agencies must balance any decision to enforce immigration laws with their daily mission of protecting and serving diverse communities, while taking into account:  limited resources;  the complexity of immigration laws; limitations on authority to enforce; risk of civil liability for immigration enforcement activities and the clear need to foster the trust and cooperation from the public including members of immigrant communities."

The MCC statement also observes that "assistance and cooperation from immigrant communities is especially important when an immigrant, whether documented or undocumented, is the victim of or witness to a crime.  These persons must be encouraged to file reports and come forward with information.  Their cooperation is needed to prevent and solve crimes and maintain public order, safety, and security in the whole community. . . . Immigration enforcement by local police would likely negatively effect (*sic*) and undermine the level of trust and cooperation between local police and immigrant communities.  If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation.  Distrust and fear of contacting or assisting the police would develop among legal immigrants as well."

The MCC statement taken as a whole articulates a two-pronged position that we frequently encountered in our review, namely that many state, county, and local law enforcement agencies are unwilling to initiate immigration enforcement but have policies that suggest they are willing to

---

[50]  See Appendix V for the MCC's "Nine-Point Position Statement."  The MCC describes its membership as the 57 Chief Executive Officers of police departments located within metropolitan areas with a population of more than 1.5 million population and that employ more than 1,000 law enforcement officers.

cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens.

**Additional Research**

We further examined the issue of cooperation between SCAAP recipients and ICE by researching the policies of localities that may have laws, resolutions, or other policies limiting the role of local agencies in the enforcement of immigration legislation.  In some cases, those localities have designated themselves with terms such as a "sanctuary city" or a "civil liberties safe zone." Our research revealed much anecdotal information, but little in the way of formal policies.

We were guided initially in our research by listings of sanctuary cities posted on the websites of several organizations.[51]  Later, we focused our search on jurisdictions that received SCAAP funding of at least $1 million from the FY 2005 appropriation.  We searched the websites for those jurisdictions in an effort to locate policy statements affecting how local law enforcement agencies interact with ICE in the effort to remove criminal aliens from the United States.

We were able to locate an official "sanctuary" policy for only two jurisdictions that received at least $1 million in SCAAP funding, the State of Oregon, which received $3.4 million, and the City and County of San Francisco, which received $1.1 million and has designated itself as a "City and County of Refuge."  We also located an Executive Order issued by the Mayor of New York limiting the activities of local law enforcement agencies and officers in the enforcement of immigration law.[52]  However, in each instance, the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers must assist ICE or share information with ICE as required by federal law.

The Oregon policy begins by stating, "No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."  However, the policy goes on to state that a law

---

[51]  In using the information posted by these organizations, we do not endorse any position they may advocate regarding immigration enforcement.  We simply used their lists as leads pointing toward jurisdictions that may have policies such as those described in our congressional mandate.

[52]  See Appendix VII.

enforcement agency may exchange information with federal immigration authorities to "verify the immigration status of a person if the person is arrested for any criminal offense;" or to "request criminal investigation information with reference to persons named in [federal] records."[53]

San Francisco has designated itself as a "City and County of Refuge" and has limited the extent to which municipal agencies and employees may assist in immigration enforcement.  The City Administrative Code states that "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals . . . *unless such assistance is required by federal or state statute, regulation or court decision.*"  [Emphasis added.]  The proviso requiring compliance with federal law reinforces our view that there is insufficient evidence to conclude that San Francisco fails to cooperate with ICE's efforts to remove undocumented aliens.

We did not locate a "sanctuary city" designation for the City of New York, which received $15.9 million in SCAAP funding.  However, we located a Mayor's Executive Order that enunciates a policy that local law enforcement officers will not initiate immigration enforcement but will cooperate with federal immigration authorities in some respects.  The Mayor's Executive Order 41 addresses local law enforcement as it relates to immigration matters and states, "Law enforcement officers shall not inquire about a person's immigration status unless investigating illegal activity other than mere status as an undocumented alien."  However, in the next paragraph it states, "Police officers and peace officers, including members of the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity."[54]

---

[53]  See Appendix VI.

[54]  See Appendix VII.

## CHAPTER 3 — COMMUNICATION BETWEEN SCAAP RECIPIENTS AND ICE

The second congressional question asked us to determine whether any SCAAP recipients have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373).  This statute, in effect, prohibits any interference in the free exchange of immigration-related information between state or local law enforcement and federal immigration authorities.  Two key provisions of the statute are 8 U.S.C. § 1373 (a) and (b), which state:

- *Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, or any individual.*

- *Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:*

  - *Sending such information to, or requesting or receiving such information from, Immigration and Naturalization Service.*

  - *Maintaining such information.*

  - *Exchanging such information with any other Federal, State, or local government entity.*[55]

**Views of ICE Officials**

ICE officials objected to provisions of the administrative code of the City and County of San Francisco that limit the ability of local agencies and officers to communicate immigration information to ICE.

The City Administrative Code states "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or

---

[55]  The statutory references to the Immigration and Naturalization Service now apply to ICE.

disseminate information regarding the immigration status of individuals in the City and County of San Francisco *unless such assistance is required by federal or state statute, regulation, or court decision.*"   [Emphasis added.]

The Code also states "nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying or reporting any person pursuant to a state or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws."  Finally, the Code states that "nothing in this chapter shall preclude any . . . department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has been booked at any county jail facility, and who has been previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law."[56]

As mentioned in the preceding chapter, ICE officials considered these policies of the City and County of San Francisco as the "bare minimum" of cooperation.  However, in light of the specific provisions requiring compliance with federal law, we cannot conclude that San Francisco's policies are contrary to 8 U.S.C. § 1373.

**Results of OIG Survey**

We included a question in our survey asking about laws, regulations, or policies affecting each organization that might restrict the free exchange of immigration-related information between local law enforcement agencies and ICE.  The 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters.  The detailed results are displayed in the following table.

---

[56]  See Appendix VIII.  The San Francisco City Administrative Code references to INS now apply to ICE.

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend: N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *In your jurisdiction, is there currently in effect any limitation on the ability of local law enforcement officers or agencies to exchange information relating to immigration enforcement due to:* | | | | |
| *State law?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 0 | 96 | 1 | 2 | 0 |
| *Local ordinance?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 1 | 94 | 1 | 0 | 3 |
| *Executive order?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 0 | 96 | 1 | 0 | 2 |
| *Departmental policy?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 1 | 96 | 1 | 0 | 1 |

Source:   Responses from SCAAP recipients to the OIG questionnaire

The City and County of San Francisco gave a qualified "yes" in response to our queries about the existence of a local ordinance or a departmental policy limiting the ability of local law enforcement officers or agencies to exchange information with ICE relating to immigration enforcement.  The response to the survey included a copy of the previously cited sections of the City Administrative Code and a police department General Order, which states that generally "a member [of the police department] shall not inquire into an individual's immigration status or release or threaten to release information to the INS regarding an individual's identity or immigration status."   However, the General Order makes exceptions that parallel those enumerated in the City Administrative Code.

**Results of Field Work**

In our interviews with local officials at the seven sites, we asked if their jurisdictions currently have in effect any statute, ordinance, executive order, or other legislation or official policy prohibiting local law enforcement agencies and officers from freely exchanging information with ICE on the citizenship or immigration status of individuals.  Officials at four of the seven sites we visited replied unequivocally, "no," while officials at the other three sites gave qualified answers.

- The State of Oregon has a state "sanctuary" statute, but the officials whom we interviewed believe it does not infringe on the exchange of information with ICE.

- 27 –

- Officials from the City of New York informed us there is no prohibition on exchanging information with ICE on individuals who have been arrested.

- Local officials stated the City of San Francisco Police Department's policy is "consistent with its obligations under state and federal law, to adhere to the City of Refuge Ordinance.  This ordinance prohibits the use of City resources to assist in the enforcement of federal immigration laws except in certain limited circumstances consistent with state and federal law."

As discussed in the preceding chapter, our examination of official policies published by those jurisdictions confirmed the views expressed by local officials.

# CHAPTER 4 — RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM LOCAL CUSTODY

The third congressional question asked us to determine how many criminal offenses were committed by criminal aliens who were released from local custody without a referral to DHS for removal from the United States.

To address this question, we performed limited testing to determine the number of subsequent *arrests* of criminal aliens who were released from state or local custody. We based our testing on information from the vetted FY 2004 SCAAP database, which was the last year when ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[57] The vetted database included 262,105 criminal histories.

## NCIC Query

We requested assistance from the Federal Bureau of Investigation (FBI) to have the vetted FY 2004 SCAAP database compared to arrest data in the FBI's National Crime Information Center (NCIC).[58]

The FBI ran two queries, one for SCAAP records that included an FBI number, and another for those records that lacked an FBI number. For the latter group, the FBI queried NCIC using the name and date of birth for each individual listed in the vetted data.

The FBI provided us with nearly 433,000 individual text files that were not searchable by automated means. Because the files were not in a searchable format, we were not able to quantify all the arrests that occurred subsequent to the cutoff date for FY 2004 funding, June 30, 2003. Instead, we reviewed a judgmental sample of 100 criminal histories for evidence of arrests of individuals subsequent to the time when their incarceration was used to support an application for SCAAP funding.

We sampled 53 from records that had FBI numbers and 47 from records that lacked such numbers.[59] The criminal histories for 73 individuals documented at least one arrest after June 30, 2003. Those 73 individuals

---

[57] FY 2004 SCAAP funding was based on the incarceration of criminal aliens between July 1, 2002, and June 30, 2003.

[58] NCIC is a computerized database of criminal justice information available to law enforcement agencies nationwide. The NCIC database consists of millions of records arranged in 18 files, including one relating to immigration violators.

[59] This number is issued by the FBI to track arrests and fingerprint records.

accounted for a total of 429 arrests based on 878 charges and included 241 convictions.  These figures represent an average of nearly six arrests per individual.

The charges for the 73 individuals ranged from traffic violations and trespassing to more serious crimes, such as burglary or assault.  Some of those charges included:

- 166 drug-related;

- 37 immigration-related;

- 213 burglary, robbery, or theft;

- 40 assault;

- 10 property damage;

- 3 terrorist threat;[60] and

- 13 weapons charges.

Based on this limited sample, we cannot statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE.  Based on the information available to us in the criminal histories, we could not determine the number of the criminal aliens in our sample that were deported, if any, and later arrested after reentering the United States.  We also could not determine if ICE was notified before the criminal aliens in our sample were released from custody.  But if this data is indicative of the full population of nearly 262,105 criminal histories, the rate at which released criminal aliens are rearrested is extremely high.

---

[60]  The "terrorist threat" cases related to misdemeanor charges based on domestic disputes.

## CHAPTER 5 – CRIMINAL ALIENS RELEASED DUE TO LACK OF RESOURCES

The fourth congressional question asked us to determine how many of the criminal aliens who were released from custody without a referral to ICE were released for lack of sufficient detention space or funding to hold them. While we believe this happens regularly, our review could not identify specific instances of such releases because ICE does not track the number of aliens released from local custody due to lack of the necessary resources to detain them. While our review did not identify any instances of such releases, it is important to note that the Inspector General of the Department of Homeland Security has reported: (1) a shortage of space available for housing aliens in ICE custody; and (2) the possible release in FY 2007 of a substantial number of removable criminal aliens from state or local custody because ICE does not have the resources to identify, detain, and remove them.

**Results of OIG Survey**

To examine this question we relied on responses to the questionnaire that we sent to 164 SCAAP recipients. Our questionnaire included a request that the respondents provide the number of criminal aliens who were released from custody between October 1, 2004, and June 30, 2006, because the respondent lacked the space or funds to detain those aliens. None of the respondents reported having released criminal aliens from custody due to lack of resources. Specifically, 9 replied "none," 78 replied "not applicable," 7 replied "unknown," and 5 did not answer the question. Some jurisdictions added comments such as the following.

- "No, ICE was always contacted." [SENSITIVE INFORMATION REDACTED]

- "Any arrestees without local charges or holds are released by law." [SENSITIVE INFORMATION REDACTED]

- "None; again, referral was made but ICE did not place detainer on subjects." [SENSITIVE INFORMATION REDACTED]

- "None – primarily due to ICE [being] unable or unwilling to transport." [SENSITIVE INFORMATION REDACTED]

**DHS Inspector General Report**

Even though the state, county, and local respondents to our questionnaire did not report releasing undocumented criminal aliens because of insufficient local resources, we noted an issue regarding the lack of space available to ICE to detain aliens in custody.  In an April 2006 report, the Inspector General of the Department of Homeland Security stated, "[the Detention and Removal Operations (DRO)] estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S.[61] Of this number, DRO estimates half (302,500) will be removable aliens. Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP).  It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove [them]."[62]

The DHS Inspector General went on to state, "additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by:  (1) the propensity of illegal aliens to disobey orders to appear in immigration court; (2) the penchant of released illegal aliens with final orders to abscond; (3) the practice of some countries to block or inhibit the repatriation of its citizens; and (4) two recent U.S. Supreme Court decisions which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in 'Special Circumstances.'  Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial 'mini-amnesty' program for criminal and other high-risk aliens."

The DHS Inspector General reported that 345,006 criminal aliens were apprehended between FYs 2001 and 2004, of which 27,947 (8 percent) were released.  However, the DHS Inspector General could not determine whether they were released for lack of detention space or for other reasons because ICE does not track that information.

---

[61]  At our exit conference, representatives of DRO stated that references to "DRO" in the DHS OIG report would in this context be more appropriately read as "ICE."

[62]  Department of Homeland Security, Office of the Inspector General.  *Detention and Removal of Illegal Aliens: U.S. Immigration and Customs Enforcement (ICE)*, OIG-06-033, April 2006, p. 2.

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS**

We have performed a congressionally mandated audit of the State Criminal Alien Assistance Program (SCAAP).  The audit generally covered FYs 2004 and 2005, included a review of selected activities, and was conducted in accordance with the *Government Auditing Standards*.

In connection with this audit, and as required by the standards, we reviewed the laws and regulations relating to SCAAP, including:

- 8 U.S.C. § 1231(i) (1996), which authorized SCAAP;

- 8 U.S.C. § 1373 (1996), which relates to open communication between local law enforcement and ICE on immigration matters; and

- 8 U.S.C. § 1357(g) (1996), which authorizes the training of local law enforcement agents in immigration enforcement.

Our audit did not disclose any non-compliance on the part of BJA or ICE with provisions of the applicable laws and regulations.

## STATEMENT ON INTERNAL CONTROL STRUCTURE

In planning and performing our audit of the SCAAP payment program, we considered the internal control structure of BJA to the extent necessary for the purpose of determining our procedures.  Because the scope of our audit was defined by congressional mandate, we did not evaluate BJA's overall internal control structure.  Through interviews with officials from OJP, BJA, and ICE, we gained an understanding of the process of applying for, vetting, and awarding SCAAP payments.  Our review did not identify any material internal control weaknesses.

APPENDIX I

## AUDIT OBJECTIVES, SCOPE, AND METHODOLOGY

In Public Law 109-162, Congress directed us to "perform a study, and report to the Committee on the Judiciary of the United States House of Representatives and the Committee on the Judiciary of the United States Senate" on four questions regarding SCAAP.  The objective of our audit was to respond to those questions by determining:

(1)  *Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. § 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section.*

(2)  *Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. § 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373).*

(3)  *The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States of local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

(4)  *The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.*

We conducted our audit in accordance with the *Government Auditing Standards* and, accordingly, included such tests of records and procedures as we considered necessary to respond to the congressional mandate.  The scope of our work generally covered the state, county, and local law enforcement agencies that received SCAAP funding from the FY 2004 and FY 2005 appropriations.

Our methodology included interviews with officials, distribution of an OIG-developed questionnaire, review of files, queries of automated systems and other research.  We interviewed BJA and ICE officials at their respective headquarters in Washington, D.C.  In addition, we:

- 35 –

- analyzed BJA records relating to the recipients of SCAAP funding;

- submitted a questionnaire to 164 selected recipients of SCAAP funding;

- researched other relevant information, especially relating to localities that have designated themselves as sanctuary cities;

- performed field work, including interviews and file reviews at the offices of SCAAP recipients in Austin, Texas; Chicago, Illinois; Las Vegas, Nevada; New York, New York; Sacramento, California; Salem, Oregon; and San Francisco, California;

- interviewed local ICE officials whose area of responsibility covered the jurisdictions mentioned above; and

- arranged for the Federal Bureau of Investigation to query the National Crime Information Center database using SCAAP data sets in an effort to identify repeat arrests of criminal aliens.

APPENDIX II

# PUBLIC LAW 109-162

119 STAT. 3130        PUBLIC LAW 109–162—JAN. 5, 2006

to evidence of postage payment approved by the United States Postal Service.".

Grants.

**SEC. 1193. AUTHORIZATION OF ADDITIONAL APPROPRIATIONS.**

In addition to any other amounts authorized by law, there are authorized to be appropriated for grants to the American Prosecutors Research Institute under section 214A of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13003) $7,500,000 for each of fiscal years 2006 through 2010.

Hurricanes Katrina and Rita.

**SEC. 1194. ASSISTANCE TO COURTS.**

The chief judge of each United States district court is encouraged to cooperate with requests from State and local authorities whose operations have been significantly disrupted as a result of Hurricane Katrina or Hurricane Rita to provide accommodations in Federal facilities for State and local courts to conduct their proceedings.

**SEC. 1195. STUDY AND REPORT ON CORRELATION BETWEEN SUBSTANCE ABUSE AND DOMESTIC VIOLENCE AT DOMESTIC VIOLENCE SHELTERS.**

The Secretary of Health and Human Services shall carry out a study on the correlation between a perpetrator's drug and alcohol abuse and the reported incidence of domestic violence at domestic violence shelters. The study shall cover fiscal years 2006 through 2008. Not later than February 2009, the Secretary shall submit to Congress a report on the results of the study.

**SEC. 1196. REAUTHORIZATION OF STATE CRIMINAL ALIEN ASSISTANCE PROGRAM.**

(a) AUTHORIZATION OF APPROPRIATIONS.—Section 241(i)(5) of the Immigration and Nationality Act (8 U.S.C. 1231(i)(5)) is amended by striking "appropriated" and all that follows through the period and inserting the following: "appropriated to carry out this subsection—

    "(A) $750,000,000 for fiscal year 2006;
    "(B) $850,000,000 for fiscal year 2007; and
    "(C) $950,000,000 for each of the fiscal years 2008 through 2011.".

(b) LIMITATION ON USE OF FUNDS.—Section 241(i)(6) of the Immigration and Nationality Act (8 U.S.C. 1231(i)(6)) is amended to read as follows:

    "(6) Amounts appropriated pursuant to the authorization of appropriations in paragraph (5) that are distributed to a State or political subdivision of a State, including a municipality, may be used only for correctional purposes.".

(c) STUDY AND REPORT ON STATE AND LOCAL ASSISTANCE IN INCARCERATING UNDOCUMENTED CRIMINAL ALIENS.—

    (1) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Inspector General of the United States Department of Justice shall perform a study, and report to the Committee on the Judiciary of the United States House of Representatives and the Committee on the Judiciary of the United States Senate on the following:

        (A) Whether there are States, or political subdivisions of a State, that have received compensation under section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and are not fully cooperating in the Department

PUBLIC LAW 109–162—JAN. 5, 2006          119 STAT. 3131

of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).

(B) Whether there are States, or political subdivisions of a State, that have received compensation under section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).

(C) The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.

(D) The number of aliens described in subparagraph (C) who were released because the State or political subdivision lacked space or funds for detention of the alien.

(2) IDENTIFICATION.—In the report submitted under paragraph (1), the Inspector General of the United States Department of Justice—

(A) shall include a list identifying each State or political subdivision of a State that is determined to be described in subparagraph (A) or (B) of paragraph (1); and

(B) shall include a copy of any written policy determined to be described in subparagraph (B).

**SEC. 1197. EXTENSION OF CHILD SAFETY PILOT PROGRAM.**

Section 108 of the PROTECT Act (42 U.S.C. 5119a note) is amended—

(1) in subsection (a)—

(A) in paragraph (2)(B), by striking "A volunteer organization in a participating State may not submit background check requests under paragraph (3).";

(B) in paragraph (3)—

(i) in subparagraph (A), by striking "a 30-month" and inserting "a 60-month";

(ii) in subparagraph (A), by striking "100,000" and inserting "200,000"; and

(iii) by striking subparagraph (B) and inserting the following:

"(B) PARTICIPATING ORGANIZATIONS.—

"(i) ELIGIBLE ORGANIZATIONS.—Eligible organizations include—

"(I) the Boys and Girls Clubs of America;

"(II) the MENTOR/National Mentoring Partnership;

"(III) the National Council of Youth Sports; and

"(IV) any nonprofit organization that provides care, as that term is defined in section 5 of the National Child Protection Act of 1993 (42 U.S.C. 5119c), for children.

"(ii) PILOT PROGRAM.—The eligibility of an organization described in clause (i)(IV) to participate in the pilot program established under this section

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| AK | Alaska Department of Corrections | $26,553 | $33,417 |
| AL | State of Alabama | 45,747 | 61,085 |
| AL | Montgomery County | 8,709 | 7,404 |
| AL | De Kalb County | 4,482 | 1,009 |
| AL | Coffee County | | 2,454 |
| AR | State of Arkansas | 148,764 | 106,382 |
| AR | Washington County | 50,329 | 25,915 |
| AR | Benton County | 29,991 | 28,348 |
| AR | Carroll County | 9,153 | 4,526 |
| AR | Sebastian County | 8,420 | 12,577 |
| AR | Pope County | 6,412 | 12,295 |
| AR | Polk County | 1,561 | 2,718 |
| AR | Hempstead County | 996 | |
| AR | Boone County | 403 | |
| AR | Independence County | | 3,211 |
| AZ | State of Arizona | 12,139,791 | 6,808,219 |
| AZ | Maricopa County | 1,297,752 | 922,938 |
| AZ | Pima County | 407,301 | 747,878 |
| AZ | Yuma County | 220,339 | 217,921 |
| AZ | Yavapai County | 93,802 | 114,615 |
| AZ | Cochise County | 72,681 | 133,904 |
| AZ | Pinal County | 55,072 | 70,660 |
| AZ | Santa Cruz County | 31,453 | |
| AZ | Gila County | 23,623 | 21,675 |
| AZ | Mohave County | 12,307 | 32,947 |
| AZ | Greenlee County | 7,503 | 581 |
| AZ | Navajo County | 6,021 | 8,733 |
| AZ | Graham County | 2,844 | 3,296 |
| CA | State of California | 85,953,191 | 77,356,015 |
| CA | Los Angeles County | 12,530,034 | 13,876,508 |
| CA | Orange County | 6,562,437 | 4,593,198 |
| CA | San Diego County | 2,346,881 | 795,416 |
| CA | Santa Clara County | 1,616,147 | 1,382,031 |
| CA | Riverside County | 1,254,534 | 1,349,430 |
| CA | San Francisco City & County | 1,087,199 | 1,405,674 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| CA | Fresno County | 1,045,772 | 1,025,096 |
| CA | San Mateo County | 955,843 | 1,185,621 |
| CA | Sacramento County | 873,005 | 1,168,675 |
| CA | Monterey County | 735,201 | 925,407 |
| CA | Kern County | 613,980 | 882,708 |
| CA | Sonoma County | 604,578 | 784,290 |
| CA | Contra Costa County | 592,346 | 520,503 |
| CA | Ventura County | 564,332 | 355,127 |
| CA | San Bernardino County | 407,580 | 487,145 |
| CA | Alameda County | 403,662 | 223,619 |
| CA | Tulare County | 402,655 | 502,577 |
| CA | Santa Barbara County | 380,622 | 516,480 |
| CA | Solano County | 273,742 | 23,266 |
| CA | Marin County | 204,748 | 310,219 |
| CA | Napa County | 184,611 | 201,916 |
| CA | San Joaquin County | 181,990 | 193,916 |
| CA | Santa Cruz County | 173,291 | 212,435 |
| CA | Stanislaus County | 161,626 | 227,381 |
| CA | Merced County | 124,493 | 134,847 |
| CA | El Dorado County | 114,379 | 92,035 |
| CA | Kings County | 114,174 | 203,337 |
| CA | San Luis Obispo County | 94,654 | 140,418 |
| CA | Mendocino County | 76,388 | 55,543 |
| CA | Placer County | 71,636 | 89,111 |
| CA | Imperial County | 56,370 | 136,356 |
| CA | Yolo County | 55,703 | 94,262 |
| CA | Nevada County | 34,847 | 58,273 |
| CA | Sutter County | 34,570 | 39,722 |
| CA | Tehama County | 32,942 | 46,980 |
| CA | Mono County | 28,913 | 22,585 |
| CA | Humboldt County | 27,626 | 49,656 |
| CA | City of Santa Ana | 21,202 | 41,524 |
| CA | Glenn County | 16,559 | 19,235 |
| CA | Yuba County | 16,472 | 19,257 |
| CA | City of Anaheim | 16,259 | 33,306 |
| CA | Colusa County | 11,836 | |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| CA | Inyo County | 10,678 | 13,302 |
| CA | Butte County | 9,790 | 19,934 |
| CA | Lake County | 8,055 | 12,626 |
| CA | Siskiyou County | 7,823 | 7,117 |
| CA | Tuolomne County | 5,591 | 6,063 |
| CA | Plumas County | 4,595 | 2,437 |
| CA | Madera County | 2,785 | 8,209 |
| CA | Calaveras County | 1,558 | 5,331 |
| CA | Amador County | 733 | 2,754 |
| CA | Shasta County | | 40,342 |
| CO | State of Colorado | 2,358,707 | 3,104,425 |
| CO | Denver City & County | 950,665 | 997,382 |
| CO | Arapahoe County | 389,607 | 332,753 |
| CO | Boulder County | 267,084 | 241,687 |
| CO | Jefferson County | 139,824 | |
| CO | Weld County | 127,640 | 217,172 |
| CO | Adams County | 115,259 | 128,316 |
| CO | El Paso County | 100,370 | 198,068 |
| CO | Garfield County | 100,232 | 88,553 |
| CO | Eagle County | 78,319 | 71,649 |
| CO | Pueblo County | 71,749 | 58,963 |
| CO | Larimer County | 64,679 | 46,613 |
| CO | Douglas County | 63,949 | 92,396 |
| CO | Pitkin County | 50,679 | 46,151 |
| CO | Morgan County | 49,935 | 66,802 |
| CO | Mesa County | 18,356 | 43,365 |
| CO | Summit County | 14,885 | |
| CO | Delta County | 12,964 | 9,606 |
| CO | Lincoln County | 9,442 | 7,374 |
| CO | San Miguel County | 8,625 | 33,548 |
| CO | Moffat County | 7,631 | |
| CO | Sedgwick County | 7,418 | 4,541 |
| CO | Bent County | 1,967 | 343 |
| CO | Baca County | | 1,941 |
| CT | State of Connecticut | 779,697 | 900,356 |
| DC | District of Columbia | 81,762 | 44,472 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| DE | State of Delaware | 132,951 | 131,263 |
| FL | State of Florida | 12,806,110 | 11,778,031 |
| FL | Collier County | 597,409 | 236,938 |
| FL | Hillsborough County | 233,499 | 248,223 |
| FL | Pinellas County | 194,285 | 180,266 |
| FL | Lee County | 186,685 | 142,645 |
| FL | Sarasota County | 148,472 | 60,064 |
| FL | Martin County | 145,025 | 130,554 |
| FL | Orange County | 139,138 | 173,276 |
| FL | Osceola County | 89,780 | |
| FL | Seminole County | 88,956 | 132,497 |
| FL | Miami Dade County | 78,587 | 140,309 |
| FL | Broward County | 75,320 | 171,361 |
| FL | Brevard County | 66,355 | 60,660 |
| FL | Lake County | 61,813 | 70,897 |
| FL | Volusia County | 55,833 | 79,046 |
| FL | Indian River County | 54,704 | 61,934 |
| FL | St. Lucie County | 50,793 | 5,771 |
| FL | Okeechobee County | 43,124 | 67,629 |
| FL | Pasco County | 32,848 | 46,722 |
| FL | Polk County | 31,815 | 84,703 |
| FL | Leon County | 31,721 | 47,624 |
| FL | Palm Beach County | 29,817 | 138,714 |
| FL | DeSoto County | 29,569 | 43,104 |
| FL | Alachua County | 26,783 | 18,252 |
| FL | Clay County | 24,970 | 10,585 |
| FL | Hendry County | 23,393 | |
| FL | Hardee County | 22,887 | 36,953 |
| FL | Marion County | 19,490 | 29,065 |
| FL | Glades County | 17,801 | |
| FL | Highlands County | 14,940 | 35,240 |
| FL | Putnam County | 13,111 | |
| FL | Levy County | 7,341 | 6,097 |
| FL | Suwannee County | 6,944 | 9,184 |
| FL | Taylor County | 3,012 | |
| FL | Gilchrist County | 1,661 | 2,483 |

