1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  JESSE C. SMITH, State Bar #122517
   Chief Assistant City Attorney
3  RONALD P. FLYNN, State Bar #184186
   Chief Deputy City Attorney
4  YVONNE R. MERÉ, State Bar #173594
   Chief of Complex and Affirmative Litigation
5  CHRISTINE VAN AKEN, State Bar #241755
   TARA M. STEELEY, State Bar #231775
6  MOLLIE M. LEE, State Bar #251404
   SARA J. EISENBERG, State Bar #269303
7  AILEEN M. McGRATH, State Bar #280846
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4602
   Telephone:    (415) 554-4748
10 Facsimile:    (415) 554-4715
   E-Mail:    brittany.feitelberg@sfcityatty.org
11
   Attorneys for Plaintiff
12 CITY AND COUNTY OF SAN FRANCISCO

13

14                 UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16 CITY AND COUNTY OF SAN              Case No. 3:17-CV-04642-WHO
   FRANCISCO,
17                                     **CITY AND COUNTY OF SAN FRANCISCO'S**
          Plaintiff,                   **NOTICE OF MOTION AND MOTION FOR**
18                                     **SUMMARY JUDGMENT**
          vs.
19                                     Judge:         Honorable William H. Orrick
   JEFFERSON B. SESSIONS III, Attorney Hearing Date:  September 5, 2018
20 General of the United States, ALAN R. Time:         2:00 p.m.
   HANSON, Acting Assist. Attorney General of Place:    Courtroom 2, 17th Floor
21 the United States, UNITED STATES
   DEPARTMENT OF JUSTICE, DOES 1-100,  Trial Date:    January 28, 2019
22
          Defendants.
23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

NOTICE OF MOTION AND MOTION ............................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................. 3

    I.       San Francisco's Sanctuary City Laws And Relevant Policies ................................ 3

    II.      The Byrne JAG Program ........................................................................................ 4

    III.     San Francisco's Use Of Byrne JAG Funds ............................................................ 5

    IV.    DOJ's Newly Announced Requirements For Byrne JAG Funding ......................... 6

          A.      Section 1373 Requirement ......................................................................... 6

          B.      Notice And Access Requirements ............................................................. 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

    I.       San Francisco Is Entitled To Summary Judgment On Its Claims That The Three Requirements Are Unlawful. ........................................................................ 8

          A.      The Three Requirements Violate The Separation Of Powers Because They Are Not Authorized By Congress. ................................................... 8

               1.     The Byrne JAG Statute Does Not Authorize The Attorney General To Impose The Challenged Requirements. ...................... 9

                    a.      The Byrne JAG Program Is Structured As A Formula Grant With Statutorily Defined Criteria. ............................ 9

                    b.      The Byrne JAG Statute Contains No Language Authorizing The Attorney General To Impose Additional Requirements. .................................................... 10

                    c.      The "Applicable Federal Laws" Provision Does Not Authorize The Section 1373 Requirement. ....................... 12

                        i.     Section 1373 Is Not An "Applicable Law" Because It Is Unconstitutional Under *Murphy* ....... 12

                        ii.    The Byrne JAG Statute's Text and Background Shows That "Applicable" Has A Narrow Meaning. ................................................................. 14

                2.     A Federal Statute Creating The Office Of The Assistant Attorney General Overseeing OJP Does Not Give The Attorney General Authority To Impose The Challenged Requirements. ...... 15

                    a.      Section 10102(a) Does Not Give The Attorney General The Authority To Impose The Challenged Requirements. ............................................................. 15

b. Even If Section 10102 Were A Grant Of Authority, It Would Not Authorize The Challenged Requirements....17

B. The Three Requirements Violate The Spending Clause............................17

1. The Challenged Requirements Are Ambiguous ............................18

a. The Section 1373 Requirement Is Ambiguous. .................18

b. The Notice And Access Requirements Are Ambiguous....21

2. The Challenged Requirements Are Not Reasonably Related To The Byrne JAG Program's Purpose. ........................................22

II. San Francisco Is Entitled To Declaratory Relief Regarding Section 1373............22

A. Section 1373 Only Concerns Limits On Sharing Citizenship And Immigration Status Information...................................................22

1. Section 1373's Plain Text Reaches Only Citizenship And Immigration Status.........................................................22

2. "Regarding" Does Not Show A Clear Intent To Cover Other Categories Of Information. .................................................24

B. Section 1373 Must Be Narrowly Construed To Avoid Raising Serious Constitutional Questions.....................................................27

C. San Francisco's Laws Comply With Section 1373....................................28

D. The San Francisco Departments Receiving Byrne JAG Funds Do Not Prohibit Or Restrict The Sharing of Citizenship Or Immigration Status Information.................................................29

III. San Francisco Is Entitled To A Declaratory Judgment.........................................31

IV. San Francisco Satisfies The Requirements For A Permanent Injunction. .............31

A. San Francisco Will Suffer Irreparable Harm Absent An Injunction.........32

1. The Section 1373 Certification Will Harm San Francisco Irreparably Absent Court Resolution. ..............................32

B. The Balance Of The Equities And Public Interest Favor Granting A Permanent Injunction. ...............................................34

V. A Nationwide Injunction Prohibiting Enforcement Of The Notice, Access, And Section 1373 Requirements Is Warranted.......................................34

CONCLUSION....................................................................................................................35

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Aetna Life Ins. Co. v. Haworth*
    300 U.S. 227 (1937)..................................................................................31

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
    559 F.3d 1046 (9th Cir. 2009) ................................................................33

*Arizona v. United States*
     567 U.S. 387 (2012)..........................................................................27, 28

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) ................................................................34

Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy
    548 U.S. 291 (2006) ................................................................................18

*Atascadero State Hosp. v. Scanlon*
    473 U.S. 234 (1985).................................................................................26

*Barnhart v. Sigmon Coal Co., Inc.*
    534 U.S. 438 (2002) ................................................................................11

*Califano v. Yamasaki*
    442 U.S. 682 (1979).................................................................................34

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)...................................................................................8

*City and Cty. of San Francisco v. Trump*
    No. 3:17-485-WHO .................................................................................19

*City of Chicago v. Sessions*
    264 F. Supp. 3d 933 (N.D. Ill. 2017)
    *aff'd by City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ...................................13, 15

*City of Chicago v. Sessions*
    888 F.3d 272 (7th Cir. 2018) ........................................................9, 13, 15, 16, 17, 30

*City of Los Angeles v. McLaughlin*
    865 F.2d 1084 (9th Cir. 1989) ..................................................................9

*City of Los Angeles v. Sessions*
    293 F. Supp. 3d 1087 (C.D. Cal. 2018) ....................................................9

*City of Philadelphia v. Sessions*
    No. CV 17-3894, 2018 WL 2725503 (E.D. Pa. 2018) ....................9, 12, 14, 15, 21, 22, 23, 33

*Drakes Bay Oyster Co. v. Jewell*
　　747 F.3d 1073 (9th Cir. 2014) ...................................................................34

*eBay Inc. v. MercExchange, L.L.C.*
　　547 U.S. 388 (2006) ...................................................................................32

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*
　　485 U.S. 568 (1988) ............................................................................27, 28

*Gregory v. Ashcroft*
　　501 U.S. 452 (1991) ...................................................................................14

*In re Aiken Cty.*
　　725 F.3d 255 (D.C. Cir. 2013) .....................................................................8

*Kansas v. United States*
　　249 F.3d 1213 (10th Cir. 2001) ..................................................................33

*Lawson v. FMR LLC*
　　134 S. Ct. 1158 (2014) ...............................................................................22

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*
　　312 U.S. 270 (1941) ...................................................................................31

*Medtronic, Inc. v. Lohr*
　　518 U.S. 470 (1996) ...................................................................................33

*Melendres v. Arpaio*
　　695 F.3d 990 (9th Cir. 2012) ......................................................................34

*Morales v. Trans World Airlines, Inc.*
　　504 U.S. 374 (1992) ...................................................................................33

*Moskal v. United States*
　　498 U.S. 103 (1990) ...................................................................................22

*Murphy v. Nat'l Collegiate Athletic Ass'n*
　　138 S. Ct. 1461 (2018) .........................................................2, 12, 13, 14, 27

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*
　　514 U.S. 645 (1995) ...................................................................................25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
　　567 U.S. 519 (2012) ...................................................................................18

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*
　　145 F.3d 1399 (D.C. Cir. 1998) ............................................................34, 35

*Nevada v. Hicks*
　　533 U.S. 353 (2001) ...................................................................................13

*New York v. United States*
    505 U.S. 144 (1992) ...........................................................................22

Pennhurst State Sch. & Hosp. v. Halderman
    451 U.S. 1 (1981) ........................................................................18, 21

*Printz v. United States*
    521 U.S. 898 (1997) ..............................................................12, 13, 27

*Rice v. Santa Fe Elevator Corp.*
    331 U.S. 218 (1947) .........................................................................26

*Roach v. Mail Handlers Benefits Plan*
    298 F.3d 847 (9th Cir. 2002) .................................................25, 26, 27

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) ........................................................34

*San Francisco v. Trump*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .............................................33

*South Dakota v. Dole*
    483 U.S. 203 (1987) .................................................................8, 17, 18

*Steele v. Bulova Watch Co.*
    344 U.S. 280 (1952) .........................................................................34

*Steinle v. City and Cty. of San Francisco*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) .............................................23

*Texas v. United States*
    201 F. Supp. 3d 810 (N.D. Tex. 2016) .............................................33

*Texas v. United States*
    809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) .......34

*United States v. Bass*
    404 U.S. 336 (1971) .........................................................................26

*United States v. Jicarilla Apache Nation*
    564 U.S. 162 (2011) .........................................................................15

*United States v. Morrison*
    529 U.S. 598 (2000).....................................................................26, 33

*United States v. North Carolina*
    192 F. Supp. 3d 620 (M.D.N.C. 2016) .............................................34

*United States v. Youssef*
    547 F.3d 1090 (9th Cir. 2008) ........................................................12

*Yates v. United States*
     135 S. Ct. 1074 (2015) .................................................................14, 29

**Federal Statutes**

8 U.S.C.
     § 1182(a)(1)(A) ......................................................................................26
     § 1182(a)(4)(B) ......................................................................................27
     § 1184(k)(3)(A) ......................................................................................24
     § 1231(a)(3)(C) ......................................................................................24
     § 1360(c)(2) ...........................................................................................24
     § 1367(a)(2) ...........................................................................................24
     § 1373 ......................................................................................... *passim*
     § 1373(a) .............................................................................7, 13, 23, 24
     § 1373(b) ....................................................................................7, 23, 24
     § 1373(c) ..........................................................................................24, 25

20 U.S.C.
     § 10006(b) ................................................................................................9

