DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:        brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>      Plaintiff,<br><br>      vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, ALAN R. HANSON, Acting Assist. Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100,<br><br>      Defendants. | Case No. 3:17-CV-04642-WHO<br><br>**DECLARATION OF CHIEF KAREN FLETCHER IN SUPPORT OF CITY AND COUNTY OF SAN FRANCISCO'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:    September 5, 2018<br>Time:           2:00 p.m.<br>Judge:          Honorable William H. Orrick<br>Dept:           Courtroom 2<br><br>Trial Date:      January 28, 2019 |

I, Karen Fletcher, declare as follows:

1.      I am a resident of the State of California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2.      I am the Chief Adult Probation Officer for the City and County of San Francisco.  I have held this position since 2015.

3.      The Adult Probation Department ("APD") uses Byrne JAG funds to fund positions in three areas: (1) Intensive Probation Supervision, which has a targeted caseload of probationers with substance abuse and/or mental health issues; (2) Transition Age Youth, which supervises 18-25 year old clients who are participating in the Young Adult Court program; (3) supervision of domestic violence cases in the Bayview neighborhood of San Francisco.

4.      I am familiar with San Francisco Administrative Code Chapters 12H and 12I ("Sanctuary City Laws") and the Adult Probation Department's policies stemming from those laws.

5.      I am also familiar with the federal law codified at 8 U.S.C. § 1373 ("Section 1373"), which provides that a local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.  Section 1373 further provides that no person or agency may prohibit, or in any way restrict, a local government entity from maintaining information regarding the immigration status, lawful or unlawful, of any individual, or exchanging such information with any other federal, state, or local government entity.

6.      In accordance with Section 1373 and San Francisco's Sanctuary City Laws, APD maintains policies that generally prohibit employees from using City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status of individuals or any other such personal information, unless required by Federal or State statute, regulation, or court decision.

7.      The relevant APD policy is Policy No. 3.06.01 "Immigrant Clients and Compliance With the Sanctuary Ordinance."  Attached hereto as Exhibit A is a true and correct copy of the current

version of that policy, which has been in effect since December 20, 2016. Attached hereto as Exhibit B is a true and correct copy of the prior version of Policy No. 3.06.01, which was in effect from January 8, 2015, through December 19, 2016.

8.      On January 19, 2017, all APD employees received a memorandum from Micki Callahan, the San Francisco Director of Human Resources. That memorandum was directed to "All City and County of San Francisco Employees." The subject of that memo was "Reminder about Sanctuary City Obligations." The memo, in relevant part, informed recipients that "federal law states that a 'local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual' (8 U.S.C. § 1373)." It further provided that: "Departments must ensure that their rules, regulations, and protocols adhere to San Francisco's sanctuary city laws, codified at Chapters 12H and 12I of the Administrative Code."

9.      APD does not have in effect, and is not subject to or bound by, any prohibition or restriction that applies to its officials and employees, and which addresses either (1) the sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status of any individual; or (2) the maintenance of information regarding the citizenship or immigration status of any individual.

10.     To carry out its public safety mission, it is critical that APD establish relationships of trust and support with the approximately 6,300 probationers it supervises. San Francisco's sanctuary city laws, and APD's current policies, help protect those critical relationships. If APD employees were permitted to share vast amounts of personal information with ICE—such as a probationer's address, phone number, emergency contact information, family relationships, or health status—it would undermine the trust necessary to maintain these relationships. A significant number of probationers would likely stop voluntarily reporting to probation officers and/or reaching out for supportive services, thereby compromising community safety. In addition, in the absence of voluntary oversight, probation officers would have to carry out bench warrants for probationers' arrests and

1   effectuate arrests.  Those arrests require additional APD resources to carry out, and also put officers

2   and members of the public at greater risk of harm.

3

4          I declare under penalty of perjury that the foregoing is true and correct and that this declaration

5   was executed on July 9, 2018 at San Francisco, California.

