CHAD A.  READLER
Acting Assistant Attorney General
ALEX G. TSE
Acting United States Attorney
JOHN R.  TYLER
Assistant Director
W.  SCOTT SIMPSON (Va.  Bar #27487)
Senior Trial Counsel
ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys
Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:      (202) 514-3495
Facsimile:       (217) 492-4888
E-mail:           scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
JEFFERSON B.  SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Assistant Attorney
General;[1] and U.S. DEPARTMENT OF JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON B.  SESSIONS III, Attorney General of the United States, *et al.*,<br><br>Defendants. | No.  3:17-cv-04642-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  September 5, 2018<br>Time: 2:00 p.m. |

---

[1] Laura L. Rogers is hereby substituted for Alan R. Hanson as a defendant herein pursuant to Federal Rule of Civil Procedure 25(d).

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT.......................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

INTRODUCTION ..........................................................................................................1

STATUTORY AND ADMINISTRATIVE BACKGROUND........................................4

    I.     The Immigration and Nationality Act ..............................................................4

    II.    USDOJ Office of Justice Programs and the Byrne JAG Program .........................5

    III.   Conditions on Byrne JAG Awards........................................................................7

    IV.   Recent Developments ...........................................................................................8

ARGUMENT ...................................................................................................................9

    I.     The Challenged Immigration-Related Byrne JAG
        Conditions Are Lawful.......................................................................................9

        A.    The Conditions Are Authorized by Statute and Do Not
             Violate the Separation of Powers.........................................................9

             1.    The Notice and Access Conditions are Lawful................................9

             2.    The Section 1373 Condition Is Lawful ...........................................15

                  a.    *Murphy* Supports the Legality of Section 1373.................15

                  b.    Section 1373 Is an "Applicable Federal Law" within
                     the Meaning of 34 U.S.C. § 10153(a)(5)(D) ......................17

        B.    The Notice, Access, and Section 1373 Conditions Are Consistent
             Consistent with the Spending Clause.......................................................19

             1.    The Notice, Access, and Section 1373 Conditions
                 Are Not Ambiguous ........................................................................19

             2.    The Notice, Access, and Section 1373 Conditions Are
                 Related to the Purposes of the Byrne JAG Program.....................21

    II.    The Court Should Enter Judgment for Defendants on
        Plaintiff's Request for a Declaration that its Ordinances
        Comply with Section 1373 ..............................................................................24

        A.    Plaintiff's Request for a Ruling Regarding Compliance
             with Section 1373 Is Non-Justiciable .......................................................25

i

      B.     Section 1373 Protects, at Minimum, the Contact Information and Release Status of Aliens .................................................................... 26

      C.     San Francisco's Ordinances and Policies Foreclose Providing at Least Some of the Information Protected by Section 1373 ..................... 29

            1.     The San Francisco Ordinances Violate Section 1373 on their Face ....................................................................... 30

            2.     The Facts Confirm that San Francisco Prohibits the Provision of at Least Some of the Information Protected by Section 1373 Program ................................................... 33

III.     If the Court Grants an Injunction, It Should Be Limited to San Francisco ........... 37

CONCLUSION ........................................................................................................................ 40

1

**TABLE OF AUTHORITIES**

2

3

<u>CONSTITUTION</u>

4

U.S. Const. art. III, § 2, cl. 1..............................................................................25

5

<u>CASES</u>

6

7

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ............................................... 25

8

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979 (3d Cir. 1986)...................................... 9

9

*Arizona v. United States*, 567 U.S. 387 (2012) ..................................................... passim

10

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) .................................... 19

11

*Atascadero State Hospital. v. Scanlon*, 473 U.S. 234 (1985) ......................................... 29

12

*Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ........................... 22

13

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995).............................. 17

14

15

*Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) ......................................................... 21

16

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003)................................................... 25

17

*Califano v. Yamasaki*, 442 U.S. 682 (1979)............................................................. 38

18

*California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018) .......................... 22

19

*Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003)......................................................... 21

20

*City & County of San Francisco v. Trump*,  No. 17-17478, 2018 WL
    3637911 (9th Cir. Aug. 1, 2018)........................................................................ 38

21

22

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017).................................... 8, 18, 31

23

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018)............................................. 38

24

*Clinton v. City of New York*, 524 U.S. 417 (1998)................................................... 9

25

*Coons v. Lew*, 762 F.3d 891 (9th Cir. 2014)......................................................... 25

26

*Copeland v. Ryan*, 852 F.3d 900 (9th Cir. 2017)...................................................... 32

27

28

*Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836 (D.C. Cir. 2008)................... 24

*Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036 (N.D. Cal. 2016) ................................ 9

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................................................. 37

*Dean v. United States*, 556 U.S. 568 (2009) ................................................................................. 26

*Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922 (1990) ........................................ 17

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275 (D.C. Cir. 1989) ................................................ 3, 10

*Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382 (3d Cir. 2006) ........................................................... 22

*Fonseca v. Fong*, 167 Cal. App. 4th 922 (2008) .......................................................................... 31

*FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018) ......................................................... 14

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ...................................................................................... 37

*Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019 (9th Cir. 2014) ............................................ 11

*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) .............................................. 26

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) .......................................................................................... 26

*Lewis v. Casey*, 518 U.S. 343 (1996) ............................................................................................ 37

*Los Angeles Haven Hosp. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) .......................................... 38

*Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006) ..................................................................... 19

*Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ........................................................ 39

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) ........................................................ 3, 22

*McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997)........................................................ 38

*Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018)................................... 15, 16

*New York v. United States*, 505 U.S. 144 (1992) ..................................................................... 19, 22

*Occidental Eng'g Co. v. INS*, 753 F.2d 766 (9th Cir. 1985)........................................................... 9

*Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*,
    288 F.3d 414 (9th Cir. 2002) ................................................................................................ 25

iv

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................. 23

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633 (1990) ........................... 14

*Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016)......................................................... 28

*Printz v. United States*, 521 U.S. 898 (1997) ............................................................... 16

*Reno v. Condon*, 528 U.S. 141 (2000) ......................................................................... 16

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ........................................................... 26

*S. Dakota v. Dole*, 483 U.S. 203 (1987).............................................................. passim

*Sesay v. Attorney Gen. of U.S.*, 787 F.3d 215 (3d Cir. 2015) ....................................... 24

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017)................................ 7

*Stone v. INS*, 514 U.S. 386 (1995) ............................................................................... 11

*Texas v. United States*, 523 U.S. 296 (1998) ............................................................... 25

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017).................................... 37

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)................................................................... 39

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*,
    844 F.2d 1087 (4th Cir. 1988) ................................................................................ 17

*United States v. Craft*, 535 U.S. 274 (2002) ............................................................... 14

*United States v. Mendoza*, 464 U.S. 154 (1984) .......................................................... 38

*United States v. Odneal*, 565 F.2d 598 (9th Cir. 1977).................................................. 17

*United States v. Wenner*, 351 F.3d 969 (9th Cir. 2003)................................................. 11

*Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014) ........................................... 26

*Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) ................... 39

*Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001)............... 25

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).................................................... 40

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983) ............................................................... 38

1
2

**STATUTES**

8 U.S.C. §§ 1101 *et seq.*......................................................................... 4, 23, 26, 28

8 U.S.C. § 1226(c).................................................................................2, 5, 28

8 U.S.C. § 1227(a)..............................................................................5, 22, 27

8 U.S.C. § 1228.............................................................................................5

8 U.S.C. § 1229b(a) .................................................................................... 27

8 U.S.C. § 1231(a)....................................................................................2, 28

8 U.S.C. § 1252c......................................................................................4, 23

8 U.S.C. § 1305...........................................................................................27

8 U.S.C. § 1324(c)....................................................................................4, 23

8 U.S.C. § 1357(g)...................................................................................4, 23

8 U.S.C. § 1373 ...................................................................................... passim

8 U.S.C. § 1373(a) ................................................................................. passim

8 U.S.C. § 1373(b) ..................................................................................... 5, 27

8 U.S.C. § 1373(c) ......................................................................................... 26

18 U.S.C. § 1913 .......................................................................................... 21

25 U.S.C. § 1644(b) ..................................................................................... 12

28 U.S.C. § 510 ........................................................................................... 11

31 U.S.C. § 1352 ......................................................................................... 21

34 U.S.C. § 1152(b).....................................................................................23

34 U.S.C. §§ 10101 *et seq.*....................................................................... passim

34 U.S.C. § 10141(b) ................................................................................... 11

34 U.S.C. §§ 10151-10158.......................................................................... passim

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

34 U.S.C. § 10202(c) ........................................................................................................ 7

34 U.S.C. § 10251(a)..................................................................................................6, 22

34 U.S.C. § 10442(b) ...................................................................................................... 13

34 U.S.C. § 10446(e) ...................................................................................................... 13

41 U.S.C. § 4712 .............................................................................................................. 21

42 U.S.C. § 713(a) ........................................................................................................... 12

42 U.S.C. § 1395*l*(t)........................................................................................................12

42 U.S.C. § 3712(a)............................................................................................................6

42 U.S.C. § 3753 .............................................................................................................. 23

42 U.S.C. § 5779(a) ......................................................................................................... 16

Omnibus Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat.197 ........ 5

Violence Against Women and Dep't of Justice Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 .................................................... 5, 6, 10, 23

Pub. L. 106-113, 113 Stat. 1535 ..................................................................................... 11

Pub. L. 106-553, 114 Stat. 2762 ..................................................................................... 11

Consolidated Appropriations Act, Pub. L. No. 115-31, 131 Stat. 135 (2017)................. 6

Cal. Health & Safety § 11369.........................................................................................31

California Penal Code § 187 ........................................................................................... 36

California Penal Code § 261.............................................................................................36

S.F., Cal., Admin. Code ch. 12H...............................................................................31, 32

S.F., Cal., Admin. Code ch. 12I.......................................................................................30

## REGULATIONS

8 C.F.R. § 214.1 .............................................................................................................. 27

28 C.F.R. § 66.12 ............................................................................................................. 14

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1

2

## OTHER AUTHORITIES

3

Exec. Order No. 13,688, 80 Fed. Reg. 3451 ................................................................... 7

4

Exec. Order No. 13,809, 82 Fed. Reg. 41,499 ............................................................... 7

5

H. R. Conf. Rep. 104-725 ........................................................................................... 28

6

H.R. Rep. No. 109-233............................................................................................10, 14

7

S. Rep. No. 104-249.....................................................................................................28

8

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,

9

    131 HARV. L. REV. 417 (2017)...............................................................................39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1        **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2              PLEASE TAKE NOTICE that on Wednesday, September 5, 2018, at 2:00 p.m., or as soon

3     thereafter as counsel may be heard, before The Honorable William H. Orrick, in Courtroom 2,

4     17th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California,

5     the defendants will move, and hereby do move, for summary judgment in this action under Rule

6     56 of the Federal Rules of Civil Procedure.  This motion is based on the following Memorandum

7     of Points and Authorities, Defendants' Request for Judicial Notice, the other evidence and records

8     on file in this action, and any other written or oral evidence or argument that may be presented at

9     or before the time this motion is heard by the Court.[2]

10            **MEMORANDUM OF POINTS AND AUTHORITIES**

11                          **INTRODUCTION**

12            This case asks whether the Federal Government – when it provides federal grants to state

13    and local law enforcement – can ensure that the recipients are not frustrating the Federal

14    Government's own law enforcement prerogatives by restricting access to information needed to

15    locate and remove aliens who have committed crimes.  Plaintiff challenges the authority of the U.S.

16    Department of Justice ("USDOJ" or "Department") to condition certain federal law enforcement

17    grants on providing modest information sharing-related cooperation with respect to individuals

18    whom the plaintiff has already taken into criminal custody for public safety reasons.  Plaintiff also

19    seeks a ruling that its ordinances limiting cooperation with federal immigration authorities do not

20    violate a federal statute that protects federal authorities' access to the needed information.

21            The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program")

22    provides federal funds for state and local law enforcement.  In furtherance of the INA and the

23    statutes governing the Byrne JAG Program, USDOJ requires Byrne JAG grantees to give federal

24    immigration authorities access to correctional facilities to meet with aliens and to notify federal

25

26            [2] Plaintiff names "DOES 1-100" as defendants in this matter but does not identify those
      individuals or specify the capacity in which they are being sued.  Am. Compl. ¶ 28.  Undersigned
27    counsel does not purport to represent those individuals, and claims against them are not at issue in
      this motion for summary judgment.  Moreover, because those individuals have not been named or
28    served, granting this motion would resolve this litigation in its entirety.

      Defs' SJ Motion & Opp.
      No. 3:17-cv-04642-WHO

1  authorities "as early as practicable" before the scheduled release of an alien from custody.  USDOJ

2  also requires grant recipients to comply with 8 U.S.C. § 1373(a), which specifically bars state and

3  local governments from prohibiting or restricting the exchange of "information regarding the . . .

4  citizenship or immigration status" of any individual with federal immigration authorities.

5        The call for intergovernmental law enforcement cooperation embodied in these three

6  conditions follows from recognition that "[c]onsultation between federal and state officials is an

7  important feature of the immigration system."  *Arizona v. United States*, 567 U.S. 387, 411

8  (2012).  For aliens who commit crimes and end up in state or local criminal custody, the

9  expectation of cooperation is particularly evident.  In deference to a state or local jurisdiction's

10  significant interest in punishing its criminals, the INA usually permits these aliens to serve their

11  entire sentence before being subject to federal detention for possible removal from the country.

12  Except in limited circumstances, the Department of Homeland Security "may not remove an alien

13  who is sentenced to imprisonment until the alien is released from imprisonment," and the alien's

14  removal period "begins on . . .  the date the alien is released from [state or local criminal]

15  detention." 8 U.S.C. §§ 1231(a)(1)(B)(iii), (a)(4)(A); *see id.* § 1226(c)(1) (requiring that federal

16  immigration authorities take custody of a criminal alien "when the alien is released" from criminal

17  custody).  But in delaying removal of these individuals until state and local jurisdictions' criminal

18  justice interests are served, it was certainly not Congress's intent that these criminal aliens would

19  evade federal immigration authorities.  *See id.* § 1226(c)(1) (requiring detention of "criminal aliens"

20  pending removal proceedings); § 1231(a)(2) (mandating detention during 90-day removal period

21  for all aliens against whom a final order of removal has been entered); § 1231(a)(1)(B)(iii)

22  (providing that "[i]f the alien is detained or confined (except under an immigration process)," the

23  90-day period presumptively runs from the date on which "the alien is released from detention or

24  confinement").  Thus, these provisions and others contemplate that federal immigration officials

25  will have access to information regarding the whereabouts, custody, and release status of aliens in

26  state and criminal custody.

27        San Francisco alleges that USDOJ lacks authority to impose these grant conditions and that

28

2

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

they violate the Spending Clause.  All of these claims are without merit.  In the very same enact-ment that created the Byrne JAG Program in 2006, Congress delegated to the Assistant Attorney General ("AAG") for USDOJ's Office of Justice Programs ("OJP") the authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  This express delegation conveys ample authority to impose the challenged conditions, which do not, accordingly, violate the constitutional separation of powers.  *See DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

In relation to plaintiff's Spending Clause claim, the challenged conditions bear much more than "some relationship" to the purposes of the Byrne JAG Program, and thus meet the relatedness element of the Spending Clause.  *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).  OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).  The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and the "long-established cooperative principles among law enforcement agencies."  *See* Administrative Record ("AR") at AR-00992 (USDOJ Press Release No. 17-826 (July 25, 2017)).  The conditions are also unambiguous.  *See S. Dakota v. Dole*, 483 U.S. 203, 210 (1987).

Plaintiff also alleges that its ordinances that expressly limit cooperation with federal immigration authorities, Chapters 12H and 12I of the San Francisco Administrative Code, nevertheless comply with 8 U.S.C. § 1373(a).  However, to give Congress's choice of the phrase "*information regarding* . . . citizenship or immigration status" its intended meaning, 8 U.S.C. § 1373 (emphasis added), Section 1373 must encompass information relevant to determining an individual's compliance with the INA, which naturally includes information relevant to ascertain-ing that individual's removability.  Thus, Section 1373 covers, at minimum, the contact informa-tion and release status of aliens, since such information is central to that inquiry.  Because Chapters 12H and 12I, on their face and as shown by the information revealed in discovery in this action,

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1  prohibits or restricts giving federal authorities these categories of information, San Francisco

2  cannot be entitled to a declaratory judgment that these ordinances comport with Section 1373.

3      For these reasons and for those explained below, the Court should grant defendants' motion

4  for summary judgment and deny plaintiff's motion.

5  **STATUTORY AND ADMINISTRATIVE BACKGROUND**

6  **I.    The Immigration and Nationality Act**

7      Enforcement of the immigration laws, including and especially the investigation and appre-

8  hension of criminal aliens, is quintessentially a law enforcement function.  Through the INA, 8

9  U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the

10 entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities

11 are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland

12 Security ("DHS"), USDOJ, and other Executive agencies to administer and enforce the immigration

13 laws.  The INA permits the Executive Branch to exercise considerable discretion to direct enforce-

14 ment pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396-97.

15     Yet, immigration enforcement is also a cooperative endeavor, as the INA *also* repeatedly

16 contemplates cooperation among state and local officers and federal officials on immigration

17 enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under

18 which trained and qualified state and local officers may perform specified functions of a

19 federal immigration officer in relation to the investigation, apprehension, or detention of aliens);

20 *id.* § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's

21 prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state

22 and local officers to arrest certain felons who have unlawfully returned to the United States); *see*

23 *also* Declaration of Francisco Madrigal (ICE) ¶¶ 6-8 (Attachment 1 hereto); Amended Declara-

24 tion of Thomas D. Homan (ICE) ¶¶ 35-38 (Attachment 2 hereto).  Under authorities such as

25 these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at

26 408.  And – of particular relevance to this suit – pursuant to 8 U.S.C. § 1373, "a Federal, State, or

27 local government entity or official may not prohibit, or in any way restrict, any government entity

28

4

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1  or official from sending to, or receiving from, [federal immigration authorities] information regard-

2  ing the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a).[3]

3        The INA further provides that certain classes of aliens shall be removed from the United

4  States upon order of the Attorney General or Secretary of Homeland Security. *See, e.g.*, *id.*

5  §§ 1227(a), 1228.  In furtherance of that statutory objective, the INA requires federal authorities

6  to take custody of certain criminal aliens pending removal proceedings "when the alien is

7  released" from state or local custody. *Id.* § 1226(c)(1).  Thus, the release of an alien who has

8  been convicted of certain criminal offenses from state custody constitutes a triggering event for

9  one of the Federal Government's core law enforcement responsibilities – that is, the removal of

10  criminal aliens under the INA.  Also in furtherance of the Federal Government's responsibility to

11  remove criminal aliens "promptly" after their release from criminal custody, federal immigration

12  authorities need to be able to interview aliens *while in custody* to determine whether they should

13  be removed upon the conclusion of that custody.

14  **II.    USDOJ Office of Justice Programs and the Byrne JAG Program**

15        Title I of the Omnibus Crime Control and Safe Streets Act of 1968 established the Office of

16  Justice Programs ("OJP"), and provides for OJP to be headed by an Assistant Attorney General.

17  *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. § 10101 *et seq.*  The

18  same title of the Omnibus Crime Control Act also established an early iteration of what became the

19  Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program.  *See generally* 34

20  U.S.C. §§ 10151-58.  Under this Program – which came into its modern iteration through the

21  Violence against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No.

22  109-162, 119 Stat. 2960 (2006) ("USDOJ Reauthorization Act") – OJP is authorized to "make

23

24        [3] Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of
Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal,
25  State, or local government entity from doing any of the following with respect to information
regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such infor-
26  mation to, or requesting or receiving such information from, [federal immigration authorites].
(2) Maintaining such information. (3) Exchanging such information with any other Federal, State,
27  or local government entity."

28                                                    5

1    grants to States and units of local government . . . to provide additional personnel, equipment . . .

2    and information systems for criminal justice, including for any one or more of [certain enumerated]

3    programs." *Id.* § 10152(a)(1). In the same chapter, "criminal justice" is defined broadly to include

4    various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

5           The Byrne JAG Program provides "formula grants," that is, grants that – when awarded –

6    follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.*

7    §§ 10152(a)(1), 10156. For Fiscal Year ("FY") 2017, Congress appropriated $396,000,000 for the

8    Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives. *See*

9    Consolidated Appropriations Act, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203 (2017).

10   By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of

11   local government must submit an application "in such form as the Attorney General may require,"

12   34 U.S.C. § 10153(a); and the application must include, among other things, "[a] certification, made

13   in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . .

14   applicable Federal laws," *id.* § 10153(a)(5)(D). The application also must contain several

15   assurances, including "[a]n assurance that, for each fiscal year covered by an application, the appli-

16   cant shall maintain and report such data, records, and information (programmatic and financial) as

17   the Attorney General may reasonably require." *Id.* § 10153(a)(4).

18          Before 2006, the statute provided, without elaboration, that the AAG for OJP had the

19   power to "exercise such other powers and functions as may be vested in the Assistant Attorney

20   General pursuant to this chapter or by delegation of the Attorney General." 42 U.S.C.

21   § 3712(a)(6) (2000). Of particular relevance to the cross-motions now before the Court, in the

22   same USDOJ Reauthorization Act that brought the Byrne JAG Program into its modern iteration,

23   Congress amended the statute to expressly provide that these powers "includ[e] p*lacing special*

24   *conditions on all grants, and determining priority purposes for formula grants*." Pub. L. No.

25   109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6).

26

27

28
                                                    6

1    **III.    Conditions on Byrne JAG Awards**

2            OJP has historically included a variety of conditions, which have varied according to

3    national law enforcement necessities and USDOJ priorities, in Byrne JAG award documents.  For

4    example, OJP has imposed, without objection, conditions related to information sharing and

5    privacy protection, *see* Defendants' Request for Judicial Notice ("RJN"), Ex. A (San Francisco

6    Byrne JAG Award 2016) ¶ 27, research using human subjects, *see id.* ¶ 30, and training, *see id.*

7    ¶¶ 33-34.[4]  Other historical conditions imposed by the Assistant Attorney General have been

8    inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent*

9    congressional codification.  One such condition, which prohibited use of Byrne JAG funds to

10   purchase military style equipment, related in part to an Executive Order issued by President

11   Obama in 2015.  *See id.* ¶ 43; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015),

12   *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).  Since 2012, other

13   conditions have required that recipients (1) comply with specific national standards when

14   purchasing body armor and (2) institute a "mandatory wear" policy for any purchased armor.

15   RJN, Ex. A ¶¶ 39-40.  While those conditions have now been codified by Congress, *see* 34 U.S.C.

16   § 10202(c)(1)(B), (C), they originated as exercises of USDOJ's authority to impose special

17   conditions.  And the AAG has imposed an "American-made" requirement for body armor

18   purchases, something Congress did not choose to codify last year.  RJN, Ex. A ¶ 39.  In recent

19   years, the number of conditions attached to Byrne JAG grants has typically numbered in the

20   several dozen.  *See* RJN, Ex. A (San Francisco 2016 award, containing more than 50 conditions).

21           In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was

22

23           [4] Plaintiff has asked the Court to take judicial notice of a wide variety of documents, from
     official government reports to news articles. Dkt. No. 107.  Although defendants do not object to
24   plaintiff's request in relation to the existence or authenticity of the documents submitted, the
     Court should not take judicial notice of any disputed facts contained in them.  *See*, *e.g.*, *Shenwick*
25   *v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1122-23 (N.D. Cal. 2017) ("The set of documents listed
     above are . . . properly subject to judicial notice.  However, because the facts contained in the
26   documents are subject to reasonable dispute, the Court takes judicial notice only of the statements
     contained therein, but not for the purpose of determining the truth of those statements.") (citations
27   omitted).

28
                                                        7
     Defs' SJ Motion & Opp.
     No. 3:17-cv-04642-WHO

1   an applicable federal law under the Byrne JAG Program.  *Id.* ¶ 53.  That recognition followed a

2   memorandum issued by the Department's Inspector General on May 31, 2016, expressing

3   concern that several state and local governments receiving federal grants may not be complying

4   with Section 1373.  *See* AR-00366-00381 ("2016 OIG Report").

5           For the current Byrne JAG grant cycle, FY 2017, OJP notified applicants that awards under

6   the Program will include three conditions requiring modest cooperation with federal law enforce-

7   ment in the immigration setting.  Those conditions require grantees (1) to have a policy of providing

8   DHS with advance notice of the scheduled release date of certain individuals held in state or local

9   correctional facilities (the "notice condition"); (2) to have a policy permitting federal agents to

10  access state or local correctional facilities for certain immigration enforcement purposes (the

11  "access condition"); and (3) to comply with Section 1373, which, as noted above, prohibits state

12  and local government and law enforcement entities or officials from restricting certain

13  communications with DHS (the "Section 1373 condition").  RJN, Ex. B (Greenville SC Award

14  2017) ¶¶ 53, 55, 56; RJN, Ex. C (Binghamton NY Award 2017) ¶¶ 16, 24, 41.

15          Under the "Rules of Construction" within those grant conditions, the award documents

16  make clear that nothing in the notice or access conditions requires a grantee to detain "any

17  individual in custody beyond the date and time the individual would have been released in the

18  absence of this condition."  RJN, Ex. B ¶¶ 53, 55, 56; RJN, Ex. C ¶¶ 53, 55, 56.  The documents

19  also make clear that these conditions impose no requirements in relation to any requests by

20  federal immigration authorities to detain non-U.S. citizens, and that the notice condition requires

21  "only as much advance notice as practicable" before the release of a non-U.S. citizen.  *Id.*

22  Finally, the conditions apply only to the "program or activity" to be funded under the award, and

23  they allow awarded funds to be used for costs incurred in implementing the conditions.  *See id.*

24  **IV.   Recent Developments**

25          OJP ceased issuing FY 2017 Byrne JAG award documents after the notice and access

26  conditions were preliminarily enjoined nationwide in *City of Chicago v. Sessions*, 264 F. Supp. 3d

27  933 (N.D. Ill. 2017), which occurred after the Office had issued only two of the awards.  OJP

28
                                                          8

resumed issuing such award documents on June 26, 2018, after the Seventh Circuit en banc stayed the nationwide application of that injunction, but the Office has not issued FY 2017 awards to those applicant jurisdictions whose compliance with Section 1373 remains under review. *See* Declaration of Marilynn B. Atsatt ¶¶ 2, 3 (Attachment 3 hereto); *see also*, *e.g.*, RJN, Ex. D (Alaska Award 2017), Ex. E (Charleston WV Award 2017). OJP is, however, retaining sufficient FY 2017 monies to fund awards to all applicant States and localities, and those funds will be available to fund such awards, as applicable, once the question of compliance with Section 1373 is resolved. *See* Atsatt Decl. ¶ 3. San Francisco is one of those jurisdictions. *Id.* ¶ 4.

**ARGUMENT**

**I.     The Challenged Immigration-Related Byrne JAG Conditions Are Lawful**

    **A.     The Conditions Are Authorized by Statute and Do Not Violate the Separation of Powers**

Count II of San Francisco's First Amended Complaint alleges that the notice, access, and Section 1373 conditions violate the Constitution's separation of powers. Am. Compl. ¶¶ 177-88. This claim rests on the fundamentally flawed premise that Congress has not authorized USDOJ to impose these conditions on the receipt of Byrne JAG funds.[5]

**1.     The Notice and Access Conditions are Lawful**

As a preliminary matter, San Francisco does not dispute that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to attach conditions on agency spending. *See*, *e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to

---

[5] Given that this case seeks judicial review of federal agency action, it is necessarily subject to the requirements and standards of the Administrative Procedure Act. Therefore, the issue under the parties' cross-motions for summary judgment is whether the agency "could reasonably" have reached its conclusion. *Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)).

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1  executive branch officials the authority to make certain decisions regarding how those funds are

2  to be spent."); *DKT Mem'l Fund Ltd.*, 887 F.2d at 280-81 (upholding conditions on spending

3  imposed by President where statute authorized President to set certain "terms and conditions as he

4  may determine").  Accordingly, San Francisco's attempt to make much of the fact that Congress

5  did not *itself* impose either the notice or the access condition,[6] *see* SF Mem. at 8, 11 (Dkt. No. 99),

6  is wholly beside the point.  Rather, the sole relevant question is whether Congress has *delegated*

7  sufficient authority to USDOJ to impose these conditions, in order to promote intergovernmental

8  law enforcement cooperation.

9           An examination of the relevant statutory framework for the Byrne JAG Program

10  inexorably provides an affirmative response to that question.  The contemporary version of the

11  Byrne JAG Program was created in 2006, when the USDOJ Reauthorization Act merged two

12  earlier programs.  Pub. L. No. 109-162.  Before the 2006 amendments, the relevant statute

13  provided only that the AAG for OJP was authorized to "exercise such other powers and functions

14  as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of

15  the Attorney General."  42 U.S.C. § 3712(a)(6) (2000).  But crucially, in the USDOJ Reauth-

16  orization Act, Congress expressly amended this provision "by inserting 'including placing special

17  conditions on all grants, and determining priority purposes for formula grants' before the period

18  at the end."  USDOJ Reauthorization Act, § 1152(b), 119 Stat. at 3113, *codified at* 34 U.S.C.

19  § 10102(a)(6).  And confirming this amendment's plain text, a report accompanying the Act

20  explained that the amendment would "allow[] the Assistant Attorney General to place special

21  conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No.

22  109-233, at 101 (2005).

23           This context confirms that Congress intended the "special conditions" and "priority

24

25           [6] San Francisco challenges all three conditions on separation of powers grounds.  *See* Am.
    Compl. ¶¶ 177-88.  However, as Section 1373 is a duly enacted federal law, the City's arguments
26  with respect to the Section 1373 condition differ from those it interposes with respect to the notice
    and access conditions.  Defendants address the Section 1373 condition below.  *See infra* text at 14-
27  18.

