1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  JESSE C. SMITH, State Bar #122517
   Chief Assistant City Attorney
3  RONALD P. FLYNN, State Bar #184186
   Chief Deputy City Attorney
4  YVONNE R. MERÉ, State Bar #173594
   Chief of Complex and Affirmative Litigation
5  TARA M. STEELEY, State Bar #231775
   SARA J. EISENBERG, State Bar #269303
6  AILEEN M. McGRATH, State Bar #280846
   Deputy City Attorneys
7  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
8  San Francisco, California 94102-4602
   Telephone:     (415) 554-4748
9  Facsimile:     (415) 554-4715
   E-Mail:        brittany.feitelberg@sfcityatty.org
10
   Attorneys for Plaintiff
11 CITY AND COUNTY OF SAN FRANCISCO

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16 CITY AND COUNTY OF SAN                  Case No. 3:17-CV-04642-WHO
   FRANCISCO,
                                           **PLAINTIFF CITY AND COUNTY OF SAN
17        Plaintiff,                       FRANCISCO'S OPPOSITION TO
                                           DEFENDANTS' MOTION FOR SUMMARY
18        vs.                              JUDGMENT AND REPLY TO DEFENDANTS'
                                           OPPOSITION TO MOTION FOR SUMMARY
19 JEFFERSON B. SESSIONS III, Attorney     JUDGMENT**
   General of the United States, LAURA L.
20 ROGERS, Acting Assist. Attorney General of   Judge:        Honorable William H. Orrick
   the United States, UNITED STATES        Hearing Date: September 5, 2018
21 DEPARTMENT OF JUSTICE, DOES 1-100,      Time:         2:00 p.m.
                                           Place:        Courtroom 2, 17th Floor
22        Defendants.
                                           Trial Date:   January 28, 2019
23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 1

I.  San Francisco Is Entitled To Summary Judgment On Its Claims That
    The Challenged Requirements Are Unconstitutional. ....................................... 1

    A.  The Challenged Requirements Violate Separation Of Powers
        Principles Because Congress Has Not Authorized Them. ........................ 2

        1.  Congress Did Not Delegate The Authority To Impose The
            Notice And Access Requirements. ................................................ 2

            a.  DOJ's Reading of Section 10102(a)(6) Is Contrary
                To The Text. ..................................................................... 2

            b.  DOJ's Additional Arguments Lack Merit ......................... 4

        2.  Section 1373 Is Not An "Applicable Federal Law." ...................... 6

            a.  Section 1373 Is Not "Applicable" Because It Is
                Unconstitutional. ............................................................... 6

            b.  "Applicable" Must Be Read Narrowly To Exclude
                Section 1373 ..................................................................... 9

    B.  The Challenged Requirements Violate The Spending Clause. ................. 10

        1.  The Requirements Are Ambiguous. ............................................. 10

        2.  The Requirements Are Not Germane To The Byrne JAG
            Program. ....................................................................................... 11

II.  San Francisco Is Entitled To Summary Judgment Regarding Section 1373. ...... 13

    A.  There Is No Dispute About What San Francisco Does—And Does
        Not—Prohibit. ........................................................................................ 13

        1.  There Is No Dispute That San Francisco Prohibits
            Employees From Sharing Contact Information And
            Release Dates With ICE. .............................................................. 13

        2.  There Is No Dispute That San Francisco *Does Not* Prohibit
            Employees From Sharing Information About What A
            Person's Immigration Status Is. .................................................. 13

    B.  Section 1373 Does Not Cover Information To Determine
        Immigration Status. ................................................................................. 17

        1.  DOJ Provides No Meaningful Response To San Francisco's
            Arguments. .................................................................................. 18

        2.  DOJ's Additional Arguments Lack Merit. ................................... 20

        C.      San Francisco's Request For Declaratory Relief Is Justiciable. ................23

III.     A Nationwide Injunction Is Warranted In This Case................................................23

CONCLUSION..........................................................................................................................25

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Arizona State Bd. For Charter Sch. v. U.S. Dep't of Educ.*
    464 F. 3d 1003 (9th Cir. 2006) ................................................................3

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
    548 U.S. 291 (2006) ..............................................................................10

*Atascadero State Hospital v. Scanlon*
    473 U.S. 234 (1985) ..............................................................................19

*Benning v. Georgia*
    391 F.3d 1299 (11th Cir. 2004) .............................................................11

*Bond v. United States*
    134 S. Ct. 2077 (2014) ..........................................................................10

*Califano v. Yamasaki*
    442 U.S. 682 (1979) ..............................................................................24

*Center for Environmental Health v. McCarthy*
    192 F. Supp. 3d 1036 (N.D. Cal. 2016) ..................................................2

*Charles v. Verhagen*
    348 F.3d 601 (7th Cir. 2003) .................................................................11

*Circuit City Stores, Inc. v. Adams*
    532 U.S. 105 (2001)..................................................................................9

*City of Chicago v. Sessions*
    No. 17 C 5720, 2018 WL 3608564 (N.D. Ill. July 27, 2018)...............1, 2, 6, 7, 8, 9

*City of Chicago v. Sessions*
    888 F.3d 272 (7th Cir. 2018) .............................................................2, 3, 24

*City of Evanston v. Sessions*
    Case No. 18 C 4853, Dkt. No. 23 at 8 (N.D. Ill. Aug. 9, 2018) ..................2

*City of New York v. Beretta U.S.A. Corp.*
    524 F.3d 384 (2d Cir. 2008) .....................................................................9

*City of Philadelphia v. Sessions*
    309 F. Supp. 3d 289 (E.D. Pa. 2018)................................2, 6, 7, 8, 9, 10, 11, 12, 18

*Clark v. Martinez*
    543 U.S. 371 (2005)................................................................................20

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*
    887 F.2d 275 (D.C. Cir. 1989) ..................................................................6

*F.A.A. v. Cooper*
   566 U.S. 284 (2012) ........................................................................................... 5

*F.C.C. v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ......................................................................................... 20

*Gaffney v. Riverboat Servs. of Ind.*
   451 F.3d 424 (7th Cir. 2006) ........................................................................... 3

*Garcetti v. Ceballos*
   547 U.S. 410 (2006) ......................................................................................... 19

*Gill v. Whitford*
   138 S. Ct. 1916 (2018) ..................................................................................... 24

*Gregory v. Ashcroft*
   501 U.S. 452 (1991) ......................................................................................... 10

*Lamar, Archer & Cofrin, LLP v. Appling*
   138 S. Ct. 1752 (2018) ................................................................................ 20, 21

*Loughrin v. United States*
   134 S. Ct. 2384 (2014) ..................................................................................... 22

*Mayweathers v. Newland*
   314 F.3d 1062 (9th Cir. 2002) ......................................................................... 12

*Medtronic, Inc. v. Lohr*
   518 U.S. 470 (1996) ......................................................................................... 19

*Missouri v. Jenkins*
   515 U.S. 70 (1995) ........................................................................................... 24

*Molzof v. United States*
   502 U.S. 301 (1992) ........................................................................................... 5

*Murphy v. Nat'l Collegiate Athletic Ass'n*
   138 S. Ct. 1461 (2018) .................................................................................... 7, 9

*New York v. United States*
   505 U.S. 144 (1992) ......................................................................................... 12

*Printz v. United States*
   521 U.S. 898 (1997) ........................................................................................... 8

*Reno v. Condon*
   528 U.S. 141 (2000) ........................................................................................... 9

*Roach v. Mail Handlers Benefits Plan*
   298 F.3d 847 (9th Circ. 2002) ......................................................................... 18

*Robinson v. Shell Oil Co.*
    519 U.S. 337 (1997).................................................................................................4

*S.E.C. v. Sloan*
    436 U.S. 103 (1978).................................................................................................6

*San Francisco v. Trump*
    No. 17-17478, 2018 WL 3637911 (9th Cir. Aug. 1, 2018) ............................2, 23, 24

*South Dakota v. Dole*
    483 U.S. 203 (1987).......................................................................................1, 11, 12

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*
    402 U.S. 1 (1971)...................................................................................................24

*United States v. California*
    No. CV-490, 2018 WL 3301414 (E.D. Cal. July 5, 2018) ...................7, 8, 18, 19, 21

**Federal Statutes**

8 U.S.C.
    § 1372 ...................................................................................................................22
    § 1373 ........................................................................................1, 6-11, 13, 17-22
    § 1374 ...................................................................................................................22

25 U.S.C.
    § 1644(b) ................................................................................................................6

28 U.S.C.
    § 509 ......................................................................................................................4

