CHAD A. READLER
Acting Assistant Attorney General
ALEX G. TSE
Acting United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys
Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:      (202) 514-3495
Facsimile:      (217) 492-4888
E-mail:          scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
JEFFERSON B. SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Assistant Attorney
General; and U.S. DEPARTMENT OF JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, <br><br> Plaintiff, <br><br> v. <br><br> JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*, <br><br> Defendants. | No. 3:17-cv-04642-WHO <br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  September 5, 2018 <br> Time: 2:00 p.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.    The Challenged Immigration-Related Byrne JAG
        Conditions Are Lawful ................................................................................................. 2

         A.    The Conditions Are Authorized by Statute and Do Not
              Violate the Separation of Powers ..................................................................... 2

              1.    The Notice and Access Conditions are Lawful .................................. 2

              2.    The Section 1373 Condition Is Lawful ............................................ 5

                   a.    *Murphy* Supports the Legality of Section 1373 .................... 5

                   b.    Section 1373 Is an "Applicable Federal Law" within
                      the Meaning of 34 U.S.C. § 10153(a)(5)(D) ........................ 8

         B.    The Notice, Access, and Section 1373 Conditions Are Consistent
              Consistent with the Spending Clause ........................................................ 10

    II.    The Court Should Enter Judgment for Defendants on Plaintiff's
        Request for a Declaration that its Ordinances Comply with Section 1373 .......... 12

         A.    Plaintiff's Request for a Ruling Regarding Compliance
              with Section 1373 Is Non-Justiciable .......................................................... 12

         B.    Section 1373 Protects, at Minimum, the Contact Information
              and Release Status of Aliens ......................................................................... 12

         C.    San Francisco's Ordinances and Policies Foreclose Providing
              at Least Some of the Information Protected by Section 1373 ..................... 16

    III.    If the Court Grants an Injunction, It Should Be Limited to San Francisco ........... 17

CONCLUSION ....................................................................................................................... 20

i

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1

## TABLE OF AUTHORITIES

2

3 **CASES**

4 *Arizona v. Evans*, 514 U.S. 1 (1995)........................................................................... 18

5 *Arizona v. United States*, 567 U.S. 387 (2012) ............................................................ 15

6 *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) ................................................... 10

7 *Bond v. United States*, 134 S. Ct. 2077 (2014) .............................................................. 9

8 *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003)..................................................... 10

9
*City & Cty. of San Francisco v. Trump*, ___ F.3d ___, 2018 WL 3637911
10    (9th Cir. Aug. 1, 2018)......................................................................................... 18, 19

11 *City of Chicago v. Sessions*, ___ F.Supp.3d ___, 2018 WL 3608564 (N.D. Ill. July 27, 2018).... 19

12 *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018)........................................... 19

13
*Gill v. Whitford*, 138 S. Ct. 1916 (2018)..................................................................... 17
14

15 *Gregory v. Ashcroft*, 501 U.S. 452 (1991) ..................................................................... 9

16 *Hills v. Gautreaux*, 425 U.S. 284 (1976) .................................................................... 18

17 *In re Cohen*, 62 F.2d 249 (2d Cir. 1932)....................................................................... 8

18 *In re North*, 50 F.3d 42 (D.C. Cir. 1995) .................................................................... 14

19 *In re Special April 1977 Grand Jury (Scott)*, 581 F.2d 589 (7th Cir. 1978)................... 8

20
*In re Tax Liabilities of Does*, No. 2:10-MC-00130-MCE, 2011 WL 6302284
21    (E.D. Cal. Dec. 15, 2011) ...................................................................................... 8

22 *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) ................... 12, 13, 14

23 *Leocal v. Ashcroft*, 543 U.S. 1 (2004)......................................................................... 12

24 *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) ................................. 5, 6, 10, 11

25 *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018)....................... 5, 8

26
27 *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)...................................... 5, 6

28

ii

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

*New York v. United States*, 505 U.S. 144 (1992) ........................................................ 12

*Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127 (1947) ........................................ 6

*Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................... 6

*Printz v. United States*, 521 U.S. 898 (1997) ............................................................... 7

*Reno v. Condon*, 528 U.S. 141 (2000) ......................................................................... 7

*Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847 (9th Cir. 2002) ......................... 15

*S. Dakota v. Dole*, 483 U.S. 203 (1987)............................................................. 5, 6, 10

*Stone v. INS*, 514 U.S. 386 (1995) ............................................................................... 3

## STATUTES

8 U.S.C. § 1182 ............................................................................................................. 8

8 U.S.C. § 1226 ............................................................................................................. 8

8 U.S.C. § 1226(c)(1)....................................................................................................13

8 U.S.C. § 1227 ............................................................................................................. 8

8 U.S.C. § 1227(a)(1)....................................................................................................13

8 U.S.C. § 1227(a)(2)....................................................................................................12

8 U.S.C. § 1229b(a)(1)..................................................................................................13

8 U.S.C. § 1229b(a)(2)..................................................................................................13

8 U.S.C. § 1229b(b)(1)..................................................................................................13

8 U.S.C. § 1231 ............................................................................................................. 8

8 U.S.C. § 1231(a)(1)....................................................................................................13

8 U.S.C. § 1231(a)(4)....................................................................................................13

8 U.S.C. § 1305 ............................................................................................................13

8 U.S.C. § 1357 ............................................................................................................. 8

iii

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

8 U.S.C. § 1357(a) ..................................................................................................... 11

8 U.S.C. § 1373 ........................................................................................................... 1

34 U.S.C. § 10102(a)(6) .................................................................................. 1, 2, 3, 5

34 U.S.C. § 10152(a)(1) .............................................................................................. 11

34 U.S.C. § 10152(a)(2) .............................................................................................. 11

34 U.S.C. § 10152(e) ................................................................................................... 3

34 U.S.C. § 10153(a) ................................................................................................... 1

34 U.S.C. § 10153(a)(4) ............................................................................................... 3

