1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   CITY AND COUNTY OF SAN                Case No.  17-cv-04642-WHO
    FRANCISCO,
8                                         **ORDER REGARDING MOTIONS FOR**
                Plaintiff,                **SUMMARY JUDGMENT**
9                                         Re: Dkt. Nos. 99, 109, 111, 113, 128, 133,
          v.                              135, 136, 137, 138
10
    JEFFERSON BEAUREGARD SESSIONS,
11  et al.,

12              Defendants.

13

14  STATE OF CALIFORNIA, EX REL.
    XAVIER BECERRA, IN HIS OFFICIAL
15  CAPACITY AS ATTORNEY GENERAL         Case No.  17-cv-04701-WHO
    OF THE STATE OF CALIFORNIA,
16
                Plaintiff,
17                                        **ORDER REGARDING MOTIONS FOR**
          v.                             **SUMMARY JUDGMENT**
18                                        Re: Dkt. Nos. 116, 118, 123, 124, 129, 130,
    JEFFERSON BEAUREGARD SESSIONS,        132
19  et al.,

20              Defendants.

21                            **INTRODUCTION**

22          In fiscal year 2017, defendants Attorney General Jefferson Beauregard Sessions III and the

23  Department of Justice (collectively, the "DOJ") announced that applicants for federal grants under

24  the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program would need to

25  satisfy three new conditions for funding directed at state and local governments that have adopted

26  so-called "sanctuary city" statues and ordinances.  The conditions require that grant recipients (i)

27  provide the Department of Homeland Security's Immigration and Customs Enforcement agency

28  ("ICE") access to their correctional facilities for immigration enforcement purposes, (ii) provide

notice to ICE of the release date for detainees, and (iii) certify their compliance with 8 U.S.C. § 1373, a statute which prohibits state and local governments from restricting information-sharing with the Department of Homeland Security.

These new conditions have sparked litigation around the country.  *See, e.g.*, *City of Philadelphia v. Sessions*, Case No. 17–cv–03894; *City of Chicago v. Sessions*, Case No. 17–cv–05720; *United States v. California*, Case No. 18–cv–490–JAM; *City of Los Angeles v. Sessions*, Case No. 17–cv–07215–R.  In the two separate, related actions captioned above, the State of California and the City and County of San Francisco challenge the conditions requiring access, notice and compliance with Section 1373, as well as the constitutionality of Section 1373.

DOJ has lost each time these issues have been raised thus far.  It continues to withhold grant funding to six states and several local jurisdictions, including California and San Francisco, which it believes do not comply with the Byrne JAG program conditions for fiscal year 2017.  California requests that I enjoin DOJ from imposing the conditions, award the State the grants for which it is eligible, and declare that certain California laws identified by the State comply with the Section 1373.  Alternatively, it seeks declaratory judgment finding Section 1373 unconstitutional on its face.  Similarly, San Francisco requests that I enjoin enforcement of the conditions, issue declaratory judgment that San Francisco's sanctuary city laws comply with Section 1373, and issue an injunction restraining the DOJ from withholding Byrne JAG funding to San Francisco because of Section 1373.  Both ask that the scope of the injunction be nationwide.  DOJ responds with its own motions for summary judgment, essentially urging that I reject the requests of California and San Francisco.

In agreement with every court that has looked at these issues, I find that: the challenged conditions violate the separation of powers; Section 1373 is unconstitutional; the Attorney General exceeds the Spending Power in violation of the United States Constitution by imposing the challenged conditions; the challenged conditions are arbitrary and capricious; California's and San Francisco's laws comply with Section 1373 as construed in this Order; California is deserving of the mandamus relief it seeks; and both parties are entitled to a permanent injunction.  Because the requisites for a nationwide injunction are met as a result of the unconstitutionality of Section 1373

1  and the uniform effect of DOJ's conditions on Byrne JAG grantees around the country, I will

2  follow the lead of the district court in *City of Chicago* and issue a nationwide injunction but stay

3  its nationwide effect until the Ninth Circuit is able to address it in the normal course on appeal.

**BACKGROUND**

## I.   FACTUAL BACKGROUND

### A.   Section 1373 of the Immigration and Nationality Act

7  The Immigration and Nationality Act ("INA") granted the Executive Branch, through its

8  Department of Homeland Security ("DHS"), DOJ, and other agencies, "broad, undoubted power

9  over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387,

10  394 (2012).  The INA allows the Attorney General or Secretary of Homeland Security to order the

11  removal of certain classes of immigrants from the United States.  *See* 8 U.S.C. §§ 1227(a), 1228.

12  The Attorney General is directed to take certain detainees into custody pending removal

13  proceedings once they are released from state or local custody.  *See* 8 U.S.C. § 1226(c)(1).  To

14  enforce the immigration laws, Executive Branch agencies exercise independent discretion; the

15  INA also gives agencies tools to encourage cooperation with state and local offices to support

16  federal policy objectives.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing state and local officers to

17  perform functions of a federal immigration officer); 8 U.S.C. § 1324(c) (authorizing state and

18  local officers to make arrests for INA violations); 8 U.S.C. § 1252c (authorizing state and local

19  officers to make arrests for unlawful reentry); Homan Decl. ¶ 36 (SF Dkt. No. 113-2) (discussing

20  Immigration and Customs Enforcement's cooperation with state and local officers to provide

21  uniformed presence in support of enforcement efforts).

22  Relevant to the present motions for summary judgment, 8 U.S.C. § 1373 prohibits

23  restricting the communication of certain information between federal, state, and local

24  governments.  It states:

25  
26  (a) In General. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

United States District Court
Northern District of California

(b) Additional Authority of Government Entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

> (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

> (2) Maintaining such information.

> (3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries. The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. § 1373.

## B.   The Office of Justice Programs and the Byrne JAG Program

The Office of Justice Programs ("OJP") was established with the passage of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 and is managed by an Assistant Attorney General.  *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. § 10101, *et seq*.  The same statute created the precursor to the Byrne JAG program; the program's current iteration was established through the Violence Against Women and Department of Justice Reauthorization Act of 2005.  *See* Pub L. No. 109-162, 119 Stat. 2960 (2006); *see also* 34 U.S.C. § 10151 (formerly 42 U.S.C. § 3750).

Under the Byrne JAG program, the Attorney General makes grants to state and local governments through the Bureau of Justice Assistance Grant Programs, a component of the OJP. *See* 34 U.S.C. § 10152.  The grants support law enforcement efforts by providing additional personnel, equipment, supplies, training, and other assistance to applicants.  *Id*.  The Byrne JAG program is a formula grant program, meaning that it awards funding to all grantees by a statutorily prescribed formula.  *See* 34 U.S.C. § 10156(d)(2)(A) (stating that "the Attorney General shall allocate to each unit of local government" funds determined by the established formula).  Grant funding derives from a state's population and violent crime rate, to be used in one of eight

program areas.  *See* 34 U.S.C.§ 10156(a).  Immigration enforcement is not listed as one of the eight program areas for use of Byrne JAG funding.  *See* 34 U.S.C. § 10152(a)(1).  The formula also allocates a portion of remaining amounts of state funding to units of local governments through sub-grants.  *See* 34 U.S.C. § 10156(c)(2).

California uses its JAG funds to support education and crime prevention, court programs, and law enforcement programs like task forces focused on criminal drug enforcement, violent crime, and gang activities.  *See* Jolls Decl. ¶ 10 (CA Dkt. No. 29-1); Caligiuri Decl. ¶ 27 (CA Dkt. No. 118-4).  Under the formula, it expected to receive (through the Board of State and Community Corrections) $28.3 million in JAG funding for fiscal year 2017, including $17.7 million to the State and the remainder to local jurisdictions.  *See* Jolls Decl. ¶ 5.

San Francisco has received Byrne JAG funding for over a decade; it applied again for funding in the 2017 fiscal year.  *See* Chyi Decl. ¶ 4 (SF Dkt. No. 105).  It was entitled to receive Byrne JAG program funds of $524,845 and Byrne JAG sub-grants equal to $923,401 under the formula.  *Id*. ¶¶ 7, 16.  San Francisco uses the funding across six departments and for ten full-time positions to support law enforcement programs focused on reducing drug trade and servicing individuals with substance and mental health problems.  *Id*. ¶¶ 10, 17, 18.  Without the Byrne JAG funds, San Francisco lacks the additional funding to support its Department of Children, Youth and their Families, including programs like the Young Adult Court, which provides case management and support to adults fighting recidivism.  *Id*. ¶¶ 11, 19.

### C.     New Byrne JAG Program Grant Conditions

In fiscal year 2016, the DOJ announced that Section 1373 was an "applicable law" for Byrne JAG funding, and the DOJ required grantees like California to submit a legal opinion on its compliance with Section 1373.  *See* Jolls Decl. ¶ 55, Ex. B; *see also* DOJ Request for Judicial Notice ("RJN") Ex. A ¶ 55 (CA Dkt. No. 125).  For the following fiscal year, in July and August 2017, the OJP posted state and local solicitations for Byrne JAG grants that formalized other conditions.  *See* Lee Decl. ¶¶ 3–4, Exs. A–B (SF Dkt. No. 106-1).  The solicitations included three new conditions required for funding, each relating to federal immigration enforcement.

Byrne JAG grant applicants must now provide a certificate of compliance with Section

1    1373, signed by the jurisdiction's chief legal officer under penalty of perjury, attesting that the

2    applicant does not have prohibitions on information-sharing with the INS about the citizenship or

3    immigration status of any individuals.  *See* Lee Decl. ¶ 4, Ex. B at 38; CA RJN Ex. 21.  California

4    certified that it complies with Section 1373, but the DOJ has not made a final determination on

5    California's compliance.  *See* Sherman Decl. Ex. B (CA Dkt. No. 116-5).  San Francisco also

6    believes it complies with Section 1373, but the DOJ has denied this.  Lee Decl. ¶ 6 Ex. D, Req. for

7    Admission No. 1.

8         Grant applicants must also have policies that satisfy "access" and "notice" conditions for

9    Byrne JAG funding.  The access and notice conditions require: (i) "that agents of the United States

10   . . . are given . . . access" to any State or local government correctional facility "for the purpose of

11   permitting such agents to meet with individuals who are (or are believed by such agents to be)

12   aliens and to inquire as to such individuals' right to be or remain in the United States;" and (ii) that

13   when a State or local correctional facility "receives from DHS a formal written request . . . that

14   seeks advance notice of the scheduled release date and time for a particular alien in such facility,

15   then such facility will honor such request and–as early as practicable . . . provide the requested

16   notice to DHS."  Lee Decl. Ex. E; Hanson Decl. ¶¶ 55–56, Ex. B (CA Dkt. No. 42-1); DOJ RJN

17   Exs. B and C (CA Dkt. No. 125).  The "Rules of Construction" applicable to these new grant

18   conditions clarify that the requirements do not extend to detaining "any individual in custody

19   beyond the date and time the individual would have been released in the absence of this condition"

20   and do not mandate detaining non-citizens at the request of federal immigration officials.  *See* DOJ

21   RJN, Exs. B and C ¶ 55.

22        **D.      The Office of Community Oriented Policing Services**

23        In addition to new Byrne JAG program conditions, the DOJ announced that grants issued

24   by the Office of Community Oriented Policing Services ("COPS") would require Section 1373

25   compliance as well.  *See* DOJ RJN, Ex. F at 1.  In fiscal year 2017, access to COPS funding

26   included the Section 1373 certification requirement.  One of the programs administered by COPS

27   is the COPS Anti-Methamphetamine Program ("CAMP"), a competitive grant.  In the past,

28   California, through its Bureau of Investigations, received CAMP funding to support law

United States District Court
Northern District of California

United States District Court
Northern District of California

1  enforcement investigations of the unlawful manufacture and distribution of methamphetamine—

2  their work on the task force has led to seizing more than $30 million in illegal drugs since 2015.

3  *See* Caligiuri Decl. ¶¶ 13–19.  California received $1 million in CAMP funding in November 2017

4  but was informed it could not "draw down" the funds until an inquiry was resolved into its

5  compliance with Section 1373.  *Id*. ¶ 23.

6          **E.      California's Sanctuary State Laws and Policies**

7          California has enacted the following statutes that are pertinent to its compliance with the

8  access and notice conditions, the certification condition, and Section 1373: the TRUST Act, Cal.

9  Gov. Code § 7282 *et seq*., the TRUTH Act, Cal. Gov. Code § 7283 *et seq*., the Values Act, Cal.

10  Gov. Code § 7284 *et seq*., and six confidentiality statutes.  It enacted the TRUST Act in 2013,

11  defining when local law enforcement agencies can detain individuals for up to 48 hours after an

12  ordinary release because of a civil detainer request by DHS.  *See* CA RJN Ex. 6.  The TRUST Act

13  states that local law enforcement may only comply with a DHS civil detainer if the detainer does

14  not "violate any federal, state, or local law, or any local policy," and (1) the detainee's criminal

15  background includes one of a delineated list of crimes, (2) the detainee was on the California Sex

16  and Arson Registry, or (3) the detainee was held after a magistrate's finding of probable cause for

17  a serious or violent felony.  *See* Gov. Code § 7282.5(a).  The purpose behind the TRUST Act,

18  according to comments by the author, was to "establish a statewide standard for responding to ICE

19  holds and. . . prevent the prolonged detention of people who would otherwise be released from

20  custody if it were not for ICE's request."  CA RJN Ex. 6. at 4.

21          in 2016, the TRUTH Act was enacted.  It requires that local law enforcement agencies give

22  notice to inmates before an interview with any immigration officials.  *See* CA RJN Ex. 5.

23  Notification includes informing the detainee that the interview is voluntary and that he has a right

24  to seek counsel.  *See* Cal. Gov. Code § 7283.1(a).  The local law enforcement agency must provide

25  the detainee with a copy of the federal immigration request to interview and inform the detainee

26  whether it intends to comply with the request.  *Id*. § 7283.1(b).

27          In October 2017, the Values Act expanded on the TRUST and TRUTH Acts to address the

28  California Legislature's concern with preserving community trust between the state and local

United States District Court
Northern District of California

1  governments and California's immigrant communities.  *See* Cal. Gov. Code § 7284.2.  It amended

2  the TRUST Act by imposing additional constraints on law enforcement's ability to share the

3  release dates of individuals, but it allows law enforcement to notify federal immigration officials

4  about an individual's release date if the individual was convicted of a wide range of specified

5  crimes or if the information is already publicly available.  *See* Cal. Gov. Code §§ 7282.5(a),

6  7284.6(a)(1)(C).  The Values Act also prohibits law enforcement agencies from using money or

7  personnel to provide the personal information of victims and witnesses of crime for immigration

8  enforcement purposes unless the information was already publicly available.  *See* Cal. Gov. Code

9  § 7284.6(a)(1)(D).

10        That said, the Values Act does not prohibit other forms of cooperation with federal

11  immigration authorities.  It does not apply to the California Department of Corrections and

12  Rehabilitation, which responds to notification requests by ICE and transfers individuals from state

13  to federal immigration custody.  *See* CA RJN Exs. 12-16.  It does not restrict sharing criminal-

14  history via three state-run databases, participation in task forces with immigration officials, or

15  federal access to jails.  *See* Cal. Gov. Code § 7284.6(b); Reich Decl. ¶ 12 (CA Dkt. No. 116-3).

16  Through a savings clause, the Values Act expressly authorizes compliance with Section 1373.  *See*

17  Cal. Gov. Code § 7284.6(e).

18        California's confidentiality statutes protect sensitive information of victims, witnesses, and

19  juveniles.  California Penal Code section 422.93 prohibits law enforcement from detaining hate-

20  crime victims and witnesses who are not charged with or convicted any state law crimes if they

21  would be detained solely for immigration violations for transfer to federal immigration officials.