– 42 –

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| FL | Bradford County | 1,203 | 160 |
| FL | Santa Rosa County | | 9,816 |
| FL | Sumter County | | 8,596 |
| FL | Madison County | | 146 |
| GA | State of Georgia | 1,393,149 | 1,885,056 |
| GA | Cherokee County | 113,614 | 41,410 |
| GA | DeKalb County | 79,948 | |
| GA | Hall County | 36,833 | 71,524 |
| GA | Forsyth County | 32,322 | 28,847 |
| GA | Chatham County | 31,561 | 42,292 |
| GA | Houston County | 25,028 | 14,342 |
| GA | Cobb County | 22,301 | |
| GA | Augusta Richmond County | 19,559 | 17,809 |
| GA | Muscogee County | 19,357 | 12,518 |
| GA | Habersham | 19,081 | |
| GA | Floyd County | 17,323 | 23,854 |
| GA | Toombs County | 13,811 | 25,454 |
| GA | Walton County | 9,028 | 1,813 |
| GA | Newton County | 8,684 | 4,081 |
| GA | Carroll County | 6,556 | |
| GA | Gilmer County | 5,359 | 5,250 |
| GA | Monroe County | 2,577 | |
| GA | Lee County | 2,104 | 8,487 |
| GA | Crisp County | 1,291 | 1,519 |
| GA | Walker County | 1,257 | |
| GA | Grady County | 1,209 | |
| GA | Decatur County | | 5,790 |
| GA | Kennesaw County | | 1,141 |
| GU | Government of Guam | 204,042 | |
| HI | State of Hawaii | 195,595 | 171,317 |
| IA | State of Iowa | 344,266 | 477,575 |
| IA | Woodbury County | 57,725 | 94,146 |
| IA | Johnson County | 22,293 | 21,568 |
| IA | Polk County | 16,332 | 23,040 |
| IA | Story County | 13,740 | 21,376 |
| IA | Black Hawk County | 8,844 | 13,792 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| IA | Crawford County | 7,033 | 5,322 |
| IA | Mahaska County | 2,611 | 1,607 |
| IA | Louisa County | 2,178 | 3,642 |
| IA | Davis County | 1,673 | 764 |
| IA | Jefferson County | 362 | 163 |
| IA | Wright County | | 10,319 |
| ID | Idaho Department of Correction | 258,458 | 350,299 |
| ID | Canyon County | 112,759 | 79,581 |
| ID | Ada County | 92,502 | 70,057 |
| ID | Cassia County | 25,601 | 30,238 |
| ID | Madison County | 20,508 | 17,841 |
| ID | Blaine County | 17,612 | 38,904 |
| ID | Bonneville County | 16,719 | 24,957 |
| ID | Washington County | 9,794 | 11,170 |
| ID | Elmore County | 9,273 | 10,222 |
| ID | Bannock County | 8,830 | 10,584 |
| ID | Bingham County | 8,076 | 19,041 |
| ID | Gooding County | 7,369 | 4,239 |
| ID | Twin Falls County | 7,103 | 9,091 |
| ID | Jefferson County | 6,191 | 11,821 |
| ID | Power County | 2,873 | 3,889 |
| ID | Owyhee County | 1,987 | 4,475 |
| ID | Teton County | 1,582 | 2,390 |
| ID | Latah County | | 891 |
| IL | State of Illinois | 4,731,269 | |
| IL | Cook County | 1,926,114 | 1,957,320 |
| IL | Lake County | 262,713 | 497,325 |
| IL | Kane County | 189,347 | 187,952 |
| IL | DuPage County | 168,975 | 349,826 |
| IL | McHenry County | 129,710 | 119,588 |
| IL | Winnebago County | 32,827 | 76,726 |
| IL | Will County | 17,029 | 69,160 |
| IL | DeKalb County | 14,869 | 4,514 |
| IL | Rock Island County | 12,496 | 23,042 |
| IL | Kendall County | 10,870 | 6,455 |
| IL | LaSalle County | 7,208 | 10,580 |

| | SCAAP Recipients – FYs 2005 and 2004 | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| IL | McLean County | 7,007 | 5,986 |
| IL | Tazewell County | 6,784 | |
| IL | Peoria County | 5,321 | 3,378 |
| IL | Champaign County | 5,284 | 13,797 |
| IL | Ogle County | 4,506 | 1,165 |
| IL | Henry County | 4,180 | |
| IL | Bureau County | 1,253 | |
| IL | Dewitt County | 710 | |
| IL | Jo Daviess County | 442 | 1,030 |
| IL | Livingston County | 439 | 1,820 |
| IL | Williamson County | 250 | |
| IL | Kankakee County | | 7,094 |
| IL | Knox County | | 935 |
| IL | Woodford County | | 568 |
| IN | State of Indiana | 263,919 | 423,469 |
| IN | Marion County | 74,287 | |
| IN | Hamilton County | 21,260 | 17,499 |
| IN | St. Joseph County | 9,261 | |
| IN | Hendricks County | 5,544 | |
| IN | Johnson County | 4,649 | 4,938 |
| IN | Allen County | 4,437 | |
| IN | Porter County | 3,868 | 4,301 |
| IN | Grant County | 3,686 | 3,048 |
| IN | Monroe County | 3,476 | 5,349 |
| IN | Jackson County | 3,426 | 8,049 |
| IN | Clark County | 1,520 | 3,079 |
| IN | Cass County | 527 | 1,918 |
| KS | State of Kansas | 290,269 | 378,600 |
| KS | Johnson County | 130,457 | 161,398 |
| KS | Sedgwick County | 85,691 | 105,520 |
| KS | Wyandotte County | 68,384 | 49,538 |
| KS | Shawnee County | 22,896 | 22,292 |
| KS | Finney County | 12,421 | 13,300 |
| KS | Saline County | 12,165 | 18,181 |
| KS | Douglas County | 5,946 | 8,962 |
| KS | Butler County | 1,572 | |

– 45 –

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| KS | Montgomery County | 730 | 49 |
| KY | Shelby County | 113,902 | 100,320 |
| KY | Lexington Fayette Urban County | 69,269 | 54,531 |
| KY | State of Kentucky | 51,142 | 60,005 |
| KY | Kenton County | 1,605 | 12,875 |
| KY | Carroll County | 1,041 | 4,531 |
| KY | Louisville Jefferson County | | 35 |
| LA | State of Louisiana | 106,834 | 143,000 |
| LA | Bossier Parish | 6,789 | 13,959 |
| LA | Rapides Parish | 6,462 | 5,223 |
| LA | Orleans Parish | 4,932 | 4,965 |
| LA | Claiborne Parish | 2,019 | 1,136 |
| LA | Lincoln Parish Police Jury | 417 | 1,424 |
| LA | Avoyelles Parish | | 6,249 |
| LA | St. Tammany Parish | | 4,007 |
| LA | St. James Parish | | 40 |
| MA | State of Massachusetts | 4,728,549 | 5,362,497 |
| MA | Suffolk County | 790,048 | 455,191 |
| MA | Middlesex County | 703,111 | 29,084 |
| MA | Plymouth County | 517,480 | 466,190 |
| MA | Bristol County | 218,130 | 326,016 |
| MA | Hampden County | 130,922 | 160,323 |
| MA | Barnstable County | 121,844 | 107,802 |
| MA | Norfolk County | 27,531 | 84,051 |
| MD | State of Maryland | 985,416 | 1,122,300 |
| MD | Montgomery County | 964,401 | 1,356,919 |
| MD | Prince Georges County | 64,396 | 44,772 |
| MD | Anne Arundel County | 36,607 | 7,287 |
| MD | Frederick County | 27,527 | 42,616 |
| MD | Washington County | 5,197 | 10,561 |
| MD | Charles County | 4,693 | 2,778 |
| MD | Carroll County | 2,733 | 10,019 |
| ME | State of Maine | 36,840 | 37,955 |
| ME | Cumberland County | 18,539 | 5,831 |
| ME | Lincoln County | 6,611 | |
| ME | York County | 6,343 | |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| ME | Piscataquis County | 866 | 991 |
| ME | Androscoggin County | | 3,405 |
| ME | Aroostook County | | 2,494 |
| MI | State of Michigan | 884,639 | 1,059,552 |
| MI | Oakland County | 82,052 | 127,681 |
| MI | Macomb County | 66,873 | 45,536 |
| MI | Ottawa County | 46,670 | 63,786 |
| MI | Wayne County | 41,587 | 5,910 |
| MI | Kent County | 37,783 | 202,160 |
| MI | Kalamazoo County | 19,192 | 9,197 |
| MI | Berrien County | 15,920 | 18,908 |
| MI | Calhoun County | 15,582 | 20,042 |
| MI | St. Clair County | 13,977 | 18,011 |
| MI | Chippewa County | 12,345 | 9,131 |
| MI | Allegan County | 10,198 | 11,780 |
| MI | Eaton County | 9,897 | 11,764 |
| MI | Lapeer County | 9,348 | |
| MI | St. Joseph County | 8,909 | 10,742 |
| MI | Muskegon County | 7,942 | 16,513 |
| MI | Saginaw County | 7,339 | 12,254 |
| MI | Jackson County | 6,069 | 5,050 |
| MI | Ionia County | 5,429 | 17,343 |
| MI | Branch County | 4,806 | 5,362 |
| MI | Lenawee County | 4,155 | 3,568 |
| MI | Van Buren County | 3,697 | 1,428 |
| MI | Cass County | 3,613 | |
| MI | Livingston County | 3,520 | 6,299 |
| MI | Shiawassee County | 2,742 | 2,418 |
| MI | Tuscola County | 738 | |
| MI | Sanilac County | 605 | 1,361 |
| MI | Gratiot County | 170 | 1,693 |
| MI | Ingham County | | 17,041 |
| MI | Washtenaw County | | 14,964 |
| MI | Huron County | | 343 |
| MN | State of Minnesota | 934,384 | 1,205,072 |
| MN | Hennepin County | 144,355 | 236,438 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| MN | Ramsey County | 113,181 | 135,525 |
| MN | Dakota County | 44,959 | 47,095 |
| MN | Stearns County | 38,207 | 36,406 |
| MN | Anoka County | 19,342 | 34,444 |
| MN | McLeod County | 13,201 | 12,387 |
| MN | Washington County | 10,570 | 25,158 |
| MN | Watonwan County | 4,690 | 4,215 |
| MN | Chippewa County | 4,273 | 3,654 |
| MN | Polk County | 40 | 966 |
| MN | Olmsted County | | 41,399 |
| MO | State of Missouri | 310,513 | 331,509 |
| MO | Greene County | 28,582 | 75,355 |
| MO | Jackson County | 25,070 | 17,219 |
| MO | St. Charles County | 24,795 | 19,518 |
| MO | St. Louis County | 8,145 | 17,411 |
| MO | Pike County | 4,582 | 237 |
| MO | Newton County | 4,279 | 1,789 |
| MO | St. Louis Metropolitan | 3,594 | |
| MO | St. Francois County | 3,079 | 9,173 |
| MO | Platte County | 2,383 | 2,431 |
| MO | Phelps County | 1,524 | 2,689 |
| MO | Lafayette County | | 1,451 |
| MO | Franklin County | | 566 |
| MS | State of Mississippi | 20,548 | 38,471 |
| MS | Lauderdale County | 2,580 | 687 |
| MS | Pike County | 2,451 | 1,002 |
| MT | Yellowstone County | 9,542 | 2,792 |
| MT | Cascade County | 1,832 | |
| NC | State of North Carolina | 2,527,797 | 2,380,105 |
| NC | Mecklenburg County | 255,020 | 281,159 |
| NC | Wake County | 143,724 | 5,402 |
| NC | Guilford County | 107,266 | 72,118 |
| NC | Durham County | 82,967 | 35,320 |
| NC | Forsyth County | 69,285 | 147,230 |
| NC | Orange County | 46,570 | 27,614 |
| NC | Pitt County | 44,896 | 35,338 |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NC | New Hanover County | 36,132 | 33,922 |
| NC | Cumberland County | 31,780 | 48,623 |
| NC | Buncombe County | 30,113 | 27,476 |
| NC | Rockingham County | 25,132 | 24,190 |
| NC | Alamance County | 24,653 | 26,413 |
| NC | Davidson County | 24,586 | 25,197 |
| NC | Gaston County | 23,987 | 37,456 |
| NC | Rowan County | 19,730 | 8,989 |
| NC | Sampson County | 18,507 | 16,694 |
| NC | Wilson County | 17,520 | 11,585 |
| NC | Henderson County | 15,301 | 22,930 |
| NC | Union County | 14,723 | 23,851 |
| NC | Lee County | 14,497 | 10,584 |
| NC | Duplin County | 13,395 | 6,462 |
| NC | Iredell County | 12,445 | 21,923 |
| NC | Randolph County | 12,184 | 30,573 |
| NC | Moore County | 12,022 | 15,345 |
| NC | Chatham County | 9,588 | 9,926 |
| NC | Wilkes County | 9,476 | 14,693 |
| NC | Stokes County | 9,249 | 5,731 |
| NC | Burke County | 8,818 | 11,208 |
| NC | Cleveland County | 7,741 | |
| NC | Catawba County | 7,605 | 5,966 |
| NC | Wayne County | 7,465 | 23,716 |
| NC | Surry County | 5,601 | |
| NC | Franklin County | 4,424 | 6,772 |
| NC | Vance County | 4,279 | 136,328 |
| NC | Davie County | 4,175 | 5,673 |
| NC | Robeson County | 4,091 | 4,815 |
| NC | Haywood County | 3,578 | 4,658 |
| NC | Lincoln County | 2,664 | |
| NC | Montgomery County | 2,373 | |
| NC | Pender County | 2,130 | 1,869 |
| NC | Jackson County | 1,441 | 2,654 |
| NC | Lenoir County | 1,423 | |
| NC | Washington County | 1,376 | 1,788 |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NC | Beaufort County | 1,315 | 9,238 |
| NC | Watauga County | 1,096 | 3,901 |
| NC | Anson County | 595 | |
| NC | Bladen County | 456 | 5,452 |
| NC | Columbus County | | 1,963 |
| NC | Cabarrus County | | 19,042 |
| NC | Johnston County | | 17,950 |
| NC | Scotland County | | 2,156 |
| NC | Caldwell County | | 1,896 |
| ND | Cass County | 25,367 | 9,663 |
| ND | State of North Dakota | 11,560 | 15,682 |
| NE | Douglas County | 456,968 | 560,878 |
| NE | State of Nebraska | 354,507 | 315,258 |
| NE | Lancaster County | 54,585 | 56,168 |
| NE | Sarpy County | 42,219 | 34,424 |
| NE | Saline County | 18,762 | 13,958 |
| NE | Dawson County | 15,394 | 20,818 |
| NE | Dakota County | 12,407 | 18,713 |
| NE | Platte County | 8,930 | 26,858 |
| NE | Phelps County | 3,593 | 448 |
| NE | Lincoln County | 2,917 | 5,838 |
| NE | Dixon County | 2,667 | 4,968 |
| NE | Buffalo County | 2,337 | 10,086 |
| NE | Gage County | 954 | 4,410 |
| NE | Thurston County | 75 | 157 |
| NH | State of New Hampshire | 127,641 | 167,264 |
| NH | Hillsborough County | 34,162 | 15,365 |
| NH | Grafton County | 7,078 | 2,141 |
| NH | Merrimack County | 4,168 | 15,848 |
| NH | Strafford County | 929 | 7,103 |
| NJ | State of New Jersey | 3,472,389 | 4,061,667 |
| NJ | Passaic County | 1,224,817 | 1,203,054 |
| NJ | Hudson County | 321,758 | 416,468 |
| NJ | Monmouth County | 145,362 | 143,831 |
| NJ | Union County | 135,118 | 73,012 |
| NJ | Essex County | 129,745 | 346,587 |