25 U.S.C.
     § 1652(b) ................................................................................................11

28 U.S.C.
     § 2201(a) ................................................................................................31

34 U.S.C.
     § 10102 ............................................................................................16, 17
     § 10102(a) ..................................................................................15, 16, 17
     § 10102(a)(1) ..........................................................................................16
     § 10102(a)(2) ..........................................................................................16
     § 10102(a)(3) ..........................................................................................16
     § 10102(a)(6) ..........................................................................................16
     § 10142 ...................................................................................................11
     § 10152(a)(1)(A)-(H) ...................................................................5, 10, 22
     § 10152(c)(1)–(2) ....................................................................................10
     § 10152(d)(2) ..........................................................................................11
     § 10152(f) ...............................................................................................11
     § 10153(a) .....................................................................................5, 10, 14
     § 10153(a)(2) & (a)(5)(A)–(C) ..................................................................5
     § 10153(a)(4) .....................................................................................5, 10
     § 10153(a)(5)(D) .................................................................................5, 12
     § 10156(a), (b) ..........................................................................................9
     § 10156(a), (d) ..........................................................................................9
     § 10156(c)(2) .............................................................................................4
     § 10156(d) .................................................................................................4
     § 10156(d)(2)(A) .......................................................................................4
     § 10157(b) ...............................................................................................10

§ 10446(e)(3) .......................................................................11
§ 20927(a) ...........................................................................11
§ 30307(e)(2) .......................................................................11
§ 60105(e)(2) .......................................................................11

42 U.S.C.
§ 1769e(b) ...........................................................................11
§ 3712 ................................................................................17
§ 10305(a)(2) .......................................................................11

**Rules**

Federal Rules of Civil Procedure
Rule 56(a) ...........................................................................8

**Regulations**

2 C.F.R.
§ 200.207 ...........................................................................17
§ 2800.101 .........................................................................17

28 C.F.R.
§ 66.12 ..............................................................................17
§ 66.12(b) ..........................................................................17

**State Cases**

*State Dep't of Pub. Health v. Superior Court*
60 Cal. 4th 940 (2015) .........................................................28

**State Statutes and Codes**

Cal. Gov't Code
§ 7282 *et seq.* ...................................................................19

Cal. Gov't Code
§ 7283 *et seq.* ...................................................................19

S.F. Admin. Code
§ 12H ............................................................1, 3, 28, 29
§ 12H.2 ..............................................................................28

S.F. Admin. Code
§ 12I .............................................................1, 3, 28, 29
§ 12I.3 ..........................................................................3, 28, 29
§ 12I.3(c), (d), (e) ...............................................................3

**Constitutional Provisions**

U.S. Const.
   art. I, § 8, cl. 1 .................................................................................................................8

**Other References**

*A California Court for Young Adults Calls on Science*, N.Y. Times (Apr. 17, 2017)
   https://www.nytimes.com/2017/04/17/health/young-adult-court-san-francisco-california-
   neuroscience.html. ..........................................................................................................6

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
   Pub. L. 104-208, §§ 384, 642, 110 Stat. 30009-546, 30009-652, 30009-707 .........................24

*Welcome to BJA's Edward Byrne Memorial Assistance Grant (JAG) Program*
   https://www.bja.gov/jag/ (last visited July 9, 2018) ................................................4

**Legislative Materials**

Enforce the Law for Sanctuary Cities Act
   H.R. 3009, 114th Cong. § 3(b) (2015) ........................................................................12

Stop Sanctuary Cities Act
   S. 1814 Cong. § 2(b)(2) (2015)...................................................................................12

1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on Wednesday, September 5, 2018, at 2:00 p.m., or as soon thereafter as the matter can be heard, in Courtroom 2 on the 17th Floor of the United States District Court for the Northern District of California, in San Francisco, California, the Honorable William H. Orrick presiding, Plaintiff City and County of San Francisco will move for summary judgment or, in the alternative, partial summary judgment.  San Francisco bases this motion on this Notice of Motion and Motion; the accompanying memorandum of points and authorities; the declarations and request for judicial notice, and the exhibits thereto; the records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

San Francisco respectfully requests that the Court enter judgment in its favor as to each of its claims for relief in the First Amended Complaint on the grounds that the undisputed evidence shows that: (1) Chapters 12H and 12I of the San Francisco Administrative Code, and the departmental policies implementing those Chapters, comply with 8 U.S.C. § 1373; and (2) the Notice, Access, and Section 1373 Requirements imposed on FY 2017 Byrne JAG funds violate separation of powers and Spending Clause principles.  San Francisco respectfully requests a declaratory judgment that its Sanctuary City laws comply with Section 1373, and an injunction restraining Defendants from withholding Byrne JAG funds from San Francisco because of Section 1373.  San Francisco further requests that this Court enjoin Defendants from enforcing the Notice, Access, and Section 1373 Requirements.

## MEMORANDUM OF POINTS AND AUTHORITIES
## INTRODUCTION

The Trump Administration has made no secret of its plans to target undocumented immigrants living in the United States—even those families and workers who have lived here for years as productive community members—and to undo any state or local policies that protect their rights.  A central aspect of that plan is at the heart of this case: carrying out President Trump's threat to cut off federal funding from so-called sanctuary cities and states, which have laws and policies in place that

restrict their employees from enforcing federal immigration law. The Administration's purpose is to try to coerce those jurisdictions to abandon their sanctuary laws and policies.

At first, the Administration attempted to act by executive fiat. President Trump signed an executive order within days of taking office that directed the Attorney General and Secretary of Homeland Security to withdraw all federal funding from sanctuary jurisdictions, like San Francisco. Despite the Attorney General's later efforts to narrowly interpret the executive order, this Court declared its unprecedented arrogation of power to the Executive unconstitutional.

Soon after, the Department of Justice ("DOJ") took a different approach, announcing the imposition of new requirements on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, which provides criminal justice funding to local jurisdictions. Those requirements demand that jurisdictions provide federal immigration officials with unfettered access to immigrants held in their custody, give federal authorities notice of individuals' release dates from custody, and allow their employees to share vast swaths of sensitive information—ranging from age to date of birth to home address—with immigration agents. These requirements undermine San Francisco's considered judgment that its employees should not serve as an extension of federal immigration authorities, because doing so would jeopardize San Francisco's efforts to build community trust, ensure the reporting of crimes, and promote the use of City services.

DOJ's new requirements are unlawful and should be enjoined. They violate the separation of powers because Congress did not authorize the Attorney General to impose them. In particular, Congress could not have authorized DOJ to impose the requirement that DOJ has linked to a federal law—8 U.S.C. § 1373 ("Section 1373")—because that requirement is unconstitutional in light of the Supreme Court's recent decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). And even if the Attorney General had the power to add conditions to Byrne JAG grants, these particular requirements would violate the Spending Clause because they are ambiguous and unrelated to the purpose of the grant program. Once again, the Executive Branch is attempting to arrogate to itself powers that the Constitution denies it. Once again, this Court should declare these efforts unconstitutional and permanently enjoin them.

And even if the Attorney General had the power to require local jurisdictions to allow their employees to share immigration status information with immigration officials pursuant to Section 1373, it could not use that requirement to deny Byrne JAG funds to San Francisco. DOJ's burgeoning and boundless interpretation of Section 1373 is incorrect and has been rejected by numerous courts. This Court should do the same. San Francisco's laws and policies comply with the proper interpretation of Section 1373.

San Francisco's sanctuary laws reflect its considered judgment that limiting involvement in federal immigration enforcement promotes public health, safety, and the general welfare. These matters of local concern lie at the heart of the police power. San Francisco is entitled to a declaration that its sanctuary laws comply with Section 1373 and to an injunction prohibiting DOJ from denying it Byrne JAG funds on this basis.

## FACTS

### I.    San Francisco's Sanctuary City Laws And Relevant Policies

San Francisco has been a Sanctuary City since 1989, when it enacted ordinances ("Sanctuary City laws") in response to a wave of refugees fleeing violence in their home countries. San Francisco's current Sanctuary City laws, codified in Chapters 12H and 12I of the San Francisco Administrative Code (Request for Judicial Notice ("RJN") Exh. A), continue to reflect San Francisco's commitment to ensure the public safety and welfare, while declining to use municipal resources to enforce federal immigration laws.

As relevant here, Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by federal or state law. Further, Chapter 12I prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual involved meets certain criteria. *See* S.F. Admin. Code § 12I.3(c), (d), (e) (RJN Exh. A). San Francisco's law enforcement departments have policies implementing these laws. Declaration of Sheriff Vicki Hennessy (San Francisco

Sheriff's Department) (hereafter "Hennessy Decl.") ¶¶ 11, 17-18; Declaration of Chief Karen Fletcher (San Francisco Adult Probation Department) (hereafter "Fletcher Decl.") ¶¶ 6-7; Declaration of Assistant Chief Hector Sainez (San Francisco Police Department) (hereafter "Sainez Decl.") ¶¶ 9-11.

The San Francisco Sheriff's Department also has policies regarding access to jails for Immigration and Customs Enforcement ("ICE") officials enforcing the civil immigration laws. Specifically, Sheriff's Department employees are not authorized to provide ICE agency representatives, or other individuals conducting civil immigration enforcement, access to inmates in jail, access to SFSD computers, databases and logs, release dates and times for inmates, and home or work contact information.  ICE requests for assistance with criminal investigations are directed to the Sheriff, who directs any assistance to ICE agents as she deems appropriate.  Hennessy Decl. ¶¶ 17-18, Exh. D.

## II.     The Byrne JAG Program

The Byrne JAG program is "the leading source of federal justice funding to state and local jurisdictions."  Office of Justice Programs, *Welcome to BJA's Edward Byrne Memorial Assistance Grant (JAG) Program*, https://www.bja.gov/jag/ (last visited July 9, 2018).  The program provides state and local governments with "critical funding necessary to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, . . . crime victim and witness initiatives and mental health programs."  *Id.*

The Byrne JAG program is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed metric.  The Bureau of Justice Assistance ("BJA")—a department within the Office of Justice Programs ("OJP")—administers this formula in awarding federal dollars. *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government" funds consistent with the established formula) (emphasis added).  The formula for state allocations is a function of population and violent crime.  *Id.* § 10156(d).[1]  For local governments, the allocation is a function of the state's allocation and the ratio of violent crime in the

---

[1] States are obligated to pass a certain percentage of the Byrne JAG funding they receive to local governments within the state.  *Id.* § 10156(c)(2).