6

7

8                                            KAREN FLETCHER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



## Policy: Immigrant Clients and Compliance with the Sanctuary Ordinance

3.06.01

Effective: 12/20/2016

Authority: San Francisco Administrative Code 12H and 12I; Health and Safety Code § 11369; 8 U.S.C. 1373

Replaces: **3.06.01**
(1/8/2015)

Responsible for Updates: **Division Directors**

*Karen L. Fletcher*                                              12/20/2016

Approved by          Chief Adult Probation Officer                          Date

**Forms**

APD-14 – Request for Status of ICE Proceeding

## I. Principles

The City and County of San Francisco "respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of [Administrative Code Chapters 12I and 12H] is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all." (San Francisco Administrative Code Chapter 12I.1)

The Department upholds these values, and recognizes that Immigrations and Customs Enforcement (ICE) investigations into a person, regardless of that person's immigration status, can result in serious consequences for the person, including:

- Detention.
- Family separation and family instability.
- Disruption to the person's employment.
- Deportation.
- Loss of future immigration privileges.
- ICE proceedings against that person's family members or co-residents.

Revision History:
1/8/2015, 6/22/2007

SF_00000939

## II. Policy

Chapter 12H of the San Francisco Administrative Code prohibits City employees from using any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status of individuals or any other such personal information in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. Chapter 12I provides limited exceptions for law enforcement purposes. These provisions apply to Departmental operations as follows:

1. **ICE** <u>**Release**</u> **Notification Requests:** ICE may submit requests for release notification (DHS Form I-247N) to custodial agencies. City employees are prohibited from responding to such requests except under limited exceptions established in Chapter 12I.

   a. In summary, the exceptions are:

      - The individual has either been convicted of:
        - A "Violent Felony," as defined in the Ordinance, in the seven years immediately prior to the request; or
        - A "Serious Felony," as defined in the Ordinance, in the five years immediately prior to the request; or
        - Three felonies identified in the Ordinance arising out of three separate incidents in the five years immediately prior to the request; and
      - A magistrate has determined that there is probable cause to believe the individual is guilty of certain felonies and has ordered the individual to answer to the same pursuant to PC §872.

        In determining whether to respond, employees shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk.

   b. In the extremely unlikely event that the Department receives such a request, employees must obtain Chief Adult Probation Officer approval via the chain of command prior to responding.

2. **Mandated** <u>**Arrest**</u> **Notification to ICE:** The only circumstance under which any Department employee is required to report information to ICE is if **APD arrests a person** for a violation of H&S §11350, 11351, 11351.5, 11352, 11353, 11355, 11357, 11359, 11360, 11361, 11363, 11366, 11368, or 11550, and there is reason to believe the person may not be a citizen of the United States (per H&S §11369). Under those circumstances, the only information that must be reported to ICE is the fact of the arrest. Department employees are not required to report an

SF_00000940

arrest for these offenses if another agency – for example the Police Department – is the arresting agency.

3. **Assistance with Enforcement of Federal Immigration Law:** Staff are otherwise prohibited from using City funds or resources to assist in the enforcement of civil immigration law, including but not limited to:

   a. Assisting or cooperating, in an official capacity, with any ICE investigation, detention, or arrest procedures related to alleged violations of civil immigration law. Note: Requests for special operations require Chief Adult Probation Officer approval, per Special Operations with Law Enforcement Agencies Policy 3.07.03.

   b. Disseminating information to ICE, in an official capacity, regarding release status of an individual or any personal information such as home or work contact information, and family or emergency contact information.

   c. Arresting or detaining an individual on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of civil immigration law.

4. **Mutual Aid:** Sworn Department staff who are in the field may choose to render mutual aid per PC 830.5(a)(5)(A) to any law enforcement agents, including ICE agents, if there is significant danger of personal injury or major property damage (e.g., when firearms or weapons are involved, a person to be detained has a history of violence, agents are physically attacked). DPOs must notify their Supervising Probation Officers (SPOs) by phone immediately after the incident is under control and document the incident as outlined in Incident Reports Policy 3.02.04.

5. **Requesting Immigration Status:** The Department shall not include questions about immigration status on any application, questionnaire, or interview form. Additionally, staff may ask about a defendant's or client's language skills, place of birth, and related social history factors and may document such information in Court reports, but **may not ask directly about his or her immigration status or citizenship.** If an A-number (also referred to as an ICE number) or an ICE detainer appears in the CII, the officer may document it in the case management system for the purposes of the Presentence Investigation.

6. **Court Reports:** Officers shall not document in any Court report that a client is facing ICE proceedings or that ICE has been notified about a client's immigration status or date of release from local custody, unless that information is necessary for the Court to make a determination on the case (such as that a client is not present in Court because he or she is in ICE custody).

   a. Most immigration matters are civil violations and not criminal offenses. As a result, they cannot be included in the Criminal History

SF_00000941

section of Presentence Reports unless they are criminal offenses (often related to reentry after removal of someone with prior criminal offenses).