28                                                      10
    Defs' SJ Motion & Opp.
    No. 3:17-cv-04642-WHO

purposes" language to confer distinctive and meaningful power.  Although San Francisco contends that Section 10102(a)(6) "is not itself a grant of authority," SF Mem. at 16, it fails to explain why Congress would have added that language, if not to confer the authority described.  Another law *already* authorized the Attorney General to delegate the performance of his functions.  *See* 28 U.S.C. § 510.  Thus, San Francisco's reading of the statute gives no practical effect to *either* the "special condition" or the "priority purpose" powers – and directly contravenes the "fundamental canon of statutory construction that a statute should not be construed so as to render any of its provisions mere surplusage."  *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003); *see, e.g.*, *Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("'When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.'") (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).[7]

Further, in keeping with the canon against surplusage, Section 10102(a)(6) conveys *independent* authority for the AAG to "determine priority purposes for formula grants." Congress's express formulation plainly indicates an intention to allow the AAG to exercise a

---

[7] San Francisco relatedly argues that Section 10102(a)(6) lies in "an entirely different, separate statutory subchapter," and therefore, "cannot bear the weight the Attorney General places upon it." SF Mem. at 15-16.  San Francisco is correct that Section 10102(a) – which sets forth the general duties and authorities of the AAG for OJP – is codified in Subchapter 1 ("Office of Justice Programs"), while the Byrne JAG Program itself is codified in Subchapter 5 ("Bureau of Justice Assistance Grant Programs") of the same chapter of Title 34 of the U.S. Code.  But plaintiff's argument fundamentally misunderstands the codification of the Byrne JAG Program among the Bureau of Justice Assistance grant programs. *See* 34 U.S.C. §§ 10151-10158.  The Director of the Bureau of Justice Assistance ("Bureau") "report[s] to the Attorney General through the Assistant Attorney General" for OJP.  34 U.S.C. § 10141(b); *see* OJP, *About Us*, https://ojp.gov/about/about.htm#ojp-bureaus (OJP organizational chart) (last visited July 31, 2018). Thus, the Bureau *is part of OJP*, not an independent entity – and the authority conferred on the AAG for OJP by Section 10102(a)(6) necessarily reaches all programs under his supervision, including (but not limited to) the Byrne JAG Program. *See, e.g.*, Pub. L. 106-113, div. B, § 1000(a)(1) [title I, § 108(a)], Nov. 29, 1999, 113 Stat. 1535, 1501A-20 (given permanent effect by Pub. L. 106-553, § 1(a)(2) [title I, § 108], Dec. 21, 2000, 114 Stat. 2762, 2762A-67), codified as amended at 34 U.S.C. § 10110 note (generally conferring upon the AAG for OJP "final authority over all functions, including any grants, cooperative agreements and contracts made, or entered into, for the Office of Justice Programs and the component organizations of that Office").

11

degree of discretion over *formula* grants in particular.[8]  Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority (1) to articulate broad priorities for a given Fiscal Year's grant program, (2) to include, on program application forms, inquiries regarding the designated priority purpose, and (3) to impose eligibility conditions reflecting the priority purpose.  In other words, under a plain reading of the statute, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.  Additionally, because States and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program if this authority were invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

San Francisco offers various arguments to avoid this conclusion, none of which has merit.  First, the City argues that "Congress's decision to structure the Byrne JAG program as a formula grant" is "irreconcilable" with the imposition of the challenged conditions.  SF Mem. at 9.  This argument, however, confuses conditions on grant *eligibility* (and conditions on the spending of grant funds by grant recipients) with the *formula* for allocating funds to eligible recipients.  Although deviation from the statutory formula for allocating funds among eligible jurisdictions is not permitted except in limited circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of an applicant's award under that formula is unrelated to the antecedent question of whether it has demonstrated its eligibility to receive the funds by complying with an eligibility condition authorized by statute.  *See id.* § 10152 ("From amounts made available to carry out this part, the

---

[8] Similar delegations of discretionary authority over the terms and conditions of federal grants are commonplace.  *See*, *e.g.*, 42 U.S.C. § 713(a)(1)(C) (providing for HHS grants for personal responsibility education, to be paid upon satisfaction of certain statutory requirements *and* "*such additional requirements as the Secretary may specify*"); *id.* § 1395*l*(t)(2)(E) (providing that HHS Secretary may make certain adjustments to Medicare spending as well as "other adjustments as determined to be necessary to ensure equitable payments"); 25 U.S.C. § 1644(b) (authorizing Secretary of Interior to "place conditions as deemed necessary to effect the purpose of this section in any grant or contract which the Secretary makes with any Indian tribe or tribal organization pursuant to this section.").

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

Attorney General *may, in accordance with the formula established under section 10156 of this title*, make grants …") (emphasis added).  And the amount of a recipient's award under a formula grant is also unrelated to the issue of whether the recipient's spending of award funds may be subject to federal conditions.  For similar reasons, the authority to impose the challenged conditions does not render superfluous provisions of other statutory regimes that contemplate USDOJ withholding designated percentages of Byrne JAG funds as a penalty for noncompliance; such penalties operate on the allocation otherwise made by the statutory formula, irrespective of whether USDOJ has exercised its authority to set conditions of eligibility for grants.  *Contra* SF Mem. at 11.

Likewise, contrary to San Francisco's assertions, giving meaningful effect to the "special conditions" and "priority purposes" powers established by 34 U.S.C. § 10102(a)(6) in no way contradicts Congress's express statement that the Attorney General can impose "reasonable conditions" when administering a separate grant program designed to combat violence against women.  *Contra* SF Mem. at 11 (citing 34 U.S.C. § 10446(e)(3)).  That program is administered not by OJP but by the Violence Against Women Office, which is a "separate and distinct office" within DOJ that is headed by a Director "who shall report to the Attorney General."  34 U.S.C. § 10442(b).  That Congress used different language to confer authority in connection with that distinct program has no bearing on the issue presented here.

Additionally, San Francisco's insistence that "special conditions" may be imposed only on a case-by-case basis, and only on "high-risk" grantees, SF Mem. at 17, is flatly belied by OJP's history of employing its "special conditions" authority to impose various substantive conditions on *all* grantees – including, to cite two recent examples, limitations on research using human subjects, and an "American-made" requirement for body armor purchases.  RJN, Ex. A ¶¶ 30, 39; *see supra* text at 7 (discussing other conditions); RJN, Ex. A (setting forth more than fifty "special conditions" of general applicability).  San Francisco fails to explain how its narrow reading of "special conditions" is compatible with any of the across-the-board conditions the

13

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1   Department has imposed for years pursuant to this delegated authority.[9]

2          Lastly, San Francisco attempts to attach legal significance to the fact that Congress

3   considered, but ultimately declined to enact, various proposed amendments to the Byrne JAG

4   Program that would – by statute – attach similar conditions to those challenged here.  SF Mem. at

5   12.  But as the Supreme Court has repeatedly cautioned, "failed legislative proposals are 'a

6   particularly dangerous ground on which to rest an interpretation of a prior statute.'"  *United States*

7   *v. Craft*, 535 U.S. 274, 287 (2002) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S.

8   633, 650 (1990)).  "Such proposals lack 'persuasive significance' because 'several equally

9   tenable inferences may be drawn from [congressional] inaction, including the inference that the

10  existing legislation already incorporated the offered change.'"  *FTC v. AT&T Mobility LLC*, 883

11  F.3d 848, 857-58 (9th Cir. 2018) (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 650).

12         Thus, the notice and access conditions – which merely promote inter-governmental law

13  enforcement cooperation with respect to criminal aliens, so that grantee policies do not impair

14  federal law enforcement policies – come comfortably within the fonts of delegated power in

15  Section 10102(a)(6).  Pursuant to this authority, the AAG may condition the award of formula

16  grants, like Byrne JAG grants, on state and local cooperation with federal authorities in achieving

17  federal law enforcement priorities, including the removal of criminal aliens.

18

19

20  _____

21         [9] Plaintiff posits that a *rescinded* regulation somehow constrains the "special conditions"
    authority conferred by Section 10102(a)(6).  SF Mem. at 17 (citing the former 28 C.F.R. § 66.12
22  (rescinded Dec. 19, 2014)).  But even apart from the absence of any legal authority supporting the
    proposition that a former regulation may somehow constrain the meaning of a current law, this
23  theory suffers from several fundamental defects.  Most significantly, if Congress had intended to
    cabin the term "special conditions" in the manner proposed by plaintiff, it could easily have said
24  so.  But not only is the statute utterly devoid of any language referencing, incorporating, or
    otherwise limiting its application to the former regulation, the statute expressly authorizes the
25  imposition of "special conditions" on not just "some" or "certain" grants, or in certain
    circumstances, but rather "*on all grants*."  34 U.S.C. § 10102(a)(6) (emphasis added).  Simply
26  put, this capacious phrasing – which, as noted above, is reaffirmed in the relevant legislative
    history, H.R. Rep. No. 109-233, at 101 – is not compatible with the straight-jacketed
27  interpretation advanced by the plaintiff.

28                                                14

1

2.       **The Section 1373 Condition Is Lawful**

2

a.       ***Murphy* Supports the Legality of Section 1373**

3

Citing the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic*

4

*Ass'n*, 138 S. Ct. 1461 (2018), San Francisco additionally argues – for the first time in this

5

litigation – that Section 1373 is facially unconstitutional under the Tenth Amendment and, *a*

6

*fortiori*, cannot be "applicable" to the Byrne JAG Program.  SF Mem. at 12-14.  These arguments

7

fail, for several reasons.

8

First and most fundamentally, *Murphy* is inapposite here, because – unlike *Murphy* – this

9

case concerns conditions on a *voluntary federal grant*.  It is beyond dispute that "a perceived

10

Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly

11

limit the range of conditions legitimately placed on federal grants."  *S. Dakota v. Dole*, 483 U.S.

12

203, 210 (1987).  Thus, the Supreme Court has routinely held that conditioning the receipt of

13

federal funds on whether a state or local jurisdiction complies with a federal statute or takes some

14

other action does not violate the Tenth Amendment, so long as the "State could . . . adopt the

15

simple expedient of not yielding to what she urges is federal coercion."  *Id.*  It follows that the

16

Spending Clause, not the Tenth Amendment, provides the proper rubric for analyzing the claims

17

at issue here – and that the facial validity of Section 1373 is not simply not legitimately before the

18

Court.

19

But even if this Court were somehow to evaluate the facial constitutionality of Section

20

1373, *Murphy* would support its legality, for several reasons.  First, the statute addressed in

21

*Murphy* – the Professional and Amateur Sports Protection Act of 1992 ("PASPA") – was a clear

22

effort to avoid accountability and require states themselves to regulate sports betting in the

23

manner Congress wished.  *See* 138 S. Ct. at 1478.  In contrast, Section 1373 is an information-

24

sharing component of the overall removal scheme, in which the Federal Government takes full

25

responsibility for regulation of and enforcement against individuals.

26

Second (and relatedly), the Supreme Court has explained elsewhere that its precedents on

27

"commandeering" do not apply in the same way when access to information is at issue – a

28

15

principle that *Murphy* does not in any way undermine.  Simply put, the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases."  *Reno v. Condon*, 528 U.S. 141, 151 (2000); *see*, *e.g.*, *Printz v. United States*, 521 U.S. 898, 918 (1997) (recognizing that statutes "which require only the provision of information to the Federal Government[ ] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program."); *id.* at 936 (noting that the commandeering principle is not properly understood as reaching "purely ministerial reporting requirements," such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice") (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).  This is because an information-access requirement like Section 1373 does not "regulate the States' sovereign authority to regulate their own citizens," *Murphy*, 138 S. Ct. at 1479 (citation omitted), but rather ensures federal access to information regarding regulated individuals that is needed for the Federal Government to regulate those individuals.[10]  Thus, since Section 1373 merely secures information needed to carry out a federal statutory scheme, it does not present any legitimate concern regarding a deflection of political responsibility.  Further, Section 1373 ensures that the Federal Government has the information it needs to "regulate individuals, not States."  *Murphy*, 138 S. Ct. at 1476.

Consistent with these principles, *Murphy* supports the legality of Section 1373.  To the extent this Court disagrees with the above, however, and concludes that *Murphy* is relevant in the grant context, that plaintiff properly raises the validity of Section 1373, and that *Murphy* requires a holding that Section 1373 itself does not allow the government to reject San Francisco's Byrne

---

[10] In this respect, *Murphy* did not call into question any aspect of *Arizona* – and indeed, cited the decision favorably with respect to the settled understanding that the Federal Government's broad immigration authority permits Congress to "foreclose any state regulation in the area," 138 S. Ct. at 1481 (quoting *Arizona*, 567 U.S. at 401).  *Murphy* thus supports defendants' argument that States and local jurisdictions may not employ conflicting standards and practices that interfere with the federal immigration scheme.

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1
2
3
4

JAG application due to constitutional concerns, the Court should nonetheless consider whether the statute's language – namely, that the City may not restrict the sharing of information regarding immigration status – can operate as an independent grant condition regardless of the underlying validity of Section 1373.

5
6

### b.       Section 1373 Is an "Applicable Federal Law" within the Meaning of 34 U.S.C. § 10153(a)(5)(D)

7
8
9

San Francisco further argues that even if Section 1373 is constitutional, defendants may not require compliance with the statute as a condition of Byrne JAG funding.  SF Mem. at 14-15. This argument likewise fails on several grounds.

10
11
12
13
14
15
16
17
18
19

The relevant statutory language provides that a Byrne JAG applicant "shall submit an application . . . in such form as the Attorney General may require," to "include . . . [a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with all provisions of this part *and all other applicable Federal laws*."  34 U.S.C. § 10153(a) (emphasis added).  Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]."  *Id*.  Under this power, USDOJ may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

20
21
22
23
24
25
26
27

Courts have broadly interpreted the term "applicable laws."  *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting statutory term "applicable laws" as "laws outside the Act" (emphasis omitted)); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude federal agency circulars but to reach laws made by

28

17

1  Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all

2  applicable federal laws" granted "very broad statutory authority").

3        Instead of "applicable Federal laws" being cabined artificially to, per the City's

4  suggestion, those federal laws that, by their text, govern federal grantees, a natural and coherent

5  reading is that "applicable Federal laws" simply refers to the corpus of federal laws that indepen-

6  dently apply to Byrne JAG grantees.  (8 U.S.C. § 1373 is, of course, one such law.)  Here, it is

7  important to bear in mind the context of the Byrne JAG Program, under which all grantees are

8  state and local jurisdictions rather than private individuals or entities.  The limitation in Section

9  10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring

10  certification of compliance with, for example, federal tax laws that by their terms apply to private

11  individuals rather than to the state and local jurisdictions that the Byrne JAG Program contem-

12  plates as grantees.  It is entirely sensible for Congress to use the word "applicable" in Section

13  10153(a)(5)(D) with this meaning tailored to this class of potential grantees; there is nothing

14  implausible about Congress expecting a recipient of federal funds to certify its compliance with a

15  federal law with which the recipient is – independent of receiving such funds – already obligated

16  to comply.  And this authorization does not confer unlimited discretion on USDOJ because the

17  Spending Clause is, of course, an independent bar – one that is met here – on what sorts of

18  applicable federal laws may be the basis of a Byrne JAG grant condition.  *Id.* at 945.

19        Finally, the City's contention that USDOJ has allegedly not heretofore asked Byrne JAG

20  grantees to comply with federal laws beyond those governing grantees is also irrelevant, as the

21  contention "that the Attorney General has not exercised authority does not necessarily speak to

22  whether he possesses it, especially where the statutory terms embrace such an authorization."

23  *Chicago*, 264 F. Supp. 3d at 945.

24        Thus, independent of the authority conferred in Section 10102(a)(6), USDOJ has statutory

25  authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws."

26  34 U.S.C. § 10153(a)(5)(D).  This authority plainly permits USDOJ to impose the Section 1373

27  condition upon providing notice that Section 1373 is an "applicable" federal law.

28

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Notice, Access, and Section 1373 Conditions Are Consistent
         with the Spending Clause**

In Count Three of its First Amended Complaint, plaintiff alleges that the notice, access,

and Section 1373 conditions violate the Spending Clause by imposing grant conditions that are

purportedly ambiguous and "not germane" to the purposes of the Byrne JAG Program.  Am.

Compl. ¶ 191.  Both contentions are incorrect.[11]

**1.      The Notice, Access, and Section 1373 Conditions Are Unambiguous**

It is well-established that the Spending Clause authority is "broad," and empowers Congress

to "set the terms on which it disburses federal money to the States[.]"  *Arlington Cent. Sch. Dist.

Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also*, *e.g.*, *Dole*, 483 U.S. at 206 (noting that

Congress has "repeatedly employed the [spending] power to further broad policy objectives by

conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and

administrative directives.") (citations omitted).  While it is beyond dispute that the Spending Clause

confers "broad" authority, that authority is nonetheless subject to certain discrete limitations,

including that any terms attached to the receipt of federal funds must be "unambiguous[]," and thus

enable the potential recipient to "exercise [its] choice" to participate (or not) in the program

"knowingly, cognizant of the consequences of [its] participation."  *Dole*, 483 U.S. at 207 (citations

omitted); *see*, *e.g.*, *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a

"'permissible method of encouraging a State to conform to federal policy choices,' because 'the

ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the

federal grant.") (quoting *New York v. U.S.*, 505 U.S. 144, 168 (1992)).  Contrary to plaintiff's

assertions, the challenged conditions easily satisfy the clear-notice requirement.

First, these conditions clearly state what conduct is required, so that grantees can "exercise

their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at

207 (citation omitted).  With regards to the Section 1373 condition, the award documents clearly

---

[11] The amended complaint also alleges that the conditions would require grantees to
"engage in unconstitutional activity," Am. Compl. ¶ 191, but plaintiff seems to have abandoned
that allegation since it is not mentioned in the motion for summary judgment.

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1   indicate that ongoing compliance with the Section 1373 condition entails not prohibiting or in any

2   way restricting information regarding citizenship or immigration status.  RJN, Ex. B ¶¶ 53-55

3   (Greenville SC Award 2017).  To further provide detail to grant applicants, in October 2016, OJP

4   issued additional guidance regarding compliance with the Section 1373 condition.  RJN, Ex. F.[12]

5   Plaintiff argues that there is no "limiting principle" on the information covered by defendants'

6   interpretation of Section 1373.  SF Mem. at 20.   However, in order to address and resolve

7   plaintiff's claim, the defendants need not articulate, and the Court need not adjudicate, every

8   category of information that may fall within Section 1373.

9          The notice and access conditions require grantees (1) to give "agents of the United States

10   acting under color of federal law" access to correctional facilities "to meet with individuals who

11   are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be

12   or remain in the United States," and (2) to notify DHS, upon "formal written request" and "as

13   early as practicable," before "the scheduled release date and time for a particular alien in such

14   facility."  RJN, Ex. B (Greenville SC Award 2017) ¶¶ 53, 55, 56; RJN, Ex. C (Binghamton NY

15   Award 2017) ¶¶ 53, 55, 56.  The award documents also specify that nothing in these conditions

16   requires a grantee to detain "any individual in custody beyond the date and time the individual

17   would have been released in the absence of this condition;" that the conditions impose no require-

18   ments regarding any requests by federal immigration authorities to detain aliens; and that the

19   notice condition requires "only as much advance notice as practicable."  *Id.*  Moreover, to the

20   extent any uncertainty might remain, the FY 2017 Byrne JAG solicitation invited any prospective

21   grantee with a question about "any . . . requirement of this solicitation" to contact OJP's Response

22   Center (customer service center) by telephone, email, or Internet chat.  Am. Compl., Ex. B at 2.

23   A prospective grantee could also contact the appropriate "Grant Manager" – that is, a specific,

24

25

26          [12] Plaintiff cites Exhibit I to the Declaration of Mollie M. Lee, which is currently at issue
    in Defendants' Administrative Motion to Strike Certain Exhibits from Plaintiffs' Summary
27   Judgment Motions.  Dkt. No. 109.  If the Court grants that motion, defendants request that the
    Court not consider the exhibit in relation to plaintiff's motion for summary judgment.

28
                                                    20

1    named OJP employee assigned to work with jurisdictions within a specified geographical area.[13]

2    *See* BJA Programs Office Contact Information, *available at* https://www.bja.gov/ about/

3    Contacts/ ProgramsOffice.html (last visited July 31, 2018).[14]

4            Further, any arguable marginal uncertainty regarding the outer boundaries of the

5    challenged conditions would not render them unconstitutionally ambiguous.  Indeed, "the exact

6    nature of [grant] conditions may be largely indeterminate, provided that the existence of the

7    conditions is clear, such that States have notice that compliance with the conditions is required."

8    *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see*, *e.g.*, *Benning v.*

9    *Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to

10   attach federal conditions to Spending Clause legislation, it need not specifically identify and

11   proscribe in advance every conceivable state action that would be improper.") (citation omitted).

12   Moreover, plaintiff does not complain about the clarity of any other Byrne JAG conditions, such

13   as those requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31

14   U.S.C. § 1352, RJN, Ex. A ¶ 17, compliance with "federal appropriations statutes" generally, *id.*

15   ¶ 18; reporting of evidence of violations of the False Claims Act, *id.* ¶ 19; and compliance with

16   prohibitions on reprisal under 41 U.S.C. § 4712, *id.* ¶ 21.

17                  **2.      The Notice, Access, and Section 1373 Conditions Are
                             Related to the Purposes of the Byrne JAG Program**

18           Second, plaintiff alleges that the Byrne JAG conditions are not reasonably related to the

19   purpose of the Byrne JAG program.  SF Mem. at 22.  As the Court of Appeals has observed,

20   however, this aspect of *Dole* suggests only a "possible ground" for invalidating an enactment, and

21

22           [13] Plaintiff argues that the access condition is ambiguous because of certain statements
     made by USDOJ in litigation.  SF Mem. at 21.  But those statements merely show different sides
23   of the same coin in relation to asking detainees whether they consent to meet with federal
     immigration authorities:  the access condition does not control what a jurisdiction may tell a
24   detainee, including that the detainee can refuse to meet with federal authorities.  But a jurisdiction
     that accepts Byrne JAG funds must still give immigration authorities access to its facility for such
25   meetings.  This does not mean that DHS would necessarily ignore an individual's failure to
     provide such consent, only that – under the access condition – San Francisco may not insert itself
26   between federal authorities and the detainee.
             [14] "BJA" refers to the Bureau of Justice Assistance, the OJP component that administers
27   the Byrne JAG Program.

28                                                      21
     Defs' SJ Motion & Opp.
     No. 3:17-cv-04642-WHO

does not impose an "exacting standard":

> The Supreme Court has suggested that federal grants conditioned on compliance with federal directives *might* be illegitimate if the conditions share no relationship to the federal interest in particular national projects or programs. This possible ground for invalidating a Spending Clause statute, which only suggests that the legislation *might* be illegitimate without demonstrating a nexus between the conditions and a specified national interest, is a far cry from imposing an exacting standard for relatedness.

*Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (citing *Dole*, 483 U.S. at 207). Thus, conditions on federal funding must only "bear some relationship to the purpose of the federal spending." 314 F.3d at 1067 (quoting *New York v. United States*, 505 U.S. 144, 167 (1992)); *see Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004) (noting that Supreme Court has never "overturned Spending Clause legislation on relatedness grounds"). In fact, this Court has observed that a certification of compliance with Section 1373 "may have a sufficient nexus to the purpose of the implicated funds, depending on the breadth of the federal government's interpretation of Section 1373." *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry. *Mayweathers*, 314 F.3d at 1067. The Byrne JAG Program's organic statute specifies that grant funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). These goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] infor-mation" and "*maintain[ing] liaison with* . . . State governments" in matters relating to "criminal justice." 34 U.S.C. § 10102(a)(1), (2) (emphasis added). As relates to these statutes, the term "criminal justice" is defined broadly as "activities pertaining to *crime prevention, control, or reduction*, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*." *Id.* § 10251(a)(1) (emphases added); *see* 8 U.S.C. § 1227(a)(2). Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." *Duvall v. Att'y Gen. of U.S.*, 436

22

F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted).  Once removed, a criminal alien who has committed a removable offense – for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses – is no longer present in this country with the potential to re-offend.

The INA also repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id*. § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id*. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  Furthermore, given that the INA contemplates the federal detention of certain aliens upon their release from state or local custody, as discussed above, the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities not impair the law enforcement activities of the Federal Government.  It is crucial to this cooperative law enforcement framework that states and localities give federal agents access to detainees in their custody and avoid restricting the communication of information regarding immigration status to DHS.[15]

---

[15] Plaintiff argues that Congress's elimination, during a reorganization of the Byrne JAG statute, of a requirement to send information on the criminal conviction of aliens to federal immigration authorities suggests an intent to divorce the Program from immigration enforcement. Am. Compl. ¶ 65.  Absent any indication of such intent in the legislative history, however, the more reasonable assumption is that Congress simply found the provision to be unnecessary. Indeed, at the same time Congress eliminated that language, it added the AAG's discretionary authority to "plac[e] special conditions on all grants, and [to] determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6); *see* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), § 1152(b) (adding language to subsection (a)(6)); *id*. § 1111(a)(2)(C) (amending 42 U.S.C. § 3753).

23

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

## II.     The Court Should Enter Judgment for Defendants on Plaintiff's Request for a Declaration that its Ordinances Comply with Section 1373

Finally, in Count One of its First Amended Complaint, San Francisco seeks a declaration that its ordinances regarding non-cooperation with federal immigration authorities, Chapters 12H and 12I of the San Francisco Administrative Code, comply with Section 1373.  Plaintiff's request, however, is non-justiciable under principles of standing and ripeness, such that this claim should be dismissed in its entirety for lack of justiciability.

Further, assuming the Court reaches the merits of this claim, it should enter judgment for the defendants denying plaintiff's request for a declaratory judgment.  In order to address and resolve the merits of plaintiff's claim, the defendants need not articulate, and the Court need not adjudicate, every category of information that may fall within Section 1373(a) and (b).  Nor need the Court address whether Section 1373 requires affirmative steps to facilitate the orderly transfer of aliens to ICE custody beyond sharing the information relevant to immigration status including possible removal.   While preemption principles require (and the Tenth Amendment does not prohibit) the minimal level of cooperation involved in permitting an orderly transfer, *see generally Arizona*, 567 U.S. at 394-97, as a matter of statutory interpretation, Section 1373 does not extend that far.

Rather, to decide plaintiff's request for a declaration that its ordinances do not violate Section 1373, it is enough to know that San Francisco's ordinances prevent the City's employees from exchanging with federal authorities *at least some* of the information covered by Section 1373.  *Cf. Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 842 (D.C. Cir. 2008) ("We need not now fix the outer boundaries of [a particular] exemption [under the Federal Advisory Committee Act] because the Commission on the Intelligence Capabilities so clearly lies at its center[.]"); *Sesay v. Attorney Gen. of U.S.*, 787 F.3d 215, 221-22 (3d Cir. 2015) ("We need not define the outer boundaries of materiality today, however, because we conclude that Sesay's actions exceeded [the minimal] threshold.").  Because the contact information and release status of aliens are essential for federal immigration authorities to perform their basic functions, Section

24

1373 encompasses at least that information.  Chapters 12I and 12H, on their face and as shown by the information revealed in discovery in this action, prohibit giving DHS the contact information and release status of aliens.

> **A.     Plaintiff's Request for a Ruling Regarding Compliance with Section 1373 Is Non-Justiciable**

Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Matters outside this rubric are "non-justiciable."  *Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*, 288 F.3d 414, 416 (9th Cir. 2002).  Constitutional justiciability requires, among other things, that a dispute be ripe for judicial consideration.  In a challenge to governmental action, that means the challenged action must have been "formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).  These considerations are part of whether a case presents a concrete controversy under Article III.  *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001) ("The ripeness doctrine is derived from Article III's case or controversy requirement.  It prevents the courts from entangling themselves in abstract disagreements over administrative policies, and also protects the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by challenging parties.") (citation omitted), *aff'd sub nom. Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).[16]

As reflected in the exhibits to plaintiff's First Amended Complaint, OJP has expressed a concern that certain provisions of Chapters 12H and 12I may violate Section 1373, *see* Am. Compl., Exs. A, C, but the Office has not reached a final administrative determination on that subject.  OJP continues to evaluate the relevant evidence so that its final agency determination can

---

[16] These considerations do not involve merely "prudential ripeness," which asks, in contrast, about the "fitness" of the issues presented for judicial review and whether withholding review would subject the parties to "hardship."  *See Coons v. Lew*, 762 F.3d 891, 900 (9th Cir. 2014).

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1   include a record with all identifiable bases for the decision.  Accordingly, plaintiff's request for a

2   ruling that its ordinances comply with Section 1373 is constitutionally unripe.

### B.    Section 1373 Protects, at Minimum, the Contact Information and Release Status of Aliens

Turning to the merits, plaintiff argues that "information regarding . . . citizenship or immigration status" under Section 1373 means nothing more than "what a person's citizenship or immigration status is," SF Mem. at 26, but that reading is contrary to the language, context, and purposes of the statute.  As the Supreme Court has recognized, "reasonable statutory interpretation must account for both 'the specific context in which ... language is used' and 'the *broader context of the statute as a whole.*'"  *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (emphasis added).  When coupled with its placement within the wider framework of federal immigration law, the text of Section 1373 reflects Congress's intent that the provision reach the types of information critical in applying the "immigration laws," including the "removal of aliens."  8 U.S.C. § 1101(a)(17).

First, Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status, and courts "must give effect to every word of a statute wherever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004).  The Supreme Court recently provided guidance on the meaning of "regarding" and similar words in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) [hereinafter *Lamar*].  There, the Court noted that "respecting" in statutory language is materially equivalent to "concerning" and "regarding," and that the use of "respecting" (and similar words) "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id*. at 1759-60.  Faced with deciding whether a given piece of information constituted a "statement respecting [a] debtor's financial condition" under the Bankruptcy Code, the Court fashioned a standard – holding that a piece of information falls within that category "if it has a direct relation to or impact on the debtor's overall financial status" – but did not delineate all types of information that might be included. *Id*. at 1761.