34 U.S.C.
    § 10102(a)(6) ..............................................................................................2, 3, 4, 5, 6
    § 10110 ...................................................................................................................4
    § 10152(e) ...............................................................................................................4
    § 10153(a) ...............................................................................................................9
    § 10153(a)(4) ...........................................................................................................4
    § 10153(a)(5)(D).........................................................................................6, 7, 9, 10
    § 10153(b)(1) ...........................................................................................................6

42 U.S.C.
    § 300v-1 ..................................................................................................................6
    § 713(a)(1)(C) ..........................................................................................................6
    § 1395*l*(t)(2)(E) ........................................................................................................6

**State Statutes and Codes**

S.F. Admin. Code
   § 12H..................................................................................................................13, 14, 17
   § 12I...................................................................................................................13, 14, 17
   § 12I.2.........................................................................................................................14

**Other References**

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*
   131 Harv. L. Rev. 417 (2017)....................................................................................23

**Legislative Materials**

H.R. Conf. Rep. 104-725 (1996)..................................................................................22

## INTRODUCTION

Over the past year and a half, the Trump administration, bypassing Congress, has made eliminating sanctuary cities a hallmark of its policy agenda.  And it has pursued this goal relentlessly, without regard for the constitutional limits that constrain federal government action.  First, just days after taking office, President Trump signed an executive order that directed the Attorney General ("AG") and Secretary of Homeland Security to withdraw all federal funds from sanctuary jurisdictions.  This Court declared that order unconstitutional.  Undeterred, the Department of Justice ("DOJ") announced the imposition of new requirements on Byrne JAG federal grants—requirements that again seek to interfere with local jurisdictions' policy judgments by conditioning their receipt of important criminal justice funds on an agreement to assist with federal immigration enforcement.

In its motion for summary judgment and opposition brief, DOJ asks this Court to be the first in the country to hold that (1) these requirements are valid, and (2) state and local jurisdiction cannot in any way restrict their employees from providing information that might assist ICE in determining a person's immigration status.  DOJ states that the AG can impose whatever conditions he chooses on DOJ grants, and *mis*states the meaning of documents produced by San Francisco to create the false impression that San Francisco does not comply with Section 1373.  Still, the most remarkable aspect about DOJ's brief is not what it says—but what is missing.  DOJ offers no meaningful response to the majority of San Francisco's arguments.  And it "has not mustered any [new] convincing argument." *City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *12 (N.D. Ill. July 27, 2018). Rather, DOJ simply repeats the same arguments it has been making in cases across the country for the last year.  But it does so without even mentioning that every single court that has considered these arguments—and there have been several—has rejected them.   This Court should do the same.

## ARGUMENT

### I.     San Francisco Is Entitled To Summary Judgment On Its Claims That The Challenged Requirements Are Unconstitutional.

The Challenged Requirements violate fundamental constitutional limitations, namely, that only Congress may impose conditions on federal spending, and that those conditions must be both germane to the spending program and unambiguous.  *South Dakota v. Dole*, 483 U.S. 203, 206-08 (1987); *see*

*also San Francisco v. Trump*, No. 17-17478, 2018 WL 3637911, at *2 (9th Cir. Aug. 1, 2018).  All of

DOJ's arguments to the contrary—which other courts have repeatedly rejected—lack merit.

> **A.      The Challenged Requirements Violate Separation Of Powers Principles Because Congress Has Not Authorized Them.**
>
> > **1.      Congress Did Not Delegate The Authority To Impose The Notice And Access Requirements.**

In defending the Notice and Access Requirements, DOJ "has not mustered any other

convincing argument in support of greater statutory authority."  *City of Chicago*, 2018 WL 3608564,

at *12.  Instead, DOJ simply repeats the argument that 34 U.S.C. § 10102(a)(6) ("Section

10102(a)(6)") grants the Assistant Attorney General ("AAG") overseeing the federal Office of Justice

Programs ("OJP") the power to impose these conditions.  DOJ Mot. & Opp. at 9-14.  Every court to

have considered this argument has rejected it.  *See City of Chicago v. Sessions*, 888 F.3d 272, 276 (7th

Cir. 2018); *City of Chicago*, 2018 WL 3608564, at *12; *City of Philadelphia v. Sessions*, 309 F. Supp.

3d 289, 321 (E.D. Pa. 2018); *see also City of Evanston v. Sessions*, Case No. 18 C 4853, Dkt. No. 23 at

8 (N.D. Ill. Aug. 9, 2018).[1]  This Court should do the same.[2]

> **a.      DOJ's Reading of Section 10102(a)(6) Is Contrary To The Text.**

Section 10102(a)(6) provides that the AAG may "exercise such other powers and functions as

may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General,

including placing special conditions on all grants, and determining priority purposes for formula

grants."  Every court that has examined this language has concluded the same thing: This language

---

[1] DOJ does not explain why this Court should depart from this weight of authority.  Indeed, DOJ does not mention—let alone discuss—any of the other cases that have invalidated the Challenged Requirements.  This is particularly curious because DOJ touts the en banc Seventh Circuit's decision to rehear a portion of the panel's decision affirming a nationwide injunction against the Notice and Access Requirements.  DOJ Mot. & Opp. at 40.  DOJ claims that this Court must not enter a nationwide injunction because of the mere possibility that the Seventh Circuit might resolve the injunction question differently.  *Id.*  It is difficult to understand why the *possibility* of such a divergence bears on the scope of relief, but an *actual* conflict has no relevance to the merits.

[2] DOJ misquotes this Court's decision in *Center for Environmental Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016), to suggest that its interpretation of the relevant statutory provisions is subject to some level of deference.  DOJ Mot. & Opp. at 9 n.5.  That decision in fact held that "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found *the facts as it did*."  *Id.* (emphasis added).  This case concerns the *legal* question of whether DOJ has the statutory authority it claims—a question this Court must determine for itself.  *See City of Chicago*, 888 F.3d at 283.

---

does not grant the AAG—or any other DOJ official—the independent power to impose grant conditions.  *See* p. 2, *supra*.  Rather, the "plain meaning" of the provision is that it describes powers the AAG may exercise when vested in her by some independent source of authority.  *See, e.g., City of Chicago*, 888 F.3d at 285.  DOJ nonetheless renews its assertion that Section 10102(a)(6)'s text "conveys independent authority" for the AAG to enact the Challenged Requirements.  DOJ Mot. & Opp. at 11.  Both of DOJ's arguments in support of this position are wrong.

First, DOJ argues that under a "plain reading of the statute," the "including" clause in Section 10102(a)(6) itself grants the AAG the power to attach other conditions of her choice.  That is, DOJ argues that Section 10102(a)(6) grants the AAG two sets of powers: the power to "exercise such other powers as functions" as may be vested in her, as well as the power to impose special conditions and determine priority purposes of formula grants.  DOJ Mot. & Opp. at 10-12.  Effectively, DOJ asks this Court to read "including" to mean "and" or "in addition to."

DOJ cites no authority for this proposition, and for good reason.  The Ninth Circuit has squarely rejected this reading of "including" clauses in statutes like Section 10102(a)(6).  *Arizona State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F. 3d 1003, 1008 (9th Cir. 2006) (rejecting the argument that "including" means "and" or "in addition to").  Instead, the Ninth Circuit and other courts of appeals have repeatedly held that the "plain and unambiguous" meaning of "including" is that it illustrates—rather than expands—the principle preceding it.  *Id.* at 1007-08 ("In both legal and common usage, the word 'including' is ordinarily defined as a term of illustrating, signifying that what follows is an example of the preceding principle."); *see also Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 459 (7th Cir. 2006) (items following "including" are merely "illustrative" of the set of things described before it).  Applying that common sense principle here confirms that special conditions and priority purposes are examples of the powers the AAG may exercise when elsewhere vested in her.

Second, DOJ argues that San Francisco's reading of Section 10102(a)(6) should be rejected because it renders the language in the "including" clause superfluous.  DOJ Mot. & Opp. at 11-12.  But every such clause is superfluous insofar as all it does is provide an example.  *See Gaffney*, 451 F.3d at 459.  And, in any case, it is the AG's interpretation that would render various portions of the Byrne JAG statute superfluous.  In DOJ's view, there would be no need for the specific grants of

authority in the statute itself, such as the authority to condition grants on submission of certain "data, records, and information" (34 U.S.C. § 10153(a)(4)), or on compliance with a "program assessment component" (*id.* § 10152(e)), because the AG already possesses these broader powers.