34 U.S.C. § 10153(a)(5) ...................................................................................... 2, 5, 10

34 U.S.C. §§ 10156-10157 ........................................................................................... 4

34 U.S.C. § 10251(a)(1) ............................................................................................. 11

42 U.S.C. § 5779(a) ..................................................................................................... 7

Judiciary Act of 1789, 1 Cong. Ch. 20, 1 Stat. 73 ...................................................... 8

Crime Control Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 .................................... 5

DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) ........................ 2, 3

S.F., CAL. ADMIN. CODE ch. 12H, § 12H.2(c) ........................................................ 17

S.F., CAL. ADMIN. CODE ch. 12I, § 12I.3(d) .......................................................... 17

**REGULATIONS**

8 C.F.R. § 214.1 ........................................................................................................ 13

8 C.F.R. § 287.5(a) .................................................................................................... 11

28 C.F.R. § 66.12 ........................................................................................................ 4

**OTHER AUTHORITIES**

H.R. Conf. Rep. 104-725 (July 30, 1996) ...................................................... 13, 14, 15

iv

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1

H.R. Rep. No. 109-233 (2005)................................................................................................... 1, 4

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

**INTRODUCTION**

Law enforcement in this country is a cooperative endeavor. Unlawful acts often implicate the jurisdiction of more than one agency, and local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety. Not surprisingly, then, federal law often contemplates, and is premised upon, such coordination. This is true for the Immigration and Nationality Act ("INA"), and it is true for the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"). Both statutes explicitly contemplate and encourage effective law enforcement by promoting coordination between the Federal Government and local, state, and tribal governments. Unfortunately, San Francisco has in recent years adopted policies of non-cooperation with respect to law enforcement involving aliens who have committed crimes. And, in this action, the City seeks to further that policy by claiming that the Federal Government cannot condition its own law enforcement grants on such cooperation – even when the express statutory purpose of that funding is to promote cooperation.

Grant award conditions are a traditional aspect of participation in the Byrne JAG Program, and there is no legal infirmity in the decision of the U.S. Department of Justice ("USDOJ") to impose the three Byrne JAG conditions that the plaintiff challenges. To further information-sharing, those conditions require grantees to comply with 8 U.S.C. § 1373, to give federal immigration authorities access to plaintiff's detention facilities to meet with aliens, and to give those authorities "as much advance notice as practicable" before releasing an alien. As a threshold matter, San Francisco does not challenge final agency action so as to bring a proper challenge to the imposition of the conditions. Even setting aside that objection, the conditions are consistent not only with the statutes governing the Byrne JAG Program, *see* 34 U.S.C. § 10102(a)(6), 10153(a), but also with legislative history confirming that the Attorney General is empowered to "place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Further, there is no merit to plaintiff's claim that these conditions violate limitations on the Spending Clause. The conditions are clearly set forth with "Rules of Construction" in grant award documents and are closely related to the prevention of crime under the Byrne JAG Program. And

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1  finally, in relation to plaintiff's claim for a declaration that its ordinances do not violate

2  Section 1373, San Francisco openly admits that it prohibits employees from providing the contact

3  information and release status of alien detainees to federal immigration authorities.  The only issue

4  on this claim, therefore, is the scope of Section 1373, and the language and context of the statute

5  establish beyond doubt that it encompasses at least contact information and release status.

6      Accordingly, defendants' motion for summary judgment should be granted.  And, if the

7  Court were to enter any injunctive relief, it should be limited to the named plaintiff, which does not

8  represent a class of potential grantees – disparate jurisdictions that, in any event, would not be

9  similarly situated.

10                          **ARGUMENT**

11  **I.    The Challenged Immigration-Related Byrne JAG Conditions Are Lawful**

12      **A.    The Conditions Are Authorized by Statute and Do Not**
            **Violate the Separation of Powers**
13

14          **1.    The Notice and Access Conditions are Lawful**

15      San Francisco's first claim, that the access and notice conditions violate the separation of

16  powers, is premised on an incorrect view that Congress has not authorized the Department of

17  Justice to impose these conditions.  SF Opp. at 2-6 (Dkt. No. 119).  These conditions fall squarely

18  within the Department's multi-faceted authority – expressly granted by Congress – to "plac[e]

19  special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for

20  formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal

21  laws." *Id.* § 10153(a)(5)(D).  The City's counter-arguments are unpersuasive.

22      First, San Francisco contends that 34 U.S.C. § 10102(a)(6) is not itself a grant of

23  authority, but rather merely "describes powers the [Assistant Attorney General ("AAG")] may

24  exercise when vested in her by some independent source of authority."  SF Opp. at 3.  As

25  discussed in defendants' opening memorandum, however, the authorities to "plac[e] special

26  conditions on all grants, and [to] determin[e] priority purposes for formula grants" were added as

27  part of the same legislation that created the Byrne JAG Program.  *See* DOJ Reauthorization Act of

28

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960 (2006) ("Reauthorization Act") (adding language to subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program).  San Francisco makes no attempt to explain why Congress would have added that language, if not to confer the authority described.  Instead, the City's interpretation of the amendment would render wholly superfluous *both* the "special condition" and the "priority purpose" powers – each of which, in order to be given effect, must confer independent and meaningful authority.  *Cf. Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect.").[1]

Second and relatedly, plaintiff argues that "[i]n DOJ's view, there would be no need for the [other] specific grants of authority in the statute itself, such as the authority to condition grants on submission of certain 'data, records, and information' . . . or on compliance with a 'program assessment component' . . . because the AG already possesses these broader powers."  SF Opp. at 3-4 (quoting 34 U.S.C. §§ 10153(a)(4), 10152(e)).  But as plaintiff itself acknowledges – in the very next sentence – "there is nothing unusual about a statute describing the [authority] of a particular federal officer in ways that are arguably redundant of other statutory provisions."  *Id.* at 4.  Thus, according to plaintiff's own argument, the fact that "the more specific" 34 U.S.C. §§ 10153(a)(4) and 10152(e) may be "arguably unnecessary" in light of the broad authority

---

[1] The full text of 34 U.S.C. § 10102(a)(6) authorizes the AAG to "exercise such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter* or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*." 34 U.S.C. § 10102(a)(6) (emphasis added).  In a vein similar to the above-described argument, San Francisco further posits that Defendants "ask[] this Court to read 'including' to mean 'and' or 'in addition to.'"  SF Opp. at 3.  This novel argument is meritless:  the plain language of the provision identifies – and thus establishes – "placing special conditions on all grants, and determining priority purposes for formula grants" *as examples of* authorities that are "vested in the Assistant Attorney General" pursuant to the statute. *Id.* at 2.  Further, for all the reasons set forth above and in defendants' opening memorandum, this language "specific[ally] . . . authoriz[es] the particular delegation at issue," SF Opp. at 6, just as do the other examples cited by defendants of the commonplace authority delegated to Executive agencies to set the terms and conditions of federal grants, *see* Defs' Mem. at 12 n.8 (Dkt. No. 113).