22  *See* Cal. Penal Code § 422.93(b).  California Penal Code sections 679.10 and 679.11 prohibit any

23  state entity that certifies information for U-visa and T-visa applications from disclosing

24  immigration status of individuals making the request "except to comply with federal law or legal

25  process, or if authorized by the victim or person requesting [the certification form]."  Cal. Penal

26  Code §§ 679.10(k), 679.11(k); *see also* RJN Ex. 18.  The California Welfare and Institutions Code

27  also contains two confidentiality statutes, sections 827 and 831, that provides privacy for

28  juveniles, including their immigration status, in court records.  *See* California Welf. & Inst. Code

§§ 831(a) and 831(e).  California Code of Civil Procedure section 155 also requires "information regarding the child's immigration status… remain confidential" in the federal Special Immigrant Juvenile process. Cal. Civ. Proc. Code § 155(c).

The State's policies seek to use limited resources for public safety rather than immigration enforcement—the State Legislature concluded that limits on local law enforcement's involvement with immigration enforcement results in safer communities.  *See* Cal. Gov. Code § 7284.2(f); CA RJN Exs. 4–6.  The California Assembly Committee on Public Safety, in a hearing held on June 13, 2017, summarized a study by the University of Illinois—Chicago that found: (i) 44 percent of surveyed Latinos were less likely to contact police officers if they had been victims of a crime for fear of police inquiring into their immigration status; (ii) 45 percent were less likely to volunteer information about a crime and were less likely to report a crime for fear of police inquiring into their immigration status; (iii) 70 percent of undocumented immigrants reported they were less likely to contact law enforcement if they were victims of a crime; (iv) 28 percent of U.S.-born Latinos were less likely to contact police if they were victims of a crime for fear of police inquiring into their immigration status; and (v) 38 percent of Latinos feel like they are under more suspicion now that local law enforcement have become involved in immigration enforcement, with the figure rising to 58 percent among undocumented immigrant respondents.  CA RJN Ex. 4.

California's policies are based on local law enforcement's belief that it is vital to maintain trust with immigrant communities; otherwise, immigrants will "fail to disclose crimes that they witness and/or are victims to out of fear of deportation."  Hart Decl. ¶¶ 7, 9, 11–18, 21, Ex. 3 (CA Dkt. No. 116-3); Rosen Decl. ¶¶ 6-9, Ex. 5 (CA Dkt. No. 116-3); Wong Decl. ¶¶ 4, 34–38, 44, 48, 53, Ex. 10 (CA Dkt. No. 116-4).  For example, in a study of 594 undocumented Mexican nationals in San Diego County, 60.8 percent of respondents were less likely to report crimes they witnessed to police, and 42.9 percent were less likely to report being a victim of a crime to police, if the police were working together with ICE.  *See* Wong Decl. ¶ 35.  When local law enforcement officials communicated that they were not working with ICE, 71.8 percent of respondents were more likely to report crimes they witnessed, and 70.8 percent were more likely to report being a victim of a crime to the police.  *See* Wong Decl. ¶ 36.  California finds that these results accord

United States District Court
Northern District of California

9

1   with other research on undocumented women who are victims of violent crime, sexual assault, or

2   domestic violence, and who are less likely to report these crimes if law enforcement officers are

3   working with federal immigration officials.  *See* Wong Decl. ¶ 38.

4         **F.**    **San Francisco's Sanctuary City Laws and Policies**

5        San Francisco declared itself a City and County of Refuge in 1989 and codified its

6   Sanctuary City Laws in Chapters 12H and 12I of the San Francisco Administrative Code.  *See* SF

7   RJN Ex. A (SF Dkt. No. 107-1).  Chapter 12H expressly prohibits any City or County funds or

8   resources from being used to assist federal immigration officers to gather or share information on

9   the release status of individuals unless required by federal or state law.  *See* S.F. Admin. Code §

10  12H.2.  Chapter 12I prohibits law enforcement in San Francisco from responding to federal

11  immigration enforcement requests for notice of release dates for individuals in custody unless the

12  individual meets certain criteria, such as having a recent conviction for a serious or violent felony

13  or three separate felonies other than domestic violence.  *See* S.F. Admin. Code § 12I.3(c), (d), (e).

14       San Francisco's law enforcement departments have policies consistent with the Sanctuary

15  City Laws, which it also believes are not violative of Section 1373.  *See* Sainez Decl. ¶¶ 9–11

16  (Police Department) (SF Dkt. No. 100); Fletcher Decl. ¶¶ 6–7 (Adult Probation Department) (SF

17  Dkt. No. 101); Hennessy Decl. ¶¶ 11, 17–18 (Sheriff's Department) (SF Dkt. No. 102).

18  Additionally, the San Francisco Sheriff's Department has policies prohibiting employees from

19  providing ICE or other federal immigration enforcement officials any access to San Francisco

20  jails, computers, databases, release dates, or contact information for inmates in its custody.  *See*

21  Hennessy Decl. ¶¶ 17–18, Ex. D.  San Francisco shares the views of California that its sanctuary

22  city policies encourage individuals to be candid with law enforcement and facilitate trust between

23  law enforcement and the community.  San Francisco believes that these policies lead to greater

24  reporting of crimes, more cooperative witnesses, and more assistance with law enforcement

25  investigations.  *See* Hennessy Decl. ¶ 8; Sainez Decl. ¶ 6.

26  **II.**    **PROCEDURAL BACKGROUND AND RELATED LITIGATION**

27       California and San Francisco filed their respective lawsuits in August 2017, seeking to

28  enjoin DOJ from requiring the three conditions on Byrne JAG program funding and to receive

United States District Court
Northern District of California

1    their grant funds.  The DOJ unsuccessfully moved to dismiss both suits, arguing that the plaintiffs

2    lacked Article III standing and that their complaints failed to state a claim.  *See* Order Denying

3    Mot. to Dismiss (SF Dkt. No. 78); Order Denying Mot. to Dismiss (CA Dkt. No. 88).  California

4    separately moved for a preliminary injunction, which I denied because at the time there was not

5    enough evidence to determine a likelihood of success on the merits and there was uncertainty

6    whether California's injury was irreparable.  *See* Order Denying Amended Mot. for Preliminary

7    Injunction (CA Dkt. No. 89).

8           Other highly relevant lawsuits are being litigated that challenge the federal government's

9    new conditions for Byrne JAG program funding, and the federal government initiated its own

10   challenge to California sanctuary state laws like the Values Act.  In *City of Chicago v. Sessions*,

11   264 F. Supp. 3d 933 (N.D. Ill. 2017), the district court initially granted Chicago's motion for a

12   nationwide preliminary injunction of the access and notice conditions but denied Chicago's

13   motion to enjoin the Section 1373 certification requirement.  *Id*. at 951.  On appeal, the Seventh

14   Circuit unanimously affirmed the lower court ruling that the new Byrne JAG program access and

15   notice conditions could not be imposed, and a divided panel affirmed the nationwide injunction.

16   *See City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018).  Attorney General Sessions

17   petitioned for a rehearing *en banc* on the scope of the injunction and the Seventh Circuit stayed the

18   nationwide scope of the injunction while a rehearing was pending.  *See* Order, *City of Chicago v.*

19   *Sessions*, Case No. 17–2991 (7th Cir. June 26, 2018), Dkt. No. 134.  The district court then

20   granted in part and denied in part Chicago's motion for summary judgment, this time finding that

21   Section 1373 was unconstitutional under the Tenth Amendment.  *See City of Chicago v. Sessions*,

22   --- F. Supp. 3d. ---, Case No. 17–5720, 2018 WL 3608564, at *5 (N.D. Ill. July 27, 2018).  The

23   court also issued a permanent nationwide injunction but stayed the nationwide scope of the

24   injunction because the *en banc* rehearing was still pending.  *Id*. at *17.  The Seventh Circuit

25   vacated its *en banc* hearing after the second district court order, allowing the stay to remain in

26   effect until the lower court issued a proper injunction under Federal Rule of Civil Procedure 65.

27   *See City of Chicago v. Sessions*, Case No. 17–2991, 2018 WL 4268814, at *2 (7th Cir. Aug. 10,

28   2018).  The district court entered an order setting forth the terms of the permanent injunction

1   under Rule 65, and the case is pending in the Seventh Circuit.  *See id.*, Dkt. No. 159.

2          In *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 588 (E.D. Pa. 2017), appeal

3   dismissed sub nom. *City of Philadelphia v. Attorney Gen. United States*, Case No. 18–1103, 2018

4   WL 3475491 (3d Cir. July 6, 2018), the court found that the access and notice conditions lacked

5   statutory authority under the Administrative Procedure Act and granted Philadelphia's motion for

6   preliminary injunction.  It enjoined the federal government from denying funds to Philadelphia for

7   fiscal year 2017.  *Id.*  On summary judgment, the court found that the new conditions were

8   arbitrary and capricious, and that Section 1373 violated the Tenth Amendment's anti-

9   commandeering principle.  *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018).

10   The court also issued a declaratory judgment that Philadelphia complied with Section 1373, and it

11   issued a permanent injunction.  *Id.* at 340–342.  The Attorney General filed an appeal that is now

12   pending in the Third Circuit.  *See City of Philadelphia v. Attorney Gen. United States*, Case No.

13   18–2648 (3rd Cir. July 26, 2018).

14          In *United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018), the federal

15   government sued to enjoin California's enforcement of three state laws it believed violated the

16   Supremacy Clause of Article VI, cl. 2.  The Hon. John A. Mendez of the Eastern District of

17   California granted in part and denied in part the federal government's motion for preliminary

18   injunction.  Relevant to this lawsuit, Judge Mendez held that the United States was not likely to

19   succeed on the merits of its conflict preemption claim against California's Values Act because it

20   found "no direct conflict between SB 54 and Section 1373."  *United States v. California*, 314 F.

21   Supp. 3d 1077, 2018 WL 3301414, at *15 (E.D. Cal. 2018).  Judge Mendez dismissed the federal

22   government's Supremacy Clause claim concerning the Values Act without leave to amend in a

23   separate order.  *See United States v. California*, Case No. 18–CV–490–JAM–KJN, 2018 WL

24   3361055, at *3 (E.D. Cal. July 9, 2018).  The Attorney General appealed.  *See United States v.*

25   *State of California*, Case No. 18–16496 (9th Cir. Aug. 9, 2018).

26                                    **LEGAL STANDARD**

27          A party is entitled to summary judgment where it "shows that there is no genuine dispute

28   as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

United States District Court
Northern District of California

1    To prevail, a party moving for summary judgment must show the lack of a genuine issue of

2    material fact with respect to an essential element of the non-moving party's claim, or to a defense

3    on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v.*

4    *Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts

5    to the party opposing summary judgment to identify "specific facts showing there is a genuine

6    issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative

7    evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty*

8    *Lobby,* 477 U.S. 242, 257 (1986).

9         On summary judgment, the Court draws all reasonable factual inferences in favor of the

10   non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

11   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

12   facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony

13   does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

14   *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

16        Before addressing the arguments on the merits, I resolve the evidentiary disputes and

17   administrative motions surrounding the motions for summary judgment.

18   **I.    EVIDENTIARY DISPUTES AND ADMINISTRATIVE MOTIONS**

19        **A.    DOJ's Motions to Strike Exhibits**

20        DOJ moves to strike Exhibit 42 of California's Request for Judicial Notice and Exhibits I

21   and J of the Lee Declaration in support of San Francisco's motion for summary judgment,

22   asserting that these exhibits are privileged.  *See* Admin. Mot. to Strike (CA Dkt. No. 123); Admin.

23   Mot. to Strike (SF Dkt. No. 109).  It argues that they were inadvertently produced and notes that

24   other copies of the same documents were properly logged as privileged and withheld during

25   discovery.  In July 2018, it sent a clawback letter for the inadvertently released privileged

26   documents.  *Id.*, Simpson Decl. at Ex. A.  California consents to striking Exhibit 42, while San

27   Francisco has not confirmed or denied its consent to strike Exhibits I and J of the Lee Declaration.

28   *Id*. at 2.

United States District Court
Northern District of California

1    The deliberative process privilege applies to documents if they are predecisional (drafted

2  before an agency adopted a given policy) and deliberative (containing opinions, recommendations,

3  or advice while determining the agency policy). *See FTC v. Warner Commc'ns Inc.*, 742 F.2d

4  1156, 1161 (9th Cir. 1984). Exemplary predecisional documents covered by the deliberative

5  process privilege are drafts of documents and documents fashioned as recommendations or

6  suggestions "which reflect the personal opinions of the writer rather than the policy of the

7  agency." *Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992).

8  Predecisional documents are part of the deliberative process if disclosing the document would

9  discourage candid discussions that undermine the agency's ability to function. *Id.*

10   Both documents are pre-decisional and reflect personal opinions of the personnel who

11  drafted them as opposed to policy determinations. One is an internal memorandum between the

12  Acting Assistant Attorney General and the Associate Attorney General, showing pre-decisional

13  analysis of compliance with California laws and Section 1373. The other is a redlined draft

14  document about the DOJ's decision and talking points. I GRANT the motion to strike Exhibit 42

15  of California Request for Judicial Notice and Exhibits I and J of the Lee Declaration.

16   **B.     San Francisco's Motion to Exclude Declarations**

17   San Francisco seeks to exclude the Madrigal and Atsatt declarations, which DOJ filed in

18  support of its opposition and cross-motion for summary judgment. *See* Mot. to Exclude (SF Dkt.

19  No. 128). San Francisco argues that DOJ did not comply with Federal Rules of Civil Procedure

20  26(a) or 26(e), and that DOJ cannot show that its failure to disclose the declarations was harmless

21  or justifiable. *Id.* at 1. DOJ contends San Francisco cannot complain of any harm from the

22  undisclosed declarations because it committed the same harmful conduct. *See* Opp. to Mot. to

23  Exclude (SF Dkt. No. 131).

24   Federal Rule of Civil Procedure 37(c)(1) states that if a party fails to "identify a witness as

25  required by Rule 26(a) or (e)," the party may not use the witness for "evidence on a motion, at a

26  hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P.

27  37(c)(1). Evidence that applies to Rule 37 must be excluded, as this is a "self-executing,

28  automatic sanction to provide a strong inducement for disclosure of material." *Hoffman v. Constr.*

*Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008), as amended (Sept. 16, 2008) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).  Rule 37 also imposes the burden of proof on the party whose evidence may be excluded.  *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

San Francisco claims that after initial disclosures and throughout discovery, DOJ never mentioned Madrigal or Atsatt at any time and there were no references to any documents authored by them.  *See* Meré Decl. ¶¶ 6, 8 (SF Dkt. No. 129).  When the parties discussed limiting discovery, they agreed to declarations by a limited number of fifteen custodians of records.  *Id*. ¶¶ 9-10.  Madrigal and Atsatt were not on the finalized list of custodians, nor did DOJ amend or supplement its disclosures.  *Id*. ¶ 13.  The first time that San Francisco apparently learned of the declarants was in August 2018, when DOJ filed its opposition and cross-motion for summary judgment.  *Id*. ¶ 16.

As DOJ argues, San Francisco served supplemental initial disclosures for seven new declarations the day before its opposition to the DOJ's motion for summary judgment.  *See* Opp. to Mot. to Exclude at ¶ 2.  However, San Francisco contends that two of those declarations were provided only to rebut arguments made by DOJ in its motion for summary judgment, and that the remaining five declarations are substantially justified because they respond to issues raised by the Ninth Circuit in *City & County of San Francisco v. Trump*, Case No. 17–17478, 2018 WL 3637911 (9th Cir. Aug. 1, 2018).  *See* Reply in Supp. of Mot. to Exclude (SF Dkt. No. 132).

In contrast, DOJ has not argued or alleged that its failure to disclose the Madrigal and Atsatt declarations was substantially justified.  Rule 37(c)(1) is "self-executing" and DOJ has not met its burden of proof.  *Hoffman*, 541 F.3d at 1180.  On this basis, I GRANT the motion to exclude the Madrigal and Atsatt declarations.[1]

### C.    Administrative Motions to File Under Seal

California and DOJ submitted administrative motions to file materials under seal.  In July 2018, California filed its administrative motion to seal portions of the Caligiuri Declaration.  *See*

---

[1] They are not dispositive in any event.