| | SCAAP Recipients – FYs 2005 and 2004 | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NJ | Morris County | 115,598 | 256,959 |
| NJ | Burlington County | 113,337 | 56,622 |
| NJ | Somerset County | 105,965 | 141,237 |
| NJ | Atlantic County | 103,295 | 105,337 |
| NJ | Ocean County | 95,431 | 101,591 |
| NJ | Camden County | 86,583 | 156,954 |
| NJ | Middlesex County | 82,747 | 692,327 |
| NJ | Cape May County | 27,591 | 20,307 |
| NJ | Cumberland County | 25,717 | 30,205 |
| NJ | Warren County | 19,759 | 26,837 |
| NJ | Sussex County | 12,362 | 26,203 |
| NJ | Hunterdon County | 10,241 | 11,764 |
| NJ | Mercer County | 8,303 | 30,660 |
| NM | State of New Mexico | 650,877 | 193,023 |
| NM | City of Albuquerque | 225,367 | |
| NM | Dona Ana County | 85,519 | 63,669 |
| NM | Lea County | 31,502 | 35,807 |
| NM | Otero County | 19,252 | 25,532 |
| NM | Santa Fe County | 15,897 | 19,813 |
| NM | Rio Arriba County | 15,520 | 22,264 |
| NM | Chaves County | 11,259 | 16,920 |
| NM | Eddy County | 7,542 | |
| NM | Valencia County | 5,618 | 18,650 |
| NM | Luna County | 4,914 | 4,549 |
| NM | Roosevelt County | 4,730 | 5,107 |
| NM | Sierra | 4,238 | 4,720 |
| NM | Taos County | 1,634 | 4,641 |
| NM | Quay County | 1,310 | 1,397 |
| NM | Colfax County | 1,009 | 5,556 |
| NM | Bernalillo County | | 248,295 |
| NM | Grant County | | 5,955 |
| NM | De Baca County | | 1,759 |
| NM | Hidalgo County | | 1,742 |
| NV | State of Nevada | 2,412,064 | 1,383,439 |
| NV | Clark County | 1,456,722 | 1,486,607 |
| NV | Washoe County | 286,440 | 477,898 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NV | City of Las Vegas | 70,837 | 55,835 |
| NV | City of North Las Vegas | 49,739 | 66,221 |
| NV | Carson City County | 19,866 | 31,104 |
| NV | Elko County | 15,765 | 21,463 |
| NV | Nye County | 12,601 | 9,612 |
| NV | Douglas County | 12,371 | 4,871 |
| NV | Churchill County | 11,816 | 12,465 |
| NV | Humboldt County | 5,121 | 18,506 |
| NV | Lyon County | 4,586 | 9,471 |
| NV | Pershing County | 2,464 | 6,790 |
| NV | Esmeralda County | 1,652 | 4,182 |
| NV | Eureka County | 1,025 | 3,240 |
| NV | Mineral County | 117 | |
| NY | State of New York | 24,022,356 | 30,859,709 |
| NY | City of New York | 15,893,255 | 20,667,392 |
| NY | Nassau County | 1,970,809 | 2,584,492 |
| NY | Westchester County | 366,356 | 489,256 |
| NY | Rockland County | 231,136 | 251,515 |
| NY | Monroe County | 65,079 | 46,565 |
| NY | Dutchess County | 37,346 | 65,050 |
| NY | Ulster County | 20,454 | 45,036 |
| NY | Jefferson County | 18,659 | 4,204 |
| NY | Niagara County | 18,531 | 27,469 |
| NY | Erie County | 17,697 | 54,067 |
| NY | Franklin County | 17,081 | 17,480 |
| NY | Onondaga County | 15,784 | 14,016 |
| NY | Albany County | 14,937 | 23,195 |
| NY | Broome County | 13,060 | 39,129 |
| NY | Oswego County | 11,045 | 8,306 |
| NY | Schenectady County | 9,621 | 38,668 |
| NY | Wayne County | 8,940 | 15,611 |
| NY | Oneida County | 7,553 | 9,014 |
| NY | Greene County | 7,422 | 10,278 |
| NY | Rensselaer County | 6,732 | 6,266 |
| NY | Ontario County | 6,724 | 15,237 |
| NY | Chemung County | 5,904 | 4,724 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NY | Schuyler County | 5,705 | 3,035 |
| NY | Washington County | 5,356 | |
| NY | Putnam County | 5,210 | 34,594 |
| NY | Genesee County | 4,098 | 2,614 |
| NY | Herkimer County | 2,859 | 145 |
| NY | Yates County | 1,588 | 1,301 |
| NY | Chautauqua County | 974 | 5,611 |
| NY | Fulton County | 785 | |
| NY | Columbia County | 764 | |
| NY | Wyoming County | 490 | 463 |
| NY | St. Lawrence County | 278 | 1,707 |
| NY | Steuben County | 225 | 2,222 |
| NY | Livingston County | | 1,273 |
| NY | Suffolk County | | 1,489,818 |
| NY | Orange County | | 142,163 |
| NY | Orleans County | | 6,699 |
| NY | Clinton County | | 3,453 |
| NY | Cayuga County | | 2,559 |
| NY | Montgomery County | | 1,099 |
| OH | State of Ohio | 664,897 | 766,829 |
| OH | Cuyahoga County | 49,216 | 70,357 |
| OH | Summit County | 17,579 | 14,729 |
| OH | Greene County | 12,192 | 8,531 |
| OH | Erie County | 2,345 | 881 |
| OH | Licking County | 1,730 | 1,542 |
| OH | Medina County | | 5,335 |
| OK | State of Oklahoma | 622,173 | 649,583 |
| OK | Oklahoma County | 65,864 | 84,623 |
| OK | Texas County | 34,926 | 44,741 |
| OK | Tulsa County | 6,843 | 21,120 |
| OK | Kay County | 4,737 | 2,526 |
| OK | Cleveland County | 3,744 | 2,912 |
| OK | Caddo County | 2,883 | 652 |
| OK | Grady County | 2,854 | 3,413 |
| OK | Carter County | 2,092 | 2,336 |
| OK | Okfuskee County | 1,507 | 270 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| OK | Pottawatomie County | 438 | 1,223 |
| OK | Cimarron County | 407 | |
| OK | Harper County | 175 | 5,304 |
| OK | Lincoln County | | 619 |
| OK | Ottawa County | | 596 |
| OK | Delaware County | | 77 |
| OR | State of Oregon | 3,417,250 | |
| OR | Multnomah County | 290,987 | 444,322 |
| OR | Lane County | 201,052 | 224,088 |
| OR | Marion County | 172,017 | |
| OR | Washington County | 158,052 | 283,682 |
| OR | Linn County | 25,166 | 28,346 |
| OR | Jackson County | 23,373 | 50,619 |
| OR | Malheur County | 21,187 | 18,496 |
| OR | Benton County | 20,856 | 22,759 |
| OR | Umatilla County | 16,857 | 30,722 |
| OR | Deschutes County | 16,797 | 10,393 |
| OR | Lincoln County | 16,776 | 29,776 |
| OR | Polk County | 14,061 | 24,536 |
| OR | Yamhill County | 13,773 | 8,963 |
| OR | Douglas County | 12,827 | 3,389 |
| OR | Clatsop County | 12,620 | 21,368 |
| OR | Hood River County | 12,488 | 16,527 |
| OR | Tillamook County | 6,601 | 8,240 |
| OR | Jefferson County | 6,405 | 8,307 |
| OR | Coos County | 6,272 | 6,725 |
| OR | Wasco County | 4,610 | 7,800 |
| OR | Columbia County | 1,888 | 1,111 |
| OR | Union County | 1,688 | 13,473 |
| OR | Gilliam County | 596 | 842 |
| OR | Clackamas County | | 75,733 |
| OR | Sherman County | | 1,546 |
| PA | Pennsylvania Department of Corrections | 908,520 | 1,156,505 |
| PA | City of Philadelphia | 132,061 | 87,983 |
| PA | Bucks County | 119,894 | 109,352 |
| PA | Lehigh County | 43,199 | 87,135 |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| PA | Dauphin County | 35,147 | 35,406 |
| PA | Lancaster County | 32,861 | 28,366 |
| PA | Luzerne County | 29,323 | 37,074 |
| PA | Lebanon County | 23,099 | 20,484 |
| PA | Berks County | 22,396 | 43,246 |
| PA | Monroe County | 20,038 | 24,924 |
| PA | Westmoreland County | 10,357 | 653 |
| PA | Franklin County | 9,856 | 10,042 |
| PA | Erie County | 8,055 | 13,815 |
| PA | Crawford County | 2,763 | 1,215 |
| PA | Pike County | 1,852 | 3,430 |
| PA | Beaver County | 635 | 2,727 |
| PA | Cambria County | | 20,479 |
| PA | Schuylkill County | | 6,923 |
| PA | Centre County | | 4,037 |
| PA | Fayette County | | 116 |
| PR | Commonwealth of Puerto Rico | 319,429 | 158,903 |
| RI | State of Rhode Island | 863,995 | 760,584 |
| SC | South Carolina Department of Corrections | 283,452 | 323,486 |
| SC | Horry County | 30,754 | 29,503 |
| SC | Lexington County | 27,521 | |
| SC | Charleston County | 25,823 | 29,919 |
| SC | York County | 22,240 | 16,190 |
| SC | Dorchester County | 6,774 | 14,539 |
| SC | Aiken County | 5,173 | 1,969 |
| SC | Colleton County | 3,199 | 3,208 |
| SC | Berkeley County | 2,849 | 4,263 |
| SC | Georgetown County | 540 | 1,675 |
| SC | Cherokee County | 457 | 1,186 |
| SC | Florence County | | 6,490 |
| SD | Minnehaha County | 51,927 | 41,493 |
| SD | State of South Dakota | 24,955 | 74,470 |
| SD | Pennington County | 6,332 | 8,553 |
| TN | State of Tennessee | 212,435 | 228,289 |
| TN | Metropolitan Nashville & Davidson County | 159,174 | 124,738 |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TN | Shelby County | 57,152 | 104,153 |
| TN | Hamilton County | 15,404 | |
| TN | Knox County | 6,375 | 6,623 |
| TN | Maury County | 1,069 | 11,145 |
| TX | State of Texas | 18,582,484 | 17,126,820 |
| TX | Harris County | 2,693,977 | 2,795,228 |
| TX | Hidalgo County | 714,808 | 48,291 |
| TX | Travis County | 658,636 | 842,159 |
| TX | Dallas County | 636,166 | |
| TX | Bexar County | 547,366 | 640,506 |
| TX | Tarrant County | 403,123 | 535,507 |
| TX | El Paso County | 357,084 | 218,179 |
| TX | Collin County | 303,305 | 257,672 |
| TX | Denton County | 163,183 | 205,350 |
| TX | Fort Bend County | 118,802 | 117,111 |
| TX | Williamson County | 107,402 | 167,020 |
| TX | Brazos County | 87,090 | 63,854 |
| TX | Galveston County | 67,131 | 41,065 |
| TX | Webb County | 64,069 | 81,443 |
| TX | Ellis County | 54,735 | 49,537 |
| TX | Montgomery County | 44,935 | 64,333 |
| TX | Hays County | 44,497 | 53,830 |
| TX | Nueces County | 42,501 | 14,979 |
| TX | Smith County | 39,542 | 53,635 |
| TX | Bell County | 35,258 | 57,193 |
| TX | Gillespie County | 34,806 | 4,828 |
| TX | Midland County | 33,738 | 177,045 |
| TX | Cameron County | 29,936 | 460,229 |
| TX | McLennan County | 28,213 | 18,607 |
| TX | Brazoria County | 27,436 | 35,670 |
| TX | Jefferson County | 26,646 | 50,789 |
| TX | Johnson County | 26,433 | 27,273 |
| TX | Rockwall County | 22,703 | 25,888 |
| TX | Ector County | 21,859 | 32,311 |
| TX | Maverick County | 20,643 | |
| TX | Moore County | 20,582 | 26,638 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TX | Nacogdoches County | 20,239 | |
| TX | Dallam County | 18,909 | |
| TX | Tom Green County | 17,670 | 18,096 |
| TX | Lubbock County | 15,500 | 13,616 |
| TX | Victoria County | 12,915 | 25,053 |
| TX | Navarro County | 12,897 | 15,758 |
| TX | Kaufman County | 12,326 | 13,137 |
| TX | Kerr County | 11,376 | 11,983 |
| TX | Hill County | 11,342 | 10,155 |
| TX | Grayson County | 11,327 | 23,750 |
| TX | Randall County | 11,122 | 16,368 |
| TX | Comal County | 10,898 | 27,947 |
| TX | Guadalupe County | 10,469 | 9,578 |
| TX | Hopkins County | 10,020 | |
| TX | Angelina County | 9,959 | |
| TX | Taylor County | 8,902 | 12,614 |
| TX | Wise County | 8,476 | 12,639 |
| TX | Andrews County | 8,379 | 11,616 |
| TX | Harrison County | 8,015 | 9,753 |
| TX | Henderson County | 7,727 | 16,810 |
| TX | Parker County | 7,400 | 18,210 |
| TX | Starr County | 7,026 | |
| TX | Val Verde County | 6,713 | 7,138 |
| TX | Limestone County | 6,399 | 5,247 |
| TX | Matagorda County | 6,257 | 18,739 |
| TX | Cherokee County | 6,017 | 10,454 |
| TX | Deaf Smith County | 5,847 | 11,477 |
| TX | Upshur County | 5,514 | 6,279 |
| TX | Comanche County | 5,463 | 6,979 |
| TX | Crane County | 5,019 | 2,625 |
| TX | Castro County | 4,817 | 53 |
| TX | Crockett County | 4,438 | 10,784 |
| TX | Caldwell County | 4,335 | 4,915 |
| TX | Hudspeth County | 4,299 | 2,704 |
| TX | Uvalde County | 4,284 | 4,977 |
| TX | Hutchinson County | 4,123 | 3,760 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TX | Wood County | 3,967 | 4,201 |
| TX | Milam County | 3,912 | 947 |
| TX | Parmer County | 3,910 | 6,707 |
| TX | Pecos County | 3,870 | |
| TX | Kinney County | 3,795 | 462 |
| TX | Van Zandt County | 3,747 | 5,262 |
| TX | Bowie County | 3,600 | 2,991 |
| TX | Walker County | 3,504 | 3,715 |
| TX | Zapata County | 3,426 | 6,841 |
| TX | Polk County | 3,392 | 6,200 |
| TX | Ochiltree County | 3,356 | 5,497 |
| TX | Burnet County | 2,769 | 6,641 |
| TX | Edwards County | 2,610 | |
| TX | Atascosa | 2,476 | |
| TX | Fayette County | 2,326 | 3,872 |
| TX | Calhoun County | 2,251 | 1,033 |
| TX | Lamar County | 2,091 | 964 |
| TX | Live Oak County | 2,038 | 2,736 |
| TX | Duval County | 1,915 | 5,155 |
| TX | Palo Pinto County | 1,658 | |
| TX | Fannin County | 1,566 | 5,247 |
| TX | Bosque County | 1,195 | |
| TX | Nolan County | 1,154 | 2,349 |
| TX | Lee County | 1,069 | 1,701 |
| TX | Lynn County | 1,005 | 1,747 |
| TX | Medina County | 947 | 184 |
| TX | Orange County | 537 | 3,767 |
| TX | Eastland County | 391 | 945 |
| TX | Atascosa County | | 3,122 |
| TX | Brown County | | 2,346 |
| UT | Salt Lake County | 623,692 | 596,712 |
| UT | State of Utah | 368,037 | 460,181 |
| UT | Davis County | 139,849 | 151,106 |
| UT | Utah County | 65,608 | 46,737 |
| UT | Weber County | 35,784 | 58,075 |
| UT | Cache County | 24,986 | 38,177 |

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| UT | Washington County | 16,032 | 21,234 |
| UT | Box Elder County | 9,867 | 5,416 |
| UT | Sevier County | 4,415 | 8,323 |
| VA | Commonwealth of Virginia | 1,011,172 | 1,300,673 |
| VA | Fairfax County | 708,545 | 618,920 |
| VA | Prince William County | 251,223 | 296,786 |
| VA | Arlington County | 235,996 | 223,125 |
| VA | City of Alexandria | 165,141 | |
| VA | Rockingham County | 65,030 | 55,401 |
| VA | Chesterfield County | 35,251 | 78,388 |
| VA | Loudoun County | 31,463 | 72,846 |
| VA | City of Chesapeake | 24,103 | 26,154 |
| VA | Henrico County | 16,860 | 17,340 |
| VA | Albemarle County | 12,386 | |
| VA | City of Newport News | 10,589 | 18,874 |
| VA | Shenandoah County | 8,226 | 13,696 |
| VA | Henry County | 7,862 | 7,023 |
| VA | York County | 4,763 | 15,427 |
| VA | Stafford County | 4,742 | 7,545 |
| VA | City of Charlottesville | 4,480 | |
| VA | City of Hampton | 3,528 | 4,912 |
| VA | James City County | 3,287 | 5,891 |
| VA | City of Danville | 2,458 | 7,401 |
| VA | City of Martinsville | 2,365 | 2,995 |
| VA | Lunenburg County | 1,478 | 730 |
| VA | City of Fredericksburg | 1,257 | 5,646 |
| VA | Williamsburg County | 1,059 | |
| VA | City of Suffolk | 907 | 3,109 |
| VA | Spotsylvania County | 658 | 3,573 |
| VA | Nottaway County | 594 | 519 |
| VA | Nelson County | | |
| VA | City of Portsmouth | | 2,581 |
| VA | City of Virginia Beach | | 1,724 |
| VA | King George County | | 1,450 |
| VA | City of Williamsburg | | 582 |
| VA | Isle of Wight County | | 54 |

- 59 –

| SCAAP Recipients — FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| VI | Virgin Islands | 269,825 | 408,132 |
| VT | State of Vermont | 14,437 | 32,118 |
| WA | State of Washington | 1,723,823 | 2,206,930 |
| WA | King County | 812,270 | 971,560 |
| WA | Pierce County | 138,288 | 139,048 |
| WA | Yakima County | 116,702 | 126,711 |
| WA | Snohomish County | 92,252 | 84,953 |
| WA | Franklin County | 85,130 | 84,519 |
| WA | Thurston County | 59,461 | 51,904 |
| WA | Benton County | 53,641 | 52,208 |
| WA | Whatcom County | 51,368 | 67,618 |
| WA | Grant County | 47,635 | 51,790 |
| WA | Chelan County | 44,389 | 40,540 |
| WA | Spokane County | 38,004 | 39,990 |
| WA | Cowlitz County | 37,382 | 30,977 |
| WA | Skagit County | 35,484 | 42,272 |
| WA | Lewis County | 33,229 | 36,370 |
| WA | Walla Walla County | 25,095 | 15,569 |
| WA | Douglas County | 23,444 | 23,729 |
| WA | City of Yakima | 20,360 | 19,551 |
| WA | City of Wapato | 19,964 | |
| WA | City of Wenatchee | 16,325 | 22,516 |
| WA | Grays Harbor County | 12,947 | 27,962 |
| WA | Kitsap County | 10,640 | 12,782 |
| WA | Okanogan County | 10,623 | 25,186 |
| WA | Kittitas County | 10,458 | 7,749 |
| WA | Adams County | 8,320 | 7,626 |
| WA | Mason County | 6,202 | 16,833 |
| WA | Clallam County | 6,178 | 6,053 |
| WA | City of Aberdeen | 5,216 | 6,085 |
| WA | Whitman County | 1,944 | 1,370 |
| WA | City of Sunnyside | 1,329 | 1,504 |
| WA | Clark County | | 78,530 |
| WI | State of Wisconsin | 1,243,892 | 1,473,682 |
| WI | Dane County | 96,180 | 105,253 |
| WI | Milwaukee County | 84,781 | 183,468 |

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| WI | Kenosha County | 59,611 | 79,239 |
| WI | Walworth County | 59,177 | 8,240 |
| WI | Sheboygan County | 54,033 | |
| WI | Brown County | 49,206 | 63,337 |
| WI | Waukesha County | 46,060 | 56,222 |
| WI | Jefferson County | 31,723 | 19,426 |
| WI | Racine County | 29,192 | 19,895 |
| WI | Rock County | 23,700 | 37,951 |
| WI | Outagamie County | 23,121 | 43,449 |
| WI | Sauk County | 14,446 | 12,277 |
| WI | Ozaukee County | 11,278 | 10,323 |
| WI | Manitowoc County | 11,011 | 8,477 |
| WI | Columbia County | 9,346 | 3,568 |
| WI | Waupaca County | 8,480 | 6,693 |
| WI | Calumet County | 7,953 | 6,471 |
| WI | Shawano County | 6,890 | 5,136 |
| WI | Winnebago County | 6,133 | 30,203 |
| WI | Waushara County | 4,733 | |
| WI | Dodge County | 4,575 | |
| WI | Portage County | 3,317 | 2,292 |
| WI | Green County | 1,030 | 1,680 |
| WI | Lafayette County | 205 | 1,780 |
| WI | Fond du Lac County | | 9,361 |
| WI | La Crosse County | | 4,604 |
| WI | Sawyer County | | 1,966 |
| WV | State of West Virginia | 6,495 | 5,824 |
| WY | State of Wyoming | 79,074 | 121,529 |

Source:   OJP

- 61 –

**APPENDIX IV**

| | | OIG Survey Recipients | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 1 | CA | State of California | $ 85,953,191 |
| 2 | NY | State of New York | 24,022,356 |
| 3 | TX | State of Texas | 18,582,484 |
| 4 | NY | New York City | 15,893,255 |
| 5 | FL | State of Florida | 12,806,110 |
| 6 | CA | County of Los Angeles | 12,530,034 |
| 7 | AZ | State of Arizona | 12,139,791 |
| 8 | CA | County of Orange | 6,562,437 |
| 9 | IL | State of Illinois | 4,731,269 |
| 10 | MA | State of Massachusetts | 4,728,549 |
| 11 | NJ | State of New Jersey | 3,472,389 |
| 12 | OR | State of Oregon | 3,417,250 |
| 13 | TX | County of Harris | 2,693,977 |
| 14 | NC | State of North Carolina | 2,527,797 |
| 15 | NV | State of Nevada | 2,412,064 |
| 16 | CO | State of Colorado | 2,358,707 |
| 17 | CA | County of San Diego | 2,346,881 |
| 18 | NY | Nassau County | 1,970,809 |
| 19 | IL | County of Cook | 1,926,114 |
| 20 | WA | State of Washington | 1,723,823 |
| 21 | CA | County of Santa Clara | 1,616,147 |
| 22 | NV | Clark County | 1,456,722 |
| 23 | GA | State of Georgia | 1,393,149 |
| 24 | AZ | Maricopa County | 1,297,752 |
| 25 | CA | County of Riverside | 1,254,534 |
| 26 | WI | State of Wisconsin | 1,243,892 |
| 27 | NJ | Passaic County | 1,224,817 |
| 28 | CA | City and County of San Francisco | 1,087,199 |
| 29 | CA | County of Fresno | 1,045,772 |
| 30 | VA | Commonwealth of Virginia | 1,011,172 |
| 31 | MD | State of Maryland | 985,416 |
| 32 | MD | Montgomery County | 964,401 |
| 33 | CA | San Mateo County | 955,843 |
| 34 | CO | City and County of Denver | 950,665 |
| 35 | MN | State of Minnesota | 934,384 |
| 36 | PA | Pennsylvania Department of Corrections | 908,520 |
| 37 | MI | State of Michigan | 884,639 |
| 38 | CA | Sacramento County | 873,005 |
| 39 | RI | State of Rhode Island | 863,995 |
| 40 | WA | King County | 812,270 |
| 41 | MA | County of Suffolk | 790,048 |
| 42 | CT | State of Connecticut | 779,697 |
| 43 | CA | County of Monterey | 735,201 |
| 44 | TX | County of Hidalgo | 714,808 |
| 45 | VA | County of Fairfax | 708,545 |

| | OIG Survey Recipients | | |
|---|---|---|---|
| | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 46 | MA | County of Middlesex | 703,111 |
| 47 | OH | State of Ohio | 664,897 |
| 48 | TX | Travis County | 658,636 |
| 49 | NM | State of New Mexico | 650,877 |
| 50 | TX | County of Dallas | 636,166 |
| 51 | UT | Salt Lake County | 623,692 |
| 52 | OK | State of Oklahoma | 622,173 |
| 53 | CA | County of Kern | 613,980 |
| 54 | CA | County of Sonoma | 604,578 |
| 55 | FL | Collier County | 597,409 |
| 56 | CA | Contra Costa County | 592,346 |
| 57 | CA | County of Ventura | 564,332 |
| 58 | TX | County of Bexar | 547,366 |
| 59 | MA | County of Plymouth | 517,480 |
| 60 | NE | Douglas County | 456,968 |
| 61 | CA | County of San Bernardino | 407,580 |
| 62 | AZ | County of Pima | 407,301 |
| 63 | NY | Westchester County | 366,356 |
| 64 | NC | Mecklenburg County | 255,020 |
| 65 | VA | County of Prince William | 251,223 |
| 66 | FL | County of Hillsborough | 233,499 |
| 67 | NY | County of Rockland | 231,136 |
| 68 | AZ | Yuma County | 220,339 |
| 69 | OR | Lane County | 201,052 |
| 70 | HI | State of Hawaii | 195,595 |
| 71 | FL | Pinellas County | 194,285 |
| 72 | IL | County of Kane | 189,347 |
| 73 | FL | County of Lee | 186,685 |
| 74 | CA | Napa County | 184,611 |
| 75 | CA | San Joaquin County | 181,990 |
| 76 | VA | City of Alexandria | 165,141 |
| 77 | FL | County of Sarasota | 148,472 |
| 78 | NC | Wake County | 143,724 |
| 79 | FL | Orange County | 139,138 |
| 80 | WA | County of Pierce | 138,288 |
| 81 | NJ | County of Essex | 129,745 |
| 82 | MA | Barnstable County | 121,844 |
| 83 | TX | County of Fort Bend | 118,802 |
| 84 | GA | County of Cherokee | 113,614 |
| 85 | CO | El Paso County | 100,370 |
| 86 | NJ | Ocean County | 95,431 |
| 87 | AZ | County of Yavapai | 93,802 |
| 88 | FL | County of Osceola | 89,780 |
| 89 | FL | Seminole County | 88,956 |
| 90 | NM | Dona Ana County | 85,519 |
| 91 | WA | County of Franklin | 85,130 |
| 92 | WI | County of Milwaukee | 84,781 |

| | | OIG Survey Recipients | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 93 | NC | County of Durham | 82,967 |
| 94 | MI | County of Oakland | 82,052 |
| 95 | DC | District of Columbia | 81,762 |
| 96 | GA | De Kalb County Georgia | 79,948 |
| 97 | FL | Miami Dade County | 78,587 |
| 98 | CO | County of Eagle | 78,319 |
| 99 | NC | Forsyth County | 69,285 |
| 100 | KY | Lexington Fayette Urban County Government | 69,269 |
| 101 | KS | Unified Government of Wyandotte County | 68,384 |
| 102 | VA | Rockingham County | 65,030 |
| 103 | TX | County of Webb | 64,069 |
| 104 | WI | County of Kenosha | 59,611 |
| 105 | IA | Woodbury County | 57,725 |
| 106 | CA | Imperial County | 56,370 |
| 107 | FL | County of Indian River | 54,704 |
| 108 | WI | County of Sheboygan | 54,033 |
| 109 | CO | County of Pitkin | 50,679 |
| 110 | WI | County of Brown | 49,206 |
| 111 | GA | Hall County | 36,833 |
| 112 | MD | County of Anne Arundel | 36,607 |
| 113 | NC | County of Cumberland | 31,780 |
| 114 | SC | County of Horry | 30,754 |
| 115 | NC | County of Buncombe | 30,113 |
| 116 | TX | County of Cameron | 29,936 |
| 117 | OR | County of Linn | 25,166 |
| 118 | UT | County of Cache | 24,986 |
| 119 | MO | County of St Charles | 24,795 |
| 120 | OR | County of Jackson | 23,373 |
| 121 | SC | County of York | 22,240 |
| 122 | IA | County of Polk | 16,332 |
| 123 | IL | De kalb County | 14,869 |
| 124 | NC | County of Duplin | 13,395 |
| 125 | IL | County of Rock Island | 12,496 |
| 126 | NC | Iredell County | 12,445 |
| 127 | NC | County of Randolph | 12,184 |
| 128 | TX | County of Hill | 11,342 |
| 129 | IL | County of Kendall | 10,870 |
| 130 | WA | Kittitas County | 10,458 |
| 131 | NJ | Hunterdon County | 10,241 |
| 132 | ID | Washington County | 9,794 |
| 133 | MT | County of Yellowstone | 9,542 |
| 134 | MI | County of St. Joseph | 8,909 |
| 135 | GA | County Of Newton | 8,684 |
| 136 | TX | County of Andrews | 8,379 |
| 137 | WA | Adams County | 8,320 |
| 138 | ID | County Of Bingham | 8,076 |
| 139 | ID | County of Twin Falls | 7,103 |

| | | OIG Survey Recipients | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 140 | FL | County of Suwannee | 6,944 |
| 141 | OK | County of Tulsa | 6,843 |
| 142 | NM | County of Valencia | 5,618 |
| 143 | NV | County of Humboldt | 5,121 |
| 144 | TX | County of Castro | 4,817 |
| 145 | NH | County of Merrimack | 4,168 |
| 146 | MI | Livingston County | 3,520 |
| 147 | TX | County of Zapata | 3,426 |
| 148 | NE | County of Lincoln | 2,917 |
| 149 | OK | Grady County | 2,854 |
| 150 | GA | County Of Monroe | 2,577 |
| 151 | TX | County of Atascosa | 2,476 |
| 152 | NV | County of Pershing | 2,464 |
| 153 | OH | Erie County | 2,345 |
| 154 | GA | County of Lee | 2,104 |
| 155 | OK | County of Carter | 2,092 |
| 156 | TX | County of Lamar | 2,091 |
| 157 | OK | County of Okfuskee | 1,507 |
| 158 | NM | Quay County | 1,310 |
| 159 | WI | Green County | 1,030 |
| 160 | VA | City of Suffolk | 907 |
| 161 | MI | County of Tuscola | 738 |
| 162 | KS | County of Montgomery | 730 |
| 163 | NC | County of Anson | 595 |
| 164 | NY | County of Wyoming | 490 |
| | | Total | $264,776,153 |

Source:  OIG and OJP data

**APPENDIX V**

# Major Cities Chiefs of Police Statement

(From a document entitled *M.C.C. Immigration Committee Recommendations*, June 2006.)

### D.   M.C.C. NINE (9) POINT POSITION STATEMENT

Based upon a review, evaluation and deliberation regarding the important and complex issue of local enforcement of federal immigration laws, the members of M.C.C., who are the 57 Chief Executive Officers of police departments located within a metropolitan area of more than 1.5 million population and which employs more than 1,000 law enforcement officers, hereby set forth our consensus position statement, which is comprised of nine crucial components.

1)   SECURE THE BORDERS

Illegal immigration is a national issue and the federal government should first act to secure the national borders to prevent illegal entry into the United States. We support further and adequate funding of the federal agencies responsible for border security and immigration enforcement so they can accomplish this goal. We also support consideration of all possible solutions including construction of border fences where appropriate, use of surveillance technologies and increases in the number of border patrol agents.  Only when the federal government takes the necessary steps to close the revolving door that exists at our national borders will it be possible for local police agencies to even begin to consider dedicating limited local resources to immigration enforcement.

2)   ENFORCE LAWS PROHIBITING THE HIRING OF ILLEGAL IMMIGRANTS

The federal government and its agencies should vigorously enforce existing immigration laws prohibiting employers from hiring illegal immigrants. Enforcement and prosecution of employers who illegally seek out and hire undocumented immigrants or turn a blind eye to the undocumented status of their employees will help to eliminate one of the major incentives for illegal immigration.

3)   CONSULT AND INVOLVE LOCAL POLICE AGENCIES IN DECISION MAKING

Major Cities Chiefs and other representatives of the local law enforcement community such as the International Association of Chiefs of Police and local district attorneys and prosecutors should be consulted and brought in at the beginning of any process to develop a national initiative to involve local police agencies in the enforcement of federal immigration laws.  The inclusion of local law enforcement at every level of development would utilize their perspective and experience in local policing, address their concerns and likely result in a better program that would be more effectively implemented.

4)   COMPLETELY VOLUNTARY

Any initiative to involve local police agencies in the enforcement of immigration laws should be completely voluntary.  The decisions related to how local law enforcement agencies allocate their resources, direct their workforce and define the duties of their employees to best serve and protect their communities should be left in the control of state and local governments.  The decision to enter this area of enforcement should be left to the local government and not mandated or forced upon them by the federal government through the threat of sanctions or the withholding of existing police assistance funding.