1   locality to violent crime in the state.  *Id.*  Award recipients are entitled to their share of the formula

2   allocation as long as their proposed programs satisfy one of eight statutory purpose areas,[2] and meet

3   certain other administrative requirements.  *See id.* § 10153(a)(2) & (a)(5)(A)–(C) (applicants must

4   supply information about their intended use of grant funding); *id.* § 10153(a)(4) (applicants must

5   provide information demonstrating financial integrity); *id.* § 10153(a)(5)(D) (Attorney General may

6   require that localities certify that they "will comply with all provisions of this part and all other

7   applicable Federal laws").

8   **III.   San Francisco's Use Of Byrne JAG Funds**

9          Byrne JAG funding provides support for some of San Francisco's critical public safety and

10  criminal justice programs.  San Francisco's Department of Children, Youth and their Families

11  ("DCYF") applies for local Byrne JAG funds and state pass-through funds on behalf of the City, and

12  administers those funds to recipient City departments.  Declaration of Leo Chyi (hereafter "Chyi

13  Decl.") ¶¶ 5, 14.  DCYF has been awarded Byrne JAG funds for over a decade and applied for these

14  funds again for the 2017 fiscal year. *Id.* ¶ 4.  DCYF keeps a portion of the grant and administers grant

15  funds to several City departments. *Id.* ¶¶ 5, 14.  For FY 2017, San Francisco is entitled to a direct

16  Byrne JAG grant in the amount of $524,845. *Id.* ¶ 16.  San Francisco also expects to receive a state

17  pass-through of Byrne JAG funds in the approximate amount of $923,401. *Id.* ¶ 7.  As of the date of

18  this filing, San Francisco is not aware of any action that DOJ has taken on its FY 2017 Byrne JAG

19  application. *Id.* ¶ 25.  San Francisco understands that DOJ has awarded FY 2017 Byrne JAG grants to

20  "jurisdictions that share the Department's commitment to keeping criminal aliens off our streets and

21  our law abiding citizens safe," while stating that "[r]eviews of some applications remain ongoing."

22  RJN Exh. B.  There is no regulatory authority for DOJ to award grants immediately to favored

23  jurisdictions and to conduct "reviews" of unspecified nature and duration for disfavored jurisdictions.

24         Consistent with the Byrne JAG statute, San Francisco uses Byrne JAG funding to support

25  critical law enforcement programs designed to reduce criminal behavior and improve public safety by

26  _____

27  [2] The eight purpose areas are: (1) law enforcement, (2) prosecution and courts, (3) prevention
    and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation,
    and technology improvement, (7) crime victim and witness programs, and (8) mental health programs.
28  34 U.S.C. § 10152(a)(1)(A)-(H).

targeting particularly acute local problems.  Many of these programs are aimed at reducing the drug trade and recidivism among repeat offenders, and at connecting individuals with substance and mental health problems to appropriate services.  Chyi Decl. ¶¶ 10, 17.  For example, San Francisco uses Byrne JAG funds to fund a path-breaking Young Adult Court that provides case management and other support for eligible young adult offenders from high-risk backgrounds.  *Id.* ¶ 11.  The pioneering program works to prevent at-risk youth from entering a "lifelong entanglement with the criminal justice system," and has been heralded as a "model" program for addressing the unique needs of youth offenders.[3]

The City's Byrne JAG-funded programs span six departments, and approximately ten full-time equivalent positions for these programs are funded with Byrne JAG funds.  Chyi Decl. ¶ 18.  Without Byrne JAG funds, San Francisco would be forced to reduce or eliminate these programs—and staff positions—unless it cut other programs and redirected funding or found new funding.  *Id.* ¶ 19.  Loss of this funding would compromise some of San Francisco's important criminal justice initiatives.  *Id.* ¶¶ 10, 17–19.

## IV.     DOJ's Newly Announced Requirements For Byrne JAG Funding

### A.      Section 1373 Requirement

In July and August 2017, OJP posted the State and Local Solicitations for the FY 2017 Byrne JAG grants.  Declaration of Mollie M. Lee (hereafter "Lee Decl.")  ¶¶ 3-4, Exhs. A-B.  Those Solicitations informed potential grant recipients that FY 2017 Byrne JAG awards would impose three new Requirements relating to federal immigration law.  DOJ has included specific conditions imposing these Requirements in grants issued to other local jurisdictions, and has stated that these Requirements will be included in all grants awarded for the 2017 fiscal year.  Decl. Alan Hanson ¶ 6, Oct. 31, 2017, Dkt. No. 46-1 ("Hanson Decl.").[4]

---

[3] Tim Requarth, *A California Court for Young Adults Calls on Science*, N.Y. Times (Apr. 17, 2017), https://www.nytimes.com/2017/04/17/health/young-adult-court-san-francisco-california-neuroscience.html.

[4] DOJ has made clear that it intends to apply similar conditions to a number of other grants, such as the State Criminal Alien Assistance Program and a number of DOJ "public safety" grants.  *See* RJN Exh. F (SCAAP application, available at https://www.bja.gov/Funding/17SCAAP_Program_Requirements.pdf), E (DOJ June 28, 2018 press release).

The first requirement concerns Section 1373 (the "Section 1373 Requirement").  It mandates that an applicant's Chief Legal Officer—in San Francisco's case, City Attorney Dennis Herrera—execute a Certification of Compliance with Section 1373 under penalty of perjury ("Section 1373 Certification").  The Section 1373 Certification requires the City Attorney to certify, under penalty of perjury that, with respect to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect, purport to have in effect, or is subject to or bound by "any prohibition or any restriction . . . that deals with either (1) a government entity or –official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or –agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b)."  Lee Decl. ¶ 4, Exh. B at 38.  The Section 1373 Certification further requires that the City Attorney acknowledge that a "materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact)" in the Certification will potentially subject him to criminal prosecution, and San Francisco to civil and administrative penalties for false claims.  *Id.* at 9.

DOJ has asserted this Certification is wide-sweeping.  Jurisdictions may not execute the Section 1373 Certification based on a good-faith belief that their laws comply with Section 1373.  (Lee Decl. ¶ 5, Exh. C at 14:8–14, 29:16–19).  Rather, DOJ has made plain its view that the Chief Legal Officer's execution of the Certification will amount to an endorsement of DOJ's views on Section 1373.  *Id.*; *see also* Lee Decl. ¶ 6, Exh. D (Defs.' Resp. to San Francisco's Req. for Admis. ("RFA") No. 16) (admitting that "Defendants take the position that the Section 1373 Certification requires jurisdictions to adopt the federal government's interpretation of what information is 'information regarding . . . immigration status' under Section 1373").

### B.    Notice And Access Requirements

The grant award documents also include two other requirements related to federal immigration enforcement.  The "Access Requirement" demands that San Francisco provide federal immigration officials unfettered physical access to local detention facilities to interrogate any suspected aliens held there.  DOJ describes the Requirement as mandating that recipients have in place a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that agents of the United States . . .

are given access [to] a local-government correctional facility" to meet with individuals believed to be aliens and question them.  Lee Decl. ¶ 7, Exh. E at ¶¶ 55, 56.  The "Notice Requirement" directs San Francisco to provide DHS with 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody.  DOJ has stated that, to comply with this Requirement, grant recipients must have in place a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that, when a local-government… correctional facility receives from DHS a formal written request . . . [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . provide the requested notice to DHS."  *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  If a court finds that there is no genuine dispute of material fact as to a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

## ARGUMENT

**I.    San Francisco Is Entitled To Summary Judgment On Its Claims That The Three Requirements Are Unlawful.**

**A.    The Three Requirements Violate The Separation Of Powers Because They Are Not Authorized By Congress.**

By requiring Byrne JAG recipients to comply with the Notice, Access, and Section 1373 Requirements (collectively, the "Challenged Requirements" or "Requirements") as a prerequisite for receiving grant funds, the Attorney General has violated fundamental separation of powers principles.  The Constitution grants *Congress*—not the Executive Branch—the power to impose conditions on federal funds.  *See* U.S. Const. art. I, § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  The Executive Branch, therefore, "does not have unilateral authority to refuse to spend . . . funds" that have been appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).  But the Challenged Requirements seek to do precisely this.  As every court to have considered these Requirements has found, the Attorney General's attempt

to impose them "strikes at one of the bedrock principles of our nation . . . —the separation of powers." *City of Chicago v. Sessions*, 888 F.3d 272, 276 (7th Cir. 2018) (invalidating Notice and Access Requirements; *see also City of Philadelphia v. Sessions*, No. CV 17-3894, 2018 WL 2725503, at *25 (E.D. Pa. 2018) (striking down all three Requirements); *cf. City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1098 (C.D. Cal. 2018) (striking down as *ultra vires* similar conditions imposed on grants funded by the Community Oriented Policing Services Office).

>  **1.      The Byrne JAG Statute Does Not Authorize The Attorney General To Impose The Challenged Requirements.**
>
>  **a.      The Byrne JAG Program Is Structured As A Formula Grant With Statutorily Defined Criteria.**

Congress's decision to structure the Byrne JAG program as a formula grant is irreconcilable with the Attorney General's position that he is authorized to invent new, substantive requirements for grant recipients.  Unlike discretionary grants, which allow federal agencies to exercise discretion over the award of federal funds,[5] formula grants specify the amount of funding recipients must receive under a statutorily prescribed framework.  *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive.").

Byrne JAG is structured precisely along these lines.  The Attorney General is directed to allocate specified portions of the Byrne JAG appropriation to the States and local governments.  34 U.S.C. § 10156(a), (b) (providing that the Attorney General "shall" allocate appropriated Byrne JAG funds in the prescribed manner).  The formula also mandates the amount of funding each recipient is to receive.  *Id.* § 10156(a), (d).  The Attorney General's assertion of discretion to impose new grant requirements like those here is impossible to square with the formula grant structure.  Congress has already said which jurisdictions "shall" receive Byrne JAG funding: any jurisdiction that satisfies the formula grant's requirements.  *See City of Chicago*, 888 F.3d at 283–84.

---

[5] *See, e.g.*, 20 U.S.C. § 10006(b) (education grant program) ("The Secretary shall determine which States receive grants under this section, and the amount of those grants, on the basis of information provided in State applications . . . and other such criteria as the Secretary determines appropriate . . . .").

Although Congress provided the Attorney General limited discretion to reserve portions of the congressional appropriation in certain circumstances, 34 U.S.C. § 10157(b),[6] the Attorney General has no authority to withhold all grant funding from a jurisdiction or to adjust the amount of grant funding a state or local government is entitled to receive.  Instead, state and local governments are entitled to their share of the Byrne JAG formula allocation as long as their proposed programs fall within the statute's enumerated goals, *see id.* § 10152(a)(1)(A)–(H), and their application is complete, *see id.* § 10153(a).  Critically, DOJ acknowledged as much recently, when then-Assistant Attorney General Peter Kadzik wrote a letter to Senator Richard Shelby regarding the Senator's request that DOJ key federal grant funding to federal immigration priorities.  Lee Decl. ¶ 8, Exh. F.  Kadzik stated that DOJ could not do so because "many Department grant funds are formula based" such that "the Department does not have the discretion to suspend funding at all."  *Id.*

> **b.** **The Byrne JAG Statute Contains No Language Authorizing The Attorney General To Impose Additional Requirements.**

The statutory language confirms that the Attorney General lacks authority to impose grant conditions of his choice on Byrne JAG funds.