Note: Immigration laws are extremely complicated. Understanding an individual's immigration status – and whether someone is undocumented – often requires specialized legal training. For example, someone who self-reports as undocumented may have a claim of U.S. citizenship. Additionally, ICE can – and periodically does – investigate or take action against naturalized U.S. citizens or others with legal status. As a result, staff must be aware that evidence of an ICE hold or proceeding, or even self-report, does not confirm that a person is not a U.S. citizen or that a person is in violation of civil immigration laws.

## III. Procedures

### Supervising Immigrant Clients

Regardless of a client's immigration status or perceived immigration status, DPOs shall supervise clients and assist them in accessing services based on their offense and criminogenic risks and needs. The following shall also apply to the supervision of immigrant clients:

1. **ICE Custody:** If a DPO cannot locate a client and believes that the client may be in ICE custody, the DPO must attempt to determine the client's whereabouts:

   a. The DPO must conduct a complete record check, including QCA, QRAP, CII, and FBI prior to contacting ICE directly. CII and FBI reports may – but do not always – indicate when a person is in ICE custody or deported. If the record check is not conclusive, the DPO may contact ICE to verify custody status using Request for Status of ICE Proceeding form APD-14.

   b. Upon confirming that a client is in ICE custody and deportation proceedings are underway, the DPO must contact ICE at least every 30 calendar days using APD-14 to monitor the case and proceedings, and follow up as needed:

   - If the client is released from ICE custody and reports to the DPO, the DPO shall continue to supervise the client.

   - If the client is released from ICE custody and does not report within 15 calendar days of release, the DPO must exhaust all efforts to contact the client. If unable to successfully contact the client within 30 calendar days of release, the DPO shall have a warrant issued as follows:

> Mailing notices to General
> Delivery helps to ensure that
> the DPO has exhausted all
> efforts to locate or notify a
> client of a reporting obligation.
> This is particularly important if
> the client is homeless. Use the
> following address:
>
> [Client Name]
> General Delivery
> 391 Ellis Street
> San Francisco, CA 94102

➤ **Probation Clients:** File an MTR using form AP-110 (Motion to Revoke Probation—Desertion) or AP-109 (Motion to Revoke Probation—Failure to Respond) per Motions to Revoke Probation for Desertion or Failure to Respond Policy 6.02.03 and request that the Court issue a bench warrant. Notify the client of the motion by mailing a Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

➤ **Mandatory Supervision Clients:** File a Petition to Revoke Mandatory Supervision and request that the Court issue a bench warrant. Notify the client of the motion by mailing a Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

➤ **Postrelease Community Supervision (PRCS) Clients:** File a PRCS Warrant and Affidavit.

2. **Deportation:** Once a DPO confirms that a client has been deported:

a. The DPO must have a warrant issued if the deported client – whether on probation, mandatory supervision, or PRCS – is one of the following:

- A PC 290 registrant.

- A high-risk domestic violence client who has not completed the 52-week Batterer's Intervention Program followed by 90 calendar days without a violation or new offense.

- A high-risk client who is an active gang member. Gang involvement could be identified via the police, through self-report, or other means.

b. **PRCS and Mandatory Supervision Clients:**

- Unless a warrant was issued as required above, the DPO shall ensure that the client's supervision term is active, and have it reinstated as needed.

- The DPO shall run QCA, QRAP, CII, and FBI checks every 30 calendar days to monitor for rearrest in the U.S.

- PRCS: The DPO must continue to track the one-year mandatory discharge date pursuant to PC 3456(a)(3), which applies to all deported PRCS clients unless a warrant is issued as specified above. Otherwise, if the client is not rearrested in the U.S prior to the one-year discharge date, the case shall be closed at the one-year mandatory discharge date per PC 3456(a)(3).

SF_00000943

- Mandatory Supervision: If the client is not rearrested during the remainder of the supervision term and a warrant was not issued as specified above, the case shall be closed once the maximum supervision period is reached (the community supervision portion of the sentence, after tolling and custody credits are accounted for).