Thus, Congress's use of "information regarding" in Section 1373(a) was clearly intended to

26

1   broaden the scope of the information covered.  Later in Section 1373, Congress used narrower

2   language, referring to "[immigration] status information." 8 U.S.C. § 1373(c); *see Dean v. United*

3   *States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a

4   statute but omits it in another section of the same Act, it is generally presumed that Congress acts

5   intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).  As the

6   Supreme Court explained in *Lamar*, the use of "regarding" in Section 1373(a) "has a broadening

7   effect."  A contrary reading would render the statute largely meaningless, as DHS is already

8   aware of an individual's legal right to be present in the United States.[17]

9       The text and relevant interpretive principles thus make clear that Section 1373(a) and

10  Section 1373(b) cover more than an alien's immigration status.  To give Congress's choice of the

11  phrase "information regarding" its intended meaning, it must encompass information relevant to

12  determining one's compliance with the INA, which naturally includes information relevant to

13  ascertaining removability.  Under the structure of the INA, information relevant to removability

14  includes the date on which an alien will be released from state or local custody, as release is

15  generally necessary before DHS may remove an alien.  "Information regarding" immigration

16  status also includes one's address, both home and work, which is crucial to many determinations

17  under the INA, including whether the alien has accrued the necessary continuous presence to be

18  eligible for relief from removal, 8 U.S.C. § 1229b(a)(1), (a)(2), (b)(1)(A); whether the alien has

19  kept DHS informed of any change of address as required by *id.* § 1305; and whether an alien

20  admitted in a particular nonimmigrant status (e.g., B-1 business visitor) has remained in the

21  United States beyond their authorized period of admission, evidenced an intent not to abandon his

22  or her foreign residence, or otherwise violated the terms and conditions of such admission (e.g.,

23  engaged in unauthorized employment), *see id.* § 1227(a)(1)(C), 8 C.F.R. § 214.1.

24

25      [17] Attempting to provide an alternative explanation for Congress's language, plaintiff argues
    that "information regarding immigration status" might include "an individual's self-report about
26  immigration status, a third party's statement about an individual's immigration status, or copies of
    immigration or visa documents."  SF Mem. at 25.  That reading, however, is too narrow.  Such
27  statements would merely declare an individual's "immigration status" without more, in different
    vehicles.

28

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1    Further, "the broader context" of the INA "as a whole" confirms the importance of

2    Section 1373 to the overall immigration system enacted by Congress.  In the INA, Congress

3    instructed DHS to enforce the "immigration laws," that is, the "laws, conventions, and treaties of

4    the United States relating to the immigration, exclusion . . . or removal of aliens." 8 U.S.C. §

5    1101(a)(17).  Further, in deference to a state or local jurisdiction's significant interest in punishing

6    its criminals, the INA generally permits aliens convicted under state or local law to serve their

7    entire sentence before being subject to federal detention for possible removal from the country.

8    Except in limited circumstances, DHS "may not remove an alien who is sentenced to imprisonment

9    until the alien is released from imprisonment," and the alien's removal period "begins on . . .  the

10   date the alien is released from [state or local criminal] detention." *Id.* § 1231(a)(1)(B)(iii), (a)(4);

11   *see id.* § 1226(c)(1) (requiring that federal immigration authorities take custody of a criminal alien

12   "when the alien is released" from criminal custody).  But in delaying removal of these individuals

13   until state and local jurisdictions' criminal justice interests are served, it was certainly not

14   Congress's intent that these criminal aliens would evade federal immigration authorities.  *See id.*

15   (requiring detention of "criminal aliens" pending removal proceedings).  Thus, to position DHS to

16   carry out its significant duties related to the removal of criminal aliens, Congress enacted Section

17   1373 to ensure the sharing of immigration-related information between all levels of government

18   and DHS.[18]

19       The legislative history accompanying Section 1373 also confirms that the provision

20   should not be narrowly construed to encompass only "what a person's citizenship or immigration

21   status is."  SF Mem. at 26.  The House Conference Report states that Section 1373 was intended

22   to enable state and local officials to "communicate with the INS *regarding the presence,*

23   *whereabouts, and activities of illegal aliens.*" H. R. Conf. Rep. 104-725, at 383 (1996) (emphasis

24

_____

25       [18] Indeed, the Ninth Circuit and certain other courts have held that DHS may not detain a
     criminal alien under the mandatory detention provisions if it does not take the alien into custody
26   "promptly upon [his or her] release" from state or local custody.  *See Preap v. Johnson*, 831 F.3d
     1193, 1202 (9th Cir. 2016), *cert granted sub nom. Nielsen v. Preap*, 138 S. Ct. 1279 (Mar. 19,
27   2018).  Although the Federal Government is challenging that particular holding, the current law in
     this Circuit highlights the need for information-sharing at that critical juncture.

28
     Defs' SJ Motion & Opp.
     No. 3:17-cv-04642-WHO

added).  The Senate Report states in more general terms that that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act."  S. Rep. No. 104-249, at 19-20 (1996).  If, as the House Report indicates, Section 1373 encompasses the "whereabouts" of illegal aliens, it should be understood to include requests to acknowledge or report the presence of incarcerated illegal aliens, plans to release those aliens into the general population, and the individual's address following release.

Finally, given that Section 1373 protects information needed for federal authorities to carry out quintessentially federal functions, this case presents a straightforward question of statutory construction, and defendants need not satisfy a heightened standard regarding Congress's intent in the statute.  Plaintiff cites *Atascadero State Hospital. v. Scanlon*, 473 U.S. 234 (1985), for the proposition that the inclusion of anything beyond an alien's mere immigration status in Section 1373 must be "unmistakably clear."  SF Mem. at 26.  But that rule of construction applies only where a statute intrudes into an area of "traditional state control," *id.*, such as whether a State is amenable to suit.  *Atascadero State Hosp.*, 473 U.S. at 242.  This case, by contrast, involves an area of traditional *federal* control – the entry, movement, and other conduct of foreign nationals in the United States.  *See Arizona*, 567 U.S. at 394.[19]

Accordingly, Section 1373 encompasses, at minimum, the contact information and release status of an alien, as well as "what [his or her] immigration status is."  SF Mem. at 26.

**C.    San Francisco's Ordinances and Policies Foreclose Providing at Least Some of the Information Protected by Section 1373**

Both on their face and as applied, Chapters 12I and 12H of the San Francisco Administrative Code prohibit giving federal immigration authorities at least some of the information

---

[19] Plaintiff argues that Section 1373 would violate the Tenth Amendment if it were understood as covering anything other than "what a person's citizenship and immigration status is."  SF Mem. at 12-14, 27.  The City cannot make such an assertion, however, because the Complaint does not plead a claim under the Tenth Amendment.  In any event, such a claim would be without merit, as shown above.  *See supra* text at 14-16.

29

1   protected by Section 1373 – specifically, the contact information and release status of aliens.

2   Chapter 12I prohibits providing an alien's release status or "personal information" (including

3   "home or work contact information") to federal immigration authorities, S.F., CAL., ADMIN. CODE

4   ch. 12I, § 12I.2, and Chapter 12H prohibits using "any City . . . resources to assist in the

5   enforcement of Federal immigration law" or to "gather or disseminate information regarding

6   release status," S.F., CAL., ADMIN. CODE ch. 12H, § 12H.2.  Moreover, in communications with

7   City employees, plaintiff's officials generalize these prohibitions and seek to prevent employees

8   from providing *any* information to federal immigration authorities.  Not surprisingly in light of

9   those communications, the City provides absolutely no information in response to ICE requests –

10  whether the target has been charged with murder or with possession of a controlled substance –

11  notwithstanding that Chapter 12I purports to permit providing notification of release under some

12  circumstances.

13          **1.   The San Francisco Ordinances Violate Section 1373 on Their Face**

14          Chapter 12I prohibits providing contact information, and both Chapter 12H and Chapter

15  12I prohibit providing notification of release status.  Chapter 12I provides that San Francisco

16  "[l]aw enforcement officials shall not . . . provide any individual's personal information to a

17  federal immigration officer, on the basis of an administrative warrant, prior deportation order, or

18  other civil immigration document based solely on alleged violations of the civil provisions of

19  immigration laws."  S.F., CAL., ADMIN. CODE ch. 12I, § 12I.3(e).  Personal information is defined

20  broadly to include "any confidential, identifying information about an individual, including, but

21  not limited to, home or work contact information, and family or emergency contact information."

22  *Id*. § 12I.2.  This ordinance, therefore, clearly prohibits providing an alien's address to federal

23  authorities.  Chapter 12I also prohibits San Francisco officers from responding to a federal

24  immigration official's request for notification regarding the release of an alien, expect in certain

25  limited situations based on the individual's crime, ties and contribution to the community,

26  "participation in social service or rehabilitation programs," and other factors.  *Id*. 12I.3(c), (d).

27          The impact of Chapter 12I on the enforcement of federal immigration law is even greater

28                                                   30

1   in light of the ordinance's requirement to report any sharing of information twice a year,

2   including "a description of any communications" made to federal immigration authorities.  *Id.*

3   § 12I.5(b).  That requirement compounds the impact of the restriction on communication by

4   further discouraging local officers from sharing immigration-status information with federal

5   authorities.  Because "personal information" is defined so broadly, a San Francisco officer would

6   risk disciplinary action any time he or she shared information regarding immigration status,

7   rendering the ordinance in square violation of Section 1373.  *See Chicago*, 264 F. Supp. 3d at 949

8   ("[T]he Court finds that Congress acts constitutionally when it determines that localities may not

9   prevent local officers from *voluntarily* cooperating with a federal program or discipline them for

10  doing so.").

11          Chapter 12H further strengthens these prohibitions by barring San Francisco employees

12  from using "any City . . . resources to assist in the enforcement of Federal immigration law" and

13  to "gather or disseminate information regarding release status of individuals or any other such

14  personal information . . . ."  *See* S.F., CAL., ADMIN. CODE ch. 12H, § 12H.2.  "[S]ending . . .

15  information regarding . . . citizenship or immigration status" to federal immigration authorities

16  under Section 1373 necessarily constitutes "assist[ing] in the enforcement of Federal immigration

17  law," which is prohibited by Chapter 12H.  Indeed, the California Court of Appeal has observed

18  that a state statute that requires arresting officers to inform federal immigration officials when a

19  person arrested for certain criminal violations "may not be" a citizen "was specifically designed

20  *to provide state assistance in the enforcement of federal immigration laws*."  *Fonseca v. Fong*,

21  167 Cal. App. 4th 922, 932 (2008) (emphasis added); *see* CAL. HEALTH & SAFETY § 11369.

22          Additionally, forbidding the use of City "resources" – such as telephones and Internet

23  access – to communicate with federal immigration authorities violates Section 1373's proscrip-

24  tion against "restrict[ing]" the transmission of immigration-status information "in any way."  8

25  U.S.C. § 1373(a).  One definition of the verb "restrict" is "to place under restrictions as to use or

26  distribution," and "restriction" is defined as "a limitation on the use or enjoyment of property or a

27  facility."  *See Restrict*, Merriam-Webster.com, https://www.merriam-webster.com/ dictionary/

28

31

1  restrict (last visited July 25, 2018); *Restriction*, https://www.merriam-webster.com/ dictionary/

2  restriction (last visited July 25, 2018).  Thus, limiting the means by which an employee can

3  transmit information to federal authorities "restrict[s]" such transmission.  Moreover, prohibiting

4  the use of telephones would not only prevent an employee from using her office telephone to call

5  federal authorities to report on an individual's immigration status, but would, presumably, also

6  require the employee to hang up if a federal official called to ask about an individual's

7  status.  That is obviously a restriction on the transmission of information.

8      Although Chapter 12H includes a saving clause providing that the prohibition does not

9  apply where "such assistance is required by Federal or State statute, regulation, or court

10  decision," that clause does not demonstrate consistency with Section 1373.  First, the clause is

11  ambiguous.  The categories listed in Chapter 12H include their own exceptions, but do not

12  reiterate the saving clause, thus making it unclear whether those subparts are subject to the saving

13  clause.[20]  Making matters even more confusing, one listed category *does* reiterate the saving

14  clause, suggesting that the other subparts intentionally do not include it.  *See id.* § 12.H.2(d)

15  (prohibiting the collection of information except as "required by Federal . . . statute, regulation, or

16  court decision").  *See Copeland v. Ryan*, 852 F.3d 900, 907 (9th Cir. 2017) ("Under the maxim of

17  *expressio unius est exclusio alterius*, there is a presumption that when a statute designates certain

18  persons, things, or manners of operation, all omissions should be understood as exclusions.")

19  (internal quotation marks omitted).

20      Second, the saving clause is entirely overshadowed by the rest of Chapter 12H.  The first

21  section of the Chapter categorically "affirm[s] that the City and County of San Francisco is a City

22  and County of Refuge."  S.F., CAL., ADMIN. CODE ch. 12H, § 12H.1.  The ordinance prohibits

23  using City funds or resources to "assist in the enforcement of Federal immigration law," and

24  provides that the prohibition "shall include, but shall not be limited to" four expressly described

---

25      [20] *See* S.F., CAL., ADMIN. CODE ch. 12H, § 12H.2 ("the prohibition . . . shall include, but shall
26  not be limited to" the listed subparts); *id.* § 12.H.2(a) (prohibition includes "[a]ssisting or
   cooperating . . . with any investigation . . . except as permitted under [another code section]"); *id.*
27  § 12.H.2(c) (prohibition includes "disseminating information . . . regarding . . . any other such
   personal information . . . except as permitted under [another code section]").

28

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

categories of conduct, including "[a]ssisting or cooperating, in one's official capacity, with any investigation" conducted by federal immigration authorities. *Id*. § 12H.2(a).  The ordinance also expressly requires "inform[ing] all employees . . . of the prohibitions in [the] ordinance, the duty of all . . . employees to comply with the prohibitions . . . and [the fact] that employees who fail to comply with the prohibitions . . . shall be subject to appropriate disciplinary action."  *Id*. § 12H.3. Chapter 12H does not, however, require informing employees that they may violate these stringent "prohibitions" if "required" by federal law.  Thus, if the City's intent were to comply with Section 1373, it would be odd for it to have enacted these many provisions that violate it.

Contrary to plaintiff's argument, Section 1373's prohibition on barring San Francisco employees from providing aliens' contact information or release status to federal immigration authorities does not impose any "significant burdens" on the City.  SF Mem. at 30-31.  For example, nothing in Section 1373 requires Sheriff's Department deputies to "spend time tracking each and every inmate's release date in real time," *id*. at 30; it merely prohibits the City from telling employees they are not to respond when DHS asks about any scheduled release of a given alien as of the time of the inquiry.

### 2.    The Facts Confirm that San Francisco Prohibits the Provision of at Least Some of the Information Protected by Section 1373

The documents produced by San Francisco in discovery confirm the breadth of Chapters 12H and 12I – and that those laws prohibit, not just in theory but also in practice, providing contact information and release status of aliens to federal immigration authorities.  Numerous City policy documents and instructions to employees expressly prohibit disseminating "information about an individual's immigration status" without acknowledging or informing employees that federal law bars such a prohibition at least in part.  For example:

- San Francisco Police Department Bulletin 17-015 states that members of the Department "shall not enforce immigration laws or assist ICE in the enforcement of immigration laws or gather or disseminate information regarding release status of individuals or any other personal information as defined in . . . Admin. Code 12I," Declaration of W. Scott Simpson ¶ 2 & Ex. A (Attachment 4 hereto).

33

- Likewise, San Francisco Police Department General Order 5.15 (revised July 5, 2017) prohibits any member of the SFPD from "disseminat[ing] information[] regarding the release status of any individual or any other confidential, identifying information such as home [or] work contact information . . . except as required by federal or state law," *id.* ¶ 3 & Ex B.

- The San Francisco Office of Civic Engagement & Immigrant Affairs' "Background Information" on "Immigrant Protection Policies" states that City agencies and employees are prohibited from "disseminating information about an individuals' immigration status (except as required by federal or state regulation)," *id.* ¶ 4 & Ex. C.

- A workshop handout produced by the San Francisco Human Rights Commission (dated February 9, 2017) states that City employees "cannot disclose information regarding an individual's immigration status," unless "mandated by federal or state law, warrant, or court decision," *id.* ¶ 5 & Ex. D.

- San Francisco Sheriff's Department Policy #SFSD 02-39, dated December 7, 2017, provides that "SFSD employees are NOT authorized to provide," among other things, "[r]elease dates and times," and/or "[h]ome or work contact information," to "any agency representatives or individuals conducting civil immigration enforcement (including DHS/ICE," *id.* ¶ 6 & Ex. E at 8.

- And the policy of the City's Adult Probation Department expressly prohibits "[d]isseminating information to ICE, in an official capacity, regarding release status of an individual or any personal information such as home or work contact information, and family or emergency contact information," *id.* ¶ 7 & Ex. F.

Although some (but not all) of these documents purport to make an exception where disclosure is "required" by federal or state law, they uniformly fail to elaborate on this purported disclaimer, or to describe any circumstances that would in fact require such disclosure. The import of these documents is thus manifestly clear, as they *uniformly convey* that City employees are "prohibited" from providing information to ICE, except in wholly undefined and hypothetical circumstances

34

1  which no City employee could reasonably be expected to perceive.

2      San Francisco's internal personnel policies and practices also reflect the broad, vigorous

3  enforcement of the City's ordinances.  In the Police Department, members are required to

4  acknowledge electronically that they have received and reviewed the City's policy on non-

5  cooperation with federal authorities, because electronic acknowledgment "allows for tracking and

6  auditing."  *Id.* ¶ 8 & Ex. G.  In the Sheriff's Department, only the sheriff herself can authorize

7  notifying federal immigration authorities regarding the release of a detainee.  *Id.* ¶ 6 & Ex. E.

8  And the City has meted out employee discipline for violation of the non-cooperation ordinances.

9  *Id.* ¶ 8 & Ex. G.

10      Additionally, in January 2017, the Deputy City Attorney responded to a request for

11  "written public guidance" from the Department of Children, Youth & Their Families on dealing

12  with ICE agents.  *Id.* ¶ 9 & Ex. H.  The memorandum provided point-by-point instructions for

13  responding to such agents.  Among other things, the City Attorney's office instructed employees:

14  - **Whenever you encounter ICE agents:**
       - Except in the limited circumstances below where ICE agents have a valid
15         subpoena or warrant, you are *not* required to cooperate with the agents.
       - You are *not* required to show ICE agents identification of any kind, including
16         documents that prove citizenship or immigration status.
       - You are *not* required to answer ICE agents' questions.
17       - You are *not* required to speak with ICE agents at all.
       - If you choose *not* to speak with ICE agents, you may tell ICE agents that you
18         choose not to speak with them, and then say nothing else.
       - As previously mentioned, City employees should immediately call the City
19         Attorney's Office if ICE agents contact employees while they are performing their
20         official duties, or if employees become aware that ICE agents are seeking access to
21         City records or other City property.

22  *Id.*  This memorandum nowhere states that City employees are not prohibited from providing

23  information regarding immigration status (let alone contact information) to federal authorities.

24  Moreover, although Section 1373 does not "require" employees to provide such information,

25  these instructions, with their repeatedly italicized negatives, give employees the clear impression

26  that they should refuse to "speak" with immigration agents, to answer any of their questions, or to

27  provide any documents that "prove citizenship or immigration status" – information that even the

28                                                  35

1    plaintiff concedes is covered by Section 1373.

2         The above-described documents establish that San Francisco's ordinances violate Section

3    1373 even under the City's own understanding of the statute.  Plaintiff argues that "information

4    regarding immigration status" might include "an individual's self-report about immigration status,

5    a third party's statement about an individual's immigration status, or copies of immigration or

6    visa documents."  SF Mem. at 25.  But providing that information to federal authorities would

7    constitute "assist[ing] the INS (ICE) in the enforcement of immigration laws" in violation of

8    Police Department Bulletin 16-015 (as well as Chapter 12H).  And providing "copies of

9    immigration or visa documents" would violate the Deputy City Attorney's advice against

10   "show[ing] ICE agents identification of any kind, including documents that prove citizenship or

11   immigration status."

12        Not surprisingly, therefore, San Francisco provides absolutely no response to requests

13   from ICE.  Between January 1, 2016, and July 21, 2018, the agency sent approximately 1,568

14   requests for release notification to San Francisco, and the City has responded to none of them,

15   regardless of the seriousness of the criminal charges brought against the person – except in one

16   instance where the employee provided release notification in error and was apparently disciplined

17   as a result.  *See* Madrigal Decl. ¶ 10; Simpson Decl. ¶ 8 & Ex. G.  During this period, in fact, ICE

18   has asked San Francisco to provide release notification regarding aliens whom the City has held

19   on several serious criminal charges, including murder under California Penal Code § 187 and rape

20   under Penal Code § 261.[21]  *See* Unopposed Administrative Motion to File a Document Under

21   Seal (Dkt. No. 111), Attachment 3.  This outcome confirms what all of the above reflects:  San

22   Francisco prohibits its employees from providing contact information or release status, and has

23   succeeded in preventing its employees from communicating with federal immigration authorities

24   "at all."[22]

---

25        [21] Defendants' Unopposed Administrative Motion to File a Document Under Seal (Dkt.
26   No. 111) is under the Court's consideration.
          [22] Also not surprisingly, not all employees agree with the City's non-cooperation policy or
27   its effects.  In an email exchange with Chief Deputy Sheriff Kathy Gorwood regarding the rules
     in Chapter 12I on responding to requests for release notification, Chief Deputy Sheriff Matthew
28
                                                  36

1  **III.    If the Court Grants an Injunction, It Should Be Limited to San Francisco**

2       Plaintiff seeks a permanent injunction against "using the Notice, Access, and Section 1373

3  [conditions] as funding restrictions for any Byrne JAG awards."  Am. Compl. at 41.  Plaintiff thus

4  asks this Court to enter a nationwide injunction, binding numerous parties who have never

5  appeared in this case.  SF Mem. at 34.  For all of the reasons set forth above, San Francisco is not

6  entitled to *any* relief.  However, and in any event, if the Court were to enter an injunction, it

7  should be limited to the plaintiff rather than extending to any jurisdiction throughout the country.

8  Such an injunction would violate the requirements of Article III and equity.

9       To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to

10  the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

11  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  "[S]tanding is not dispensed in

12  gross," and the plaintiff must establish standing "separately for each form of relief sought."  *Town*

13  *of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

14       The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct.

15  1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged

16  statewide partisan gerrymandering of Wisconsin legislative districts.  The plaintiffs alleged that

17  voters who shared their political views were disadvantaged by the way district lines were drawn

18  statewide, and that they were therefore entitled to challenge the entire state map.  *Id.* at 1924-25.

19  But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that

20  produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is

21  district specific" because it "results from the boundaries of the particular district in which he

22  resides."  *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Accordingly, the Court

23  held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the

24  individual's own district," not the broader remedy of "restructuring all of the State's legislative

25  districts."  *Id.* at 1930-31; *accord id.* at 1933 ("The Court's constitutionally prescribed role is to

26  _____

27  Freeman commented, "This list leaves [a lot] of room for serious offenders to not meet the
eligibility requirements that would allow us to cooperate with ICE."  To which Chief Deputy
Gorwood responded, "Yes."  Simpson Decl. ¶ 10 & Ex. I.

28

Defs' SJ Motion & Opp.
No. 3:17-cv-04642-WHO

1    vindicate the individual rights of the people appearing before it.").

2          The Ninth Circuit, among others, has recognized these same principles.  *Zepeda v. INS*,

3    753 F.2d 719, 729 n.1 (9th Cir. 1983) (recognizing the "elementary principle" that in the absence

4    of class certification, plaintiffs are "not entitled to relief for people whom they do not represent"

5    because any individual plaintiff "could merely file an individual suit as a pseudo-private attorney

6    general and enjoin the government in all cases"); *see, e.g.*, *McKenzie v. City of Chicago*, 118 F.3d

7    552, 555 & n.* (7th Cir. 1997).  On August 1, 2018, the Court of Appeals reversed and remanded

8    a nationwide injunction in *San Francisco v. Trump*, No. 3:17-cv-00485-WHO (N.D. Cal.), based

9    on these very principles.  The court noted that a court is "'required to tailor the scope of the

10   remedy to fit the nature and extent of the constitutional violation,'" and that cases warranting a

11   nationwide injunction are "exceptional."  *City & County of San Francisco v. Trump*,  No. 17-

12   17478, 2018 WL 3637911, at *12-13 (9th Cir. Aug. 1, 2018) (quoting *Hills v. Gautreax*, 425 U.S.

13   284, 293–94 (1976)).  Specifically in relation to the case before it, the court held that "the record

14   [was] insufficiently developed as to the question of the national scope of the injunction," and

15   remanded for "a more searching inquiry into whether this case justifies the breadth of the

16   injunction imposed."  *Id.* at 13.[23]  The present action, like *San Francisco v. Trump* before the

17   remand, has not undergone such a "searching inquiry."

18         Even apart from Article III's requirements, fundamental principles of equity support the

19   same rule.  Both the Supreme Court and the Ninth Circuit have cautioned that "injunctive relief

20   should be no more burdensome to the defendant than necessary to provide complete relief to the

21   plaintiffs before the court."  *L.A. Haven Hosp. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)

22   (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (vacating the entry of a nationwide

23   injunction insofar as it applied to parties other than the plaintiff, and specifically rejecting the

24   _____

25         [23] In noting that the record was not sufficiently developed to support a nationwide
     injunction, the Court of Appeals discussed the Seventh Circuit's decision in *Chicago* upholding a
26   nationwide preliminary injunction against the notice and access conditions, and noted that court's
     reasoning that "the statute 'interconnects' all recipients of Byrne JAG grants."  2018 WL
27   3637911, at *13.  The *Chicago* decision cited, however, was vacated by the Seventh Circuit en
     banc.

28                                                   38

     Defs' SJ Motion & Opp.
     No. 3:17-cv-04642-WHO

1    argument that the district court's holding that a challenged federal policy was "facially invalid"

2    sufficed to justify this remedy); *see Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765

3    (1994); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L.

4    REV. 417, 428-37 (2017) (explaining the lack of historical basis for nationwide injunctions).

5            Moreover, nationwide injunctions "take a toll on the federal court system – preventing

6    legal questions from percolating through the federal courts, encouraging forum shopping, and

7    making every case a national emergency for the courts and for the Executive Branch." *Trump v.*

8    *Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see L.A. Haven Hosp.*, 638 F.3d

9    at 664-65 (noting tendency of nationwide injunctions to "thwart the development of important

10   questions of law by freezing the first final decision rendered on a particular legal issue") (quoting,

11   *inter alia*, *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001)).  They

12   also create an inequitable "one-way-ratchet" under which any prevailing plaintiff obtains relief on

13   behalf of all others, but a victory by the government would not preclude other potential plaintiffs

14   from "run[ning] off to the 93 other districts for more bites at the apple." *City of Chicago v.*

15   *Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., dissenting in part), *reh'g en banc*

16   *granted*, Order of June 4, 2018 (No. 17-05270) (vacating panel judgment "insofar as it sustained

17   the district court's decision to extend preliminary relief nationwide"); *cf. United States v.*

18   *Mendoza*, 464 U.S. 154, 158-62 (1984) (holding that non-parties to an adverse decision against

19   the federal government may not invoke the decision to preclude the government from continuing

20   to defend the issue in subsequent litigation).

21           The course and status of the *Chicago* Byrne JAG litigation referred to above further

22   demonstrate the impropriety of entering a nationwide injunction in this action.  As noted earlier,

23   the district court in that case entered a nationwide preliminary injunction against the notice and

24   access conditions on September 15, 2017, which prompted OJP to cease issuing FY 2017 award

25   documents.  *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017); Atsatt Decl. ¶ 2.

26   The en banc Seventh Circuit stayed the nationwide application of that injunction on June 26, 2018,

27   after which OJP resumed issuing award documents.  *Id.*  Therefore, the initial nationwide injunction

28                                          39

1    caused a nine-and-a-half month delay in the issuance of more than 800 Byrne JAG awards.  *Id.*  The

2    district court in *Chicago* has now entered a nationwide permanent injunction against all three

3    conditions, but *sua sponte* stayed its nationwide application pending appeal.  *City of Chicago v.*

4    *Sessions*, Case No. 17 C 5720, 2018 WL 3608564, at *17-18 (N.D. Ill. July 27, 2018).  The Seventh

5    Circuit will, therefore, be considering whether a nationwide permanent injunction is warranted.

6    Further, if this court were to issue a nationwide injunction and then the Seventh Circuit en banc

7    were to find the nationwide injunction in *Chicago* unlawful, this Court would be authorizing the

8    very relief within the Seventh Circuit that the Seventh Circuit en banc court had rejected.

9         In short, there are multiple cases across the country challenging the same Byrne JAG grant

10   conditions at issue here.  Each court should adjudicate the claims of the plaintiffs before it, and

11   the plaintiffs in others cases should not benefit if this Court were to rule against the defendants

12   here as to certain issues – just as those plaintiffs will not be bound by any aspect of the Court's

13   decision if defendants prevail in full or in part in this action.[24]  Conversely, San Francisco does

14   not have standing to seek an injunction broader than necessary to remedy its own asserted

15   injuries.  And issuing such an injunction would harm the development of legal precedent in this

16   area.  The plaintiff simply cannot plausibly assert that an injunction extending to any other

17   jurisdictions is necessary to remedy its own claimed harm.

18                                  **CONCLUSION**

19        For the reasons set forth above, the Court should grant summary judgment in defendants'

20   favor and deny plaintiff's motion for summary judgment.

21   Dated:  August 1, 2018

22

23   _____

24        [24] Plaintiff's argument is not supported by *Washington v. Trump*, 847 F.3d 1151 (9th Cir.
     2017), or similar cases regarding presidential executive orders.  In *Washington*, for example, the

25   court allowed a nationwide temporary restraining order in a very different context – immigrant
     arrivals at various ports of entry – from the disbursement of grants funds to a particular

26   recipient.  *See id.* at 1167 (noting what the court viewed as the "lack of a workable alternative," in
     light of the "nation's multiple ports of entry and interconnected transit system" as well as the
     "proprietary interests of the States" there at issue).  Thus, *Washington* does not support the entry

27   of a nationwide injunction where, as here, more limited measures are sufficient to redress a
     particular plaintiff's injuries.