Further, there is nothing unusual about a statute describing the duties of a particular federal officer in ways that are arguably redundant of other statutory provisions. For instance, 34 U.S.C. § 10110 provides that the AG has final authority over "all functions, including any grants" administered by OJP. That more specific provision is arguably unnecessary in light of 28 U.S.C. § 509, which generally provides that "all functions of other officers of [DOJ] and all functions of agencies and employees of [DOJ] are vested in the Attorney General." It cannot be that all such specific authorizations are nugatory because the same powers are granted elsewhere. The same is true of the powers that Section 10102(a)(6) references.

### b. DOJ's Additional Arguments Lack Merit.

DOJ offers several additional arguments, apart from the statutory language, in defending their reading of Section 10102(a)(6). Because that provision's language is unambiguous, this Court need not entertain any of them. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). But regardless, each of these arguments fails on its own terms.

First, DOJ appeals to legislative history. DOJ Mot. & Opp. at 10-11. It argues that the "special conditions" and "priority purposes" language was added as part of the same legislation that created the current version of the Byrne JAG program. *Id.* But this does not help DOJ's position. Congress's decision to add this language to a separate statutory provision,[3] unconnected to the Byrne JAG program itself, does not cast doubt on the many other aspects of Byrne JAG that are inconsistent with DOJ's claim of sweeping discretionary authority: the grant's structure as a formula grant; the lack of any authority in the statute itself for any DOJ official to impose substantive conditions; the limitations on the AG's discretion to withhold funds; and the relationship between the funding and

---

[3] DOJ misunderstands San Francisco's point about the appearance of the "special conditions" language in a different statutory subchapter. DOJ Mot. & Opp. at 11 n. 7. San Francisco fully understands DOJ's organization (*contra id.*); the point is not that Section 10102(a)(6) fails to reach grants that OJP administers. Rather, the point is that it is unlikely that Congress would choose to include language in a wholly different statutory subchapter that would override many of the specific limitations Congress placed on DOJ's authority within the Byrne JAG statute itself. SF Mot. at 15.

1  specific federal policy objectives.  *See* SF Mot. at 9-11.  These carefully crafted congressional choices

2  belie any intent to give DOJ free reign to impose substantive conditions of its choice.

3        In any case, that the "special conditions" language was added at the same time that Byrne JAG

4  was codified in its current form is meaningless in light of the scope of the authority DOJ claims.  DOJ

5  concedes that the authority conferred on the AAG by Section 10102(a)(6) "necessarily reaches all

6  programs under [her] supervision, including (but not limited to) the Byrne JAG program."  DOJ Mot.

7  & Opp. at 11 n. 7.  That is, whatever is true about the AAG's authority to condition Byrne JAG funds

8  must be equally true for the dozens of other grant programs that OJP administers.[4]  That this language

9  was added at the same time that *one* of those many programs was amended means very little.[5]

10        At the same time, DOJ has no meaningful response to San Francisco's legislative history

11  argument showing that "special conditions" had a particular, established meaning at the time that

12  Congress added that language to Section 10102(a)(6).  SF Mot. at 17.  DOJ says that if Congress had

13  intended to limit the term to that pre-existing meaning, it would have said so explicitly.  DOJ Mot. &

14  Opp. at 14 n.9.  But that gets the analysis precisely backwards.  When Congress adopts a term of art, it

15  "presumably" knows and adopts the cluster of ideas attached to it.  *F.A.A. v. Cooper*, 566 U.S. 284,

16  292 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)).  DOJ does not deny that this

17  term of art was in longstanding use at the time that Congress amended Section 10102(a)(6), so the

18  strong presumption should be that Congress intended to import that term's meaning as well.

19        <u>Second</u>, DOJ argues that there is nothing unusual about the Challenged Requirements—

20  Congress routinely delegates to the Executive the authority to attach conditions on federal spending,

21  and DOJ has previously exercised that discretion in conditioning the Byrne JAG program.  DOJ Mot.

22  & Opp. at 9-10, 12 n.8, 13.  But neither point helps DOJ.

23        As to the former, all of the delegations that DOJ highlights support San Francisco—not DOJ—

24  because they differ dramatically from the purported delegation here.  All of the statutory delegations

25      [4] *See* U.S. Department of Justice, Office of Justice Programs, Past Funding Opportunities,

26  *https://ojp.gov/funding/Explore/PastFundingOpportunities.htm* (last visited Aug. 14, 2018), (listing grant solicitations and challenges administered by OJP that closed during the 2018 fiscal year).

27      [5] DOJ also relies on a snippet of the House Report, which it claims shows Congress's intent to grant the AAG affirmative powers.  DOJ Mot. & Opp. at 10.  It does not.  This provision simply

28  restates the statutory language and therefore demonstrates little about Congress's intent.

DOJ cites appear within the grant-authorizing provision itself, and all make clear the Executive's authority to place conditions on that *specific* grant program. DOJ Mot. & Opp. at 12 n. 8 (citing 42 U.S.C. §§ 713(a)(1)(C), 1395*l*(t)(2)(E); 25 U.S.C. § 1644(b)). Likewise, the delegations that courts have considered have contained specific statutory language authorizing the particular delegation at issue. *See, e.g., DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 277 (D.C. Cir. 1989) (executive restrictions on the use of population planning funds authorized by the Foreign Assistance Act were permissible in light of the Act's language authorizing the President to "furnish assistance, on such terms and conditions as he may determine, for voluntary population planning"). Such language is conspicuously absent from the Byrne JAG statute.

As to the latter, DOJ is wrong to suggest that San Francisco's argument is "flatly belied by OJP's history of employing its 'special conditions' authority to impose various substantive conditions" on Byrne JAG grantees. DOJ Mot. & Opp. at 13-14. As an initial matter, each of those conditions was at least arguably authorized by Congress directly—not by any putative delegation through Section 10102(a)(6). *See, e.g.,* 42 U.S.C. § 300v-1 (providing that agency shall engage in notice and comment rulemaking regarding human research); 34 U.S.C. § 10153(b)(1) (requiring the AG to provide technical assistance for Byrne JAG recipients). And even if some conditions have previously been imposed without statutory direction (DOJ Mot. & Opp. at 13), that does not legitimize the Challenged Requirements. DOJ "may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *See S.E.C. v. Sloan*, 436 U.S. 103, 119 (1978).

### 2. Section 1373 Is Not An "Applicable Federal Law."

The Section 1373 Requirement violates the separation of powers as well, for two independent reasons. The Requirement is not authorized by 34 U.S.C. § 10153(a)(5)(D) ("Section 10153(a)(5)(D)") because Section 1373 is unconstitutional and thus not "applicable." And regardless, DOJ's definition of "applicable" is overbroad and would not embrace Section 1373.

### a. Section 1373 Is Not "Applicable" Because It Is Unconstitutional.

As every court to have considered the question has found, Section 1373 is not—and cannot be—an "applicable federal law" under Section 10153(a)(5)(D) because it is unconstitutional under the anticommandeering doctrine. *See City of Philadelphia*, 309 F. Supp. 3d at 329; *City of Chicago*, 2018

WL 3608564, at *13; *see also* SF Mot. at 12.  The Supreme Court's recent decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), makes this clear.  DOJ does not even mention—let alone address—any of the other cases that have struck down the Section 1373 Requirement on this basis.  Nor does it meaningfully address San Francisco's showing that Section 1373 violates each of the tenets of the anticommandeering rule.  *See* SF Mot. at 13-14.  Instead, DOJ offers two meritless reasons why this Court should uphold the Section 1373 Requirement.

First, DOJ tries to avoid the anticommandeering framework altogether, arguing that because Section 1373 is imposed as a condition on a federal grant, the Spending Clause "provides the proper rubric" for analyzing this case.  DOJ Mot. & Opp. at 15.  Other courts have readily disposed of this argument.  "If this were correct, then Congress could pass blatantly unconstitutional statutes—including statutes already struck down as unconstitutional by courts—but essentially require states and localities to adhere to those statutes by tying a 'certification' of compliance with those conditions to federal grants."  *City of Philadelphia*, 309 F. Supp. 3d at 329.  This is because "Section 1373 is an extant federal law with which [San Francisco] must comply, completely irrespective of whether or not the City accepts Byrne JAG funding."  *City of Chicago*, 2018 WL 3608564, at *6.  Thus, DOJ cannot avoid Section 1373's blatant unconstitutionality by cloaking itself in the purported protection of the Spending Clause.  Whether Section 1373 is constitutional is determinative of whether it is an applicable law under Section 10153(a)(5)(D).[6]

Second, DOJ makes the surprising claim that *Murphy* actually supports Section 1373's constitutionality, despite the growing weight of authority to the contrary.  *See* p. 2, *supra*; *see also United States v. California*, No. CV-490, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) (finding Section 1373's constitutionality "highly suspect").  DOJ argues that Section 1373 is merely an information-sharing provision that the Tenth Amendment does not reach.  DOJ Mot. & Opp. at 15-16.