3

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1    conveyed by Section 10102(a)(6) "cannot" render the former "nugatory." *Id.*

2          Third, San Francisco argues that the term "special conditions," as used in Section

3    10102(a)(6), is necessarily limited to certain accountability measures that may only be imposed

4    on "high risk" grantees, because a concededly *repealed* regulation, 28 C.F.R. § 66.12, so defined

5    that term at the time of the passage of the Reauthorization Act.  But the statutory "special

6    conditions" authority contains no language referencing, incorporating, or otherwise limiting its

7    application to the former regulation.  On the contrary, the legislative history contains the same

8    broad language as the statute, explaining that the new provision "allows the Assistant Attorney

9    General to place special conditions on all grants and to determine priority purposes for formula

10   grants."  H.R. Rep. No. 109-233, at 101 (2005).  And, in any event, plaintiff's reading leaves

11   unexplained the AAG's complementary power to "determin[e] priority purposes" for formula

12   grants like those in the Byrne JAG Program.

13          Finally, without offering much in the way of specific argument, San Francisco intimates

14   that the Byrne JAG Program's "structure as a formula grant," "the limitations on [USDOJ's]

15   discretion to withhold funds," and "the relationship between the funding and specific federal

16   policy objectives" somehow counsel in favor of the City's position.  SF Opp. at 4-5.  The first two

17   items, however, confuse conditions placed on grant awards – such as the conditions at issue here

18   – with the *formula* for allocating funds to eligible recipients.  Although deviation from the statu-

19   tory formula for allocating funds among eligible jurisdictions is not permitted except in limited

20   circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of a jurisdiction's award under that

21   formula is unrelated to conditions on spending under the award.  And the notice and access award

22   conditions do less to mandate a "one size fits all" approach than, for example, a Byrne JAG

23   condition that for years prohibited using award funds to purchase items on a Prohibited Expen-

24   diture List that includes various types of equipment and weapons that some law enforcement

25   agencies might otherwise have wanted to acquire.  *See* FY 2016 Byrne JAG Award to San

26   Francisco (Dkt. No. 115) ¶ 49.  Finally, while it is unclear what San Francisco means by "the

27   relationship between the funding and specific federal policy objectives," SF Opp. at 4-5, for the

28

4

reasons set forth at length both in defendants' opening memorandum, *see* Defs' Mem. at 21-23 (Dkt. No. 113), and below, there is a close relationship between criminal immigration enforcement, which the challenged conditions promote, and "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government" that the Crime Control Act of 1968 (of which the Byrne JAG Program authorizing statute is a part) was expressly enacted to promote. Pub. L. No. 90-351, 82 Stat. 197. Thus, the conditions easily satisfy the requirement under the Spending Clause that they bear at least "some relationship" to the purposes of the Byrne JAG Program. *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see infra* text at 11-12.

### 2.     The Section 1373 Condition is Lawful

#### a.     *Murphy* Supports the Legality of Section 1373

All of the foregoing applies to the Section 1373 condition as well; it is supported by the AAG's authority to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and, especially, to ensure that grantees "comply with . . . all other applicable Federal laws." *Id.* § 10153(a)(5)(D). Plaintiff advances a further argument with respect to the Section 1373 condition only. Namely, citing the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), San Francisco argues that Section 1373 is facially unconstitutional under the Tenth Amendment and, *a fortiori*, cannot be "applicable" to the Byrne JAG Program. SF Opp. at 6-9. That is incorrect.

As a preliminary matter, plaintiff's First Amended Complaint does not plead a claim that Section 1373 violates the Tenth Amendment or seek a declaration to that effect. Further, it is black-letter law that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987); *see, e.g.*, *Nat'l Fed'n of Indep. Bus. v.*

5

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1   *Sebelius*, 567 U.S. 519, 537 (2012) [hereinafter *NFIB*].[2]  Thus, the Tenth Amendment does not

2   constrain the conditions that the Federal Government may impose on grants, and the only

3   pertinent question in that regard is whether the conditions satisfy the strictures of the Spending

4   Clause – which, for the reasons set forth in Part I.B., *infra*, it incontrovertibly does.  However,

5   even assuming *arguendo* that plaintiff could overcome these initial deficiencies, to the extent the

6   City could nevertheless proceed with an attack on Section 1373 as an independent statutory

7   mandate, any such claim would be without merit.

8       Plaintiff advances two closely related arguments regarding Section 1373's comportment

9   with the Tenth Amendment – first, that the statute "supplants local control of local officers," and

10  second, that an information-access law like Section 1373 is not "categorically immune from

11  anticommandeering principles."  SF Opp. at 8.  Neither argument prevails, because there can be

12  no dispute that federal statutes relating to immigration – including the gathering of information

13  protected by Section 1373 – is exclusively concerned with regulating private actors, namely

14  aliens whose presence violates federal law.  The information that is subject to Section 1373 is

15

16      [2] Plaintiff argues that if defendants were correct that the Spending Clause, not the Tenth

17  Amendment, provides the proper rubric for this analysis, "'then Congress could pass blatantly
    unconstitutional statutes – including statutes already struck down as constitutional by courts – but

18  essentially require states and localities to adhere to those statutes by tying a 'certification' of
    compliance with those conditions to federal grants.'"  SF Opp. at 7 (quoting *Philadelphia v.*

19  *Sessions*, 309 F. Supp. 3d 289, 329 (E.D. Pa. 2018)).  But this argument (and, respectfully, the
    holding in *Philadelphia*) ignores the well-established rule that Congress may not use the

20  Spending Clause to evade an "independent [constitutional] bar to the conditional grant of federal
    funds."  *Dole*, 483 U.S. at 208; *see also*, *e.g.*, *Mayweathers*, 314 F.3d at 1066 (noting that "other

21  constitutional provisions may provide independent grounds for invalidating an otherwise proper
    exercise of Congress's Spending Clause authority").