1    Admin. Mot. (CA Dkt. No. 118).  That same month, DOJ filed its administrative motion to seal a

2    document designated as "Confidential" under a Protective Order in this case and produced by San

3    Francisco.  *See* Admin. Mot. (SF Dkt. No. 111).

4         Given the historically recognized public right of access to judicial records, there is a

5    "strong presumption in favor of access."  *Foltz v. State Farm Mutual Auto. Insurance Company,*

6    331 F.3d 1122, 1135 (9th Cir. 2003).  With dispositive motions, such as the present motions for

7    summary judgment, the presumption of access can be overcome only by demonstrating a

8    compelling reason to do so, such as an articulated interest favoring secrecy that outweighs the

9    public interest in understanding the judicial process.  *Kamakana v. City & Cty. of Honolulu*, 447

10   F.3d 1172, 1179, 1181 (9th Cir. 2006) (stating that the movant must "present articulable facts

11   identifying the interests favoring continued secrecy.").  If the court decides to seal certain

12   documents, it must "base its decision on a compelling reason and articulate the factual basis for its

13   ruling, without relying on hypothesis or conjecture." *Hagestad v. Tragesser*, 49 F.3d 1430, 1434

14   (9th Cir. 1995).

15        Here, there are compelling reasons to seal portions of California's Caligiuri Declaration

16   and the document attached to the DOJ's Mauler Declaration.  The subject portions of the Caligiuri

17   Declaration contain details about ongoing and active criminal investigations.  *See* Ehrlich Decl. ¶

18   4 (CA Dkt. No. 118-1).  The spreadsheet attached to the Mauler Declaration also contains partially

19   redacted confidential criminal offender record information that could be reverse engineered with

20   extraneous data if unsealed.  *See* McGrath Decl. ¶ 7 (SF Dkt. No. 112).  I GRANT the

21   administrative motions to file these materials under seal.

22        **D.    Motions for Leave to File Amicus Briefs**

23        There are also eight motions for leave to file amicus briefs with the court.  *See* Admin.

24   Mots. for Leave (CA Dkt. Nos. 129, 130, 132; SF Dkt. Nos. 133, 135, 136, 137, 138).  Because

25   each motion complies with my prior Order Regarding Amicus Briefing, I GRANT the motions.

26   *See* Order (CA Dkt. No. 41; SF Dkt. No. 55).

27   **II.    SEPARATION OF POWERS AND THE SPENDING CLAUSE**

28        California and San Francisco argue that the new conditions are unconstitutional because

United States District Court
Northern District of California

16

they seek to exercise Congress's exclusive Spending Power in violation of the constitutional separation of powers and the Spending Clause.  Article I of the United States Constitution specifically grants the Spending Powers to Congress.  "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  Art. I, § 8, cl. 1.  Congress's Spending Power includes "condition[ing] the receipt of funds, by states and others, on compliance with federal directives."  *State of Nev. v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989); *see also Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) ("Incident to this power, Congress may attach conditions on the receipt of federal funds.").

Congress is in control of the Spending Power to "set the terms on which it disburses federal money to the State," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), but if it intends to impose conditions on federal grants, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  By extension, the Executive Branch "does not have unilateral authority to refuse to spend...funds" already appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).  Congress still may, consistent with the separation of powers, delegate certain authority to spend money to the Executive Branch.  *See Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.").  However, the Constitution evidences the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process."  *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983).  DOJ's conditions on Byrne JAG grant funding violate these constitutional principles.

### A.  Separation of Powers

DOJ argues that the context of the Byrne JAG program statute shows that Congress intended to delegate discretionary authority to the Attorney General.  Congress expressly amended the statute to include the Assistant Attorney General's power of "placing special conditions on all grants, and determining priority purposes for formula grants."  USDOJ Reauthorization Act, § 1152(b), 119 Stat. at 3113, codified at 34 U.S.C. § 10102(a)(6).

San Francisco and California offer three generally overlapping arguments to contend that DOJ's conditions on Byrne JAG program funds violate the separation of powers. First, they contend that Congress, through the Byrne JAG program, only authorizes the Attorney General to exercise ministerial powers and not the limitless discretionary authority to impose new conditions. Second, they challenge the notion that 34 U.S.C. § 10102(a) justifies the Attorney General's authority to impose the access and notice conditions. Finally, they argue that the Byrne JAG statute does not permit the certification condition because Section 1373 is unconstitutional considering the anti-commandeering principle and the Supreme Court's recent decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). Each of these points is discussed in turn.

### 1. The Byrne JAG Program Does Not Grant the Attorney General Authority to Impose the Challenged Conditions

The Byrne JAG Program is a formula grant program, not a discretionary program, meaning that Congress has already determined who the recipients are and how much money they receive. *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive."). The operative statute leaves it to the Attorney General to determine and make the formula grants "in accordance with the formula established under section 10156 of this title..." for specified purposes such as law enforcement programs, court programs, and drug or preventative education programs. 34 U.S.C. § 10152(a)(1)(A)–(H). The question becomes to what extent Congress granted DOJ, and the Assistant Attorney General heading OJP, the power to impose its own conditions on Byrne JAG grants.

Starting with the text itself, the Byrne JAG statute contains limited discretionary authority for the Attorney General to carry out specific parts of the grant program. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue."). The statute provides discretionary authority over waiving the "program assessment component" requirement, *id*. at § 10152(c)(1)–(2), allowing prohibited uses of the funds in "extraordinary and exigent circumstances," *id*. at § 10152(d)(2), and renewing funds for four-year periods. *Id*. § 10152(f). Applicants must submit

their applications to the Attorney General in a certain format, and the Attorney General has discretion related to that ministerial process.  For instance, the statute requires assurances that the applicant maintains certain programmatic and financial records "as the Attorney General may reasonably require."  *Id*. at § 10153(a)(4).  Completed applications require a certification, "made in a form acceptable to the Attorney General," that the application contains correct information and that the funds will generally be used for the program the applicant seeks funding for.  *Id*. at § 10153(a)(5).  Congress provided discretion for DOJ to reserve up to five percent of funds to award to one or more states or local governments under § 10152 where there is a special need like "extraordinary increases in crime."  *Id*. at § 10157(b).  Some authority to reduce the amount paid is explicit in § 10158(b)(3), stating that "the Attorney General shall reduce amounts to be provided . . ." if the recipient fails to spend the money as planned and does not repay it.  *Id*. at § 10158(b)(3).  None of these provisions grant the Attorney General authority to impose the challenged conditions.

Other actions or inactions of Congress do not support DOJ's position.  Congress has exercised its power to impose conditions on Byrne JAG funding in the past, legislating a ten percent withholding of Byrne JAG funds for failing to implement federal Sex Offender Registration and Notification Act, 34 U.S.C. § 20927(a), a penalty for failing to implement the Death in Custody Act, *id*. § 60105(e)(2), and a penalty for failing to certify compliance with Prison Rape Elimination Standards.  *See id*. § 30307(e)(2).  In 2005, Congress repealed the only directly immigration-related requirement for Byrne JAG program funding.  *See* Violence Against Women and Department of Justice Reauthorization Act, H.R. Rep. 109-233, 109th Cong. at 8 (2005).  Several amici insist that Congress intentionally entrusted state and local jurisdictions with the discretion to tailor funds to their needs, recognizing the need for "flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution."  *See, e.g.*, Amicus Brief (CA Dkt No. 129; SF Dkt. No. 133) (quoting H.R. Rep. 109-233, at 89 (2005)).

San Francisco points out that Congress has chosen not to exercise its power to impose immigration conditions on Byrne JAG grants in the past, rejecting such legislation several times.  *See, e.g.*, Stop Sanctuary Cities Act, S. 1814, 114 Cong. § 2(b)(2) (2015); Enforce the Law for

19

United States District Court
Northern District of California

1 Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015).  DOJ believes this is unpersuasive.

2 *See FTC v. AT&T Mobility LLC*, 883 F.3d 848, 857–58 (9th Cir. 2018) ("Such proposals lack

3 'persuasive significance' because 'several equally tenable inferences may be drawn from

4 [congressional] inaction, including the inference that the existing legislation already incorporated

5 the offered change.'") (internal quotations and citations omitted).  But the Ninth Circuit has found

6 congressional inaction, or unsuccessful actions, are relevant to show Congress's lack of

7 authorization of the Executive Branch's purported authority "to withdraw federal grant moneys

8 from jurisdictions that do not agree with the current Administration's immigration strategies."

9 *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (finding that given

10 the "divisiveness of the policies in play," Congress did not approve of an Executive Order

11 withholding grant funding to cities that failed to certify compliance with Section 1373.).

12        DOJ disagrees that a formula grant program like the Byrne JAG program is

13 "irreconcilable" with the access and notice conditions.  It relies on the single sentence, "the

14 Attorney General *may*, in accordance with the formula…, make grants…," to contend that there is

15 a difference between grant eligibility discretion and fund allocation discretion.  34 U.S.C. § 10152

16 (emphasis added).  No party disputes that the Attorney General has some discretion to make grants

17 in the statute.  The dispute is whether the text supports discretion to the degree that DOJ assumed

18 when it created the conditions.  The text itself does not support such an exercise of power.  Yet

19 DOJ simply writes-off the lack of express authorization and instances when Congress imposed its

20 own conditions on Byrne JAG funding as being coextensive with its own discretionary authority

21 to determine conditions for grant eligibility.

22        DOJ does not offer any argument not already considered on this exact issue in the parallel

23 cases.  *See, e.g.*, *City of Chicago*, 2018 WL 3608564, at *12 (holding that the Byrne JAG statute

24 did not grant authority to impose notice and access conditions); *City of Philadelphia v. Sessions*,

25 309 F. Supp. 3d at 321 (finding that all three conditions violated the separation of powers

26 principle); *see also City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1098 (C.D. Cal. 2018)

27 (striking down similar conditions on COPS grants).  It made no attempt to address those

28 unfavorable cases or explain why I should depart from that authority, and I will not.  It is evident

20

1    from the text of the statute that the federal funds designated by Congress for the Byrne JAG

2    program do not impose their own immigration enforcement conditions on recipients.  To the

3    contrary, "nothing in the Byrne JAG statute grant[s] express authority to the Attorney General to

4    impose the notice and access conditions."  *City of Chicago*, 888 F.3d at 280.

### 2.   Section 10102 Does Not Grant the Attorney General Authority to Impose the Challenged Conditions

6         As an independent basis for imposing the conditions, DOJ relies on the authority granted in

7    34 U.S.C. § 10102, a statute in the subchapter creating the OJP titled "Duties and Functions of

8    Assistant Attorney General."  The statute states, "The Assistant Attorney General shall...(6)

9    exercise such other powers and functions as may be vested in the Assistant Attorney General

10   pursuant to this chapter or by delegation of the Attorney General, *including placing special*

11   *conditions on all grants, and determining priority purposes for formula grants*."  34 U.S.C. §

12   10102 (emphasis added).

13        The parties once again offer opposing statutory interpretations.  San Francisco argues that

14   Section 10102(a) did not give DOJ authority to impose conditions because the power of "placing

15   special conditions" on and "determining priority purposes" of grants refers to powers that have to

16   be vested by some other statutory authority and are not enumerated in Section 10102.  California

17   contends that the access and notice conditions are not justified by Section 10102(a)(6) because it

18   only permits the OJP to place special conditions on all grants to "high-risk" grantees.  California

19   also asserts that Section 1373 identifies a "special award condition" to COPS grants as a "high-

20   risk condition" but refers to other conditions as "award terms and conditions" only.  CA RJN Ex.

21   31 at 5, 20.

22        DOJ counters that Section 10102(a)(6) must be interpreted to grant the Assistant Attorney

23   General discretion to impose the conditions given that the statute was amended to add the "special

24   conditions" and "priority purposes" language.  To give the amended language no power would

25   therefore contravene the canon of statutory construction against surplusage.  S*ee, e.g.*, *Johnson v.*

26   *Consumerinfo.com, Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("'When Congress acts to amend a

27   statute, we presume it intends its amendment to have real and substantial effect.'") (quoting *Stone*

28

1    *v. INS*, 514 U.S. 386, 397 (1995)).  DOJ emphasizes the absence of any language limiting "special

2    conditions" on only "high-risk" grantees when the text grants authority to place conditions on "all

3    grants."  34 U.S.C. § 10102(a)(6).  It interprets "determine priority purposes" broadly as including

4    the authority to prioritize federal grant funds to further federal policies.

5          DOJ's interpretation that Section 10102 establishes an independent grant of authority to

6    impose the challenged conditions contradicts the plain meaning of the statute.  The Seventh

7    Circuit's decision in *City of Chicago*, 888 F.3d at 284–85, and the district court's order in *City of*

8    *Philadelphia*, 280 F. Supp. 3d at 616–17, are particularly instructive.  They found, and I agree,

9    that DOJ asserts its independent authority to place "special conditions" on grants to determine

10   "priority purposes" based on the subordinate clause in the last sentence of Section 10102.  The

11   clause begins with the word "including," conveying a reference to part of a whole.  In this statute,

12   "placing special conditions" and "determining priority purposes" refers to part of the powers that

13   the Assistant Attorney General could have that were described earlier in the sentence.  Those

14   powers depend on the authority "vested in the Assistant Attorney General pursuant to this chapter

15   or by delegation of the Attorney General."  34 U.S.C. § 10102.  No portion of the same chapter

16   authorizes the conditions explicitly.  The Attorney General lacks the power to impose additional

17   conditions on Congress's exercise of the Spending Power independent of Congress.[2]  Moreover,

18   the Byrne JAG program statute does not reference Section 10102 and does not provide the

19   authority to impose the notice and access conditions as discussed above.  *See* Sec. II.A.1.

20         In addition, the statutory structure of Section 10102(a)(6) does not support DOJ's broad

21   interpretation of its power to impose the challenged conditions.  Section 10102(a)(6) is in a

22   different subchapter than the Byrne JAG statute and there is no text expressly applying it to the

23   Byrne JAG program.  *See City of Chicago,* 888 F.3d at 285 ("A clause in a catch-all provision at

24   the end of a list of explicit powers would be an odd place indeed to put a sweeping power to

25

26   _____

27   [2] Even if there were independent authority granted by Section 10102(a)(6), courts hearing the
     parallel cases found that the language "placing special conditions on all grants" is most likely a
     term of art for the additional conditions placed on "high-risk grantees" only.  *See City of*

28   *Philadelphia*, 280 F. Supp. 3d at 617; s*ee also City of Chicago*, 888 F.3d at 285 n.2 (noting a
     possible term of art but not analyzing further).

United States District Court
Northern District of California

impose any conditions on any grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General.")  Ultimately, if such a broad power was not granted to the Attorney General under Section 10102(a)(6) or elsewhere, by the statute's plain meaning the Assistant Attorney General does not hold such power either.  *See also City of Philadelphia*, 280 F. Supp. 3d at 617 ("Congress is unlikely to ground the Attorney General's authority to impose substantive conditions in a subsection dedicated to conferring power on the AAG.")  Section 10102(a)(6) does not provide DOJ authority to impose the challenged conditions on Byrne JAG program funding.

> ### 3. Section 1373 is Not an Applicable Federal Law for Compliance with the Byrne JAG Statute

In addition to the lack of authority for the notice and access conditions, San Francisco and California assert that DOJ lacks authority to impose the Section 1373 certification condition from the text of the Byrne JAG statute.  DOJ insists that language in the Byrne JAG statute supports its authority to impose the certification condition.  Specifically, 34 U.S.C. § 10153(a)(5)(D) states:

> (a) In general. To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General ... Such application shall include the following:
> ...
> (5) A certification, ...that--
> ...
> (D) the applicant will comply with all provisions of this part *and all other applicable Federal laws*.

34 U.S.C. § 10153(a)(5)(D).  Although Section 1373 is a federal law, San Francisco and California argue that it cannot be broadly read as an "applicable Federal law" as stated in the Byrne JAG statute because it is unconstitutional on its face.  This raises two questions: (i) whether Section 1373 is unconstitutional; and (ii) whether it applies to the Byrne JAG program statute.