5)   INCENTIVE BASED APPROACH WITH FULL FEDERAL FUNDING

Any initiative to involve local police agencies in the enforcement of immigration laws should be an incentive based approach with full federal funding to provide the necessary resources to the local agencies that choose to enforce immigration laws.  Federal funds should be available to participating local agencies to cover the costs associated with enforcement such as expenditures on equipment and technology, training and educational programs and costs of housing, caring for and transporting immigrants prior to their release to federal authorities.

6)    NO REDUCTION OR SHIFTING OF CURRENT ASSISTANCE FUNDING

The funding of any initiative to involve local police agencies in the enforcement of immigration laws should not be at the detriment or reduction directly or indirectly of any current federal funding or programs focused on assisting local police agencies with local policing or homeland security activities.  Local police agencies are currently working on strained budgets and limited resources to meet local policing needs and strengthening homeland security and in fact need increased funding and grant assistance in these areas.  Merely shifting or diverting federal funding currently available for local policing and homeland security activities to any new immigration enforcement initiative would only result in a detrimental net loss of total resources available to local police agencies to police their neighborhoods and strengthen homeland security.

7)    CLARIFICATION OF AUTHORITY AND LIMITATION OF LIABILITY

The authority of local police agencies and their officers to become involved in the enforcement of immigration laws should be clearly stated and defined.  The statement of authority should also establish liability protection and an immunity shield for police officers and police agencies that take part in immigration enforcement as authorized by clear federal legislation.

8)    REMOVAL OF CIVIL IMMIGRATION DETAINERS
      FROM THE N.C.I.C. SYSTEM

Until the borders are secured and vigorous enforcement against employers who hire illegal immigrants has taken place and the concerns regarding lack of authority and confusion over the authority of local agencies to enforce immigration laws and the risk of civil liabilities are adequately addressed, M.C.C. strongly requests that the federal agencies cease placing civil immigration detainers on N.C.I.C. and remove any existing civil detainers currently on the system.  The integrity of the system as a notice system for criminal warrants and/or criminal matters must be maintained.  The inclusion of civil detainers on the system has created confusion for local police agencies and subjected them to possible liability for exceeding their authority by arresting a person upon the basis of a mere civil detainer.


M.C.C. would encourage the federal agencies to seek federal criminal warrants for any person they have charged criminally with violations of immigration laws and submit those criminal warrants on the N.C.I.C. system so the warrants can be acted upon by local police officers within their established criminal enforcement authority and training.


9)    COMMITMENT OF CONTINUED ENFORCEMNT AGAINST CRIMINAL
      VIOLATORS REGARDLESS OF IMMIGRATION STATUS

M.C.C. member agencies are united in their commitment to continue arresting anyone who violates the criminal laws of their jurisdictions regardless of the immigration status of the perpetrator. Those immigrants, documented and/or undocumented, who commit criminal acts will find no safe harbor or sanctuary from their criminal violations of the law within any major city but will instead face the full force of criminal prosecution.

# State of Oregon Policy

The text appearing in this database was produced from material provided by the Legislative Counsel Committee of the Oregon Legislative Assembly. The official record copy is the printed published copy of the Oregon Revised Statutes. The text in the database is not the official text of Oregon law.

Although efforts have been made to match the database text to the official legal text they represent, substantive errors or differences may remain. It is the user's responsibility to verify the legal accuracy of all legal text. The Legislative Counsel Committee claims copyright protection in those parts of Oregon Revised Statutes that are legally subject to copyright protection. The State of Oregon is not liable for any loss or damage resulting from errors introduced into the materials supplied by the Legislative Counsel Committee, by a user or any third party, or resulting from any defect in or misuse of any search software, drivers or other equipment.

Hint: Use your browser's Find feature (usually found in the Edit menu) to get to a section more quickly.

Chapter 181 — State Police; Crime Reporting and Records;
Public Safety Standards and Training

2005 EDITION

**181.850 Enforcement of federal immigration laws.** (1) No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws.

(2) Notwithstanding subsection (1) of this section, a law enforcement agency may exchange information with the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services and the United States Bureau of Customs and Border Protection in order to:

(a) Verify the immigration status of a person if the person is arrested for any criminal offense; or

(b) Request criminal investigation information with reference to persons named in records of the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services or the United States Bureau of Customs and Border Protection.

(3) Notwithstanding subsection (1) of this section, a law enforcement agency may arrest any person who:

(a) Is charged by the United States with a criminal violation of federal immigration laws under Title II of the Immigration and Nationality Act or 18 U.S.C. 1015, 1422 to 1429 or 1505; and

(b) Is subject to arrest for the crime pursuant to a warrant of arrest issued by a federal magistrate.

(4) For purposes of subsection (1) of this section, the Bureau of Labor and Industries is not a law enforcement agency.

(5) As used in this section, "warrant of arrest" has the meaning given that term in ORS 131.005. [1987 c.467 §1; 2003 c.571 §1]

**APPENDIX VII**

## City of New York Policy



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EXECUTIVE ORDER No. 41

September 17, 2003

**CITY-WIDE PRIVACY POLICY AND AMENDMENT OF EXECUTIVE ORDER
NO. 34 RELATING TO CITY POLICY CONCERNING IMMIGRANT ACCESS TO
CITY SERVICES**

WHEREAS, it is the policy of the City of New York to promote the utilization of its services by all of its residents who are entitled to and in need of them; and

WHEREAS, individuals should know that they may seek and obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives; and

WHEREAS, the obtaining of pertinent information, which is essential to the performance of a wide variety of governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments regulate the use of such information by their employees; and

WHEREAS, in furtherance of this policy, confidential information in the possession of City agencies relating to immigration status or other personal or private attributes should be disclosed only as provided herein;

NOW, THEREFORE, by virtue of the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. As used herein, "confidential information" means any information obtained and maintained by a City agency relating to an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, or immigration status, and shall include all information contained in any individual's income tax records.

Section 2. No City officer or employee shall disclose confidential information, unless

– 69 –

(a)     such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or legal guardian; or

(b)     such disclosure is required by law; or

(c)     such disclosure is to another City officer or employee and is necessary to fulfill the purpose or achieve the mission of any City agency; or

(d)     in the case of confidential information other than information relating to immigration status, such disclosure is necessary to fulfill the purpose or achieve the mission of any City agency; or

(e)     in the case of information relating to immigration status, (i) the individual to whom such information pertains is suspected by such officer or employee or such officer's or employee's agency of engaging in illegal activity, other than mere status as an undocumented alien or (ii) the dissemination of such information is necessary to apprehend a person suspected of engaging in illegal activity, other than mere status as an undocumented alien or (iii) such disclosure is necessary in furtherance of an investigation of potential terrorist activity.

Agencies shall promulgate such rules as may be appropriate to detail circumstances in which confidential information may or may not be disclosed pursuant to this executive order. Any City officer or employee with a question relating to the disclosure of confidential information under this section shall consult with the general counsel of such officer's or employee's agency.

Section 3. Section 2 of Executive Order No. 34, dated May 13, 2003, is amended by adding a new subdivision d to read as follow:

d.     "Illegal activity" means unlawful activity but shall not include mere status as an undocumented alien.

Section 4. Sections 3 and 4 of such Executive Order are amended to read as follows:

Section 3. Information respecting aliens.

a.     A City officer or employee, other than law enforcement officers, shall not inquire about a person's immigration status unless:

(1)     Such person's immigration status is necessary for the determination of program, service or benefit eligibility or the provision of City services; or

(2)     Such officer or employee is required by law to inquire about such person's immigration status.

2

- 70 –

Section 4. Law Enforcement Officers.

a.       Law enforcement officers shall not inquire about a person's immigration status unless investigating illegal activity other than mere status as an undocumented alien.

b        Police officers and peace officers, including members of the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity.

c.       It shall be the policy of the Police Department not to inquire about the immigration status of crime victims, witnesses, or others who call or approach the police seeking assistance.

Section 5. This Order shall take effect immediately.

Michael R.Bloomberg

MICHAEL R. BLOOMBERG
MAYOR

- 71 –

**APPENDIX VIII**

# San Francisco City Administrative Code



# CHAPTER 12H: IMMIGRATION STATUS

Sec. 12H.1. City and County of Refuge.

Sec. 12H.2. Use of City Funds Prohibited.

Sec. 12H.2-1. Chapter Provisions Inapplicable to Persons Convicted of Certain Crimes.

Sec. 12H.3. Clerk of Board to Transmit Copies of This Chapter; Informing City Employees.

Sec. 12H.4. Enforcement.

Sec. 12H.5. City Undertaking Limited to Promotion of General Welfare.

Sec. 12H.6. Severability.

**SEC. 12H.1. CITY AND COUNTY OF REFUGE.**

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.2. USE OF CITY FUNDS PROHIBITED.**

No department, agency, commission, officer or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by federal or State statute, regulation or court decision. The prohibition set forth in this Chapter shall include, but shall not be limited to:

(a) Assisting or cooperating, in one's official capacity, with any Immigration and Naturalization Service (INS) investigation, detention, or arrest procedures, public or clandestine, relating to alleged violations of the civil provisions of the federal immigration law.

(b) Assisting or cooperating, in one's official capacity, with any investigation, surveillance or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State or federal criminal laws.

(c) Requesting information about, or disseminating information regarding, the immigration status of any individual, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d) Including on any application, questionnaire or interview form used in relation to benefits, services or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by federal or State statute, regulation or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.2-1. CHAPTER PROVISIONS INAPPLICABLE TO PERSONS CONVICTED OF CERTAIN CRIMES.**

Nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying and reporting any person pursuant to State or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. In addition, nothing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law. For purposes of this Section, an individual has been "convicted" of a felony when: (a) there has been a conviction by a court of competent jurisdiction; and (b) all direct appeal rights have been exhausted or waived; or (c) the appeal period has lapsed.

However, no officer, employee or law enforcement agency of the City and County of San Francisco shall stop, question, arrest or detain any individual solely because of the individual's national origin or immigration status. In addition, in deciding whether to report an individual to the INS under the circumstances described in this Section, an officer, employee or law enforcement agency of the City and County of San Francisco shall not discriminate among individuals on the basis of their ability to speak English or perceived or actual national origin.

This Section shall not apply in cases where an individual is arrested and/or convicted for failing to obey a lawful order of a police officer during a public assembly or for failing to disperse after a police officer has declared an assembly to be unlawful and has ordered dispersal.

Nothing herein shall be construed or implemented so as to discourage any person, regardless of immigration status, from reporting criminal activity to law enforcement agencies.

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93)

### SEC. 12H.3. CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY EMPLOYEES.

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the INS, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each city and county employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.4. ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.5. CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

CHAPTER 12H: IMMIGRATION STATUS

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.6. SEVERABILITY.**

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

**APPENDIX IX**

## California Attorney General's Opinion #01-213

TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

BILL LOCKYER
Attorney General

———————————————

|  |  |  |
|---|---|---|
| OPINION | : | No. 01-213 |
| of | : | November 16, 2001 |
| BILL LOCKYER<br>Attorney General | : | |
| ANTHONY S. DA VIGO<br>Deputy Attorney General | : | |

———————————————————————————————

THE HONORABLE LOU CORREA, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following questions:

1. Are the mandatory provisions of Penal Code section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws subject to enforcement by local law enforcement officers?

2. May a local law enforcement officer, during a detention of a Spanish-speaking person for otherwise valid purposes, question the person as to his or her immigration status?

3. May an arrested person's immigration status be investigated by local law enforcement officers prior to arraignment?

CONCLUSIONS

1.   The mandatory provisions of Penal Code section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement officers.

2.   A local law enforcement officer, during a detention of a Spanish-speaking person for otherwise valid purposes, may question the person as to his or her immigration status.   However, a local officer may not question an individual as to immigration status solely because the individual speaks Spanish or other non-English language.

3.   An arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.

ANALYSIS

The three questions presented for resolution concern the procedures under which local police officers may ascertain whether a person is in the United States in violation of federal immigration laws and the consequences that may arise with respect to such determination.

1.   Mandatory Provisions of Penal Code Section 834b

The first inquiry is whether law enforcement officers in California must comply with the mandatory provisions of Penal Code section 834b[1] regarding persons who are suspected of being in the United States in violation of federal immigration laws.   Section 834b states:

"(a) Every law enforcement agency in California shall fully cooperate with the United States Immigration and Naturalization Service regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws.

"(b) With respect to any such person who is arrested, and suspected of being present in the United States in violation of federal immigration laws, every law enforcement agency shall do the following:

---

[1]  All references hereafter to the Penal Code are by section number only.

2                                                    01-213

"(1) Attempt to verify the legal status of such person as a citizen of the United States, an alien lawfully admitted as a permanent resident, an alien lawfully admitted for a temporary period of time or as an alien who is present in the United States in violation of immigration laws. The verification process may include, but shall not be limited to, questioning the person regarding his or her date and place of birth, and entry into the United States, and demanding documentation to indicate his or her legal status.

"(2) Notify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that, apart from any criminal justice proceedings, he or she must either obtain legal status or leave the United States.

"(3) Notify the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status and provide any additional information that may be requested by any other public entity.

"(c) Any legislative, administrative, or other action by a city, county, or other legally authorized local governmental entity with jurisdictional boundaries, or by a law enforcement agency, to prevent or limit the cooperation required by subdivision (a) is expressly prohibited."

The provisions of section 834b are mandatory and prohibitory. Local law enforcement officers are to "fully cooperate with the United States Immigration and Naturalization Service," shall attempt to verify the legal status of certain arrested persons, and make certain notifications regarding violations of federal immigration laws.

Section 834b's terms, however, have been declared preempted by federal law and their enforcement has been permanently enjoined by a federal court. (*League of United Latin American Citizens v. Wilson* (C.D.Cal. 1995) 908 F.Supp. 755, 771, 776, sub. opn. (C.D.Cal. 1997) 997 F.Supp. 1244, 1250, 1252, 1261.) Accordingly, the statute's provisions are not subject to enforcement by local law enforcement officers.

Nevertheless, do the federal court's rulings prohibit local law enforcement officers from *voluntarily* engaging in the conduct described in section 834? In *League of United Latin American Citizens v. Wilson, supra*, 997 F.Supp. 1244, the court stated that not only *could* state and local government entities cooperate with federal immigration agents, federal law *required* them to do so and that "[n]othing in the Court's decision should be interpreted to proscribe cooperation between state officials and the I.N.S. *pursuant to the*

*[federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996]." (Id.* at p. 1252, fn. 9; see *City of New York v. U.S.* (2d Cir. 1999) 179 F.3d 29, 31-33.)

Hence, local law enforcement officers are not prohibited from cooperating with federal agents in the discharge of their duties. (See 75 Ops.Cal.Atty.Gen. 270 (1992).) Federal statutes provide that state and local governments may not be prohibited from cooperating with the Immigration and Naturalization Service. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, noted by the court in the 1997 *Wilson, supra,* decision, provides in part:

> "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." (8 U.S.C. § 1644.)

Similarly, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 provides in part:

> "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. § 1373(a).)

In answer to the first question, we conclude that the mandatory provisions of section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement agencies.

2. Questioning a Spanish-speaking Person's Immigration Status

The second inquiry is whether a local law enforcement officer who has stopped a Spanish-speaking person for otherwise valid purposes, such as for a driving infraction, may inquire during the detention as to the person's immigration status. We may assume that the stop was not made at or in the vicinity of a border station or known point of illegal entry. We do not consider it significant that the language spoken by the person is Spanish as distinguished from some other foreign language. The focus here is upon what a local peace officer may do during a lawful detention to ascertain the individual's immigration status.

4                                                              01-213

An officer making such an inquiry would be engaged in the exercise of a federal power. (*DeCanas v. Bica* (1976) 424 U.S. 351, 354.)  This characterization, however, would not resolve, but merely raise, the issue of whether the exercise of such local authority would be preempted by federal law. (*Id.* at p. 355.) As previously noted, Congress has expressly recognized the authority of state and local officers "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." (8 U.S.C. § 1357(g)(10)(B).) Such provisions evince "a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws." (*U. S. v. Vasquez-Alvarez* (10th Cir. 1999) 176 F.3d 1294, 1300.)

While Congress may invite local law enforcement officers to establish a person's immigration status, may the inquiry be made during an adjudication for an unrelated purpose such as a traffic violation?[2]  The Fourth Amendment to the Constitution of the United States provides:  "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." Ordinarily, a judicial warrant issued on probable cause is necessary to render either a search or seizure of one's person or possessions reasonable. (*United States v. Place* (1983) 462 U.S. 696, 701.)[3]  This right of personal security is inherent in the concept of due process, and therefore applies as well to state officers through the Fourteenth Amendment. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652; *Elkins v. United States* (1960) 364 U.S. 206, 213; 80 Ops.Cal.Atty.Gen. 354, 355 (1997).)

In addition, section 1 of article I of the California Constitution, as amended by the 1972 "privacy initiative," provides: "[a]ll people are by nature free and independent and have inalienable rights.  Among these are . . . pursuing and obtaining safety, happiness, and privacy."  The state's privacy guarantee operates separately and in addition to the Fourth Amendment's protections against unreasonable searches and seizures.  For our purposes, however, we need not distinguish between the state and federal constitutional guarantees. (See *In re Williams G.* (1985) 40 Cal. 3d 550, 557, fn. 4.)

---

[2] We do not have the issue of whether the stop itself may be justified because the person is heard speaking a foreign language. (See, e.g., *United States v. Cortez* (1981) 449 U.S. 411, 417; *State v. Kettlewell* (Vt. 1987) 544 A.2d 591; *Cheung Tin Wong v. United States Immigration & Nat. Serv.* (D.C. Cir. 1972) 468 F.2d 1123; *Hon Keung Kung v. District Dir., Immigration & Nat. Serv.* (E.D. Mo. 1973) 356 F.Supp. 571.)

[3] The warrant clause of the Fourth Amendment states that ". . . no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

5                                                                           01-213

The protections of the Fourth Amendment apply to brief investigatory stops made by law enforcement officers. In *United States v. Cortez* (1981) 449 U.S. 411, 417, the court observed:

> "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. [Citations.] An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. [Citations.]" (Fn. omitted.)

Here, we have a valid stop and detention of a person who does not speak English. In *I.N.S. v. Delgado* (1984) 466 U.S. 210, 215-217, the court stated with regard to the questioning of persons as to their immigration status:

> "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Citation.] Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' [Citation.] While applying such a test is relatively straightforward in a situation resembling a traditional arrest, [citation], the protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.' [Citation.] What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Citation]; see *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion).

> "Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in *Royer, supra,* plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. In *Royer*, when Drug Enforcement Administration agents found that the respondent

6                                                                                           01-213

matched a drug courier profile, the agents approached the defendant and asked him for his airplane ticket and driver's license, which the agents then examined. A majority of the Court believed that the request and examination of the documents were 'permissible in themselves.' [Citations.] In contrast, a much different situation prevailed in *Brown v. Texas*, 443 U.S. 47 (1979), when two policemen physically detained the defendant to determine his identity, after the defendant refused the officers' request to identify himself. The Court held that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure. [Citation.]

"What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. [Citation.] Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps–such as those taken in *Brown*–to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. [Citations.]"

In *Delgado*, federal immigration agents questioned employees at a factory regarding their immigration status. During the survey, which lasted from one to two hours, the agents positioned themselves near the factory exits while others moved systematically through the factory, approaching employees and, after identifying themselves, asking the employees from one to three questions relating to their citizenship. Meanwhile, employees continued their work and were free to walk around within the factory. Certain employees, who were citizens or permanent resident aliens, contended that the surveys violated their rights under the Fourth Amendment. The employees argued that the element of surprise, the systematic questioning of individual workers, the stationing of agents near the exits of the factory, and the failure to inform workers that they were free to leave created an intimidating psychological environment which negated any reasonable impression that they were free to leave without answering the questions. Nevertheless, the United States Supreme Court ruled that the conduct of the immigration agents, consisting simply of questioning employees and arresting those they had probable cause to believe were unlawfully present in the United States, "should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." (*Id.* at p. 218.)

7                                                      01-213

Here, we note that the authority of state and local law enforcement officers to investigate and arrest for violations of federal law is determined by reference to state law. (*U. S. v. Vasquez-Alvarez, supra*, 176 F.3d at pp. 1295-1296; *Gates v. Superior Court* (1987) 193 Cal.App.3d 205, 215; see, e.g., 8 U.S.C. § 1252c [". . . to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who . . . is an alien illegally present in the United States. . . ."].) In California, a local peace officer may make an arrest when an individual has committed a felony, or where reasonable cause exists to suspect that a person has committed a felony, whether or not a felony has been committed. (§ 836, subd. (2), (3).)[4] Therefore, a local officer may arrest for a felony violation of federal immigration law any time the officer has reasonable cause to believe such a violation has occurred. (*Gates v. Superior Court, supra*, 193 Cal.App.3d at p. 215.) Inasmuch as a local law enforcement officer is authorized under state and federal law to make such an arrest, and to exchange information pertaining to immigration status with federal authorities (*id.* at p. 219), it follows that a local law enforcement officer may question an individual as to his or her immigration status.

In answer to the second question, therefore, we conclude that a local law enforcement officer who has detained a Spanish-speaking person for otherwise valid purposes may question such person as to his or her immigration status. It is emphasized, however, that for purposes of the question here considered, the inquiry as to alienage was not posited *because* the individual spoke Spanish. A contrary supposition would produce an entirely different result. Thus, it has been held that ethnic appearance is not, in general, an appropriate factor in the reasonable suspicion calculus. (*United States v. Montero-Camargo* (9th Cir. 2000) 208 F.3d 1122, 1132.) While suspicion is not a constitutional prerequisite for inquiry as to alienage, such an inquiry directed selectively to individuals who speak a language other than English would be tantamount to an aspect of the practice commonly referred to as racial profiling, where sound is substituted for appearance or other indicia of ethnicity. It has been noted that primary language skill flows generally from one's national origin. (*Berke v. Ohio Department of Public Welfare* (6th Cir. 1980) 628 F.2d 980, 981; *Yu Cong Eng v. Trinidad* (1926) 271 U.S. 500, 517.) In the context presented here, therefore, a non-English speaking classification is, for all practical purposes, a classification based on national origin. Such a selective enforcement would clearly violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.

---

[4] In the case of both felonies and misdemeanors, a California peace officer is further authorized to make an arrest either in obedience to a warrant, or without a warrant where the officer has probable cause to believe that a public offense has been committed in the officer's presence. (Pen. Code, § 836, subd. (a), (a)(1).) Civil violations of immigration law are not cognizable under this formula.

8                                                                                01-213

### 3. Investigations of Arrested Persons Prior to Arraignment

The third inquiry is whether an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment. This inquiry is based upon a federal program established by Congress in 1997. (Pub.L. No. 105-141 (Dec. 5, 1997) 111 Stat. 2647 [see note under 8 U.S.C.A. § 1226].) The legislation provides as follows:

"(a) . . . [T]he Attorney General shall establish and implement a program to identify, from among the individuals who are incarcerated in local governmental incarceration facilities prior to arraignment on criminal charges, those individuals who are within 1 or more of the following classes of deportable aliens:

"(1) Aliens unlawfully present in the United States.

"(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) The program authorized by subsection (a) shall include -

"(1) the detail, to each incarceration facility selected under subsection (c), of at least one employee of the Immigration and Naturalization Service who has expertise in the identification of aliens described in subsection (a); and

"(2) provision of funds sufficient to provide for -

"(A) the detail of such employees to each selected facility on a full time basis, including the portions of the day or night when the greatest number of individuals are incarcerated prior to arraignment;

"(B) access for such employees to records of the Service and other Federal law enforcement agencies that are necessary to identify such aliens; and

"(C) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. ."

We are not apprised as to the manner in which this federal program is being implemented by federal immigration agents at any particular local incarceration facility. It will be assumed, therefore, that the selection criteria are constitutionally sufficient. The actual arraignment of an individual on formal charges is clearly not a prerequisite for an otherwise proper investigation of immigration status under the federal law. In the case of an individual who is determined to be present in the United States unlawfully, the local magistrate will be apprised of the true identification of the person and will receive a report regarding the intention of the federal Immigration and Naturalization Service to remove the alien from the United States.

Consistent with our conclusions to questions one and two and in answer to the third question, we conclude that an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.

*****

10                                                                        01-213

APPENDIX X

| JURISDICTION | STATE [SENSITIVE INFORMATION REDACTED] | If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status? | If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody? | Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody? | Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody? |
|---|---|---|---|---|---|
| **JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY** | | | | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | No | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | No | | No |

| | STATE [SENSITIVE INFORMATION REDACTED] | If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status? | If law enforcement officers from your jurisdiction have reason to believe that someone may be an undocumented alien, do they generally inform ICE that the individual is in their custody? | Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody? | Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody? |
|---|---|---|---|---|---|
| **JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY** | | | | | |
| JURISDICTION | | | | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | | No | No |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |

Source:  Responses to OIG survey

The following explanatory comments were offered by respondents listed in this table.  The respondents did not necessarily offer an explanation for each negative answer.

*(1)  If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?*

- [SENSITIVE INFORMATION REDACTED] – "Generally, if an individual does not appear to be foreign they will not be asked.  Now if an individual has no proper identification and it is apparent that they may be foreign then they will ask."

- [SENSITIVE INFORMATION REDACTED] – "Not everyone arrested would prompt an arresting officer to inquire about a person's immigration status.  It is unknown as to how many times a day an arresting officer would have cause to ask an arrestee about their immigration status."

- [SENSITIVE INFORMATION REDACTED]a – "The [SENSITIVE INFORMATION REDACTED] does not generally ask immigration status. We may if need be, but not generally."

- [SENSITIVE INFORMATION REDACTED] – "There is no local ordinance or regulation from the County's Board of Supervisors authorizing the Department of Correction to ask arrestees about their immigration status."

- [SENSITIVE INFORMATION REDACTED] – "It is not the Police Department's policy to ask, however, some officers ask voluntarily.  It is not the Police Department's policy to take proactive enforcement action against undocumented aliens.  However, if an encounter with an undocumented alien yields a wanted status for an immigration violation listed by another agency, the Police Dept. will confirm extradition before arrest."