Specifically, the statutory text shows that Congress intended the Attorney General to have only limited, ministerial powers in carrying out the Byrne JAG program.  For instance, the Attorney General has the authority to determine the "form" of the application, while the statute delimits the application requirements—assurances, certifications, and so forth—that Byrne JAG applicants must satisfy.  34 U.S.C. § 10153(a).  Similarly, Congress allows the Attorney General to exercise limited oversight of an applicant's financial status to ensure that it remains financially sound.  *Id.* § 10153(a)(4).  Also, the Attorney General has limited powers over certain defined aspects of grant administration: the ability to waive the requirement that a program receiving grant funds submit "a program assessment component," *id.* § 10152(c)(1)–(2); the authority to determine that "extraordinary and exigent circumstances exist" that allow recipients to use funds in ways that would ordinarily be

---

[6] This provision states: "Of the total amount made available to carry out this part for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government) to address, for instance, "extraordinary increases in crime."

prohibited, *id.* § 10152(d)(2); and the discretion to issue renewals and extensions for the typical four-year period for Byrne JAG grants, *id.* § 10152(f).  None of these ministerial powers include the authority to impose substantive requirements of the Attorney General's own creation.

The absence of such authorizing language is particularly stark given that Congress has shown that it knows how to delegate the discretion to impose conditions on federal grants, when it chooses to do so.  For instance, the same statute that authorizes Byrne JAG funding, the Omnibus Crime Control and Safe Streets Act of 1968, also authorizes funding under the Violence Against Women Act that permits the Attorney General to "impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements."  34 U.S.C. § 10446(e)(3); *see also id.* § 10142 (authorizing the Bureau of Justice Assistance to award certain discretionary grants "on terms and conditions determined by the Director").  Similar language appears in various other federal grant programs.  *See, e.g.*, 42 U.S.C. § 10305(a)(2) (providing that the Secretary "may establish any condition" on water-technology grant funds "which the Secretary considers to be in the best interest of the Nation"); 25 U.S.C. § 1652(b) (giving the Secretary authority to "include such conditions" on grant funds to "urban Indian organizations" as "the Secretary considers necessary"); 42 U.S.C. § 1769e(b) (providing that grant funds to combat childhood hunger shall be awarded "[u]nder such terms and conditions as are established by the Secretary").

Likewise, Congress knows how to impose penalties on Byrne JAG recipients to create incentives related to other federal priorities.  For instance, jurisdictions that fail to satisfactorily implement the federal Sex Offender Registration and Notification Act ("SORNA") or the Death in Custody Act are subject to a 10-percent withholding of their Byrne JAG funds.  34 U.S.C. § 20927(a); *see also id.* § 60105(e)(2) (imposing a similar penalty on states that do not comply with the Death in Custody Reporting Act).  Similarly, states that fail to certify compliance with Prison Rape Elimination Standards may be subject to a 5-percent reduction in grant funding.  *Id.* § 30307(e)(2).

The only reasonable conclusion to draw from the absence of similar language regarding federal immigration priorities is that Congress did not intend to give the Attorney General these powers.  *See, e.g.*, *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 439–40 (2002) ("[I]t is a general principle of statutory construction that when one statutory section includes particular language that is omitted in

another section of the same Act, it is presumed that Congress acted intentionally and purposely."); *United States v. Youssef*, 547 F.3d 1090, 1094–95 (9th Cir. 2008) (holding that Congress's "omission" of a term, combined with its inclusion of that term "in a similar statutory provision, is evidence of Congress's expressed intent"). Indeed, Congress has consistently rejected legislation that would link Byrne JAG funding to compliance with federal immigration priorities. *See, e.g.*, Stop Sanctuary Cities Act, S. 1814, 114 Cong. § 2(b)(2) (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015).

### c.   The "Applicable Federal Laws" Provision Does Not Authorize The Section 1373 Requirement.

The Attorney General has argued that general statutory language allowing DOJ to require applicants to certify compliance with "all other applicable Federal laws" (*see* 34 U.S.C. § 10153(a)(5)(D)) authorizes the Attorney General to impose the Section 1373 Requirement (the only one of the three Challenged Requirements that is purportedly linked to any existing federal statute). Section 1373 could not be an "applicable" federal law because it is unconstitutional in light of the Supreme Court's recent *Murphy* decision. 138 S. Ct. at 1481. And even putting that decision aside, both the statutory text and legislative history make clear that "applicable federal laws" include only those federal laws related to the grant-making process. Section 1373 has nothing to do with that process.

### i.   Section 1373 Is Not An "Applicable Law" Because It Is Unconstitutional Under *Murphy*.

Section 1373 is not—indeed, cannot be—an "applicable federal law" under Section 10153(a)(5)(D) because it is unconstitutional under the anticommandeering doctrine. Section 1373 is "a direct command to the States. And that is exactly what the anticommandeering rule does not allow." *Murphy*, 138 S. Ct. 1461, 1481 (2018). An unconstitutional law cannot be "applicable" either to San Francisco or to Byrne JAG awards. *See City of Philadelphia*, 2018 WL 2725503, at *32–*33 ("Because the JAG Byrne Program requires compliance with an unconstitutional statute (in this case, Section 1373) in order to receive grant funds, the Certification Condition is itself unconstitutional."); *see also United States v. California*, No. 2:18-cv-00490, Dkt. No. 193 at 35–36 (E.D. Cal. July 5, 2018) ("The Court finds the constitutionality of Section 1373 highly suspect.").

The anticommandeering rule flatly forbids federal laws where "the whole *object* . . . is to direct the functioning" of state governments. *Printz v. United States*, 521 U.S. 898, 932 (1997). Yet that is

exactly what Section 1373 does.  By its terms, Section 1373(a) targets only "Federal, State, or local government entit[ies] or official[s]."  And as its title indicates, Section 1373 is exclusively directed at "[c]ommunication between government agencies and the Immigration and Naturalization Service."  There is simply no way to read Section 1373 as an instance "when Congress evenhandedly regulates an activity in which both States and private actors engage."  *Murphy*, 138 S. Ct. at 1478.  Further, the commandeering inherent in Section 1373(a) is especially grave because it targets an authority basic to how a government functions—the authority to control its own officials.  *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) ("[A] State 'can act only through its officers and agents.'").

Section 1373 violates each of the tenets of the anticommandeering rule.  First, Section 1373 entangles state and local government officials in federal immigration enforcement, with the inevitable effect of "blurr[ing]" "responsibility for the benefits and the burdens of the regulation."  *Murphy*, 138 S. Ct. at 1477.  Because Section 1373 requires San Francisco to allow its employees to administer federal policies, residents of San Francisco will understandably hold local government officials accountable for local officials' enforcement of those federal policies.  *See Printz*, 521 U.S. at 930 (commandeering occurs when local governments are "put in the position of taking the blame for [a federal policy's] burdensomeness and for its defects").  This is not an abstract concern.  Section 1373 directly undermines one of the central purposes of San Francisco's sanctuary laws, which is to ensure that there are clear lines between federal immigration enforcement and local law enforcement.  *See* Fletcher Decl. ¶ 10; *see also* p. 3, *supra*.  "[B]y leaving it up to local officials whether to assist in enforcement of federal immigration priorities, the statute may effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program."  *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 949 (N.D. Ill. 2017), *aff'd by City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018).

Second, Section 1373 "shift[s] the costs of regulation to the States."  *Murphy*, 138 S. Ct. at 1477.  Section 1373 requires local jurisdictions to allow their employees to spend their time—and thus, local resources—communicating with federal immigration officials.  This is precisely what the anticommandeering doctrine forbids, in part because it allows Congress to shirk its duty to "weigh the expected benefits of the program against its costs."  *Murphy*, 138 S. Ct. at 1477; *see also Printz*, 521

U.S. at 930 ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes.").

Finally, by blurring the distinction between federal and state government, and by forcing states to help administer federal programs, Section 1373 contravenes the "fundamental structural decision incorporated into the constitution" that liberty is best served by a government of "dual sovereignty." *Murphy*, 138 S. Ct. at 1475 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). As a result of Section 1373, the activities of federal immigration agents, and state and local law enforcement, become inextricably intertwined. *See United States v. California*, Dkt. No. 193 at 50 ("Under such a regime, federal priorities dictate state action, which affects the State's relationship with its constituency and that constituency's perception of its state government and law enforcement.") This reality removes structural checks on federal activity—the need to fund federal programs and the need to answer to the electorate for the actions of federal officials—that are necessary to protect against "tyranny and abuse." *Id.* at 1477.

Because Section 1373 violates each of the interests the anticommandeering doctrine protects, it violates the Tenth Amendment of the Constitution. *City of Philadelphia*, 2018 WL 2725503, at *32. It is therefore not an "applicable" law to the Byrne JAG program. If applicable means anything, it must—at a minimum—mean constitutional.

### ii.    The Byrne JAG Statute's Text and Background Shows That "Applicable" Has A Narrow Meaning.

In any case, DOJ's interpretation of "all applicable Federal laws" as embracing Section 1373 fails on its own terms. First, DOJ's argument conflicts with the statutory context. A statutory term is given meaning "by the company it keeps." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015). All of the other conditions listed in Section 10153(a) apply solely to the grant itself. *See* pp. 5, 10, *supra*. None imposes a condition that goes beyond the context of grant administration. Defining "applicable" as including only those laws related to grant administration is consistent with those terms.

Second, "applicable" must be read as placing some limit on the universe of federal laws with which DOJ may require applicants to certify compliance. The canon against superfluity counsels

against an interpretation that renders some statutory terms unnecessary. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011).  If "all applicable Federal laws" means "all Federal laws," then the word "applicable" has no function.  And it would create additional superfluity problems.  If DOJ has the authority to withhold *all* Byrne JAG funding for a grant recipient's failure to comply with *any* federal law, then there would be no need for the specific—and limited—penalties imposed on jurisdictions that violate *particular* federal laws like SORNA and the Prison Rape Elimination Act.  By contrast, construing "applicable" as limited to those federal laws that relate to grant administration or that by their own terms apply to federal grant recipients avoids these difficulties.