- If the PRCS or mandatory supervision client is rearrested in the U.S. prior to the discharge date, the DPO shall have a warrant issued and follow up appropriately.

c. **Probation Clients:**

- If a bench warrant **was not** issued, the DPO shall transfer the client to the ICE caseload. If a bench warrant **was** issued, the DPO shall transfer the case after the client has been on bench warrant status for at least 30 calendar days without rearrest in the U.S.

- The DPO assigned to the ICE caseload or a designee shall conduct QCA, QRAP, CII, and FBI checks every 90 calendar days to monitor for rearrest in the U.S.

- If the client is not rearrested during the remainder of the supervision term, the case shall be closed when supervision expires if a bench warrant **was not** issued.

- If the client is rearrested, the DPO on the ICE caseload shall transfer the case back to the previous caseload. The assigned DPO shall follow up as appropriate, including filing a motion to revoke and request a bench warrant within 10 business days of identifying the arrest, per New Arrests of Persons on Probation Policy 6.02.01. The motion must contain the following information:

  ➢ Deportation date, if known.
  ➢ New arrest date.
  ➢ New charges.
  ➢ Status of case.
  ➢ Client's custody status.
  ➢ A copy of the police incident report, if available.
  ➢ The date the QCA, QRAP, CII, & FBI checks were completed.
  ➢ Any balance owed on victim restitution, if applicable.

## Compliance

The Department strives to adequately train all staff in order to ensure that staff are successful in carrying out their duties in a manner consistent with all federal, state, and local laws and all policies of the Department and the City and County of San Francisco. Violation of this policy will be reviewed on a case by case basis, but may result in discipline, up to and including termination, in accordance with appropriate progressive discipline policies and collective bargaining agreements.

SF_00000944

# EXHIBIT B



Chapter: General Operations
Section: Client Rights and Access to Services

## Policy: Immigrant Clients and Compliance with the Sanctuary Ordinance

**3.06.01**

Effective:   **1/8/2015**       Authority: <u>Code San Francisco Administrative Code 12H</u>; <u>Health and Safety Code § 11369</u>; <u>8 U.S.C. 1373</u>

Replaces: **100.16**       Responsible for Updates: **Division Directors**
(6/22/2007)

*Wendy S. Fr* (signature)       1/8/2015

Approved by       Chief Adult Probation Officer       Date

**Forms**

APD-14 – Request for Status of
ICE Proceeding

## I. Principles

The Department takes a balanced approach to compliance with local, state, and federal laws regarding immigration in order to enhance public safety without placing undue burdens on our immigrant community. Immigrations and Customs Enforcement (ICE) investigations into a person, regardless of that person's immigration status, can result in serious consequences for the person, including:

- Detention.
- Family separation and family instability.
- Disruption to the person's employment.
- Deportation.
- Loss of future immigration privileges.
- ICE proceedings against that person's family members or co-residents.

## II. Policy

1. All Department employees must comply with Chapter 12H of the San Francisco Administrative Code, the "Sanctuary Ordinance", which prohibits City employees from using any City funds or resources to:

   a. Assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation or court decision.

   b. Assist or cooperate in the employee's official capacity with any investigation, detention, or arrest procedures conducted by federal

Revision History: 6/22/2007

SF_00000933

Immigration and Customs Enforcement (ICE) agents and relating to alleged violations of civil provisions of Federal immigration law.

c. Request information about, or disseminate information regarding, the immigration status of any individual, or condition the provision of services or benefits upon immigration status.

2. There are limited exceptions to the Sanctuary Ordinance. The Department shall apply the exceptions as follows:

a. Staff **are not required to** – but may – use City funds or resources to report to ICE information regarding the citizenship or immigration status of an individual who has been booked at county jail, has a prior felony conviction, AND is reasonably suspected of violating civil immigration laws. Such reporting should be reserved for individuals who the DPO determines pose a significant public safety risk, such as those who are likely to be violent or are active gang members. In this case, reporting does not include sending additional information such as the individual's residential address or whereabouts.

b. The only circumstance under which any Department employee is required to report information to ICE is if **APD arrests a person** for a violation of H&S 11350, 11351, 11351.5, 11352, 11353, 11355, 11357, 11359, 11360, 11361, 11363, 11366, 11368 or 11550, and there is reason to believe the person arrested may not be a citizen of the United States (per H&S 11369). Under those circumstances, the only information that must be reported to ICE is the fact of the arrest.

c. Staff may not otherwise use City funds or resources to cooperate with a request for additional information from ICE (such as a request for a client's residential address or whereabouts) except under exceptional circumstances that comply with the Sanctuary Ordinance (regarding a person who has been convicted of a felony and is suspected of violating civil immigration laws) and with approval by the Chief Adult Probation Officer, through the chain of command.

d. Staff may ask about a defendant's or client's language skills, place of birth, and related social history factors and may document such information in Court reports, but **may not ask directly about his or her immigration status or citizenship**. If an A-Number (also referred to as an ICE Number) or an ICE detainer appears in the CII, the officer may document it in the case management system for the purposes of the Presentence Investigation.