28                                                    40

     Defs' SJ Motion & Opp.
     No. 3:17-cv-04642-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

CHAD A.  READLER
Acting Assistant Attorney General

ALEX G. TSE
United States Attorney

JOHN R.  TYLER
Assistant Director

/s/ W. Scott Simpson

_____
W.  SCOTT SIMPSON (Va.  Bar #27487)

ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys

Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:   (202) 514-3495
Facsimile:    (217) 492-4888
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

JEFFERSON B.  SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Assistant Attorney
General; and U.S. DEPARTMENT OF JUSTICE

*City & County of San Francisco v. Jefferson B. Sessions, et al.*,
No. 3:17-cv-04642-WHO (N.D. Cal.)

Defendants' Motion for Summary Judgment and
Opposition to Plaintiff's Motion for Summary Judgment

Attachment 1

Declaration of Francisco Madrigal
U.S. Immigration and Customs Enforcement

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>            Plaintiff,<br><br>    v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, et al.,<br><br>            Defendants. | **DECLARATION OF FRANCISCO MADRIGAL, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**<br><br><br>No. 3:17-cv-04642-WHO |
| STATE OF CALIFORNIA, ex rel. XAVIER BECERRA, Attorney General of the State of California,<br><br>            Plaintiff,<br><br>    v.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, et al.,<br><br>            Defendants. | <br><br><br><br>No. 3:17-cv-04701-WHO |

**DECLARATION OF FRANCISCO MADRIGAL**

I, Francisco Madrigal, hereby make the following declaration with respect to the above-captioned matters:

1. I am the Deputy Assistant Director (DAD) for Criminal Alien Division within the U.S.

Decl. of Francisco Madrigal, USICE
No. 3:17-cv-04642/04701-WHO

Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). The Criminal Alien Division performs strategic planning and provides policy guidance and operational support in the identification and arrest of criminal aliens as well as criminal prosecutions for immigration offenses, and is responsible for oversight and support of 287(g) partnerships with state and local law enforcement agencies.

2. I have been employed with ICE and its legacy agency Immigration and Naturalization Service since 2001. From January 1, 2018 to present, I have been employed as the DAD for the Criminal Alien Division. Prior to this assignment, I served as the DAD for the Fugitive Operations and Training Division from November 20, 2011 to December 31, 2017. During my career, I have also served as an Assistant Field Office Director for the Washington Field Office (Virginia and Washington, DC area of responsibility); a Supervisory Detention and Deportation Officer for the Washington Field Office; and Deportation Officer in the Washington Field Office.

3. In my current position as DAD for the Criminal Alien Division, I supervise the Headquarters ERO Criminal Alien Program, 287(g) Program Unit, and 287(g) Program Management Office, which provide planning, policy, and operational expertise to field operators and managers, as well as agency, departmental, and external leaders and stakeholders. This declaration is based upon my personal knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. Among other sources, I have reviewed the declaration that my former ICE colleague Jim Brown provided in *California v. Sessions*, portions of which I am adopting herein.

<u>Agency Mission</u>

4. ICE is the principal investigative arm of DHS. ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. ICE is authorized to identify and

2

Decl. of Francisco Madrigal, USICE
No. 3:17-cv-04642/04701-WHO

1  remove several classes of aliens, including those who have been convicted of crimes such as

2  murder, predatory sexual offenses, narcotics trafficking, alien smuggling, and many other

3  offenses that harm persons in the United States and have extraordinary public safety

4  consequences.  Such aliens can be dangerous and recidivist.

5      5. ERO is one of the two principal operational components in ICE, the other being

6  Homeland Security Investigations (HSI).  ERO oversees programs and conducts operations to

7  identify and arrest removable aliens, to detain these individuals when necessary, and to ensure

8  their removal from the United States.  ERO prioritizes the arrest and removal of convicted

9  criminal aliens, those who pose a threat to national security, fugitives, recent border entrants, and

10  aliens who thwart immigration controls.  ERO manages all logistical aspects of the removal

11  process, including domestic transportation, detention, alternatives to detention, bond

12  management, and supervised release.  ERO consists of more than 7,500 employees, located at

13  ICE headquarters, in 24 field offices in the United States, and overseas.

14                    Cooperation with State and Local Governments

15      6. The cooperation that ICE receives from state and local law enforcement agencies is

16  critical to its ability to identify, locate, and arrest criminal aliens who meet DHS immigration

17  enforcement and removal priorities.  The assistance of state and local governments frequently

18  allows ICE to identify and detain removable aliens who have committed crimes.  I have been

19  asked to address in what ways ICE uses the types of information that are covered by the

20  "California Values Act" when the agency receives such information from state and local

21  governments.  I am informed that the California Values Act covers, among other things, an

22  individual's name, home or work address, home or work telephone number, employer, physical

23  description, and date or time of release from state or local custody, as well as other information

24  that identifies or describes the individual.

25      7. ICE uses all of the types of information listed in paragraph 6 in fulfilling its mission.

26  As noted already, the mission of ICE ERO is to identify, locate, detain, and, when appropriate,

27  remove aliens who are in the United States illegally.  Although certain aspects of ERO's

28                                    3

1   techniques for identifying and locating removable aliens are law-enforcement privileged and thus

2   cannot be divulged, those techniques may include locating an individual using his or her home or

3   work address, calling the individual's home or work telephone number, interviewing an

4   individual's employer, and/or identifying an individual partly based on physical characteristics.

5   Knowing where an individual is employed or conducts other business is sometimes essential to

6   enabling ICE to locate and take custody of the individual. Further, having an individual's birth

7   date and/or birth place often allows ICE to identify an individual and determine immigration

8   status. One of ICE's challenges is distinguishing among individuals with the same or similar

9   names, and all of this identifying information may be used in making that determination. ICE

10  uses this information to identify and locate individuals seeking to elude law enforcement and/or

11  avoid compliance with immigration laws to maintain unlawful presence in the United States

12  and/or continue criminal activity. Finally, ICE uses all of this information to fully establish

13  removability of an alien and to ensure enforcement of the appropriate law or laws.

14      8. Regarding the means by which ICE receives the types of information discussed in

15  paragraphs 6-7 above, jurisdictions that cooperate with ICE provide such information in a variety

16  of ways. Many jurisdictions contact a local ICE office by telephone or email when they know or

17  suspect that a detainee is in the country illegally. The information conveyed in this way may

18  include the name, home or work address, home or work telephone number, employer, and/or

19  physical description of the individual. Other jurisdictions provide information regarding their

20  detainees by entering complete information into electronic databases to which ICE has access.

21  Also, jurisdictions will allow ICE physical access to facilities, as is afforded to other law

22  enforcement agencies, in order for ICE to obtain information or verify information.

23      9. Besides the information discussed above, I am informed that the California Values Act

24  also restricts use of an individual's Social Security number, educational history, financial history,

25  employment history, and medical history. ICE rarely, if ever, uses these categories of

26  information in conducting its mission. An alien in the U.S. illegally would not have a valid

27  Social Security number, although the use of a false Social Security number constitutes identity

28

4

Decl. of Francisco Madrigal, USICE
No. 3:17-cv-04642/04701-WHO

1   theft for which ICE conducts criminal investigations.  However, ICE may utilize a Social Security

2   number associated with an individual even fraudulently if it will help to locate that individual,

3   and will utilize current (if not historical) employment information to help locate an individual.

4   Otherwise, an individual's educational, financial, employment, or medical history is of minimal

5   use to ICE because such past conduct is usually not helpful in identifying or locating an

6   individual.

7                          Communication with San Francisco

8          10.  Local law enforcement officials in San Francisco, California, do not respond to any

9   non-criminal requests from ICE, including requests for notification regarding the release of

10  detainees or requests to detain individuals pending ICE custody.  Nevertheless, ICE has continued

11  to send requests for notification and detention to the San Francisco Sheriff's Department

12  throughout 2016, 2017, and the first seven months of 2018.  During that period since January 1,

13  2016, and thru July 21, 2018, ICE has sent to San Francisco approximately 1568 requests to be

14  notified regarding the release of detainees.  With one exception, San Francisco has never

15  responded, without regard to the nature of the state or local criminal charges against the

16  individual sought.  ICE believes that the one exception was an error on the part of the San

17  Francisco employee who provided the notice.

18                         Access to Information from California

19         11.  I am informed that California asserts in this case that "immigration authorities have

20  access to, and actively use, California's criminal history databases that contain addresses."  In

21  relation to that subject, I have reviewed the Declaration of Jenny Reich in Support of Plaintiff's

22  Motion for Summary Judgment in *California v. Sessions*, dated July 6, 2018, along with its

23  exhibits.

24         12.  ICE has access, through the California Law Enforcement Telecommunications

25  System, to certain law enforcement databases maintained by the State of California.  Those

26  California databases include the Automated Criminal History System ("ACHS"), the Supervised

27  Release File ("SRF"), and the California Sex and Arson Registry ("CSAR").  Ms. Reich asserts

28                                               5

1  that ACHS and SRF "allow" law enforcement agencies to input the addresses of subjects, but this

2  does not mean that California agencies always take advantage of that functionality.  In fact, ICE

3  has found that ACHS and SRF often do not contain timely, complete, useful information

4  regarding the home or work addresses of persons sought by ICE in California.  And although Ms.

5  Reich asserts that law enforcement agencies "must" provide the addresses of persons entered into

6  CSAR, the sex and arson registry identifies only very small subset of persons encountered by

7  California law enforcement.

8       13. Aside from the extent to which CLETS gives ICE access to the addresses of persons it

9  seeks in California, these databases do not provide the release dates of persons in the custody of

10  California state agencies to allow ICE to take custody of such persons upon their release.

11  Although the Supervised Release File states a "Start Date of Supervision" for each person

12  undergoing probation, parole, or other law enforcement supervision, that date is not reliable for

13  determining the date of release from custody because the start date of supervision is not

14  necessarily the same date that the jail or prison releases the individual.  As a result, ICE generally

15  does not use CLETs as a primary source for determining release dates; rather, the county jail

16  release dates are more reliable and accurate.

17       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

18  and correct.

19       Dated this 1st day of August, 2018.

20

21

22                                 FRANCISCO MADRIGAL

23                                  Deputy Assistant Director
                                Office of Enforcement and Removal Operations

24                                  U.S. Immigration and Customs Enforcement

25

26

27

28                                6

*City & County of San Francisco v. Jefferson B. Sessions, et al.*,
No. 3:17-cv-04642-WHO (N.D. Cal.)

Defendants' Motion for Summary Judgment and
Opposition to Plaintiff's Motion for Summary Judgment

Attachment 2

Amended Declaration of Thomas D. Homan
U.S. Immigration and Customs Enforcement

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF CALIFORNIA;
EDMUND GERALD BROWN, JR.,
Governor of California, in his Official
Capacity; and XAVIER BECERRA,
Attorney General of California, in his
Official Capacity,

Defendants.

Case No. 18-cv-490

---

## AMENDED DECLARATION OF THOMAS D. HOMAN

I, Thomas D. Homan, hereby declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1. I am the Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS), a position I have held since November 2017. From January 2017 until November 2017, I served as Acting Director of ICE.[1] In both positions, I directly oversee ICE's core operational programs, as well as the agency's managerial and administrative support functions. I direct and oversee ICE's day-to-day work of enforcing the nation's immigration and customs laws; investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and outside of the United States; and supporting the DHS litigators who prosecute exclusion, deportation, and removal

---

[1] On November 14, 2017, President Trump nominated me to serve as the Director of ICE, and the confirmation process before the U.S. Senate remains ongoing.

proceedings, including against national security threats, criminal aliens, and other aliens posing a threat to public safety. ICE employs more than 20,000 federal civil servants and contract staff in more than 400 offices within the United States and 50 foreign countries.

2. I hold a Bachelor of Science degree in Criminal Justice from the State University of New York Polytechnic Institute (formerly SUNYIT) at Utica-Rome.

3. I am a 34-year veteran of law enforcement, having begun my career as a police officer in New York in 1983. In 1984, I became a U.S. Border Patrol Agent with the former Immigration and Naturalization Service (INS) in Campo, California.[2] In 1988, I became an INS Special Agent in Phoenix, Arizona, and was later promoted to Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I became the Assistant District Director for Investigations (ADDI) in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas.

4. Upon the creation of ICE in March 2003, I was named the Assistant Special Agent in Charge in Dallas, Texas. In August 2004, I was named the Deputy Special Agent in Charge (DSAC) in that same office. As DSAC, I directed the day-to-day operations of seven local offices, with more than 200 special agents and support personnel, conducting investigations related to terrorism, export enforcement, illicit financing, money laundering, human trafficking, intellectual property rights violations, and cybercrimes.

5. In March of 2009, I became Enforcement and Removal Operations (ERO) Assistant Director for Enforcement at ICE Headquarters. In that position, I was responsible for ICE's

---

[2] The INS was abolished by the Homeland Security Act of 2002, and ICE was created to perform many of its former enforcement functions, along with the investigative functions of the former U.S. Customs Service. *See* 6 U.S.C. § 252(c); *see also* Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 3-4 (2003) (set forth as a note to 6 U.S.C.A. § 542 (West 2018)).

2

enforcement initiatives and components through which ERO identifies and arrests removable aliens, including the Criminal Alien Program, the National Fugitive Operations Program, Field Training, the 287(g) Program,[3] the Law Enforcement Support Center (LESC), the Fugitive Operations Support Center (now the National Criminal Analysis and Targeting Center (NCATC)), the Detainee Enforcement and Processing Offenders by Remote Technology Center, and the Interoperability Response Centers.

6. In October of the following year, I was promoted to Deputy Executive Associate Director for ERO, and in May 2013, I was promoted to Executive Associate Director for ERO, a position I held until January 2017.

7. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

*Overview of ICE Programs*

8. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. ICE's mission is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety. To carry out that mission, ICE focuses on enforcing immigration law, preventing terrorism, and combating transnational criminal threats.

9. Homeland Security Investigations (HSI), one of ICE's core operational directorates, employs ICE's special agents, who are both immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a, charged with investigating criminal and civil violations of the federal customs and immigration laws. HSI consists of more than 8,500

---

[3] This refers to section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g).

employees, of which more than 6,000 are special agents, assigned to more than 200 cities throughout the United States and 50 countries around the world.  In fiscal year (FY) 2017, HSI made 32,958 criminal arrests; arrested 4,818 gang members, including 796 MS-13 members; seized $56 million in bulk cash; identified or rescued 904 child exploitation victims and 518 human trafficking victims; and seized 981,586 pounds of narcotics, including 2,370 pounds of fentanyl and 6,967 pounds of heroin.  HSI operations in California alone accounted for 4,767 criminal arrests, identifications or rescues of 62 child exploitation victims and 204 human trafficking victims, and seizures of 238,224 pounds of narcotics, including 4,072 pounds of fentanyl and heroin.

10. HSI special agents handling national security and counterterrorism issues participate in Joint Terrorism Task Forces (JTTFs) throughout the country, working closely with federal, state, and local law enforcement agencies to investigate and eradicate terrorist networks.  They also work with the U.S. Department of State to ensure that individuals who pose a security risk are not issued U.S. visas and to investigate those believed to have violated the terms of their admission to the United States.  HSI also monitors schools, nonimmigrant students, and exchange visitors to ensure that legitimate students, researchers, and exchange visitors are welcomed while those who seek to harm the United States are excluded.

11. HSI works with other federal and foreign law enforcement agencies on investigations targeting transnational organized crime.  HSI also conducts investigations related to bulk cash smuggling, commercial fraud, and other financial crimes, as well as worksite violations, immigrant document fraud, benefit fraud, and cybercrime.

12. Key to all HSI investigations is close collaboration with other federal, state, and local partners, from information-sharing to complex joint operations.  A global law enforcement

mission that spans so many investigative disciplines simply cannot be advanced without institutional partners.  Relatedly, in order to facilitate the prosecution, both federal and state, of aliens who violate our criminal laws, HSI uses its delegated authority pursuant to 8 U.S.C. § 1182(d)(5) to parole aliens into the United States as witnesses and defendants. This mechanism is critical to bringing investigations through to their conclusion and holding violators – both foreign nationals and U.S. citizens – accountable.

13. ERO, another core ICE operational directorate, consists of more than 7,600 employees, including more than 5,700 deportation officers assigned to 24 ERO field offices and overseas locations in 19 countries.  ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs officer authority under 19 U.S.C. § 1589a.  It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally – including those who cross the border illegally, a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, a federal felony, 8 U.S.C. § 1326 – or otherwise undermine the integrity of our immigration laws and our border control efforts.

14. While ERO has significant assets near the border, the majority of its immigration enforcement operations take place in the interior of the country.  ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States.  This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody

without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

15. To accomplish ICE's immigration enforcement objectives, ERO coordinates closely with law enforcement partners within the United States and around the world. One of the most notable law enforcement coordination and partnership efforts within ERO is the 287(g) Program, which involves the identification of aliens who are incarcerated within state and local prisons and jails. This program enables a state or local law enforcement entity to receive delegated immigration officer authority, training, and technology resources for immigration enforcement under the oversight and direction of ICE.

16. ERO enhances multi-agency task forces through its authority to administratively arrest removable aliens who threaten public safety and national security. And, leveraging resources available through foreign law enforcement partners, including INTERPOL, and ICE HSI Attachés stationed abroad, ERO develops investigative leads and provides support in locating and arresting aliens who are wanted for crimes committed in other countries and are at-large in the United States.

17. ERO also administers the LESC, the NCATC, and the Pacific Enforcement Response Center (PERC). The LESC is a national clearinghouse providing timely immigration status, identity information, and real-time assistance to federal, state, and local law enforcement agencies regarding aliens suspected, arrested, or convicted of criminal activity. 8 U.S.C. § 1373(c). The NCATC serves as a national enforcement operations center, analyzing data, developing leads, and disseminating information to ERO law enforcement officials in order to locate and arrest aliens who pose a threat to U.S. communities nationwide. The PERC

operates around-the-clock, 365 days per year, and takes appropriate law enforcement action against aliens suspected, arrested, or convicted of criminal activity across the United States, including by sharing timely and relevant information with ERO field offices and law enforcement partners nationwide and issuing immigration detainers for criminal aliens.

18. Acting principally through ERO (both through the PERC and its 24 field offices across the country), ICE issues immigration detainers to federal, state, and local law enforcement agencies to provide notice of its intent to assume custody, at the time of their release from state or local custody, of aliens detained in these agencies' custody, based on their violation of federal immigration law.  In 2017, in California alone, ICE issued over 35,000 detainers which request that the law enforcement agency in whose custody the alien is currently held: provide advance notification of the alien's release to allow for an orderly transfer of the individual into ICE custody; and maintain custody of the alien for up to 48 hours after the time he or she would otherwise have been released, so that ICE may respond to the prison or jail and assume custody.  That number is a significant percentage of the 142,356 detainers issued by ICE nationwide during the same time period.

19. In FY 2017, ERO maintained an average daily capacity of 38,125 detention beds nationwide and conducted 143,470 administrative arrests, 105,736 of which were of aliens with at least one known criminal conviction and 22,256 of which were for aliens with a pending criminal charge at the time of arrest.  Of these arrests, 40,666 were conducted at-large, meaning that the arrest did not occur in a custodial setting such as a prison or jail.  In FY 2017, ICE apprehended 20,201 aliens in California alone, or roughly 14% of the aliens apprehended nationwide, 5,943 of which occurred at-large.  Thus far in FY 2018, ICE has apprehended 8,588 aliens in California, or roughly 14% of the aliens apprehended nationwide.  In FY

2018 to date, ERO has conducted 14,849 at-large arrests nationwide, of which 2,566

occurred in California.  In FY 2017, ERO booked a total of 323,591 aliens into custody,

41,880 of whom were detained in California, and removed 226,119 aliens from the United

States, of which 127,699 had at least one known criminal conviction.  Of the aliens

apprehended by ERO in 2016, 2017, and in 2018 to date, 92%, 90%, and 87%, respectively,

were criminal aliens.

***Overview of California Legislation Impacting ICE Operations***

20.  California has enacted a series of laws designed to obstruct enforcement of federal

immigration law – California Assembly Bill No. 103 (AB 103), which went into effect on

June 27, 2017; and Senate Bill No. 29 (SB 29); Senate Bill No. 54 (SB 54); Assembly Bill

No. 450 (AB 450); and Assembly Bill No. 90 (AB 90), all of which became effective on

January 1, 2018.   These laws affect all aspects of ICE's operations, but they have the most

profound impact on ICE's ability to conduct criminal investigations and participate in

cooperative efforts with both state and other federal agencies; identify and apprehend

removable aliens, especially criminal aliens; and manage the congressionally authorized

detention of removable aliens.

21.  California's laws impact three ICE geographic Areas of Responsibility (AORs):  Los

Angeles, San Diego, and San Francisco.  The Los Angeles ERO Field Office footprint

encompasses seven southern California counties:  Los Angeles, Orange, Riverside, San

Bernardino, Ventura, Santa Barbara, and San Luis Obispo.  The San Diego ERO Field

Office encompasses San Diego and Imperial Counties, both of which include the border

between the United States and Mexico.  The San Francisco ERO Field Office encompasses

the remaining 49 counties in California.

8

*Impact on ICE's Ability to Identify Removable Criminal Aliens – SB 54*

22.  The limitations imposed by SB 54 on the discretion of state and local law enforcement

agencies in California to cooperate with ICE have served as an obstacle to ICE's

enforcement of the immigration laws, including by limiting ICE's ability to determine which

individuals detained in state or local criminal custody are removable from the United States.

They also largely prevent state and local law enforcement from exercising discretion to

notify ICE prior to releasing criminal aliens into the community or to allow ICE law

enforcement officers access to secure space within prisons and jails to serve documents or

effectuate arrests.  In effect, these laws shield from detection removable aliens detained in

California prisons and jails and obstruct ICE's efforts to take these aliens into custody for

removal purposes.  The lack of access to state and local information requires ICE to expend

greater time and resources to identify removable criminal aliens.

23.  Historically, ICE officers could obtain alien information (including personally identifiable

information (PII)) directly from state and local law enforcement agencies to assist in

determining whether prisoners or inmates were removable.  However, given recent laws and

policies enacted at the state and local level in California, ICE officers must now rely on the

publicly available information provided by the prisons and jails.  This has complicated the

process, requiring that ICE cross-check the limited information provided in such public state

and local records against federal databases to determine alienage and criminal history.  It is

not, however, always possible to determine based on the limited public information whether

the individual taken into custody by the state (including for serious crimes) is a removable

alien.  Moreover, since ICE officers no longer have direct computer access or have only

limited computer access in the jails, and portable devices may not always work in the facilities, records searches may need to be conducted remotely, requiring an even greater expenditure of officer time and resources. Overall, not only is this a more burdensome process than otherwise would be available with better cooperation from state and local law enforcement agencies, but also many removable criminal aliens cannot be identified by this process.

24.     In the Los Angeles AOR, ICE maintained cooperative relationships with state and local law enforcement agencies prior to the enactment of the state laws referenced above. Generally, state and local law enforcement agencies provided ICE with access to local jails by providing inmate information and notification of release, temporarily housing inmates for ICE, and honoring detainers – including by providing ICE with advance notice of release information, thereby enabling an orderly transfer of custody to ICE, or briefly maintaining custody of the alien. California law enforcement agencies also participated in the 287(g) Program, pursuant to which ICE enters into agreements with state, local, and tribal law enforcement agencies for those agencies to perform certain limited federal immigration functions at the direction and under the supervision of federal officials. The 287(g) Program enables ICE to achieve more apprehensions and removals than would be possible with existing resources.

25.     Previously, ICE had four active 287(g) programs, through which the agency partnered with the Sheriffs of Los Angeles, Orange, Riverside, and San Bernardino Counties. Through the 287(g) Program, ICE had office space and computer access at the local jails in all four counties, including Los Angeles County and Orange County. The jails would also share

detainee information directly with ICE, making it possible for ICE to efficiently investigate and identify criminal aliens.

26. SB 54 now prohibits state and local law enforcement agencies from performing the functions of an immigration officer, whether pursuant to the 287(g) Program or any other law, regulation, or policy. On or about December 27, 2017, the Orange County Sheriff's Department (OCSD) terminated its 287(g) agreement with ICE, the last in the Los Angeles AOR, due to SB 54. The loss of the OCSD 287(g) program will result in a significant reduction in the number of criminal aliens identified and removed. In FY 2013, with four active 287(g) programs, the programs had approximately 5,500 encounters with criminal aliens, resulting in approximately 2,600 removals. In FY 2017, the OCSD 287(g) program had approximately 227 encounters with criminal aliens, resulting in approximately 104 removals. An additional six deportation officers would be required to fill the gap left by the loss of the OCSD 287(g) program. With the termination of the OCSD 287(g) program, ICE lost its office space and access to computer equipment, including data lines it had installed at the Intake Release Center of the Orange County Jail.

27. In the San Diego AOR, ICE maintained cooperative relationships with state and local law enforcement agencies prior to the enactment of SB 54. One example of this cooperative relationship between ICE ERO and the Escondido Police Department was the creation of "Operation Joint Effort," which commenced in May 2010, and produced effective enforcement results year after year. In FY 2017 alone, more than 333 removable aliens were arrested by ICE officers assigned to this operation. This partnership allowed for information-sharing between ICE and local law enforcement that resulted in the successful identification of individuals through the use of technology to remotely identify and arrest

removable criminal aliens.  Local law enforcement and the California public benefited from ICE assistance when investigating crimes leading to more convictions and case closures. Prior to SB 54, ERO San Diego received notification on all jail releases for which an immigration detainer was lodged, allowing ICE to assume custody in a controlled area of the jail.  The enactment of SB 54 ended Operation Joint Effort and decreased public safety by allowing criminal aliens to remain in the community.

28. SB 54 also prevents ICE from having dedicated work space inside the San Diego County jails, resulting in operational inefficiencies, ongoing relocation costs, increased equipment purchases, and strained manpower resources.  ERO San Diego was required to remove permanent computer workstations, including desktop computers, printers, scanners, and other items used by ICE officers.  In order to maintain a presence at San Diego County jails, ERO instead was forced to purchase new laptop computers and mobile printers and scanners at additional government expense.  The new law has also forced the Escondido and Oceanside Police Departments to remove ICE's permanent presence within those departments.

29. Prior to the enactment of SB 54 and similar legislation, most counties in the San Francisco AOR generally cooperated with ICE in providing access to prisoners and inmates, booking information, and release dates.  They would generally allow ERO personnel access to secure areas within their jail facilities in order to effectuate arrests, rather than forcing ERO to effectuate those arrests in non-secure locations.  Since the enactment of SB 54, Monterey, Sacramento, San Joaquin, and Fresno counties have denied ICE access to relevant booking information, including the names, places of birth, addresses, and criminal histories of aliens in their custody.  Access to this information is critical to identifying and removing criminal

aliens who have been arrested by local and county officials. Prior to December 22, 2017, Monterey County Jail permitted ICE to assign an officer on-site daily to access inmate booking records. An ICE officer is no longer allowed access. Prior to January 4, 2018, Sacramento County Jail provided booking information and lists of foreign-born inmates. Now, due to SB 54, Sacramento County Jail will provide ICE access only to information that is available to the general public. Prior to January 24, 2018, San Joaquin County Jail provided ICE inmate-booking information, including lists of foreign-born inmates, but will no longer do so. Prior to enactment of SB 54, Fresno County Jail provided ICE complete access to the jail and its automated systems for booking information and lists of foreign-born inmates. Since January 4, 2018, Fresno County Jail provides ERO only with information that is available to the public.

30. Because SB 54 prevents county jails from notifying ICE of release unless that information is publicly available, the San Diego Sheriff's Office (SDSO) made pending release information available on its public website. However, whereas ICE previously received such information directly from SDSO and could send personnel to the facilities to take custody of the inmate(s) in a secure area without undue delay, ICE must now expend additional officer time actively monitoring the SDSO's webpage to identify release dates for removable aliens. The notification of pending release may be as short as twenty to thirty minutes on "book-and-release" cases or up to eight to ten hours for other releases. Rather than being able to have one officer go directly to the facility, pick up the alien in a secure environment, and travel to the next location as part of an orderly and planned effort, multiple ICE officers must now wait in a public area for an undetermined amount of time and make

an at-large arrest outside the facility, at greater cost to the government and with needless risks to the safety of officers and the general public.

31. Starting January 1, 2018, California state prisons began denying ICE access to state prisoners to conduct interviews regarding their immigration status unless the prisoners have provided written consent.   Before then, only some county jails required written consent before providing ICE access to county inmates.  These consent requirements make it difficult for ICE to conduct enforcement operations.  For example, the Wasco State Prison requires written consent from the state prisoners before it will allow ICE access even to serve administrative warrants and removal documents.  Thus, ICE is prevented from exercising its authorities under the Immigration and Nationality Act (INA) to initiate removal proceedings and execute removal orders, due to the consent requirement.  Because ICE officers are unable to access state prisoners, the Criminal Alien Program (CAP) has been impacted, forcing those officers to conduct at-large arrests out in the community, which poses greater risk to them and the community, while also requiring expenditure of additional resources to achieve the same result (i.e., apprehension of a criminal alien subject to removal from the United States under our immigration laws).

32. SB 54's restrictions on having dedicated space within the police departments have also impacted criminal investigations. The lack of an ICE presence at state police departments has reduced the ability of police detectives from the gang, sex crimes, and violent crimes departments to directly engage with ICE officers to request assistance and share information. Historically, local law enforcement partners would seek ICE assistance and technology to identify individuals with no identification documents or who refused to provide identification, often revealing that individuals had provided false identification to homicide

detectives and the gang unit. This ICE technology was previously utilized approximately 30 times each month.