---

[6] Alternatively, DOJ argues that this Court should analyze the statute as if DOJ had included "the statute's language" as an independent grant condition.  DOJ Mot. & Opp. at 16-17.  DOJ offers no authority to support its request that the Court rewrite the Byrne JAG grant conditions.  DOJ explicitly tied the Section 1373 Requirement to *Section 1373 itself*, and it cannot retract that decision in the face of litigation.  In any case, even if DOJ had included the statute's language as an independent grant condition, that condition would still violate separation of powers for the same reasons the Notice and Access Requirements do.  *See* pp. 2-6, *supra*.

1    But this is wrong for two reasons.  As an initial matter, Section 1373 is not a statute governing "purely

2    ministerial reporting requirements," as DOJ contends.  *Id.* at 16 (citation omitted).  Instead, Section

3    1373 "supplants local control of local officers" by precluding San Francisco from imposing *any* limits

4    on how and when its employees may share immigration-related information with federal authorities.

5    *City of Chicago*, 2018 WL 3608564 at *8.  For instance, it prevents San Francisco "from limiting the

6    amount of paid time its employees use to communicate with INS."  *Id.*  It also constrains local

7    lawmakers from passing laws that—under the federal government's view (*see* p. 19, *infra*)—intrude in

8    any way on employees' freedom to share vast swaths of information with federal immigration

9    authorities.  *Id.*; *see also California*, 2018 WL 3301414, at *14 (finding that the "information sharing

10   provisions" DOJ references "do not appear to approximate the level of state and local law enforcement

11   integration into federal immigration enforcement operations").  These are quintessential sovereign

12   functions that the Tenth Amendment protects.  *Printz v. United States*, 521 U.S. 898, 931 (1997).[7]

13       Further, even if Section 1373 is an "information access" law, such laws are not categorically

14   immune from anticommandeering principles.  No case has ever recognized that an exception for

15   information sharing laws exists.  *Printz* suggested only that such an exception *might* exist for some

16   subset of information-access laws.  521 U.S. at 918; *see also City of Chicago*, 2018 WL 3608564, at

17   *9 (expressing doubt that *Printz* recognized such an exception); *City of Philadelphia*, 309 F. Supp. 3d

18   at 331 (similar).  Indeed, Justice O'Connor's concurrence in *Printz* confirms that the Court

19   "refrain[ed] from deciding whether . . . purely ministerial reporting requirements" are invalid.  521

20   U.S. at 936.  In any case, *Printz* made clear that any exception for information-access laws would not

21   apply to "information that belongs to the State and that is available to [local officials] only in their

22   official capacity."  521 U.S. at 932 n.17.  But that is precisely the type of information Section 1373

23

24

25       [7] DOJ also obliquely suggests that policy reasons justify Section 1373, because "States and
     local jurisdictions may not employ conflicting standards and practices that interfere with the federal
26   immigration scheme."  DOJ Mot. & Opp. at 16 n.10.  But even if this somehow bore on the Tenth
     Amendment analysis, the premise is wrong.  Jurisdictions like San Francisco do not "interfere" with
27   federal immigration law merely by declining to conduct federal immigration enforcement.  *See City of
     Chicago*, 2018 WL 3608564, at *10; *see also California*, 2018 WL 3301414, at *18 ("Standing aside
28   does not equate to standing in the way.").

requires cities to permit their law enforcement officers to provide.[8]  Indeed, according to DOJ, such

information includes an expansive amount of government-held information, including custody status,

release date, and any other information immigration authorities might deem useful to them.  *See* pp.

19-20, *infra*; *see also* SF Mot. at 20.  Therefore, Section 1373 is constitutionally infirm and cannot be

an "applicable federal law" for purposes of Section 10153(a)(5)(D).

### b.   "Applicable" Must Be Read Narrowly To Exclude Section 1373.

In any case, Section 10153(a)(5)(D)'s reference to "applicable" federal laws does not extend to

provisions like Section 1373.  DOJ's sole argument is that "applicable" is most naturally read broadly,

based on a variety of cases interpreting the term "applicable" in unrelated contexts.  DOJ Mot. & Opp.

at 17-18.  But this ignores the statutory interpretation principle that "applicable" must be analyzed in

light of the particular context at issue (SF Mot. at 14); other courts construing the term have

recognized as much.  *See*, *e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 400 (2d Cir.

2008) (meaning of "applicable" must "be determined . . . by reading the term in the context of the

surrounding language and of the statute as a whole").  Here, Congress used limiting language—"the

provisions of *this part* [the Byrne JAG statute] and all *other* applicable Federal laws," 34 U.S.C. §

10153(a)(5)(D)—that indicates a limited meaning of "applicable" that encompasses only those laws

that apply to grant recipients in that capacity.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105,

114-15 (2001) (phrases in statutes are "controlled and defined by reference to" preceding terms).

Further, Section 10153(a) is part of a section titled "Applications" that is focused on grant applications

and technical requirements.  That this section would nonetheless incorporate broader requirements

related to all federal laws would be unusual, given this context.

Further, federalism principles counsel in favor of San Francisco's interpretation.  DOJ ignores

the particular target of the Section 1373 Requirement—the operation of state and local law

---

[8] DOJ cites *Reno v. Condon*, 528 U.S. 141 (2000), but that case does not help it.  *Reno* involved a law that applied "equally to state and private actors" who controlled certain databases. *Murphy*, 138 S. Ct. at 1479.  That law neither "appl[ied] solely to States," nor sought to regulate the States as "States in their sovereign capacity."  *Reno*, 528 U.S. at 142, 146.  By contrast, Section 1373 is directed *specifically* to State and local governments and seeks to direct their officers or employees in the performance of their official duties.  "Thus, the saving grace of *Reno* does not apply here."  *City of Chicago*, 2018 WL 3608564, at \*7; *see also City of Philadelphia*, 309 F. Supp. 3d at 330.

enforcement departments.  *See* SF Mot. at 20.  The law enforcement function is one of the "clearest example[s] of traditional state authority."  *See Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).  When Congress intends to intrude on areas traditionally resolved to local sovereign authority, this intent must be "unmistakably clear in the language of the statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Here, at most Section 10153(a)(5)(D) is ambiguous regarding whether Congress intended to allow the AG to require compliance with the vast expanse of federal laws  that "independently apply to Byrne JAG grantees."  DOJ Mot. & Opp. at 18; *see also City of Philadelphia*, 280 F. Supp. 3d at 646-47 (Section 10153(a)(5)(D)'s "malleable language does not provide the 'clear notice that would be needed to attach [the Section 1373 Requirement] to a State's receipt of . . . funds'" (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006)).  Given the federalism implications, that ambiguity must be resolved in favor of a narrow interpretation.

**B.    The Challenged Requirements Violate The Spending Clause.**

Even if Congress had authorized DOJ to impose the Challenged Requirements, they would still be unconstitutional under the Spending Clause.  The Challenged Requirements are both ambiguous and insufficiently related to the purpose of the Byrne JAG program.

**1.    The Requirements Are Ambiguous.**

All three of the Challenged Requirements are fatally ambiguous in violation of the Spending Clause, in large part because of the vague, conflicting, and indecipherable statements that DOJ has made about the Requirements' demands.  *See* SF Mot. at 18-20.  DOJ offers no meaningful response to San Francisco's ambiguity argument.  Instead, DOJ largely restates the text of the provisions and baldly proclaims that the Challenged Requirements "clearly state what conduct is required."  DOJ Mot. & Opp. at 19.  But this is no answer to the City's description of the many uncertainties that Defendants have themselves created regarding the meaning and scope of these provisions.

Indeed, DOJ's arguments confirm that San Francisco has no certainty whatsoever about what it means to comply with the Challenged Requirements.  As to the Section 1373 Requirement, DOJ persists in its refusal to tell jurisdictions what Section 1373 requires of them.  Instead, DOJ continues to suggest that "information regarding . . . immigration status" under Section 1373 applies to vast swaths of information, including all "information relevant to removability" and "the types of

information critical in applying the 'immigration laws.'" DOJ Mot. & Opp. at 26-27.  And—without explaining why—DOJ urges the Court not to define the outer boundaries of what information might fall within Section 1373's ambit.  *Id.* at 24.  These statements only exacerbate the Section 1373 Requirement's ambiguity.  And the same is true for the Access Requirement.  DOJ gives no real answer to the conflicting statements it has made regarding the Requirement's demands.  *See* SF Mot. at 21.  Rather, DOJ now adds the additional vague directive that "San Francisco may not insert itself between federal authorities and the detainee."  DOJ Mot. & Opp. at 21 n.3.  This adds, not subtracts, to the unanswered critical questions that the Challenged Requirements create: What does it mean for San Francisco to "insert itself" when DOJ seeks access to an inmate in its custody?