22
    However, while this rule provides a bulwark against the imposition of unconstitutional

23  conditions, in the context of the Tenth Amendment in particular, even where "the United States is
    not concerned with and has no power to regulate local political activities as such of state officials,

24  it does have power to fix the terms upon which its money allotments to states shall be disbursed."
    *Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127, 143 (1947); *see NFIB*, 567 U.S. at 537

25  (noting that the federal government "may offer funds to the States, and may condition those offers
    on compliance with specified conditions.  These offers may well induce the States to adopt

26  policies that the Federal Government itself could not impose.").  Nevertheless, to the extent the
    Court reaches the issue, Section 1373 satisfies the Tenth Amendment.

27

28

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1   information regarding those private actors that is needed for federal immigration authorities to

2   perform their regulatory function against such private actors.  And, contrary to San Francisco's

3   assertions, the fact that this information is in the hands of a state or local government does not

4   immunize it, under the Tenth Amendment, from being accessed by the Federal Government when

5   necessary for federal enforcement or regulation.

6           As the Supreme Court has recognized, the Constitution does not prohibit federal

7   enactments that "do[] not require the States in their sovereign capacity to regulate their own

8   citizens," but instead "regulate[] the States as the owners of data bases."  *Reno v. Condon*, 528

9   U.S. 141, 151 (2000).  Thus, *Reno* held that a provision that "restricts the States' ability to

10  disclose a driver's personal information without the driver's consent," *id.* at 144, was consistent

11  with the Tenth Amendment even if the regulation would "require time and effort on the part of

12  state employees," or the State had acquired the relevant information in its capacity as a regulator

13  of drivers.  *Id.* at 150.  Similarly, the Court in *Printz v. United States*, 521 U.S. 898, 918 (1997),

14  recognized that statutes "which require only the provision of information to the Federal

15  Government[] do not involve . . . the forced participation of the States' executive in the actual

16  administration of a federal program."  *Id.* at 918.[3]  Accordingly, the Court's key Tenth

17  Amendment cases reflect the different considerations that apply when the Federal Government

18  needs access to information to perform its functions, and *Murphy* – which has nothing to do with

19  information access – does not disturb this analysis or the basic principles that underlie it.

20          Indeed, it would be an extraordinary departure from historical practice to immunize states

21  from this responsibility to provide information relevant to the federal regulation of individuals.

22  Congress frequently calls on States to share relevant information, and these enactments have

23  never been drawn into question.  It makes sense that access to information works differently:  for

24  example, it is not controversial that courts have the authority to obtain information relevant to the

25

26          [3] Justice O'Connor further explained that Tenth Amendment jurisprudence is not properly
    read to invalidate information sharing requirements, such as the requirement for "state and local
27  law enforcement agencies to report cases of missing children to the Department of Justice."
    *Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).

28
                                          7

controversies before them, that this authority may extend to state officials, and that this is not treated as a regulation of those officials. *See* Judiciary Act of 1789, §§ 13, 15, 1 Cong. Ch. 20, 1 Stat. 73  (providing that "all . . . said courts . . . shall have the power . . . to require the parties to produce books or writings in their possession or power"); *cf. In re Special April 1977 Grand Jury (Scott)*, 581 F.2d 589, 592 (7th Cir. 1978) ("Nothing in the United States Constitution immunizes any exclusive domain of the state . . . from the reach of a federal grand jury.").  This is also true with respect to administrative processes that require information in state hands. *See In re Tax Liabilities of Does*, No. 2:10-MC-00130-MCE, 2011 WL 6302284, at *4 (E.D. Cal. Dec. 15, 2011) ("If the Tenth Amendment cannot bar a grand jury subpoena, it cannot bar an IRS summons").  These cases involving subpoena authority raise different issues, but there is one important takeaway:  obtaining information relevant to a regulatory function is not the same as regulating the party with that information, just as a court subpoena for information would never be thought of as regulation of the State qua State.  Here, Section 1373 protects access to information that is essential to the regulation of aliens and to initiating the removal process. *See* 8 U.S.C. §§ 1182, 1226, 1227, 1231, 1357.

Thus, this case cannot properly be analogized to *Murphy*.  The statute at issue in *Murphy* – the Professional Amateur Sports Protection Act of 1992 ("PASPA") – made it "unlawful" for States to authorize any "betting, gambling, or wagering scheme based . . . on competitive sporting events." 138 S. Ct. at 1470.  The Court found that PASPA was a clear effort to avoid accounta-bility by requiring the States themselves to regulate sports betting in the manner Congress wished. *See id.* at 1477.  Section 1373, on the other hand, is an information-access component of a regulatory scheme – immigration removal – over which the Federal Government retains full responsibility and accountability for its actions.

### b.  Section 1373 Is an "Applicable Federal Law" within the Meaning of 34 U.S.C. § 10153(a)(5)(D)

Plaintiff further argues that even if Section 1373 is constitutional, defendants may not require compliance with the statute as a condition of Byrne JAG funding, because, according to the City, the statutory authority to require compliance with "all other applicable Federal laws"

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

"indicates a limited meaning of 'applicable' that encompasses only those laws that apply to grant recipients in that capacity" and Section 1373 is not such a law.  SF Opp. at 9.  The City raised no such challenge when the Section 1373 condition was first imposed on the City in the FY 2016 grant cycle, and the challenge is groundless now.