> #### a. The Tenth Amendment and Anti-Commandeering Principle

The Tenth Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. Amend. X.  This amendment confirms that "the power of the Federal

23

1   Government is subject to limits that may, in a given instance, reserve power to the States." *New*

2   *York v. United States*, 505 U.S. 144, 157 (1992).

3          The Supreme Court has applied the anti-commandeering principle to various claims that

4   the federal government overstepped its bounds. *See id*. at 188 ("The Federal government may not

5   compel the States to enact or administer a federal regulatory program."); *Printz v. United States*,

6   521 U.S. 898, 935 (1997) ("The Federal government may neither issue directives requiring the

7   States to address particular problems, nor command the States' officers, or those of their political

8   subdivisions, to administer or enforce a federal regulatory program."); *Nat'l Fed'n of Indep. Bus.*

9   *v. Sebelius*, 567 U.S. 519, 578 (2012) (applying anti-commandeering principle to "whether

10  Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal

11  regulatory system as its own."). Most recently, in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), the

12  Court applied it to the Professional and Amateur Sports Protection Act ("PASPA"), which

13  prevented states from legalizing sports betting and from repealing existing laws that prohibited it.

14  PASPA's provision prohibiting state authorization of sports gambling "unequivocally dictate[d]

15  what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1478. Plaintiffs

16  unsuccessfully argued that PASPA differed from anti-commandeering case law since "it does not

17  command the States to take any affirmative act." *Id.* at 1471. The Court rejected that distinction

18  as "empty" because "the basic principle—that Congress cannot issue direct orders to state

19  legislatures—applies in either event." *Id.* at 1478.

20          DOJ offers three threshold challenges to applying the anti-commandeering principle to this

21  case. First, it asserts that the Tenth Amendment and the *Murphy* opinion are inapposite because

22  the certification condition is for a voluntary federal grant program. It argues that applicants can

23  simply decline to participate in the Byrne JAG program, making the Spending Clause the

24  appropriate legal battleground as opposed to the Tenth Amendment's anti-commandeering

25  principle. But this argument "ignores that Section 1373 is an extant federal law with which

26  [California or San Francisco] must comply, completely irrespective of whether or not [it] accepts

27  Byrne JAG funding." *City of Chicago*, 2018 WL 3608564, at *6. San Francisco and California

28  challenge the certification condition because Section 1373 is unconstitutional; they do not

24

United States District Court
Northern District of California

1    necessarily challenge the Attorney General's power to impose other grant conditions requiring

2    compliance with "all other applicable Federal laws" that are consistent with the Byrne JAG

3    program statute language.  For these reasons, the voluntariness of the grant program does not

4    remove a challenge to a potentially applicable federal law, here Section 1373, from the scope of

5    the Tenth Amendment.

6         Second, DOJ contends that, regardless of *Murphy*, the federal government has "broad,

7    undoubted power" over immigration, *Arizona*, 567 U.S. at 394, and that statutes like Section 1373

8    are presumed to be a constitutional exercise of that power.  *Reno v. Condon*, 528 U.S. 141, 148

9    (2000).  But *Reno* was distinguished from other commandeering cases by the Court in *Murphy*

10   because the statute involved "did not regulate the States' sovereign authority to 'regulate their own

11   citizens.'" *Murphy*, 138 S. Ct. at 1479 (quoting *Reno*, 528 U.S. at 151).  On that basis, the Court

12   gathered that "[t]he anticommandeering doctrine does not apply when Congress evenhandedly

13   regulates an activity in which both States and private actors engage." *Murphy*, 138 S. Ct. at 1478.

14   The court in *City of Chicago* directly addressed the contention that Section 1373 ought to be

15   presumed constitutional under *Reno* as well, and I find its analysis persuasive.  *City of Chicago*,

16   2018 WL 3608564, at *7.  Section 1373 does not regulate private actor activities, nor does it

17   regulate with equal force an activity in which state and private actors engage.  This argument

18   raised by DOJ against applying the anti-commandeering principle fails.

19        Third, at the hearing DOJ offered a subtler distinction, that Section 1373 is a preemption

20   provision rather than an attempt at commandeering.  It insisted that the INA is a broad regulatory

21   scheme over individuals, unlike PASPA in *Murphy* which involved direct regulation of the states

22   to enforce a specific sports betting policy.  *See* Transcript of Proceeding at 8–9 (CA Dkt. No. 136;

23   SF Dkt. No. 144); *see also Murphy*, 138 S. Ct. at 1481 ("every form of preemption is based on a

24   federal law that regulates the conduct of private actors, not the States.").  *Murphy* explained how

25   the Airline Deregulation Act of 1978 had a preemption provision (rather than a commandeering

26   provision) since it "confer[red] on private entities…a federal right to engage in certain conduct

27   subject only to certain (federal constraints)." *Murphy*, 138 S. Ct. at 1480.  The Court also

28   explained how *Arizona* involved "standards governing alien registration," and in turn conferred "a

                                                    25

federal right to be free from any other registration requirements." *Id*. at 1481.

Here, Section 1373 applies regardless of any State's attempt to regulate immigration, and in fact restricts States in unrelated criminal justice contexts completely outside the scope of the INA. Section 1373, as already discussed, does not regulate private actors or provide private actors with any additional rights in the INA's statutory scheme. DOJ's preemption argument fails on this distinction.

I turn now to analyzing Section 1373 and the anti-commandeering case law. *Murphy* provided a non-exhaustive set of three policy reasons that make adhering to the anti-commandeering principle important. First, the principle is "one of the Constitution's structural protections of liberty," dividing federal and state authority "for the protection of individuals." *Id*. at 1477 (internal quotation and citation omitted). Second, it "promotes political accountability" against the backdrop that voters are unable to place credit or blame when the roles of the State and Congress are blurred. *Id*. Finally, it prevents the federal government from "shifting the costs of regulation to the States." *Id*. These three concerns are relevant.

Section 1373 contravenes the idea that liberty is best served by the Constitution's intended division of "authority between federal and state governments for the protection of individuals." *Murphy*, 138 S. Ct. at 1477 (quoting *New York*, 505 U.S. at 181). DOJ argues that Section 1373 requires states and local governments to allow the disclosure of an immigrant's address, location information, release date, date of birth, familial status, contact information, and any other information that would help federal immigration officials perform their duties. *See* Sherman Decl. Ex. B (Defs. Interrog. Resp. 17); Ex. E (Defs. RFA Resps. 9–16). To comply with that interpretation, California and San Francisco would need to submit control of their own officials' communications to the federal government and forego passing laws contrary to Section 1373. They would also need to allocate their limited law enforcement resources to exchange information with the federal government whenever requested instead of to the essential services (like enforcing generally applicable criminal laws) they believe would most benefit their respective communities.

As DOJ interprets Section 1373 today, the statute requires communications by state and local governments in ways that create an appearance of a uniform federal/state/local immigration

enforcement policy indiscernible to San Francisco or California residents. *Murphy*, 138 S. Ct. at 1477 ("When Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent.").  Section 1373 effectively "supplants local control of local officers" by prohibiting those jurisdictions from preventing employees from communicating with the INS. *City of Chicago*, 2018 WL 3608564, at *8; *see also United States v. California*, 314 F. Supp. 3d at 1099 ("Section 1373 does just what *Murphy* proscribes: it tells States they may not prohibit (i.e., through legislation) the sharing of information regarding immigration status with the INS or other government entities.").  The statute undermines existing state and local policies and strips local policy makers of the power to decide for themselves whether to communicate with INS.  *See Printz*, 521 U.S. at 931 ("To say that the Federal Government cannot control the State, but can control all of its officers…merits the description 'empty formalistic reasoning of the highest order.") (internal quotations and citation omitted).

California expresses the legitimate concern that entanglement with federal immigration enforcement erodes the trust that Latino and undocumented immigrant communities have in local law enforcement, which is essential for victims and witnesses to feel they can safely report crimes. *See* Wong Decl. ¶¶ 4, 41–44, 52–53 (discussing how entanglement affects undocumented immigrants' trust in law enforcement); Hart Decl. ¶¶ 9, 11 (reiterating the Santa Cruz Sheriff's Office view that trust is essential to community-oriented policing); Goldstein Decl. ¶ 5 (summarizing California's belief, embodied in the Values Act, that trust between law enforcement and the immigrant community is central to public safety); Rosen Decl. ¶ 8 (expressing firsthand experience of immigration enforcement actions chilling voluntary reporting in domestic violence cases); *see also Chicago*, 888 F.3d at 280 ("State and local law enforcement authorities are thus placed in the unwinnable position of either losing needed funding for law enforcement, or forgoing the relationships with the immigrant communities that they deem necessary for efficient law enforcement").

The harm that entanglement with immigration enforcement does to community trust is more than theoretical, as plaintiffs and amici have shown.  To summarize just one study, the fear of police inquiring into immigration status results in a lower likelihood that Latinos will report

being a victim or witnessing crimes by 44 percent, undocumented immigrants by 70 percent, and even U.S.-born Latinos by 28 percent.  *See* CA RJN Ex. 4; *see also* Wong Decl. ¶¶ 35-38 (sharing similar results in a separate study); Amicus Brief (CA Dkt. No. 130; SF Dkt. No. 136-1) (providing many other studies documenting the erosion of trust in local law enforcement who implicate themselves in immigration enforcement).

Finally, Section 1373 shifts a portion of immigration enforcement costs onto the States. *Murphy*, 138 S. Ct. at 1477 (finding that Congress "is pressured to weigh the expected benefits of the program against its costs" but fails to do so if it can "compel the States to enact and enforce its program.").  It compels state and local governments not to prohibit their employees from communicating with federal immigration officials.  California's law enforcement agencies experienced double the detainer requests from ICE in one year—from 15,000 in fiscal year 2016 to 30,000 in fiscal year 2017.  *See* TRAC Reports, Inc., Latest Data: Immigration and Customs Enforcement Detainers, California (2018).  According to DOJ's broad interpretation of Section 1373, San Francisco and California must respond to each request, including release dates, no matter the burden on the law enforcement agencies or the length of the person's detainment term. *See* Hart Decl. ¶¶ 19–20 (reporting that Santa Cruz County jails are run over capacity, with staff shortages making compliance impossible, and that 60 percent of all arrests are misdemeanors where individuals are booked and released within hours).

DOJ does not directly respond to the arguments made by San Francisco and California that track the three policy considerations supporting the anti-commandeering principle, and instead portrays Section 1373 merely as protecting the transfer of information to federal officials.  It distinguishes a prohibition on states from regulating their own state citizens and a law that regulates states as "the owners of data bases."  *Reno*, 528 U.S. at 151.  It contends that *Murphy* supports the defense because PASPA was an effort to "regulate the States' sovereign authority to regulate their own citizens," while in contrast Section 1373 is just an information-sharing component of a larger statutory scheme to enforce immigration.

In *Printz*, the Supreme Court found that a federal statute requiring state and local law enforcement to conduct background checks on handgun license applications was unconstitutional.

521 U.S. at 935 (holding that the federal government cannot "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").  DOJ relies on dicta, remarking that statutes "which require only the provision of information to the Federal Government, do not involve the precise issue [of]...forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918; *see also id.* at 936 ("the Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid.") (O'Connor, J., concurring).  The Court has yet to decide the merits of that distinct issue.  *Id.* (finding that those statutes requiring only information-sharing "do not involve the precise issue before us here."); *see also United States v. California*, 314 F. Supp. 3d at 1101 (finding "[t]he more critical question, however, is whether required information sharing constitutes commandeering at all.  *Printz* left this question open.").  *Printz's* holding, as the Court later explained in *Murphy*, applied "not only to state officers with policymaking responsibility but also to those assigned more mundane tasks."  138 S. Ct. at 1477.  *Printz* does not support carving out statutes that focus on information-sharing from the anti-commandeering principle if the statutes are still characteristic of commands to States, their officers, or their political subdivisions.

There is no distinction for anti-commandeering purposes, post-*Murphy*, between a federal law that affirmatively commands States to enact new laws and one that prohibits States from doing the same.  Even if the Court would recognize an exception for statutes requiring "purely ministerial reporting," *Printz*, 521 U.S. at 936, Section 1373's impact is not merely as a ministerial information-sharing statute.  It prohibits state and local jurisdictions, their agencies, and officials, from preventing information-sharing with the federal government whether through ministerial reporting, local agency policymaking, or legislative rulemaking.  *See* 8 U.S.C. § 1373 ("a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [INS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.").  The statute takes control over the State's ability to command its own law enforcement.  This is particularly concerning given the State's and San Francisco's view of the decidedly negative impact that

1   entanglement with federal immigration enforcement has on community trust and reducing crime.

2   Section 1373 lacks the "critical alternative" discussed in *New York*, 505 U.S. at 176, allowing a

3   state to decline to administer a federal program.  *Id*. at 176–177.

4       As the court wrote in *City of Chicago*, Section 1373 "effectively thwart[s] policymakers'

5   ability to extricate their state or municipality from involvement in a federal program."  264 F.

6   Supp. 3d at 949.  It goes beyond information-sharing to "require[] local policymakers to stand

7   aside and allow the federal government to conscript the time and cooperation of local employees."

8   *City of Chicago*, 2018 WL 3608564, at *11.  Further, with Section 1373 imposed on states and

9   local governments, "federal priorities dictate state action" and this inevitably reaches the state's

10  relationship with its own citizens and undocumented immigrant communities in ways that no

11  doubt will affect their perceptions of the state and trust in its law enforcement agencies.  *United*

12  *States v. California*, 314 F. Supp. 3d at 1109, Dkt. No. 193 at 50.  For the reasons discussed

13  above, I find that Section 1373 is unconstitutional.[3]

14          **b.     Applicable Federal Laws in the Byrne JAG Statute**

15      DOJ asserts that it has the power to condition Byrne JAG grants on any federal law as long

16  as it gives notice that it applies, as it did for Section 1373.  Given that Section 1373 is

17  unconstitutional, "[a]s an unconstitutional law, Section 1373 automatically drops out of the

18  possible pool of 'applicable Federal laws' described in the Byrne JAG statute" whether I interpret

19  the statute as DOJ requests or not.  *City of Chicago*, 2018 WL 3608564, at *13 (citing *Branch v.*

20  *Smith*, 538 U.S. 254, 281–82 (2003) (finding that the phrase "as state law requires" does not

21  include unconstitutional state laws)); *see also City of Philadelphia*, 2018 WL 2725503, at *32–33

22  ("Because the JAG Byrne Program requires compliance with an unconstitutional statute (in this

23  case, Section 1373) in order to receive grant funds, the Certification Condition is itself

24  unconstitutional.").  DOJ has no authority to demand state and local governments certify

25  _____

26  [3] DOJ also asks the court to consider whether Section 1373's language can operate as an
    independent grant condition regardless of the validity of Section 1373.  Because I do not find that
27  the Byrne JAG statute or Section 10102(a)(6) provided independent authority for the Attorney
    General to impose the conditions, it follows that there would not be authority to impose a separate
28  grant condition identical to Section 1373's terms, without an act of Congress.

United States District Court
Northern District of California

compliance with an unconstitutional law.[4]

For completeness, though, I will address DOJ's argument on whether Section 1373 is an applicable law if it is constitutional.  San Francisco makes three persuasive counterarguments based in the text, context, and legislative history of the Byrne JAG statute to interpret the "applicable Federal laws" provision as limited to federal laws about the grant-making process. *See* SF Mot. for Summ. J. at 14–15; *see also* Amicus Brief (SF Dkt. No. 135-1) (advancing similar arguments).

First, it is superfluous to interpret "all other applicable Federal laws" as "all Federal laws," especially considering that Congress explicitly imposed compliance with other conditions by implementing the Sex Offender Registration and Notification Act and the Prison Rape Elimination Act.  Second, because all the other conditions in Section 10153(a) apply to the grant itself, the statutory context does not support imposing a condition beyond the grant administration process. Finally, DOJ's own practice narrowly interprets "applicable laws" to the grant process, and the certification form only asks grant applicants to certify compliance with federal laws "applicable to the award."  SF RJN Ex. C § 3(a).