- [SENSITIVE INFORMATION REDACTED] – "Since [SENSITIVE INFORMATION REDACTED] is a home rule city the Sheriff Dept doesn't 'arrest' persons as part of our normal duties.  When persons are brought to us or we take someone into our custody we do ask for place of birth.  Anyone who self reports as being born outside the USA is forwarded to ICE."

- [SENSITIVE INFORMATION REDACTED] – "No means they don't generally ask, since their immigration status has no bearing on the local charge.  Additionally, if they did ask and the defendant said he was illegal, who would we tell?"

- [SENSITIVE INFORMATION REDACTED] – "Not unless there is a reason to believe there would be an issue with the status."

- [SENSITIVE INFORMATION REDACTED] – "Not Applicable."

- [SENSITIVE INFORMATION REDACTED] – "We complete an NCIC check on all arrestees, and we report those with a history of deportation."

- [SENSITIVE INFORMATION REDACTED] – "Ask where born but don't check immigration status."

- [SENSITIVE INFORMATION REDACTED] – "Generally no, unless there is reason to believe individual has been involved in certain criminal activities such as: arrested for, or has been convicted of a felony, violent crime, etc."

- [SENSITIVE INFORMATION REDACTED] – "Deputies working patrol within [SENSITIVE INFORMATION REDACTED] do not generally ask arrestees their immigration status."

- 87 –

- [SENSITIVE INFORMATION REDACTED] – "Immigration status is determined during the Booking process."

- [SENSITIVE INFORMATION REDACTED] – "Only if the investigation points to the fact that the individual(s) may be an undocumented alien."

*(2)   If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "Notification may occur in felony offenses, but not usually for minor offenses."

- [SENSITIVE INFORMATION REDACTED] – "From my experience it is difficult to contact these agencies."

- [SENSITIVE INFORMATION REDACTED] – "Unknown.  However, the [SENSITIVE INFORMATION REDACTED] Custody Division is implementing an automated inquiry and notification process for consular notifications as part of the booking process."

- [SENSITIVE INFORMATION REDACTED] – "ICE agents come into our facility on a regular basis and review our records of undocumented aliens."

- [SENSITIVE INFORMATION REDACTED] – "There is no policy or local regulation from the County's Board of Supervisors that allows Department of Correction officers to inform ICE that an individual is in custody."

- [SENSITIVE INFORMATION REDACTED] – "This is a Sheriff's [Department] function."

- [SENSITIVE INFORMATION REDACTED] – "Our experience has shown that ICE is not going to respond anyway."

- [SENSITIVE INFORMATION REDACTED] – "Not Applicable."

- [SENSITIVE INFORMATION REDACTED] – "All arrestees in [SENSITIVE INFORMATION REDACTED] are brought to the [SENSITIVE INFORMATION REDACTED] County Jail; this is when the NCIC [check] is done."

- 88 –

- [SENSITIVE INFORMATION REDACTED] – "Depends on nature of crime."

- [SENSITIVE INFORMATION REDACTED] – "Law enforcement officers may contact ICE but jail staff do not.  We have an ICE employee that regularly reviews inmate rosters."

- [SENSITIVE INFORMATION REDACTED] – "No, unless certain conditions are met such as: if individual is reasonably suspected of participating in certain criminal activity, arrested for using a firearm during commission of a crime, involvement in violent crime. Etc."

- [SENSITIVE INFORMATION REDACTED] – "Deputies working patrol within [SENSITIVE INFORMATION REDACTED] do not generally inform the DHS/ICE that the individual they have in custody may be undocumented.  However, on occasion deputies will advise the 287(g) Officers of the undocumented arrestee."

- [SENSITIVE INFORMATION REDACTED] – "Past history has shown that they will rarely pick the subjects up for transport."

- [SENSITIVE INFORMATION REDACTED] – "Sheriff's Deputies do not inform ICE.  Detention staff will notify ICE if information obtained from a criminal history rap sheet or information obtained from our local database alerts [this] Department of previous contacts with ICE (releases to ICE or previously deported criminal alien)."

*(3)  Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "ICE does not bring people (inmates) to our facility."

- [SENSITIVE INFORMATION REDACTED] – "The [SENSITIVE INFORMATION REDACTED] has a contract to have ICE inmates."

*(4)  Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "[No.] Unless ICE asks us to."

- [SENSITIVE INFORMATION REDACTED] – "In most cases we are unaware of status."

**APPENDIX XI**

**Bureau of Justice Assistance Response to the Draft Audit Report**

| | |
|---|---|
| MEMORANDUM TO: | Glenn A. Fine<br>Inspector General<br>United States Department of Justice |
| THROUGH: | Guy K. Zimmerman<br>Assistant Inspector General for Audit<br>Office of the Inspector General<br>United States Department of Justice |
| FROM: | Regina B. Schofield<br>Assistant Attorney General |
| SUBJECT: | Response to Office of the Inspector General's Draft Audit Report, *Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States* |

This memorandum responds to the Office of the Inspector General's (OIG's) draft audit report entitled "*Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States.*"  The draft report does not contain any recommendations.   The Office of Justice Programs has reviewed the draft audit report and does not have any comments.

Thank you for the opportunity to review and respond to the draft audit report.  If you have any questions regarding this response, please feel free to contact me on (202) 307-5933, or LeToya Johnson, Director, Program Review Office, on (202) 514-0692.

cc:  Beth McGarry
     Deputy Assistant Attorney General
        for Operations and Management

     Domingo Herraiz
     Director, Bureau of Justice Assistance

     LeToya A. Johnson
     Director, Program Review Office

     Richard P. Theis
     DOJ Audit Liaison

- 91 –

# EXHIBIT H

**City and County of San Francisco**                                    **Department of Human Resources**



Edwin M. Lee                                                                        Micki Callahan
Mayor                                                                       Human Resources Director

## MEMORANDUM

**Date:**       Jan. 19, 2017

**To:**         All City and County of San Francisco Employees

**From:**       Micki Callahan
                Human Resources Director

**Subject:**    Reminder about Sanctuary City Obligations

---

This memo is being issued to remind City and County of San Francisco (City) departments and employees of their duties under the San Francisco Charter and Administrative Code. All people seeking or receiving City services must be treated with equal dignity, respect for human rights, and due process under the law, regardless of immigration status. This includes informing them of their rights and access to services, as well as giving out general and/or translated information on services and programs that is timely, accurate and complete.

Departments must ensure that their rules, regulations, and protocols adhere to San Francisco's sanctuary city laws, codified at Chapters 12H and 12I of the Administrative Code. Although federal law states that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual" (8 U.S.C. § 1373), Chapters 12H and 12I impose other types of restrictions, which are consistent with federal law and are summarized below.

Department employees acting in their official capacities may not use City funds or resources to:

  a) Assist or cooperate with any investigation, detention, or arrest procedures, public or clandestine, conducted by federal immigration authorities (ICE) and relating to alleged violations of the civil provisions of federal immigration law.
  b) Request or give out information regarding the release status or personal information of any individual, except as permitted under Administrative Code Section 12I.3.
  c) Condition the receipt of City services or benefits on immigration status, except as required by federal or state statute or regulation, public assistance criteria, or court decision.
  d) Include any question regarding immigration status (other than those required by federal or state statute, regulation, or court decision ) on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City.
  e) Detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody. (See Administrative Code § 12I.3(a).)
  f) Respond to a federal immigration officer's request for notification of an individual's release, unless the individual meets specified criteria listed in Administrative Code section 12I.3(c).

It's important to make sure all City employees are aware of these rules. Departments may include education on the City's sanctuary city laws in regular employee trainings and orientations based on templates that will be established by the Office of Civic Engagement and Immigrant Affairs (OCEIA).

Departments are reminded to include education on Administrative Code Chapters 12H and 12I in regular community outreach.

This memorandum is provided as a general summary of the City's sanctuary city laws and is not a substitute for legal advice. State and federal law may impose additional obligations. If you have any questions about how to apply the City's sanctuary city laws to a particular situation, please contact your manager or the Deputy City Attorney assigned to your department.

# EXHIBIT I

**August 29, 1997**

**MEMORANDUM FOR THE RECORD**

**FROM:**     Norwood J. Jackson
                     Deputy Controller
                     Office of Federal Financial Management

**SUBJECT:**   Recompilation of OMB Circular A-102

I certify that the attached document constitutes a recompilation of Office of Management and Budget Circular A-102, "Grants and Cooperative Agreements with State and Local Governments." The recompilation consists of the last complete revision of the Circular published at 59 FR 52224 (dated October 7, 1994, published October 14, 1994), as further amended at 62 FR 45934 (August 29, 1997).

---

**CIRCULAR A-102 (REVISED 10/7/94, As Further Amended 8/29/97)**

CIRCULAR NO. A-102
Revised

TO THE HEADS OF EXECUTIVE DEPARTMENTS AND ESTABLISHMENTS

SUBJECT:  Grants and Cooperative Agreements with State and Local Governments

1. **Purpose**. This Circular establishes consistency and uniformity among Federal agencies in the management of grants and cooperative agreements with State, local, and federally-recognized Indian tribal governments. This revision supersedes Office of Management and Budget (OMB) Circular No. A-102, dated March 3, 1988.

2. **Authority**. This Circular is issued under the authority of the Budget and Accounting Act of 1921, as amended; the Budget and Accounting Procedures Act of 1950, as amended; Reorganization Plan No. 2 of 1970; Executive Order 11541 and the Chief Financial Officers Act, 31 U.S.C. 503. Also included in the Circular are standards to ensure consistent implementation of sections 202, 203, and 204 of the Intergovernmental Cooperation Act of 1968, the Office of Federal Procurement Policy Act Amendments of 1983, and sections 6301-08, title 31, United States Code.

3. **Background**. On March 12, 1987, the President directed all affected agencies to issue a

grants management common rule to adopt government-wide terms and conditions for grants to State and local governments, and they did so. In 1988, OMB revised the Circular to provide guidance to Federal agencies on other matters not covered in the common rule.

4. **Required Action**. Consistent with their legal obligations, all Federal agencies administering programs that involve grants and cooperative agreements with State, local and Indian tribal governments (grantees) shall follow the policies in this Circular. If the enabling legislation for a specific grant program prescribes policies or requirements that differ from those in this Circular, the provisions of the enabling legislation shall govern.

5. **OMB Responsibilities**. OMB may grant deviations from the requirements of this Circular when permissible under existing law. However, in the interest of uniformity and consistency, deviations will be permitted only in exceptional circumstances.

6. **Information Contact.** Further information concerning this Circular may be obtained from:

> Office of Federal Financial Management
> Office of Management and Budget
> Room 6025
> New Executive Office Building
> Washington, DC 20503
> (202) 395-3993

7. **Termination Review Date.** The Circular will have a policy review three years from the date of issuance.

8. **Effective Date.** The Circular is effective on publication.

Attachment

Top of Page

---

ATTACHMENT
Circular No. A-l02

## GRANTS AND COOPERATIVE AGREEMENTS
## WITH STATE AND LOCAL GOVERNMENTS

1. **Pre-Award Policies**.

a. **Use of grants and cooperative agreements**. Sections 6301-08, title 31, United States Code govern the use of grants, contracts and cooperative agreements. A grant or cooperative agreement shall be used only when the principal purpose of a transaction is to accomplish a public purpose of support or stimulation authorized by Federal statute. Contracts shall be used when the principal purpose is acquisition of property or services for the direct benefit or use of the Federal Government. The statutory criterion for choosing between grants and cooperative agreements is that for the latter, "substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement."

b. **Advance Public Notice and Priority Setting**.

(1) Federal agencies shall provide the public with an advance notice in the **Federal Register**, or by other appropriate means, of intended funding priorities for discretionary assistance programs, unless funding priorities are established by Federal statute. These priorities shall be approved by a policy level official.

(2) Whenever time permits, agencies shall provide the public an opportunity to comment on intended funding priorities.

(3) All discretionary grant awards in excess of $25,000 shall be reviewed for consistency with agency priorities by a policy level official.

c. **Standard Forms for Applying for Grants and Cooperative Agreements**.

(1) Agencies shall use the following standard application forms unless they obtain Office of Management and Budget (OMB) approval under the Paperwork Reduction Act of 1980 (44 U.S.C. 35) and the 5 CFR Part 1320, "Controlling Paperwork Burdens on the Public":

SF-424 Facesheet
SF-424a Budget Information (Non-Construction)
SF-424b Standard Assurances (Non-Construction)
SF-424c Budget Information (Construction)
SF-424d Standard Assurances (Construction)

When different or additional information is needed to comply with legislative requirements or to meet specific program needs, agencies shall also obtain prior OMB approval.

(2) A preapplication shall be used for all construction, land acquisition and land development projects or programs when the need for Federal funding exceeds

$100,000, unless the Federal agency determines that a preapplication is not needed. A preapplication is used to:

(a) Establish communication between the agency and the applicant,

(b) Determine the applicant's eligibility,

(c) Determine how well the project can compete with similar projects from others, and

(d) Discourage any proposals that have little or no chance for Federal funding before applicants incur significant costs in preparing detailed applications.

(3) Agencies shall use the Budget Information (Construction) and Standard Assurances (Construction) when the major purpose of the project or program is construction, land acquisition or land development.

(4) Agencies may specify how and whether budgets shall be shown by functions or activities within the program or project.

(5) Agencies should generally include a request for a program narrative statement which is based on the following instructions:

(a) Objectives and need for assistance. Pinpoint any relevant physical, economic, social, financial, institutional, or other problems requiring a solution. Demonstrate the need for the assistance and state the principal and subordinate objectives of the project. Supporting documentation or other testimonies from concerned interests other than the applicant may be used. Any relevant data based on planning studies should be included or footnoted.

(b) Results or Benefits Expected. Identify costs and benefits to be derived. For example, show how the facility will be used. For land acquisition or development projects, explain how the project will benefit the public.

(c) Approach. Outline a plan of action pertaining to the scope and detail how the proposed work will be accomplished for each assistance program. Cite factors which might accelerate or decelerate the work and reasons for taking this approach as opposed to others. Describe any unusual features of the project, such as design or technological innovations, reductions in cost or time, or extraordinary social and community involvements. Provide for each assistance program quantitative projections of the accomplishments to be achieved, if possible. When accomplishments cannot be quantified, list the activities in chronological order to show the schedule of accomplishments and target expected completion dates. Identify the kinds of data to be collected and maintained, and discuss the criteria to be used to evaluate the results and

success of the project. Explain the methodology that will be used to determine if the needs identified and discussed are being met and if the results and benefits identified are being achieved. List each organization, cooperator, consultant, or other key individuals who will work on the project along with a short description of the nature of their effort or contribution.

(d) Geographic location. Give a precise location of the project and area to be served by the proposed project. Maps or other graphic aids may be attached.

(e) If applicable, provide the following information: for research and demonstration assistance requests, present a biographical sketch of the program director with the following information: name, address, telephone number, background, and other qualifying experience for the project. Also, list the name, training and background for other key personnel engaged in the project. Describe the relationship between this project and other work planned, anticipated, or underway under Federal assistance. Explain the reason for all requests for supplemental assistance and justify the need for additional funding. Discuss accomplishments to date and list in chronological order a schedule of accomplishments, progress or milestones anticipated with the new funding request. If there have been significant changes in the project objectives, location, approach or time delays, explain and justify. For other requests for changes, or amendments, explain the reason for the change(s). If the scope or objectives have changed or an extension of time is necessary, explain the circumstances and justify. If the total budget has been exceeded or if the individual budget items have changes more than the prescribed limits, explain and justify the change and its effect on the project.

(6) Additional assurances shall not be added to those contained on the standard forms, unless specifically required by statute.

d. **Debarment and Suspension.** Federal agencies shall not award assistance to applicants that are debarred or suspended, or otherwise excluded from or ineligible for participation in Federal assistance programs under Executive Order 12549. Agencies shall establish procedures for the effective use of the List of Parties Excluded from Federal Procurement or Nonprocurement programs to assure that they do not award assistance to listed parties in violation of the Executive Order. Agencies shall also establish procedures to provide for effective use and/or dissemination of the list to assure that their grantees and subgrantees (including contractors) at any tier do not make awards in violation of the nonprocurement debarment and suspension common rule.

e. **Awards and Adjustments.**

(1) Ordinarily awards shall be made at least ten days prior to the beginning of the grant period.

(2) Agencies shall notify grantees immediately of any anticipated adjustments in the amount of an award. This notice shall be provided as early as possible in the funding period. Reductions in funding shall apply only to periods after notice is provided. Whenever an agency adjusts the amount of an award, it shall also make an appropriate adjustment to the amount of any required matching or cost sharing.

f.   **Carryover Balances.** Agencies shall be prepared to identify to OMB the amounts of carryover balances (e.g., the amounts of estimated grantee unobligated balances available for carryover into subsequent grant periods). This presentation shall detail the fiscal and programmatic (level of effort) impact in the following period.

g.   **Special Conditions or Restrictions.** Agencies may impose special conditions or restrictions on awards to "high risk" applicants/grantees in accordance with section __.12 of the grants management common rule. Agencies shall document use of the "Exception" provisions of section __.6 and "High-risk" provisions of section __.12 of the grants management common rule.

h.   **Waiver of Single State Agency Requirements.**

(1) Requests to agencies from the Governors, or other duly constituted State authorities, for waiver of "single" State agency requirements in accordance with section 31 U.S.C. 6504, "Use of existing State or multi-member agency to administer grant programs," shall be given expeditious handling and, whenever possible, an affirmative response.

(2) When it is necessary to refuse a request for waiver of "single" State agency requirements under section 204 of the Intergovernmental Corporation Act, the Federal grantor agency shall advise OMB prior to informing the State that the request cannot be granted. The agency shall indicate to OMB the reasons for the denial of the request.

(3) Legislative proposals embracing grant-in-aid programs shall avoid inclusion of proposals for "single" State agencies in the absence of compelling reasons to do otherwise. In addition, existing requirements in present grant-in-aid programs shall be reviewed and legislative proposals developed for the removal of these restrictive provisions.

i.   **Patent Rights.** Agencies shall use the standard patent rights clause specified in "Rights to Inventions made by Non-profit Organizations and Small Business Firms" (37 CFR Part 401), when providing support for research and development.

j.   **Metric System of Measurement.** The Metric Conversion Act of 1975, as amended,

declares that the metric system is the preferred measurement system for U.S. trade and commerce. The Act requires each Federal agency to establish a date(s), in consultation with the Secretary of Commerce, when the metric system of measurement will be used in the agency's procurement, grants, and other business-related activities. Metric implementation may take longer where the use of the system is initially impractical or likely to cause significant inefficiencies in the accomplishment of federally-funded activities. Heads of departments and agencies shall establish a process for a policy level and program level review of proposed exceptions to metric usage in grants programs. Executive Order 12770 ("Metric Usage in Federal Government Programs") elaborates on implementation of the Act.

## 2. Post-award Policies.

a. **Cash Management.** Agency methods and procedures for transferring funds shall minimize the time elapsing between the transfer to recipients of grants and cooperative agreements and the recipient's need for the funds.

   (1) Such transfers shall be made consistent with program purposes, applicable law and Treasury regulations contained in 31 CFR Part 205, Federal Funds Transfer Procedures.

   (2) Where letters-of-credit are used to provide funds, they shall be in the same amount as the award.

b. **Grantee Financial Management Systems.** In assessing the adequacy of an applicant's financial management system, the awarding agency shall rely on readily available sources of information, such as audit reports, to the maximum extent possible. If additional information is necessary to assure prudent management of agency funds, it shall be obtained from the applicant or from an on-site review.

c. **Financial Status Reports.**

   (1) Federal agencies shall require grantees to use the SF-269, Financial Status Report-Long Form, or SF-269a, Financial Status Report-Short Form, to report the status of funds for all non-construction projects or programs. Federal agencies need not require the Financial Status Report when the SF-270, Request for Advance or Reimbursement, or SF-272, Report of Federal Cash Transactions, is determined to provide adequate information.

   (2) Federal agencies shall not require grantees to report on the status of funds by object class category of expenditure (e.g., personnel, travel, equipment).

   (3) If reporting on the status of funds by programs, functions or activities within the project or program is required by statute or regulation, Federal agencies shall instruct

grantees to use block 12, Remarks, on the SF-269, or a supplementary form approved by the OMB under the Paperwork Reduction Act of 1980.

(4) Federal agencies shall prescribe whether the reporting shall be on a cash or an accrual basis. If the Federal agency requires accrual information and the grantees's accounting records are not normally kept on an accrual basis, the grantee shall not be required to convert its accounting system but shall develop such accrual information through an analysis of the documentation on hand.

d. **Contracting With Small and Minority Firms, Women's Business Enterprises and Labor Surplus Area Firms.** It is national policy to award a fair share of contracts to small and minority business firms. Grantees shall take similar appropriate affirmative action to support of women's enterprises and are encouraged to procure goods and services from labor surplus areas.

e. **Program Income.**

(1) Agencies shall encourage grantees to generate program income to help defray program costs. However, Federal agencies shall not permit grantees to use grant-acquired assets to compete unfairly with the private sector.

(2) Federal agencies shall instruct grantees to deduct program income from total program costs as specified in the grants management common rule at paragraph __.25 (g)(1), unless agency regulations or the terms of the grant award state otherwise. Authorization for recipients to follow the other alternatives in paragraph __.25 (g) (2) and (3) shall be granted sparingly.

f. **Site Visits and Technical Assistance.** Agencies shall conduct site visits only as warranted by program or project needs. Technical assistance site visits shall be provided only (1) in response to requests from grantees, (2) based on demonstrated program need, or (3) when recipients are designated "high risk" under section __.12 of the grants management common rule.

g. **Infrastructure Investment.** Agencies shall encourage grantees to consider the provisions of the common rule at Section __. 31 and Executive Order 12803 ("Infrastructure Privatization"). This includes reviewing and modifying procedures affecting the management and disposition of federally-financed infrastructure owned by State and local governments, with their requests to sell or lease infrastructure assets, consistent with the criteria in Section 4 of the Order. Related guidance contained in Executive Order 12893 ("Principles for Federal Infrastructure Investments") requiring economic analysis and the development of investment options, including public-private partnership, shall also be applied. On March 7, 1994, OMB issued guidance on Executive Order 12893 in OMB Bulletin No. 94-16.

h. **Resource Conservation and Recovery Act.** Agencies shall implement the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. 6962). Any State agency or agency of a political subdivision of a State which is using appropriated Federal funds must comply with Section 6002 of RCRA. Section 6002 requires that preference be given in procurement programs to the purchase of specific products containing recycled materials identified in guidelines developed by the Environmental Protection Agency (EPA). Current guidelines are contained in 40 CFR Parts 247-253. State and local recipients of grants, loans, cooperative agreements or other instruments funded by appropriated Federal funds shall give preference in procurement programs to the purchase of recycled products pursuant to the EPA guidelines.

i. **Procurement of Goods and Services.** Agencies should be aware of and comply with the requirement enacted in Section 623 of the Treasury, Postal Service and General Government Appropriations Act, 1993, and reenacted in Section 621 of the fiscal year 1994 Appropriations Act. This Section requires grantees to specify in any announcement of the awarding of contracts with an aggregate value of $500,000 or more, the amount of Federal funds that will be used to finance the acquisitions.

j. **Conditional exemptions**.

(1) OMB authorizes conditional exemption from OMB administrative requirements and cost principles circulars for certain Federal programs with statutorily-authorized consolidated planning and consolidated administrative funding, that are identified by a Federal agency and approved by the head of the Executive department or establishment. A Federal agency shall consult with OMB during its consideration of whether to grant such an exemption.

(2) To promote efficiency in State and local program administration, when Federal non-entitlement programs with common purposes have specific statutorily-authorized consolidated planning and consolidated administrative funding and where most of the State agency's resources come from non-Federal sources, Federal agencies may exempt these covered State-administered, non-entitlement grant programs from certain OMB grants management requirements. The exemptions would be from all but the allocability of costs provisions of OMB Circulars A-87 (Attachment A, subsection C.3), "Cost Principles for State, Local, and Indian Tribal Governments," A-21 (Section C, subpart 4), "Cost Principles for Educational Institutions," and A-122 (Attachment A, subsection A.4), "Cost Principles for Non-Profit Organizations," and from all of the administrative requirements provisions of OMB Circular A-110, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations," and the agencies' grants management common rule.

(3) When a Federal agency provides this flexibility, as a prerequisite to a State's

exercising this option, a State must adopt its own written fiscal and administrative requirements for expending and accounting for all funds, which are consistent with the provisions of OMB Circular A-87, and extend such policies to all subrecipients. These fiscal and administrative requirements must be sufficiently specific to ensure that: funds are used in compliance with all applicable Federal statutory and regulatory provisions, costs are reasonable and necessary for operating these programs, and funds are not be used for general expenses required to carry out other responsibilities of a State or its subrecipients.

3. **After-the-grant Policies.**

    a. **Closeout.** Federal agencies shall notify grantees in writing before the end of the grant period of final reports that shall be due, the dates by which they must be received, and where they must be submitted. Copies of any required forms and instructions for their completion shall be included with this notification. The Federal actions that must precede closeout are:

        (1) Receipt of all required reports,

        (2) Disposition or recovery of federally-owned assets (as distinct from property acquired under the grant), and

        (3) Adjustment of the award amount and the amount of Federal cash paid the recipient.

    b. **Annual Reconciliation of Continuing Assistance Awards.** Federal agencies shall reconcile continuing awards at least annually and evaluate program performance and financial reports.

        Items to be reviewed include:

        (1) A comparison of the recipient's work plan to its progress reports and project outputs,

        (2) the Financial Status Report (SF-269),

        (3) Request(s) for payment,

        (4) Compliance with any matching, level of effort or maintenance of effort requirement, and

        (5) A review of federally-owned property (as distinct from property acquired under the grant).