Finally, this interpretation is consistent with DOJ's own longstanding practice, which has been to construe all "applicable" laws as limited to the universe of federal statutes that, by their terms, impose conditions on federal grant funds.  *City of Chicago*, 264 F. Supp. 3d at 945.  Consistent with that view, DOJ's current certification form, *see* Dep't of Justice, Certified Standard Assurances, OMB No. 1121-0140, expires May 31, 2019, https://ojp.gov/funding/Apply/Resources/StandardAssurances.pdf (RJN Ex. C) asks grant applicants to certify compliance with "all federal statutes and regulations," but makes clear that this refers to federal laws that are "applicable to the award," not the applicant, *id.* § 3(a).

### 2. A Federal Statute Creating The Office Of The Assistant Attorney General Overseeing OJP Does Not Give The Attorney General Authority To Impose The Challenged Requirements.

Because the Byrne JAG statute does not authorize the Challenged Requirements, Defendants have argued that a provision from an entirely different, separate statutory subchapter authorizes the three Requirements.  That statute—34 U.S.C. § 10102(a) ("Section 10102(a)")—contains language referring to the Assistant Attorney General's ("AAG") exercise of various powers, including "placing special conditions on all grants."  But this reference does not provide the power the Attorney General claims, as multiple courts have already concluded for the Notice and Access Requirements. *See City of Chicago*, 888 F.3d at 287; *City of Philadelphia*, 2018 WL 2725503, at *25.

### a. Section 10102(a) Does Not Give The Attorney General The Authority To Impose The Challenged Requirements.

Section 10102(a)'s text and structure make clear that this provision cannot bear the weight the

Attorney General places upon it.  The language on which DOJ relies appears in a statutory provision describing the powers that the AAG overseeing OJP shall exercise.  In total, Section 10102(a) provides that the AAG shall exercise certain "specific, general, and delegated powers":

> The Assistant Attorney General shall—
>
> > (1) publish and disseminate information on the conditions and progress of the criminal justice systems;
> >
> > (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;
> >
> > (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;
> >
> > (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;
> >
> > (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency prevention; and
> >
> > (6) exercise such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants*, and determining priority purposes for formula grants.

34 U.S.C. § 10102(a) (emphasis added).

Section 10102(a)(6)'s reference to the AAG's ability to place special conditions on grants is not itself a grant of authority.  Rather, the provision allows the AAG to exercise other powers "as may be vested" in him or her through another source, namely, "pursuant to this chapter or by delegation of the Attorney General."  *Id.*  Some other statutory authority must exist for the powers in question.  *See City of Chicago*, 888 F.3d at 285 (the "plain meaning" of subsection 6 is to "set forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in [him] either by the terms of this chapter or by delegation of the Attorney General").

This much is clear when subsection (6) is viewed in comparison to the other enumerated provisions in Section 10102.  Each of the other references to the AAG's powers is an express directive: the AAG shall "publish and disseminate information," *id.* § 10102(a)(1); "maintain liaison with the executive and judicial branches," *id.* § 10102(a)(2); provide information to the President, *id.* § 10102(a)(3); and so forth.  None of the other enumerated provisions uses the "may be vested" language that subsection (6) does.  This contrast illustrates that subsection (6) is a "catch-all

provision" that does not itself create any authority for the AAG, or the Attorney General, to exercise. *See City of Chicago*, 888 F.3d at 285.  And in any case, "a clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it." *Id.*

**b.  Even If Section 10102 Were A Grant Of Authority, It Would Not Authorize The Challenged Requirements.**

Even if Section 10102 did give the Attorney General some measure of authority, that authority would still not allow the Attorney General to impose the Challenged Requirements, because those Requirements are not "special conditions."

"Special conditions" has a particular meaning that does not encompass the Challenged Requirements.  According to a DOJ regulation in place when Congress amended Section 10102(a)—then codified as 42 U.S.C. § 3712—the agency could impose "special grant or subgrant conditions" on "high-risk grantees" if the grant applicant had, for instance, a history of poor grant performance, was financially unstable, had violated the terms of a previous grant award, or was "not otherwise responsible."  28 C.F.R. § 66.12 (removed Dec. 25, 2014).  In these circumstances, the agency could impose certain types of award conditions—like "additional project monitoring"—that would mitigate the risk that the recipient will fail to successfully use its grant funding.  *Id.* § 66.12(b).[7]  Those "special conditions" bear no similarities to the Challenged Requirements.  These conditions do not encompass broader requirements borne from the Attorney General's policy agenda, which are designed to coerce sanctuary cities to abandon their considered policy judgments.

**B.  The Three Requirements Violate The Spending Clause.**

Even if the Attorney General had the power to impose substantive conditions on Byrne JAG funds, he has violated the Constitution by imposing requirements that exceed constitutional limits on the spending power.  Congress's spending power is not unlimited.  *Dole*, 483 U.S. 203, 207–08 (1987).  Rather, the Constitution provides that federal funding conditions must, among other things,

---

[7] Although OMB has amended the regulations governing "special conditions" to now refer to these conditions as "specific conditions," the definition of those conditions remains largely unchanged. *See* 2 C.F.R. § 200.207; 2 C.F.R. § 2800.101.

(1) be unambiguous and (2) relate to Congress's purpose in authorizing the funds. *Id.* The Challenged Requirements violate both of these limitations.

### 1.     The Challenged Requirements Are Ambiguous

The Challenged Requirements are unconstitutional because they violate the Spending Clause's prohibition on ambiguous funding conditions. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); see also *Dole*, 483 U.S. at 203. This is because "legislation enacted pursuant to the spending power is much in the nature of a contract." *Pennhurst*, 451 U.S. at 17. Congress's exercise of the spending power in that "contract" is invalid unless the "State voluntarily and knowingly accepts [its] terms." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012). Grant recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). All of the Attorney General's new Requirements fail this test.[8]

### a.     The Section 1373 Requirement Is Ambiguous.

The Attorney General's vacillating positions regarding Section 1373 make it impossible for San Francisco to understand what the Section 1373 Requirement demands. Over the past several years, DOJ has made conflicting statements about Section 1373 and offered conflicting views regarding whether San Francisco's laws comply with that provision. In 2007, for instance, DOJ's Office of Inspector General evaluated jurisdictions' compliance with Section 1373, including San Francisco's. Lee Decl. ¶ 9, Exh. G. The report concluded that San Francisco's laws comply with Section 1373 because they contain a savings clause allowing the dissemination of immigration status information when federal law requires it. *Id.* at 24. But more recently, DOJ has taken precisely the opposite view, and has asserted that San Francisco's Sanctuary City laws violate Section 1373

---

[8] San Francisco's First Amended Complaint alleged that the Notice and Access Requirements violate the Spending Clause because they would induce Byrne JAG recipients to engage in unconstitutional conduct by detaining individuals without probable cause. Dkt. No. 61 ¶ 192. Defendants have now taken the position that the Notice or Access Requirements do not require Byrne JAG recipients to maintain an individual in custody beyond the date and time the individual would have otherwise been released. Lee Decl. ¶ 7, Exh. E at ¶ 55. Accordingly, San Francisco no longer argues that the Notice and Access Requirements violate the Spending Clause for this reason.

notwithstanding the use of the same savings clause.  *See* Lee Decl. ¶ 10, Exh. H at 5–6 n. 7; *see also* Lee Decl. ¶ 6, Exh. D (RFA No. 1).  These conflicting communications create significant ambiguity for San Francisco regarding the Section 1373 Requirement.  Indeed, around the same time, DOJ officials internally acknowledged that grant recipients had not been provided "clear directions" or specific guidance "on the requirements of Section 1373."  Lee Decl. ¶ 11, Exh. I.

This uncertainty is compounded by DOJ's burgeoning interpretation of what information Section 1373 requires jurisdictions to allow their employees to share with the federal government.  In the span of mere months, DOJ has broadened its understanding of "information related to immigration status" on multiple occasions.  In September 2017, when opposing San Francisco's Motion for Summary Judgment in the related case of *City and Cty. of San Francisco v. Trump*, No. 3:17-485-WHO ("*San Francisco v. Trump*"), DOJ incorrectly argued that San Francisco's laws violate Section 1373 because they might discourage or restrict employees from sharing immigration status information.  Dkt. No. 172 at 14–15 (N.D. Cal. Sept. 27, 2017).  But other than suggesting that some "information requested in a detainer may be covered by Section 1373," DOJ did not suggest at the time that Section 1373 prohibits restrictions on the sharing of information beyond straightforward immigration status.  *Id.* at 12.  And around this same time, DOJ officials evaluated California's laws and concluded that there was "nothing in any provision of California law (including any regulation, rule, or policy) that does, or appears to" violate Section 1373.  Lee Decl. ¶ 12, Exh. J.[9]

Soon after, DOJ changed its tune.  At the October 23, 2017 hearing on San Francisco's Motion for Summary Judgment in *San Francisco v. Trump*, counsel for DOJ suggested that Section 1373 applies to a wide range of information, including a person's custody status or release date, his or her home address, and residence information, and a person's age.  Lee Decl.  ¶ 13, Exh. K at 17:2-23:6.  DOJ echoed some of these requirements in a November 15, 2017 letter to San Francisco, where it expressed "concern[s]" that San Francisco's Sanctuary City laws violate Section 1373 because they

---

[9] DOJ officials reached this conclusion notwithstanding that California then—as now—had in effect laws that regulate how California law enforcement agencies interact with ICE officials.  *See, e.g.*, Cal. Gov't Code § 7282 *et seq.* (Transparency and Responsibility Using State Tools Act) (as effective January 1, 2014 to December 31, 2017; subsequently amended by Stats.2017, c. 495 (S.B.54), §  2, eff. Jan. 1, 2018); *id.* § 7283 *et seq.* (Transparent Review of Unjust Transfers and Holds Act).

prohibit employees from notifying ICE of a person's custody status or release date.  Lee Decl. ¶ 14, Exh L.

And now, DOJ takes an even broader interpretation of Section 1373.  As the record in this case shows, DOJ claims that a detained alien's release date, as well as any alien's residential address, location information, date of birth, familial status, and contact information are all "information regarding . . . immigration status" under Section 1373.  Lee Decl. ¶ 6, Exh. D (RFA Nos. 9-14).  Indeed, in discovery responses in the related *California v. Sessions* case,[10] DOJ set forth its broadest articulation yet of the meaning of "information regarding . . . immigration status," stating that it protects the exchange of information "that supports federal immigration authorities in performing their duties under the INA, including the responsibilities to determine and track the status of aliens in the United States."  Lee Decl. ¶ 15, Exh. M (Defs.' Resp. and Obj. to Cal. Interrog. ("Cal. Interrog.") No. 18).  This echoes a recent statement that DOJ made to this Court, when it said that Section 1373 prohibits any restrictions that local governments have on the sharing of "information that allows [ICE] to do its job."  Lee Decl. ¶ 5, Exh. C at 30:8-10.