## III. Procedures

Staff shall apply the Sanctuary Ordinance to operations in the Department as follows.

SF_00000934

## Reasonable Suspicion

Any report to ICE must be based on reasonable suspicion. Reasonable suspicion may not be based on a person's "ability to speak English or perceived or actual national origin (Administrative Code 12H.2-1)," and staff may never request proof of citizenship or immigration status. Reasonable suspicion must be based on consideration of objective, non-discriminatory factors, such as the following:

- Self-report of immigration status.
- Inconsistent report of immigration status.
- Court or criminal history information showing a conviction for illegal reentry or a recent, prior deportation.

Note: Immigration laws are extremely complicated. Understanding an individual's immigration status – and whether someone is undocumented – often requires specialized legal training. For example, someone who self-reports as undocumented may have a claim of U.S. citizenship. Additionally, ICE can – and periodically does – investigate or take action against naturalized U.S. citizens or others with legal status. As a result, staff must be aware that evidence of an ICE hold or proceeding, or even self-report, does not confirm that a person is not a U.S. citizen or that a person is in violation of civil immigration laws.

## Court Reports

Officers shall not document in any Court report that ICE has been notified about a client or whether a client is facing ICE proceedings unless that information is necessary for the Court to make a determination on the case (such as that a client is not present in Court because he or she is in ICE custody).

## Field Assistance to ICE

Department staff are prohibited from assisting ICE in the enforcement of immigration laws, including any ICE investigation, detention, arrest, transport of an arrestee, operations, or raids. If the Department receives a request to participate in a special operation that an ICE agent(s) will also participate in, the Department lead for the operation must notify the Chief Adult Probation Officer. See also Special Operations with Law Enforcement Agencies Policy 3.07.03.

However, sworn Department staff who are in the field may choose to render mutual aid per PC 830.5(a)(5)(A) to any law enforcement agents, including ICE agents, if there is significant danger of personal injury or major property damage (e.g., when firearms or weapons are involved, a person to be detained has a history of violence, agents are physically attacked). DPOs must notify

SF_00000935

their Supervising Probation Officers (SPOs) by phone immediately after the incident is under control and document the incident as outlined in Incident Reports Policy 3.02.04.

## Stopping, Questioning, or Detaining Individuals

Department staff are prohibited from stopping, questioning, or detaining any individual based on his or her national origin, ability to speak English, or immigration status and may not ask a person for proof of citizenship or immigration status.

## Supervising Undocumented Clients

Regardless of a client's immigration status or perceived immigration status, DPOs shall supervise clients and assist them in accessing services based on their offense and criminogenic risks and needs. The following shall also apply to the supervision of immigrant clients:

1.  **New Arrests:** Per H&S 11369, when APD is the arresting agency and there is reason to believe that a person arrested for a violation of H&S 11350, 11351, 11351.5, 11352, 11353, 11355, 11357, 11359, 11360, 11361, 11363, 11366, 11368, or 11550, may not be a citizen of the United States, the arresting officer must report the matter to ICE officials. The assigned DPO shall otherwise continue to supervise clients and manage cases per usual after incurring a new arrest.

2.  **ICE Custody:** If a DPO cannot locate a client and believes that the client may be in ICE custody, the DPO must attempt to determine the client's whereabouts:

    a.  The DPO must conduct a complete record check, including QCA, QRAP, CII, and FBI prior to contacting ICE directly. CII and FBI reports may – but do not always – indicate when a person is in ICE custody or deported. If the record check is not conclusive, the DPO may contact ICE to verify custody status using Request for Status of ICE Proceeding form APD-14.

    b.  Upon confirming that a client is in ICE custody and deportation proceedings are underway, the DPO must contact ICE at least every 30 calendar days using APD-14 to monitor the case and proceedings, and follow up as needed:

        •   If the client is released from ICE custody and reports to the DPO, the DPO shall continue to supervise the client.