33. ICE's ability to identify removable aliens who are public safety risks was further limited by AB 90. Leading up to the effective date of AB 90, California terminated ICE's access to the CalGang database in October 2017. It is my understanding that the access of other federal law enforcement agencies has not been terminated. The CalGang database is the largest state repository of information concerning suspected and confirmed gang members and is accessed by over 6,000 law enforcement officers in over 56 counties. ICE can no longer effectively identify confirmed gang members in California as a result of AB 90. The CalGang database has been a very important law enforcement tool for ICE in carrying out its mission of enforcing the nation's immigration laws, and keeping the country safe by identifying, locating, and removing criminal aliens who pose a public safety or national security threat. ICE has dedicated gang units that are tasked exclusively with identifying and removing known gang members from the United States. Gang violence is a significant public safety issue in California and across the country. The CalGang database was used to generate leads for immigration law enforcement by screening known gang members in the database against the identity of an encountered subject. The CalGang database was also used by ICE officers upon arrest, or prior to an encounter, while a subject was still in local law enforcement custody. ICE's Fugitive Operations officers routinely ran checks on suspected gang members to identify any potential threats prior to an operation or enforcement action. The CalGang database also allowed for checks on detainees in custody with gang-related tattoos to verify gang membership status and last known contact with

police, and was helpful in confirming or corroborating ICE's information about a gang member.

34. The loss of access to information on confirmed gang members and their affiliations also poses an officer and public safety risk. The CalGang database is an important tool for all law enforcement officers who need to follow trends and gang member affiliations within known gang areas, as well as the number of arrests and other law enforcement encounters of known gang members.  The CalGang database allows law enforcement officers to obtain photographs of subjects, in addition to identifying characteristics such as facial scars and tattoos; location information such as reported addresses, locations of arrests, and locations where interviewed; information from field interviews conducted by local police, such as location of the interview, the subject's attire, and persons and vehicles associated with the subject.

35. When ICE lacks access to state and local prisons and jails or communication with state and local officials, ICE is less able to identify criminal aliens who are subject to removal from the United States and must spend more time apprehending those aliens at large.  As a result, ICE officers have less time to address other enforcement priorities – for example, they have less time to manage caseloads with respect to aliens not detained in ICE custody, leading to delays in resolving those cases.  They also have less time to meet with detained aliens regarding detention concerns or post-order custody issues, such as securing identity documents for removal.  Ultimately, the more time and resources ICE officers must spend on at-large apprehensions, the fewer criminal illegal aliens they will be able to place into removal proceedings, leaving those criminals and the high recidivism risk they pose at large in the United States.

***Impact on ICE Operations to Apprehend Removable Criminal Aliens – SB 54***

36. The inability to identify removable criminal aliens prior to release from state or local

custody inhibits the safe and effective apprehension of criminal aliens for removal.  SB

54's prohibition on notification of criminal release information hinders apprehension of

criminal aliens before they are released into the community.  Having advance notice of a

criminal alien's release from detention is exceptionally important to ICE's ability to

enforce the immigration laws and remove dangerous criminal aliens from the United

States.  There is a serious threat to community safety when criminal aliens are released

into the community, and also a very real safety risk for ICE officers who must then re-

apprehend these aliens at large.  Rather than having these sometimes violent and

dangerous offenders transferred to ICE custody in a controlled, law enforcement setting,

where they have been searched for weapons and contraband, ICE officers must now search

for them at-large in the community.  During such encounters, other people may be present,

the surroundings are not secure, and individuals may be armed or ready to flee.  The

inability of state and local law enforcement agencies to cooperate with ICE also means

that ICE is unable to obtain information regarding whether additional criminals reside at

or frequent the location of the planned ICE arrest, heightening the risk that is already

inherent in at-large operations.  Additionally, prior to these limitations on cooperation,

state and local officers would accompany ICE officers to residences in order to provide a

uniformed presence and serve as a deterrent to resistance to ICE's enforcement efforts, as

well as allowing for the arrest of individuals who illegally interfered with such efforts.

37. At-large arrests of removable aliens generally require five officers to be present for officer safety reasons. When ICE is able to effect an orderly transfer from state or local custody by arresting a removable alien within a prison or jail, only one officer is needed, because the alien will have been subject to search and be known to be unarmed; the encounter will be in a controlled environment with law enforcement officers available in the event there is a need for assistance; and there will be no opportunity for innocent bystanders or potential associates who mean to harm a law enforcement officer to be present. On the other hand, during an at-large arrest, the target may be armed; the officers have no physical control over the location; and there is always the potential for disruption of the ICE officers' enforcement action by family members, associates of the target, or members of the public who oppose immigration law enforcement. Thus, at a minimum, the manpower requirement for an at-large arrest is generally at least five times that required for arrests within state or local detention facilities. Also, the cost of training and equipping five officers for an at-large apprehension team is significantly greater than the resources required for an officer making an in-custody arrest (e.g., the costs of weeks of additional training related to at-large arrests, vehicle costs, fuel costs, and tactical communication equipment costs). Moreover, while a single ICE officer in a state or local detention facility can encounter, lodge detainers against, and arrest multiple aliens each day, each team of ICE officers must engage in time-consuming work (e.g., data-base searches, visits to address(es) associated with the target, deconfliction with the activities of other law enforcement agencies, and surveillance), in order to locate each at-large alien, compounding the inefficiencies created by SB 54.

38. At-large arrests unquestionably involve a greater possibility that the target will resist or resort to violence against ICE officers, particularly given that he or she will now have greater access to weapons. For example, in September 2017, while a Los Angeles ERO Fugitive Operations team (FOT) was conducting a vehicle stop to arrest a confirmed gang member for whom a detainer was not honored by Ventura County, the alien placed his vehicle in reverse and attempted to collide with the FOT vehicle behind him. The FOT member in the vehicle slammed on his brakes and veered left to avoid the gang member, who then proceeded forward, driving around one FOT vehicle and colliding into another FOT vehicle, which immobilized the vehicles of both the alien and the FOT member. The gang member subsequently had to be extracted from his vehicle at gun-point. He was found with a loaded firearm on his person.

39. Since January 2018, ERO Los Angeles has repurposed at-large teams to focus on aliens released into the community by state and local law enforcement. The original focus of these at-large teams was to arrest fugitive aliens who had been issued a final order of removal. However, due to the increase in detainers not being honored, including refusal to provide release dates and prohibitions on the transfer of removable aliens to ICE in a secure custodial setting, ERO Los Angeles has been forced to direct some of the teams to focus on aliens released into the communities from state custody. This shift in resources will lead to an increased backlog of fugitive aliens in the community.

40. Although Fresno County Jail does provide ERO advance notification of pending releases and allows ERO officers to make arrests in the release vestibule area, since January 1, 2018, it has denied ICE physical access to its secured booking and processing area to effectuate arrests of aliens upon their release from the jail. Instead, ICE officers are forced to make

arrests in public areas of the jail, significantly increasing the risk to officer safety and public safety, and necessitating multiple officers.  Upon making an arrest in the release vestibule at Fresno County Jail, ICE officers must exit via a public area.  This is a reversal of prior policy, which allowed ICE personnel access to non-public areas in order to effectuate arrests.

41. Since January 1, 2018, Sacramento County Jail will release an alien to ICE in the secure area of the jail only if the alien meets certain criteria under SB 54, such as convictions for specific serious crimes or inclusion on the California Sex and Arson Registry.  For aliens who do not meet these narrow criteria, however, the jail will release the alien into a public area irrespective of the existence of an ICE detainer requesting advance notification of release and orderly transfer of custody.  Even if ICE is aware in advance of the release, ICE officers must take custody of the alien in public areas of the jail, significantly increasing the risk to officer safety and public safety, and necessitating the presence of multiple ICE officers.

42. In the short time since SB 54 went into effect, SDSO has refused to provide advance notification of release in the cases of more than 119 aliens against whom ICE ERO San Diego issued detainers seeking such notification.  Some of these aliens were released with serious criminal charges pending, including 8 arrested for spousal battery, 32 arrested for driving under the influence, 5 arrested for drug crimes, and 1 for possession of a weapon. Aiming to be a cooperative partner, ICE transferred one alien in its custody to the San Diego Police Department on a warrant for possession of a firearm silencer, but rather than transfer the alien back to ICE after it completed its work on the case, SDSO simply allowed him to bond out of custody without notifying ICE of the release.

43.   When California law enforcement agencies release these aliens into the community, rather than enabling ICE to enforce the federal immigration laws against them, they reoffend in the communities at an alarming rate.  By way of reference, of 533 criminal aliens who were released pursuant to *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *rev'd and remanded sub nom., Jennings v. Rodriguez*, 583 U.S. ---, 2018 WL 1054878 (2018) (No. 15-1204), in the Los Angeles ERO Field Office AOR from October 2012 through December 2013, ICE records indicate that 223 were subsequently re-arrested by other law enforcement agencies, for a total of 651 crimes as of December 15, 2017.  The arrests include arrests for murder, rape, kidnapping, burglary, domestic abuse, and crimes involving child sexual assault, abuse, or cruelty.  More generally, I understand based upon statistics from the Department of Justice's Bureau of Justice Statistics that approximately two-thirds of prisoners released from state prisons were arrested for a new crime within 3 years.[4]  Given these recidivism rates, ICE has a very strong interest in removing criminal aliens from the United States, and it is remarkable that California would decline to provide release information or transfer these aliens for removal or removal proceedings.

44.   There are numerous examples in which state and local law enforcement agencies failed to honor detainers, requesting advance notification of release and the transfer of custody upon release, in cases of aliens convicted of serious offenses, including willful cruelty to a child, drug offenses, sexual battery, and lewd and lascivious acts with a minor.

   a.   On January 12, 2017, ICE lodged a detainer against an alien who had been arrested and was later convicted of felony child cruelty and felony possession/purchase for sale of narcotics/controlled substance, among other

---

[4]  Bureau of Justice Statistics, Recidivism of Prisoners Released in 30 States in 2005, https://www.bjs.gov/index.cfm?ty=pbdetail&iid=4986.

offenses.  On July 12, 2017, Santa Clara County Jail (SCCJ) released the alien
without notification to ICE.

b.  On June 19, 2017, an alien twice removed from the United States was booked into
the SCCJ, and ICE issued a detainer for the alien the same day.  This alien had
prior convictions for domestic violence and burglary, and Santa Clara County had
failed to honor six prior detainers against the alien.  On July 2, 2017, the alien was
again released from custody by SCCJ without notification to ICE.

c.  On October 30, 2017, the San Jose Police Department arrested a previously
removed alien on the charge of assault with a firearm.  The alien was booked into
the SCCJ, and ICE issued a detainer.  The next day, SCCJ released the alien
without notification to ICE.  This alien has prior convictions for possession of a
controlled substance and carrying a loaded firearm.

d.  On April 26, 2016, the Stockton Police Department arrested an alien on a charge
of lewd or lascivious act with a child under 14.  The alien was booked into San
Joaquin County Jail, and ICE issued an immigration detainer against the alien.
On February 21, 2017, the alien was convicted of the charge of lewd or lascivious
acts with a child under fourteen.  On an unknown date, the alien was released
without notification to ICE.

e.  On May 31, 2017, the Stockton Police Department arrested an alien on the charge
of unlawful sexual intercourse with a minor and booked him into the San Joaquin
County Jail.  The alien had previously been granted voluntary return to Mexico.
On the day of the arrest, ICE lodged a detainer.  On August 8, 2017, the alien was

convicted of unlawful sexual intercourse with a minor, and was subsequently released from custody without notification to ICE.

f.   On January 2, 2018, a detainer was placed on an alien while he was in custody at the Ventura County Jail based on an arrest for continuous sexual abuse of a minor.  On or about January 2, 2018, the detainer was declined by Ventura County Jail and no notification was sent to ERO.  The alien was released without notification to ERO.

g.   On February 6, 2018, an alien was booked into the Sacramento County Jail for the offenses of violation of probation, taking a vehicle without consent, and presenting false identification to peace officers.  He was previously convicted on April 13, 2011 for taking a vehicle without consent, a felony, and was sentenced to 487 days jail on March 29, 2012, following multiple probation violations.  ICE lodged a detainer against him.  On February 14, 2018, ICE ERO was notified that the Sacramento County Jail would not honor ICE's detainer due to SB 54.

h.   On February 7, 2018, an alien was arrested for felony possession of a controlled substance while armed and booked into Santa Rita, Alameda County Jail.  On February 8, 2018, ICE lodged a detainer with Alameda County.  The alien has prior convictions, including a January 2006 conviction for possession of narcotics for sale, for which he was sentenced to 333 days in jail and 5 years of probation.  On an unknown date following his arrest, the alien posted bond and was released from Santa Rita, Alameda County Jail without notification to ICE.

45. There have been egregious consequences to California's refusal to notify ICE of a criminal alien's release or transfer such aliens to ICE custody upon release, including the following:

a.  On September 1, 2017, ICE lodged a detainer with the San Francisco County Jail (SFCJ) for an alien detained on the charge of petty theft.  The SFCJ released the alien without even providing ICE advance notification of release.  After his release, on December 6, 2017, he was arrested for first degree murder, second degree robbery, and participating in a criminal gang.

b.  On August 2, 2017, the Santa Rosa Police Department arrested a previously removed alien on the charge of inflicting bodily injury on a spouse/cohabitant and booked him into the Sonoma County Jail (SCJ).  On the same day, ICE lodged a detainer with the SCJ.  SCJ released the alien from custody without providing ICE an opportunity to assume custody.  Approximately two weeks after his release by SCJ, the alien was re-arrested for second degree murder and booked back into SCJ.

c.  On May 24, 2017, the San Francisco Police Department (SFPD) arrested an alien who illegally entered the United States in 2013, on charges of marijuana sales, conspiracy to commit crime, and possession of brass knuckles.  The SFPD booked the alien into the SFCJ.  The next day, ICE lodged a detainer.  The SFCJ subsequently released the alien without notifying ICE.  On September 11, 2017, SFPD arrested the same alien and booked him into the SFCJ on charges of second degree burglary, three counts of robbery in the first degree, conspiracy to commit crime, and accessory to commit a crime.

d.  On June 20, 2015, ICE lodged a detainer with the Buena Park Police Department on an alien following his arrest for driving under the influence.  The alien had been removed from the United States on two prior occasions and had prior

24

criminal convictions for cruelty to a child, infliction of corporal injury on a spouse or cohabitant, damage to power lines, DUI, spousal battery, and violation of a protective order. The detainer was not honored, and the alien was released back into the community. On February 18, 2018, the alien was arrested for homicide after he struck and killed a six-year-old girl while driving under the influence and then tried to leave the scene.

46. Rather than promoting security, California's laws increase the risk to public safety by making it more likely that thousands of criminal aliens will be released into the community and reoffend. The laws also reduce efficiency of federal immigration enforcement efforts and expenditures and increase the risk to law enforcement officers by effectively requiring ICE to conduct at-large arrests.

***Impact on ICE Detention Operations – AB 103***

47. In addition to ICE's authority to identify and apprehend aliens for removal, Congress has authorized, and in some circumstances mandated, detention of aliens, placing particular emphasis on detention of criminal aliens, during removal proceedings and pending effectuation of a final order of removal. AB 103 prohibits state and local law enforcement agencies from entering into immigration detention contracts with the federal government if they did not have such a contract on June 15, 2017.

48. ICE is authorized to contract for detention services, and Congress appropriates funding for this purpose. Pursuant to the Competition in Contracting Act and the Federal Acquisition Regulation, ICE regularly awards contracts through negotiated procurements for detention space and detention services across the United States. ICE operates Service Processing Centers that are owned by the U.S. government, and contracts for support services at these

facilities.  ICE also utilizes Contract Detention Facilities, which are owned and operated by private contractors for detaining aliens.

49. ICE also has specific statutory authority, 8 U.S.C. § 1103(a)(11)(A), to enter into Intergovernmental Service Agreements (IGSAs).  Under this authority, ICE may enter into agreements with a state or its subdivisions, "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE] pursuant to Federal law . . . ."  ICE relies on this authority for many detention contracts.

50. Finally, ICE also utilizes U.S. Marshals Service (USMS) Intergovernmental Agreements (IGAs) for detention bed space.  The tradition of shared detention space between USMS prisoners, federally sentenced inmates, and immigration detainees is longstanding, dating back to the era of the former INS.  The USMS enters into IGAs pursuant to 18 U.S.C. § 4013(a), and ICE is often an authorized agency user on these IGAs.

51. ICE has 20 active contracts, IGSAs, or IGAs in California and regularly uses 9 of those facilities, allowing ICE to access approximately 5,700 detention beds in California.  These contractors employ approximately 1,903 Californians.  Since FY 2013, ICE has spent $687,735,308 on detention beds in California.  Average daily ICE detainee populations in California were 4,847 in FY 2016, 5,172 in FY 2017, and 5,209 so far in FY 2018.

52. The enactment of AB 103 has already prevented ICE from entering into new detention contracts and expanding the scope of existing detention contracts with county sheriffs.  In addition to adversely impacting the local economy and preventing the creation of additional jobs in California, these laws limit ICE's ability to respond to the demand for detention capacity in California, including reopening any former facilities or contracting with new facilities if a need to accommodate a future surge of illegal immigration arises, and may

ultimately require that aliens apprehended in California be detained in other states, far from their family, friends, and legal representatives. This need to transport detainees across the country would also impose a great fiscal cost on taxpayers.

53. ICE's efforts to expand its detention capacity in Sutter, Solano, Placer, Shasta, Fresno, Stanislaus, and San Mateo counties, have been completely frustrated by the enactment of AB 103. ICE was informed by officials in those counties that they were prohibited from negotiating any new contracts with ICE to house detainees in their county facilities. Further, ICE's efforts to modify existing contracts with its current partners – Theo Lacy and James Musick Facilities in Orange County, West County Detention Center in Contra Costa County, Yuba County Jail, and Rio Cosumnes Correctional Center in Sacramento County – were likewise refused. Many of these declinations directly cited a willingness to expand, but the inability to do so under SB 54 or AB 103.

54. Section 12 of AB 103 requires the California Attorney General to review immigration detention facilities, including with regard to: (1) conditions of confinement; (2) "the standards of care and due process provided" to the detainees; and (3) the "circumstances around the immigrants' apprehension and transfer to the facility." It also purports to allow the California Attorney General "all necessary access for the observations necessary to effectuate reviews" including, "but not limited to, access to detainees, officials, personnel, and records." Prior to AB 103, California did not engage in such review.

55. ERO is already responsible for ensuring a safe and secure environment for aliens detained in its custody, including by monitoring contract facilities for compliance with applicable laws, regulations, policies, and ICE detention standards; and renovating or acquiring new facilities as necessary. ICE takes very seriously the health, safety, and welfare of individuals in its

custody.  ICE's National Detention Standards 2000 and the Performance-Based National

Detention Standards, dated 2008 and 2011, establish consistent conditions of confinement,

program operations, and management expectations across the agency's detention system.

These standards were designed with the unique nature of civil immigration detention in

mind and were developed with input from agency employees, stakeholders, subject matter

experts, and nongovernmental organizations.  ICE has also established policy and

procedures for the prevention of sexual abuse and assault of individuals in ICE custody.

ICE is committed to operating facilities that provide effective medical and mental health

services, access to legal services and religious opportunities, improved communication with

detainees with limited English proficiency, timely resolution of complaints and grievances,

and increased recreation and visitation.

56.  All ICE facilities undergo robust inspections to ensure they meet applicable ICE detention

standards.  ICE uses a multi-pronged approach to oversee conditions in its facilities,

including inspections by local field office compliance teams; contract performance reviews

conducted on an ongoing basis by the Contracting Officers' Representatives who manage

facility contracts; and annual inspections conducted by ICE ERO via a contractor.

Additionally, ICE has Detention Service Managers stationed at facilities housing nearly 80%

of its detained population, who conduct daily on-site compliance reviews to quickly identify

and resolve issues that arise during facility operations.

57.  Facilities are also subject to oversight by the ICE Office of Professional Responsibility's

Office of Detention Oversight (ODO), which conducts inspections focused solely on

compliance with ICE detention standards tied directly to detainee life, health, safety, civil

rights, and civil liberties.  These targeted inspections focus on local policies and practices

that may have long lasting and meaningful impacts on ICE detainees.  ODO inspection

teams consist of subject matter experts from the private and public sectors, many of whom

have 20-30 years of experience operating detention facilities.  ODO provides its findings to

ICE executive management and releases its final inspection reports publicly via ICE's

Freedom of Information Act (FOIA) reading room at https://www.ice.gov/foia/library.  ICE

detention facilities are also subject to compliance visits and investigations by the DHS

Office for Civil Rights and Civil Liberties and DHS Office of the Inspector General.

58.  Representatives from the California Department of Justice, Office of the Attorney General

(OAG) inspected the James A. Musick facility and the Intake and Release Center of the

Orange County Jail on December 13, 2017 and the Theo Lacy facility on December 14,

2017.  These facilities are maintained and operated by OCSD.  ICE officials were notified

that the inspection was conducted pursuant to California Government Code section 12532,

as well as the Attorney General's authority under the California Constitution, article V,

section 13.  OCSD conducted the tours with local ICE management in attendance.  Prior to

the tour, Los Angeles ICE management objected to allowing the California OAG to conduct

detainee interviews and to the release of PII.  The OAG lead inspector noted the objection,

cited California law, and continued with the inspection.  OCSD staff permitted the OAG to

interview federal immigration detainees over ICE's objections.

59.  Representatives from the California OAG have also inspected the West County Detention

Center in Contra Costa County, the Yuba County Jail, and the Rio Cosumnes Correctional

Center in Sacramento County.

60.  These inspections have caused the facilities  to expend resources otherwise necessary for

ensuring the safety and security of the detainees.  Each inspection presents a burdensome

intrusion into facility operations and pulls scarce resources away from other sensitive law enforcement tasks.  These burdens are ongoing.

61.  Moreover, as a federal agency subject to federal statutes, regulations, and policies on information disclosure, enforcement of AB 103's provisions allowing the California OAG to perform reviews of immigration detention facilities, including wide-ranging access to facilities, individuals, and records conflict with ICE's ability to comply with federal information disclosure laws, regulations, and policies.

62.  Information obtained or developed as a result of the agreement with the detention facility are federal records under the control of ICE for purposes of disclosure and are subject to disclosure pursuant to applicable federal information laws, regulations, and policies.

63.  In the first instance, AB 103 on its face allows the State of California to circumvent the provisions of the FOIA by providing for access to federal records outside the parameters of this statutory framework.  The FOIA has specific requirements as to how third parties must seek access to records and information maintained by federal agencies.  The FOIA also has specific exemptions that the federal government can apply to withhold certain types of information.

64.  Notwithstanding the requirements of the FOIA, the broad allowances made by AB 103 for the California OAG to perform reviews of immigration detention facilities to include wide-ranging access to facilities, individuals, and records, if enforced by the state, will conflict with ICE's ability to comply with other federal information disclosure laws, regulations, and policies.  For example, ICE is unable to provide such wide-ranging access to detainees in person or access to detainee information as would be required by AB 103, absent consent from the individual.  For those individuals who are lawful permanent residents, ICE may

only release personal information pursuant to the federal Privacy Act.  For other aliens, ICE must comply with other DHS policies that generally prohibit the disclosure of information about persons to third parties.  Both the Privacy Act and the DHS Privacy Policy require that there be a valid exception (one of which is consent) to release any information pertaining to an individual.

65.  In addition to compliance with the Privacy Act and DHS Privacy Policy, ICE is also required to comply with several confidentiality statutes and regulations that prohibit disclosure of information about persons who are applicants for or beneficiaries of certain types of immigration statuses.  For example, 8 U.S.C. § 1367 prohibits disclosure of *any* information about an individual who is an applicant for or beneficiary of immigration benefits under the Violence Against Women Act or a T or U visa applicant, unless one or more specific statutory exceptions apply.  The California OAG review under AB 103 would not fall under one of the statutory exceptions. Thus, ICE would be prohibited by law from disclosing any information about detainees that have these particular confidentiality protections.  This places the access to information and records provisions of AB 103 in conflict with ICE's ability to comply with other federal information disclosure laws, regulations, and policies.

66.  Further, AB 103 contemplates allowing the California OAG broad access to the facilities, records, and personnel in furtherance of their reviews.  This access is in direct conflict with the law enforcement privilege that ICE routinely asserts over such records pertaining to the operations of ICE facilities.  ICE routinely withholds such information in response to FOIA requests, responses to third-party requests for information, and other public disclosures, as law enforcement sensitive to the extent such records or access to information would disclose

details regarding facility operations (e.g., information such as how many guards are at the facility at any given time, shift changes, hours of guard duty, staffing and incident response plans, blueprints or layout of the facility).

67. Finally, section 12 of AB 103 provides that the California Attorney General will report to the State Legislature, Governor, and public on his findings. The law, as drafted, makes no allowance for the protection from disclosure of law enforcement sensitive information or statutorily protected information about individuals, or for any other information considered by the government to be privileged. This provision exacerbates the information-sharing issues mentioned above relating to individualized detainee access/information and access/information to law enforcement sensitive material or other privileged material. As written, not only will AB 103 place ICE in potential conflict with federal information law statutes, regulations, and policies, but if any of the above information was then released to the state legislature, Governor, and the public as part of the California OAG's findings, it may subject ICE to potential liability from individuals, and potentially subject ICE officers or facility personnel to operational risk or harm.

68. The imposition of burdensome new requirements on private contractors by AB 103, including reviews of detention conditions by the California OAG and the requirement that all facilities used to detain aliens for immigration purposes be subject to the California Public Records Act (CPRA), may also deter private contractors from working with ICE. For example, the Adelanto Detention Facility has already received an extensive request for records under the CPRA.

69. In addition, SB 29, a separate law, builds on AB 103 by extending the contracting prohibitions to apply to ICE contracts with private entities. SB 29 also requires all

immigration detention facilities in California to be subject to CPRA, rendering all of the private corporation's records subject to release.

***Impact on ICE National Security and Investigative Operations – SB 54***

70. In addition to their significant impact on ICE removal operations, California's laws encroach upon ICE's investigative authorities—adversely impacting ICE's national security and criminal investigation missions. SB 54 only permits local and state authorities to accept a judicial warrant that is based on probable cause for a violation of federal criminal immigration law before turning a removable alien over to ICE for processing under federal immigration law. Congress, however, provided authority to ICE officers and agents to arrest on administrative civil immigration warrants. ICE makes hundreds of thousands of civil immigration arrests each year. Requiring ICE to first seek out a federal judge would create operational difficulties and burdens for both ICE and the federal courts, significantly impeding ICE's ability to fulfill its Congressional charge to issue administrative warrants for the arrest of aliens believed to be removable. Requiring criminal immigration violations as a predicate to cooperating with ICE also prevents ICE from setting its own immigration enforcement priorities. And, SB 54 proceeds from a flawed assumption, as I am unaware of any authority for a federal court to issue a warrant for a civil immigration arrest under the INA.

71. Although SB 54 provides a carve-out to its limitations for participation in joint law enforcement task forces where "the primary purpose" of the task force is not "immigration enforcement," and other requirements are met, many jurisdictions have read this exception exceedingly narrowly. While HSI continues to contribute the second largest number of personnel to JTTFs nationwide, certain California law enforcement agencies now refuse to

share information directly with HSI and, rather, require that the request for such information come directly from the Federal Bureau of Investigation (FBI).

72.  The lack of prompt information-sharing will impede HSI's counter-terrorism work on a day-to-day basis and could have a significant negative impact on national security in the event of a crisis when the need for such sharing is most critical.  For example, following the December 2, 2015, terrorist attack in San Bernardino, California, information-sharing between the San Bernardino Police Department (SBPD) and HSI agents assigned to the local JTTF allowed for real-time sharing of essential DHS-held information, including immigration history, information from alien files, and international travel histories of several subjects of interest in the investigation.  SBPD led the investigation in the first 72 hours post-attack, at which point the FBI declared the San Bernardino attack an international terrorism event and took lead of the investigation.  Within the first 72 hours post-attack, the ease of information-sharing between ICE and SBPD resulted in the identification of accomplices and the discovery of a marriage fraud conspiracy among the accomplices. Today, if a similar terrorist attack were to occur within California, the SB 54 prohibitions on information-sharing between local law enforcement agencies and ICE could significantly delay a time-sensitive investigation, the identification of additional targets, and the ability for DHS to place lookouts in systems to prevent outbound travel via air carrier should a target attempt to flee the United States.

73.  SB 54 has also limited ICE access to aliens who may assist in building criminal cases, thus interfering with ICE's ability to pursue the prosecution or removal of aliens who pose particularly significant threats to public safety or national security.  Aliens unlawfully in the United States may have important information about criminals they encounter—from

transnational narco-terrorists to alien smugglers and beyond—and routinely support ICE's

enforcement activities by serving as confidential informants (CIs) or witnesses.  When ICE's

witnesses or CIs are removable aliens, ICE can exercise its discretion to ensure the alien is

able to remain in the United States to assist in an investigation, prosecution, or both.

74.   In addition, lack of cooperation among California law enforcement agencies and ICE

jeopardizes public safety, as well as the safety of our nation's law enforcement officers.  For

example, in May 2017, HSI San Jose notified the Santa Cruz County Sheriff's Office

(SCCSO) of an impending child exploitation search warrant to be executed at a residence

behind a local elementary school.  In light of the possibility that HSI may encounter illegal

aliens in executing the warrant, the SCCSO denied HSI San Jose's request for marked units

to be parked outside the subject's residence, during the execution of the warrant, to ensure

public and officer safety.  As a result, HSI San Jose was forced to acquire assistance outside

of the Santa Cruz County jurisdiction.  Throughout FY 2017, similar denials of cooperation

with HSI occurred in Los Angeles during an enforcement action against 18th Street gang

members, and in Long Beach during a criminal narcotics investigation.  The lack of

cooperation and delays in enforcement action not only place the local community at risk, but

also create an increasing risk to officer safety.

75.   SB 54 has also had adverse implications for state criminal prosecutions.  Federal law, 8

U.S.C. § 1182(d)(5)(A), authorizes DHS to parole into the United States aliens who are

otherwise inadmissible for urgent humanitarian reasons or a significant public benefit.