DOJ's remaining arguments regarding ambiguity are unpersuasive.  First, DOJ offers an "OJP employee['s]" contact information as a solution to any uncertainties.  DOJ Mot. & Opp. at 21.  But an agency cannot save an unconstitutional grant condition by setting up a hotline.  Second, DOJ cites two cases—both construing the same statutory provision, the Religious Land Use and Institutionalized Persons Act—which it claims stands for the proposition that some ambiguity is tolerable.  *Id* (citing *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003); *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004)).  But the cases stand for nothing of the sort.  Both involved conditions enacted by Congress, not ones added by an agency.  *City of Philadelphia*, 280 F. Supp. 3d at 645 (highlighting this difference).  And neither case involved the circumstances here, where an agency has itself created confusion about what the meaning of a grant condition is.  Finally, DOJ points out that San Francisco has not challenged other Byrne JAG conditions on ambiguity grounds.  DOJ Mot. & Opp. at 21.  But that has no relevance to whether the Challenged Requirements are ambiguous.

### 2.     The Requirements Are Not Germane To The Byrne JAG Program.

DOJ also provides little response to San Francisco's argument about the Spending Clause's reasonable relationship standard.  *See* SF Mot. at 22.  Instead, DOJ understates the relatedness inquiry and argues that the Supreme Court has imposed only a minimal standard.  DOJ Mot. & Opp. at 21-22. But the very authority DOJ relies on contradicts this, and suggests that a more demanding nexus is required.  Specifically, the Supreme Court in *Dole* made clear that the relatedness standard has teeth. It requires a determination that "Congress conditioned the receipt of federal funds in a way reasonably

1  calculated to address [a] particular impediment to a purpose for which the funds are expended." 483

2  U.S. at 209.  And in analyzing the particular grant condition at issue there—the requirement that states

3  adopt a minimum drinking age to receive federal highway funds—the Supreme Court suggested what

4  must be shown for relatedness to be satisfied.  The Court emphasized that "[a] Presidential

5  commission appointed to study alcohol-related accidents and fatalities on the Nation's highway

6  concluded that the lack of uniformity in the States' drinking ages created 'an incentive to drink and

7  drive.'"  *Dole*, 483 U.S. at 209.  Thus, the Court found the funds "directly related to one of the main

8  purposes for which highway funds are expended—safe interstate travel."  *Id.* at 208.  The other courts

9  applying the *Dole* framework have reiterated that there must be a direct relationship between the

10  conditions and the purpose *of the federal spending*.  *See, e.g., New York v. United States*, 505 U.S.

11  144, 167 (1992); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).[9]

12      DOJ does not seriously attempt to show how there is a direct relationship between these grant

13  conditions and the purposes for which Byrne JAG funds are expended.  Indeed, while DOJ argues that

14  the Byrne JAG program's statute provides funding for criminal justice—a point that the City agrees

15  with—DOJ does not attempt to show how these immigration-related conditions further the

16  enforcement of local criminal laws.  DOJ Mot. & Opp. at 22.  Most likely, DOJ does not attempt to do

17  so because it cannot—there is no evidence in the record suggesting that the Challenged Requirements

18  will have the effect of preventing, controlling, or reducing crime or apprehending criminals, consistent

19  with the Byrne JAG statute's purposes.  *Id.*  Instead, DOJ argues that the conditions further the goals

20  of the INA.  *Id.* at 22-23.  But whether that is true or not is beside the point, because DOJ concedes

21  that the Challenged Requirements must further the purpose *of the federal spending*.  DOJ Mot. & Opp.

22  at 22.  The grant program at issue is not promulgated under the INA, so the INA is irrelevant.

23

24      [9] It is for this reason that the Court in *City of Philadelphia* rejected DOJ's arguments that a

25  minimal showing of relatedness is sufficient.  280 F. Supp. 3d at 641-42 (finding that "framing the
Court's inquiry as whether a discernable relationship exists between immigration law and law

26  enforcement, as the Attorney General seeks to do, situates the discussion at much too general a level").
That court found that even though the criminal law may be "integral to immigration law," immigration

27  law "has nothing to do with the enforcement of local criminal laws."  *Id.* at 642.  Thus "[t]he federal
interest in enforcing immigration laws falls outside the scope of the Byrne JAG program," because the

28  purpose of the Byrne JAG program is to "enhanc[e] *local* criminal justice."  *Id.*

**II.     San Francisco Is Entitled To Summary Judgment Regarding Section 1373.**

There is no genuine dispute as to the material facts at issue concerning San Francisco's request for declaratory relief regarding Section 1373.  It is undisputed that San Francisco *does* prohibit its employees from sharing individuals' contact information and release dates with ICE.  *See* Part II(A)(1), *infra*.  But there is also no question that San Francisco does *not* prohibit its employees from sharing information about what a person's immigration status is (*e.g.*, a statement about an individual's immigration status or copies of immigration or visa documents).  *See* Part II(A)(2), *infra*. This case therefore turns on the legal question of whether this undisputed conduct violates the law—*i.e.*, whether Section 1373 covers all information that could help ICE *determine* an individual's immigration status, such as contact information and release status.  It does not.  *See* Part II(B), *infra*. Accordingly—and because this Court has already correctly determined that San Francisco's declaratory relief claim is justiciable (*see* Part II(C), *infra*)—the City is entitled to summary judgment.

**A.     There Is No Dispute About What San Francisco Does—And Does Not—Prohibit.**

**1.     There Is No Dispute That San Francisco Prohibits Employees From Sharing Contact Information And Release Dates With ICE.**

DOJ spills much ink to demonstrate that San Francisco employees are prohibited from sharing individuals' contact information and release dates with ICE.  *See* DOJ Mot. & Opp. at Part II(C)(1). But these efforts were needless.  San Francisco expressly acknowledged as much in its complaint. *See, e.g.*, First Amended Complaint ¶ 36 ("Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in question meets certain criteria."); *id.* ¶ 165 ("San Francisco also does not provide a person's home address, residence, date of birth, or similar sensitive personal information to federal immigration officials."). In short, there is no dispute that San Francisco laws and policies prohibit City employees from sharing contact information and release dates with federal immigration authorities.

**2.     There Is No Dispute That San Francisco *Does Not* Prohibit Employees From Sharing Information About What A Person's Immigration Status Is.**

There is also no genuine dispute that San Francisco's Sanctuary City laws—codified in San Francisco Administrative Code Chapters 12H and 12I—do not prohibit, or in any way restrict, San

Francisco employees from maintaining or communicating information about what a person's immigration status is—*e.g.*, an individual's statements about their own (or someone else's) immigration status.[10]  Indeed, although a prior version of the law included a prohibition on sharing immigration status information, the City amended Chapter 12H in 2016 specifically to delete that provision.  *See* SF Mot. at 28 n.12; RJN in Support of SF's MSJ ("RJN"), Exh. G.

Nor is there any genuine dispute that the relevant City departments (those that would receive FY 2017 Byrne JAG funds) have no policies that prohibit or restrict their employees from sharing this information.  San Francisco submitted declarations to this effect from each relevant department.  *See* SF Mot. at 29-30 (citing Declarations).  DOJ does not even mention—let alone dispute the content or import of—these declarations.  And not one fact that DOJ references is to the contrary.

DOJ lists several documents that it characterizes as "City policy documents and instructions to employees expressly prohibiting disseminating 'information about an individual's immigration status.'"  DOJ Mot. & Opp. at 33-34.  The majority of these documents, however, do *not* indicate that employees are prohibited from sharing information about *what a person's immigration status is*.  San Francisco Police Department ("SFPD") Bulletin 17-015 tracks San Francisco's Sanctuary City laws by stating that members of the department shall not gather or disseminate release date information or other "personal information" as defined in Chapter 12I.  ("Personal information" is a defined term that does *not* include immigration status.  *See* S.F. Admin. Code § 12I.2.)  Similarly, SFPD General Order 5.15, San Francisco Sheriff's Department Policy #02-39, and San Francisco Adult Probation Department Policy 3.06.01 prohibit sharing release status, contact information, or other confidential identifying information.  But not one of these policy documents prohibits employees from sharing information about what a person's immigration status is.