Section 10153(a)(5)(D) of Title 34, U.S. Code, is properly read to refer to the corpus of federal laws that independently apply to Byrne JAG grantees – recognizing that such grantees are state and local jurisdictions (not private individuals and entities) as to whom some federal laws are inapplicable.  If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that San Francisco suggests, it could have done so expressly without requiring resort to the attempts at straightjacketed statutory interpretation that the City offers.  Instead, the prefatory language "all other" in Section 10153(a)(5)(D) connotes that "applicable Federal laws" has a broader reach than the artificial limit that plaintiff ascribes.  The City offers no meaningful response to case law demonstrating that courts repeatedly have broadly interpreted the reach of similar statutory language.  *See* Defs' Mem. at 17-18.

San Francisco ventures even further astray in suggesting that defendants' reading of Section 10153(a)(5)(D) implicates "federalism principles."  SF Opp. at 9.  Whereas the condition at issue here is an exercise of the Spending Clause power, the City cites cases addressing efforts to directly regulate state and local activities.  *See Gregory v. Ashcroft*, 501 U.S. 452, 457-64 (1991) (absent a clear statement a federal statute would not be construed to invalidate state mandatory retirement age for state judges); *Bond v. United States*, 134 S. Ct. 2077, 2091 (2014) (federal law criminalizing the knowing possession or use of chemical weapons could not permissibly be read to reach "traditionally local criminal conduct").  A funding condition requiring compliance with an existing federal law that already applies to a State or locality does not alter the federal-state framework – especially because the State or locality is entirely free to refuse the funding rather than accept the condition.  Thus, independent of the authority conferred in Section 10102(a)(6), USDOJ has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).  This authority

plainly permits the defendants to impose the Section 1373 condition upon providing notice that Section 1373 is an "applicable" federal law.

**B.      The Notice, Access, and Section 1373 Conditions Are Consistent with the Spending Clause**

In relation to plaintiff's Spending Clause claim, the challenged conditions enable potential Byrne JAG applicants to "exercise their choice" to participate in the program "knowingly, cognizant of the consequences of their participation," *Dole*, 483 U.S. at 207 (citations omitted), and the conditions bear much more than "some relationship" to the purposes of the program, *Mayweathers*, 314 F.3d at 1067.  Plaintiff makes only a half-hearted argument in response.  SF Opp. at 10-12. On the first question – whether the conditions are such that potential applicants can choose to participate "cognizant of the consequences of their participation" – plaintiff attacks the applicability of *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003), and *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), which held, respectively, that "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear," 348 F.3d at 607, and that "[o]nce Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper," 391 F.3d at 1306.  Plaintiff argues that those decisions "stand for nothing of the sort" here because they "involved conditions enacted by Congress, not ones added by an agency."  SF Opp. at 11.  But the Spending Clause analysis of grant conditions does not depend on whether the subject conditions were imposed by Congress in the first instance or by a federal agency based on statutory authority.  In either case, the conditions satisfy this aspect of the test if potential applicants can "exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  The access and notice conditions clearly require grant recipients to allow federal immigration officers to visit suspected deportable aliens in custody and to provide reasonable advance notice of any releases from custody, and the "existence" of the Section 1373 condition is clear and unambiguous.

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

In relation to the germaneness element of Spending Clause analysis, plaintiff all but ignores the Ninth Circuit's controlling decision in *Mayweathers*, which held that the relationship between grant conditions and the grant program under the Spending Clause is a "low-threshold" inquiry that "is a far cry . . . from an exacting standard for relatedness." 314 F.3d at 1067. The conditions challenged here easily meet that threshold. Plaintiff argues that the conditions do not "further the enforcement of local criminal laws," SF Opp. at 12, but plaintiff's characterization of the Byrne JAG Program is much too narrow. Congress ordained that the program should "make grants to States and units of local government . . . for criminal justice" (a very broadly defined term under the statute; *see* 34 U.S.C. § 10251(a)(1)), *id.* § 10152(a)(1), and, among other things, should aid crime *prevention* in addition to criminal *enforcement*. *Id.* § 10152(a)(1)(C) (directing that Byrne JAG funds may be used for crime "[p]revention and education programs."). In fact, Congress authorized the use of Byrne JAG funds for a host of other aspects of criminal justice, including "drug treatment . . . programs", "mental health . . . programs", and "community corrections programs." *Id.* §§ 10152(a)(1)(A-H). This is *in addition to* funding for "[l]aw enforcement programs." *Id.* § 10152(a)(1)(A); *see id.* § 10152(a)(2).

One reasonable way to prevent future crime is to remove deportable aliens who have committed past crimes, and the notice and access conditions aid federal immigration authorities in accomplishing that task. The access condition allows immigration authorities to interview suspected deportable aliens – who are already being held on state or local criminal charges – about their removability and their criminal backgrounds. *Cf.* 8 U.S.C. § 1357(a) (stating that federal immigration authorities "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); 8 C.F.R. § 287.5(a) (stating that authority in 8 U.S.C. § 1357(a) may be exercised "anywhere in or outside the United States"). The notice condition allows immigration authorities to take removable aliens into safe, controlled custody after their release from criminal custody. And the Section 1373 condition enables law enforcement personnel to identify criminal aliens within their custody and to determine the aliens' removability. Considering the numerous provisions of the INA that

11

1  directly relate to criminal law (*see, e.g.,* 8 U.S.C. § 1227(a)(2) (delineating list of crimes that

2  render an alien immediately deportable)), a reasonable, rational relationship exists between the

3  challenged conditions and the Byrne JAG Program's goal of preventing crime.  This easily satis-

4  fies the nexus requirement of the Spending Clause, as the conditions "bear some relationship to

5  the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).

6  **II.    The Court Should Enter Judgment for Defendants on Plaintiff's Request**
   **for a Declaration that its Ordinances Comply with Section 1373**

7          **A.    Plaintiff's Request for a Ruling Regarding Compliance**
               **with Section 1373 Is Non-Justiciable**

8

9          Plaintiff's request for a declaration that Chapters 12H and 12I comply with Section 1373 is

10  constitutionally non-justiciable. Although OJP has expressed a concern that the Values Act may

11  violate Section 1373, the Office has not reached a final administrative determination on that subject

12  and continues to evaluate the relevant evidence so that its final agency determination can include a

13  record with all identifiable bases for the decision.