Starting with the text, the Ninth Circuit has found that, in isolation, "the term 'applicable' has a spectrum of meanings."  *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1134 (9th Cir. 2009).  Here, the words "all other" that precede the "applicable" term do not give me much of any guidance on the scope of the provision's application.  DOJ's cases are also not determinative of the plain meaning of the text in this statute.  I agree with the courts in *City of Philadelphia*, 280 F. Supp. 3d at 619, and *City of Chicago*, 264 F. Supp. 3d at 944, that "[b]oth positions are plausible" and this question is a "close call."  Because "applicable" could hold either meaning proposed by the parties based on the text alone, to determine the congressional intent of this language I turn to "the specific

---

[4] In *City of Chicago*, the court also emphasized the constitutional distinction between Section 1373 and the condition that recipients must certify compliance with Section 1373.  The anti-commandeering principle may invalidate an unconstitutional law, but it would not invalidate agency authority to impose federal grant conditions if it is appropriately permitted by Congress. *See S. Dakota v. Dole*, 483 U.S. 203, 210 (1987) (finding that the Tenth Amendment limits congressional regulation of state affairs, not the conditions attachable to federal grants).  I agree with this distinction in reaching the conclusion here.

United States District Court
Northern District of California

context in which [the term 'applicable'] is used[] and the broader context of the statute as a whole." *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

The statutory structure suggests "applicable" was intended to refer to laws related to grant applications. The entire sentence appears in the last of four "residual clauses" within a proviso, all of which concern the grant application. In *Republic of Iraq v. Beaty*, 556 U.S. 848, 857–58 (2009), the Court recognized that "presumptively, the 'grammatical and logical scope [of a proviso] is confined to the subject-matter of the principal clause.'" *Id.* (quoting *United States v. Morrow*, 266 U.S. 531, 534–535 (1925)); *see also Alabama Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct. 1136, 1144–45, (2015) (finding that "the meaning of [a residual clause] is best understood by reference to the provisions that precede it."). In some instances, a proviso can state an independent rule—it "may be lazy drafting, but is hardly a novelty." *Id.* at 859. Here, the phrase "all other applicable Federal laws" refers to the preceding clause requiring grant applications to include a certification "in a *form* acceptable to the Attorney General." 34 U.S.C. § 10153(a)(5) (emphasis added). There is no indication that an acceptable form of the certification would encompass additional substantive compliance with laws not directly required by Congress. Accordingly, I would find that Section 1373 is not an applicable law regardless of its constitutionality.

## B.       The Spending Clause

California and San Francisco also argue that even if the Attorney General had the power to impose the conditions on grant funding delegated to him by Congress, it exceeds the constitutional limits of the Spending Power to require the new conditions. As discussed above, the Spending Power includes "condition[ing] the receipt of funds, by states and others, on compliance with federal directives." *Skinner*, 884 F.2d at 447. But this power is not absolute. Exercising the Spending Power to impose grant conditions must: (i) be in pursuit of the general welfare; (ii) be unambiguous; (iii) be reasonably related to Congress's articulated goal; and (iv) not induce the State to commit an unconstitutional action. *Id.* San Francisco and California challenge the ambiguity and relatedness of the three conditions.

1

### 1.    Unambiguous Requirement

When Congress requires conditions on federal funds, "it must do so unambiguously" so that state and local governments can decide whether to accept the funds and "exercise their choice knowingly, cognizant of the consequences of their participation." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17). Congress cannot implement new conditions after-the-fact because states must decide to opt-in to a federal program willingly and aware of the conditions. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602-04 (2012). Courts tasked with determining if an exercise of the Spending Power is unambiguous must find that the underlying statute provides "clear notice" of its application. *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296. San Francisco challenges all three conditions as ambiguous, while California focuses its briefing on the access and notice conditions.

### a.    Access and Notice Conditions

California asserts that the access and notice conditions do not provide clear notice of what is required to comply. There is no statute providing guidance about the condition requirements, and the award letters presumably outlining the terms of compliance do not explain the requirement that a state or local statute, rule, regulation, policy, or practice, must be in place and "designed to ensure" federal agents have access to and get notice concerning individuals in correctional facilities and their release date information. *See* DOJ RJN, Ex. B ¶¶ 55, 56. California also takes issue with DOJ's lack of explanation about whether the TRUTH Act disqualifies it from satisfying the access condition, and what state entities in the California Board of State and Community Corrections, which receives the Byrne JAG funds, are included in the award letter language "program and activity." *See* Sherman Decl. Ex. E at RFA Resp. 21 & 39.

San Francisco's contentions focus on the inconsistency of the DOJ's statements and positions explaining the access and notice conditions. San Francisco asserts that the notice condition, requiring notice "as early as practicable," is unclear and that the award letter language does not acknowledge times when notice is impossible because inmates are released with little or no notice. *See* Lee Decl. ¶ 7, Ex. E at ¶¶ 55, 56; DOJ RJN, Ex. B ¶¶ 55, 56. Further, San Francisco believes it is unclear from the DOJ's briefing in *City of Philadelphia v. Sessions* and

United States District Court
Northern District of California

*California v. Sessions* if San Francisco must provide access to inmates who consent or if it can decline access if the inmate is unwilling to meet with ICE. *Compare City of Philadelphia v. Sessions*, No. 2:17–cv–03894–MMB, Dkt. No. 28, at 32 (E.D. Pa. Oct. 12, 2017) (citing DOJ's argument that access conditions require access "even if the inmate refuses to answer questions"), *with California v. Sessions*, Dkt. No. 83, at 6 (N.D. Cal. Nov. 22, 2017) (arguing that the access condition does not "forbid a jurisdiction from informing detainees…that they may choose not to meet with immigration authorities.").

DOJ's response to San Francisco and California is nearly the same; it quotes the language of its award letters and contends that the notice and access conditions are unambiguous in their text. It also notes that to the extent grant applicants had questions, they should have contacted their respective "Grant Manager" as encouraged in the 2017 Byrne JAG solicitation. *See* Lee Decl. Ex. A & B. It pushes back against the need to specify the outer limits of its conditions, arguing that the conditions are not ambiguous even if they are indeterminate "provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see, e.g., Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper.") (citation omitted). It also responds to San Francisco's focus on inconsistent statements concerning the access condition merely as "different sides of the same coin" requiring San Francisco not to insert itself between federal immigration officials and detainees. DOJ Mot. Summ. J & Opp. at 21 n.13 (SF Dkt. No. 113).

In the case of a condition on federal funding, courts "must view the [governing statute] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296. Beginning with the text of the statute, if the "language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*,

34

1    530 U.S. 1, 6 (2000) (internal quotations omitted).

2         Here, as in *City of Philadelphia*, "[w]hether Congress unambiguously imposed the

3    Challenged Conditions (or unambiguously authorized the Attorney General so to do) entails

4    largely the same inquiry as whether it conferred authority upon the Attorney General to impose

5    them." 280 F. Supp. 3d at 646. I found no authority within the Byrne JAG statute to support the

6    Attorney General's purported power to impose the new conditions, and I found no independent

7    authority to impose the conditions based on the Assistant Attorney General's powers delineated in

8    Section 10102. *See supra* Sec. II.A.1-2. On that basis, the notice and access conditions "cannot

9    have been unambiguously authorized by Congress if they were never statutorily authorized." *Id*.

**b.      Certification Condition**

11         The certification condition is unclear from San Francisco's perspective because DOJ has

12   maintained different and increasingly broad interpretations of how state and local governments

13   must comply with Section 1373. In 2007, DOJ's Office of Inspector General ("OIG") evaluated

14   San Francisco's compliance with Section 1373 and concluded that even though ICE officials

15   objected to its policies, there was no concern about the flow of information between the two

16   agencies. *See* Lee Decl. ¶ 9, Ex. G at AR00010–12. However, in 2016, DOJ's OIG noted the

17   opposite conclusion based on its interpretation of San Francisco's Sanctuary City laws' internal

18   savings clause. *See* Lee Decl. ¶ 10, Ex. H at 5–6 n.7. San Francisco also alludes to various

19   representations that DOJ has made throughout this litigation and in parallel cases, which offer

20   inconsistent guidance on the scope of the certification condition. *See* SF Mot. Summ. J. at 19–20.

21         DOJ considers the certification condition unambiguous from the text of the award

22   documents. The award documents in defendants' exhibits show that complying with Section 1373

23   entails not restricting information on citizenship or immigration status. *See* DOJ RJN, Ex. B ¶¶

24   53–55. In October 2016, DOJ contends that OJP also issued "guidance" on compliance with the

25   Section 1373 certification condition. But at no point in this guidance does the OJP clearly answer

26   the questions raised by San Francisco about what its interpretation of compliance really means.

27   *See* DOJ RJN, Ex. F (repeating generally that its "goal is to ensure that our JAG and SCAAP

28   recipients are in compliance...").

1   In *City of Philadelphia*, the court found that whether the certification condition was

2   unambiguous was a "close call," just as it found it was a close call whether Section 1373 was

3   authorized by the "all other applicable Federal laws" language in Section 10153(a)(5)(D) of the

4   Byrne JAG statute.  280 F. Supp. 3d at 619, 646.  It concluded that Philadelphia was likely to

5   succeed on the merits of its ambiguity argument given that there were several interpretations of the

6   "applicable Federal laws" text that did not provide clear notice of the Section 1373 certification

7   condition.  *Id.* at 646–647 ("on one hand it could signify all federal laws related to grantmaking

8   (as the City would have it), or on the other, all federal laws related to law enforcement, or even the

9   entire corpus of federal law codified in the United States Code.").

10   As discussed above, I find that the plain text was not definitive in interpreting the meaning

11   of "all other applicable Federal laws," and the structure of the statute supported a limited

12   interpretation encompassing federal laws related to the grant.  *See supra* Sec. II.A.3.b.  Congress

13   required applications for Byrne JAG program grants to be certified in compliance with "all other

14   applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D).  However, the certification of "applicable"

15   laws is understood in relation to the preceding language "in such form as the Attorney General

16   may require," which I do not interpret as conferring more than ministerial powers to the Attorney

17   General.  *Id.*

18   DOJ's evolving interpretations of the certification condition further demonstrate

19   ambiguities that prevent applicants from deciding whether to accept the funds "cognizant of the

20   consequences of their participation."  *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. &*

21   *Hosp.*, 451 U.S. at 17).  In September 2017, in its opposition to San Francisco's motion for

22   summary judgment in *City and Cty. of San Francisco v. Trump*, DOJ argued that San Francisco's

23   sanctuary city ordinances violated Section 1373 because they discouraged or restricted employees

24   from sharing information regarding immigration status.  *See* Oppo. at 14–15, Case No. 3:17–485–

25   WHO (N.D. Cal. Sept. 27, 2017) (Dkt. No. 172).  Then at the October 23, 2017 hearing, DOJ

26   suggested that Section 1373 applies to a person's release status, identity or age, date of birth,

27   residence, and address.  Lee Decl. ¶ 13, Ex. K at 17:2–22:23.  In a November 15, 2017 letter to

28   San Francisco, DOJ expressed that it was concerned that San Francisco's sanctuary city policies

United States District Court
Northern District of California

1  violate Section 1373 since they prohibit notifying ICE of release state or personal information.

2  *See* Lee Decl. ¶ 14, Ex. L.  Now in this case, DOJ takes the expansive position that Section 1373

3  encompasses a detainee's release date, residential address, location information, date of birth,

4  familial status, and contact information.  *See* Lee Decl. ¶ 6, Ex. D (RFA Nos. 9–14).

5  ### 2.   Relatedness Requirement

6  In addition to being unambiguous, conditions on congressional spending must share some

7  nexus such that they are "reasonably related to the purpose of the federal program."  *See Dole*, 483

8  U.S. at 213 (O'Connor, J., dissenting).  This means that Byrne JAG program funds conditioned on

9  certified compliance with Section 1373 and the notice and access conditions "must have some

10  nexus to immigration enforcement."  *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532

11  (N.D. Cal.), reconsideration denied, 267 F. Supp. 3d 1201 (N.D. Cal. 2017), appeal dismissed as

12  moot sub nom. *City & Cty. of San Francisco v. Trump*, Case No. 17–16886, 2018 WL 1401847

13  (9th Cir. Jan. 4, 2018).

14  California contends that the challenged conditions, which pertain to federal immigration

15  enforcement, lack any reasonable relationship to the criminal justice purpose of Byrne JAG

16  program and in fact undermine its purpose of recognizing local control over local public safety.

17  *See* AR-992 (announcing the DOJ's new conditions so that "federal immigration authorities have

18  the information they need to enforce immigration laws.").  It also emphasizes DOJ's increasing

19  focus on removing classes of immigrants who have incurred civil penalties but have not been

20  convicted of any crime, which is beyond the criminal justice goals of the Byrne JAG program.

21  Similarly, San Francisco asserts that Congress's purpose for the Byrne JAG program was to give

22  state and local governments support for their own initiatives related to one of eight criminal justice

23  purposes—none of which is immigration enforcement.  34 U.S.C. § 10152(a)(1)(A)–(H).

24  DOJ argues that the grant conditions satisfy the relatedness inquiry because the term

25  "criminal justice" is broadly defined in the same chapter of the Byrne JAG statute as "activities

26  pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law,

27  including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend

28  criminals, . . . activities of courts having criminal jurisdiction, and related agencies." 34 U.S.C. §

United States District Court
Northern District of California

37

1   10251(a)(1).  Drawing from Section 10102(a), DOJ also contends that the conditions relate to the

2   Assistant Attorney General's responsibility to "maintain liaison with" state governments in

3   criminal justice matters.  34 U.S.C. § 10102(a)(1), (2).  It contends that its efforts to remove

4   immigrants convicted of serious crimes are sufficiently related to apprehending criminals and

5   reducing crime because once removed, a criminal is no longer present to re-offend.

6          As I have already discussed at length, on its face the Byrne JAG program is a formula

7   grant program for specified funds to be used by states and local law enforcement in programs

8   related to one of eight broad program areas related to criminal justice.  34 U.S.C. §

9   10152(a)(1)(A)–(H); s*ee also City of Philadelphia*, 280 F. Supp. 3d at 643 ("the best reading of

10  the Byrne statute is that Congress intended to create a formula grant program that simply provided

11  fiscal assistance to states and localities for any of a wide variety of permissible purposes that the

12  applicant jurisdictions, having heard from various stakeholders, were entitled to select.").  The

13  legislative history bolsters this interpretation of its purpose.  *See, e.g.*, H.R. Rep. 109–233, at 89,

14  reprinted in 2005 U.S.C.C.A.N. 1636, 1640 ("The Committee believes that these reforms will

15  work to give State and local governments more flexibility to spend money for programs that work

16  for them rather than to impose a 'one size fits all' solution."); 151 Cong. Rec. 25, 919 (2005)

17  ("Byrne grants fund local law enforcement to combat the most urgent public safety problems in

18  their own communities.").

19         Congress repealed the only requirement related to immigration that existed before, and it

20  has failed to amend the Byrne JAG statute to add similar conditions since.  *See* Immigration Act of

21  1990, Pub. L. 101-649, § 507(a); Misc. and Tech. Immigration and Naturalization Amend. of

22  1991, Pub. L. 102-232, § 306(a)(6) (repealed 2006) (requiring states to provide records of the

23  "criminal convictions of aliens"); CA RJN Exs. 32–36 (various House and Senate bills that failed

24  to amend the Byrne JAG statute with an immigration enforcement component); *see also* Amicus

25  Brief at 4 n.6 (CA Dkt. No.132; SF Dkt. No. 138-1) (summarizing failed efforts since the 1990s to

26  impose immigration conditions on Byrne JAG grant funding).  In fact, "Congress has repeatedly,

27  and frequently, declined to broadly condition federal funds or grants on compliance with Section

28  1373 or other federal immigration laws," as DOJ is now attempting to do with the challenged

United States District Court
Northern District of California

38

conditions. *Cty. of Santa Clara*, 250 F. Supp. 3d at 531 (citing Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2016)).