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE CITY OF PHILADELPHIA,** | |
| *Plaintiff*, | |
| **v.** | **Case No. 2:17-cv-03894-MMB** |
| **JEFF SESSIONS, in his official capacity as Attorney General of the United States,** | |
| *Defendant*. | |

MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DATED:  October 12, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

LOUIS D. LAPPEN
Acting United States Attorney

JOHN R. TYLER
Assistant Director

ARJUN GARG
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 4

    A.  The Immigration and Nationality Act ................................................4

    B.  The Office of Justice Programs and the Byrne JAG Program....................6

    C.  The Byrne JAG Grant-Making Process....................................................7

    D.  Conditions on Byrne JAG Awards ...........................................................8

    E.  Additional Conditions for FY 2017 Byrne JAG Awards ...........................9

    F.  Recent Developments.............................................................................10

LEGAL STANDARD ............................................................................................. 11

ARGUMENT ......................................................................................................... 12

    I.  The City Is Unlikely to Succeed on the Merits of Its Claims. ..................... 12

    A.  Federal Statutes Authorize Imposition of the Conditions. .........................12

    B.  The City Is Unlikely to Succeed on Its Separation of Powers Claim.......................21

    C.  The City Is Unlikely to Succeed on Its Arbitrary and Capricious Claim.................23

    D.  The Conditions Are Consistent with the Spending Clause. .....................................27

    E.  The Court Should Decline the City's Request for a Declaration That It Complies with 8 U.S.C. § 1373. ..............................................................33

    II.  The City Fails to Establish That It Will Suffer Irreparable Harm Absent a Preliminary Injunction. ........................................................... 45

    III. The Public Interest and the Balance of the Equities Militate Against a Preliminary Injunction. .............................................................................. 48

CONCLUSION....................................................................................................... 50

# TABLE OF AUTHORITIES

**CASES**

*A. O. Smith Corp. v. FTC,*
530 F.2d 515 (3d Cir. 1976)...................................................................47

*A.W. v. Jersey City Pub. Sch.,*
341 F.3d 234 (3d Cir. 2003)............................................................28, 44

*Adams v. Freedom Forge Corp.,*
204 F.3d 475 (3d Cir. 2000)......................................................45, 46, 48

*Allen v. DeBello,*
861 F.3d 433 (3d Cir. 2017)...................................................................36

*Ameron, Inc. v. U.S. Army Corps of Eng'rs,*
809 F.2d 979 (3d Cir. 1986)...................................................................21

*Arizona v. United States,*
567 U.S. 387 (2012)....................................................................*passim*

*Ashcroft v. Mattis,*
431 U.S. 171 (1977)..........................................................................35, 36

*Barbour v. Wash. Metro. Area Transit Auth.,*
374 F.3d 1161 (D.C. Cir. 2004)............................................................29

*Bennett v. Spear,*
520 U.S. 154 (1997).................................................................................24

*Bennett Enters., Inc. v. Domino's Pizza, Inc.,*
45 F.3d 493 (D.C. Cir. 1995).................................................................18

*Calderon v. Ashmus,*
523 U.S. 740 (1998).................................................................................35

*Campbell Soup Co. v. ConAgra, Inc.,*
977 F.2d 86 (3d Cir. 1992).....................................................................45

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
566 U.S. 399 (2012).................................................................................20

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994).................................................................................20

*Charles v. Verhagen,*
348 F.3d 601 (7th Cir. 2003) .................................................................28

*City of Chicago v. Sessions*,
  --- F. Supp. 3d ----, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ...................... 10, 11, 45, 46

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999)............................................................................................43, 44

*Clinton v. City of New York*,
  524 U.S. 417 (1998)..............................................................................................................21

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014)...................................................................................47, 48

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008)........................................................................................48

*Dean v. United States*,
  556 U.S. 568 (2009)..............................................................................................................38

*Dep't of Treasury v. Fed. Labor Relations Auth.*,
  494 U.S. 922 (1990)..............................................................................................................18

*Diamond v. Chakrabarty*,
  447 U.S. 303 (1980)..............................................................................................................33

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989)........................................................................................2, 21

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
  539 F.3d 199 (3d Cir. 2008)..................................................................................................14

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................................................25, 26

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
  765 F.3d 205 (3d Cir. 2014)..................................................................................................11

*Freilich v. Bd. of Directors*,
  142 F. Supp. 2d 679 (D. Md. 2001) ......................................................................................43

*FTC v. Standard Oil Co.*,
  449 U.S. 232 (1980)..............................................................................................................24

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980)..............................................................................................................49

*Geisenger Cmty. Med. Ctr. v. Sec'y, U.S. Dep't of Health & Human Servs.*,
  794 F.3d 383 (3d Cir. 2015).....................................................................32

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)................................................................................42

*Harris Cty. Texas v. MERSCORP Inc.*,
  791 F.3d 545 (5th Cir. 2015) ..............................................................36, 37

*Hearst Radio, Inc. v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948).................................................................23

*Invention Submission Corp. v. Rogan*,
  357 F.3d 452 (4th Cir. 2004) ...................................................................23

*Jama v. ICE*,
  543 U.S. 335 (2005)................................................................................22

*Kingdomware Techs., Inc. v. United States*,
  136 S. Ct. 1969 (2016)............................................................................22

*Knick v. Twp. of Scott*,
  862 F.3d 310 (3d Cir. 2017).....................................................................42

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002)............................................................3, 28, 30

*Landon v. Plasencia*,
  459 U.S. 21 (1982)..................................................................................49

*Langbord v. U.S. Dep't of Treasury*,
  832 F.3d 170 (3d Cir. 2016).....................................................................14

*Lockhart v. United States*,
  546 U.S. 142 (2005)................................................................................20

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ............................................................28, 29

*N. Arapaho Tribe v. Burwell*,
  90 F. Supp. 3d 1238 (D. Wyo. 2015)........................................................48

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*,
  575 F. App'x 88 (3d Cir. 2014) ..........................................................23, 25

*Nashville, Chattanooga. & St. Louis Ry. v. Browning*,
    310 U.S. 362 (1940) ................................................................................. 37

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................... 42, 46, 47

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................. 28, 44, 45

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................. 48

*Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*,
    631 F.3d 652 (3d Cir. 2011) ............................................................ 23, 24

*Phik Ha Lie v. Attorney Gen.*,
    349 F. App'x 706 (3d Cir. 2009) ....................................................... 14

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................................. 43

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,
    867 F.3d 338 (3d Cir. 2017) .............................................................. 25

*Reifer v. Westport Ins. Corp.*,
    751 F.3d 129 (3d Cir. 2014) ........................................................ 34, 35

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ........................................................ 11, 12

*Reno v. Condon*,
    528 U.S. 141 (2000) ................................................................................. 42

*Rossi v. Procter & Gamble Co.*,
    597 F. App'x 69, 71 (3d Cir. 2015) ..................................................... 46

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................ *passim*

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ................................................................................. 35

*Stone v. INS*,
    514 U.S. 386 (1995) ................................................................................. 16

*Train v. City of New York*,
420 U.S. 35 (1975)....................................................................................22

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*,
844 F.2d 1087 (4th Cir. 1988) ...................................................................18

*U.S. ex rel. Kovalev v. Ashcroft*,
223 F. Supp. 2d 688 (E.D. Pa. 2002) .........................................................49

*United Savings Ass'n v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988)...................................................................................39

*United States v. Craft*,
535 U.S. 274 (2002)...................................................................................20

*United States v. Odneal*,
565 F.2d 598 (9th Cir. 1977) .....................................................................18

*United States v. Wise*,
370 U.S. 405 (1962)...................................................................................20

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995)...................................................................................34

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)...........................................................................11, 46, 48

*Zuber v. Allen*,
396 U.S. 168 (1969)...................................................................................20

**CONSTITUTION**

U.S. Const. art. I, § 8, cl. 1.................................................................21, 27

U.S. Const. art. VI, cl. 2...................................................................................42

**STATUTES**

5 U.S.C. § 553.............................................................................................26

5 U.S.C. § 702.............................................................................................23

5 U.S.C. § 704......................................................................................2, 3, 23

5 U.S.C. § 706.............................................................................................23

vi

8 U.S.C. § 1101 *et seq.* ................................................................................... 4

8 U.S.C. § 1226 ........................................................................... 26, 30, 39, 50

8 U.S.C. § 1227 ........................................................................................ 5, 26, 29

8 U.S.C. § 1228 ................................................................................................ 5

8 U.S.C. § 1231 .............................................................................................. 30

8 U.S.C. § 1252c ...................................................................................... 6, 29

8 U.S.C. § 1324 ........................................................................................ 6, 29

8 U.S.C. § 1357 ................................................................................... *passim*

8 U.S.C. § 1373 ................................................................................... *passim*

18 U.S.C. § 1913 ............................................................................................ 33

28 U.S.C. § 530C ........................................................................................... 15

28 U.S.C. § 2201 ..................................................................................... 33, 34

31 U.S.C. § 1352 ............................................................................................ 33

34 U.S.C. § 10101 ..................................................................................... 6, 15

34 U.S.C. § 10102 ............................................................................... *passim*

34 U.S.C. § 10110 ......................................................................................... 15

34 U.S.C. §§ 10151-58 ................................................................................... 6

34 U.S.C. § 10152 ........................................................................... 6, 7, 22, 29

34 U.S.C. § 10153 ............................................................................... *passim*

34 U.S.C. § 10154 .................................................................................... 7, 24

34 U.S.C. § 10156 ........................................................................................... 7

34 U.S.C. § 10444 ................................................................................... 15, 16

41 U.S.C. § 4712 ............................................................................................ 33

Omnibus Crime Control and Safe Streets Act of 1968,
　　Pub. L. No. 90-351, 82 Stat. 197 ........................................................................ 6

Joint Resolution Making Continuing Appropriations for FY 1985,
　　Pub. L. No. 98-473, 98 Stat. 1837 (1984)............................................................ 15

DOJ Reauthorization Act of 2005,
　　Pub. L. No. 109-162, 119 Stat. 2960 (2006).......................................................... 15

Consolidated Appropriations Act, 2017,
　　Pub. L. No. 115-31, 131 Stat. 135 ...................................................................... 7


**REGULATIONS**

2 C.F.R. § 200.203 ............................................................................................... 8, 10

2 C.F.R. § 2800.101 ................................................................................................... 8

8 C.F.R. § 287.5 ....................................................................................................... 49


**LEGISLATIVE MATERIALS**

H.R. Rep. No. 104-469, pt. 1 (1996)................................................................... 38, 43

H.R. Rep. No. 109-233 (2005)............................................................................... 13

S. Rep. No. 104-249 (1996)............................................................................... 43, 44


**OTHER**

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*,
　　78 Va. L. Rev. 821 (1992) ................................................................................. 31

## INTRODUCTION

The Department of Justice distributes federal grant funds to aid law enforcement in jurisdictions throughout the country. These funds serve to aid both local and cooperative law enforcement priorities. Consistent with federal prerogatives, the Department has long imposed conditions on these grants, including on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"). If the City's theories in this lawsuit are correct, however, long-standing and never-before-challenged conditions are in jeopardy.

One cooperative priority for the Department is the enforcement of a lawful system of immigration, especially the removal of aliens who have committed crimes in the United States. Accordingly, the Department notified applicants that Fiscal Year ("FY") 2017 Byrne JAG Program grants will include conditions that require modest cooperation with federal law enforcement prerogatives in the immigration setting. Those conditions will require grant recipients (1) to comply with a federal statute, 8 U.S.C. § 1373, which prohibits state and local government and law enforcement entities or officials from restricting certain communications with the Department of Homeland Security ("DHS") ("the Section 1373 compliance condition"); (2) to ensure that certain federal officials are permitted access to state or local correctional facilities for certain immigration enforcement purposes ("the correctional facility access condition"); and (3) to ensure that certain federal officials are provided advance notice of the scheduled release date of certain individuals held in state or local correctional facilities ("the custody release condition"). *See* Decl. of Alan R. Hanson ("Hanson Decl.") ¶¶ 4-5.

The City has adopted policies that frustrate the federal government's ability to remove criminal aliens from the country. In addition to avoiding cooperative efforts through its own, local policies, the City now seeks to do the same with respect to federal prerogatives, asking the Court to enjoin the Department from imposing immigration-related law enforcement conditions on the

receipt of *federal dollars*. The City's position would, in essence, allow the City, not the Department, to determine the conditions associated with a federal grant that Congress has authorized the Department to award. The City's position contravenes clear statutory language authorizing the Department to condition Byrne JAG funding, and ignores the close relationship between the federally-imposed conditions, federal law enforcement prerogatives, and the purposes of the Byrne JAG Program. For these reasons and others, the City has not carried its burden to establish a compelling basis for preliminary injunctive relief against the Department.

The City is unlikely to succeed on the merits of the claims asserted in its motion. Congress has expressly authorized the Assistant Attorney General ("AAG") for DOJ's Office of Justice Programs ("OJP") to impose the challenged conditions. In the very same enactment in 2006 that created the Byrne JAG Program, Congress delegated to the AAG authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). With respect to 8 U.S.C. § 1373 in particular, the City is independently required to comply with federal law (including Section 1373) regardless of whether it accepts federal grant funding, and, in any event, Congress has separately authorized the Department to require grantees in the Byrne JAG Program to comply with "all . . . applicable Federal laws," of which Section 1373 is one. *Id*. § 10153(a)(5)(D); *see also* OJP Guidance Regarding Compliance with 8 U.S.C. § 1373 (Dkt. No. 1-12). The Department thus has ample authority to impose the challenged conditions, and their imposition does not violate the constitutional separation of powers. *See DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

The City's claim under the Administrative Procedure Act that the conditions are arbitrary and capricious fails as a threshold matter because judicial review is not available in the absence of

final agency action.  *See* 5 U.S.C. § 704.  Even if there were final agency action to review, the conditions comfortably satisfy the "arbitrary and capricious" standard because their promotion of immigration enforcement undoubtedly intersects with the criminal justice purposes of the Byrne JAG Program.

The City also is unlikely to succeed on its Spending Clause challenge.  The Byrne JAG Program and the challenged conditions bear "a discernible relationship," and thus meet the relatedness requirement of the Spending Clause.  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).  OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).  The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and the "long-established cooperative principles among law enforcement agencies." *See, e.g.*, DOJ Press Release No. 17-826, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (July 25, 2017).[1]  And the purported ambiguities that the City claims exist in the conditions are illusory.

Additionally, the City's request for a declaration that it complies with Section 1373 is unlikely to succeed.  The Court in the first instance should exercise its discretion to decline jurisdiction over that request for declaratory relief—especially at this preliminary stage of proceedings—where the requested declaration would not in fact absolve the City of legal jeopardy, the parties are in the midst of an administrative process that may narrow or sharpen any points of concrete dispute regarding the City's compliance, and the City lacks a cause of action.  If the Court were to reach the request for declaratory relief, the City's claim is unlikely to succeed because

---

[1]     The cited press release is available at https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

multiple of the City's policies do or potentially do improperly restrict information-sharing in violation of Section 1373.

The City likewise fails to establish the irreparable harm needed for preliminary relief, as the harm it alleges is neither immediate nor substantial. The City faces no immediate deadline for consenting to the challenged conditions, because the Department has not issued grant award documents to the City, and at present the Department is enjoined from imposing the correctional facility access and custody release conditions. *See* Hanson Decl. ¶¶ 6-7. Should the City receive award documents, it will still have at least 45 days to review them and the specific grant conditions therein, before determining whether to accept or reject the funding. Moreover, the funding at issue amounts to less than one tenth of one percent of the City's budget, and the City's uncertainty in that regard does not establish the irreparable harm needed for preliminary relief.

The public interest and the balance of equities also militate against preliminary relief. The United States has an interest in enforcing federal law, including the effective enforcement of the immigration laws. The challenged conditions are designed to promote those interests and to effectuate the Department's mission of reducing crime and illegality and promoting law enforcement cooperation. *See generally* Decl. of Jim Brown ("Brown Decl."). Those interests far outweigh the City's speculative allegations of public harm.

For all of these reasons, and as discussed in more detail below, the Court should deny the City's motion for a preliminary injunction.

## BACKGROUND

### A. The Immigration and Nationality Act

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted

the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. The INA authorizes the Department of Homeland Security, the Department of Justice, and other Executive Branch agencies to administer and enforce the immigration laws. Likewise, the INA accords the Executive Branch considerable discretion to direct enforcement pursuant to federal policy objectives. *See Arizona*, 567 U.S. at 396.

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws. For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Separately, pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id*. § 1373(a).[2] The INA provides that certain classes of non-citizens, including certain criminal aliens, shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g*., *id.* §§ 1227(a), 1228.

The INA also establishes immigration enforcement as a cooperative endeavor among federal, state, and local law enforcement agencies. *See, e.g.*, *id*. § 1357(g) (providing that DHS may enter into formal cooperative agreements with states and localities under which appropriately

---

[2]     Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id.* § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States); *id.* § 1231(i) (establishing State Criminal Alien Assistance Program, under which federal government compensates states and localities for their incarceration of certain criminal aliens).

   **B.      The Office of Justice Programs and the Byrne JAG Program**

   Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, established the Office of Justice Programs within the Department of Justice, and provides for OJP to be headed by an Assistant Attorney General.  *See* Pub. L. No. 90-351, 82 Stat. 197, *codified as amended at* 34 U.S.C. § 10101 *et seq*.  Congress provided the AAG certain "[s]pecific, general and delegated powers," including the power to "publish and disseminate information on the conditions and progress of the criminal justice systems" and "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." *Id.* §§ 10102(a)(1), (2).  The AAG shall also "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*."  *Id.* § 10102(a)(6) (emphasis added).

   The same title of the Omnibus Crime Control Act also established the Byrne JAG Program. *See generally* 34 U.S.C. §§ 10151-58.  Under this program, OJP is authorized to –

> make grants to States and units of local government . . . to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of [certain enumerated] programs.

*Id.* § 10152(a)(1). In the same chapter, the Omnibus Crime Control Act defines "criminal justice" broadly. *Id.* § 10251(a)(1).

To request funds under the Byrne JAG Program, applicants must "submit an application to the Attorney General . . . in such form as the Attorney General may require." *Id.* § 10153(a). Congress provided that these applications must include, among other things, an "assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such *data*, records, *and information (programmatic and financial) as the Attorney General may reasonably require*"; "[a] certification, made in a form *acceptable to the Attorney General*, . . . that . . . there has been *appropriate coordination with affected agencies*;" and "[a] certification, made in a form acceptable to the Attorney General, . . . that . . . the applicant will comply with all provisions of this part and *all other applicable Federal laws*." *Id.* § 10153(a)(4), (5) (emphases added). Before issuing a final disapproval of an application under the Byrne JAG Program, the Attorney General must "first afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." *Id.* § 10154.

The Byrne JAG Program is a formula grant that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.* §§ 10152(a)(1), 10156. Funding under the Byrne JAG Program is subject to annual appropriations. For FY 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives. *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203.

## C. The Byrne JAG Grant-Making Process

The federal grant-making process, including the issuance of Byrne JAG Program grants, contains several steps. The awarding agency typically issues a solicitation that contains "sufficient information to help an applicant make an informed decision about whether to submit an

7

application." *See generally* Office of Management and Budget Guidance for Grants and Agreements ("OMB Uniform Guidance"), 2 C.F.R. § 200.203(c)(2);[3] *see also* OJP Grant Process Overview, *available at* https://ojp.gov/funding/Apply/GrantProcess.htm. Applicants respond to the solicitation by submitting an application in the form specified and with the relevant information requested. *See generally* OJP Grant Process Overview. The deadline for local units of government to submit FY 2017 Byrne JAG applications was September 5, 2017.[4] *See* Byrne JAG Program, FY 2017 Local Solicitation (Dkt. No. 1-16).

For grants administered by OJP and its subcomponents, OJP engages in a multi-factored review of each application and, for those applications that are approved, OJP generates an award package that is transmitted to the applicant. *See generally* OJP Grant Process Overview. Applicants typically have 45 calendar days to accept the award documents, during which time the applicant has an opportunity to "[r]eview the special conditions on the award document." *Id*. Throughout the course of the grant period, OJP monitors compliance with the terms and conditions of the award and, ultimately, the grantee and OJP engage in certain activities to complete relevant closeout requirements for each award. *Id.*

### D. Conditions on Byrne JAG Awards

OJP has historically included a variety of conditions in Byrne JAG award documents, including, for example, conditions requiring the grantee to comply with regulations pertaining to civil rights and nondiscrimination, conditions requiring that body armor purchased with grant funding meet certain minimum quality standards, and conditions designed to encourage grantees to adopt policies banning employees from text messaging while driving on duty. These conditions

---

[3] The Department of Justice has adopted the OMB Uniform Guidance through regulation, with limited exceptions. *See* 2 C.F.R. § 2800.101.

[4] Some exceptions to the deadline were made relating to jurisdictions affected by Hurricane Harvey.

have varied over time, depending upon national law enforcement necessities and Department priorities. For FY 2016, the City of Philadelphia's award included fifty-three conditions, all of which were accepted by the City without objections or legal challenges. *See* FY 2016 Byrne JAG Award to Philadelphia (Aug. 23, 2016) ("2016 Philadelphia Award") at 2-13 (Dkt. No. 1-9).

In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was an applicable federal law under the Byrne JAG Program. *Id.* ¶ 53. That recognition was prompted by a memorandum issued by the Department of Justice's Inspector General on May 31, 2016, expressing concern that several state and local governments receiving federal grants may not be complying with Section 1373. *See* Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen., Office of Justice Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016) (Dkt. No. 1-10).

Although the Inspector General observed that applications of certain local ordinances might be inconsistent with Section 1373, *id.* at 4-8, the report made clear that "no one at DHS . . . has made a formal legal determination whether certain state and local laws or policies violate Section 1373, and we are unaware of any Department of Justice decision in that regard." *Id.* at 8 n.12. From each of ten jurisdictions identified in the report, OJP sought a legal analysis of how the jurisdiction is in compliance with 8 U.S.C. § 1373. *See* DOJ Press Release No. 17-736, *Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions* (July 6, 2017) (Dkt. No. 1-2). The City provided its analysis in June 2017. *See* Letter from City of Philadelphia (June 22, 2017) (Dkt. No. 1-14).

### E. Additional Conditions for FY 2017 Byrne JAG Awards

In July 2017, OJP published a solicitation seeking applications from units of local government for participation in the FY 2017 Byrne JAG Program. *See* Byrne JAG Program, FY

2017 Local Solicitation (Dkt. No. 1-16). That solicitation notified potential applicants that the grant award documents for FY 2017 would contain two new special conditions, in addition to the requirement to certify compliance with 8 U.S.C. § 1373. *Id*. at 30. Specifically, OJP notified potential applicants that the correctional facility access condition would be designed to ensure that Byrne JAG Program grantees would permit "personnel of . . . DHS to access any correctional or detention facility in order to meet with an alien . . . and inquire as to his or her right to be or remain in the United States." *Id*. OJP further notified potential applicants that the custody release condition would be designed to ensure that Byrne JAG Program grantees would "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the [INA]." *Id*. The notification contained in the FY 2017 solicitation was not itself a grant condition, akin to those contained in the grant award documents; rather, it was merely a notification designed to "help an applicant make an informed decision about whether to submit an application." 2 C.F.R. § 200.203.

The actual conditions that OJP intends to attach to FY 2017 Byrne JAG awards are viewable in award documents that OJP issued to units of local government on August 23, 2017. *See, e.g.,* Byrne JAG Program Grant Award for County of Greenville, SC ("2017 Greenville Award") (Dkt. No. 21-6). Those award documents contain the precise text of the conditions that the City has challenged in this lawsuit. *See id*. ¶¶ 53, 55-56. The conditions apply only to the "program or activity" to be funded under the award, and allow awarded funds to be used for costs incurred in implementing the conditions. *See id*.

### F.    Recent Developments

In a challenge brought by the City of Chicago, a federal district court on September 15, 2017 issued a nationwide preliminary injunction against imposition of the correctional facility

access and custody release conditions. *See City of Chicago v. Sessions*, --- F. Supp. 3d ----, 2017 WL 4081821, at *14 (N.D. Ill. Sept. 15, 2017). As to the Section 1373 compliance condition, the *Chicago* court granted no relief "because the City has failed to establish a likelihood of success on the merits" as to that condition. *Id*. The Department has appealed that decision, and asked the district court to stay the nationwide application of the preliminary injunction pending resolution of the appeal. *See* No. 1:17-cv-5720, Dkt. No. 81 (N.D. Ill. Sept. 26, 2017). That stay application remains pending for the district court's decision as of this filing.

The City of Philadelphia submitted its application for an FY 2017 Byrne JAG award on September 5, 2017. *See* Hanson Decl. ¶ 5. OJP has not taken a decision on that application, and at this time is not issuing FY 2017 Byrne JAG award documents to any applicants while awaiting developments in the *Chicago* litigation. *Id*. ¶¶ 6-7. In the meantime, OJP has sent the City of Philadelphia a letter containing a "preliminary assessment" of the City's compliance with Section 1373, and requesting the City's response by October 27, 2017 before OJP makes its final determination. *Id*. ¶ 8 & Ex. A.

## **LEGAL STANDARD**

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). In the Third Circuit, a party seeking a preliminary injunction must first demonstrate that "it can win on the merits" and that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Under *Reilly*, "[i]f these gateway

factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*.

**ARGUMENT**

I.      **The City Is Unlikely to Succeed on the Merits of Its Claims.**

        A.      **Federal Statutes Authorize Imposition of the Conditions.**

        Congress has expressly authorized the Department to "plac[e] special conditions on all grants" administered by OJP, 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id*., and to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws."  *Id*. § 10153(a)(5)(D).  Despite these capacious delegations of authority, the City contends that Congress has not empowered the Department to impose the challenged conditions.  *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem.") at 16-29 (Dkt. No. 21-1).[5]  The City is incorrect.