DOJ has not suggested any limiting principle on the information Section 1373 covers.  To the contrary, the evidence in this case shows that DOJ is persistently refusing to commit to a specific interpretation of what Section 1373 covers.  *See* Lee Decl. ¶ 16, Exh. N (Defs.' Resp. and Obj. to First Set of Interrog. No. 6, 10–12) ("Depending on the situation, federal immigration authorities may need other categories of information that would also fall within Section 1373.")  And recently, counsel for DOJ admitted in a different case analyzing Section 1373 that DOJ's definition may be unreasonably broad.  Lee Decl. ¶ 17, Exh. O. at 152:3-22.  Counsel acknowledged that it "may well be true" that DOJ's interpretation would mean that "state and local governments could not prohibit doctors and other medical staff from sending immigration officers health records of individuals who come in for treatment" even though "[t]his interpretation would conflict with numerous federal and state confidentiality laws."  *Id.*

---

[10] *See California ex rel. Becerra v. Sessions*, No. 3-17-cv-4701 ("California v. Sessions").

Statements like this create significant and problematic ambiguity regarding Section 1373's reach.  As a result, it is unlawfully impossible for San Francisco to "ascertain what is expected of it" to comply with the Section 1373 Requirement.  *Pennhurst*, 451 U.S. at 17.

### b.    The Notice And Access Requirements Are Ambiguous.

The Notice and Access Requirements are likewise impermissibly ambiguous.  The Access Requirement is unclear on its face as to whether jurisdictions are required to provide access to inmates in custody only when those inmates consent, or instead whether jurisdictions are required to compel unwilling inmates to meet with ICE.  DOJ has not resolved this question; instead in litigation it has suggested irreconcilable interpretations of this Requirement.

Specifically, in briefing in the City of Philadelphia's case, DOJ claimed that Philadelphia "wishfully identifies a supposed ambiguity about whether the [Access Requirement] requires allowing ICE agents access to visit an inmate even when the inmate has told the facility that the inmate does not consent to an interview.  The answer is yes.  The condition does require access in this scenario, even if the inmate refuses to answer questions."  *City of Philadelphia v. Sessions*, No. 2:17-cv-03894-MMB, Dkt. No. 28, at p. 32 (E.D. Pa. Oct. 12, 2017).  But in briefing in *California v. Sessions*, DOJ stated that "the Department does not understand either the Notice or the Access Condition to forbid a jurisdiction from informing detainees, where required by law, that they may choose not to meet with immigration authorities."  Def.'s Reply Mem. P. & A. in Supp. of their Mot. to Dismiss, at 6, *California v. Sessions*, Dkt. No. 83, (N.D. Cal. Nov. 22, 2017).  It is unlawfully impossible for grant recipients to reconcile these statements.

The Notice Requirement is likewise ambiguous.  The Requirement demands that jurisdictions provide as much advance notice of an individual's release as is "practicable."  Lee Decl. ¶ 7, Exh. E at ¶¶ 55–56.  But the Requirement gives no guidance as to what "practicable" means.  Further, the Requirement refers to an inmate's "scheduled release date and time" but fails to acknowledge that inmates may at times be released with little or no notice.  *Id.*; *see also* Hennessy Decl. ¶ 13.  In these circumstances, San Francisco would have no opportunity to provide DOJ with any advance notice.  The Notice Requirement is ambiguous regarding whether this would be sufficient.

### 2. The Challenged Requirements Are Not Reasonably Related To The Byrne JAG Program's Purpose.

The Challenged Requirements also violate the basic rule that conditions imposed on federal grants must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992). Congress's purpose in creating the Byrne JAG program was to give state and local governments the ability "to use the grants constructively" to combat crime and to further criminal justice policies related to one of the statutorily defined purpose areas. H.R. Rep. 109-233, at 89. Congress made clear that Byrne JAG funds were not part of a "one size fits all" approach to reducing crime. *Id.* Rather, Congress left local jurisdictions free to use Byrne JAG funds as they saw fit as long as their programming related to one of eight purpose areas related to criminal justice. 34 U.S.C. § 10152 (a)(1)(A)–(H). None of these purpose areas are related to federal immigration enforcement. As another court has already found, "the federal interest in enforcing immigration laws falls outside the scope of the Byrne JAG program." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 642 (E.D. Pa. 2017).

## II. San Francisco Is Entitled To Declaratory Relief Regarding Section 1373.

But even if the Section 1373 Requirement were lawful, DOJ should not be permitted to withhold Byrne JAG funding from San Francisco on Section 1373-related grounds. San Francisco's Sanctuary City laws do not "prohibit, or in any way restrict" any San Francisco department or officials from sharing immigration status or citizenship information with the federal government, consistent with Section 1373. And none of the departments administering a Byrne JAG-funded program have in place "any prohibition or any restriction" on the sending or receiving of immigration status information with the federal government. Lee Decl. ¶ 4, Exh. B at 38.

### A. Section 1373 Only Concerns Limits On Sharing Citizenship And Immigration Status Information.

#### 1. Section 1373's Plain Text Reaches Only Citizenship And Immigration Status.

To determine the meaning of a statute, a court must "look first to its language, giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). Here, Section 1373 refers to information about an individual's "citizenship or immigration status," and the ordinary meaning of these words does not

include home address, work address, release date, or any of the other information DOJ has claimed

falls within this category.  *See* pp. 19-20, *supra*.

The plain text of Section 1373 requires that San Francisco "not prohibit, or in any way restrict"

any of its departments or officials from "sending to, or receiving from, the Immigration and

Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful,

of any individual," 8 U.S.C. § 1373(a), "maintaining such information," *id.* § 1373(b), or "exchanging

such information with any other Federal, State, or local government entity," *id.*   For purposes of the

Byrne JAG award, the Section 1373 Certification concerns only the departments administering a

"program or activity" funded with Byrne JAG dollars.  Lee Decl. ¶ 4, Exh. B at 38.

On its face, this prohibition imposes a significant but narrow obligation: State and local

governments may not restrict government officials from communicating with federal immigration

officials about an individual's citizenship or immigration status, but they may regulate

communications about other types of information.

Every federal court that has construed Section 1373 has uniformly agreed with this

interpretation.  Most recently, in *United States v. California*, the district court held that "the plain

meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e.,

what one's immigration status is) and does not include information like release dates and addresses."

Dkt. No. 193 at 38–39.  Additionally, in *City of Philadelphia v. Sessions*, the district court held that

"Section 1373(a), by its terms, does not require advance notice of an individual's release from

custody."  2018 WL 2725503 at *35.  Instead, the phrase "'citizenship or immigration status,' plainly

means an individual's category of presence in the United States—*e.g.,* undocumented, refugee, lawful

permanent resident, U.S. citizen, etc." and the phrase "'information regarding' includes only

information relevant to that inquiry."  *Id.*  Likewise, another court in this district has held that "no

plausible reading of 'information regarding . . . citizenship or immigration status' encompasses the

release date of an undocumented inmate."  *Steinle v. City and Cty. of San Francisco*, 230 F. Supp. 3d

994, 1015 (N.D. Cal. 2017).  The *Steinle* court found the "plain language of the statute . . . clear on this

point," and noted that Congress could have used more specific language if it had intended to bar "*all*

restriction of communication between local law enforcement and federal immigration authorities, or specifically to bar restrictions of sharing inmates' release dates." *Id.*

Congress is well aware of how to use such broader language. For instance, the same bill that enacted Section 1373 also enacted a statute prohibiting the disclosure of "*any information which relates to an alien* who is the beneficiary of an application for relief under [specific provisions] of the Immigration and Nationality Act." 8 U.S.C. § 1367(a)(2) (emphasis added); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, §§ 384, 642, 110 Stat. 30009-546, 30009-652, 30009-707 (emphasis added). Other provisions of the INA refer to "information regarding the name and address of the alien," 8 U.S.C. § 1360(c)(2), "information concerning the alien's whereabouts and activities," *id.* § 1184(k)(3)(A), and information "about the alien's nationality, circumstances, habits, associations, and activities," *id.* § 1231(a)(3)(C). If Congress wanted Section 1373 to include these types of information, it easily could have used similar language.

### 2.    "Regarding" Does Not Show A Clear Intent To Cover Other Categories Of Information.

Fighting against this plain meaning, DOJ has repeatedly argued that Section 1373's use of the phrase "information regarding . . . immigration status" expands the scope of the statute to include other categories of information that merely relate to immigration status. *See* pp. 19-20, *supra*. As this Court has already noted, if "information regarding . . . immigration status" is read as broadly as DOJ urges, the phrase could cover "everything in a person's life." Lee Decl. ¶ 5, Exh. C at 23:1–2; *see also United States v. California*, Dkt. No. 193 at 39 (DOJ's interpretation of Section 1373 "would know no bounds").

But this is wrong. Section 1373 uses "regarding" to distinguish between *unofficial* immigration status information that may be in the possession of state or local governments, and the *official* immigration status information that federal immigration authorities maintain. This is clear from the contrast between Section 1373 subsections (a) and (b), which are addressed primarily to state and local governments and refer to "information regarding . . . immigration status," and subsection (c),

1    which is addressed to federal immigration authorities and does not use "regarding" but instead speaks

2    directly about "citizenship or immigration status."

3        This difference reflects the unique and paramount role of the federal government as to

4    immigration status information.  State and local governments are not empowered to make immigration

5    status determinations and cannot vouch for the accuracy of citizenship and immigration status

6    information that may be in their possession.  This information might include, for example, an

7    individual's self-report about immigration status, a third party's statement about an individual's

8    immigration status, or copies of immigration or visa documents.  This type of information is not

9    official immigration status, but is necessarily information "regarding" immigration status.  In contrast,

10    subsection (c) applies to information maintained by federal immigration officials, who *do* know

11    individuals' actual citizenship and immigration status.  Congress did not need to use "regarding" in

12    subsection (c) because federal immigration officials possess actual immigration status information, not

13    the unverified information that state and local governments are likely to have in their records.

14        Further, Ninth Circuit precedent squarely forecloses DOJ's broad interpretation of the term

15    "regarding."  In *Roach v. Mail Handlers Benefits Plan*, 298 F.3d 847 (9th Cir. 2002), the Ninth Circuit

16    addressed the meaning of the term "relate to," which DOJ has previously argued is "closely

17    analogous" to "regarding."  Defs.' Mot. to Dismiss, at 16, Jan. 19, 2018, Dkt. No. 66.  *Roach* turned

18    on the proper interpretation of the preemption provision of the Federal Employees Health Benefits Act

19    (FEHBA), which states that the terms of a contract under that act "which relate to the nature,

20    provision, or extent of coverage or benefits" supersede and preempt any state or local law "which

21    relates to health insurance or plans."  298 F.3d at 849.  The Ninth Circuit stated: "[I]n the context of a

22    similarly worded preemption provision in the Employee Retirement Income Security Act (ERISA), the

23    Supreme Court has explained that the words 'relate to' cannot be taken too literally."  *Id.*  The court

24    went on to explain:

25        "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy,
        then for all practical purposes pre-emption would never run its course, for
26        'really, universally, relations stop nowhere.'"  *N.Y. State Conference of Blue
        Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)
27        (quoting H. James, Roderick Hudson xli (New York ed., World's Classics
        1980)).  Instead, "relates to" must be read in the context of the presumption that
28        in fields of traditional state regulation "the historic police powers of the States

[are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 655 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

*Id.* at 849–50.