        •   If the client is released from ICE custody and does not report within 15 calendar days of release, the DPO must exhaust all efforts to contact the client. If unable to successfully contact the client within 30 calendar days of release, the DPO shall have a warrant issued as follows:

SF_00000936

> Mailing notices to General Delivery helps to ensure that the DPO has exhausted all efforts to locate or notify a client of a reporting obligation. This is particularly important if the client is homeless. Use the following address:
>
> [Client Name]
> General Delivery
> 101 Hyde Street
> San Francisco, CA 94107

➤ **Probation Clients:** File an MTR using form AP-110 (Motion to Revoke Probation—Desertion) or AP-109 (Motion to Revoke Probation—Failure to Respond) per Motions to Revoke Probation for Desertion or Failure to Respond Policy 6.02.03 and request that the Court issue a bench warrant. Notify the client of the motion by mailing a Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

➤ **Mandatory Supervision Clients:** File a Petition to Revoke Mandatory Supervision and request that the Court issue a bench warrant. Notify the client of the motion by mailing a Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

➤ **Postrelease Community Supervision (PRCS) Clients:** File a PRCS Warrant and Affidavit.

3. **Deportation:** Once a DPO confirms that a client has been deported:

a. The DPO must have a warrant issued if the deported client – whether on probation, mandatory supervision, or PRCS – is one of the following:

- A PC 290 registrant.

- A high-risk domestic violence client who has not completed the 52-week Batterer's Intervention Program followed by 90 calendar days without a violation or new offense.

- A high-risk client who is an active gang member. Gang involvement could be identified via the police, through self-report, or other means.

b. **PRCS and Mandatory Supervision Clients:**

- Unless a warrant was issued as required above, the DPO shall ensure that the client's supervision term is active, and have it reinstated as needed.

- The DPO shall run QCA, QRAP, CII, and FBI checks every 30 calendar days to monitor for rearrest in the U.S.

- PRCS: The DPO must continue to track the one-year mandatory discharge date pursuant to PC 3456(a)(3), which applies to all deported PRCS clients unless a warrant is issued as specified above. Otherwise, if the client is not rearrested in the U.S prior to the one-year discharge date, the case shall be closed at the one-year mandatory discharge date per PC 3456(a)(3).

SF_00000937

- Mandatory Supervision: If the client is not rearrested during the remainder of the supervision term and a warrant was not issued as specified above, the case shall be closed once the maximum supervision period is reached (the community supervision portion of the sentence, after tolling and custody credits are accounted for).

- If the PRCS or mandatory supervision client is rearrested in the U.S. prior to the discharge date, the DPO shall have a warrant issued and follow up appropriately.

c. **Probation Clients:**

- If a bench warrant **was not** issued, the DPO shall transfer the client to the ICE caseload. If a bench warrant **was** issued, the DPO shall transfer the case after the client has been on bench warrant status for at least 30 calendar days without rearrest in the U.S.

- The DPO assigned to the ICE caseload or a designee shall conduct QCA, QRAP, CII, and FBI checks every 90 calendar days to monitor for rearrest in the U.S.

- If the client is not rearrested during the remainder of the supervision term, the case shall be closed when supervision expires if a bench warrant **was not** issued.

- If the client is rearrested, the DPO on the ICE caseload shall transfer the case back to the previous caseload. The assigned DPO shall follow up as appropriate, including filing a motion to revoke and request a bench warrant within 10 business days of identifying the arrest, per New Arrests of Persons on Probation Policy 6.02.01. The motion must contain the following information:

  ➢ Deportation date, if known.
  ➢ New arrest date.
  ➢ New charges.
  ➢ Status of case.
  ➢ Client's custody status.
  ➢ A copy of the police incident report, if available.
  ➢ The date the QCA, QRAP, CII, & FBI checks were completed.
  ➢ Any balance owed on victim restitution, if applicable.

## Compliance

The Department strives to adequately train all staff in order to ensure that staff are successful in carrying out their duties in a manner consistent with all federal, state, and local laws and all policies of the Department and the City and County of San Francisco. Violation of this policy will be reviewed on a case by case basis, but may result in discipline, up to and including termination, in accordance with appropriate progressive discipline policies and collective bargaining agreements.

SF_00000938