Pursuant to that authority as delegated within DHS, a federal, state or local law enforcement

agency may request that HSI grant a "significant public benefit parole" (SPBP) to allow

inadmissible aliens to enter the United States, for a brief period of time, if their limited

presence would be beneficial to enforcing public safety.  This frequently occurs in the context of paroling into the United States criminal defendants or important witnesses needed for trial or investigations but who are otherwise inadmissible.  Of note, such witnesses or defendants may be inadmissible due to a violent criminal history, or for having engaged in terrorist activity or human rights violations.  Allowing a criminal defendant into the United States for prosecution may ensure that justice is done because one or more criminal investigations or prosecutions are successful.  However, public safety demands that the paroled alien be monitored and removed from the country when the criminal proceedings, or sentence, is complete.  To this end, law enforcement agencies requesting SPBP are required to adhere to HSI protocols with regard to requesting, vetting, supervising, and tracking individuals for whom HSI has granted a SPBP.  In the interest of public safety, cooperation from the law enforcement agency that is granted a SPBP is necessary to allow ICE to ensure that the parolee is subsequently removed from the United States upon termination of the SPBP.  SB54 makes it impossible for state and local law enforcement agencies to meet their obligation to return parolees to DHS custody, frustrating our ability to authorize them to come to the United States for prosecution.

76. While SPBP is a vital tool for furthering law enforcement in the United States, ICE takes into consideration the serious risks associated with SPBPs and the possibility that an otherwise inadmissible alien may permanently remain in the United States, for instance, if the state or local law enforcement agency fails to notify ICE that a defendant has been acquitted or released on bail by a state court judge overseeing the criminal case.

77. HSI has approved approximately 45 SPBP requests each of the past three FYs from California for state prosecutions.  While the total number of SPBP requests granted annually

has remained constant since FY 2015, SB 54 interferes with the ability to grant SPBPs for

the purpose of California criminal prosecutions. Specifically, the prohibitions on California

law enforcement agencies to cooperate with ICE to ensure the transfer of custody of a

parolee to ICE for removal at the conclusion of the SPBP period stand in the way of this

important law enforcement and foreign policy tool.

78. In fact, HSI previously denied a California law enforcement agency's request for a parole to

bring into the United States a Guatemalan native charged with multiple counts of child

abuse because the requesting law enforcement agency could not confirm that it would notify

ICE if the alien were released from state or local custody.  In light of the recent enactment of

SB 54, ICE must weigh the benefit of a potentially successful prosecution with the very

likely risk that the relevant California law enforcement agencies cannot, due to SB 54, notify

ICE of an impending release or transfer the alien to ICE custody for removal upon

completion of criminal proceedings.  The law's prohibition on advance notification of

release or transfer of custody would result in the alien being released, without legal status in

the United States or effective monitoring, among the public in California, and with the

possibility of becoming a repeat criminal offender.  Upon receipt of the January 5, 2018,

parole denial, the offices of the county sheriff and prosecutor seeking the parole submitted a

letter providing assurances, despite their apparent conflict with SB 54, that, should the alien

be released from criminal custody, including due to a lack of probable cause finding,

acquittal, or release on bail, the county would immediately notify ICE.  On or about

February 13, 2018, the letter was submitted to ICE with a new parole request.  The new

parole request was approved on or about February 20, 2018.  On February 27, 2018, the

alien was paroled into the United States to face the pending criminal charges.

79. The harms caused by SB 54's prohibitions on information sharing are compounded by AB 90, which, as discussed above, precludes ICE access to the CalGang database, hampering state and local criminal law enforcement efforts.  Previously, ICE not only accessed the database, but also provided information for inclusion therein, including new or updated photographs of the subject showing the face, tattoos, scars, and style of dress; aliases; associates; change in gang membership (e.g., switching to a different gang, or dropping out of a gang); and information important to officer safety such as whether the individual is violent, uses controlled substances, or possesses a weapon.  As ICE has now lost access to CalGang, it will no longer be able to search, update, or add subjects and their information.  Consequently, AB 90 deprives state and local law enforcement agencies in California of information in ICE's possession that it once provided freely.

***Impact on ICE Worksite Enforcement Operations – AB 450***

80. In a combination of criminal and civil interference, California has targeted ICE's ability to conduct investigations regarding unlawful employment.  Unlawful employment is a magnet for illegal immigration.  Accordingly, ICE is committed to combating violations of federal law by both employers and employees.  AB 450 prohibits public and private employers from providing voluntary consent for ICE to enter any nonpublic area of a place of labor without a judicial warrant except where otherwise provided by federal law or to access to records other than Employment Eligibility Verification Form I-9 (Form I-9) documents.  AB 450 also imposes requirements on employers to notify employees of information pertaining to a notice of inspection.

81. Section 274A(b) of the INA, 8 U.S.C. § 1324a(b), requires employers to verify the identity and employment eligibility of all individuals hired in the United States after November 6,

1986.  An implementing regulation, 8 C.F.R. § 274a.2, designates the Form I-9 as the primary means of documenting this verification.  Employers are required by law to maintain for inspection original Forms I-9 for all current employees.  In the case of former employees, retention of Forms I-9 is required for a period of at least three years from the date of hire or for one year after the employee is no longer employed, whichever is longer.

82. ICE's worksite enforcement efforts are not only related to unlawful employment and document fraud.  Employment violations can relate to numerous other areas of criminal activity including those that pose grave danger to American communities.  Unlawful employment can increase the risk to, and vulnerabilities of, high-value target worksites, including chemical facilities, communications, critical manufacturing, dams, emergency services, government facilities, information technology, nuclear reactors and materials and waste and transportation systems.  As such, ICE focuses its criminal investigations on the most egregious violators and concentrates its worksite inspection efforts on employers conducting business in these critical infrastructure and national security interest industries and sectors   Further, ICE prioritizes employers who abuse and exploit their workers, aid in the smuggling or trafficking of their alien workforce into the United States, create false identity documents or facilitate document fraud, or create an entire business model using an unauthorized workforce.  ICE also investigates employers who use force, threats, or coercion – such as threatening to have employees deported – to keep unauthorized alien workers from reporting substandard wages or unsafe working conditions.

83. The Form I-9 inspection process is an essential component of ICE's overall worksite enforcement efforts.  The Notice of Inspection initiates the Form I-9 administrative inspection process.  Employers are provided with at least three business days to produce the

Forms I-9.  ICE conducted approximately 1,300 I-9 inspections in FY 2017 across the country, including approximately 230 in California.  If conditions are appropriate, any of those I-9 inspections could lead to a worksite inspection with the consent of the employer, and employers are often very willing to provide consent in order to alleviate and address concerns that arise during the inspection process.  AB 450 may directly interfere with this cooperative process.

84.  While Section 2(a)(2) of AB 450 exempts I-9 Employment Eligibility Verification forms and other documents for which a Notice of Inspection has been provided to an employer, the overall language of the law may add confusion about what an employer is and is not permitted to do during a Form I-9 inspection.  While service of the Notice of Inspection may not be impacted, the law may create confusion on behalf of an employer when HSI agents or auditors return to the place of business to retrieve the Forms I-9 and other supporting documentation.  This documentation may be located in a non-public area of a business.  However, under AB 450, an employer may violate the law if he or she permits HSI agents to enter into the private areas of the business to retrieve these documents.  Preventing ICE officers or agents from entering a non-public area to have discussions with employers has negative consequences.  The ability to communicate freely in private benefits both ICE and the employer, including when the PII of employees or other sensitive information is being discussion.  In practice, the prohibition of ICE officers from entering a non-public area places the employer in an extremely difficult situation.  Even employers complying with all laws and regulations related to the Forms I-9 may not want the public, including their customers or clients, to see ICE reviewing their records.

85. During a Form I-9 inspection, HSI often has cause to serve additional notices upon an employer, to include a Notice of Technical/Procedural Failures, Notice of Discrepancies, Notice of Suspect Documents, Warning Notice and a Notice of Intent to Fine.  Service of these documents usually occurs in person at the place of business, in an office or private area to allow the employer some discretion and to permit HSI to answer any questions that the employer may have.  AB 450 would prohibit HSI from entering the private areas for the service of these additional documents.  HSI agents and auditors routinely conduct in-depth interviews with business owners, managers and human resource personnel in connection with a Form I-9 inspection, either during service of the Notice of Inspection or during a follow-up interview at a previously arranged time.  These interviews often involve sensitive discussions regarding particular employees, hiring practices, and information that may contain PII.  AB 450 would prohibit an employer from admitting HSI agents/auditors into non-public areas of a business to conduct this interview in a private setting.  This prohibition could impede HSI from obtaining valuable evidence (e.g., statements from business owners, employees and/or human resource managers) to be used in the prosecution of an employer found to be committing egregious employment violations.  This prohibition may also prevent HSI from obtaining sufficient information to determine the existence of aggravating or mitigating factors used in the process of determining any civil monetary sanctions contemplated against an employer in connection with a Form I-9 audit, as an employer may be hesitant to cooperate with HSI agents for fear of being prosecuted under AB 450.

86. In enforcing civil and criminal violations of federal law, consent can be a valuable tool, especially when an investigation has not proceeded to the point where a judicial warrant is available.  In warrantless situations, AB 450 would become problematic where an employer

wishes to grant consent to enter but cannot do so because of the civil penalties he or she would face due to AB 450. This impedes ICE's ability to conduct operations in a manner which would be permissible in any non-immigration-related civil or criminal investigation by any other federal agency. In many cases, consensual entry and encounters occur at the beginning of civil and criminal investigations with the information gleaned acting to further the investigation. Not being able to commence an investigation in this manner could be extremely detrimental to ICE's enforcement efforts, particularly in the realm of human smuggling and trafficking.

87. While the stated purpose of AB 450 is to protect employees, the practical effect of AB 450 will likely be that discussions that have historically been, and should be, conducted in private between ICE and the employer will now be conducted in a public area. This may cause the disclosure of an employee's PII, which is not in the employee's best interest and jeopardizes the employee's privacy.

88. AB 450 could also cause the workforce, authorized and unauthorized, undue panic and adversely affect ICE's worksite enforcement investigations. Employees whom ICE would identify for potential interview may now think when ICE comes to interview them that they are going to be arrested. This could lead to a violent confrontation, which would put the agent, the individual, and others in the vicinity at risk. Finally, AB 450 would also potentially prohibit employers from joining the ICE Mutual Agreement between Government and Employers (IMAGE) program. This voluntary program allows employers to partner with ICE to ensure the integrity and stability of their workforce. Partnership in the IMAGE program requires an employer to voluntarily submit to a Form I-9 audit, and requires close, repeated interaction between HSI agents and a business. By necessity, this

interaction would normally occur in a private area of a business and may include training on Form I-9 completion, use of the E-Verify system, and an analysis of an employer's hiring policies and practices. Many issues discussed during the IMAGE process may involve sensitive personnel issues and may include PII of employees. While entirely voluntary, the IMAGE program will be negatively impacted by AB 450.

89. As illustrated by these examples, SB 54, AB 90, and AB 450 extend well beyond immigration-related enforcement to target national security operations and investigations regarding potential violations of federal law. The combined effect of these laws is to impede the entirety of ICE's mission set, jeopardizing agency operations and public safety throughout the United States, not simply California.

***General Impact of Mosaic of Anti-Immigration Enforcement Legislation on ICE Operations***

90. In addition to the concrete adverse effects on ICE's law enforcement operations, the attitudinal climate in California has fostered hostility towards ICE's congressionally authorized mission and obligations. For example, on February 24, 2018, Oakland County Mayor Libby Schaaf issued a press release warning of upcoming ICE immigration enforcement actions, noting that California state law prohibits federal agents from accessing employee-only areas of business and concluding that "immigrants and families [ ] deserve to live free from the constant threat of arrest and deportation." These irresponsible actions, explicitly premised in part on state law, serve only to impede federal law enforcement and place federal law enforcement officials at risk.

91. Although not directly attributable to a specific California law, the mosaic of anti-immigration enforcement legislation enacted by California has created an atmosphere of defiance, which places the safety of ICE officers and employees at risk. The increase in the

number of assaults on ICE law enforcement officers and contract personnel is particularly

concerning.  The number of such incidents increased from 15 in FY 2015 to 73 in FY 2017,

nationwide.  As of January 10, 2018, there have already been 34 incidents.  In California

alone, the incidents increased from 4 in FY 2015 to 17 in FY 2017, with 2 reported as of

January 10, 2018.

**Conclusion**

92.  California's efforts to put into place its own immigration law regime are frustrating ICE's

ability to identify, apprehend, detain, and remove criminal aliens from the United States and

hindering ICE's enforcement missions in other arenas, including national security, criminal

investigations and prosecutions, and worksite enforcement. In addition, California's

legislative obstructions to enforcement of federal law have jeopardized officer and public

safety by requiring unnecessary at-large arrests, limiting sharing of valuable law

enforcement information, and promoting a culture of hostility toward ICE's mission and

personnel.  As long as these laws remain in effect, the safety of the people of California,

including ICE employees and contractors who reside in the state, is subject to unnecessary

and inappropriate risk.

93.  The information in this declaration is current and accurate as of March 6, 2018.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct

to the best of my knowledge, information, and belief.


Executed in Washington, D.C. on this 2nd day of April, 2018.



_____
Thomas D. Homan
Deputy Director and Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

*City & County of San Francisco v. Jefferson B. Sessions, et al.*,
No. 3:17-cv-04642-WHO (N.D. Cal.)

Defendants' Motion for Summary Judgment and
Opposition to Plaintiff's Motion for Summary Judgment

Attachment 3

Declaration of Marilynn B. Atsatt
Office of Justice Programs

1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11
CITY AND COUNTY OF SAN
12   FRANCISCO,
                                          **DECLARATION OF**
13                Plaintiff,              **MARILYNN B. ATSATT**
14          v.

15   JEFFERSON B. SESSIONS III, Attorney      No. 3:17-cv-04701-WHO
     General of the United States, et al.,
16
                 Defendants.
17

18          1. I am the Deputy Chief Financial Officer of the Office of Justice Programs ("OJP" or

19   "Office"), within the U.S. Department of Justice. In this capacity, I am the first assistant to the

20   Chief Financial Officer, who is primarily responsible for OJP's appropriations and budget

21   activities, among other things. I have been Deputy Chief Financial Officer of OJP since 2015,

22   and, before that, was Deputy Director of the U.S. Department of Justice's Budget Staff (located

23   within the Justice Management Division) for more than seven years. This declaration is based on

24   personal knowledge and information obtained by me in the performance of my official duties.

25          2. On June 26, 2018, the Office of Justice Programs resumed making awards under the

26   Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") for Fiscal

27   Year 2017, after the United States Court of Appeals for the Seventh Circuit stayed the nationwide

28

1   application of the preliminary injunction issued by the district court in *Chicago v. Sessions*. The

2   Office has issued 839 Byrne JAG awards for FY 2017 since that date.

3       3. OJP is not yet issuing Byrne JAG awards for FY 2017 to those states and localities

4   whose compliance with 8 U.S.C. § 1373 is under review. The Office is, however, retaining

5   sufficient FY 2017 funds to make all of the FY 2017 Byrne JAG awards that have been

6   announced, with respect to those states and localities. Once the question of compliance with

7   Section 1373 is resolved, those funds, which were appropriated without fiscal year limitation, will

8   be available to make the awards.

9       4. The City and County of San Francisco is one of the jurisdictions whose compliance

10   with 8 U.S.C. § 1373 is under review.

11       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

12   and correct.

13   Dated this ___30ᵗʰ___ day of July, 2018.

14

15

16                    Marilynn B. Atsatt

16                    Marilynn B. Atsatt

17                    Deputy Chief Financial Officer

17                    Office of Justice Programs

18                    U.S. Department of Justice

19

20

21

22

23

24

25

26

27

28

*City & County of San Francisco v. Jefferson B. Sessions, et al.*,
No. 3:17-cv-04642-WHO (N.D. Cal.)

Defendants' Motion for Summary Judgment and
Opposition to Plaintiff's Motion for Summary Judgment

Attachment 4

Declaration of W. Scott Simpson

1
2
3
4
5
6
7
8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                           SAN FRANCISCO DIVISION

11

12 | CITY AND COUNTY OF SAN FRANCISCO, | **DECLARATION OF W. SCOTT SIMPSON**

13                 Plaintiff,

14         v.                                    No. 3:17-cv-04642-WHO

15 JEFFERSON B. SESSIONS III, Attorney
   General of the United States, et al.,

16

17                 Defendants.

18         1.  I am a Senior Trial Counsel in the Civil Division of the U.S. Department of Justice in

19 Washington, D.C.  I am one of the attorneys responsible for representing the defendants in the

20 above-captioned cases.  This declaration is based on personal knowledge that I obtained in the

21 performance of my official duties.

22         2.  Attached hereto as Exhibit A is a true and correct copy, as produced by the plaintiff, of

23 San Francisco Police Department Bulletin 17-015, dated January 19, 2017.

24         3.  Attached hereto as Exhibit B is a true and correct copy, as produced by the plaintiff, of

25 San Francisco Police Department General Order 5.15, dated July 5, 2017.

26         4.  Attached hereto as Exhibit C is a true and correct copy, as produced by the plaintiff, of

27 an undated document from the San Francisco Office of Civic Engagement & Immigrant Affairs

28

1    entitled *Background Information: City and County of San Francisco Immigrant Protection*
2    *Policies*.

3         5.  Attached hereto as Exhibit D is a true and correct copy, as produced by the plaintiff, of
4    an Immigrant Rights Workshop conducted by the San Francisco Human Rights Commission,
5    dated February 9, 2017.

6         6.  Attached hereto as Exhibit E is a true and correct copy, as produced by the plaintiff, of
7    San Francisco Sheriff's Department Policy #SFSD 02-39, dated December 7, 2017, with the
8    accompanying memorandum from Vick L. Hennessy, Sheriff, to All Personnel, dated December
9    8, 2017.

10        7.  Attached hereto as Exhibit F is a true and correct copy, as produced by the plaintiff, of
11   the San Francisco Adult Probation Department's *Policy: Immigrant Clients and Compliance with*
12   *the Sanctuary Ordinanc*e, dated March 8, 2018.

13        8.  Attached hereto as Exhibit G is a true and correct copy, as produced by the plaintiff, of
14   an undated *General Order 5.15 Police Commission Presentation*.

15        9.  Attached hereto as Exhibit H is a true and correct copy, as produced by the plaintiff, of
16   a memorandum from Matthew Lee, Deputy City Attorney, to Maria Su, Executive Director,
17   Department of Children, Youth & Their Families, dated January 27, 2017.

18        10.  Attached hereto as Exhibit I is a true and correct copy, as produced by the plaintiff, of
19   an email exchange between Matthew Freeman, Chief Deputy Sheriff, and Kathy Gorwood, Chief
20   Deputy Sheriff, dated March 1, 2017.

21        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
22   and correct.

23   Dated this 1st day of August, 2018.

24

25                              /s/ W. Scott Simpson
                              _____
26                              W. SCOTT SIMPSON
                              Senior Trial Counsel
27                              Federal Programs Branch, Civil Division
                              U.S. Department of Justice
28

Declaration of W. Scott Simpson                    2
No. 3:17-cv-04642-WHO

 **DEPARTMENT BULLETIN**

A
17-015
1/19/17

## Enforcement of Immigration Laws
(Supersedes DB 16-015)

Members are reminded that it is the policy of the San Francisco Police Department to foster respect and trust between law enforcement and residents, to protect limited local resources to encourage cooperation between residents and City officials, including law enforcement and public health officers and employees; and to ensure community security. It is also Department policy, consistent with its obligations under state and federal law, to adhere to the City of Refuge Ordinance, San Francisco Administrative Code Section 12H.2. This ordinance prohibits the use of City resources to assist in the enforcement of federal immigration laws or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I. Administrative Code 12I.2 defines "personal information" as "any confidential, identifying information about an individual, including, but not limited to home or work contact information, and family or emergency contact information unless required by Federal or State statute, regulation or court decision.

In accordance with the City of Refuge Ordinance and state law, members of the Department shall adhere to the following:

1. DETENTION/DOCUMENTS. Members shall not:

   a. Stop, question, or detain any individual solely because of the individual's national origin, foreign appearance, inability to speak English, or immigration status (also see DGO 5.03, Investigative Detentions). The mere presence of so called "illegal aliens," "undocumented individuals" is not a criminal offense.

   b. Ask for documents regarding an individual's immigration status in the course of their duties, e.g., traffic enforcement, investigations, taking reports, officers.

2. ASSISTING THE U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT- (ICE) Members shall not enforce immigration laws or assist ICE in the enforcement of immigration laws or gather or disseminate information regarding release status of individuals or any other personal information as defined in Administrative Code Admin. Code 12I.

Nothing in this bulletin precludes officers from providing emergency assistance to members of outside law enforcement agencies when there is a significant danger, as outlined in DGO 5.15. In such cases, once scene safety has been established, members shall notify their immediate supervisor of the incident. That supervisor shall respond to the scene and ensure that such assistance was warranted. Members involved in providing emergency back-up assistance shall file an incident report describing their reasons for their assistance.

TONEY D. CHAPLIN
Interim Chief of Police

*Per DB 15-141, both sworn and non-sworn members are required to electronically acknowledge this Department Bulletin in HRMS.*

# Exhibit A

SF_00000045

San Francisco Police Department                                    **5.15**
# GENERAL ORDER                                       Rev. 07/05/17

---

## ENFORCEMENT OF IMMIGRATION LAWS

The purpose of this order is to establish policies regarding the San Francisco Police Department's role in the enforcement of immigration laws and cooperation with U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP") or successor agencies whose role is to enforce immigration laws, in conformity with state and federal laws and San Francisco Administrative Code Chapters 12H and 12I.

## I. POLICY.

It is the policy of the San Francisco Police Department to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents, City officials, and law enforcement, and to ensure community security. It is also Department policy, consistent with its obligations under state and federal law, to adhere to San Francisco Administrative Code Chapters 12H and 12I. These Chapters generally prohibit the use of City resources to assist in the enforcement of federal immigration laws, except as required by federal or state law.

## II. STATE AND LOCAL LAW.

In accordance with Chapter 12H and state law, members of the Department shall, in performing their official duties, adhere to all of the following:

**A.    DETENTION:** Members shall not stop, question, or detain any individual solely because of the individual's national origin, foreign appearance, inability to speak English, or immigration status (also see DGO 5.03, Investigative Detentions). Members shall not inquire into an individual's immigration status.

**B.    DOCUMENTS:** In the course and scope of their duties e.g., traffic enforcement, investigations, and taking reports, members shall not require individuals to produce any document to prove their immigration status.

**C.    ASSISTING ICE/CBP:** Members shall not cooperate with or assist ICE/CBP in any investigation, detention, or arrest procedures, public or clandestine, where in any such instance the purpose is enforcing federal immigration laws.

1

# Exhibit B

SF_00000051

**DGO 5.15**
**Rev. 07/05/17**

D. **INFORMATION GATHERING/DISSEMINATION FOR IMMIGRATION ENFORCEMENT PURPOSES:**

1) **Release Status/Confidential Information for immigration enforcement purposes.** Members shall not request information about, or disseminate information, regarding the release status of any individual or any other confidential, identifying information such as home, work, or family or emergency contact information, except as required by federal or state law.

2) **Services.** The Department shall not include on any application, questionnaire, or interview form it uses in relation to benefits, services, or opportunities provided by the City and County of San Francisco, any questions regarding immigration status other than those required by federal or state law.

E. **ICE/CBP DETAINERS/ADMINISTRATIVE (CIVIL) WARRANTS:**
Members shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, solely on the basis of an administrative (civil) warrant, prior deportation order, or other civil immigration document that only addresses alleged violations of the civil provisions of immigration laws. Members shall not place an administrative (civil) immigration hold or detainer on an individual who is in custody. National Crime Information Center ("NCIC") or California Law Enforcement Telecommunication System ("CLETS") warrant responses currently make clear whether the warrant is administrative (civil) or criminal.

Members shall adhere to all of the following when reviewing or examining outstanding warrants in the NCIC or CLETS system.  Members:

1) Shall contact the Sheriff's Central Warrant Bureau ("CWB") to confirm any warrant before taking action on the warrant.
2) Shall not enforce federal administrative (civil) warrants for arrest (currently Department Homeland Security ("DHS") Form I-200) or for removal/deportation (currently DHS Form I-205).
3) Shall not enforce Administrative Immigration Detainer – Notice of Action (currently DHS Form I-247A).
4) May enforce criminal warrants after consulting with CWB and confirming the criminal warrant.
5) Shall record the name of the individual from CWB staff who confirmed the criminal warrant in the incident report. (See DGO 6.18, Warrant Arrests.)

SF_00000052

DGO 5.15
Rev. 07/05/17

## III. PROVIDING EMERGENCY ASSISTANCE TO ICE/CBP.

A.  **ICE/CBP REQUESTS FOR EMERGENCY ASSISTANCE:** Members may provide emergency assistance to ICE/CBP to the same extent members would respond to emergency assistance to any other law enforcement agency. For example, members may provide emergency assistance when the member determines there is an emergency posing a significant and immediate danger to public safety or to the ICE/CBP agents.

B.  **DUTIES OF MEMBERS:** Members providing emergency assistance to ICE/CBP shall immediately notify their supervisor and complete an incident report describing the reasons for their assistance.

C.  **DUTIES OF SUPERVISORS:** When notified that a member is providing emergency assistance to ICE/CBP, supervisors shall immediately respond to the location and ensure that such assistance is warranted.

D.  **TRANSPORTATION:** Members shall not assist ICE/CBP in transporting individuals suspected solely of violating federal immigration laws.

E.  **ASSISTANCE:** Members shall not provide assistance to ICE/CBP agents for routine ICE/CBP operations, investigations, or raids. If ICE/CBP requests assistance that does not amount to an emergency as outlined in this section, members shall follow the protocols listed for Interagency Operations. (See DGO 5.14, Interagency Operations.)

## IV. ASSISTING OTHER LAW ENFORCEMENT AGENCIES AND FOREIGN GOVERNMENT.

A.  **INTERAGENCY OPERATIONS:** If ICE/CBP requests assistance with a planned, unplanned, or spontaneous operation, members must obtain approval from the member's Assistant Chief. (See DGO 5.14, Interagency Operations.)

B.  **JOINT CRIMINAL OPERATIONS:** Members may continue to collaborate with other law enforcement agencies, with approval of the member's Assistant Chief, to protect public safety and participate in joint criminal investigations that are permitted under Department policy or applicable city or state law. When a member becomes aware that the criminal investigation involves the enforcement of immigration laws, the member shall:
1)  Notify a Supervisor; and
2)  Cease operations if doing so would not pose a risk to the officers or the public; and
3)  Suspend Interagency Operations.

3

**DGO 5.15**
**Rev. 07/05/17**

      C.    **ASSISTING FOREIGN GOVERNMENT:** Members shall not assist or cooperate with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws. (See DGO 8.10, Guidelines for First Amendment Activities.) Any assistance or cooperation with a foreign government must be approved by the member's Assistant Chief. (See DGO 5.14, Interagency Operations.) Members requesting approval of the Interagency Operation shall notify the Officer-In-Charge ("OIC") of the Special Investigations Division ("SID") who will evaluate whether the U.S. State Department should be notified of the assistance or cooperation.

**V. DEPARTMENT BULLETINS.** Department Bulletins describing current versions or relevant examples of DHS forms and the most current samples of NCIC or CLETS print-outs of both administrative (civil) and criminal warrants will be issued as necessary.

**VI. COMPLIANCE WITH OTHER STATE OR LOCAL LAWS.** Nothing in this General Order prohibits members from performing their duties in enforcing state and local laws.

References

DGO 5.03, Investigative Detentions
DGO 5.14, Interagency Operations
DGO 6.18, Warrant Arrests
DGO 8.10, Guidelines for First Amendment Activities

4

**CITY AND COUNTY OF SAN FRANCISCO**

# OFFICE OF CIVIC ENGAGEMENT & IMMIGRANT AFFAIRS

Edwin M. Lee, Mayor                                                                                              Adrienne Pon, Executive Director
Naomi Kelly, City Administrator

**Background Information: City and County of San Francisco Immigrant Protection Policies**

Many people talk about San Francisco being a Sanctuary City, but few know exactly what that means. **SF's Sanctuary City policies do NOT mean that federal immigrant enforcement cannot or does not happen in San Francisco.** Instead, the policies provide specific restrictions on how the City can interact with federal immigration authorities.

**Sanctuary City Policy:**

San Francisco is a Sanctuary City and has been since 1989. This means that City departments, agencies, commissions and employees are prohibited from:

- Assisting with the enforcement of federal immigration law.
- Cooperating with foreign government investigations or surveillance.
- Requesting or disseminating information about an individuals' immigration status (except as required by federal or state regulation).
- Conditioning city services or benefits on immigration status (except as required by federal or state regulation).
- Including on any application, questionnaire or interview form used in relation to City services, benefits or opportunities questions regarding to immigration status (except as required by federal or state regulation).

**Due Process for All:**

San Francisco provides specific regulations for law enforcement officials to ensure Due Process for All (passed 2013, amended 2016):

- Federal immigration authorities, under the Priority Enforcement Program, issue notification or detainer requests to local law enforcement agencies, asking that local law enforcement either notify or hold individuals that fall under federal immigration enforcement priority rule.
- Law enforcement agencies are allowed to respond to notification requests only if an individual has been convicted of a violent or serious felony, or numerous other felonies, and has been held to answer to the same.
- Law enforcement agencies should consider evidence of rehabilitation when choosing to respond to hold requests even under these circumstances. This includes, but is not limited to: ties to the community, whether the individual has been a victim of crime, contribution to the community, participation in social services or rehabilitation programs.
- Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

**To file a complaint regarding a violation of the Sanctuary City policy, please contact the Human Rights Commission at 415.252.2517.**

**For general information on immigrant rights and services, contact OCEIA at 415.581.2360 or visit www.sfgov.org/oceia**

**Exhibit C**

SF_00005010

**City and County of San Francisco**
# HUMAN RIGHTS COMMISSION



**Sheryl Evans Davis**
Executive Director

**Edwin M. Lee**
Mayor

**COMMISSIONERS**

Susan Belinda Christian
*Chair*
Richard Pio Roda
*Vice-Chair*

Melanie Ampon
Eva Chan
Theodore Ellington
Hala Hijazi
Mark Kelleher
Andrea Nill Sanchez
Michael Pappas
Abby Porth
Michael Sweet

**Immigrant Rights Workshop**
**The Women's Building**
**February 9, 2017**

1) San Francisco passed the Sanctuary City Ordinance in 1989. Regardless of what happens in Washington, San Francisco will continue to be a Sanctuary City. This is a commitment from the Mayor, the Board of Supervisors, and leaders in law enforcement, public health, and education.