The other two documents on DOJ's bulleted lists are neither policy documents nor instructions

---

[10] There is a single sentence in DOJ's brief arguing that Chapter 12H violates Section 1373 "even under the City's understanding of the statute" because the law prohibits employees from "assit[ing ICE] in the enforcement of immigration laws," and sharing a statement about immigration status constitutes "assisting."  DOJ Mot. & Opp. at 36.  Not so.  As San Francisco has explained before (*see, e.g.*, SF Mot. at 28 n.11; SF Opp. to DOJ's Mot. to Dismiss at 16), Chapter 12H's general prohibition against "using City funds or resources to assist in the enforcement of Federal immigration law" does not prohibit employees from sharing immigration information with ICE.  The more specific language about release status and other "personal information" controls over this general language.

to employees.  The Office of Civic Engagement and Immigrant Affairs ("OCEIA") document entitled

"*Background Information: City and County of San Francisco Immigrant Protection policies*" is a *draft*

document summarizing the old version of San Francisco's Sanctuary City laws, prior to the 2016

revisions.[11]  Declaration of Adrienne Pon ¶ 5.  Accordingly, it stated—as the law did at the time—that

employees could not disclose information regarding an individual's immigration status, except as

required by federal or state law.  This draft was never distributed to the public.  *Id.*  Rather, it (along

with all of OCEIA's materials) was amended to accurately reflect San Francisco's revised Sanctuary

City laws.  *Id.* at ¶¶ 6-8 & Exh. A (updated document accurately reflecting current law).

   The other document was talking points prepared by the San Francisco Human Rights

Commission ("HRC") for a public workshop.  Declaration of Sheryl Evans Davis ¶ 6.  It too is an

outdated document—which was cut and pasted from even earlier documents—summarizing the pre-

2016 version of San Francisco's Sanctuary City laws.  *Id.*  By March 2017—within weeks of the

workshop for which the talking points document was prepared—HRC's materials were updated to

accurately reflect San Francisco's revised Sanctuary City laws.  *Id.* ¶¶ 7-9 & Exh. A.

   In addition to its bulleted list, DOJ also references a handful of other facts that "reflect the

broad, vigorous enforcement of the City's ordinances."  DOJ Mot. & Opp. at 34-35.  For instance,

DOJ notes that police officers are required to acknowledge that they have received and reviewed the

City's policy on "Enforcement of Immigration Laws."  *Id.* at 35.  But DOJ does not—because it

cannot—allege that anything in that policy prohibits sharing information about what an individual's

immigration status is.  Requiring employees to acknowledge review of a policy that is consistent with

federal, state and local law is good government practice—not a bad thing, as DOJ implies.  DOJ also

notes that only the sheriff herself can authorize notifying ICE of an inmate's release date (*id.*), that the

City has meted out discipline for violation of its Sanctuary City laws (*id.*), and that San Francisco has

not responded to any requests from ICE to provide 48 hours' notice before an individual is released

from the City's custody (*id.* at 36).[12]  San Francisco does not dispute any of these facts.  But not one of

---

[11] Indeed, the OCEIA document was produced to DOJ along with the email that attached it, which clearly indicates that the document was a "draft."  *See* Declaration of Sara J. Eisenberg Exh. A.

[12] As evidence that San Francisco has not responded to numerous notification requests sent by ICE, DOJ cites to a declaration from Francisco Madrigal.  San Francisco objects to this declaration

them demonstrates, indicates, or even implies that San Francisco prevents its employees from sharing information about what a person's immigration status is.

The last document DOJ relies upon is a memorandum to the Executive Director of the Department of Children, Youth & Their Families from a Deputy City Attorney in response to a request for guidance about the "legal limits on the authority of [ICE] agents to request information or conduct searches in San Francisco, including on City property." Simpson Decl. Exh. H ("DCYF Memo") at 1. The DCYF Memorandum states, *inter alia*, that if and when a city employee encounters an ICE agent:

> o Except in the limited circumstances below where ICE agents have a valid subpoena or warrant, you are *not* required to cooperate with the agents.
> o You are *not* required to show ICE agents identification of any kind, including documents that prove citizenship or immigration status.
> o You are *not* required to answer ICE agents' questions.
> o You are *not* required to speak with ICE agents at all.
> o If you choose *not* to speak with ICE agents, you may tell ICE agents that you choose not to speak with them, and then say nothing else.

DOJ first takes issue with the fact that the DCYF Memo "nowhere states that City employees are not prohibited from providing information regarding immigration status . . . to federal authorities." DOJ Mot. & Opp. at 35. This criticism misses the mark. Nowhere does the DCYF Memo say that employees are prohibited from sharing this information. Certainly, the City was not required to list everything that its employees are *not* prohibited from doing. Moreover, in a separate memo to "All City and County of San Francisco Employees" that was emailed to employees the week before the DCYF Memo was written, the Director of the San Francisco Department of Human Resources

---

(and to the declaration of Marilynn B. Atsatt) because these witnesses have not been previously disclosed by Defendants. *See* SF's Motion to Exclude Pursuant to FRCP 37 (filed concurrently herewith). There is no reasonable justification for this omission, which is but one example of late disclosures by DOJ during the course of discovery in this case. Most recently, at approximately 2:00pm on the Friday before the deadline to file this brief—nearly two months after the close of discovery—DOJ informed San Francisco that due to a technical error, Defendants had omitted a batch of emails from the search for documents responsive to the City's requests. Eisenberg Decl. ¶ 4 & Exh. A. DOJ acknowledged that its belated review of those documents revealed 15 responsive documents that "should be produced in full." *Id.* at ¶ 6 & Exh. A. Although DOJ clearly knew about the omission for long enough to obtain, search, and review the emails, they did not mention this to San Francisco until the eleventh hour and, even then, did not actually produce the responsive documents. Instead DOJ stated that it would produce the documents at some unspecified time the following week. *Id.* San Francisco did not receive all of the documents from DOJ until approximately noon on Tuesday, August 14, 2018. *Id.* at ¶ 8. Given the short timeframe between San Francisco's receipt of these documents and the deadline to file this brief on August 15th, the City is still evaluating the documents and, if necessary, may request leave to file additional materials with the Court.

expressly reminded all employees that "federal law states that a 'local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.'"  RJN Exh. D at 1.

DOJ next contends that the "repeatedly italicized negatives[] [in the DCYF Memo] give employees the clear impression that they should refuse to 'speak' with immigration agents, to answer any of their questions, or to provide any documents that 'prove citizenship or immigration status.'" DOJ Mot. & Opp. at 35.  Not so.  The DCYF Memo says that employees are not *required* to do any of these things, which is an accurate statement of the law.  Moreover, it provides: "If you *choose* not to speak with ICE agents, you may tell ICE agents that you *choose* not to speak with them, and then say nothing else." (Emphasis altered.)  The clear message relayed by this language is that whether to speak with ICE agents is a choice—left to the discretion of each individual employee.

Finally, DOJ says that "providing 'copies of immigration or visa document' would violate the DCYF Memo's advice against 'show[ing] ICE agents identification of any kind, including documents that prove citizenship or immigration status.'"  DOJ Mot. & Opp. at 36.  This misconstrues the Memo.  The Memo does not anywhere or in any way purport to advise employees against showing documents to ICE.  It simply (and accurately) states that providing these documents is not required by law.

In sum, DOJ asserts that San Francisco has succeeded in preventing its employees from communicating with ICE "at all" (*id.*)—but the evidence does not support that broad assertion.  There is ample evidence that San Francisco prohibits its employees from sharing *contact information and release dates*, but there is no evidence in the record that employees are prohibited from sharing information about what an individual's immigration status is.  To the contrary, the only evidence in the record proves that the City's laws and policies do *not* prohibit such disclosures.  *See* RJN Exhs. A (Chapters 12H & 12I); RJN Exh. D (DHR Memorandum); Declarations of Leo Chyi, Sheriff Vicki Hennessy, Chief Karen Fletcher, Assistant Chief Hector Sainez, Cristine DeBerry, and Jeff Adachi.

**B.**     **Section 1373 Does Not Cover Information To Determine Immigration Status.**

Because the record establishes that there is no genuine dispute about the material facts, this case now turns entirely on a question of law—namely, the scope of Section 1373.

San Francisco contends that "information regarding . . . immigration status" covers information about what a person's immigration status is. This is more than just the fact of a person's status—*e.g.*, John Smith is a citizen or Jane Doe is an alien—which the federal government is uniquely situated to know. It also includes information about what that status is—information that local officials are in a position to obtain, such as an individual's self-report about their immigration status, a third party's statement about an individual's immigration status, or copies of immigration or visa documents.