14         The City's only response to this problem is to note that the Court rejected standing and

15  ripeness arguments in ruling on defendants' motion to dismiss.  SF Opp. at 23; Dkt. No. 78.

16  Defendants respect the Court's prior holding, but hope to convince the Court otherwise, and, in any

17  event, seek to preserve their position to the contrary.

18         **B.    Section 1373 Protects, at Minimum, the Contact Information**
               **and Release Status of Aliens**

19         Turning to the merits, Section 1373 forbids a state or local government from prohibiting the

20  exchange of "information *regarding*" an individual's immigration status, not merely the individ-

21  ual's immigration status.  The courts "must give effect to every word of a statute wherever

22  possible," *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004), and the use of "regarding" and similar words

23  in a statute "generally has a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.

24  Ct. 1752, 1760 (2018) [hereinafter *Appling*].  "Information regarding" immigration status under

25  the INA necessarily includes one's address, both home and work, which is crucial to the

26  fulfillment of several federal responsibilities, including determining whether an alien has kept

27  federal authorities informed of any change of address and whether an alien has engaged in

28                                                    12
   Defs' Reply Summ. Judgment
   No. 3:17-cv-04642-WHO

unauthorized employment.  8 U.S.C. §§ 1227(a)(1)(C), 1229b(a)(1), (a)(2), (b)(1)(A), 1305; 8 C.F.R. § 214.1; *see* H.R. Conf. Rep. 104-725, at 383 (July 30, 1996) (stating that language of Section 1373 was intended to enable state and local officials to "communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens").  Additionally, since federal authorities generally cannot remove an alien from the United States until after release from state or local custody, the timing of that release is necessarily included within "information regarding" immigration status.  8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4); *see id.* § 1226(c)(1).[4]  Therefore, Section 1373 protects, at minimum, the contact information and release status of aliens.

In response, plaintiff argues that "information regarding . . . citizenship or immigration status" under Section 1373 encompasses only a statement, in some form, of an individual's citizenship of immigration status, such as "an individual's self-report about their immigration status, a third party's statement about an individual's immigration status, or copies of immigration or visa documents."  SF Opp. at 18.  As noted in defendants' opening memorandum, however, such statements would merely declare an individual's citizenship or immigration status, without more, in different vehicles.  In so arguing, plaintiff attempts to distinguish the Supreme Court's decision in *Appling*.  SF Opp. at 20-21.  The City argues that its interpretation of Section 1373 "does not read 'regarding' out of the statute," unlike the position that the Court rejected in *Appling*, which the Court held would have read the word "respecting" out of the statute involved there.  *Id.* at 21; *see* 138 S. Ct. at 1761.  But the Court in *Appling* expressly *rejected* a contention that the phrase "a statement respecting [a] debtor's . . . financial condition" in the Bankruptcy Code meant only a statement "expressing the balance of a debtor's assets and liabilities," because "there are several ways in which [Congress] could have so specified, e.g., 'statement disclosing the debtor's financial condition' or 'statement of the debtor's financial condition.'"  138 S. Ct. at 1761.  Similarly, if Congress had intended to limit Section 1373 as plaintiff contends, the statute would

---

[4] Plaintiff argues that defendants cite no authority for the proposition that Congress enacted Section 1373 to enable federal immigration authorities to carry out their responsibility to remove criminal aliens.  SF Opp. at 21-22.  Plaintiff does not, however, suggest any other plausible purpose for the statute.

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1  say "a statement disclosing an individual's citizenship or immigration status" or "a statement of an

2  individual's citizenship or immigration status" rather than "*information regarding* citizenship or

3  immigration status."  Instead, the Court held in *Appling*, "a statement *respecting* [a] debtor's . . .

4  financial condition" under the Bankruptcy Code is one that has "*a direct relation to or impact* on

5  the debtor's overall financial status." *Id.* (emphasis added).  Applying that rule here, an alien's

6  contact information and release status have "a direct relation to or impact" on the individual's status

7  under the INA.

8        Plaintiff also attacks defendants' reliance on the legislative history quoted above, to the

9  effect that the language of Section 1373 was intended to enable state and local officials to

10  "communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens."

11  H.R. Conf. Rep. 104-725, at 383; *see* SF Opp. at 22.  The City quotes the immediately preceding

12  sentence in the conference report, which says, "The conference agreement provides that no State or

13  local government entity shall prohibit, or in any way restrict, any entity or official from sending to

14  or receiving from the INS information regarding the immigration status of an alien or the presence,

15  whereabouts, or activities of illegal aliens."  Plaintiff argues that the committee's use of "or" meant

16  that "the immigration status of an alien" does not encompass "the presence, whereabouts, or

17  activities" of an alien. SF Opp. at 22.  However, "[a] congressional report, even a conference

18  report, is not legislation," *In re North*, 50 F.3d 42, 46 (D.C. Cir. 1995), and should not be read

19  expecting the precision of legislation.  Also, the bill to which Conference Report 104-725 relates

20  contained essentially the same language that was enacted as Section 1373:  "Notwithstanding any

21  other provision of Federal, State, or local law, no State or local government entity may be

22  prohibited, or in any way restricted, from sending to or receiving from the Immigration and

23  Naturalization Service information regarding the immigration status, lawful or unlawful, of an

24  alien in the United States."  H.R. Conf. Rep. 104-725, at 178.  And the entire passage from the

25  conference report reads as follows:

26           The conference agreement provides that no State or local government entity
        shall prohibit, or in any way restrict, any entity or official from sending to or
27        receiving from the INS information regarding the immigration status of an alien or

28                                                    14

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

the presence, whereabouts, or activities of illegal aliens.  It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.

> The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens.  This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS.  The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

*Id*. at 383 (emphasis added).  Therefore, the conference committee plainly intended the language now contained in the statute to encompass "the presence, whereabouts, or activities of illegal aliens."