The Byrne JAG programs that are at risk of losing funding because of the access and notice conditions do not relate to immigration enforcement. The conditions address interviewing and accessing detained individuals for removal purposes, and as applied they "target[] for defunding grants with no nexus to immigration enforcement at all." *Cty. of Santa Clara*, 250 F. Supp. 3d at 533. As recognized in *City of Philadelphia*, criminal law is integral to federal immigration law, but it is not a two-way street; immigration law does not impact local law enforcement's administration and enforcement efforts in the criminal justice system. 280 F. Supp. 3d at 642, 642 ("Immigration law has nothing to do with the enforcement of local criminal laws."). The INA authorizes local law enforcement to cooperate with the federal government to enforce immigration laws, but it does not require it. *See, e.g.*, 8 U.S.C. §§ 1252c, 1324(c), 1357(g) (authorizing state and local officers to arrest for INA violations, and to enter formal cooperative agreements to perform other specific functions of federal immigration officers). Relatedly, both California and San Francisco have shown that their own policies and laws respect the separation between immigration enforcement and the essential duties local law enforcement carry out with their limited resources.

California's Byrne JAG program funding is intended to support law enforcement programs like task forces focused on criminal drug enforcement, violent crime, and gang activities; none of these involve immigration enforcement. *See* Caligiuri Decl. ¶ 29. California's COPS grant funding also funds the salaries and costs of four full-time employees who work on anti-methamphetamine efforts. *Id*. ¶ 21. Likewise, San Francisco's funding goes towards at-risk youth programs to reduce recidivism, law enforcement programs aiming to reduce drug trade and servicing people with drug use and mental health problems. *See* Chyi Decl. ¶¶ 10, 17, 18. The access and notice conditions, which DOJ admits are intended to promote immigration enforcement, lack any relationship to (and in fact interfere with) the criminal justice priorities set

39

by the plaintiffs applying for criminal justice program funding through the Byrne JAG statute. Contrary to DOJ's view, maintaining liaison with state and local governments on criminal justice matters does not justify requiring access to their detainees and notice of release dates for every individual the federal government requests.

Even if the Attorney General had the Spending Power to impose immigration enforcement on traditional criminal justice responsibilities of local law enforcement, the conditions are more substantial than the relationship between the dual sovereigns can reasonably bear. The Attorney General has made it clear that DOJ "no longer will exempt classes or categories of removable aliens from potential enforcement," yet many immigration violations do not involve criminal law and are only violations of civil penalties. *Cf.* CA RJN Ex. 37 at 2, *with* 8 U.S.C. §§ 1182(a)(6)(A) & (9)(B), 1202(g), 1227(a)(1)(B). California and San Francisco have shown that their uses of the Byrne JAG grants are much broader than preventing reoffenders, such that "adherence to the Department of Justice conditions would conflict with its justifiable policies towards non-criminal aliens." *City of Philadelphia*, 280 F. Supp. 3d at 644. In this respect, "the federal interest in enforcing immigration laws falls outside the scope of the Byrne JAG program." *Id.* at 642.

The certification condition is unrelated as well. In my prior Order on California's motion for a preliminary injunction, I found that the Section 1373 certification condition may have a sufficient nexus to the purposes of the Byrne JAG program "depending on the breadth of the federal government's interpretation of Section 1373." Order at 23 (CA Dkt. No. 89). Even though the federal government's interest in immigration enforcement extends beyond the Byrne JAG statute's goal of supporting criminal justice programming, "the Certification Condition appears to have some relationship with the JAG Program." *City of Philadelphia*, 280 F. Supp. 3d at 642, 644. But as the court in *City of Philadelphia* found, Section 1373 by its plain terms was not limited to "aliens, criminal aliens, or even convicted criminals." *Id*. at 644. Philadelphia established that it uses Byrne JAG funds for justifiable policies related to non-criminal aliens outside just prosecuting criminals. *Id*. Based on these facts, it noted the certification condition "arguably exceeds the relatedness requirement." *Id*. (citing *Dole*, 483 U.S. at 215 (O'Connor, J., dissenting). I agree.

40

United States District Court
Northern District of California

1    The Supreme Court has required only that grant conditions "bear some relationship to the

2    purpose of the federal spending." *New York*, 505 U.S. at 167.  I have already discussed why I

3    would have found Section 1373 is not an "applicable law" under the Byrne JAG statute regardless

4    of its constitutionality.  Requiring a certification of compliance with an inapplicable law would

5    seem to exemplify un-relatedness.  Assuming that Section 1373 was an "applicable law,"

6    according to its text it still prevents restricting "information regarding the citizenship or

7    immigration status, lawful or unlawful, *of any individual*." 8 U.S.C. § 1373(a) (emphasis added).

8    In turn, the Section 1373 certification condition exceeds the bounds of the Byrne JAG statute and

9    demonstrates "an attenuated or tangential relationship" that the DOJ is not entitled to impose.

10   *Dole*, 483 U.S. 203, 215 (1987).  By its express terms it applies to "any individual," including

11   non-criminal immigrants and United States citizens alike.  *See City of Philadelphia*, 280 F. Supp.

12   3d at 644 (quoting 8 U.S.C. § 1373(a)).  This condition, like the access and notice conditions, does

13   not apply to the criminal justice purposes of the programs the Byrne JAG statute supports.

14   Accordingly, even if Congress delegated the Spending Power to the Attorney General, the

15   challenged conditions are ambiguous and insufficiently related to the grant or the local criminal

16   justice program purposes of the federal spending.

## III.   CALIFORNIA'S ARBITRARY AND CAPRICIOUS CLAIM

18   California argues that all three conditions for Byrne JAG program funding are "arbitrary

19   and capricious" under the Administrative Procedure Act ("APA").  DOJ counters that there is no

20   final agency action because it has not yet granted or denied California's fiscal year 2017 Byrne

21   JAG application or imposed the conditions on the grant.[5]  Assuming for the sake of argument that

22   there was final agency action, DOJ contends that the conditions are not arbitrary and capricious.  I

23   address each argument below.

### A.   Requiring the Challenged Conditions is a Final Agency Action

25   An agency action is final if it "marks the consummation of the agency's decisionmaking

---

[5] Defendants note that their argument is unchanged from earlier in the case, when I found
California demonstrated that the imposition of the certifying condition is a final agency action.
*See* DOJ Mot. Summ. J & Opp. at 10 n.4 (CA Dkt. No. 124).

1    process" and determines "rights or obligations…from which legal consequences flow." *Bennett v.*

2    *Spear*, 520 U.S. 154, 177–178 (1997) (internal quotations omitted).  DOJ acknowledges that it has

3    determined certain California laws violate Section 1373, as evidenced by its affirmative litigation

4    in *United States v. California*, Case No. 2:18–cv–490, Dkt. No. 1 (E.D. Cal. Mar. 6, 2018).  *See*

5    DOJ Mot. Summ. J & Opp. at 11 n.5 (CA Dkt. No. 124).  It tries to distinguish this legal

6    conclusion from a final factual determination on the Byrne JAG program application.  But as I

7    found in the prior Order, finding that the Byrne JAG program and COPS grants require

8    compliance with Section 1373 is a final action, and there are clear legal consequences for

9    California stemming from imposing the condition.  *See* Order at 19–20 (CA Dkt. No. 89) (finding

10   "the federal government has articulated that certain funds…will require adherence to the

11   certification condition" and "[r]eceipt of the grants is conditioned on certifying compliance with

12   the federal government's interpretation of Section 1373.").  For the reasons expressed in the prior

13   Order, I find that all the challenged conditions have been determined by the Attorney General as

14   requirements for grant funding and constitute final agency action.

15          Courts presiding over the parallel cases agree.  On a motion to dismiss in *City of*

16   *Philadelphia*, the court found that the decision to impose the conditions was final since plaintiffs

17   pleaded facts showing the conditions were required for funding, and that compliance with them

18   would significantly alter their local policies.  309 F. Supp. 3d at 280.  In *City of Chicago*, the court

19   found DOJ's decision to impose the grant funding conditions was a final agency action, not the

20   factual determination whether to award the funds (as DOJ argues again here).  2018 WL 3608564,

21   at *4.  Compliance with the conditions is required for grant funding based on the Byrne JAG 2017

22   Solicitation.  *Id*.  The conditions forced Chicago to decide between accepting the award at the loss

23   of dictating its own local policy preferences or foregoing the monetary award.  *Id*.

24          These are the same circumstances here.  California has shown that the decision to impose

25   new conditions on the Byrne JAG and COPS grants was final and will lead to significant legal

26   consequences depending on its decision to participate as well as to certify its compliance.

27          **B.    Imposing the Challenged Conditions was Arbitrary and Capricious**

28          The APA requires courts to "hold unlawful and set aside agency action, findings, and

42

1    conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

2    accordance with law." 5 U.S.C. § 706(2)(A).  Actions where there is a "rational connection

3    between the facts found and the choice made" to achieve these goals are valid.  *Motor Vehicle*

4    *Mfrs Ass'n v. State Farm Mut. Auto Ins. Co*, 463 U.S. 29, 43 (1983).  Agency action should be

5    overturned when, among other things, the agency: (i) relied on factors Congress did not intend for

6    it to consider; (ii) failed to consider important aspects of the problem it is addressing; or (iii)

7    explained its decision counter to the evidence before it.  *State Farm*, 463 U.S. at 43; *see also Pac.*

8    *Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir.

9    2001).  California contends that the administrative record establishes all those problems and

10   requires overturning the agency action.

11        Because California challenges grant conditions, the usual administrative procedures that

12   show an agency's justification for its action, such as formal rules, notice and comment, or

13   hearings, are not present here.  *See* 5 U.S.C. § 553(a)(2).  I did not have the complete

14   administrative record at the time of the preliminary injunction, and in the prior Order I was not

15   prepared to find the certification condition was arbitrary and capricious because "the change in

16   policy might 'be ascribed to a difference in view.'"  Order at 22 (CA Dkt. No. 89).

17        Now I am presented with the complete administrative record of 48 documents totaling

18   1037 pages.  *See* Administrative Record (CA Dkt. No. 96) (SF Dkt. No. 84).  DOJ bases its

19   agency action to impose the new conditions on five documents in the record: (i) a 2007 OIG Audit

20   Report, *see id*. AR-00001-00109; (ii) a 2016 OIG Memorandum, *see id*. AR-00366-00381; (iii) a

21   Letter from Assistant Attorney General Kadzik to Rep. Culberson, *see id*. AR-00382-00391; (iv)

22   DOJ Press Release No. 17–826, *see id*. AR-00992; and (v) the Backgrounder on Grant

23   Requirements, *see id*. AR-00993.  These are nearly the identical records it unsuccessfully relied on

24   in *City of Philadelphia*, 280 F. Supp. 3d at 619–625, with the addition of the Letter to Rep.

25   Culberson.  The records do not "articulate a satisfactory explanation for [DOJ's] action." *State*

26   *Farm*, 463 U.S. at 43.

27        First, citing the 2007 OIG Audit Report, DOJ claims that the challenged conditions were

28   arrived at understandably because they promote interests in "maintain[ing] liaison" between tiers

United States District Court
Northern District of California

43

of government in criminal justice matters.  DOJ Mot. for Summ. J. at 21.  The thorough analysis

by the court in *City of Philadelphia* explains why this argument misses the mark.  The 2007 OIG

Audit Report concluded that it could not "statistically extrapolate the number of offenses

committed by undocumented criminal aliens who were released from local custody without a

referral to ICE" and that it "could not determine if ICE was notified before the criminal aliens in

our sample were released from custody."  AR-00014.  As a result, DOJ cannot look to this record

to establish that it properly "examine[d] the relevant data to reach a relevant basis for its

decision…because it failed to use the relevant data to form an opinion at all."  *City of*

*Philadelphia*, 309 F. Supp. 3d at 324 (internal quotations omitted) (identifying two more reasons

the 2007 OIG Report provided no support as to the arbitrary and capriciousness of the challenged

conditions).

Second, a similar issue arises with the 2016 OIG Memorandum.  The Memorandum

presents findings on ten state and local jurisdictions, with the express purpose of updating DOJ on

steps taken to address compliance with Section 1373.  *See* AR-00367.  From the outset, this record

comes after "OJP notified SCAAP and JAG applicants about the requirement to comply with

Section 1373."  AR-00374.  It does not attempt to justify any of the new conditions, and instead it

offers the DOJ steps to consider in light of DOJ's focus on "ensuring that grant applicants comply

with Section 1373."  *Id*.  DOJ cannot rely on this document to establish a "rational connection

between the facts found and the choice made" to impose the new conditions because the choice to

impose a certification condition was already made and this record does not purport to offer any

post-hoc rationalization.  *State Farm*, 463 U.S. at 43.

Nevertheless, the 2016 OIG Memorandum recommends that DOJ consider providing

"clear guidance" on whether Section 1373 is an applicable federal law, acknowledging that the

record does not purport to provide that guidance and clarifying that DOJ has not yet confirmed

Section 1373's applicability to the Byrne JAG grant statute.  *See* AR-00374 at n.13.  DOJ cannot

justify its certification condition on this record, which did not assess any of the reasons DOJ

imposed the certification condition and which offered recommendations to DOJ specifically in

response to DOJ's decision to notify applicants of the certification condition.  To attempt to justify

44

1    the condition on this record is an exercise in circular reasoning.  *See City of Philadelphia*, 280 F.

2    Supp. 3d at 624 ("The Attorney General cannot justify the Certification on a tautology; a report

3    concluding that many jurisdictions are not complying with Section 1373 does not justify imposing

4    a condition requiring those jurisdictions to certify compliance.").

5         Third, in fiscal year 2016 the prior administration introduced the Section 1373 certification

6    idea and recognized Section 1373 as an applicable federal law for the Byrne JAG program.  *See*

7    Attachment to Letter from Assistant Attorney General Kadzik to Rep. Culberson, AR-00384.  The

8    attachment is a Memorandum from the Assistant Attorney General for OJP to DOJ's Inspector

9    General, discussing OJP's determination that Section 1373 is an applicable federal law for

10   purposes of the Byrne JAG grant program.  *See id*.  This document does not explain how or why

11   the OJP reached its determination about Section 1373 either.  At most it demonstrates another

12   tautology where the DOJ is justifying its conclusion to impose the conditions in this lawsuit based

13   on a separate document that also makes an unsupported conclusion about the Section 1373

14   compliance condition.

15        Fourth, relying on the Backgrounder on Grant Requirements, DOJ contends that the

16   challenged conditions had a "goal of increasing information sharing between federal, state, and

17   local law enforcement . . . to enforce the law and keep our communities safe."  *See* Backgrounder,

18   AR-00993.  I addressed the Backgrounder thoroughly in my prior Order.  *See* Order at 21 (finding

19   that it was unclear that the certification condition had the requisite rational connection to the facts

20   in the Backgrounder).  There is not a clear link, or at least the government has not been able to

21   provide one, between localities keeping release dates or contact information confidential and more

22   dangerous or less safe communities.

23        Finally, DOJ relies on a 2017 press release by the Attorney General proclaiming that

24   sanctuary city policies "make all of us less safe because they intentionally undermine our laws and

25   protect illegal aliens who have committed crimes."  DOJ Press Release No. 17–826, AR-00992.