        **1.**      In 34 U.S.C. § 10102, Congress set forth the duties and functions of the Assistant Attorney General (AAG) for the Office of Justice Programs (OJP), which administers the Byrne JAG Program.  Within that section, Congress stated that the AAG is to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  A plain reading of the statutory language indicates that the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP.  The breadth of the AAG's statutory

---

[5]      To the extent that the City couches this theory as a claim under the Administrative Procedure Act, judicial review under that statute is not available because the Department has not taken any final agency action with respect to the City in connection with an FY 2017 Byrne JAG award.  *See infra* Part I.B.1.

power is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants." *Id.* Confirming what is plain on the face of the statute, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. 109-233, at 101 (2005).

The challenged conditions come comfortably within these fonts of delegated power. Pursuant to this authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that assist federal authorities in achieving federal law enforcement priorities, including removal of criminal aliens under immigration law.

Apart from the conditions that the City challenges here, under the Department's authority Byrne JAG awards have historically contained various discretionary conditions that are not compelled by any federal law, but promote the Department's law enforcement and public safety goals. The Department has, for example, imposed a condition that requires complying with certain guidelines and recommendations enumerated by the Department to "promote information sharing and enable interoperability among disparate systems across the justice and public safety community." 2016 Philadelphia Award ¶ 26. Another condition has prohibited the use of award funds to purchase various types of equipment and weapons that are listed on a Prohibited Expenditure List,[6] which list in turn traces back in significant part not to any statute or regulation but to an Executive Order. *See id.* ¶ 49. Multiple conditions have also imposed training mandates: certain training must be completed for law enforcement task forces, *see id.* ¶ 32; a grantee must agree to participate, upon request, in various training events, technical assistance events, or conferences, *see id.* ¶ 33; and quarterly data must be submitted regarding certain kinds of training

---

[6]    The Prohibited Expenditures List is available at https://www.bja.gov/funding/JAGControlledPurchaselist.pdf.

that law enforcement officers have received, *see id.* ¶ 43. Grantees have also been encouraged to adopt policies banning employees from text messaging while driving on duty, *see id.* ¶ 22, and to submit "JAG success stories," *id.* ¶ 44. In a condition for FY 2017, the Department is requiring that when award funds are used for DNA testing, any resulting eligible DNA profiles must be uploaded to a DNA database operated by the FBI. *See* 2017 Greenville Award ¶ 57. The particular conditions that the City challenges in this lawsuit are not different in kind from these many other Byrne JAG grant conditions.

Through a series of misconceptions, the City reads out of Section 10102(a)(6) the broad power that the statute on its face confers. According to the City, the reference in Section 10102(a)(6) to "placing special conditions on all grants, and determining priority purposes for formula grants" does not "endow the AAG with any authority" that did not already exist independently through other statutory provisions. Pl.'s Mem. at 28-29. But if that were so, there would be no reason to convey that authority, duplicatively, through Section 10102. Thus, the City's "contrary interpretation would render the emphasized statutory text mere surplusage, a result [courts] try to avoid." *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 182 (3d Cir. 2016) (en banc) (quotation omitted). Section 10102(a)(6) "should not be construed so as to render a portion of it superfluous, void, or meaningless." *Phik Ha Lie v. Attorney Gen.*, 349 F. App'x 706, 711 (3d Cir. 2009). "Faced with a choice between [the City's] interpretation, which essentially renders the phrase surplusage, and [the Department's] interpretation, which gives it substantial effect," the Court should "choose the latter." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 211 (3d Cir. 2008).

The City compounds its misinterpretation by misreading "the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 210 (citation omitted).

First, the City minimizes Section 10102 as "an ancillary provision governing a sub-cabinet post." Pl.'s Mem. at 29. The AAG for OJP is appointed by the President, subject to Senate confirmation, and answerable to the Attorney General's supervision. *See* 34 U.S.C. § 10101. And the Attorney General has "final authority over all functions, including any grants . . . made . . . for the Office of Justice Programs." *Id.* § 10110; *see also* 28 U.S.C. § 530C(a)(4). Placement of the "special conditions" and "priority purposes" powers in the organic statute for OJP, and their investiture in OJP's head (subject to the Attorney General's final authority), comports with those powers' importance and breadth.

Second, contrary to the City's "elephants in mouseholes" criticism, Pl.'s Mem. at 29, Congress added these powers not casually, but deliberately. The City observes that the provision codified at Section 10102(a)(6) first appeared in 1984, *see* Pl.'s Mem. at 28, but does not mention that the particular language at issue here—the authority for "placing special conditions on all grants, and determining priority purposes for formula grants"—was added in 2006, *as part of the very same legislation that created the Byrne JAG Program. See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), § 1152(b) (adding language to subsection (a)(6)); *id.* § 1111 (creating Byrne JAG Program). Prior to that 2006 enactment, the provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General." Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837 (1984). The organic statute enacted in 2002 for the head of a separate Department grant-making component, by comparison, continues to contain substantially the same, more limited language as Section 10102 earlier used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP. *See* 34 U.S.C. § 10444(7)

(providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General").  All of this context, which is missing from the City's discussion, confirms that Congress did intend the "special conditions" and "priority purposes" language to confer distinctive and meaningful power, contrary to the City's reading.  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  *Stone v. INS*, 514 U.S. 386, 397 (1995).

Third, the City's analysis is additionally incomplete in criticizing Section 10102(a)(6) as conferring "unlimited discretion" and "unbridled authority" to impose grant conditions.  Pl.'s Mem. at 29.  With this argument, the City on one hand (correctly) confirms the textual breadth of the authority provided by Section 10102(a)(6), but on the other hand overlooks important external limitations on that authority.  An obvious limitation on the Department's discretion is the Constitution.  Under the Supreme Court's jurisprudence articulating requirements for use of the Spending Clause power to condition federal grants, a grant condition must, for example, be germane and non-coercive.  *See S. Dakota v. Dole*, 483 U.S. 203, 207 (1987).  A grant condition must also comport with all "other constitutional provisions" apart from the Spending Clause.  *Id.* at 208.  Moreover, the Department's conditioning power is self-limiting in practice, because extremism in imposing conditions will cause prospective recipients to reject the grant rather than accept the condition.  In addition to those limits, Congress judiciously vested these powers in Senate-confirmed officers, including the nation's chief law enforcement officer.

Fourth, the City incorrectly imputes a conflict between imposition of the conditions and a congressional purpose to retain Byrne JAG grantees' "broad control over the decision how to use the funds."  Pl.'s Mem. at 22.  The conditions go to eligibility to receive funds; they do not direct

how a grantee must spend the funds received. These conditions of eligibility do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years has prohibited the use of award funds to purchase items that are listed on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire. *See* 2016 Philadelphia Award ¶ 49. The conditions also comport with congressional purposes, expressly stated in the Byrne JAG statute, of ensuring that grantees under the Byrne JAG Program "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5).

Finally, the City cites other statutes where Congress has used various different types of language to confer discretionary power to impose grant conditions. *See* Pl.'s Mem. at 20. Such statutes and their various formulations confirm no more than that Congress indeed does routinely delegate such power, and that in doing so Congress uses a variety of textual formulations rather than any magic words. Section 10102(a)(6) is just another example.

**2.** Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the Section 1373 compliance condition. Under the Byrne JAG Program, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). Section 1373 is, of course, a federal law. According to the City, however, "it is not an 'applicable Federal law[].'" Pl.'s Mem. at 18. The City contends that the phrase "applicable Federal laws" refers only to "federal laws that, by their terms, are 'applicable' to federal grant-making—*i.e.*, to statutes that directly speak to recipients of federal funds." *Id*. That straightjacketed interpretation of this statutory text is inconsistent with a plain reading of the statute. The relevant statutory language provides:

To request a grant under this part, the chief executive officer of a . . . local government shall submit an application to the Attorney General . . . in such form as the Attorney General may require.  Such application shall include the following:

. . .

(5) A certification, made in a form acceptable to the Attorney General, . . . that—

. . .

(D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

34 U.S.C. § 10153.  Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]."  *Id*.  If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly.  Instead, under this power, the Department may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

Rather than the City's narrow construction, courts have broadly interpreted the term "applicable laws."  *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting the statutory term "applicable laws" as "laws outside the Act"); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude Office of Management and Budget circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

18

Rather than "applicable Federal laws" being cabined artificially to those laws that "directly speak to recipients of federal funds," Pl.'s Mem. at 18, or "substantive[ly] relat[e] . . . to Byrne JAG grants," Pl.'s Mem. at 19,[7] a natural and coherent reading is that "applicable Federal laws" refers simply to the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees. (8 U.S.C. § 1373 is, of course, one such law.) Here, it is important to bear in mind the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities. The limitation in Section 10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees. It is entirely sensible for Congress to have used the word "applicable" in Section 10153(a)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a recipient of federal funds to certify its compliance with a federal law where the recipient is—independent of receiving those federal funds—already obligated to comply with that federal law.

3.     Unable to overcome the authority that plainly is provided under Section 10102(a)(6) and Section 10153(a)(5)(D) to impose the challenged conditions, the City embarks on the misadventure of examining "[s]ubsequent legislative history for the Byrne JAG statute as well as for Section 1373." Pl.'s Mem. at 23. The City focuses on various legislative proposals, which did not pass, that the City says would have withheld federal funds for jurisdictions that do not cooperate with federal immigration enforcement efforts. *See id*. at 23-26.

---

[7]     The City also argues that the constitutional relatedness limitation of *Dole* narrows the sweep of "applicable Federal laws" so that the phrase "requires a substantive relationship . . . to Byrne JAG grants." Pl.'s Mem. at 19. Here, Section 1373 and the compliance condition do sufficiently relate to the purposes of the Byrne JAG Program. *See infra* Parts I.C.2 and I.D.1.

19

The City's approach is improper, because "statutes are construed by the courts with reference to the circumstances existing at the time of the passage. The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here." *United States v. Wise*, 370 U.S. 405, 411 (1962). The Court should "decline to read any meaning into" such later legislative efforts, as "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Lockhart v. United States*, 546 U.S. 142, 146-47 (2005) (quotation omitted).

"[C]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft*, 535 U.S. 274, 287 (2002) (quotation omitted). The City points to legislative proposals to impose a permanent congressional mandate to withhold federal funds; the different issue in this case, by contrast, is whether Congress, in paired provisions of a statute it actually enacted, gave the Department discretion to determine when to impose such conditions—and it is plausible that Congress preferred simply to stop at maintaining discretion and deferring to the judgment of the nation's chief law enforcement agency.

If the Court were to consider this subsequent legislative history at all—which it ought not to—at best "these arguments deserve little weight in the interpretive process." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 422 (2012) (citation omitted). "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis." *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969). Rather than speculation about subsequent legislative proposals, what controls here is a plain reading of the statutes that Congress enacted.

20

B.      The City Is Unlikely to Succeed on Its Separation of Powers Claim.

The statutes that authorize imposition of the challenged conditions render it unlikely that the City will establish a violation of the constitutional separation of powers. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds . . . ." *Dole*, 483 U.S. at 206. Importantly, Congress may delegate to the Executive Branch the authority to attach conditions on funding. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund*, 887 F.2d at 280-81 (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

Here, Congress delegated authority to the Department to impose the challenged conditions on units of local government participating in the Byrne JAG Program. As discussed above, the custody release and correctional facility access conditions are authorized under the Department's power to "plac[e] special conditions on all grants" administered by OJP, and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). In addition to that authority, the Section 1373 compliance condition is further authorized by the Department's power to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). The conditions moreover comport with statutory purposes of ensuring that Byrne JAG grantees "report such data . . . and information (programmatic and financial) as the

21

Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5). The challenged conditions thus do not "change the law unilaterally or ignore it altogether." Pl.'s Mem. at 30. Instead, because Congress has explicitly delegated to the Department certain powers to attach conditions on the receipt of Byrne JAG funds, the City is unlikely to establish a separation of powers violation here.

The City attempts to locate a separation-of-powers violation in what the City characterizes as the Department's choice "to spend less than the full amount of funding Congress has authorized under a statute." *Id*. That argument fails for multiple reasons.

First, the City overlooks that Congress has expressly given the Department discretionary power not to award Byrne JAG funds. *See* 34 U.S.C. § 10152(a)(1) ("From amounts made available to carry out this part, the Attorney General *may*, in accordance with the formula established under . . . this title, make grants to States and units of local government . . . ." (emphasis added)). "The word 'may' customarily connotes discretion." *Jama v. ICE*, 543 U.S. 335, 346 (2005). The City points the Court to *Train v. City of New York*, 420 U.S. 35 (1975), as "instructive" for the proposition that "the expenditure of appropriated funds is mandatory." Pl.'s Mem. at 30-31. In *Train*, however, a statute provided that "sums authorized to be appropriated . . . *shall* be allotted by the Administrator." 420 U.S. at 42 (emphasis added). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016). Comparison to *Train* thus underscores that Congress has authorized the Department to decline to award funds appropriated under the Byrne JAG Program.

Second, the City's separation-of-powers argument proves too much. Under the City's broad theory, the Department would be required to spend all funds appropriated for the Byrne JAG

Program even if no valid applications for grants were submitted. The Department would also appear to commit a separation-of-powers violation, in the City's view, whenever the Department rejects even a single Byrne JAG application, whenever a prospective grantee declines to accept a Byrne JAG award based on the wide array of grant conditions that the City does not dispute are permissible, and whenever the Department seeks to claw back awarded funds based on a post-award violation of a grant condition. The City thus has not articulated a principle that plausibly applies here, and is unlikely to succeed on its claim that imposing the conditions violates the constitutional separation of powers.

### C. The City Is Unlikely to Succeed on Its Arbitrary and Capricious Claim.

The City contends that, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the "imposition of the new conditions was also arbitrary and capricious." Pl.'s Mem. at 32. But the conditions have not been imposed on the City for the FY 2017 grant cycle, meaning that this APA claim fails at the threshold because the City does not challenge "final agency action." 5 U.S.C. § 704. Even if APA review were available, the challenged conditions are supported by a reasoned explanation.

**1.** "[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). One limitation is that "[t]he APA provides for judicial review of 'final agency action.'" *Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (citing 5 U.S.C. §§ 702 & 704). To qualify as final agency action, "the action must mark the 'consummation' of the agency's decisionmaking process" and also "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Ocean Cty. Landfill Corp. v.*

23

*U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The City does not identify a final agency action that allows judicial review of its APA claim. Although the City earlier told the Court it would wait to seek a preliminary injunction until seeing "if and when the new funding conditions are, in fact, included in the City's FY 2017 Local Byrne JAG award," Pl.'s Mem. at 12, the City instead moved for a preliminary injunction before the Department acted on the City's FY 2017 Byrne JAG application. Yet the City acknowledges that imposition of the correctional facility access and custody release conditions is presently enjoined nationwide, *id.*, and separately the City asserts that it "could be conceivably denied an [FY 2017] award at any time if the Department rejects its Section 1373 submission." *Id*. at 14.[8] In view of these contingencies, the City might never receive any FY 2017 award (irrespective of the conditions that could have been attached to it), or an award to the City might not contain at least some of the challenged conditions. And by statute there is an administrative review-and-reconsideration process that is to be followed before "finally disapprov[ing]" the City's FY 2017 Byrne JAG application, until which time there is no final agency action. 34 U.S.C. § 10154.

Accordingly, no final agency action has been taken with respect to the City, precisely because it remains to be seen "if and when the new funding conditions are, in fact, included in the City's FY 2017 Local Byrne JAG award." Pl.'s Mem. at 12. For present purposes of the City's APA claim, there has been no consummation of the Department's decisionmaking process, no

---

[8]     Since the City filed its motion for a preliminary injunction, the Department has sent a letter to the City questioning the City's compliance with 8 U.S.C. § 1373 and inviting the City's response before the Department takes a decision on the issue. *See* Hanson Decl. ¶ 8 & Ex. A. That letter, too, is not "final agency action" under the APA. Rather, "issuance of" that preliminary assessment—which is "not a definitive ruling"—had no "legal or practical effect, except to impose upon [the City] the burden of responding to the charges made against it." *FTC v. Standard Oil Co.*, 449 U.S. 232, 242-43 (1980) (finding no final agency action, and cautioning against using APA review as "a means of turning prosecutor into defendant before adjudication concludes").

determination of rights or obligations, and no legal consequence that flows. *Cf. Naik*, 575 F. App'x at 92 (finding no final agency action where agency "has yet to respond to or act upon" submission and has "not taken any action to officially deny" petition).

      **2.** Even if APA review of the challenged conditions were available here (which it is not), the City's claim is unlikely to succeed. The City's "arbitrary and capricious" claim is accorded a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted). Where the action represents a shift in policy, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515.

      In the Third Circuit, "the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 353 (3d Cir. 2017). Here, "the agency's reasons for" imposing the challenged conditions "were entirely rational." *Fox Television*, 556 U.S. at 517. The Department publicly offered—before FY 2017 applications were due and before any FY 2017 awards were made—a sound explanation for the challenged conditions. As stated in the Department's July 25, 2017 "Backgrounder on Grant Requirements," which the City attached to its Complaint, the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." Dkt. No. 1-1. The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal

immigration authorities in information sharing about illegal aliens who commit crimes," and states that the grant conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id*.

Federal immigration enforcement undoubtedly intersects with criminal justice, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Once removed, a criminal alien who has committed such an offense—*e.g.*, an aggravated felony, certain firearm offenses, domestic violence, or child abuse—is no longer present in this country with the potential to re-offend. Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." DOJ Press Release No. 17-826.

The City does not dispute this "common-sense" rationale, *id*., and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521. The City's demand for supporting "reports, studies, or analysis," Pl.'s Mem. at 33, ignores that Congress did not intend to encumber agencies with a burdensome procedural exercise for determining grant conditions; to the contrary, Congress expressly exempted "grants" from the APA's ordinary notice-and-comment rulemaking procedures. 5 U.S.C. § 553(a)(2). It suffices that the challenged conditions rationally promote interests in "maintain[ing] liaison" among the various branches of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the cooperation between federal, state, and local authorities in immigration enforcement that Congress contemplates. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373.

While attempting to impose heightened scrutiny because allegedly "[t]he Department departed from past practice," Pl.'s Mem. at 32, the City ignores that a requirement to certify compliance with Section 1373 was first imposed by the prior Administration in the FY 2016 grant cycle and accepted then by the City as a condition of its Byrne JAG award. *See* 2016 Philadelphia Award ¶ 53. As to the imposition of the challenged conditions, their use in the FY 2017 cycle is understandable as a result of a May 2016 report by the Department's Office of Inspector General (OIG) finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States." Dkt. No. 1-10 at 1-2 n.1. The 2016 OIG report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" in a 2007 audit when federal immigration authorities had back then "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions" that were examined. *Id*. The OIG report focused on the City of Philadelphia, among other jurisdictions, in reaching its conclusions about the changed state of affairs in 2016. *See id*. at 3, 7, 8.

For all of these reasons, even if APA review were available, the City is unlikely to succeed on the merits of its claim that the challenged conditions are arbitrary and capricious.

**D.     The Conditions Are Consistent with the Spending Clause.**

The City contends that the conditions run afoul of relatedness and notice requirements under the Spending Clause. *See* Pl.'s Mem. at 34-42. As stated above, the Spending Clause provides that Congress may "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress may employ the spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206 (citation omitted).

In *Dole*, the Supreme Court described certain limitations on the spending power. One of these limitations is that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id*. at 207 (citation omitted). Another limitation is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id*. (citation omitted).

1.      The City interprets the relatedness requirement much too stringently; the conditions are sufficiently related to the purposes of the Byrne JAG Program under the relevant constitutional analysis.

Courts have generally found that the relatedness showing does not pose a difficult hurdle. In *Dole* itself, the Supreme Court upheld conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one. *See id*. at 208. The Supreme Court has stated that only "some relationship" is necessary between spending conditions and "the purpose of federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992). The Third Circuit has required only "a discernible relationship" between a condition and a federal interest in a program, *Koslow*, 302 F.3d at 175, rejecting the argument that a "condition must be specifically tailored to a particular federal interest" and furthermore rejecting any requirement "to make specific findings of relatedness in the text of the statute itself." *A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 241 (3d Cir. 2003). Other Circuits, too, require only loose relatedness to satisfy the constitutional requirement. *See Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003) (explaining that a challenged funding condition and the program involved must only "share[] the same goal"); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (holding that conditions on federal funding need only "bear some relationship to the purpose of

the federal spending" and disclaiming "an exacting standard for relatedness").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here satisfy the relatedness requirement.  The Byrne JAG Program's organic statute specifies that Byrne JAG funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "maintain[ing] liaison" and disseminating information regarding "criminal justice."  *Id*. § 10102(a)(1), (2).  Contrary to the City's view that the Byrne JAG Program's goal is to preserve "flexibility" for grantees, *see* Pl.'s Mem. at 36, the program's overall goals are much broader: to support and strengthen law enforcement and criminal justice.

The City is simply wrong in viewing immigration enforcement as unrelated to criminal justice.  Numerous federal statutes expressly tie these two subjects together.  As discussed above, *see supra* at 26, a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend.   The INA also repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (providing that DHS may enter into formal cooperative agreements with states and localities under which appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); 8 U.S.C. § 1324(c) (authorizing state and local law-enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the

29

United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  Congress also contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), further animating the sort of cooperation between federal, state, and local law enforcement that the conditions are designed to foster.

Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose.  Even the City's own arguments reflect that immigration enforcement bears some relationship to criminal justice, because the City connects its local immigration enforcement policies to the City's crime rates.  *See* Pl.'s Mem. at 10-11, 51. Accordingly, because there is a discernible relationship between the conditions and the Byrne JAG program's goals, the conditions satisfy the constitutional relatedness requirement.

The City also disputes relatedness based on its contention that the "conditions reach activities wholly unrelated to those funded through the Byrne JAG program."  Pl.'s Mem. at 38. The City is mistaken.  The requirements of the conditions are expressly limited "to the 'program or activity' that is funded (in whole or in part) by this award."  2017 Greenville Award ¶¶ 53, 55, 56.[9]  This limitation mirrors the *Koslow* case that the City cites approvingly.  *See* Pl.'s Mem. at 38 (citing *Koslow*, 302 F.3d at 176 (noting that challenged condition "governs only a 'program or activity' receiving federal funds")).  The City's relatedness challenge thus fails.

> **2.**     The City further overreaches in characterizing the conditions as "highly ambiguous" in violation of the Spending Clause.  Pl.'s Mem. at 39.  As a threshold flaw of the

---

[9]     The text of the Section 1373 compliance condition is materially identical in limiting its requirements "to the 'program or activity' funded in whole or part under this award."  2017 Greenville Award ¶ 53.

City's argument, the City ignores that the Department has, in the challenged conditions that appear in the award document for a prospective grantee to consider accepting, invited submission of "[a]ny questions about the meaning or scope of this condition . . . before award acceptance." 2017 Greenville Award ¶¶ 53, 55, 56. The City's assertion of ambiguity in this litigation comes before the City has availed of the invitation for administrative consultation. Moreover, even as the City analogizes the conditions to the terms of a contract, *see* Pl.'s Mem. at 39, the City's nit-picking ignores that "all contracts are, by necessity, incomplete to some degree" and it is impossible for "terms specifically to cover all contingencies." Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 821-22 (1992).

To back up its litigation posture, the City contrives ambiguities where there are none. Regarding the custody release condition, the City suggests it needs clarity regarding whether the requirement to provide "advance notice of the scheduled release date" for detained aliens would "apply to detainees who have no 'scheduled release date,' such as individuals who are awaiting preliminary hearings, trials, or sentencing." Pl.'s Mem. at 40-41. The condition calls for a correctional facility to honor "a formal written request" "from DHS" "that seeks advance notice of the scheduled release date and time for a particular alien in such facility," by providing "the requested notice to DHS" "as early as practicable." 2017 Greenville Award ¶ 56. What makes the condition applicable is whether the alien is "in" the facility, not the circumstances of the alien's detention. And, in practice, it will be evident exactly which aliens the condition applies to because the condition is triggered only upon DHS providing "a formal written request" concerning "a particular alien." *Id*. On its face, the condition does not admit of the ambiguity that the City describes; it applies to any alien detained for whatever reason, but only upon a request from DHS

as to a particular alien, and with the possibility of a response that no scheduled release date presently exists but that notice will be provided "as early as practicable."

With respect to the correctional facility access condition, the City wishfully identifies a supposed ambiguity about whether the condition requires allowing ICE agents access to visit an inmate even when the inmate has told the facility that the inmate does not consent to an interview. *See* Pl.'s Mem. at 41-42. The answer is yes. The condition does require allowing access in this scenario, even if the inmate might decline to answer questions. The City does not attempt to point to anything in the text of the condition that indicates otherwise.

As to the Section 1373 compliance condition, the City remarkably complains of supposed unconstitutional ambiguity concerning the City's obligations under a statute with which the City has been required to comply for over twenty years (entirely independent of any Byrne JAG award condition), and for which the City provided a certification of its compliance in the FY 2016 grant cycle. The City moreover discounts that the Department has provided public guidance regarding the requirements of Section 1373. *See* Dkt. Nos. 1-11, 1-12. That guidance explains, in part:

> Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information. Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.
>
> Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

Dkt. No. 1-12. The City does not explain what is ambiguous about that. "Broad general language is not necessarily ambiguous when congressional objectives require broad terms." *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*, 794 F.3d 383, 393 (3d Cir. 2015)

(quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980)).  Moreover, the Department has now provided the City with further guidance in the form of a preliminary assessment of the City's compliance with Section 1373.  *See* Hanson Decl. ¶ 8 & Ex. A.

To the extent there is any uncertainty at the margins of the statute's requirements, such a penumbra is hardly a basis to find the Section 1373 compliance condition unconstitutionally ambiguous.  The City does not complain, for example, about other, long-standing Byrne JAG conditions requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, 2017 Greenville Award ¶ 19, compliance with "federal appropriations statutes" generally, *id*. ¶ 20, reporting of evidence of violations of the False Claims Act, *id*. ¶ 21, and complying with prohibitions on reprisal under 41 U.S.C. § 4712, *id*. ¶ 23.  All these statutes on which various unchallenged grant conditions are predicated could have some zone of uncertainty at the margin.  The Section 1373 compliance condition presents no special problem of ambiguity that creates a constitutional infirmity.