In *Roach*, the Ninth Circuit followed the Supreme Court's directive that federal statutes should not be interpreted to preempt matters of traditional state control unless that intent is "unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971).

Applying this precedent here requires limiting Section 1373 to information about what a person's citizenship or immigration status is (as opposed to information that would help the federal government *to determine* what it is), because those are the only categories of information that are "unmistakably clear" in the statute. Sanctuary laws like San Francisco's reflect the considered judgment that limiting involvement in federal immigration enforcement promotes public health, safety, and the general welfare. These matters of local concern lie at the heart of the police power. *See, e.g., United States v. Morrison*, 529 U.S. 598, 618 (2000).

DOJ's interpretation of Section 1373 would directly intrude on this power by requiring local jurisdictions to allow the federal government access to significant amounts of sensitive information, in the name of "support[ing] federal immigration authorities in performing their duties under the INA." Lee Decl. ¶ 15, Exh. M (Cal. Interrog. No. 18.) For example, under the Immigration and Nationality Act, individuals are inadmissible and removable from the country if they have a communicable disease or have not received vaccinations against mumps, measles, rubella, polio, tetanus and diptheria toxoids, pertussis, influenza type B and hepatitis B, or other recommended vaccinations. 8 U.S.C. § 1182(a)(1)(A). Thus, under DOJ's interpretation of Section 1373—which DOJ all but confirmed in another hearing, *see* p. 20, *supra*,—state and local governments could not prohibit staff at public hospitals from sending immigration officials health records of individuals who come in for treatment. Similarly, local governments may not be able to prohibit child protective services from sharing information about an individual's family status, or to restrict the treasurer and tax collector from

sharing information about an individual's financial status.  Under the INA, the Attorney General is supposed to consider such information in deciding whether people are likely to become a "public charge," rendering them inadmissible.  *Id.* § 1182(a)(4)(B).

Thus, *Roach* is directly on point: The use of "regarding" in Section 1373 cannot be understood to "extend to the furthest reach of its indeterminacy."  It must be limited to "information strictly pertaining to immigration status" and not information like "an immigrant's release date or home and work addresses."  *United States v. California*, Dkt. No. 193 at 39, 42.

## B.  Section 1373 Must Be Narrowly Construed To Avoid Raising Serious Constitutional Questions.

Even if the Tenth Amendment does not invalidate Section 1373 as a grant condition altogether (*see* pp. 12-14, *supra*), at a minimum it requires that Section 1373 be narrowly construed to apply only to information regarding what a person's citizenship and immigration status is.  This information is largely federal in character.  *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (recognizing that federal laws "provide a full set of standards governing alien registration").  A directive that local government employees may communicate with federal officials about federal information is fundamentally different from a requirement that employees be permitted to share local information with federal officials.

As an example, it is one thing to say that a local government employee must be permitted to communicate with federal authorities about an individual's immigration documents.  It is another to authorize those employees to provide information about an individual's visit to a local public health clinic.  The first directive concerns information that the federal government maintains, and may therefore be treated as a "modest requirement" that does "not infringe the States' sovereign powers." *Murphy*, 138 S. Ct. at 1479.  The second directive, in contrast, "requires [State officials] to provide information that belongs to the State and is available to them only in their official capacity."  *Printz*, 521 U.S. at 932 n.17.

When faced with two possible constructions of a statute, one of which raises "serious constitutional problems," a reviewing court shall adopt the interpretation that poses no such constitutional difficulty.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades*

*Council*, 485 U.S. 568, 575 (1988).  At the very least, Section 1373 would give rise to a substantial

constitutional question if it directed local governments to allow *local* employees to use *local* resources

to share *local* information, all in the service of a federal program.  The Court can avoid this

constitutional quandary by construing Section 1373 to apply only to the information regarding

citizenship and immigration status over which Congress exerts control.  *See Arizona*, 567 U.S. at 401.

### C.     San Francisco's Laws Comply With Section 1373.

The plain text of San Francisco's Sanctuary City laws allows the communications that Section

1373 addresses, when interpreted properly.  Chapter 12H generally forbids use of City resources to

"assist in the enforcement of Federal immigration law" and specifically prohibits using City resources

to "gather or disseminate information regarding release status of individuals or any other such personal

information."  S.F. Admin. Code § 12H.2.  Chapter 12I prohibits responding to civil immigration

detainer requests from federal immigration officials and provides that San Francisco employees may

only respond to requests for notification of release status in certain circumstances.  *Id.* § 12I.3.

These terms comply with Section 1373 because they do not prohibit, or in any way restrict, San

Francisco employees from communicating information regarding citizenship or immigration status.

Nor do they prohibit maintaining this information.  Rather, Chapter 12H restricts San Francisco

employees from "disseminat[ing] information regarding *release status* of any individual *or any other*

*such personal information*" unless required to do so by federal law.  S.F. Admin. Code § 12H.2

(emphases added).[11]  Neither "release status" nor "personal information" is information about

"immigration" or "citizenship status" under Section 1373.[12]  "Release status" refers to whether an

individual is in law enforcement custody—a status unrelated to immigration status.  And "personal

information" means "any confidential, identifying information about an individual, including, but not

---

[11] Chapter 12H's general prohibition against "using City funds or resources to assist in the enforcement of Federal immigration law" does not prohibit employees from sharing immigration information with ICE.  The more specific language about release status and other "personal information" controls over this general language.  *See, e.g., State Dep't of Pub. Health v. Superior Court*, 60 Cal. 4th 940, 960 (2015).

[12] Indeed, San Francisco amended Chapter 12H specifically to delete a prior restriction against sharing immigration status information.  RJN Exh. G.  The San Francisco departments implementing the Sanctuary City laws amended their policies and updated their public statements over the next several months to reflect these changes.  *See, e.g.,* Sainez Decl. ¶ 10, Exh. F.

limited to, home or work contact information, and family emergency contact information." This does not include more general descriptors such as citizenship or immigration status, which cannot be used to identify or contact an individual. *See Yates*, 135 S. Ct. at 1085 (relying "on the principle of *noscitur a sociis*—a word is known by the company it keeps").

Chapter 12I, likewise, does not restrict or prohibit sharing immigration-related information with the federal government. Rather, Chapter 12I is directed to ICE detainer holds and notification requests, and limits the circumstances in which San Francisco officials may respond to these requests. S.F. Admin. Code § 12I.3. But the provision does not prohibit any San Francisco officer or employee from communicating an individual's immigration or citizenship status.

### D. The San Francisco Departments Receiving Byrne JAG Funds Do Not Prohibit Or Restrict The Sharing of Citizenship Or Immigration Status Information.

None of the San Francisco departments administering a Byrne JAG-funded program prohibit or restrict the sharing of citizenship or immigration status information with the federal government. Thus, San Francisco can validly certify compliance with Section 1373, under the terms set forth in the Section 1373 Certification. Lee Decl. ¶ 4, Exh. B at 38.

Evidence from each of the departments receiving Byrne JAG funds shows that this is true. Six San Francisco departments administer programs funded with Byrne JAG dollars: DCYF, Adult Probation, the Sheriff's Department, the San Francisco Police Department, the District Attorney's Office, and the Public Defender's Office. Chyi Decl. ¶¶ 5, 14; Fletcher Decl. ¶¶ 3,9; Hennessy Decl. ¶ 6; Sainez Decl. ¶¶ 4, 11; Declaration of Cristine DeBerry (hereafter "DeBerry Decl.") ¶¶ 3–4; Declaration of Jeff Adachi (hereafter "Adachi Decl.") ¶ 3. Policymaking officials in each department are familiar with Chapters 12H and 12I. Chyi Decl. ¶ 26; Fletcher Decl. ¶ 4; Hennessy Decl. ¶ 7; Sainez Decl. ¶ 5; DeBerry Decl. ¶ 5; Adachi Decl. ¶ 4. Those departments either administer policies that are consistent with those laws (Fletcher Decl. ¶¶ 6-7; Hennessy Decl. ¶¶ 11, 17-18; Sainez Decl. ¶¶ 9-11), or do not have any policies that implicate the topics that Chapters 12H and 12I cover (Chyi Decl. ¶ 27; DeBerry Decl. ¶ 5; Adachi Decl. ¶ 5).

Additionally, each department is familiar with Section 1373's requirements. Fletcher Decl. ¶ 5; Hennessy Decl. ¶ 9; Sainez Decl. ¶ 7; Chyi Decl. ¶ 28; DeBerry Decl. ¶ 6; Adachi Decl. ¶ 6. All employees of those departments have been informed that federal law requires that they be allowed to

share information regarding immigration status and citizenship information with the federal government.  Fletcher Decl. ¶ 8; Hennessy Decl. ¶ 10; Sainez Decl. ¶ 8; Chyi Decl. ¶ 29; DeBerry Decl. ¶ 7; Adachi Decl. ¶ 7; *see also* RJN Exh. D.  And none of those departments has in place a prohibition or restriction on the sharing of immigration status or citizenship information with the federal government, or on the maintenance of such information.  Fletcher Decl. ¶ 9; Hennessy Decl. ¶ 11; Sainez Decl. ¶¶ 9, 11; Chyi Decl. ¶ 30; DeBerry Decl. ¶ 8; *see also* Adachi Decl. ¶ 8 (stating that the Public Defender is not subject to any such prohibitions or restrictions other than obligations related to attorney-client privilege).

These laws and policies serve important local public interests.  San Francisco is one of many communities that "have determined that their local law enforcement efforts are handcuffed by . . . unbounded cooperation with immigration enforcement" due to the risk that immigrants will "avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home."  *City of Chicago*, 888 F.3d at 280.  To that end, San Francisco's Sanctuary City laws and policies encourage individuals to be candid and forthcoming with law enforcement, and facilitate trust between law enforcement and the public.  Hennessy Decl. ¶ 8; Sainez Decl. ¶ 6.  And they create an environment where individuals feel comfortable reporting crimes, serving as witnesses, and assisting with law enforcement investigations.  Hennessy Decl. ¶ 8; Sainez Decl. ¶ 6.  Forcing these departments to abandon these policies would countermand these important interests.