2) What is the Sanctuary City Ordinance? The Sanctuary Ordinance generally prohibits City employees from using City funds or resources to assist Immigration and Customs Enforcement (ICE) in the enforcement of Federal immigration law (unless such assistance is required by federal or state law).

3) Specifically, this means that city employees, including police, cannot do the following (unless it is mandated by federal or state law, warrant, or court decision):

- They cannot ask about an individual's immigration status
- They cannot disclose information regarding an individual's immigration status
- They cannot condition services based on an individual's immigration status

4) In other words, you generally do not need to worry about immigration issues when seeking services including law enforcement, public health, and education.

5) HRC is charged with implementing the Sanctuary City Ordinance. We assist the public in filing, mediating, and investigating complaints of non-compliance with the ordinance.

6) In other words, if any city official violates the Sanctuary City Ordinance and asks about immigration status, you have the right to file a complaint. The HRC will investigate your complaint and move forward as appropriate.

# Exhibit D



# San Francisco Sheriff's Department

INTER-OFFICE CORRESPONDENCE

December 8, 2017
Reference: 2017-137

To:        All Personnel

From:      Sheriff V. Hennessy *Vicki L. Hennessy*

Re:        Policy & Procedure 02-39 Immigration

Attached to this memo you will find policy and procedure, **02-39 Immigration**, as well as a training bulletin which covers 8 U.S.C. section 1373 and San Francisco Administrative Code section 12I.

The Sheriff's Department practices conform to local ordinances which govern how we process requests from Immigration and Customs Enforcement (ICE); this policy and procedure formalizes our current protocols. This policy consolidates and supersedes ALL prior memoranda issued regarding the Sheriff's Departments immigration policies.

The purpose of this policy is to guide Sheriff's employees in their duties and responsibilities associated with the enforcement of immigration law, including ICE requests for release notification and or detention for purposes of civil immigration enforcement, in conformity with federal, state and local law. As an integral component of the City and County of San Francisco's criminal justice system, we are required to ensure due process to all we serve.

There are three key areas of the policy and procedure that I bring to your attention:

### 1. Compliance with Title 8 United States Code Section 1373

- This United States Code prohibits restrictions on the exchange of information regarding citizenship and immigration status among Federal, State and Local government. This policy reaffirms our continuing compliance with this federal statute.

# Exhibit E

## 2. Compliance with San Francisco Administrative Code 12I.3 (d.)

- The San Francisco Administrative Code defines the circumstances under which the Sheriff *may* honor an ICE notification request. This policy affirms our continuing compliance with Administrative Codes 12H and 12I.

## 3. Compliance with California Government Code Section 7283.1 – California Truth Act

- This Government Code section requires that we notify each undocumented inmate in our custody whenever we receive an administrative communication from ICE (not a warrant signed by a magistrate) requesting voluntary detention and/or notification of release of that inmate. It also requires us to provide each person with a copy of any documents we have received from ICE.  Prisoner Legal Services will be responsible for delivering the required documents, which will also include SFSD Form 17-01 – "Information Regarding ICE Request for Notification of Release" and SFSD Form 17-02 – "Designation of Persons to Receive ICE Request Notification," to each person in our custody.  Copies of these forms are attached to the Policy and Procedure.

PLS staff will contact inmates in our jails in order to comply with the TRUTH Act. Please assist them with this effort.

For the most part, the policy concerns the work of our Central Records Unit, Classification Unit, and Prisoner Legal Services; however, all personnel are expected to read and understand this policy.  Any questions that require clarification should be addressed through your chain of command.

In the event inmates have any questions, they should be directed to PLS.

Thank you for your attention to this matter.

2

| SAN FRANCISCO SHERIFF'S DEPARTMENT  | Date Issued:  12/07/2017 | Policy #: SFSD 02-39 |
|---|---|---|
| | Last Revised: | |
| | Related Policies:<br>SFSD 01-09 - CORI<br>SFSD 01-17 - CLETS Complaince<br>PODM 07-01 - Central Warrant Bureau Responsibilities | |
| | Approved By:<br>*Vicki L. Hennessy* | |
| **POLICY AND PROCEDURE** | **Vicki L. Hennessy, Sheriff** | |
| Chapter:  **02 Legal Enforcement and Operations** | Title: **Immigration** | |

**POLICY:** The San Francisco Sheriff's Department (SFSD) shall serve all members of the public equally without consideration of immigration status. A person's immigration status shall have no bearing on the manner in which employees execute their duties. The SFSD does not comply with Department of Homeland Security / Immigration and Customs Enforcement Agency (DHS / ICE) requests to detain individuals after they are eligible to be released from SFSD custody.

The Sheriff alone may exercise discretion to respond to DHS / ICE requests for notification of release from SFSD custody, if the subject of that request meets the specific criteria set forth in San Francisco Administrative Code 12I.3(d.)

The SFSD does comply with criminal arrest warrants signed by a judge. This policy does not prohibit or restrict employees "from sending to, or receiving from, DHS / ICE information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. 1373.)

Under no circumstances shall employees arrest or detain an individual based solely on their known or suspected immigration status.

**PURPOSE:** To provide guidelines about SFSD employees duties, and responsibilities associated with the enforcement of immigration law, including DHS / ICE Requests for Release Notification and / or detention, in conformity with federal, state and local law.

**I. General:**

A. This policy supersedes and replaces all previous SFSD policies and directives concerning immigration.

B. Background

1. Immigration Enforcement Jurisdiction

a. DHS / ICE has primary responsibility to investigate and enforce federal immigration laws. DHS / ICE is responsible for the identification, apprehension, and removal of undocumented persons, where appropriate under federal immigration law.

   i. Removal is a civil, not a criminal matter.

b. Federal law does not compel state and local LEA' (LEA) participation

SF_00004618

in federal civil immigration functions. SFSD employees may not assist DHS / ICE in the enforcement of federal civil immigration laws, except as noted in this policy.

    *i.* All employees must forward DHS / ICE requests for SFSD enforcement assistance in the investigation of non-immigration related criminal violations to the Sheriff, through the chain of command, for approval.

    *ii.* SFSD employees may assist DHS / ICE by providing emergency assistance when employees determine that an emergency poses an imminent danger to public safety, including to the safety of DHS / ICE agents.

    *iii.* If safety permits, employees must seek supervisor approval before providing emergency assistance. On-scene supervisors shall evaluate each request for emergency assistance to ensure the SFSD's participation remains consistent with this policy while protecting human life and property.

2. Federal Criminal Enforcement:

    a. State and local law permits SFSD cooperation with federal criminal investigations. The Sheriff, through the chain of command, shall direct all SFSD cooperation with federal criminal investigations.

3. DHS / ICE Voluntary Detainer / Notification Requests:

    a. A DHS / ICE detainer / notification request is typically a written request to a LEA, asking the LEA to:

        *i.* hold an individual beyond the time when the individual is otherwise eligible for release from local custody, so that DHS / ICE may take custody of that individual and / or:

        *ii.* notify DHS / ICE in advance of the individual's scheduled release. DHS / ICE detainer / notification requests are only requests, and compliance is completely voluntary. The form of these requests may vary. Currently, DHS / ICE requests detention and release notification by submitting to LEAs a Form I-247A (Immigration Detainer – Notice of Action). According to DHS / ICE, Form I-247A replaces the following forms:

- Form I-247D (Immigration Detainer- Request for Voluntary Action)

- Form I-247N (Request for Voluntary Notification of Release of Suspected Priority Alien)

- Form I-247X (Request for Voluntary Transfer.)

- Form I-247 A requests that the receiving local LEA:

        *iii.* Notify DHS / ICE as early as practicable, at least 48 hours, if

SF_00004619

possible, before a removable alien is released from local custody; and

    *iv.*  Maintain custody of the alien for a period not to exceed 48 hours beyond the time he / she would otherwise have been released to allow DHS / ICE to assume custody for removal purposes.

b.  Additionally, DHS / ICE requests for detention and release notification may include the following attachments:

    *i.*  Form I-200, "Warrant for Arrest of Alien" or

    *ii.*  Form I-205, "Warrant for Removal/Deportation."

    *iii.*  Both Form I-200 and Form I-205 are administrative civil warrants signed by Immigration officials and not by a judge. These documents are not criminal warrants.

## II. Procedures:

A.  Order

1.  When SFSD personnel encounter perceived immigration law violations, members shall be guided by the options set forth in this policy, in compliance with federal, state and local law.

2.  Immigration Violation Complaints:

a.  If members of the public contact SFSD employees to report suspected immigration violations, employees shall inform such persons that DHS / ICE – not SFSD – enforces the civil immigration laws.

3.  Immigration Status:

a.  SFSD employees shall not initiate contact with, investigate, detain, or arrest any person based solely upon their known or suspected immigration status.

    *i.*  However, employees may investigate the immigration status of victims, witnesses or suspects if employees reasonably believe that immigration status may be a material fact of an alleged criminal violation, including for example, trafficking, smuggling, harboring and terrorism.

b.  SFSD personnel shall not conduct sweeps, or assist DHS / ICE sweeps, intended solely to locate and detain undocumented immigrants.

c.  Employees may assist DHS / ICE by providing emergency assistance when employees determine that an emergency poses an imminent danger to public safety, including to the safety of DHS / ICE agents.

    *i.*  If safety permits, employees must seek supervisor approval before providing emergency assistance.

    *ii.*  On-scene supervisors shall evaluate each request for emergency assistance ensure the SFSD's participation remains consistent

SF_00004620

with this policy while protecting human life and property.

B. Establishing Identity

    1. SFSD personnel shall attempt to identify any person they detain, arrest or who come into the custody of the SFSD.

    2. Any person eligible for citation and release, who is unable to present satisfactory evidence of his or her identity, shall be detained for the purpose of establishing his or her identity.

C. Central Warrant Bureau Procedure:

    1. SFSD personnel who are tasked with confirming warrants shall continue to process DHS / ICE warrants for booking that are confirmed as criminal warrants per memo (Reference: 2016-037, dated March 11, 2016, see attached.) If there is such a booking, Central Warrant Bureau employees shall notify Sheriff's Legal Counsel immediately.

    2. SFSD employees shall process all confirmed criminal arrest warrants received from any law enforcement agency, including DHS / ICE, consistent with SFSD Field Operations Division Policy 17-01, Central Warrant Bureau Responsibilities.

        a. As noted above, DHS / ICE requests for detention and notification are not criminal arrest warrants.

D. DHS / ICE Immigration Detainers and Requests for Notification / Process

    1. Fingerprints:

        a. Once a person is arrested, SFSD scans his / her fingerprints during the booking intake process. The inmate's fingerprints are automatically sent to California Department of Justice (Cal DOJ). According to Cal DOJ, the fingerprints are shared with the Federal Bureau Investigations (FBI), the FBI shares them with DHS / ICE to check for prior contacts, and following a contact, DHS / ICE may then send a Form I-247A – a combination detainer and notification request - to the SFSD requesting action.

    2. Detainer Requests:

        a. A DHS / ICE detainer (currently Form I-247A) requests that SFSD detain the subject for up to 48 hours after they are eligible to be released from local custody.

        b. The SFSD does not honor these detainer requests.

    3. Notification Requests:

        a. A DHS / ICE release notification request (currently Form I-247A) asks that SFSD notify DHS / ICE at least 48 hours before the inmate is released from custody. All DHS / ICE notification requests for intended release dates of suspected undocumented immigrant inmates in our custody are voluntary in nature. San Francisco Administrative Code 121.3(d) defines the circumstances under which the Sheriff may honor

SF_00004621

DHS / ICE notification requests. If those conditions are met, the Sheriff may exercise discretion to notify pursuant to that request.

    b. SFSD has established the following process to individually review each request and track the appropriate action in each case.

        *i.* The Central Records Unit shall review all Voluntary Requests (DHS Form 1-247 D, 1-247X, 1-247 N) and the consolidated form 247A) to determine if responding to the request complies with local and state law.

        *ii.* If an inmate, who is the subject of a voluntary notification request, is held to answer on an open felony case, the Central Records Unit will then review the individual's criminal history to determine if the individual meets the Administrative Code section 12I.3(d) criteria.

        *iii.* If the Central Records Unit determines that the individual meets the Administrative Code section 12I.3(d) criteria, Central Records employees shall forward the voluntary request to the Sheriff for final consideration.

E. Truth Act Compliance

    1. In conformance with Government Code Section 7283.1, upon receiving a DHS / ICE detention, notification or transfer request, Prisoner Legal Services Employees shall:

        a. Provide a copy of the request to the inmate in our custody.

        b. Provide a copy of the attached SFSD Form 17-1, "Information Regarding DHS / ICE Request for Notification of Release", which informs the subject whether the Department intends to comply with the DHS / ICE voluntary request, to the inmate.

        c. Request that the inmate complete SFSD Form 17-2 "Designation of Persons to Receive DHS / ICE Request Information" so SFSD will know who to notify in the event the Sheriff exercise discretion under 12I to notify DHS / ICE of the inmate's release date or release.

    2. The decision whether to honor the voluntary request will be made pursuant to this policy and in compliance with San Francisco Administrative Code 12I.3(d).

    3. If SFSD notifies DHS / ICE that an individual is being, or will be, released on a certain date and time, the SFSD employees providing that information to DHS / ICE shall promptly provide the same notification, using Form 17-3 "Decision to Notify ICE", to the inmate and to the inmate's attorney or designee, using the contact information provided by the inmate on Form 17-2.

F. Communications with LEA, Including Agencies Conducting Civil Immigration Enforcement.

    1. SFSD employees are authorized to provide to any LEA, including DHS / ICE, upon request, the following information,

SF_00004622

      a.  Date and location of Arrest

      b.  Current charges

      c.  Next court date

      d.  Bail amount

2.  SFSD employees are NOT authorized to provide the following access or information to any agency representatives or individuals conducting civil immigration enforcement (including DHS / ICE):

      a.  Access to inmates in jail

      b.  Access to SFSD computers and/or databases

      c.  SFSD Logs

      d.  Booking and arrest documents

      e.  Release dates and times

      f.  Home or work contact information

3.  Responses to I-247A or other DHS / ICE release notification requests unless expressly authorized by the Sheriff.

4.  Employees shall refer all DHS / ICE requests for assistance with criminal investigations to the Central Records Unit. The Central Records Unit shall forward those requests to the Sheriff who shall direct any assistance, through the chain of command.

G.  Contact:

1.  SFSD employees or others with questions regarding this policy shall be referred to Sheriff's Legal Counsel, Monday thru Friday 0800 to 1700 hours:

      a.  Chief Legal Counsel Mark Nicco

          415-554-7212

      b.  Assistant Chief Legal Counsel Suzy Loftus

          415-554-7295

      c.  Or after hours at the Central Warrant Bureau – emergency notification line to reach Sheriff's Legal Counsel 415-558-2411.

## III. Forms:

SFSD Form "Information Regarding ICE Requests for Notification of Release, Initial Statement"

SFSD Form "Information Regarding ICE Requests for Notification of Release, Designation of Persons to Receive ICE Request Information"

SFSD Form "Information Regarding ICE Requests for Notification of Release, Determination to Notify"

## IV. Reference:

"The Miranda-Olivares v. Clackamas County decision (Case No. 3:12-cv-02317-ST), a 2014 Federal decision, established that holding a person in custody based solely upon an ICE immigration detainer request may violate the individual's constitutional rights, and the involved local/state agency can be held liable for this violation of constitutional rights.

"ICE Guidance for Completing FORM I-247A

San Francisco Administrative Code 12I.3(d.)

(8 U.S.C. 1373.)

SFSD Criminal Warrants Memo (Reference: 2016-037, dated March 11, 2016)

SF_00004624



**San Francisco Sheriff's Department**
**Information Regarding ICE Request for Notification of Release**
**Initial Statement**

- ❏ Solicito recibir este formulario en español. / I request to receive this form in Spanish.
- ❏ 請寄來中文表格。 / I request to receive this form in Chinese.
- ❏ Nais ko pong makiusap na matanggap ang forma na ito sa Tagalog. / I request to receive this form in Tagalog.
- ❏ Tôi yêu cầu để nhận mẫu đơn này trong tiếng Việt. / I request to receive this form in Vietnamese.
- ❏ 저는 이 서류를 한국어로 번역된 것으로 받고 싶습니다 / I request to receive this form in Korean.

Date: _____ Name: _____ DOB: _____

A#_____ Housing Location: _____ SF#: _____

Current charge(s): _____

_____

Under the Transparent Review of Unjust Transfers and Holds (TRUTH) Act, we are required to provide you with the attached copy of the ICE request and inform you of whether we intend to comply with the request. ICE requests that SFSD notify them prior to your release and that SFSD maintain custody of your for up to 48 hours after your scheduled release to allow ICE to take you into their custody.

**The San Francisco Sheriff's Department does not intend to comply at this time.** However, based on San Francisco Administrative Code 12H and 12I, if you are held to answer on a qualifying felony, a review of your criminal history will be conducted to determine if you qualify for possible notification based on local law.

If your background, current charges and history of convictions and other information conforms to San Francisco Administrative Code 12I and SFSD decides to notify ICE of your release, we will notify you and your attorney or another person that you choose. Please provide the contact information, including phone number and / or email, for your attorney or another person that you choose on the provide SFSD Form 17-02, "Designation of Persons to Receive ICE Information Requests".

Please contact Prisoner Legal Services or your attorney if you have any questions or concerns.

Public Defender Phone: 415-553-1671          Prisoner Legal Services Phone: 415-558-2472

NOTE: A copy of the list of non-profit legal service providers for the San Francisco Immigration Court is also included with the notice. Please consider reaching out to one of the listed Immigration Rights Advocates since you have been informed that you are the subject of ICE proceedings. If you return to the San Francisco County Jail for future charges, ICE may continue to request a notification. If you are re-incarcerated elsewhere, that jurisdiction may elect to notify ICE of your impending release.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

For SFSD Use Only:

Delivered By: _____ Title:_____ Date: _____ Time:_____

Copies to:     SFSD Records          Public Defender/Attorney of Record          Prisoner Legal Services

SFSD 02-39     (17-01)                                                          12/07/2017

SF_00004625



**San Francisco Sheriff's Department**

## Information Regarding ICE Request for Notification of Release
### Designation of Persons to Receive ICE Request Information

❏ Solicito recibir este formulario en español. / I request to receive this form in Spanish.

❏ 請寄來中文表格。 / I request to receive this form in Chinese.

❏ Nais ko pong makiusap na matanggap ang forma na ito sa Tagalog. / I request to receive this form in Tagalog.

❏ Tôi yêu cầu để nhận mẫu đơn này trong tiếng Việt. / I request to receive this form in Vietnamese.

❏ 저는 이 서류를 한국어로 번역된 것으로 받고 싶습니다 / I request to receive this form in Korean.

Date: _____    Name: _____    DOB: _____

A#: _____    Housing Location: _____    SF#: _____

Current charge(s): _____

_____

Please complete the following information regarding the person you would like notified regarding any ICE Requests for Notification: (Select one)

| <u>Attorney</u> | <u>Other Designee (if applicable)</u> |
|---|---|
| Name: _____ | Name: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Email: _____ | Email: _____ |
| Phone: _____ | Phone: _____ |

The above selected individuals are to be notified with copies of any documents received from ICE that request notification of my release. In the event the San Francisco Sheriff's Department elects to notify ICE pursuant to the San Francisco Administrative Code 12I, these persons will also be provided with that information at the earliest opportunity.

Inmate Signature: _____    Date: _____

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

SFSD Use Only:

❏ I was able to see the above named inmate and complete this form. I subsequently forwarded a copy of this form, Form 17-1 and the request from ICE to the name individual(s)

❏ I was not able to see the above named inmate due to his/her release from custody via _____

❏ The person was contacted and did not want to complete this form

❏ Other _____

Processed by: _____    Unit: _____    Title: _____

Date: _____    Time: _____

Copies to:    SFSD Records    Public Defender/Attorney of Record    Prisoner Legal Services

_____

SFSD 02-39 (17-02)                                                                    12/07/2017

SF_00004626

<div align="center">

**San Francisco Sheriff's Department**
**Information Regarding ICE Request for Notification of Release**
**Determination to Notify**

</div>

❑ Solicito recibir este formulario en español. / I request to receive this form in Spanish.

❑ 請寄來中文表格。 / I request to receive this form in Chinese.

❑ Nais ko pong makiusap na matanggap ang forma na ito sa Tagalog. / I request to receive this form in Tagalog.

❑ Tôi yêu cầu để nhận mẫu đơn này trong tiếng Việt. / I request to receive this form in Vietnamese.

❑ 저는 이 서류를 한국어로 번역된 것으로 받고 싶습니다 / I request to receive this form in Korean.

Date: _____   Name: _____   DOB: _____

A#: _____   SF#: _____   Housing Location: _____

Date of Original Notice 17-01 _____

Under the Transparent Review of Unjust Transfers and Holds (TRUTH) Act, we are required to notify you and your attorney or another person that you choose in writing if we inform Immigration and Customs Enforcement (ICE) of your release.

The San Francisco Sheriff's Department makes such notifications only if you meet the criteria as listed in San Francisco Administrative Code section 12I.

**[X]   It has been determined that you meet the criteria for Notification of Release.**

**The purpose if this letter is to inform you that on** _____ **at** _____ **, we**
                                                    Date of Notice to ICE              Time of Notice to ICE

**notified ICE that you are scheduled to be released on** _____ **at** _____ **,**
                                                         Date of Scheduled Release        Time of Release

We will also provide this information to your attorney/designee of record as noted below:

Attorney/Designee Name and Contact Information: (as provided on SFSD Form 17-02)

Name: _____   Contact Info: _____

Date Contacted: _____   Contacted by: _____

Please contact the Sheriff's Department Prisoner Legal Services at 415-558-2472 if you have any questions or concerns.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

SFSD USE ONLY:

❑   I provided a copy of this form to the above named inmate on: Date_____ Time: _____

❑   I was not able to see the above named inmate due to his/her release from custody via _____

❑   Other: _____
❑
Processed by: _____   Unit:_____   Title: _____

Date: _____   Time: _____

Copies to:      SFSD Records,              Attorney of Record,              Prisoner Legal Services

SFSD 02-39   (17-03)

SF_00004627



San Francisco Sheriff's Department
Policy & Procedure Manual
Table of Contents
December 7, 2017

**ADOPTED/REVISED**

## Mission Statement

## Chapter 01  Administration

| | | |
|---|---|---|
| SFSD 01-01 | Department Organization and Chain of Command | 01-03-2013 |
| SFSD 01-02 | Public Information Plan | 01-03-2013 |
| SFSD 01-03 | Record Retention, Storage and Destruction | 01-03-2013 |
| SFSD 01-04 | Policy and Procedure Manual | 01-03-2013 |
| SFSD 01-05 | Revolving Fund Usage | 01-03-2013 |
| SFSD 01-06 | Inmate Welfare Fund | 01-03-2013 |
| SFSD 01-07 | Punitive Damage Awards | 01-03-2013 |
| SFSD 01-08 | Jail Clearance | 01-03-2013 |
| SFSD 01-09 | Criminal Offender Record Information Security | 04-03-2017 |
| SFSD 01-10 | Computer and Data Security | 04-03-2017 |
| SFSD 01-12 | Critical Incident: Administrative Action | 01-03-2013 |
| SFSD 01-13 | Management and Labor Meetings | 01-03-2013 |
| SFSD 01-14 | Americans with Disabilities | 01-03-2013 |
| SFSD 01-15 | Carry Concealed Weapon | 01-03-2013 |
| SFSD 01-16 | Language Access | 01-03-2013 |
| SFSD 01-17 | California Law Enforcement Telecommunications System (CLETS) Compliance | 04-03-2017 |

## Chapter 02  Legal Enforcement and Operations

| | | |
|---|---|---|
| SFSD 02-01 | NIMS / SEMS and Incident Command System | 05-23-2013 |
| SFSD 02-02 | Critical Incident Notification | 05-15-2013 |
| SFSD 02-03 | Use of Force | 01-16-2013 |
| SFSD 02-04 | Projectile Impact Weapon | 01-16-2013 |
| SFSD 02-05 | Authorized Handguns | 01-16-2013 |
| SFSD 02-06 | Authorized Shotguns | 01-16-2013 |
| SFSD 02-07 | Impact Weapons | 06-27-2014 |
| SFSD 02-08 | Individual Aerosol Dispenser / Chemical Agents | 01-16-2013 |
| SFSD 02-09 | Protective Hood | 01-16-2013 |
| SFSD 02-10 | Shields | 01-16-2013 |
| SFSD 02-11 | Electronic Control Device (ECD) / Taser | 01-16-2013 |
| SFSD 02-12 | Recording Devices | 05-15-2013 |
| SFSD 02-13 | Searches | 01-21-2004 |
| SFSD 02-14 | Non-Intrusive Sensor and Scanning Devices | 05-15-2013 |
| SFSD 02-15 | Emergency Vehicle Response and Pursuit Driving | 08-28-2015 |

SF_00004628



San Francisco Sheriff's Department
Policy & Procedure Manual
Table of Contents
December 7, 2017

**ADOPTED/REVISED**

## Chapter 02  Legal Enforcement and Operations

| | | |
|---|---|---|
| SFSD 02-16 | Detention and Arrest | 05-23-2013 |
| SFSD 02-17 | Arrests by Private Person | 01-16-2013 |
| SFSD 02-19 | Communicable Disease Management | 05-01-2002 |
| SFSD 02-20 | Subpoenas | 05-14-2013 |
| SFSD 02-21 | Juveniles | 10-16-2013 |
| SFSD 02-22 | Knives | 05-15-2013 |
| SFSD 02-23 | Incident Reports | 08-16-2010 |
| SFSD 02-24 | Legibility of Handwriting | 01-16-2013 |
| SFSD 02-25 | Vehicle Collision Reports | 05-15-2013 |
| SFSD 02-26 | Preservation of an Investigation Scene | 05-15-2013 |
| SFSD 02-27 | Suspect Interrogation | 08-08-2002 |
| SFSD 02-28 | Radio Use / Unit Identifiers | 05-15-2013 |
| SFSD 02-29 | Safety Belts | 01-16-2013 |
| SFSD 02-30 | Hostage Incidents | 01-16-2013 |
| SFSD 02-31 | Escape / Release in Error | 01-16-2013 |
| SFSD 02-33 | Out of State Commitments | 11-18-2016 |
| SFSD 02-36 | Employee-Involved Domestic Violence Criminal Complaint | 07-05-2017 |
| SFSD 02-39 | Immigration | 12-07-2017 |

## Chapter 03  Payroll and Personnel

| | | |
|---|---|---|
| SFSD 03-01 | Employee Rules and Regulations | 01-18-2013 |
| SFSD 03-02 | Discrimination and Harassment | 12-01-2008 |
| SFSD 03-03 | Seniority | 09-17-1997 |
| SFSD 03-04 | Substance Abuse | 09-17-1997 |
| SFSD 03-05 | Personnel Files | 09-17-1997 |
| SFSD 03-06 | Performance Appraisal | 05-01-2007 |
| SFSD 03-07 | Counseling and Disciplinary Procedures | 10-10-1997 |
| SFSD 03-09 | Record of Absences | 09-17-1997 |
| SFSD 03-09A | Recording Attendance | 09-17-1997 |
| SFSD 03-10 | Punctuality - Tardiness | 07-01-2004 |
| SFSD 03-11 | Sick Leave with Pay | 03-05-2008 |
| SFSD 03-11A | Sick Leave without Pay | 10-10-1997 |
| SFSD 03-12 | Disability Leave | 07-29-2003 |
| SFSD 03-12A | Assignment of Personnel on Disability | 10-10-1997 |
| SFSD 03-13 | Modified Duty Policy | 08-27-2013 |
| SFSD 03-14 | Maternity and Family Care Leave | 09-17-1997 |
| SFSD 03-15 | Military Leave | 09-17-1997 |
| SFSD 03-16 | Jury Duty | 09-17-1997 |
| SFSD 03-18 | Request for Time Off | 09-14-2009 |
| SFSD 03-19 | Annual Vacation Sign-Up | 09-14-2009 |

SF_00004629



San Francisco Sheriff's Department
Policy & Procedure Manual
Table of Contents
December 7, 2017

| | | ADOPTED/REVISED |
|---|---|---|
| SFSD 03-20 | Overtime | 09-08-2009 |
| SFSD 03-21 | Work Substitution | 07-01-2006 |
| SFSD 03-22 | Extended Work Week | 08-02-2002 |
| SFSD 03-23 | Employee Assignments | 10-10-1997 |
| SFSD 03-24 | Hardship Accommodations | 08-24-1998 |
| SFSD 03-25 | Department Awards | 01-18-2013 |
| SFSD 03-26 | Psychiatric and / or Psychological Evaluations | 09-17-1997 |
| SFSD 03-27 | Weapon Discharge Review Board | 07-24-1996 |
| SFSD 03-28 | Department Business Cards | 09-17-1997 |
| SFSD 03-29 | Disclosure of Impeachment Evidence for Deputies called as Witnesses | 01-31-2013 |
| SFSD 03-30 | Department Training | 09-17-1997 |
| SFSD 03-31 | POST Certificates | 01-18-2013 |
| SFSD 03-32 | Training Pay | 05-06-2002 |
| SFSD 03-33 | Peace Officers Use of a Business Address | 02-07-2001 |
| SFSD 03-34 | Employee / Prisoner Relations | 10-10-1997 |
| SFSD 03-35 | Employee / Supervisory Relations | 01-18-2013 |
| SFSD 03-36 | Use of As-Needed Personnel | 10-10-1997 |
| SFSD 03-37 | Off Duty Security Employment | 10-10-1997 |
| SFSD 03-38 | Retired Deputy Sheriffs | 05-06-2002 |
| SFSD 03-39 | Investigation of Employees | 10-10-1997 |
| SFSD 03-40 | Uniform Equipment and Grooming Standards | 01-18-2013 |
| SFSD 03-41 | Conflict of Interest | 09-17-1997 |
| SFSD 03-42 | No Smoking | 09-17-1997 |
| SFSD 03-43 | Daylight Savings Compensation | 01-18-2013 |
| SFSD 03-44 | Alternative Shift Call In Time | 01-18-2013 |
| SFSD 03-45 | Work Pay Stabilization for Twelve (12) Hour Shift | 01-18-2013 |
| SFSD 03-46 | Firearms (Qualifications) | 02-12-2007 |
| SFSD 03-49 | Work Rules – Deputy Sheriff's | 05-05-1997 |
| SFSD 03-50 | Family Notification of Death / Serious Injury | 11-18-2016 |
| SFSD 03-51 | Absence without Leave -AWOL | 04-03-2017 |

**Chapter 04    Specialized Units**
| SFSD 04-01 | Departmental Honor Guard / Color Guard | 04-02-2004 |
| SFSD 04-02 | Peer Support Unit | 06-13-2001 |
| SFSD 04-03 | Peer Support and Critical Incident Response Team | 03-29-2001 |
| SFSD 04-04 | Emergency Services Unit | 03-31-2008 |
| SFSD 04-05 | Satellite Assignment | 07-01-2006 |
| SFSD 04-06 | Internal Affairs Policy and Procedure | 10-10-1997 |
| SFSD 04-06 A | Contacting Investigative Services / I.A. | 10-10-1997 |

SF_00004630



San Francisco Sheriff's Department
Policy & Procedure Manual
Table of Contents
December 7, 2017

**ADOPTED/REVISED**

## Chapter 5  Definitions

### Labor Agreements

| L-02 | County Jail #3 / #2, 12-Hour Shift Alternative work week Agreement | 10-24-2002 |
|------|------------------------------------------------------------------|------------|
| L-05 | Involuntary Satellite Assignments | 12-17-2002 |
| L-09 | Civil Unit Vacation Slots | 12-09-2002 |
| L-13 | Department Overtime | 03-27-2003 |
| L-14 | County Jail #7 Closure | 05-01-2003 |
| L-17 | CARC/DCSS Reporting Procedures | 05-29-2003 |
| L-24 | Overtime Approval Procedure at City Hall Security | 02-05-2004 |
| L-31 | Training Procedure for Personnel Assigned to 12-hour Shifts | 12-22-2004 |
| L-32 | Classification Unit Work Hours | 06-04-2005 |
| L-36 | Satellite Assignments - Non-Rotating Bailiff Assignment | 02-28-2007 |
| L-37 | Procedure for Drafting Personnel for City Hall Events (revised) | 05-16-2007 |
| L-38 | Satellite Assignment - Employees on Modified Duty and/or Disability Leave Status | 06-12-2007 |
| L-41 | Employee Absent from their Satellite Unit Assignment for Ninety (90) Calendar Days or Longer | 09-10-2007 |
| L-45 | Satellite Sign-Up, Eligibility and Selection Process | 01-28-2008 |

SF_00004631



# SHERIFF
## 12.08.2017 TRAINING BULLETIN

## *PROCESSING ICE REQUESTS*

This training bulletin is being distributed to clarify the Sheriff's obligation regarding ICE notification requests. The SFSD does not honor immigration detainer requests from ICE. SFSD reviews immigration notification requests pursuant to San Francisco Administrative Code 12I, which limits notifications to ICE only if individuals meet specific criteria. These requests are not criminal warrants; they are administrative in nature and never to be confused with a criminal warrant. The Sheriff will continue to book criminal ICE warrants signed by a Federal magistrate. SFSD Policy & Procedure 02-39 does not prohibit or restrict staff "from sending to, or receiving from, [DHS/ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. 1373)

Starting December 11, 2017, the responsibility for processing all administrative ICE requests will be transferred from Administration to the Central Records Unit. These requests will continue to be evaluated and processed according to San Francisco Administrative Code Section 12I.3 "Restrictions on Law Enforcement Officials."