The disagreement between the parties is over whether "information regarding . . . immigration status" includes not just information about *what* a person's status *is*—but also information that could help ICE *determine* what it is. It does not. Accordingly, the undisputed facts demonstrate that San Francisco is fully compliant with the law and entitled to summary judgment in its favor.

### 1.     DOJ Provides No Meaningful Response To San Francisco's Arguments.

In its motion, San Francisco explained in detail why Section 1373 cannot be read as broadly as DOJ suggests. DOJ offers no meaningful response to the majority of San Francisco's arguments:

• San Francisco pointed out that every federal court that has construed Section 1373 has rejected DOJ's expansive reading of its terms. *See* SF Mot. at 23-24 (citing *United States v. California*, *City of Philadelphia v. Sessions*, and *Steinle v. City and County of San Francisco*). DOJ ignores these cases. DOJ is asking this Court to break from its sister courts and be the first one to embrace a dubious and novel interpretation of Section 1373 without even acknowledging—let alone addressing—the growing weight of contrary authority.

• San Francisco also argued that Section 1373 should not be read so broadly because Congress knows how to—and has—used broader language to sweep in more types of information when that is its intent. *See* SF Mot. at 24 (citing statutes). DOJ has no response to this point.

• San Francisco cited a Ninth Circuit case— *Roach v. Mail Handlers Benefits Plan*, 298 F.3d 847 (9th Circ. 2002)—that bears directly on the interpretation of the term "information regarding . . . immigration status." SF Mot. at 25-26. The *Roach* court held that the term "relate to" cannot be "taken to extend to the furthest stretch of its indeterminacy," and must be read more narrowly to avoid encroaching on an area of traditional state regulation "unless that was the clear and manifest purpose of Congress." *Roach*, 298 F.3d at 850. DOJ does not even reference—much less distinguish—this

binding case law.[13]

    • San Francisco also explained in its motion that expanding the scope of Section 1373 to include information that helps ICE determine immigration status would result in the potential exposure of substantial sensitive information about individuals—like health records, family status, and financial information.  SF Mot. at 26-27.  DOJ does not disagree.

    DOJ does not even attempt to establish a limiting principle.  It simply says that this Court need not define the outer boundaries of what is covered by Section 1373, because it only seeks a ruling on release dates and contact information.  DOJ Mot. & Opp. at 24-25.  It is true that this is all DOJ is seeking to bring within the scope of Section 1373 *today*.  But to interpret Section 1373 to cover this information, this Court would necessarily have to embrace DOJ's argument that "information regarding . . . immigration status" includes all "information relevant to determining one's compliance with the INA [including] information relevant to ascertaining removability."  *Id.* at 27.  This is the only justification offered for including contact information and release date within Section 1373.

    And once that principle is embraced, the reach of Section 1373 "would know no bounds." *United States v. California*, 2018 WL 3301414, at *16.  DOJ acknowledged as much in a recent hearing in the Eastern District of California.  There, DOJ counsel stated that it "may well be true" that DOJ's interpretation would mean that "state and local governments could not prohibit doctors and other medical staff from sending immigration officers health records of individuals who come in for treatment" even though "[t]his interpretation would conflict with numerous federal and state confidentiality laws."  Declaration of Mollie M. Lee ¶ 17 & Exh. O at 152:3-22.  And DOJ has made

---

[13] DOJ does attempt to distinguish *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), but its attempt fails.  DOJ Mot. & Opp. at 29.  San Francisco cited *Atascadero* for the proposition that federal statutes should not be read to preempt matters of traditional state control unless it is "unmistakably clear in the language of the statute" that Congress intended to do so.  SF Mot. at 26. DOJ claims that this standard is inapplicable here because Section 1373 "involves an area of traditional *federal* control—the entry, movement, and other conduct of foreign nationals in the United States."  *Id.*  This misstates the inquiry.  The relevant inquiry is whether the law at issue *intrudes on* an area of traditional state control.  There is no question that Section 1373 intrudes on state and local jurisdictions' ability to direct their employees, to control employees' communications, and to set policies that promote public health, safety, and the general welfare.  And there is no question that these are all areas of traditional local control. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475 (1996). *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.").

no effort to reassure this Court or the state and local jurisdictions subject to Section 1373 that it will not in fact come back next week or next year seeking to expand the law's reach to cover more than release date and contact information.  To the contrary, DOJ expressly stated in discovery responses that "[d]epending on the situation, federal immigration authorities may need other categories of information that would also fall within Section 1373."  *Id.* ¶ 16 & Exh. N (Defs.' Resp. and Obj. to First Set of Interrog. No. 6, 10-12).

In short, DOJ essentially concedes that a ruling in its favor here would open the door to the exposure of a substantial amount of additional and highly sensitive information down the road.

• Finally, San Francisco argued that DOJ's expansive interpretation of Section 1373 should be rejected pursuant to the doctrine of constitutional avoidance because it raises significant concerns under the Tenth Amendment.  SF Mot. at 27-28.  In a three sentence footnote, DOJ contends that San Francisco cannot raise this argument because the City did not plead a claim under the Tenth Amendment.  DOJ Mot. & Opp. at 29 n.19.  "This accusation misconceives—and fundamentally so—the role played by the canon of constitutional avoidance in statutory interpretation."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Constitutional avoidance is "an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  It thus applies regardless of whether the complaint includes a separate cause of action for violation of the constitutional provision at issue.  DOJ offers no substantive response to San Francisco's analysis of the serious Tenth Amendment concerns triggered by DOJ's interpretation of Section 1373.

DOJ's inability to meaningfully respond to any of these arguments is striking, and counsels strongly in favor of granting San Francisco's motion.

### 2.    DOJ's Additional Arguments Lack Merit.

Rather than engage in any meaningful way with San Francisco's brief, DOJ simply sets forth its own affirmative argument.  Specifically, DOJ makes three points in support of its overly broad reading of Section 1373.  Not one has merit.

First, DOJ cites to the Supreme Court's recent decision in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) (hereafter, "*Appling*").  DOJ Mot. & Opp. at 26-27.  In *Appling*, the

Court was called upon to interpret the phrase "statement respecting the debtor's financial condition." Specifically, the question presented was whether the phrase was limited to statements capturing the debtor's overall financial status or also included statements about a single asset.  The Court ruled that the phrase was broad enough to encompass both types of statements.  The Court began by setting forth the general proposition that the word "respecting" (and other similar words) "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to the subject."  *Id.* at 1759-60.  But the Court did not stop there.  It closely examined the language and context of the law and determined that the narrower reading had to be rejected because it would read the word "respecting" out of the statute and "yield incoherent results." *Id.* at 1761.

Such is not the case here.  Unlike the law at issue in *Appling*, a narrow reading of Section 1373 does not read "regarding" out of the statute.  Under San Francisco's reading, information that local officials are in a position to obtain—such as an individual's self-report about their immigration status, a third party's statement about an individual's immigration status, or copies of immigration or visa documents—are swept into the scope of Section 1373 by the word "regarding."  This type of information is not official immigration status, but is necessarily information "regarding" immigration status.  Moreover, as the Eastern District recently noted in rejecting DOJ's reliance on *Appling*, "[t]he *Appling* Court was not called upon to determine the preemptive effect of a federal statute and thus did not have presumptions against preemption to factor into its analysis."  *United States v. California*, 2018 WL 3301414, at *17.  For both of these reasons, "the law in *Appling* [is] sufficiently distinct from the law at issue here to limit the decision's instructional value."  *Id.*  That case simply cannot support the great weight that DOJ attempts to rest upon it.

Second, DOJ argues that the "broader context" of the INA "as a whole" supports its reading of Section 1373.  DOJ Mot. & Opp. at 28.  In support of this assertion, DOJ cites to provisions of the INA stating that individuals sentenced to imprisonment cannot be removed from the United States until they are released from prison—and to cases holding that DHS may not detain an individual under the mandatory detention provision if it does not take the person into custody "promptly" upon his or her release from prison.  *Id.*  Certainly, this explains why ICE *wants* release date information.  But it has no bearing on the question presented here—*i.e.*, whether Congress chose to include it within the

scope of Section 1373.  It is therefore unsurprising that DOJ cites no authority at all for its bald assertion that Congress enacted Section 1373 for the purpose of helping DHS to "carry out its significant duties related to the removal of criminal aliens." *Id.*

Indeed, the idea that Congress enacted Section 1373 to help ICE remove "criminal aliens" upon their release from prison arguably *conflicts* with the broader context of the INA.  Section 1373's terms are not limited to individuals who have committed crimes—it applies to "any individual."  And Section 1373 is not in Part IV of the INA, which covers "Inspection, Apprehension, Examination, Exclusion, and Removal."  It is in Part IX ("Miscellaneous Provisions"), sandwiched between a provision about nonimmigrant foreign students (*see* 8 U.S.C. § 1372) and a provision about female genital mutilation (*see* 8 U.S.C. § 1374).  If Congress had enacted Section 1373 to ensure that ICE was able to pick up and deport criminals after their release from prison, one would expect both the language and placement of the section to be different.