Next, plaintiff cites the Court of Appeals' decision in *Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847 (9th Cir. 2002), for the proposition that Section 1373 "must be read more narrowly to avoid encroaching on an area of traditional state regulation "unless that was the clear and manifest purpose of Congress.'"  SF Opp. at 18 (quoting *Roach*, 298 F.3d at 850).  The City contends that "[t]he relevant inquiry is whether the law at issue *intrudes* on an area of traditional state control," and that Section 1373 (as understood by defendants) "intrudes on state and local jurisdictions' ability to direct their employees, to control employees' communications, and to set policies that promote public health, safety, and the general welfare."  SF Opp. at 19 n.13.  Plaintiff fails to acknowledge, however, that its own ordinances intrude upon an area of traditional – and constitutional – *federal* control:  the treatment and conduct of aliens in the United States.  When a local government exercises its authority in relation to aliens, the matter necessarily and fundamentally involves the Federal Government.  For example, although the INA allows state and local governments to punish criminal conduct by aliens before imposing immigration-related consequences under the INA, the treatment of foreign nationals in the United States is quintessentially a federal concern – so that Congress could have preempted criminal punishment in favor of immigration consequences.  *See Arizona v. United States*, 567 U.S. 387, 394 (2012).

15

1   Finally, the City argues that reading Section 1373 as applying to more than mere citizenship

2   or immigration status would necessarily bring unlimited categories of information within the scope

3   of the statute, including "health records, family status, and financial information."  SF Opp. at 19.

4   In the context of this case, however, the Court need not adjudicate the complete scope of Section

5   1373, and plaintiff lacks standing to seek a ruling on that subject.[5]  The City seeks a ruling that its

6   ordinances comply with Section 1373; thus, the Court need only determine that those ordinances

7   prohibit the exchange of at least some of the information covered by the federal statute.  A ruling on

8   the outer reaches of Section 1373 would be a dictum.

9   **C.     San Francisco's Ordinances and Policies Foreclose Providing
         at Least Some of the Information Protected by Section 1373**

10

11   In relation to whether San Francisco's ordinances violate Section 1373, plaintiff openly

12   admits that "San Francisco employees are prohibited from sharing individuals' contact

13   information and release dates with [U.S. Immigration and Customs Enforcement ("ICE")]."  SF

14   Opp. at 13.  That strict prohibition is reflected in several documents that the City produced in

15   discovery in this action.  *See* Declaration of W. Scott Simpson ¶¶ 2, 3, 6, 7 & Ex. A, B, E, F (Dkt

16   No. 114-4).  Thus, since Section 1373 necessarily encompasses that information, the Court should

17   deny the City's request for a declaration that its ordinances do not violate the federal statute.

18   San Francisco's effort to prevent its employees from helping federal immigration

19   authorities "at all" is also reflected in the Deputy City Attorney's advice that employees "are *not*

20   required to show ICE agents identification of any kind, including documents that prove citizen-

21   ship or immigration status . . . are *not* required to answer ICE agents' questions . . . are *not*

22   required to speak with ICE agents at all [and] may tell ICE agents that you choose not to speak

23   with them, and then say nothing else."  *Id*. ¶ 9 & Ex. H.  Plaintiff asserts that the Deputy City

24   Attorney's advice merely relays the "clear message" that "whether to speak with ICE agents is a

25   choice."  SF Opp. at 17.  But the memorandum makes extremely clear what "choice" the City

26   [5] In any event, the Declaration of Francisco Madrigal submitted with defendants' motion
    for summary judgment stated that U.S. Immigration and Customs Enforcement "rarely, if ever,"
27   uses an individual's medical history, educational history, or financial history.  Dkt. No. 113-1,
    ¶ 9.

28                                                        16

    Defs' Reply Summ. Judgment
    No. 3:17-cv-04642-WHO

Attorney's office wants employees to make.

Further, the *success* of San Francisco's effort to prevent its employees from helping federal immigration authorities is reflected in its record.  Plaintiff ignores the fact that from at least January 1, 2016, through July 21, 2018, the City has rejected each and every request for notification of release status from immigration authorities, including requests regarding detainees charged with murder and rape.  *See* Madrigal Decl. ¶ 10; Simpson Decl. ¶ 8 & Ex. G; Unopposed Admin. Mot. to File a Doc. Under Seal, Attachment 3 (Dkt. No. 111).  Although the City's ordinances purport to permit providing notification of release status under certain circumstances, S.F., CAL., ADMIN. CODE ch. 12H, § 12H.2(c); *id*. ch. 12I, § 12I.3(d), the evidence indicates that those circumstances are never found to exist.

## III.   If the Court Grants an Injunction, It Should Be Limited to San Francisco

Lastly, San Francisco continues to overreach by seeking a nationwide injunction to benefit parties that are not before this Court.  But plaintiff has failed to explain why a nationwide injunction – as opposed to an injunction limited to the parties – is necessary to afford appropriate relief.  Plaintiff has not, for example, shown that any funds to which it is supposedly entitled are at risk of transfer to another jurisdiction.  As the Supreme Court noted this past term, "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appear-ing before it."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  This Court should not attempt to regulate the relationship between the United States and non-parties, many of which do not object to the conditions challenged here.

San Francisco has clearly chosen one set of public policies regarding immigration.  Yet the City's request for nationwide relief ignores the reality that other jurisdictions are free to choose vastly different policies.  Many jurisdictions have chosen policies that closely mirror the United States' immigration enforcement priorities, and as such, would have no objection to the chal-lenged conditions.  At the same time, still other jurisdictions have chosen policies that are a mixture of opposition and cooperation to federal immigration enforcement priorities. Considering the gravity of any constitutional challenge to federal action, each of these different

17

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1    choices by different jurisdictions must be evaluated on its own merits.  A one-size-fits-all

2    injunction issued by a single district court is inappropriate.