26   The Attorney General contends that "[t]hese [sanctuary city] policies also encourage illegal

27   immigration and even human trafficking by perpetuating the lie that in certain cities, illegal aliens

28   can live outside the law."  *Id*.  The press release expressly communicates the DOJ's "top priority

45

United States District Court
Northern District of California

1   of reducing violent crime" by encouraging jurisdictions to "change their policies and partner with

2   federal law enforcement to remove criminals." *Id*. Much of the rhetoric discussed in this

3   document tracks with the DOJ's Backgrounder in the administrative record, such as the

4   contentions that sanctuary city policies make communities less safe, encourage illegal

5   immigration, and allow crimes to be committed. However, also like the Backgrounder, this press

6   release lacks any demonstrable linkage between allowing local government to maintain

7   immigration confidentiality and less safe communities. As noted in *City of Philadelphia*, some

8   claims in the press release are also "factually untrue" with respect to California's laws and

9   policies. 280 F. Supp. 3d at 624; *see also* DOJ Press Release No. 17–826, AR-00992 (claiming

10  that sanctuary policies nationwide "perpetuat[e] the lie that in certain cities, illegal aliens can live

11  outside the law," and "protect illegal aliens who have committed crimes.").

12          It is worth emphasizing that the evidence before me indicates the opposite of DOJ's

13  rhetoric. In contrast to DOJ's unsubstantiated view, California shows that imposing the

14  challenged conditions may damage its law enforcement efforts. In support of its sanctuary

15  policies, the California Assembly Committee on Public Safety relied on a study finding lower

16  likelihoods of contacting law enforcement by Latinos (44 percent), undocumented immigrants (70

17  percent), and U.S.-born Latinos (28 percent) who were victims of a crime, for fear of police

18  inquiring into their immigration status. *See* CA RJN Ex. 4; *see also* Wong Decl. ¶¶ 35-38 (sharing

19  similar results in a separate study of San Diego undocumented Mexican nationals).

20           This evidence is not isolated to California. A letter from the Mayor of New Orleans to the

21  Attorney General explains the work their law enforcement does in coordination with federal

22  officials and why the conditions and rhetoric of the Executive Branch are hindering their work to

23  make communities safer. *See* AR-00487 ("Fear within immigrant communities pushes individuals

24  and families, undocumented or not, into the shadows, and makes the task of protecting everyone

25  much more difficult for law enforcement."). A second letter from the City Solicitor of

26  Philadelphia explains its view that trust between law enforcement and residents, regardless of

27  immigration status, leads to safer communities. *See* AR-00640 ("gain[ing] the trust and

28  cooperation of . . . residents, crime victims and witnesses . . . regardless of their immigration

46

1    status" makes the "community stronger and . . . streets safer.")  The record also includes a letter

2    from Milwaukee County's Corporation Counsel to the Acting Assistant Attorney General, stating

3    that its local policies make the community safer and that the conditions will undermine those

4    policies.  *See* AR-00722 (finding that its resolutions "make the community safer by fostering trust

5    between residents and local law enforcement.").

6           Amici prosecutors and law enforcement leaders provide many other studies showing that

7    interjecting federal immigration enforcement into local law enforcement weakens trust, which is

8    vitally important to community-oriented policing and reducing crime.  *See* Amicus Brief (CA Dkt.

9    No. 130; SF Dkt. No. 136-1).  Not only do Latinos and undocumented immigrants become less

10   likely to contact law enforcement if they are victims or witnesses of a crime, but 85 percent of

11   immigrant families are mixed-status households, meaning that the fear or lack of trust extends to

12   United States citizens who worry about the deportation of their family members or close relatives.

13   *See id.* (citing Anita Khashu, The Role Of Local Police: Striking a Balance Between Immigration

14   Enforcement and Civil Liberties, Police Found. (Apr. 2009), available at

15   https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-

16   PoliceNarrative.pdf.).

17          According to a study of law enforcement officers, two-thirds expressed views that

18   immigrants were reporting less crimes.  *See id.* (citing Robert C. Davis et al., Access to Justice for

19   Immigrants Who Are Victimized, 12 Crim. Just. Pol'y Rev. 183, 187 (2001)).  These sentiments

20   are corroborated by a national survey evidencing declines in immigrant communities that are

21   willing to cooperate with law enforcement.  *See id.* (citing Nat'l Immigrant Women's Advocacy

22   Project Report, at 99 (May 3, 2018), available at http://library.niwap.org/wp-

23   content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.).

24          The evident consequence of a widespread fear of deportation within Latino communities is

25   an underreporting of violent crimes such as domestic violence and gang-related violence.  *See id.*

26   (citing Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, Texas Dist. & Cty. Attorneys

27   Ass'n, The Texas Prosecutor, Vol. 47, No. 4 (July/Aug. 2017) (finding rape reporting by the

28   Hispanic community in Houston fell 40 percent from 2016 to 2017 despite overall increase in

United States District Court
Northern District of California

crime reporting city wide); James Queally, Fearing Deportation, Many Domestic Violence

Victims Are Steering Clear of Police and Courts, L.A. Times, Oct. 9, 2017,

http://www.latimes.com/local/lanow/la-me-lnundocumented-crime-reporting-20171009-

story.html. (finding similar declines in sexual assault and domestic violence reporting by the

Hispanic community, but not other ethnic groups, in San Diego, Los Angeles, and San

Francisco)).  In another study focused on Latinas, those surveyed were increasingly unlikely to

report violent crimes because of a fear of deportation and a lack of trust in the police.  *See id*.

(citing Jill Theresa Messing et al., Latinas' Perceptions of Law Enforcement: fear of Deportation,

Crime Reporting, and Trust in the System, 30 J. Women & Soc. Work 328, 334 (2015)).

DOJ fails to explain adequately the reasons it imposed the challenged conditions.  Its own

justifications cannot "be ascribed to a difference in view or the product of agency expertise;" the

record demonstrates the lack of evidence supporting its position, that it failed to consider

important problems with its conditions and has repeatedly offered explanations that are counter to

the evidence.  *State Farm*, 463 U.S. at 43.  The challenged conditions are arbitrary and capricious

under the APA.

## IV.    DECLARATORY RELIEF

California and San Francisco seek a declaratory judgment that their respective laws comply

with Section 1373 so that they can complete the certification condition.  On its cross motion for

summary judgment, DOJ argues that the requests for declaratory relief are non-justiciable under

principles of standing and ripeness.  Further it asks for judgment denying declaratory relief for

California's Values Act and San Francisco's Administrative Code Chapters 12H and 12I.

When a party requests declaratory judgment, "the question in each case is whether the facts

alleged, under all the circumstances, show that there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."  *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  A

court can issue declaratory judgment "[i]n a case of actual controversy within its jurisdiction."  28

U.S.C. § 2201(a).  I find that the claims are ripe for review and issue declaratory relief consistent

with the forthcoming discussion.

48

United States District Court
Northern District of California

### A.   Justiciability

DOJ argues that San Francisco and California's claims are not justiciable.  It contends that California does not have the injury-in-fact needed to establish standing and its claims are not ripe.  This is substantially the same argument it made against California's preliminary injunction motion (pertaining to Section 1373), which I rejected in a prior Order.  *See* Order (CA Dkt. No. 89).  It makes a ripeness argument against San Francisco, though I also found standing and ripeness previously.  *See* Order Denying Motion to Dismiss at 2 (SF Dkt. No. 78).  The analysis in those Orders applies with equal force today and extends to all the challenged conditions.

California and San Francisco have demonstrated Article III standing to challenge the conditions and their claims are ripe for review.  Rather than restate the reasoning here, I refer to the discussions of justiciability in my prior Orders.  *See* Order at 11–19 (CA Dkt. No. 89) (finding "the State has demonstrated Article III standing" and "its claims are ripe for review."); Order at 2 (SF Dkt. No. 78) (discussing the same finding for San Francisco); *see also Cnty. of Santa Clara*, 275 F. Supp. 3d. at 1207–11 (discussing justiciability in the context of the previous Executive Order imposing a Section 1373 certification condition).

### B.   Interpreting Section 1373

Assuming for the moment that Section 1373 is not unconstitutional on its face, I need to consider what it requires.  DOJ asserts that Section 1373, at a minimum, includes contact information and release status information for any detained immigrants.  *See* DOJ Mot. for Summ. J. at 29; *see also* Sherman Decl. Ex. B (Defs. Interog. Resps. 6, 17).  San Francisco and California contend that Section 1373 only extends to citizenship and immigration status inquiries.  *See* SF Mot. for Summ. J. 22–24; CA Mot. for Summ. J. at 25-27.  This familiar disagreement about Section 1373 has already been analyzed and resolved by three district courts.

In *Steinle v. City & Cnty. of San Francisco*, the Hon. Joseph C. Spero found that Section 1373 was void of anything addressing inmate release dates because by its terms it only governed citizenship or immigration status information.  230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) ("no plausible reading of [Section 1373]...encompasses the release date of an undocumented inmate.").  The court found no need to interpret legislative history because a plain reading of the statute is so

clear.  Following *Steinle*, in *City of Philadelphia* the court concluded that Section 1373 "does not require advance notice of an individual's release from custody."  *City of Philadelphia*, 309 F. Supp. 3d at 332.  The court offered two additional interpretations of Section 1373's text as well. The language "citizenship or immigration status" was limited to an individual's class of presence in the United States, such as undocumented, refugee, or United States citizen.  *Id*. at 333.  Further, the language "information regarding" was also limited only to information relevant to the "citizenship or immigration status" inquiry, of which release dates was not a part.  *Id*.  Finally, in *United States v. California*, DOJ's affirmative litigation to invalidate California's sanctuary state laws like the Values Act, DOJ argued that prohibiting release dates and addresses for detainees violated Section 1373. *United States v. California*, 314 F. Supp. 3d at 1101.  But the court found "no direct conflict between SB 54 [the Values Act] and Section 1373."  *Id*.  Section 1373 was limited to information strictly related to immigration status and did not include information on release dates and addresses.  *Id*. at 1102.

I have also discussed Section 1373 in my prior Order on California's preliminary injunction motion.  *See* Order (CA Dkt. No. 89).  I found that the meaning of the phrase "regarding immigration status" was ambiguous; DOJ offered no definition of the phrase.  As I wrote then, "Under the INA, almost every bit of information about an individual could be relevant to status, particularly with respect to the right to asylum or as a defense to removal."  *Id*.  I cannot read the phrase "regarding immigration status" as broadly as the DOJ requests without inviting the same concern for ambiguity I identified before.  "A contrary interpretation would know no bounds."  *United States v. California*, 314 F. Supp. 3d at 1102.

San Francisco and California are also correct that if Congress intended to give Section 1373 broad enforcement application, it could have used broader language.  *See Curtis v. United States*, 511 U.S. 485, 492 (1994) (finding Congress "knew how to do so" if it intended to draft a statute broadly); *see also United States v. California*, 314 F. Supp. 3d at 1103 ("If Congress intended the statute to sweep so broadly, it could have used broader language or included a list to define the statute's scope.").  For example, 8 U.S.C. § 1367(a)(2) was enacted within the same bill as Section 1373 and prohibits immigration officials from disclosing "any information which

relates to an alien." In other provisions of the INA, Congress used language such as "information regarding the name and address of the alien," 8 U.S.C. § 1360(c)(2), information "about the alien's nationality, circumstances, habits, associations, and activities," *id*. § 1231(a)(3)(C), "any information...regarding the purposes and intentions of the applicant," *id*. § 1225(a)(5), and "information concerning the alien's whereabouts and activities," *id*. § 1184(k)(3)(A).

Accordingly, I agree with the other district courts that found Section 1373 would support only a narrow interpretation that extends to "information strictly pertaining to immigration status (i.e. what one's immigration status is)." *United States v. California*, 314 F. Supp. 3d at 1102.

### C.    California's Sanctuary State Laws Comply with Section 1373

California asserts that its laws comply with Section 1373 as this court narrowly interprets the statute. It seeks declaratory judgment with respect to its TRUST Act, TRUTH Act, Values Act, California Penal Code Sections 422.93, 679.10, and 679.11, California Code of Civil Procedure Section 155, and California Welfare and Institutions Code Sections 827 and 831. The DOJ only requests judgment for defendants on the Values Act, effectively conceding that the other state laws would comply with Section 1373.[6] Based on the DOJ's concession, the only question remaining is whether the Values Act complies with Section 1373.

California relies on its interpretation that the Values Act's savings clause in subsection (e) expressly authorizes compliance with Section 1373. *See* Cal. Gov. Code § 7284.6(e). The savings clause states:

> (e) This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, *information regarding the citizenship or immigration status, lawful or unlawful, of an individual*, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of Title 8 of the United States Code.

Cal. Gov. Code § 7284.6 (emphasis added).

---

[6] The DOJ discusses in a footnote that the other state laws that California seeks declaratory judgment for may not be implicated by Section 1373 but may still give rise to different conflicts with analogous provisions elsewhere in the INA. *See* DOJ Mot. for Summ. J at 28 n.19 ("The complexity of such an assessment is yet another reason not to evaluate these statutes where OJP has made no inquiry or allegation that they violate Section 1373.").

United States District Court
Northern District of California

Given my interpretation of Section 1373, limiting it to information relevant to citizenship or immigration status not including release date information, it is clear the Values Act complies with Section 1373.  Its savings clause expressly does not prohibit the state government from communicating or sharing "information regarding the citizenship or immigration status, lawful or unlawful, of an individual," exactly what Section 1373 requires.  *Compare* Cal. Gov. Code § 7284.6(e), with 8 U.S.C. § 1373 (stating state and local governments "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [INS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.").

### D.      San Francisco's Sanctuary City Ordinances Comply with Section 1373

San Francisco also requests a declaratory judgment that its sanctuary city laws, Chapters 12H and 12I, comply with Section 1373.  DOJ disputes declaratory relief because it asserts the San Francisco laws prohibit providing contact information and the release status of detainees.  Because I do not interpret Section 1373 broadly to require state and local governments to share contact information and release status information with federal immigration officials, I find that San Francisco's sanctuary city laws comply with the federal statute.

Chapter 12H prohibits San Francisco employees from "disseminat[ing] information regarding release status of any individual or any other such personal information" and allows them to communicate that information if required to by federal law.  SF Admin. Code § 12H.2.  The term "personal information" is defined expressly in Chapter 12I as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information."  *See* SF RJN Ex. A.  San Francisco's Board of Supervisors also amended this chapter in 2016, changing restrictions on communicating "immigration status" to "release status."  *See* SF RJN Ex. G.  Chapter 12I prohibits responding to detainer requests from federal immigration officials and allows employees to notify federal officials of inmate release status in certain limited circumstances.  SF Admin. Code § 12I.3.

There is no dispute that Chapters 12H and 12I prohibit sharing contact information and release dates with ICE, but that is not a requirement of Section 1373.  Still, the DOJ interprets

United States District Court
Northern District of California

1    Chapter 12H as violating Section 1373 even under the court's interpretation, based on its language

2    prohibiting employees from "assist[ing] in the enforcement of Federal immigration law."  SF

3    Admin. Code § 12H.2.  In reply, San Francisco contends that this general prohibition should not

4    control where elsewhere in the chapter there is specific language that only prohibits employees

5    from sharing release status information and personal information.  I agree and do not read

6    Chapters 12H and 12I so broadly where a narrower reading harmonizes the sanctuary city laws

7    with Section 1373.

8         Neither Chapter 12H or 12I concerns communications about information on an

9    individual's immigration and citizenship status.  San Francisco's six departments that received

10   Byrne JAG funds: the Department of Children Youth & Their Families, Adult Probation, Sheriff's

11   Department, Police Department, District Attorney's Office, and Public Defender's Office, either

12   administer policies that are consistent with San Francisco's Sanctuary City laws or do not have

13   policies that involve Chapters 12H and 12I.  *Cf.* Fletcher Decl. ¶¶ 6–7; Hennessy Decl. ¶¶ 11, 17–

14   18; Sainez Decl. ¶¶ 9–11 (outlining policies consistent with San Francisco's sanctuary city laws),

15   *with* Chyi Decl. ¶ 27; DeBerry Decl. ¶ 5; Adachi Decl. ¶ 5 (describing the lack of policies related

16   to Chapters 12H and 12I).  Additionally, these departments have notified their employees that

17   federal laws requiring information-sharing, such as Section 1373, should be followed.  *See* SF

18   RJN Ex. D; *see also* Fletcher Decl. ¶ 8; Hennessy Decl. ¶ 10; Sainez Decl. ¶ 8; Chyi Decl. ¶ 29;

19   DeBerry Decl. ¶ 7; Adachi Decl. ¶ 7.

20        DOJ discusses several San Francisco documents that it believes communicate policies

21   instructing employees to prohibit immigration status information-sharing.  *See* DOJ Mot. for

22   Summ. J. at 33-34.  It also believes the City Attorney's Office's written public guidance on

23   interacting with ICE agents give employees the impression that they should refuse to speak with

24   federal immigration officials because it lists what employees "are not required" to do for ICE

25   agents and italicizes negatives like the word "not."  I do not agree that the format of the documents

26   is significant or dispositive of compliance with Section 1373.  What is required, and what is

27   apparent in the documents, is that they do not prohibit information-sharing of an individual's

28   immigration status.  San Francisco's sanctuary city laws, Chapters 12H and 12I, comply with

Section 1373.