> **E.    The Court Should Decline the City's Request for a Declaration That It Complies with 8 U.S.C. § 1373.**

The City seeks a preliminary injunction on the basis of its request for a declaration that it complies with 8 U.S.C. § 1373.  *See* Pl.'s Mem. at 42; Compl. ¶¶ 138-44.  On this motion for a preliminary injunction, the Court should exercise its discretion to decline the City's invitation for declaratory relief, which concerns conduct the City has already undertaken, would not absolve the City of legal jeopardy, prematurely disrupts an ongoing administrative process, and rests on no proper cause of action.  Even if the Court were to reach this claim, Philadelphia is unlikely to succeed in demonstrating that it complies with Section 1373.

**1.**    Under the Declaratory Judgment Act, courts "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could

be sought." 28 U.S.C. § 2201(a) (emphasis added). "The Supreme Court has long held that this confers discretionary, rather than compulsory, jurisdiction upon federal courts." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 134 (3d Cir. 2014). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

"[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Id.* at 287 (citation omitted). "[D]istrict courts exercising DJA discretion are governed by 'considerations of practicality and wise judicial administration.'" *Reifer*, 751 F.3d at 139 (quoting *Wilton*, 515 U.S. at 288). The Third Circuit has articulated a "non-exhaustive list" of factors for the district court to consider, "to the extent they are relevant," in exercising its discretion over whether and when to entertain a request for a declaratory judgment:

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
>
> (2) the convenience of the parties;
>
> (3) the public interest in settlement of the uncertainty of obligation;
>
> (4) the availability and relative convenience of other remedies;
>
> (5) a general policy of restraint when the same issues are pending in a state court;
>
> (6) avoidance of duplicative litigation;
>
> (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and
>
> (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.

*Reifer*, 751 F.3d at 146. For the purpose of adjudicating the City's motion for preliminary relief, the relevant *Reifer* factors support declining to exercise declaratory jurisdiction at this time.

First, a declaratory judgment—which is available to test the legality of a course of conduct prior to its implementation to avoid legal jeopardy—is not appropriate in these circumstances, where the City seeks to test the legality of policies that have already been adopted. The jeopardy the City seeks to avoid through a declaration of rights already exists. A declaratory judgment, by contrast, "is an alternative to pursuit of the arguably illegal activity." *Steffel v. Thompson*, 415 U.S. 452, 480 (1974).

Second, while the City might face legal jeopardy if its policies facially violate Section 1373, it would not be *free from* legal jeopardy—the relief sought here—unless the City's policies, *together with the City's conduct in implementing those policies*, are consistent with Section 1373. Here, at this preliminary stage of proceedings, the City asks the Court to bless the City's Section 1373 compliance before the Department has had an opportunity to take discovery of the City's actual practices and conduct. The City's request to be declared compliant with Section 1373 accordingly is not comprehensively presented for the Court's review. In contrast to a declaration that the City is facially *non*-compliant, a declaration that the City's policies, on their face and standing alone, comport with Section 1373—without regard to scrutiny of the City's actual practices—would be an advisory opinion and would not declare the respective rights of the parties so as to protect the City from legal jeopardy. *See Calderon v. Ashmus*, 523 U.S. 740, 749 (1998) (no jurisdiction where "[t]he present declaratory judgment action would not completely resolve those challenges, but would simply carve out one issue in the dispute for separate adjudication"); *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam) (dismissing action seeking declaratory judgment that law violated Constitution, explaining that "[f]or a declaratory judgment to issue,

there must be a dispute which calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts" (citation omitted)).

Third, declaratory relief on this motion for preliminary injunction would preempt the administrative process the Department is presently conducting with the City regarding Section 1373 compliance.  In that process, the City has provided its explanation regarding whether it complies, *see* Dkt. No. 1-14, the Department has responded with a "preliminary assessment,"[10] *see* Hanson Decl. ¶ 8 & Ex. A, and the Department has invited the City to respond further by October 27, 2017 for additional consideration before the Department renders its final assessment.  *Id*.  The Court would prudently wait for that process to complete itself, rather than intervening—at a preliminary stage of this federal court lawsuit, no less—where the aspects of any dispute remain to be sharpened or may not in fact exist.  As discussed below, *see infra* nn. 12-13, there is particular reason to believe this administrative process may deliver better clarity about the contours of any dispute.  The federal government, for its part, has not requested a declaration that the City violates Section 1373, and the Court should not take up that question absent an enforcement action brought by the United States, which has also not occurred.

Fourth, the City pursues declaratory relief without identifying an underlying cause of action.  "The Declaratory Judgment Act does not, however, provide an independent basis for subject-matter jurisdiction; it merely defines a remedy."  *Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017).  Plaintiff does not identify a right of action, in Section 1373 or elsewhere, to seek a declaration that the City complies with Section 1373.  A plaintiff does not automatically have a right of action to seek declaratory judgment wherever Article III standing exists.  *See Harris Cty.*

---

[10]     As stated in the Department's letter, the "preliminary assessment" is based on the City's "submission, all attached documentation, and [the City's] laws, policies, and practices relating to compliance with section 1373, to the extent they were provided or are readily available."  Hanson Decl. Ex. A at 1.

*Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("The Counties do not contend that [the governing statute] itself creates a private right of action. Instead, the Counties believe that the Declaratory Judgment Act provides a right to relief because there is an 'actual controversy.' This argument is flawed because the Declaratory Judgment Act alone does not create a federal cause of action."). Declaratory relief is thus unavailable.

For all of these reasons, the Court should—especially at this stage of proceedings, for the purpose of resolving the City's motion for preliminary relief—exercise its discretion to decline to entertain the City's request for a declaration that it complies with Section 1373.

      **2.** If the Court were to ignore the flaws of the City's request and nonetheless exercise discretion to consider declaratory relief at this time, the Court should find that the City is unlikely to demonstrate that it complies with 8 U.S.C. § 1373. The Department below identifies various facial problems with the City's policies, but emphasizes that this review does not account for any additional problems that may be revealed by further scrutiny of the City's actual practices and conduct in implementing those policies—a subject on which the Department has not taken discovery at this preliminary stage of proceedings. Further factual development would be required before an adjudication could be made that the City's practices, beyond the face of the City's policies, comply with Section 1373. *See Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 369 (1940) ("It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice . . . can establish what is state law."). Importantly, Section 1373 speaks not only to local policies, but also to any restriction on information-sharing by any "entity or official." The record in this action, accordingly, is inadequate to make any comprehensive declaratory ruling that the City complies with Section 1373.

a. Looking only to the face of the City's policies, the City does not comply with Section 1373. The statute provides, in part, that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). At least two City policies do not comply with Section 1373, and at least three additional policies may also be non-compliant depending on how the City interprets and applies them.

First, the City's Executive Order No. 5-16, which the City's brief refers to as "Detainer Order II," Pl.'s Mem. at 9, states in Section 1 that notice of a person's "pending release" from City custody shall not be provided, "unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant." Dkt. No. 1-6. This section restricts the sharing of "information regarding . . . immigration status" in violation of 8 U.S.C. § 1373(a).[11] Nothing in the statute allows the City to impose a prohibition that limits information-sharing only to certain circumstances.

---

[11] The INA states that the "immigration status of any individual" specifically "includ[es] . . . that a particular alien *is not lawfully present* in the United States." 8 U.S.C. § 1357(g)(10)(a) (emphasis added). "Present" means "being in a certain place and not elsewhere," *Webster's New International Dictionary* (2d ed. 1958), so the fact that an alien is in custody for a specific duration (in a certain place and not elsewhere) fits within the INA's contemplation of immigration status. Moreover, "information regarding . . . immigration status" is a broader category than "immigration status" itself. Comparison of different subsections within Section 1373 demonstrates that Congress used the broader "information regarding" formulation deliberately. *Compare* 8 U.S.C. § 1373(a) (concerning "information regarding . . . immigration status") *with* 8 U.S.C. § 1373(c) (discussing "immigration status" but omitting the broader "information regarding" formulation). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted). Indeed, the House Report accompanying the legislation stated that Section 1373 was intended "to give State and local officials the authority to communicate with the INS [Immigration and Naturalization Service] regarding the *presence, whereabouts, and activities* of illegal aliens." H.R. Rep. No. 104-469, pt. 1, at 277 (1996) (emphasis added). Custody release (. . . *cont'd*)

Second, Police Commissioner Memorandum No. 01-06 states at Section III.C that "immigrants who are victims of crimes will not have their status as an immigrant transmitted in any manner." Dkt. No. 1-3. This Memorandum restricts the sharing of information regarding immigration status in violation of 8 U.S.C. § 1373(a). To be sure, it is not the Department of Justice's or the Department of Homeland Security's policy or practice to request information from state and local jurisdictions regarding the immigration status of victims. There are, however, instances where requesting this information could be appropriate, such as where a person is both a perpetrator and a victim. The key point is that, notwithstanding limits that the federal government may prudentially self-impose, nothing in 8 U.S.C. § 1373 allows the City to impose a prohibition that limits information-sharing under these circumstances.

Additionally, three other City policies may violate Section 1373 depending on how the City interprets and applies them. In its preliminary assessment recently transmitted to the City, the Department has invited the City to provide clarification regarding each of these policies. *See* Hanson Decl. Ex. A at 3.

The City's Executive Order No. 8-09, which the City's brief refers to as the "Confidentiality Order," Pl.'s Mem. at 8, states at Section 2(b) that police officers "shall not . . . inquire about a person's immigration status," unless certain limited exceptions apply. Dkt No. 1-

---

information falls within the sweep of "information regarding . . . immigration status" that Congress intended under Section 1373(a). Indeed, it is relevant to the federal government's statutory duties, enacted at the same time as Section 1373, to "take into custody any alien who" has committed certain offenses, 8 U.S.C. § 1226(c)(1)(A), and to "take into custody any alien who . . . is inadmissible . . . when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation," 8 U.S.C. § 1226(c)(1)(D). It is sensible to read section 1373(a) to include information that assists the federal government in carrying out its statutory responsibilities under the same Act. *See United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

4. Under 8 U.S.C. § 1373(b)(1), however, the City may not "in any way restrict" the "requesting" of "information regarding . . . immigration status" from federal immigration officers. On its face, the Executive Order appears to bar City officers from requesting information regarding immigration status from federal immigration officers. In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this Executive Order to not restrict City officers and employees from requesting information regarding immigration status from federal immigration officers. The City would also need to show that it has communicated this interpretation to its officers and employees. Otherwise, this provision on its face violates Section 1373.

In that same Executive Order No. 8-09, Section 3 states that City officers and employees generally "shall [not] disclose" information "relating to an individual's immigration status," but that disclosure is allowed when "required by law." Dkt No. 1-4. In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this Executive Order to not restrict City officers from sharing information regarding immigration status with federal immigration officers.[12] The City would also need to show that it has communicated this interpretation to its officers and employees. Otherwise, this provision on its face violates Section 1373.

Finally, Police Commissioner Memorandum No. 01-06 states at Section III.A that "police personnel" shall not transmit "information regarding an immigrant . . . to federal immigration authorities" unless "[r]equired by law" or certain other exceptions apply. Dkt. No. 1-3. In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this

---

[12]     Underscoring why the Court should not exercise its discretion to consider declaratory relief at this time, the parties potentially may not have a dispute on this point because the City's brief asserts that this "required by law" language is a "saving clause" that rescues the policy from non-compliance by "ensur[ing] that Section 1373 will be followed." Pl.'s Mem. at 49-50.

policy to not restrict City officers and employees from sharing information regarding immigration status with federal immigration officers.[13]  The City would also need to show that it has communicated this interpretation to its officers and employees.  Otherwise, this provision on its face violates Section 1373.

To find these facial violations, the Court need not disagree with the City's view that "Section 1373 imposes no affirmative requirement on States or localities to collect immigration-status information."  Pl.'s Mem. at 43.  These violations turn, instead, on impermissible "prohibitions and restrictions on information exchange" that the City acknowledges come within the sweep of what Section 1373 disallows.  *Id.*  Moreover, four of the City's facially non-compliant or suspect policies identified above are wholly independent of "the City's non-collection policies" that may result in "City officials [being] rarely in active possession of information about persons' immigration or citizenship status."  *Id.* at 44.

**b.**     Perhaps in recognition that its policies facially violate Section 1373, the City turns to seeking a limiting construction of the statute and questioning the statute's constitutionality, arguing that Section 1373 does not "displace" the City's "police powers" and cannot commandeer the City's personnel under the Tenth Amendment.  *See* Pl.'s Mem. at 46-49.  These attacks miss the mark.

In the first instance, the City's argument incorrectly frames the dispute in this case.  The dispute here turns on a grant condition that the City is free to accept or reject, not on a statutory mandate that directly regulates the City.  The relevant question, therefore, is not whether Section 1373, as an independent statutory obligation of the City, infringes the Tenth Amendment.  Instead,

---

[13]     Similar to the preceding footnote, there potentially may be no dispute on this point in view of the City's statements in its brief regarding this "required by law" savings clause, *see* Pl.'s Mem. at 49-50, which highlights why declaratory relief is inappropriate at this juncture.

the only pertinent constitutional question the City presents for the Court is whether the Section 1373 compliance condition—which could have been written to state the same textual requirements as Section 1373 even if Section 1373 did not exist—is a valid exercise of the Spending Clause power. In that context that pertains here, it is settled that the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions. These offers may well induce the States to adopt policies that the Federal Government itself could not impose." *NFIB*, 567 U.S. at 537. A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210.

To any extent that the City could nevertheless proceed with a facial attack on Section 1373, the City bears "a higher substantive burden," because, "[a]s the Supreme Court has repeatedly intoned, facial challenges are the most difficult to mount successfully because the challenger 'must establish that no set of circumstances exist under which the statute would be valid.'" *Knick v. Twp. of Scott*, 862 F.3d 310, 321 (3d Cir. 2017) (citations omitted). The City does not meet that burden.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. The Supremacy Clause provides the clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "may legislate in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991). And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

The Second Circuit has rejected a Tenth Amendment facial challenge to Section 1373 of the kind the City raises here. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not give states and their subdivisions "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context. *Id*. at 34-35; s*ee also Printz v. United States*, 521 U.S. 898, 918 (1997) (contrasting federal statutes that "require only the provision of information to the Federal Government" with those that "force[] participation of the States' executive in the actual administration of a federal program"); *Freilich v. Bd. of Directors*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."). The City's anti-commandeering theory is especially diminished here because the conditions allow a grantee to use the awarded Byrne JAG funds to cover its costs incurred in implementing the conditions. *See* 2017 Greenville Award ¶¶ 53, 55, 56.

The City's sovereignty argument flies in the face of legislative history, recounted in part by the Second Circuit in *City of New York*, *see* 197 F.3d at 32-33, demonstrating that Congress intended Section 1373 to counteract passive resistance to sharing information. The House Report accompanying the legislation stated that "[t]his section is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS." H.R. Rep. No. 104-469, pt. 1, at 277. The Report of the Senate Judiciary Committee asserted that, "[u]nfortunately, U.S. immigration law is violated on a massive scale," S. Rep. No. 104-249, at 3 (1996), and that "[s]ome Americans appear to be ambivalent about the enforcement of the Immigration and Nationality Act." *Id*. at 7. Admonishing "[t]hose who are

reluctant to enforce the immigration laws," *id*. at 7, the Report went on to declare, with reference specifically to what became Section 1373, that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government." *Id*. at 19. "The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." *Id*. at 19-20. In this history, together with the unqualified text of Section 1373 and the plenary power of Congress to regulate immigration, is an answer to the City's demand for a "clear statement" of congressional intent "[t]o displace a State's or municipality's police powers." Pl.'s Mem. at 46.

It makes no difference on these points whether the City cabins its objection to the reach of Section 1373 to information-sharing concerning "witnesses to crimes, victims of crimes, and other law-abiding persons seeking City services." *Id*. at 45. Irrespective, the City does not enjoy "the power to forbid even voluntary cooperation by state and local officials and workers" in sharing information with federal immigration authorities. *City of New York*, 179 F.3d at 34.

The City is unlikely to succeed on its additional argument that "construing Section 1373 to compel Philadelphia to disclose information about witnesses and victims as a condition of receiving Byrne JAG funds would violate the Spending Clause" on relatedness grounds. Pl.'s Mem. at 48. The City improperly attempts to frame a Spending Clause violation by diverting focus away from the gravamen of what the Section 1373 compliance condition concerns: information-sharing regarding criminal aliens. *See supra* at 29-30; *see also A.W.*, 341 F.3d at 241 (rejecting the argument that a "condition must be specifically tailored to a particular federal interest"). The condition as a whole undoubtedly satisfies the City's demand that it "bear some relationship" to the Byrne JAG Program's criminal justice goals. Pl.'s Mem. at 48 (quoting *New York*, 505 U.S.

at 167); *see supra* at 29-30.  Finally, as the City has been advised, "[i]t is not the Department of Justice's nor the Department of Homeland Security's policy or practice to request information from state and local jurisdictions regarding the immigration status of victims," although there could be "instances where the Department finds that requesting this information could be appropriate, such as where a person is both a perpetrator and a victim."  Hanson Decl. Ex. A at 2.

Because the issue presented for the Court is a grant condition that can be declined, rather than a direct statutory mandate, and because the City is in any event unable to avoid the reach of Section 1373 through either canons of construction or constitutional limits, the City is unlikely to succeed on a claim that its policies comply with the statute, if this Court were even to entertain the City's request for declaratory relief.

## II.    The City Fails to Establish That It Will Suffer Irreparable Harm Absent a Preliminary Injunction.

"[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).  "Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of *immediate* irreparable harm."  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (quotation omitted).  The Third Circuit has "insisted that the risk of irreparable harm must not be speculative."  *Adams*, 204 F.3d at 488.  "The *dramatic and drastic power* of injunctive force may be unleashed only against conditions generating a presently existing actual threat."  *Id.* at 487 (quotation omitted).  "[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties."  *Id.* at 490 (quotation omitted).

The City cannot demonstrate irreparable harm from the correctional facility access and custody release conditions because the Department is presently enjoined nationwide from

imposing those two conditions on Byrne JAG grants. *See Chicago*, 2017 WL 4081821, at *14. Any purported risk of irreparable harm to the City from those conditions is thus inherently speculative and relegated to the indefinite future rather than posing an immediate threat. Irreparable harm to the City does not exist under these circumstances, notwithstanding that the Department has appealed and sought to stay the nationwide injunction in *Chicago*. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "[T]he potential harm facing" the City "is remote and hypothetical, which is fatal to [the City's] request for injunctive relief" because "an injunction may not be used to eliminate the possibility of remote future injury." *Rossi v. Procter & Gamble Co.*, 597 F. App'x 69, 71 (3d Cir. 2015).

Separately, the City's claim of irreparable harm from imposition of the Section 1373 compliance requirement is belied by its acceptance of a requirement to certify such compliance in the FY 2016 Byrne JAG cycle and its long delay in raising any legal challenge. Under these circumstances, the City cannot show *immediate* irreparable harm that justifies exercising "the extraordinary nature of the preliminary injunction power." *Adams*, 204 F.3d at 487. "[T]he use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter," *id.*, not so lightly invoked as the City would do so here in spite of its own conduct demonstrating a lack of urgency.

Even apart from the existing nationwide injunction and the City's unexplained delay in challenging the applicability of Section 1373 to the Byrne JAG Program, the City's claim that the conditions cause irreparable harm by attempting to unconstitutionally coerce the City into abandoning its right to self-government also fails. *See* Pl.'s Mem. at 50-52. The Supreme Court

has admonished that "courts should not conclude that [an enactment] is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear," *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 681 (2012) (opinion of Scalia, Kennedy, Thomas & Alito, JJ.), such as where a state is subjected to the risk of losing "over *10 percent* of a State's overall budget" if it declines to adopt certain conditions. *Id.* at 582 (emphasis added).

The amount of funding at stake to the City through the Byrne JAG Program does not come close to meeting that constitutional threshold. The City asserts that it expects "$1.6 million in FY 2017 Byrne JAG funding." Pl.'s Mem. at 52. The City's FY 2017 budget (which ran from July 1, 2016 to June 30, 2017, whereas the federal fiscal year runs from October 1 to September 30) stated estimated obligations of $4.2 billion,[14] and its budget for FY 2018 assumes over $4.4 billion in expenditures.[15] Thus, the funds at issue for the City's FY 2017 Byrne JAG award constitute approximately 0.036% to 0.038% of the City's overall budget. Such a relatively miniscule impact on the City's finances does not meet the threshold for establishing unconstitutional coercion. *See NFIB*, 567 U.S. at 581 (noting that in *Dole* "the threatened loss of less than half of one percent of South Dakota's budget left that State with a 'prerogative' to reject Congress's desired policy"); *see also A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527-28 (3d Cir. 1976) (no irreparable harm where movants "are not 'small' corporations" and there is no "contention that the cost of compliance would be so great vis a vis the corporate budget that significant changes in a company's operations would be necessitated"); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) (in determining irreparable harm, a "claim of substantial financial losses must be evaluated from the

---

[14]     *See* City of Philadelphia, *The Mayor's Operating Budget in Brief for Fiscal Year 2017*, at i, available at http://www.phila.gov/finance/pdfs/FY17FinalBudgetinBriefAdopted.pdf.

[15]     *See* City of Philadelphia, *The Mayor's Operating Budget in Brief for Fiscal Year 2018*, at 3, available at http://www.phila.gov/finance/pdfs/Operating%20Budget/FY18%20BudgetinBrief _Adopted.pdf.

perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief").

Finally, the City claims irreparable harm from a "cloud of uncertainty" regarding its FY 2017 Byrne JAG grant. Pl.'s Mem. at 53. Such uncertainty does not amount to irreparable harm. The Third Circuit has at least thrice emphasized that "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Adams*, 204 F.3d at 490 (collecting quotations). "There are many rearrangements—not just scrimping and saving rearrangements—that individuals involved in a legal battle must endure pending the conclusion of a suit, and very few will be without some anguish." *Id*. The City thus does not meet its burden to demonstrate it will suffer irreparable harm absent preliminary relief.

## III.  The Public Interest and the Balance of the Equities Militate Against a Preliminary Injunction.

The City also bears the burden of establishing "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These factors merge in a suit against the federal government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the public interest weighs heavily against the City's attempt to enjoin congressionally-authorized Executive Branch policies designed to promote enforcement of federal immigration law in jurisdictions that receive Byrne JAG Program funds. Courts have repeatedly held that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), *aff'd sub nom. Cornish v. Doll*, 330 F. App'x 919 (Fed. Cir. 2009); *accord N. Arapaho Tribe v. Burwell*, 90 F. Supp. 3d 1238, 1255 (D. Wyo. 2015).

"Issuing a" preliminary injunction "would harm" the federal government's "enforcement of the immigration laws and is not in the public interest as 'control over matters of immigration is

48

a sovereign prerogative, largely within the control of the executive and the legislature' and the 'government's interest in efficient administration of immigration laws . . . is weighty.'" *U.S. ex rel. Kovalev v. Ashcroft*, 223 F. Supp. 2d 688, 698 (E.D. Pa. 2002) (Baylson, J.) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). The federal government additionally has an interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980).

The challenged conditions promote those interests by, for example, minimizing potentially hazardous public safety situations that may arise where criminal aliens are released into the community, minimizing officer safety risk by limiting potentially dangerous arrest situations, and promoting operational efficiency by conserving the resources needed by DHS to execute its mission. *See* Brown Decl. ¶¶ 6-11. At bottom, encouraging cooperation among local governments and DHS promotes the public interest in executing federal laws that require removal of criminal aliens. *See id.*

Each of the three challenged conditions, moreover, ties closely to interests encapsulated in specific federal laws. First, the Section 1373 compliance condition, of course, promotes adherence to 8 U.S.C. § 1373. Second, the correctional facility access condition reinforces investigative authority provided by federal law. An immigration officer "authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). An implementing regulation provides that "[a]ny immigration officer is hereby authorized and designated to exercise *anywhere in* or outside *the United States* the power conferred by" that statute. 8 C.F.R. § 287.5(a)(1) (emphasis added). The correctional facility access

condition facilitates such investigation in state and local correctional facilities.  Third, the custody release condition helps federal authorities take custody of criminal aliens and comply with the requirement to detain criminal aliens pending removal.  *See* 8 U.S.C. §§ 1226(c), 1231(a)(2).  All three conditions, which collectively support the federal ability to remove criminal aliens from the country, help reduce federal expenditures on the State Criminal Alien Assistance Program, under which the federal government compensates states and localities for their incarceration of certain criminal aliens.  *See* 8 U.S.C. § 1231(i).  These concrete interests tip the equities at play here sharply toward denying an injunction.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court deny the City's motion for a preliminary injunction.[16]


DATED:  October 12, 2017     Respectfully submitted,

             CHAD A. READLER
             Acting Assistant Attorney General

             LOUIS D. LAPPEN
             Acting United States Attorney

             JOHN R. TYLER
             Assistant Director

             */s/ Arjun Garg*
             ARJUN GARG
             Trial Attorney
             U.S. Department of Justice

---

[16] The Department does not understand the City to be seeking injunctive relief that extends beyond application of the challenged conditions to the City itself.  In the prayer for relief in the City's Complaint, *see* Dkt. No. 1 at 46, and in the proposed order on the City's motion for a preliminary injunction, *see* Dkt No. 21-2, the City seeks relief only as to its own prospective FY 2017 Byrne JAG award.  Relief extending beyond the City—for example, a nationwide injunction—would be improper in scope.  Not only has the City not requested such relief, but also constitutional and equitable principles require that injunctive relief be limited to redressing the City's own cognizable injuries.

Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Arjun Garg, hereby certify that on October 12, 2017 I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

*/s/ Arjun Garg*
ARJUN GARG