Requiring jurisdictions to allow their employees to provide immigration officials with the vast universe of information DOJ claims Section 1373 covers would impose significant burdens on San Francisco.  San Francisco would be forced to allow its employees to divert their attention from their public safety responsibilities in favor of coordinating with federal immigration officials.  For instance, Sheriff's Department deputies would be required to spend time tracking each and every inmate's release date in real time—even though release dates are often unpredictable and uncertain.  Hennessy Decl. ¶ 13.  Permitting employees to spend their time in this way would strain the Department's resources, and detract from their public safety function.

Public safety would be compromised in other ways as well, as evidence from the San Francisco Adult Probation Department ("APD") makes clear.  To carry out its public safety mission, it is critical that APD establish relationships of trust and support with the approximately 6,300 number of probationers it supervises.  San Francisco's Sanctuary City laws, and APD's current policies, help protect those critical relationships.  Fletcher Decl. ¶ 10.  But if APD employees were permitted to share vast amounts of personal information with ICE—a probationer's address, family relationships, health status, and so forth—that circumstance would put an end to that relationship of trust.  Fletcher Decl. ¶ 10.  The likely consequence would be that probationers would stop voluntarily reporting to parole officers, and cease reaching out for supportive services, thereby compromising community safety.   Fletcher Decl. ¶ 10.  Also, in the absence of voluntary oversight, parole officers would have to carry out bench warrants for probationers' arrests and effectuate arrests.  Fletcher Decl. ¶ 10.  Those arrests require additional APD resources to carry out, and also put officers and members of the public at greater risk of harm.  Fletcher Decl. ¶ 10.

## III.   San Francisco Is Entitled To A Declaratory Judgment.

San Francisco is entitled to a declaratory judgment that its laws comply with Section 1373 and that it may execute the Section 1373 Certification.  This Court may issue declaratory relief "[i]n a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201(a); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  This standard is satisfied here, where DOJ denies that San Francisco's laws and policies satisfy Section 1373.  Lee Decl. ¶ 6, Exh. D (RFA No. 1).

## IV.   San Francisco Satisfies The Requirements For A Permanent Injunction.

San Francisco is also entitled to a permanent injunction prohibiting enforcement of the Notice, Access, and Section 1373 Requirements, or the withholding of Byrne JAG funding from San Francisco on the basis of Section 1373.  A permanent injunction is appropriate when four factors are satisfied: (1) the plaintiff has or will suffer an irreparable injury; (2) remedies available at law are

1  inadequate to address that injury; (3) the balance of hardships between the plaintiff and defendant

2  justify an equitable remedy; and (4) the public interest is "not disserved" by a permanent injunction.

3  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  All four factors are satisfied here.[13]

### A. San Francisco Will Suffer Irreparable Harm Absent An Injunction.

#### 1. The Section 1373 Certification Will Harm San Francisco Irreparably Absent Court Resolution.

6         A permanent injunction is necessary to avoid putting San Francisco to the unconstitutional

7  choice of having to either rescind its Sanctuary City laws or forgo federal criminal justice funding.

8  The Challenged Requirements collectively aim to put San Francisco to precisely this kind of

9  impermissible choice.  San Francisco cannot comply with the Notice and Access Requirements

10  without undoing local policies that limit the entanglement with ICE that these Requirements would

11  create.  *See* p. 3, *supra*.  And San Francisco cannot comply with the Section 1373 Requirement

12  without acquiescing to DOJ's impossibly expansive view of what Section 1373 requires.  *See* pp. 19-

13  20, *supra*.

14         Indeed, the Section 1373 Requirement imposes particularly draconian conditions: It requires

15  the City Attorney to sign the Section 1373 Certification under penalty of perjury, and imposes various

16  penalties on him, and San Francisco itself, if DOJ determines that he has improperly certified.  And at

17  the same time, DOJ has made clear what it means to certify compliance: Jurisdictions must "adopt the

18  federal government's interpretation of what information is 'information regarding . . . immigration

19  status' under Section 1373," which is wide sweeping.  Lee Decl. ¶ 6, Exh. D (RFA No. 16); *see also*

20  pp. 19-20, *supra*.  Although San Francisco believes that its laws and policies comply with Section

21  1373 as properly interpreted, DOJ denies that San Francisco's laws, policies, and practices conform to

22  Section 1373.  Lee Decl. ¶ 6, Exh. D (RFA No. 1).  The Challenged Requirements thus impose

23  irreparable harm for at least two reasons.

24

___

25  [13] San Francisco's First Amended Complaint contained allegations related to San Francisco FY 2016 Byrne JAG grant, but did not include a separate count asking for relief regarding that grant.  *See, e.g.*, S.F. First Am. Compl. at ¶¶ 90, 117–123, Dkt. No. 61, Dec. 12, 2017.  Since then, DOJ has not clarified whether San Francisco's FY 2016 Byrne JAG funding is at risk.  Consequently, San Francisco has decided to focus this action on the FY 2017 Byrne JAG program alone, and has therefore elected not to ask for declaratory or injunctive relief regarding its FY 2016 Byrne JAG funds at this time.

First, DOJ's attempt to force the City to make a "stark choice" between complying with unlawful grant requirements or foregoing federal funding that supports vital municipal services is alone an irreparable injury. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009); *San Francisco v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017). The Supreme Court has recognized that irreparable injury occurs in these circumstances. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380–81 (1992). Here, because the Challenged Requirements are unconstitutional, putting San Francisco in a position where it must decide whether or not to comply with those Requirements itself inflicts an irreparable injury.

Second, the outcome of whichever choice San Francisco makes will lead to irreparable injury. If San Francisco decides to comply with the Challenged Requirements—as it must to accept its Byrne JAG grant—then it will have to abandon its Sanctuary City laws, which is the very goal of the Trump Administration's threats. *See* pp. 1-2, *supra*. A local jurisdiction's adoption of policies that it believes promote public health, safety, and welfare, and its administration of facilities like jails, are traditional matters of local concern that lie at the heart of the police power. *See, e.g., Morrison*, 529 U.S. at 618; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Courts have recognized that an injury to a sovereign's exercise of its police powers is an irreparable one. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *Texas v. United States*, 201 F. Supp. 3d 810, 834–35 (N.D. Tex. 2016). Here, San Francisco's sanctuary policies reflect its considered judgment that public safety and the general welfare are best served by restricting employees from sharing certain sensitive information with federal immigration authorities. Requiring San Francisco to undo these policies constitutes irreparable injury. *City of Philadelphia*, 2018 WL 2725503, *41.

Or, if San Francisco decides not to accept Byrne JAG funds because it cannot comply with the Challenged Requirements, it will likewise suffer an irreparable injury from the loss of that funding. Byrne JAG funds support a number of crucial municipal programs in the criminal justice area. *See* pp. 5-6, *supra*; *see also* Chyi Decl. ¶¶ 10–11, 17. Those funds support the salaries for a number of San Francisco employees, and provide funding for programs that would otherwise lack resources. *Id.* ¶¶ 18–19. Depriving San Francisco of this funding will "have an immediate impact on [the City's] ability to provide critical resources to the public, causing damage that would persist regardless of

whether funding [was] subsequently reinstated."  *United States v. North Carolina*, 192 F. Supp. 3d
620, 629 (M.D.N.C. 2016).  Whatever option San Francisco chooses will cause irreparable harm.

### B.     The Balance Of The Equities And Public Interest Favor Granting A Permanent Injunction.

The balance of the equities and the public interest favor an injunction.  In a case against the
government, these factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.
2014).  And in a case involving an alleged constitutional violation, the two factors are satisfied by
success on the merits of the underlying claim.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069
(9th Cir. 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (finding that "it is
always in the public interest to prevent the violation of a party's constitutional rights").

This approach is sensible, because there can be no harm to the Attorney General from an
injunction prohibiting him from enforcing grant requirements that are unauthorized by statute and
offend established constitutional principles.  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.
2013) (defendants "cannot suffer harm from an injunction that merely ends an unlawful practice").  By
contrast, there would be serious harm to the City if these Requirements continue in effect.  *See* pp. 32-
33, *supra*.

## V.     A Nationwide Injunction Prohibiting Enforcement Of The Notice, Access, And Section 1373 Requirements Is Warranted.

A nationwide injunction that prohibits Defendants from enforcing the Challenged
Requirements against all Byrne JAG recipients is warranted in this case.  The Court has the discretion
to issue a nationwide injunction.  *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd
by an equally divided Court*, 136 S. Ct. 2271 (2016); *see also Steele v. Bulova Watch Co.*, 344 U.S.
280, 289 (1952) ("[T]he District Court in exercising its equity powers may command persons properly
before it to cease or perform acts outside its territorial jurisdiction.").  This is because "the scope of
injunctive relief is dictated by the extent of the violation established, not by the geographical extent of
the plaintiff."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Where a federal law, regulation, or other requirement is invalid on its face, a nationwide
injunction prohibiting its enforcement is appropriate.  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,

145 F.3d 1399, 1410 (D.C. Cir. 1998).  There is no good reason why DOJ should be allowed to enforce these Requirements against any jurisdiction. [14]  Defendants have acknowledged under penalty of perjury that the Requirements are imposed identically on all grant recipients, therefore foreclosing any argument that these Requirements vary in their application.  Hanson Decl. ¶ 6.  In light of this concession, the legal issues presented in this case are identical across all Byrne JAG applicants—if the Attorney General lacks the authority to apply those Requirements to one, he lacks the authority to apply them to any other.  And a nationwide injunction is particularly necessary in this case, because a more limited injunction will require each of the many hundreds of jurisdictions that apply for Byrne JAG funds to bring individual challenges to the Challenged Requirements.  A nationwide injunction will help avoid this needless and duplicative litigation.  The public interest thus weighs strongly in favor of a nationwide injunction in this case.

## CONCLUSION

For the foregoing reasons, San Francisco respectfully requests that the Court grant its Motion for Summary Judgment.

Dated: July 11, 2018

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
JESSE C. SMITH
YVONNE R. MERÉ
CHRISTINE VAN AKEN
TARA M. STEELEY
MOLLIE M. LEE
SARA J. EISENBERG
AILEEN M. McGRATH

Deputy City Attorneys

By: */s/ Aileen M. McGrath*
AILEEN M. MCGRATH
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

---

[14] The Seventh Circuit upheld a nationwide injunction against the Notice and Access Requirements.  *City of Chicago*, 888 F.3d at 293.  The en banc Seventh Circuit has stayed that injunction as to all jurisdictions other than the City of Chicago pending further review by the en banc Court.  *City of Chicago v. Sessions*, No. 17-2991, Dkt. No. 134 (June 26, 2018).