Pursuant to state law, any individual for whom ICE has requested notification, whether or not the notification is honored, must be notified of the request. Prisoner Legal Services will notify the individual of the request and provide them with information about social and legal services available for undocumented immigrants. The Public Defender's office/attorney of record will also be informed of the notification request.

<u>San Francisco Administrative Code Section 12I.3 Simplified</u>

*12I.3 allows the Sheriff to respond to an ICE Request for voluntary notification (ICE Form 247A) of the release of an individual from custody, after a review of the individual's criminal record shows the following circumstances:*

1. *A conviction of a violent felony, as defined in PC Section 667.5(C), within the last seven years;*

   *Or*

   *A conviction of one of a list of certain serious felonies defined in PC 1192.7(c) within five years;*

   *Or*

   *Has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request;*

   *AND*

2. *A magistrate has determined that there is probable cause to believe the individual is guilty of a violent or serious local felony and has ordered the individual held to answer to the same pursuant to PC section 872.*

*If the above criteria are present, they will trigger the following evaluation:*

- *The Sheriff shall review the individual's background to consider evidence of the individual's rehabilitation and evaluate whether or not the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors includes but is not limited to: the individual's ties to the community; whether the individual is a victim of crime; the individual's contribution to the community; and, the individual's participation in social services or rehabilitation programs.*

If you have any questions, please contact Sheriff's Legal Counsel.

## *NEVER SACRIFICE SAFETY FOR CONVENIENCE!*

### SAN FRANCISCO SHERIFF'S DEPARTMENT

### VICKI HENNESSY, SHERIFF

SF_00004632



## Policy: Immigrant Clients and Compliance with the Sanctuary Ordinance

**3.06.01**

Effective:   3/8/2018

Replaces:  3.06.01
(12/20/2016)

Authority: San Francisco Administrative Code 12H & 12I; 8 U.S.C. 1373

**Responsible for Updates:** Division Directors

*Karen L. Fletcher*                    *3/8/2018*

Approved by           Chief Adult Probation Officer                    Date

**Forms**

APD-14 – Request for Status of
ICE Proceeding

## I. Principles

The City and County of San Francisco "respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of [Administrative Code Chapters 12I and 12H] is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all." (San Francisco Administrative Code Chapter 12I.1)

The Department upholds these values, and recognizes that Immigrations and Customs Enforcement (ICE) investigations into a person, regardless of that person's immigration status, can result in serious consequences for the person, including:

- Detention.
- Family separation and family instability.
- Disruption to the person's employment.
- Deportation.
- Loss of future immigration privileges.
- ICE proceedings against that person's family members or co-residents.

Revision History:

12/20/16; 1/8/15; 6/22/2007

**Exhibit F**

SF_00004432

Client Rights and Access to Services: **Immigrant Clients and Compliance with the Sanctuary Ordinance**

## II. Policy

Chapter 12H of the San Francisco Administrative Code prohibits City employees from using any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status of individuals or any other such personal information in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. Chapter 12I provides limited exceptions for law enforcement purposes. These provisions apply to Departmental operations as follows:

1. **ICE Release Notification Requests:** ICE may submit requests for release notification (DHS Form I-247N) to custodial agencies. City employees are prohibited from responding to such requests except under limited exceptions established in Chapter 12I.

   a. In summary, the exceptions are:

      - The individual has either been convicted of:
        – A "Violent Felony," as defined in the Ordinance, in the seven years immediately prior to the request; or
        – A "Serious Felony," as defined in the Ordinance, in the five years immediately prior to the request; or
        – Three felonies identified in the Ordinance arising out of three separate incidents in the five years immediately prior to the request; and

      - A magistrate has determined that there is probable cause to believe the individual is guilty of certain felonies and has ordered the individual to answer to the same pursuant to PC §872.

        In determining whether to respond, employees shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk.

   b. In the extremely unlikely event that the Department receives such a request, employees must obtain Chief Adult Probation Officer approval via the chain of command prior to responding.

2. **Assistance with Enforcement of Federal Immigration Law:** Staff are otherwise prohibited from using City funds or resources to assist in the enforcement of civil immigration law, including but not limited to:

   a. Assisting or cooperating, in an official capacity, with any ICE investigation, detention, or arrest procedures related to alleged violations of civil immigration law. Note: Requests for special operations require Chief Adult Probation Officer approval, per Special Operations with Law Enforcement Agencies Policy 3.07.03.

City and County of San Francisco Adult Probation Department

b. <mark>Disseminating information to ICE, in an official capacity, regarding release status of an individual or any personal information such as home or work contact information, and family or emergency contact information.</mark>

c. Arresting or detaining an individual on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of civil immigration law.

3. **Mutual Aid:** Sworn Department staff who are in the field may choose to render mutual aid per PC §830.5(a)(5)(A) to any law enforcement agents, including ICE agents, if there is significant danger of personal injury or major property damage (e.g., when firearms or weapons are involved, a person to be detained has a history of violence, agents are physically attacked). DPOs must notify their Supervising Probation Officers (SPOs) by phone immediately after the incident is under control and document the incident as outlined in Incident Reports Policy 3.02.04.

4. **Requesting Immigration Status:** The Department shall not include questions about immigration status on any application, questionnaire, or interview form. Additionally, staff may ask about a defendant's or client's language skills, place of birth, and related social history factors and may document such information in Court reports, but **may not ask directly about his or her immigration status or citizenship.** If an A-number (also referred to as an ICE number) or an ICE detainer appears in the CII, the officer may document it in the case management system for the purposes of the Presentence Investigation.

5. **Court Reports:** Officers shall not document in any Court report that a client is facing ICE proceedings or that ICE has been notified about a client's immigration status or date of release from local custody, unless that information is necessary for the Court to make a determination on the case (such as that a client is not present in Court because he or she is in ICE custody).

a. Most immigration matters are civil violations and not criminal offenses. As a result, they cannot be included in the Criminal History section of Presentence Reports unless they are criminal offenses (often related to reentry after removal of someone with prior criminal offenses).

Note: Immigration laws are extremely complicated. Understanding an individual's immigration status – and whether someone is undocumented – often requires specialized legal training. For example, someone who self-reports as undocumented may have a claim of U.S. citizenship. Additionally, ICE can – and periodically does – investigate or take action against naturalized U.S. citizens or others with legal status. As a result, staff must be aware that evidence of an ICE hold or proceeding, or even self-report, does

SF_00004434

not confirm that a person is not a U.S. citizen or that a person is in violation of civil immigration laws.

## III. Procedures

### Supervising Immigrant Clients

Regardless of a client's immigration status or perceived immigration status, DPOs shall supervise clients and assist them in accessing services based on their offense and criminogenic risks and needs. The following shall also apply to the supervision of immigrant clients:

1. **ICE Custody:** If a DPO cannot locate a client and believes that the client may be in ICE custody, the DPO must attempt to determine the client's whereabouts:

   a. The DPO must conduct a complete record check, including QCA, QRAP, CII, and FBI prior to contacting ICE directly. CII and FBI reports may – but do not always – indicate when a person is in ICE custody or deported. If the record check is not conclusive, the DPO may contact ICE to verify custody status using Request for Status of ICE Proceeding form APD-14.

   b. Upon confirming that a client is in ICE custody and deportation proceedings are underway, the DPO must contact ICE at least every 30 calendar days using APD-14 to monitor the case and proceedings, and follow up as needed:

   - If the client is released from ICE custody and reports to the DPO, the DPO shall continue to supervise the client.

   - If the client is released from ICE custody and does not report within 15 calendar days of release, the DPO must exhaust all efforts to contact the client. If unable to successfully contact the client within 30 calendar days of release, the DPO shall have a warrant issued as follows:

     ➢ **Probation Clients:** File an MTR using form AP-110 (Motion to Revoke Probation—Desertion) or AP-109 (Motion to Revoke Probation—Failure to Respond) per Motions to Revoke Probation for Desertion or Failure to Respond Policy 6.02.03 and request that the Court issue a bench warrant. Notify the client of the motion by mailing a Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

     ➢ **Mandatory Supervision Clients:** File a Petition to Revoke Mandatory Supervision and request that the Court issue a bench warrant. Notify the client of the motion by mailing a

Mailing notices to General Delivery helps to ensure that the DPO has exhausted all efforts to locate or notify a client of a reporting obligation. This is particularly important if the client is homeless. Use the following address:

[Client Name]
General Delivery
391 Ellis Street
San Francisco, CA 94102

Notice to Appear in Court form APD-12 to all known addresses for the client, as well as to the primary San Francisco General Delivery address.

➢ **Postrelease Community Supervision (PRCS) Clients:** File a PRCS Warrant and Affidavit.

2. **Deportation:** Once a DPO confirms that a client has been deported:

   a. The DPO must have a warrant issued if the deported client – whether on probation, mandatory supervision, or PRCS – is one of the following:

      - A PC §290 registrant.

      - A high-risk domestic violence client who has not completed the 52-week Batterer's Intervention Program followed by 90 calendar days without a violation or new offense.

      - A high-risk client who is an active gang member. Gang involvement could be identified via the police, through self-report, or other means.

   b. **PRCS and Mandatory Supervision Clients:**

      - Unless a warrant was issued as required above, the DPO shall ensure that the client's supervision term is active, and have it reinstated as needed.

      - The DPO shall run QCA, QRAP, CII, and FBI checks every 30 calendar days to monitor for rearrest in the U.S.

      - PRCS: The DPO must continue to track the one-year mandatory discharge date pursuant to PC §3456(a)(3), which applies to all deported PRCS clients unless a warrant is issued as specified above. Otherwise, if the client is not rearrested in the U.S prior to the one-year discharge date, the case shall be closed at the one-year mandatory discharge date per PC §3456(a)(3).

      - Mandatory Supervision: If the client is not rearrested during the remainder of the supervision term and a warrant was not issued as specified above, the case shall be closed once the maximum supervision period is reached (the community supervision portion of the sentence, after tolling and custody credits are accounted for).

      - If the PRCS or mandatory supervision client is rearrested in the U.S. prior to the discharge date, the DPO shall have a warrant issued and follow up appropriately.

   c. **Probation Clients:**

      - If a bench warrant **was not** issued, the DPO shall transfer the client to the ICE caseload. If a bench warrant **was** issued, the DPO shall

transfer the case after the client has been on bench warrant status
for at least 30 calendar days without rearrest in the U.S.

- The DPO assigned to the ICE caseload or a designee shall conduct
QCA, QRAP, CII, and FBI checks every 90 calendar days to
monitor for rearrest in the U.S.

- If the client is not rearrested during the remainder of the
supervision term, the case shall be closed when supervision expires
if a bench warrant **was not** issued.

- If the client is rearrested, the DPO on the ICE caseload shall
transfer the case back to the previous caseload. The assigned DPO
shall follow up as appropriate, including filing a motion to revoke
and request a bench warrant within 10 business days of identifying
the arrest, per New Arrests of Persons on Probation Policy 6.02.01.
The motion must contain the following information:

  ➢ Deportation date, if known.
  ➢ New arrest date.
  ➢ New charges.
  ➢ Status of case.
  ➢ Client's custody status.
  ➢ A copy of the police incident report, if available.
  ➢ The date the QCA, QRAP, CII, & FBI checks were completed.
  ➢ Any balance owed on victim restitution, if applicable.

## Compliance

The Department strives to adequately train all staff in order to ensure that staff
are successful in carrying out their duties in a manner consistent with all
federal, state, and local laws and all policies of the Department and the City
and County of San Francisco. Violation of this policy will be reviewed on a
case by case basis, but may result in discipline, up to and including
termination, in accordance with appropriate progressive discipline policies
and collective bargaining agreements.

SF_00004437

## **General Order 5.15 Police Commission Presentation**

Thank you Commissioner Turman, Commissioners, DPA Interim Director Henderson, and all the people who took the time to be with us tonight to talk about this important issue.

As reflected in our City laws, it is the policy of the City and the Police Department to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents, City officials, and law enforcement to ensure community security.

The changes to the draft Department General Order reflect the laws as they exist today in 12H and 12I of the Administrative Code. The Department has issued Department bulletins to reflect the Admin Code changes in our policies. We are taking existing language from those bulletins and incorporating them into the draft General Order. We have added language that reflects the prohibition against asking and disseminating the release status of an individual. We have expressly incorporated procedures for confirming warrants that officers already follow.  We have also made some formatting changes, moved text for the ease of reading, and added clarifying language.

We want to assure all residents and visitors of San Francisco that they can report crimes and cooperate with SFPD without fear of any member inquiring into his or her immigration status.

The updated policy outlines that SFPD Members:

- Shall not stop, question, or detain individuals based on appearance, national origin or inability to speak English.

- Shall not require individuals to produce any documents to prove their immigration status.

- Shall not cooperate with Immigrations and Customs Enforcement (ICE), or Customs and Border Protection (CPB) in enforcing immigration laws.

- Shall not arrest or detain an individual for and administrative warrant or civil warrant. (This policy and the existing Dept. Bulletin provides guidance on recognizing administrative warrants).

- Shall not provide routine assistance to ICE/CBP, only in emergency situations to the extent we would assist any other law enforcement agency.

- Requires supervisors to respond to all ICE/CBP emergency assistance calls and that an incident report to be completed documenting the nature of the call.

# **Exhibit G**

- Requires Department Bulletins (DB) be issued, as necessary, to update members on recognizing the most current law enforcement database returns on both administrative and civil warrants and documents.

Policy Distribution
- The Department will provide an electronic copy of the policy to all members.
- Members will be required to review the policy and adhere to its requirements.
- Members are required to electronically acknowledge receipt and review of the policy (allows for tracking and auditing of review).

Training
- Training coordinators will be required to conduct roll call training on this policy Department wide.
- Members will be required to sign the roll call training sheet.
- Members will be provided with a hard copy of the updated DGO and DB 17-016 (Prohibition on the Enforcement of Administrative Immigration Warrants) which assists members in identifying administrative warrants.

Supervision
- Supervisors are required to respond to ICE/CBP emergency calls and ensure strictly adherence to the policy and Department Bulletins.
- ICE/CBP interagency operations requests require adherence to this policy and the approval of a Deputy Chief.

Accountability
- The Department will continue to meet with community stakeholders (LEP working group) and City agencies (DPA, Office of Civic Engagement and Immigrant Affairs) to obtain feedback regarding Member's compliance with this policy.

Discipline
- All violations of this policy will be thoroughly investigated and discipline imposed where appropriate.

Final Thoughts…

Critical issues:

The civil case has not settled yet, nor has the administrative discipline case.

The NBC Investigates UN Plaza ICE comment case is still under investigation.

SF_00000195

CITY AND COUNTY OF SAN FRANCISCO

OFFICE OF THE CITY ATTORNEY



DENNIS J. HERRERA
City Attorney

MATTHEW LEE
Deputy City Attorney

Direct Dial:    (415) 554-4677
Email:          matthew.s.lee@sfgov.org

## MEMORANDUM

TO:        Maria Su, Executive Director
           Department of Children, Youth & Their Families

FROM:      Matthew Lee *ML*
           Deputy City Attorney

DATE:      January 27, 2017

RE:        Limits on U.S. Immigration and Customs Enforcement Search Authority

In this memorandum, we respond to your request for written public guidance regarding legal limits on the authority of U.S. Immigration and Customs Enforcement (ICE) agents to request information or conduct searches in San Francisco, including on City property. City employees should immediately call the City Attorney's Office if ICE agents contact employees while they are performing their official duties, or if employees become aware that ICE agents are seeking to access City records or to come onto City property. Individuals and organizations that are funded by the City but are not part of City government should ensure that they comply with their agreements with the City, and should rely on their own counsel for legal advice.

Under the City's Sanctuary Ordinance, City agencies and employees are generally prohibited from assisting ICE in enforcing federal immigration laws. The purpose of this policy is to ensure that all residents trust City government, cooperate with City institutions, and participate in City programs that promote the public welfare. For example, the City needs crime victims and witnesses to cooperate with its police department, to make San Francisco's streets safe. The City needs parents to send their children to school, to keep San Francisco's economy strong. And the City needs people to seek medical care, to prevent the spread of disease. For these reasons, and others like them, the City needs all City residents to know they can access City services without fear of federal immigration consequences.

The City's Sanctuary Ordinance policies do not mean that federal immigration enforcement cannot happen in San Francisco. Instead, the policies provide specific restrictions on how City agencies and employees may interact with federal immigration authorities. Consistent with those policies and federal law, which does not allow the federal government to coerce local governments into performing immigration enforcement, we offer this guidance about City interaction with ICE agents on City property.

- **Whenever you encounter ICE agents:**
    - Except in the limited circumstances below where ICE agents have a valid subpoena or warrant, you are *not* required to cooperate with the agents.
    - You are *not* required to show ICE agents identification of any kind, including documents that prove citizenship or immigration status.
    - You are *not* required to answer ICE agents' questions.
    - You are *not* required to speak with ICE agents at all.

---

**Exhibit H**

SF_00004985

CITY AND COUNTY OF SAN FRANCISCO          OFFICE OF THE CITY ATTORNEY

**MEMORANDUM**

| | |
|---|---|
| TO: | Maria Su, Executive Director |
| | Department of Children, Youth & Their Families |
| DATE: | January 27, 2017 |
| PAGE: | 2 |
| RE: | Limits on U.S. Immigration and Customs Enforcement Search Authority |

- o If you choose *not* to speak with ICE agents, you may tell ICE agents that you choose not to speak with them, and then say nothing else.
- o As previously mentioned, City employees should immediately call the City Attorney's Office if ICE agents contact employees while they are performing their official duties, or if employees become aware that ICE agents are seeking access to City records or other City property.

- **If ICE agents have no warrant:**
  - o ICE agents may ask for your permission to enter a non-public area or conduct some other kind of search, even if they do not have a warrant giving them the right to do so. But you do not need to give ICE agents permission to enter a non-public area, or conduct any other kind of search.
  - o City employees acting in their official capacities should tell ICE that they cannot consent to any search of City property without first consulting the City Attorney's Office.

- **If ICE agents have a document they call a warrant:**
  - o ICE agents may show you a piece of paper and tell you that they have a warrant.
  - o But ICE uses the word "warrant" to refer to different kinds of legal documents.
  - o Sometimes ICE uses warrants issued by federal judges.
  - o Sometimes ICE uses warrants issued by administrative officials.
  - o Each kind of warrant has different legal consequences.
  - o City employees presented with a warrant during the course of their official duties should immediately call the City Attorney's Office.
  - o ICE agents may also present a document called a "subpoena." This guidance addresses subpoenas separately.

- **Was the warrant issued by a federal judge, or was it issued by an administrative official?**
  - o Was the warrant issued by someone called a "District Judge" or "Magistrate Judge"? Was the warrant issued by a court called a "U.S. District Court"? If so, the warrant was issued by a federal judge.
  - o Was the warrant issued by *anyone other than* a "District Judge" or "Magistrate Judge"? Was the warrant issued by an institution called *anything other than* a "U.S. District Court"? If so, the warrant was issued by an administrative official.
    - ▪ "Immigration judges" and "administrative law judges" are **NOT** federal judges. They are administrative officials.

SF_00004986

CITY AND COUNTY OF SAN FRANCISCO          OFFICE OF THE CITY ATTORNEY

**MEMORANDUM**

| | |
|---|---|
| TO: | Maria Su, Executive Director |
| | Department of Children, Youth & Their Families |
| DATE: | January 27, 2017 |
| PAGE: | 3 |
| RE: | Limits on U.S. Immigration and Customs Enforcement Search Authority |

- o City employees should consult the City Attorney's Office in determining whether a warrant was issued by a federal judge or an administrative official.

- **If ICE agents have a warrant issued by an administrative official:**

    - o ICE typically uses this kind of warrant to arrest the specific person named in the warrant.

    - o An administrative official's arrest warrant does not allow ICE agents to enter any area that they could not have otherwise entered.

    - o An administrative official's arrest warrant does not allow ICE agents to search anything that they could not have otherwise searched. This includes City records.

    - o You do *not* need to tell ICE agents anything about the person they are looking for.

    - o You do *not* need to help ICE agents find the person they are looking for.

    - o You may inform ICE agents that you will not give them any information.

    - o You may tell ICE agents that you do not consent to their presence on the premises.

    - o You may ask ICE agents to leave.

- **If ICE agents have a warrant issued by a federal judge:**

    - o ICE typically uses this kind of warrant to search property.

    - o A valid judicial search warrant allows ICE agents to conduct any search authorized by the warrant.

    - o If the warrant is invalid, or there are other problems with the search, it may be possible to challenge the search later.

- **If ICE agents have a document called a subpoena:**

    - o A subpoena is a document that asks you to produce documents or other evidence. ICE has the power to issue subpoenas.

    - o But you do *not* need to comply with an ICE subpoena on the spot.

    - o If you are served with an ICE subpoena, you will have an opportunity to challenge the subpoena before a federal judge in U.S. District Court.

        - Again, "immigration judges" and "administrative law judges" are **NOT** federal judges. They are administrative officials.

        - A subpoena issued by an "immigration judge" or "administrative law judge" was **NOT** issued by a federal judge and does not require immediate compliance.

CITY AND COUNTY OF SAN FRANCISCO      OFFICE OF THE CITY ATTORNEY

**MEMORANDUM**

| | |
|---|---|
| TO: | Maria Su, Executive Director |
| | Department of Children, Youth & Their Families |
| DATE: | January 27, 2017 |
| PAGE: | 4 |
| RE: | Limits on U.S. Immigration and Customs Enforcement Search Authority |

> o   You cannot be punished for refusing to comply with an ICE subpoena until after you have had the opportunity to challenge it before a federal judge in U.S. District Court.

- **If ICE agents try to serve a subpoena on the City:**

> o   Most City employees are not authorized to accept subpoenas issued to the City and County of San Francisco, or to decide whether to comply with those subpoenas.

> o   City employees presented with subpoenas should immediately call the City Attorney's Office.

SF_00004988

| | |
|---|---|
| **From:** | Gorwood, Kathy <kathy.gorwood@sfgov.org> |
| **Sent:** | Wednesday, March 1, 2017 3:16 PM |
| **To:** | Freeman, Matthew (SHF) <matthew.freeman@sfgov.org> |
| **Subject:** | RE: Google Alert - "San Francisco Sheriff" |

Yes

Thank-you,

Chief Deputy Kathy Gorwood, #1319
San Francisco Sheriff's Department
Administration and Programs Division
415-554-7223

**From:** Freeman, Matthew (SHF)
**Sent:** Wednesday, March 01, 2017 2:16 PM
**To:** Gorwood, Kathy <kathy.gorwood@sfgov.org>
**Subject:** RE: Google Alert - "San Francisco Sheriff"

This list leaves allot of room for serious offenders to not meet the eligibility requirements that would allow us to cooperate with ICE.

Matthew Freeman
Chief Deputy #727
Capital Planning & Special Projects
City & County of San Francisco Sheriff's Department
Office: (415) 575-4475 Cell: (415) 850-5480

---

**From:** Gorwood, Kathy
**Sent:** Wednesday, March 01, 2017 11:34 AM
**To:** Freeman, Matthew (SHF)
**Subject:** RE: Google Alert - "San Francisco Sheriff"

Matt,

These are the requirements, in order to respond to notification requests, in the ordinance:
1) Person has been convicted of a violent felon in 7 years or
2) The person has been convicted of a serious felon in 5 years or
3) Has been convicted of 3 felonies codified in 1192.7 © or 667.5 PC, or 7282.5 GC arising out of three separate incidents in 5 years  **and**
4) The person is HTA on a serious or violent felony

Kathy

Thank-you,

Chief Deputy Kathy Gorwood, #1319
San Francisco Sheriff's Department
Administration and Programs Division
415-554-7223

---

**From:** Freeman, Matthew (SHF)
**Sent:** Wednesday, March 01, 2017 8:14 AM

<div align="right">

# Exhibit I

</div>

SF_00004645

**To:** Gorwood, Kathy <[kathy.gorwood@sfgov.org](mailto:kathy.gorwood@sfgov.org)>
**Subject:** RE: Google Alert - "San Francisco Sheriff"

*For San Francisco to alert ICE about an undocumented immigrant that person has to be convicted of three felonies in the last five years and there has to be probable cause they will commit a fourth. Only then will the San Francisco Sheriff's Office tell immigration officials when that person is being released from local custody so ICE can then make an arrest.*- Is this statement accurate?

Matthew Freeman
Chief Deputy #727
Capital Planning & Special Projects
City & County of San Francisco Sheriff's Department
Office: (415) 575-4475 Cell: (415) 850-5480

---

**From:** Gorwood, Kathy
**Sent:** Wednesday, March 01, 2017 8:11 AM
**To:** Freeman, Matthew (SHF)
**Subject:** FW: Google Alert - "San Francisco Sheriff"

Take a look

Thank-you,

Chief Deputy Kathy Gorwood, #1319
San Francisco Sheriff's Department
Administration and Programs Division
415-554-7223

---

**From:** Google Alerts [[mailto:googlealerts-noreply@google.com](mailto:googlealerts-noreply@google.com)]
**Sent:** Tuesday, February 28, 2017 9:55 PM
**To:** [kayjay1319@gmail.com](mailto:kayjay1319@gmail.com)
**Subject:** Google Alert - "San Francisco Sheriff"



## "San Francisco Sheriff"

As-it-happens update · March 1, 2017

NEWS

### San Francisco Signs Immigrant Protection Memo With Mexican Consular General

CBS San Francisco Bay Area
Only then will the **San Francisco Sheriff's** Office tell immigration officials when that person is being released from local custody so ICE can then make ...

     Flag as irrelevant

SF_00004646

See more results | Edit this alert

You have received this email because you have subscribed to **Google Alerts**.
Unsubscribe | View all your alerts

Receive this alert as RSS feed

Send Feedback

SF_00004647