<u>Finally</u>, DOJ claims that the legislative history of Section 1373 supports its broad interpretation of the law.  DOJ Mot. & Opp. at 28.  It does not.

DOJ cherry picks one sentence from House Conference Report 104-725, but omits language from the paragraph directly above it that supports San Francisco's interpretation of Section 1373.  That preceding paragraph states: "The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien **_or_** the presence, whereabouts, or activities of illegal aliens."  H.R. Conf. Rep. 104-725, at 383 (1996) (emphasis added).  The use of the disjunctive term "or" in this sentence indicates that—contrary to DOJ's assertion—the Committee members did *not* think "information regarding the immigration status" *included* the "presence, whereabouts, or activities of illegal aliens."  Quite the opposite; they understood those categories of information to mean *different* things.  As the Supreme Court has explained, to read a disjunctive sentence like this otherwise would "effectively read[] 'or' to mean 'including'—a definition foreign to any dictionary we know of." *Loughrin v. United States*, 134 S. Ct. 2384, 2388 (2014) (rejecting an argument that "would have [the Court] construe the two entirely distinct statutory phrases that the word 'or' joins as containing an identical element").  And the language Congress ultimately adopted in

1    Section 1373 includes only the former category ("information regarding . . . immigration status")—not

2    the latter ("the presence, whereabouts, or activities of illegal aliens").  DOJ's selective quotation from

3    the Conference Report is misleading.

4         And DOJ's citation to Senate Report Number 104-249 is ineffectual.  The quotation DOJ relies

5    upon simply expresses the general principle that obtaining information from state and local

6    governments is helpful to federal immigration authorities.  In short, the legislative history does not

7    help DOJ—if anything, it supports *San Francisco's* position that contact information and release date

8    are *not* included in "information regarding . . . immigration status."

9         **C.    San Francisco's Request For Declaratory Relief Is Justiciable.**

10        In its order denying DOJ's motion to dismiss this case, this Court ruled "that the City has

11   Article III standing because it has a well-founded fear of enforcement, injury-in-fact, and ripe claims."

12   Order Denying Motion to Dismiss at 2.  DOJ provides no new evidence, offers no new arguments, and

13   fails to present the Court with any reason whatsoever to deviate from its prior ruling.  This Court

14   properly rejected DOJ's justiciability arguments before, and it should do so again now.

15   **III.   A Nationwide Injunction Is Warranted In This Case.**

16        DOJ does not dispute that San Francisco satisfies the necessary elements for entry of a

17   permanent injunction.  Rather, DOJ limits its argument to the breadth and scope of the relief,

18   questioning whether San Francisco has standing to merit such broad relief, and expressing concern that

19   nationwide injunctions more generally violate principles of equity.  Both arguments are unavailing.

20        *Standing*.  DOJ argues that principles of Article III standing mandate that injunctions be

21   limited to redress the particular injuries suffered by plaintiffs in any given action.  DOJ Mot. & Opp. at

22   37-38.  But neither DOJ's own authorities, nor broader case law, support such a conclusion.

23        Although no court has articulated a particular test applicable in all instances where a litigant

24   seeks nationwide relief, "there is no rule against national injunctions."  Samuel L. Bray, *Multiple*

25   *Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 444-45 (2017) (cited in DOJ

26   Mot. & Opp. at 39); *see also San Francisco v. Trump*, No. 17-17478, 2018 WL 3637911, at *13 (9th

27   Cir. Aug. 1, 2018) (rejecting DOJ's arguments advocating for a "blanket restriction on all nationwide

28   injunctions").  Rather, the issuance of a nationwide injunction is left to the court's sound discretion.

And such relief is appropriate here for three reasons.

First, the case law makes clear that courts have the discretion to fashion remedies—including nationwide injunctions—where the nature of the violation and the harms justify such relief.  *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) ("As with any equity case, the nature of the violation determines the scope of the remedy."); *see also Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) ("[T]he principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of the injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff.").  Here, the nature of the violation is the unconstitutional imposition of the Challenged Requirements in Byrne JAG grants, and the remedy San Francisco seeks is to enjoin DOJ and its unconstitutional acts.  A remedy limited to San Francisco does not stop DOJ's unlawful behavior.

Second, DOJ has conceded that the (unlawful) Challenged Requirements apply identically to jurisdictions across the country—meaning that all jurisdictions will suffer from those unconstitutional requirements in the same way.[14]  And, indeed, the Ninth Circuit recently suggested that a nationwide injunction would be appropriate in this case.  In *San Francisco v. Trump*, the Ninth Circuit vacated the nationwide injunction and remanded to this Court to determine whether the facts justify a nationwide injunction.  But it specifically distinguished Chicago's challenge to the same Byrne JAG conditions at issue in this case on because "the [Byrne JAG] statute 'interconnects' all recipients of Byrne JAG grants."  *Trump*, 2018 WL 3637911, at *13 (citing *City of Chicago*, 888 F.3d at 292-93).  This interconnectedness illustrates that the Byrne JAG conditions affect all grant recipients around the country and that the victims of DOJ's constitutional violations are all Byrne JAG grant recipients.

---

[14] This fact distinguishes this case from *Gill v. Whitford*, 138 S. Ct. 1916 (2018), upon which DOJ primarily relies.  *Gill* involved a citizen challenge to Wisconsin's voter redistricting.  There was no evidence—as there is here—that the redistricting changes would uniformly affect the state's various legislative districts in the same way.  As the Court noted, "a person's right to vote is individual and personal in nature."  *Id.* at 1920 (internal quotation marks omitted).  The Court further acknowledged that "[t]o the extent that the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."  *Id.* at 1920-19.

1   Lastly, to the extent that further facts are helpful to the Court, San Francisco is submitting

2   declarations from five jurisdictions: Central Falls, RI; Montgomery County, MD; Somerville, MA;

3   Seattle, WA; and Denver, CO.  These Declarations illustrate that although each jurisdiction may be

4   awarded and use grant funds differently, unconstitutional grant conditions plague Byrne JAG

5   recipients across the country.  To limit the injunction to San Francisco would mean that DOJ would be

6   enjoined from enforcing nationwide grant conditions differently in just one city; leaving the remaining

7   states and localities applying for Byrne JAG funds across the country in the perverse position of

8   complying with unconstitutional grant terms, or be burdened with the reality of initiating litigation

9   against the Challenged Requirements—a reality that is already wreaking havoc across the country.

10  *See https://www.bja.gov/jag/* (last visited Aug. 14, 2018) (extending deadline in light of pending

11  litigation for FY 2017 Byrne JAG award recipients to accept their awards).   A nationwide injunction

12  will help avoid this untenable outcome.

13  *Equity.*  DOJ argues that nationwide injunctions wreak havoc with our courts: risking

14  inconsistent rulings; encouraging venue shopping; and creating a "one-way-ratchet" or unfair playing

15  field for government defendants.  DOJ Mot, & Opp. at 39.  It is true that courts in different districts

16  and circuits can come to different conclusions on similar legal theories and facts, but this does not

17  justify disregarding a powerful and effective remedy.  Splits of that sort are often addressed by

18  superior appellate courts.  Similarly, the risk of forum shopping is vitiated by Article III.  No litigant

19  can successfully bring a case, let alone be awarded a remedy, if she does not have the requisite injury

20  to render the matter justiciable.  And in terms of fairness to a government defendant facing a

21  nationwide injunction, if the violation operates nationwide, the harms are constitutional in nature, and

22  a broad court order would eliminate the reality of expensive and duplicative litigation.

23  DOJ cites a handful of cases where a particular court, on a particular set of facts, expressed

24  concern over broad nationwide injunctions.  But none of those cases can be read to do anything more

25  than serve as a word of caution that remedies must fit the violations presented.  San Francisco agrees:

26  a nationwide injunction is an exceptional remedy—and one that is warranted here.

## CONCLUSION

27

28  For the above reasons, this Court should grant summary judgment in favor of San Francisco.

Dated: August 15, 2018

                              DENNIS J. HERRERA
                              City Attorney

                          By: */s/ Sara J. Eisenberg*
                              SARA J. EISENBERG
                              Deputy City Attorney

                              Attorneys for Plaintiff
                              CITY AND COUNTY OF SAN FRANCISCO