3         Indeed, this Court has already recognized that different jurisdictions have different

4    policies, which can lead to different legal results.  When the City of Los Angeles sought to

5    intervene in this action, the Court denied the motion, noting that Los Angeles's "policies are

6    different than those of San Francisco."  Dkt. No. 39 at 2.  The Court went on to say that the same

7    "would be true for virtually every jurisdiction," and that while the "legal analyses for similar

8    cases will overlap, they may not be identical because of the difference in the policies and

9    practices of each governmental entity."  *Id.*  The Court also noted that "established forum and

10   venue rules [will] result in different lower courts deciding similar legal issues, sometimes with

11   divergent results."  *Id.* at 2.  Those different rulings, however, "*are appropriately reconciled by*

12   *higher courts.*"  *Id.* (emphasis added).  Here, the potential for "divergent results" counsels against

13   issuing a nationwide injunction settling the propriety of the challenged grant conditions in relation

14   to all States and localities throughout the country.  Percolation of legal issues across the country is

15   proper, necessary, and helpful for the federal courts to grapple with complicated legal issues.  *See*

16   *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("We have in many

17   instances recognized that when frontier legal problems are presented, periods of 'percolation' in,

18   and diverse opinions from, state and federal appellate courts may yield a better informed and

19   more enduring final pronouncement by this Court.").

20        Thus, both the Supreme Court and the Ninth Circuit have warned about the dangers of

21   nationwide injunctions.  "Once a constitutional violation is found, a federal court is required to

22   tailor the scope of the remedy to fit the nature and extent of the constitutional violation."  *Hills v.*

23   *Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations omitted).  This is so because "broad injunc-

24   tions may stymie novel legal challenges and robust debate."  *City & Cty. of San Francisco v.*

25   *Trump*, ___ F.3d ___, 2018 WL 3637911, at *12 (9th Cir. Aug. 1, 2018).[6]

26   _____

27        [6] Plaintiff quotes part of the Ninth Circuit's decision in *San Francisco v. Trump* to the
     effect that "the [Byrne JAG] statute 'interconnects' all recipients of Byrne JAG grants," implying
     that the Ninth Circuit has approved entry of a nationwide injunction in the Byrne JAG context.

28                                                        18

     Defs' Reply Summ. Judgment
     No. 3:17-cv-04642-WHO

Further, events in the current Byrne JAG litigation in Chicago reflect the inadvisability of a nationwide injunction.  The district court in that case initially entered a preliminary injunction with nationwide scope, but the U.S. Court of Appeals for the Seventh Circuit stayed the injunction as to all parties outside Chicago.  *See City of Chicago v. Sessions*, No. 17-cv-2991 (7th Cir. June 26, 2018) (Dkt. No. 134) ("A majority of the judges participating in the en banc rehearing of this case have voted to grant the stay requested by the Attorney General.").  And later, in entering a permanent injunction, the district court sua sponte chose to stay its nationwide application pending appeal.  *See City of Chicago v. Sessions*, ___ F.Supp.3d ___, 2018 WL 3608564, at *18 (N. D. Ill. July 27, 2018).  The district court justified the stay by noting that the "scope of the injunction involves novel issues upon which reasonable minds could differ" and that because the appellate court had granted rehearing en banc, "Chicago's nationwide-scope argument [is] less auspicious than it had otherwise been."  *Id.*

Finally, in attempting to justify the entry of nationwide relief, plaintiff has submitted declarations from various cities throughout the country, and argues that a nationwide injunction is necessary to protect jurisdictions that cannot justify the expense of litigation when balanced against the small-dollar amounts of a Byrne JAG award.  SF Opp. at 25.  As an initial matter, this eleventh-hour barrage of hearsay is improper and should be disregarded by the Court.  In any event, this rationale is no justification to award relief to a party not before the Court.  The reality of our legal system is that parties are generally expected to vindicate their own rights, not to sit on their hands.  Many potential litigants lack the financial resources (or the will) to pursue litigation.  Such situations are not novel.  What would be novel is to award extraordinary nationwide injunctive relief on such grounds.  That would make significant new law, undermine the existence

---

SF Opp. at 24 (quoting *Trump*, 2018 WL 3637911, at *13 (citing *City of Chicago*, 888 F.3d, 272, 292-93 (7th Cir. 2018)).  That statement by the Court of Appeals, however, cites a portion of the Seventh Circuit panel's decision in *City of Chicago v. Sessions* that the en banc Seventh Circuit later vacated.  *See City of Chicago v. Sessions*, No. 17-cv-2991 (7th Cir. June 4, 2018) (ECF No. 128) ("Part IV of the panel's opinion of April 19, 2018 in this matter is VACATED and the panel's judgment of the same date is likewise VACATED insofar as it sustained the district court's decision to extend preliminary relief nationwide.").

19

Defs' Reply Summ. Judgment
No. 3:17-cv-04642-WHO

1    of class-action rules, and set courts on a path with no discernible limiting principle.  This Court

2    should decline San Francisco's invitation to do so.

3                                        **CONCLUSION**

4          For the reasons set forth above and in defendants' opening memorandum, the Court should

5    grant summary judgment in defendants' favor.

6    Dated:  August 22, 2018

7
                                                Respectfully submitted,
8
                                                CHAD A.  READLER
9                                                Acting Assistant Attorney General

10
                                                ALEX G. TSE
11                                               United States Attorney

12                                               JOHN R.  TYLER
                                                Assistant Director
13
                                                /s/ W. Scott Simpson
14
                                                _____
15                                               W.  SCOTT SIMPSON (Va.  Bar #27487)

16                                               ANTONIA KONKOLY
                                                LAURA HUNT
17                                               DANIEL MAULER
                                                Trial Attorneys
18
                                                Department of Justice, Civil Division
19                                               318 South Sixth Street, Room 244
                                                Springfield, Illinois 62701
20                                               Telephone:  (202) 514-3495
                                                Facsimile:   (217) 492-4888
21                                               E-mail:       scott.simpson@usdoj.gov
22
                                                COUNSEL FOR DEFENDANTS
23
                                                JEFFERSON B.  SESSIONS III, Attorney
24                                               General of the United States; LAURA L.
                                                ROGERS, Acting Assistant Attorney
25                                               General; and U.S. DEPARTMENT OF JUSTICE

26

27

28                                               20