## V.   INJUNCTIVE RELIEF

According to well-established principles of equity, a permanent injunction is appropriate when: (i) a plaintiff "suffered an irreparable injury;" (ii) available remedies at law are "inadequate;" (iii) the "balance of hardships" between the parties supports an equitable remedy; and (iv) public interest is "not disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). For all the reasons discussed above, San Francisco and California are entitled to a permanent injunction. They have demonstrated that the challenged conditions caused and will continue to cause them constitutional injury because imposing those conditions violates the separation of powers. As in *City & Cty. of San Francisco v. Trump*, DOJ "has not even attempted to argue that the injunction causes it any burden at all" and in light of the loss of Byrne JAG funding the balance of hardships tips in favor of enjoining the enforcement of the challenged conditions against California and San Francisco. 897 F.3d at 1244. Finally, I renew my earlier observation that "the public interest would appear to be better served if the [plaintiffs] did not have to choose between the Byrne JAG Program grant funds to assist [their] criminal law enforcement efforts and the health of [their] relationship with the immigrant community." *See* Order at 27. The public interest is not disserved here because an injunction "brings clarity to all parties and to citizens dependent on public services." *City & Cty. of San Francisco*, 897 F.3d at 1244.

The remaining question is one of scope. *See Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation."). After a careful review of the record, I conclude that a nationwide injunction is the appropriate remedy in this case. That said, I will stay the effect of the nationwide scope of the injunction until the Ninth Circuit has the opportunity to review it on appeal.

A district court, pursuant to its powers in equity, "may command persons properly before it to cease or perform acts outside its territorial jurisdiction." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952); *see also United States v. Oregon*, 657 F.2d 1009, 1016 n.17 (9th Cir.1981) ("When a district court has jurisdiction over all parties involved, it may enjoin commission of acts

54

United States District Court
Northern District of California

outside of its district.").  Yet "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  When considering the scope of injunctive relief, the court "must be mindful of any effect its decision might have outside its jurisdiction," and "should not award injunctive relief that would cause substantial interference with another court's sovereignty." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 770 (9th Cir. 2008) (citing *Steele*, 344 U.S. at 289).

In *City & Cty. of San Francisco*, the Ninth Circuit discussed recent cases upholding nationwide injunctions when "necessary to give Plaintiffs a full expression of their rights."  897 F.3d at 1244 (collecting cases).  Nationwide injunctions are exceptional but are "not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987).

The Ninth Circuit has offered recent guidance on the breadth of evidence and inquiry needed to justify nationwide injunctive relief in the context of the Trump Administration's Executive Order attempting to place similar conditions on grant funding.  *See City & Cty. of San Francisco,* 897 F.3d at 1245 (vacating nationwide injunctive relief when "the record is insufficiently developed as to the question of the national scope of the injunction" and lacks "a more searching inquiry into whether this case justifies the breadth of the injunction imposed.").  Granting a nationwide injunction requires me to undertake "careful consideration" of a factual record evidencing "nationwide impact," or in other words, "specific findings underlying the nationwide application of the injunction."  *Id*. at 1231, 1244.[7]  The Ninth Circuit cited *City of*

---

[7] At the hearing, California also argued that Ninth Circuit precedent compels a nationwide injunction when there is a violation of the APA, as here, because the agency action is necessarily set aside.  *See* Transcript at 27 (citing *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), (rev'd in part on other grounds), ("The nationwide injunction…is compelled by the text of the Administrative Procedure Act...").  This line of reasoning was followed in *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1101 (C.D. Cal. 2018), and the permanent injunction is currently on appeal in the Ninth Circuit.  Yet even *Earth Island Inst.* recognized that a nationwide injunction is discretionary relief that the Ninth Circuit reviews under an abuse of discretion.  *See* 490 F.3d at 699.  Here, I follow the Ninth Circuit's guidance in *City & Cty. of San Francisco*, 897 F.3d at 1245, which more thoroughly addressed how district court's exercise discretion and dealt specifically with conditions placed on the Byrne JAG grant program.

1    *Chicago*, 888 F.3d at 292–93, for a point of comparison where the Seventh Circuit affirmed a

2    nationwide injunction in part because the statute "interconnects" all recipients of Byrne JAG

3    grants. *Id.* at 1244. The Seventh Circuit's decision has now been vacated, but the district court's

4    ruling remains.

5        California offers three reasons why a nationwide injunction is needed here: (i) it protects

6    California's interest in its Byrne JAG funding because there is a limited annual fund; (ii) it is the

7    most equitable response to Section 1373's unconstitutionality; and (iii) it addresses constitutional

8    deficiencies not geographically limited to California. San Francisco reiterates that nationwide

9    injunctive relief is appropriate when a federal law is invalid, adding that the new conditions for

10    Byrne JAG funding do not vary in their application or the legal issues presented for the hundreds

11    of jurisdictions that also apply for the grants.

12        As in *City of Chicago*, I find that this case presents a narrow issue of law that does not vary

13    from one jurisdiction to the next. 888 F.3d at 290–91. The court there explained how grant

14    recipients were interconnected because "[t]he conditions imposed on one can impact the amounts

15    received by others." *Id.* at 292. It continued to specify that the funding the Attorney General

16    allocates under the Byrne JAG program is directly affected by the money distributed to other

17    applicants, because the amount withheld or penalized for non-compliance with other

18    Congressional statutory requirements is then reallocated to other recipients. *See id.* (citing 34

19    U.S.C. § 10156(f) ("If the Attorney General determines...that a State will be unable to qualify or

20    receive funds ...then such State's allocation (or portion thereof) shall be awarded by the Attorney

21    General to units of local government, or combinations thereof, within such State..."); § 20927

22    ("Amounts not allocated under a program referred to in this section to a jurisdiction for failure to

23    substantially implement this subchapter shall be reallocated..."); § 30307(e) ("any amount that a

24    State would otherwise receive for prison purposes...shall be reduced by 5 percent, unless the chief

25    executive officer of the State submits to the Attorney General proof of compliance with this

26    chapter.")). The structure of the grant program supports nationwide relief.

27        California contends that it will be unable to fund critical public safety programs if the

28    federal government continues to cut it off from funding it is allocated by the Byrne JAG program.

1   *See* Jolls Decl. ¶ 19 ("a substantial number of local programs funded by the BSCC are funded

2   entirely or in large part by JAG" and California will not be able to continue funding them);

3   Caligiuri Decl. ¶¶ 23, 31, 32 (explaining the amount of CAMPgrant funding at issue and what

4   programs it funds); McDonnell Decl. ¶¶ 8–9, 15 (discussing the programs the Byrne JAG program

5   helps fund and the impact that lack of funding will have on them) (CA Dkt. No. 31).  DOJ has

6   withheld $56.6 million nationwide and issued $197.3 million in Byrne JAG funding that

7   California was excluded from after the Seventh Circuit partially stayed its injunctive relief.  *See*

8   CA RJN Exs. 27, 28.  California's funding also affects San Francisco's sub-grant funding.  *See* 34

9   U.S.C. § 10156(c)(2) (allocating a portion of state funding to local governments); *see also City of*

10   *Chicago*, 888 F.3d at 292 (finding it noteworthy that "the City is obligated to apply for Byrne JAG

11   funds not only for itself but for eleven neighboring localities.").

12         San Francisco offers five declarations from municipal jurisdictions across the country,

13   similarly demonstrating the far-reaching impact that the Byrne JAG conditions and distributions

14   have on all types grant recipients across the geographical spectrum.  *See* Jerzyk Decl. ¶ 9 (SF Dkt.

15   No. 123) (stating Central Falls, Rhode Island is presented with a Hobson's Choice of declining

16   funding to protect its citizens or agreeing to the conditions at the expense of its longstanding

17   policies); Pittman Decl. ¶¶ 8, 10 (SF Dkt. No. 126) (stating the same Hobson's Choice for Seattle

18   and the King County, Washington consortium of cities); Maesta Decl. ¶ 17 (SF Dkt. No. 127)

19   (stating the same Hobson's Choice for Denver, Colorado); Hansen Decl. ¶ 5 (SF Dkt. No. 124)

20   (stating a nationwide injunction would make it possible for Montgomery County, Maryland to

21   accept Byrne JAG funding); Wright Decl. ¶ 8 (SF Dkt. No. 125) (stating that filing a lawsuit for

22   Somerville, Massachusetts is not feasible since the litigation costs outweigh the amount of funding

23   it would receive).

24         DOJ counters that nationwide injunctive relief is overbroad.  It contends that a nationwide

25   injunction would violate Article III standing.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018)

26   (rejecting standing for a statewide gerrymandering challenge because a plaintiff's remedy must be

27   limited to his injury); s*ee also Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719,

28   729 n.1 (9th Cir. 1983) (finding that class action plaintiffs were not entitled to relief for those they

United States District Court
Northern District of California

did not represent outside of class certification).  It also invokes the principle that injunctive relief should be limited only to the relief needed for the plaintiffs before the court.  S*ee Los Angeles Haven Hosp. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.").  During the hearing, it argued that nationwide injunctive relief should be limited to class actions.

I am not persuaded that DOJ's Article III standing argument should prevent a nationwide injunction if it is evidently needed to provide complete relief from a facially unconstitutionally and uniformly applied law.  Like the Ninth Circuit, I disagree with DOJ's wholesale arguments against nationwide injunctions; the scope of nationwide injunctive relief is not limited to class actions.  *See, e.g.*, *Bresgal*, 843 F.2d at 1170–71 (determining over-breadth by the relief the parties are entitled to, not by the threshold issue of whether there is a certified class action).

DOJ expressed additional concern that nationwide injunctions prevent "legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  I share that concern.  Indeed, the issues in this case are the same issues before the Third and Seventh Circuits.  *See* DOJ. Mot. for Summ. J. at 40 (noting that granting a nationwide injunction would authorize relief that the *en banc* Seventh Circuit might itself reject).  DOJ called nationwide injunctions a "one-way-ratchet" that allows plaintiffs to have relief on behalf of all others, while the government cannot preclude all plaintiffs' claims.  *City of Chicago*, 888 F.3d at 298 (Manion, J., dissenting in part).  That is also a fair point.

Amici assert, on the other hand, that because there is a narrow constitutional issue in dispute with little variance in the DOJ's arguments and defenses, this does not appear to be the type of situation in which allowing more cases to percolate in federal courts would be of much benefit.  *See* Amicus Brief at 11 (SF Dkt. No. 137-1).  In addition, a nationwide injunction would not implicate some of the other concerns raised in the DOJ's briefing.  In *L.A. Haven Hospice, Inc.*, the Ninth Circuit held that "a nationwide injunction would not be in the public interest because it would significantly disrupt the administration of the Medicare program . . . and would

United States District Court
Northern District of California

1    create great uncertainty." 638 F.3d at 665.  A nationwide injunction would not disrupt the

2    administration of the Byrne JAG program, a formula grant program that does not independently

3    give the Attorney General authority to impose additional conditions not conferred by Congress.

4    Public interest would be served, as I stated earlier, because an injunction would bring "clarity to

5    all parties and to citizens dependent on public services." *City & Cty. of San Francisco*, 897 F.3d

6    at 1244.  Without a nationwide injunction when the court finds a constitutional violation, there is

7    even greater likelihood that relief limited to the parties "would not cure the constitutional

8    deficiency, which would endure in all [its] applications." *See Int'l Refugee Assistance Project v.*

9    *Trump*, 857 F.3d 554, 605 (4th Cir. 2017).

10          California and San Francisco have shown that Section 1373 is unconstitutional and that the

11    challenged conditions violate the separation of powers.  In consideration of the factual record,

12    including the structure of the Byrne JAG program and the harm to jurisdictions across the country,

13    I find that this case justifies nationwide relief under *City & Cty. of San Francisco*, 897 F.3d at

14    1231.  That said, this Order alternatively relies on my narrow interpretation of Section 1373 as it

15    applies to California's and San Francisco's "sanctuary" laws and practices.  If the Ninth Circuit

16    agreed with those alternative findings, but disagrees about the constitutionality of Section 1373, a

17    nationwide injunction would be inappropriate because the laws and practices of each "sanctuary"

18    jurisdiction differ.  Accordingly, I grant the injunction in favor of California and San Francisco

19    and stay its nationwide scope until the Ninth Circuit has the opportunity to consider it on appeal.

20    **VI.    MANDAMUS RELIEF**

21          California also seeks a writ of mandamus compelling the Attorney General to disburse

22    Byrne JAG and COPS grant funding because the challenged conditions are unlawful under the

23    APA.  The APA authorizes the court to "compel agency action unlawfully withheld or

24    unreasonably delayed."  5 U.S.C. § 706(1).  The Ninth Circuit evaluates mandamus under the so-

25    called *TRAC* factors.  *See Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (citing

26    *Telecommc'ns. Research & Action v. FCC* (TRAC), 750 F.2d 70, 79–80 (9th Cir. 1984)).

27          (1) the time agencies take to make decisions must be governed by a rule of reason;
      (2) where Congress has provided a timetable or other indication of the speed with

28

                                          59

which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d at 80 (citations and internal quotation marks omitted).  The first factor, the "rule of reason," is the most important but is not determinative.  *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).  The court is still required to consider all factors.  *See In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017).

Each factor supports mandamus relief for the Byrne JAG grant and COPS grant funding. For the first two factors, delays beyond a year time frame preclude recipients from receiving their awards when they need them to support more immediate projects or programs. *See City of Philadelphia*, 309 F. Supp. 3d at 343 ("it bears emphasis that Congress specifically set the JAG Program as an annual award, and the DOJ's delay has precluded the City from receiving the intended award at such time as the City can make timely use of it.").  The Byrne JAG program is a formula grant that requires the Attorney General to disburse funds annually, and the COPS grant is a competitive program California applies for and has traditionally received each year.

Factor three favors relief because the delay impacts human health and welfare, particularly for California as the COPS and Byrne JAG funds aid task forces aimed at stopping illicit drug trafficking and go towards funding court programs to reduce recidivism of at-risk youth.  *See* Jolls. Decl. ¶ 10; Caligiuri Decl. ¶¶ 23–25.  Similarly, factor five supports relief because the human welfare and community safety concerns that California's grant funding addresses are at risk of being discontinued for lack of funding and are prejudiced by this delay.  Expediting this matter, as discussed in factor four, would not prejudicially affect the federal government's tangentially related interest in federal immigration enforcement.  Finally, the sixth factor, if it has any weight at all here, would favor relief because DOJ is withholding grant funding based on conditions that violate the separation of powers.  I will GRANT California's request for mandamus relief.

**CONCLUSION**

For the reasons stated, California and San Francisco's motions for summary judgment are GRANTED and the DOJ's motions for summary judgment are DENIED.[8]  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: October 5, 2018



William H. Orrick
United States District Judge

---

[8] The parties requested judicial notice of various public records and government documents in support of their motions for summary judgment, with no opposition or dispute to their accuracy or authenticity.  To the extent I rely on those documents, the requests are GRANTED.  *See* CA Dkt. Nos. 117, 125, 128; SF Dkt. Nos. 107, 115.  All other requests for judicial notice are DENIED AS MOOT.